UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *ex. rel.* DAWN BARRETT, | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 03-12382-MLW |
| v. | ) | |
| | ) | |
| CIGNA CORPORATION and | ) | |
| LIFE INSURANCE COMPANY | ) | |
| OF NORTH AMERICA, | ) | |
| Defendants. | ) | |
| | ) | |

**FIRST AMENDED COMPLAINT FOR VIOLATION
OF FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729, <u>et seq.</u>
AND DEMAND FOR JURY TRIAL**

## I.     INTRODUCTION

1.      This is an action to recover damages and civil penalties on behalf of the United

States of America arising from false statements and claims made, or caused to be made, by

the Defendants to the United States of America in violation of the False Claims Act, 31

U.S.C. § 3729 *et seq.* ("the FCA").

2.      Originally enacted in 1863, the FCA was substantially amended by the False

Claims Amendments Act of 1986, Pub.L. 99-562, 100 Stat. 3153.  The 1986 amendments

enhanced the Government's ability to recover losses sustained as a result of fraud against the

United States of America.

3.      The FCA provides that any person who knowingly presents, or causes to be

presented to the government a false or fraudulent claim for payment or approval is liable for a

civil penalty ranging from $5,000 up to $11,000 for each such claim, and three times the amount of the damages sustained by the Government.

4.    Pursuant to the FCA, plaintiff seeks to recover, on behalf of the United States of America, damages and civil penalties arising from false claims and statements Defendants knowingly caused to be made to the United States Social Security Administration ("Social Security" or "SSA") in connection with applications and appeals for the award of Social Security Disability Insurance ("SSDI") benefits. More specifically, Defendants routinely require all long term disability claimants to apply for SSDI in order to receive the full long term disability benefits to which they are entitled. In so doing, Defendants make no good faith assessment or review to determine whether claimants are likely to be entitled to SSDI benefits. Instead, Defendants recklessly require all claimants (except for claims related to pregnancy) to apply for SSDI despite the fact that Defendants know, based on their own extensive experience in reviewing such claims, that most disability claimants do not meet the stringent disability requirements for SSDI. The false claims and statements to SSA resulted in the imposition of many millions of dollars of additional administrative costs on the already heavily burdened Social Security system, and in the improper award of SSDI benefits to individuals who did not in fact qualify for, and were not entitled to, those benefits.

**II.    PARTIES**

5.    Plaintiff and Relator, Dawn Barrett ("Plaintiff/Relator" or "Relator"), is a resident of Pittsburgh, Pennsylvania. She has been employed by the Defendants since September 2000 and has knowledge of the allegations contained herein.

6.      Defendant CIGNA Corporation sells employee benefits and services, including group disability insurance, to employers and individuals all across the United States. It conducts this business through various wholly-owned subsidiary corporations including Life Insurance Company of North America, CIGNA Life Insurance Company of New York and Connecticut General Life Insurance Company. Hereinafter CIGNA and these wholly-owned subsidiaries will be jointly referred to as "CIGNA". In 2000, CIGNA was the third-largest seller of disability insurance in the country, with a market share of 8.7%. CIGNA is headquartered in Philadelphia, Pennsylvania. Defendant Life Insurance Company of America is ("LINA") a wholly-owned subsidiary of CIGNA.

7.      Defendant LINA is registered and qualified to do business in Massachusetts, and has sold disability insurance policies in Massachusetts.

8.      In addition to selling disability insurance, CIGNA also administers self-insured group disability benefits for large corporations, including for example, AT&T Corporation ("AT&T"), and Honeywell International, Inc. ("Honeywell"). The allegations of this complaint include disability claims insured by CIGNA as well as claims administered by CIGNA but insured by others.

## III.  JURISDICTION AND VENUE

9.      The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3729 *et seq*. The false claims allegations of this complaint are not the subject of any public disclosure as defined in 31 U.S.C. § 3730(e)(4).

10.    The Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, and because the Defendants can be found in, and/or transacts business in, this District.

11.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because the Defendants can be found in this District.

## IV.    BACKGROUND

### A.    The Social Security Disability Insurance Program

#### 1.    Overview

12.    The SSDI Program ("the Program") was established in 1954 under Title II of the Social Security Act, 42 U.S.C. § 401, *et seq*. ("the Act"). The Program provides federally-funded benefits to disabled wage earners and their families.

13.    Individuals seeking to obtain SSDI benefits must be severely disabled. Social Security does not pay for partial disability or for short-term disability. To be considered disabled under SSA's definition of disability, a claimant must "have a medically determinable physical or mental impairment that has lasted or is expected to last at least twelve months or result in death and that prevents him/her from performing *any* substantial gainful activity." Substantial gainful activity is defined as work resulting in earnings of at least $800.00 per month or equivalent activity.

14.    Even if a person meets SSA's stringent definition of "disability," SSA will not begin paying disability benefits until the person is disabled for more than five months.

15.    The application process for obtaining Social Security disability benefits typically takes many months. In recognition of this, if and when Social Security disability

benefits are ultimately awarded, the claimant is entitled to a lump-sum retroactive payment of

benefits for the period during which the claim was being considered by Social Security. This

lump-sum retroactive payment includes payment from the sixth month of disability up to the

date of the award. This retroactive award, however, can only be granted for up to one year

prior to the date the application for Social Security disability benefits was filed.

### 2.     Applications for Social Security Disability Benefits

16.     To apply for SSDI benefits the applicant (or "claimant") completes an SSA

Application Form (Form SSA-3368-BK) and files that Form ("the Application" or "the

Claim") with a local Social Security Field Office (a "Field Office").

17.     An applicant may file on his or her own behalf, or he or she may choose to have

a representative handle his or her claim before SSA. To appoint such a representative the

applicant must file an "Appointment of Representative" Form (Form 1696, or "the

Appointment Form") with SSA. Once a representative is appointed it is the representative,

rather than the applicant, who usually interacts with SSA.

18.     The instructions appearing on the SSDI Disability Report which is used by SSA

to make a decision on disability claims contain the prominent warning that the Social Security

Administration's definition of disability is quite stringent. Following the bold-faced, capital

letters **"WHAT WE MEAN BY DISABILITY,"** the Report instructions explain that:

> Disability under Social Security is based on your inability to work. For
> purposes of this claim we want you to understand that "disability" means that
> you are unable to work as defined by the Social Security Act. You will be
> considered disabled if you are unable to do any kind of work for which you are
> suited and if your disability is expected to last (or has lasted) for at least a year
> or to result in death. So when we ask, "when did you become unable to work,"
> we are asking when you became disabled as defined by the Social Security Act.

19.    The SSDI Form requires the applicant to provide information about medical treatment and records and asks the applicant to describe how his or her illness or injuries or conditions limit his/her ability to work.  The Application also includes a section for "Remarks" and invites the applicant to include "any added information you did not show in earlier parts of the form."

20.    The SSDI Disability Report Form concludes with a signature line, which is immediately preceded by a prominently displayed warning that states in bold-faced, capital type:

> **"ANYONE MAKING A FALSE STATEMENT OR REPRESENTATION OF A MATERIAL FACT FOR USE IN DETERMINING A RIGHT TO PAYMENT UNDER THE SOCIAL SECURITY ACT COMMITS A CRIME PUNISHABLE UNDER FEDERAL LAW."**

21.    Under 42 U.S.C. § 408, a felony is committed by whomever: (1) makes or causes  any false statement or representation for the purpose of causing an unauthorized SSDI payment; (2) makes or causes to made any false statement or representation of material fact in any application for any payment or for a disability determination; or (3) makes or causes to be made any false statement or representation of a material fact for use in determining rights to an SSDI payment.

22.    Significantly, the statute also imposes an obligation upon someone who files for SSDI--on his or her own behalf or on behalf of another--to disclose "any event affecting" the "initial or continued right" to SSDI payment.  Failure to disclose such an event, or the concealment of such an event "fraudulently to secure payment either in a greater amount than is due or when no payment is authorized," is a felony under 42 U.S.C.§ 408.

23.    "Fraud" is defined by SSA to include: (1) making false statements or misrepresentations in applying for benefits; (2) making false statements or misrepresentations of material facts at any time for use in determining benefit rights; and (3) concealing or failing to reveal information about events effecting initial or continued right to benefits or the amount of payment.

### 3.    The SSDI Initial Claim Process

24.    The first step in the SSDI claim process is the initial consideration. During this step, SSA determines if the applicant meets the non-medical eligibility requirements as well as the medical eligibility requirements.

25.    The SSDI Application is received by the Field Office whereupon an SSA claims representative establishes a disability folder, compiling the non-medical and preliminary medical information associated with the Application.

26.    The claims representative then immediately makes the determination whether the claimant satisfies the non-medical eligibility for SSDI, i.e., whether the claimant has paid enough taxes on his or her wages so as to be insured for SSDI benefits. If not, the claim is denied.

27.    If the claimant meets the non-medical eligibility requirements, the folder is sent to a state Disability Determination Service Center ("a DDS") where the determination of whether the claimant meets the medical eligibility requirements is undertaken.

28.    In the DDS, a team composed of a disability examiner and a physician and/or a psychologist makes the disability determination based upon an evidentiary record.

29.    The evidentiary record includes "medical evidence of record" ("MER") which the DDS is to obtain from the claimant's treating physicians. MER includes copies of

7

medical records, laboratory reports, prescriptions, x-rays, ancillary tests, operative and pathology reports, consultative reports and other technical information.

30.     DDSs are required to make every reasonable effort to obtain MER from the claimants' treating sources. SSA's instructions define "every reasonable effort" as: (1) making an initial request for MER from the treating source; (2) making a follow-up request any time between 10 and 20 calendar days after the initial request if the MER has not been received; and (3) allowing a minimum of 10 calendar days from the follow-up request for the treating source to respond. However, if MER is not received within 10 calendar days of the follow-up request, the DDS can purchase a Consultative Examination (a "CE").

31.     A CE is an examination performed on behalf of, and at the expense of, SSA by vendor physicians or psychologists. These include medical and psychological examinations of claimants, as well as performance and interpretation of x-rays and laboratory studies.

32.     In addition, the DDS may supplement the MER by purchasing Vocational and/or Occupational Consultations performed by vendor consultants.

33.     Once the investigation is completed, the DDS makes a claim decision, whereupon the applicant's claim for SSDI benefits is either allowed or denied.

34.     As explained more fully below, the Disability Insurance Trust Fund ("the DI Trust Fund") incurs substantial administrative expenses investigating claims for SSDI benefits at the initial level. These costs include, but are not limited to, costs for personnel, supplies, telephone charges, collecting the claimant's medical record and other MER information, and hiring doctors, psychologists and vocational consultants to perform Consultative Medical and Vocational examinations.

### 4.    Administrative Appeals

35.    Reconsideration review ("a Reconsideration") is the *first* administrative review for claimants who are denied benefits by the DDS. Within 60 days of the initial denial, the claimant must file a Form SSA-561-U2 ("Request for Reconsideration"), as well as a Form SSA-3441-F6 ("Reconsideration Disability Report") if the initial denial was based upon a finding that the claimant did not meet the medical or vocational requirements.

36.    Reconsideration involves a *de novo* review of the claim (including any new evidence) by individuals at the DDS level who did not participate in the original determination. The reviewers consider all the evidence and issue a Reconsideration Determination.

37.    The SSA incurs substantial administrative expenses performing Reconsiderations.

38.    Claimants whose claims are denied on Reconsideration may appeal the denial within 60 days to the Office of Hearing and Appeals ("OHA") by filing a Form HA-501 ("Request for Hearing By Administrative Law Judge"). This *second* level of administrative appeal is a *de novo* hearing before an Administrative Law Judge ("ALJ") who can call on medical or vocational experts, if needed, to help evaluate the evidence.

39.    In the event that the claim was denied at the DDS level because the claimant did not meet the medical or vocational requirements, the claimant must also file at the ALJ level a Form HA-4486 ("Claimant's Statement When Request for Hearing is Filed and the Issue is Disability"). The claimant must also file several copies of Form SSA-827 ("Authorization to Disclose Information to SSA").

40.    Frequently, at the ALJ level, new evidence is introduced by the claimant and his or her representative, often at the hearing itself. Claimants are allowed to appear before the ALJ and to call witnesses.

41.    Claimants whose claims are denied at the ALJ level may request a review by the Appeals Council by filing a Form 520-HA ("Request for Review of Decision/Order of Administrative Law Judge") within 60 days of the ALJ's denial. The Appeals Council is the *third* and final level of administrative appeal. The Appeals Council may grant, deny, or dismiss a request for review of the ALJ decision. It will grant review if the ALJ decision contains an error of law, is not supported by substantial evidence, involves a broad policy issue, or if there appears to be an abuse of discretion by the ALJ.

42.    The Social Security Administration incurs substantial administrative expenses with respect to adjudicating appeals at the Appeals Council level.

43.    If the Appeals Council denies or dismisses the request for review, or denies the claim after accepting review, the remedy for the claimant who is still dissatisfied is to file a civil action in Federal District Court within sixty days. The District Court may affirm, modify or reverse SSA's decision, with or without remanding the case to SSA.

### 5.    Administrative Costs Incurred By SSDI

44.    The DI Trust Fund referenced above expends substantial sums of money adjudicating claims. These "administrative expenses" are incurred regardless of whether a claim is allowed (i.e. paid) or denied, due to the fact that Social Security must investigate and adjudicate all claims.

45.    The DI Trust Fund also expends substantial sums of money paying SSDI claims.

46.    In the six-year period from 1997–2002, the total amount spent for

"administrative expenses" and "benefit payments" were as follows (numbers in millions of

dollars):

| Calendar Year | Total Expenditures | Benefit Payments | Administrative Expenses |
|---|---|---|---|
| 1997 | 47,034 | 45,695 | 1,280 |
| 1998 | 49,931 | 48,207 | 1,567 |
| 1999 | 53,035 | 51,381 | 1,519 |
| 2000 | 56,782 | 54,983 | 1,639 |
| 2001 | 61,369 | 59,618 | 1,741 |
| 2002 | 67,905 | 65,702 | 2,049 |
| **Totals** | **336,056** | **325,586** | **9,759** |

47.    A 2001 study commissioned by SSA estimated that the average cost per claim

for adjudicating all claims (both meritorious and non-meritorious) submitted to the DI Trust

Fund in 1999 was $1,364.00. Obviously, each level of appeal increases the cost of a

particular claim. The average estimated costs of processing claims for an ALJ proceeding

was $1,645.

48.    During the six-year period from 1997–2002, SSA received 8,061,148 new

applications for SSDI benefits as follows:

| Year | Number of Claims | Number Of Awards | Awards as % Of Applications |
|---|---|---|---|
| 1997 | 1,180,235 | 587,417 | 49.77% |
| 1998 | 1,169,255 | 608,131 | 52.01% |
| 1999 | 1,200,087 | 620,488 | 51.70% |
| 2000 | 1,330,558 | 621,650 | 46.72% |
| 2001 | 1,498,559 | 691,390 | 46.13% |
| 2002 | 1,682,454 | 750,464 | 44.61% |

49.    The "awards as a percentage of applications" column in the chart listed in the

paragraph above is a crude allowance rate. This rate expresses the number of awards in a

given time period as a percentage of the number of Applications in the same time period. The rate is crude because some of the awards in any time period resulted from Applications in previous time period(s). Some of the awards made in 1997 were the result of Applications filed in 1996. Further, some of the Applications filed in late 2002 may in fact result in awards in 2003, but the statistical fact of the award is not yet recorded.

50.    In any event, the *average* "awards as a percentage of applications" relating to all applications filed during the six-year period from 1997–2002 was 48.49%.

51.    The average percentage of denied claims per applications filed during this same six-year period is 51.51%.

### B.    Private (Non-Governmental) Disability Insurance

52.    Private insurers, such as CIGNA, sell disability insurance products that provide income protection for workers who become disabled. These private policies not only are broader in their definition of disability than is Social Security, but they also typically provide higher monthly benefits than does SSDI.

### 1.    Group Short-Term and Long-Term Disability Income Coverage

53.    Many employers purchase short-term disability ("STD") and long-term disability ("LTD") insurance coverage for their employees. CIGNA is the third largest provider of such insurance policies in the United States.

54.    STD and LTD insurance coverage is typically provided to the employees through group employee welfare benefit plans established pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA").

55.    Under the typical CIGNA STD policy, the employee is entitled to benefits in the event that the employee is unable to perform the usual and customary duties of his or her *own occupation* as a result of injury or sickness.

56.    Customarily, the STD coverage does not begin until after the employee is disabled for anywhere from 7 to 30 days. This period is called the "Elimination Period." During the Elimination Period employees often receive income pursuant to employer sick leave plans and/or their vacation days.

57.    Once STD coverage begins, payments are made on a weekly basis. The typical STD policy provides coverage for anywhere from 13 to 26 weeks (i.e. 3-6 months), after which time the STD coverage period ends.

58.    The amount of the benefit under the typical STD policy ranges from 50% - 60% of the employee's pre-disability earnings.

59.    The definition of disability applicable to the typical CIGNA STD policy never changes--so long as the employee is disabled from performing his or her *own occupation*, the insurer must pay the benefits. Thus, many individuals covered by an STD policy can receive disability benefits under that policy despite the fact that they do not qualify for benefits under Social Security's *"any occupation"* definition.

60.    CIGNA Long-Term Disability ("LTD") coverage typically begins once STD coverage ends. Thus, the "Elimination Period" for the typical LTD policy is that period of time during which the employee is covered by the STD policy (i.e. 3-6 months).

61.    Although the employee's claim converts from an STD claim to an LTD claim, for a discrete period of time (typically 24 months) the definition of disability under the typical CIGNA LTD policy remains the *"own occupation"* definition that was applicable to the STD

benefit period. Thus, during this initial 24 month period, as long as the employee remains unable to perform the customary duties of his or her *own occupation*, he or she will be entitled to LTD benefits.

62.    CIGNA LTD policies typically contain a provision in the policy known as the "change in definition" provision. Pursuant to this provision, the definition of disability under the policy changes after 24 months of coverage from the *"own occupation"* definition to the *"any occupation"* definition. Thereafter, in order to recover LTD benefits, the claimant must be totally disabled from performing the material and substantial duties of *"any occupation"* for which he or she is qualified by training, education and experience. Said another way, after receiving CIGNA LTD benefits for 24 months, the employee must thereafter meet Social Security's stringent *"any occupation"* definition of disability in order to be eligible for LTD benefits.

63.    CIGNA LTD benefits are paid on a monthly, rather than weekly basis. The rate of payment is consistent with the STD coverage--income is replaced at the rate of anywhere from 50% to 66-2/3% of the pre-disability earnings level. LTD coverage typically continues until the individual reaches age 65.

64.    CIGNA's Group Disability Income Insurance policies, therefore, provide much greater protection to the insured than does Social Security coverage. Although Social Security pays nothing in the event that the employee is merely disabled from performing his *own occupation*, CIGNA's products are designed typically to provide the employee 30 months of income protection for such disabilities (6 months of STD and 24 months of LTD).

###    2.    The Offset Provision

65.    Although the typical disability income policy provides that the weekly (STD) or monthly (LTD) benefit will be paid at some percentage of the pre-disability earnings, the policies also contain an "offset" provision. This provision requires that the monthly disability payment be reduced by certain other income received by the insured.

66.    CIGNA's policies define SSDI payments received by the insured (or by his or her spouse and children) as a type of income to which the CIGNA offset provision applies. Accordingly, CIGNA policies entitle CIGNA to reduce the insured's benefit by the amount the insured is receiving for disability from Social Security (including all amounts paid to the insured's spouse and children).

67.    CIGNA's policies also contain language mandating that the insured apply for Social Security benefits in the event that CIGNA determines, unilaterally, that the insured may be eligible for Social Security benefits. If the insured does not apply for Social Security benefits after CIGNA directs the insured to apply, CIGNA's insurance policies provide that CIGNA is entitled to reduce the monthly benefit owed under the policy by the *estimated* Social Security benefit to which CIGNA determines the insured would be entitled if the insured applied for Social Security.

## V.    ALLEGATIONS

### A.    CIGNA'S SSDI "Referral Guidelines"

68.    From at least 1997 until May 2002, CIGNA's Case Managers ("CMs"), who process disability claims by CIGNA's insureds for payments under CIGNA's disability insurance policies, were instructed to begin SSDI assessment within seven business days of

receipt of any disability claim. The first determination for the CM was whether or not the claim met CIGNA's Social Security Referral Guidelines ("SS Referral Guidelines").

69.    These Guidelines instructed the CMs to determine whether the claimant's age and income preclude a claim for SSDI benefits, or whether there was some other contract exclusion that may be a basis for CIGNA denying coverage for the claim (for example, the disability arises from an excluded, pre-existing medical condition). If not, the Guidelines required that the CM determine whether the claimant is pregnant or whether the claimant had a firm "return to work" date within nine months of the time the disability was incurred. If the claimant was neither pregnant nor had a firm "return to work" date within the nine months, the claim qualified for SS referral.

70.    As a next step for claims that met the referral guidelines, the CIGNA CM was to contact the claimant, by letter and/or by telephone, and was instructed by the Guidelines to make the following points to the claimant:

* the disability insurance contract requires the claimant to file for SSDI (and may also require the claimant to appeal any SSDI denial);

* if the claimant refuses to cooperate with CIGNA and does not apply for SSDI, CIGNA will assume that the claimant has received SSDI benefits and will offset an estimated benefit amount from the claimant's disability benefit. This offset will apply on a date that is the later of: (1) 60 days from the date of the contact by CIGNA; or (2) six months from the onset of the underlying disability.

* the claimant is also to be told that if SSDI pays the claimant, the claimant must notify CIGNA and will owe that "overpayment" to CIGNA. The claimant is told that he or she must sign a Reimbursement Agreement agreeing to send any overpayment to CIGNA.

       * if the claimant has already filed for SSDI on his or her own initiative, he or she is to send to CIGNA a copy of the SSA Form titled "Receipt for your claim for Social Security Disability Benefits."

       * if the claimant has not yet filed for SSDI, the CM is to tell the claimant that CIGNA will assist with the filing process, and that CIGNA is referring the claim to its Social Security Assistance Team.  The claimant is to be told that he or she will soon be contacted by the Team.

71.     From at least 1997 until May 2002, even if a claim did not meet the guidelines for Social Security assistance referral, CIGNA still instructed its CM's to contact those claimants and, unless the Claimant had filed an Application for benefits from CIGNA based upon a pregnancy-related disability, the CM was to tell the Claimant that CIGNA's policy required that the claimant file for SSDI benefits.  Claimants were told that if they did not file for SSDI benefits, their CIGNA benefits would be offset by the amounts CIGNA determined they would have received had they applied for those benefits the later of 60 days from their first contact with CIGNA or six months from the onset of the disability.

72.     If the claimant had already filed for SSDI benefits, he or she was asked to send the "Receipt of Claim for Social Security Disability Benefits" to CIGNA.  Claimants who had firm "return to work" dates within nine months were told that they still must file in case return to work were not possible. The CMs were instructed to give these claimant the Social Security toll-free "800" telephone number.

73.     CIGNA's a policy, practice and procedure thus (1) required all disability claimants to file for SSDI without regard to whether or not the claimant met the stringent SSDI *any occupation* definition of disability; (2) provided SSDI filing assistance for <u>all</u>

disability claimants <u>unless</u> the disability were related to a simple pregnancy diagnosis or the claimant had a firm return to work date within nine months; and (3) threatened claimants that if they refused to file, they would lose a substantial portion of their disability benefits. Prior to making these threats and demands, CIGNA performed no review of whether or not the claimant meets the stringent "***any occupation***" definition of disability required for SSDI.

74.    Both before and after May 2002, once the initial contact has been made with the claimant (whether or not the referral guidelines apply), CMs were instructed to "Set all applicable Offset Diaries" according to the "Diary Checklist." The Diary Checklist requires that the CM set his or her diary to monitor proof that the claimant filed for SSDI and returned an executed "Reimbursement Agreement." The Checklist also requires that the claim be referred for a calculation of estimated SSDI benefits at the eighth month.

75.    CMs were also responsible for entering the appropriate offset code for SSDI benefits. These offset codes are used to calculate offsets that may be taken against reserves held by the company for that claim.

76.    CMs were instructed that within 14 days of their first contact with the claimant they were to send the claimant the Social Security application and the Reimbursement Agreement for completion and signature.

77.    The Reimbursement Agreement sent to the claimant requires that the claimant affirm that he or she has applied for a benefit under a Group Short Term or Long Term Disability policy, and that he or she understands that under the terms of the policy, benefits may be reduced by amounts received from SSDI. The agreement provides that the claimant understands that CIGNA "has the right to immediately reduce benefits by an amount it

estimates will be received, but by signing this agreement and complying with its terms the Insurance Company will not reduce my benefits."

78.    The Reimbursement Agreement also provides that the claimant has applied or will apply for SSDI, and typically provides that the claimant understands that CIGNA's agreement not to reduce benefits is valid only if the claimant provides proof that: (1) he or she has applied for benefits; (2) the signed Reimbursement Agreement has been submitted to CIGNA; and (3) "any and all appeals were made for these benefits, or the Insurance Company has determined that further appeals will not be successful."

79.    Where the underlying policy does not contain language requiring the insured to pursue SSDI appeals, the "Reimbursement Agreement" similarly does not require that the claimant provide proof of any appeal.  It does, however, condition CIGNA's agreement not to estimate and offset benefits upon proof that: (1) an SSDI application was filed within the first six months of disability; and (2) payments were denied prior to one year from the date disability commences.

80.    The "Reimbursement Agreement" ends with the following:

> **"Note: As a service to you, we have created this agreement so that you are able to receive your Net STD/LTD Benefit while waiting for your Other Benefits award or denial.  If you choose not to sign and return this form, we will estimate Other Benefits and deduct the amount from your STD/LTD benefits according to the provisions of the contract."**

81.    Not every person who becomes disabled from performing his or her *own occupation* is necessarily disabled from performing *any occupation*.  Indeed, CIGNA's STD and LTD policies are written so as to entitle CIGNA insureds who are only disabled from performing their *own occupations* to be paid STD benefits from CIGNA for 6 months, and

then LTD benefits for 24 additional months.   In exchange for providing this protection, CIGNA receives significant premium payments.

82.    Thus while CIGNA should pay an insured who is disabled from performing his or her own occupation full disability income benefits for the first 24 months of LTD coverage (after which time the definition of disability changes to "any occupation"), CIGNA has a policy, practice and procedure which conditions receipt of those 24 months of full own occupation benefits upon the insured's compliance with CIGNA's demand that the insured also file for SSDI.

83.    This requirement is imposed despite that fact that CIGNA knows or should know that many of these individuals do not, cannot and will not qualify for Social Security disability benefits.

84.    Furthermore, many CIGNA policies also require that insureds not only file for SSDI benefits, but that they continue to appeal if the SSDI claim is denied. CIGNA imposes this requirement despite the fact that it knows or should know that denial was appropriate because the claimant is not "disabled" as defined by Social Security.

85.    CIGNA uses economic duress to cause its claimants to file for Social Security. Individuals who are receiving CIGNA benefits have ceased to receive income from their employment, and most are dependent upon their disability insurance checks (which are usually only 60% or less of their pre-disability income). CIGNA instructs these financially stressed individuals that unless they file for Social Security, their disability checks will be reduced by the *estimated* Social Security benefit. This leaves most insureds with no real option other than to file false claims with the Government. Most monthly disability insurance checks, if reduced by the *estimated* Social Security disability benefit for the insured and his or

her spouse and children, would reduce the monthly benefit down to a level upon which the insured could not survive.

**B.    Referrals for SSDI Assistance**

86.    From at least 1997 until 2000, Case Managers (then known as "Benefit Analysts" or "BAs") were instructed to forward all newly approved LTD claims to a CIGNA "Social Security Specialist" for review.

87.    The Specialist was to ensure that the claimant either had filed or was able to file the initial SSDI application. The Specialist's primary role was to review medical and vocational factors to identify claimants who either had been or were likely to be wrongfully denied SSDI benefits.  For those so identified, the Specialist's role was to determine whether or not the claim had the potential to succeed at the hearing level, and where appropriate to provide assistance at the appeal level.

88.    By 2000, the process changed, and from then until mid- 2002, when claims met the "referral guidelines" (which were inappropriately based merely upon the anticipated duration of the disability rather than on whether the disability, in fact, rendered the claimant unable to engage in "substantial gainful activity" as is required by Social Security Administration's definition of disability), the CM sent the claim to an internal CIGNA offset specialist who oversaw the SSDI issues for the claimant.

89.    As a first step, the Offset Specialist would send a form letter to the claimant informing the claimant that "Your LTD claim was referred to me by your Case Manager to provide you with information regarding the Social Security Disability process and how I may be able to assist you in obtaining those benefits." The letter instructed the claimant to apply for SSDI; to return proof of that application; to sign an enclosed "Social Security Release of

Information" to allow CIGNA to obtain information from the SSA about the claim; and to sign an Authorization to allow CIGNA to release information from its files to a legal representative for the claimant.

90.    The letter to the claimant also would include, as an implicit threat, a reminder that CIGNA has the right to reduce benefits by an estimated amount for SSDI benefits. The letter would enclose a fact sheet to "explain some of the advantages of receiving Social Security benefits." The Offset Specialist would also promise that "I will remain in contact with you throughout the application and/or appeal process. I may also be able to provide you access to legal services. If these services are necessary, I'll refer your case to a legal representative who is a specialist in Social Security law. *These services will be provided at no out of pocket cost to you.*" (Emphasis in original).

91.    If the proof of application was not received, the claimant would be sent a follow-up letter in six weeks reminding and/or threatening the claimant that "As I explained to you, your group Long-Term Disability policy allows us to reduce your benefits by an estimate of the amount you (and your dependents, if applicable) would be eligible to receive from Social Security." The letter would then warn that this reduction would occur if proof of application was not received in a month.

92.    Until the summer of 2002, the CIGNA Offset Specialist (also known at various times as "social security specialists," "economic consultants," and "vendor coordinators") would typically refer the file to one of several outside vendors that specialized in obtaining SSDI benefits. The referral letter from CIGNA would tell the vendor that CIGNA believes that the claimant is entitled to SSDI benefits, that the claimant's application is pending or has been denied, and that while CIGNA is asking that the vendor directly represent the insured,

the vendor will be working on a 25% contingency fee, not to exceed $4,000 (or in later years $5300). The CIGNA form letter then states "Again, we believe the claimant is entitled to Social Security Disability benefits. If you feel additional investigation is required, e.g., Independent Medical Examination, please contact me prior to incurring the expense."

93.    These vendors primarily used by CIGNA included the Social Security Law Group which is located in Avon, Massachusetts; and ALLSUP which is located in Belleville, Illinois. In addition, CIGNA on occasion referred SSDI claims to David Brown, an attorney located in Rancho Santa Margarita, California; the Coats & Todd law firm in Dallas, Texas; Jerry Zivic, located in Chicago, Illinois; and Integrated Benefits, Inc. located in Jefferson City, Missouri. If the outside vendor was successful in obtaining benefits, the vendor received a fee capped at the higher 25% of the retroactive benefits or $4,000 to $5,300 (depending on when the claim was filed). This fee was taken from the retroactive benefits paid to the claimant. However, because CIGNA did not offset the amount paid to these representatives from the claimant's CIGNA benefits, CIGNA bore the cost of this representation.

94.    In the summer of 2002, CIGNA entered into an agreement with Advantage 2000 Consultants, Inc. to pursue SSDI claims for CIGNA claimants whose claims were processed through CIGNA's office in Pittsburgh, Pennsylvania.

95.    Advantage 2000 is a privately held consulting firm, staffed by former Social Security Administration personnel, that specializes in obtaining Social Security disability benefits for individuals.

96.    Under the agreement between Advantage 2000 and CIGNA, CIGNA pays Advantage 2000 a flat fee for successfully obtaining SSDI benefits: $1,250 if SSDI is

obtained upon the initial application or at reconsideration, and $2,150 if SSDI is obtained at the ALJ level or some other level of appeal.

97.    Once Advantage 2000 agreement was in place, CIGNA terminated its Pittsburgh offset specialists, and CMs were directed to refer all claimants meeting the "SS Referral Guidelines" to Advantage 2000.

98.    To increase the pace of SSDI applications, CIGNA held periodic contests among the CMs to determine who could refer the greatest number of claimants to Advantage 2000. Prizes were awarded to the two CMs with the highest numbers of referrals. The contests also offered prizes for the CMs with the highest estimation rates. Until an estimation was calculated and entered into the system with the correct offset codes, CIGNA could not adjust its reserves. These referral and estimation contests included both new incoming claims, and older claims that had never been referred to an outside vendor for SSDI assistance.

99.    Advantage 2000 reports back to CIGNA periodically on the status of each CIGNA referral. By September 2003, more than 2000 claimants had been referred from CIGNA to Advantage 2000, and in virtually every case, Advantage 2000 had filed an SSDI application and/or had pursued an SSDI appeal.

100.    When Advantage 2000 receives a CIGNA referral it sends a form letter to the CIGNA insured. In that letter Advantage 2000 informs the claimant that the case has been referred, that CIGNA will pay for Advantage 2000's service, and that Advantage 2000 will provide professional representation by "completing all necessary paperwork, answering questions and managing the presentation of your case to Social Security." Additionally, Advantage 2000 promises that their services will "minimize contact between you and the Social Security Administration...."

**C.    SSDI Claims were  Filed and Pursued with Reckless Disregard for their Propriety, with Deliberate Ignorance of the Facts Underlying them, and/or with Actual Knowledge of their Falsity**

101.    Frequently, after CIGNA causes its insured to file for SSDI  benefits, and while the SSDI claim is pending, CIGNA denies or terminates the insured's LTD claim and does so on the basis of the opinions of its employee physicians, nurses and vocational rehabilitation consultants who all opine that the insured is, in fact, not disabled from performing either (1) their *own occupation* or (2) *any occupation*.  When this occurs, CIGNA does not advise the Federal Government of the fact that CIGNA does not consider the insured to be disabled, despite the fact that CIGNA has arranged for and is paying a vendor to represent insured before SSA and despite the fact that CIGNA is the true "stakeholder" in the insured's Social Security disability claim.

102.    For example, a Claimant under LINA policy LK980001 was injured in a fall in June 2003, and went on short term disability.  This Claimant provided medical records to CIGNA as part of his application for LTD benefits in late 2003.

103.    On December 31, 2003 this Claimant signed a "Reimbursement Agreement" whereby he acknowledged that CIGNA has the right to "immediately reduce the benefits by an amount it estimates" the claimant will receive from SSDI.  The Agreement further provided that "by signing this agreement and complying with its terms" CIGNA agreed to not reduce Claimant's LTD benefits.  LTD benefits began on January 6, 2004.

104.    On February 13, 2004, CIGNA referred Claimant to Advantage 2000's Social Security Assistance Program.

105.    On March 30, 2004, Advantage 2000 filed a claim for SSDI on behalf of Claimant. Two weeks later on April 13, 2004, Advantage 2000 received the medical records for Claimant.

106.    The same day, April 13, 2004, Susan Kerr, Case Manager for CIGNA Disability Management Solutions, wrote a letter to Claimant informing him that "after a thorough review of your file it has been determined that you are not eligible to receive Long Term Disability benefits." Ms. Kerr told Claimant that CIGNA believed "based on the medical information in your file, there is no medical information to support your inability to perform your occupation as an Operations Associate Assemble I." Ms. Kerr also noted that "your benefits for Long Term Disability may have begun on January 6, 2004, but there is no evidence to support why you were and remain unable to perform the essential duties of your regular occupation, as required by the policy."

107.    In a similar example, on February 11, 2004, David Ruffennach, Case Manager for CIGNA Disability Management Solutions, sent a letter informing a Claimant under Policy LK8002 that his application for LTD benefits had been received. In that letter, Ruffennach also informed Claimant that beginning with the sixth month of disability, his LTD benefits would be offset by an estimated Social Security benefits unless Claimant signed a Reimbursement Agreement and applied for SSDI.

108.    On February 15, 2004, CIGNA referred Claimant to Advantage 2000, and on March 10, 2004, Advantage 2000 filed an initial SSDI claim for Claimant.

109.    On April 14, 2004, David Ruffennach sent a letter to Claimant in which Ruffennach reviewed information from Claimant's physicians and concluded that on the basis

of those reviews, "we are unable to verify your claimed disability and must deny your claim for benefits."

110.    On May 13, 2004, Burt Wikgren of Advantage 2000 sent an e-mail to Ruffennach seeking copies of medical reports relating to Claimant.

111.    CIGNA's entire motivation in causing its insureds to file for, and be awarded, Social Security disability benefits is to promote and benefit its own economic interests.

112.    Although it is the insured who is awarded the Social Security benefits, it is CIGNA, and not the insured, that is the "stakeholder" in, and receives the benefit of, the government awarding SSDI benefits to the insured. First, with respect to the lump-sum retroactive award of Social Security benefits, by virtue of the insured signing the "Reimbursement Agreement" the insured has contractually promised to pay CIGNA this lump-sum award. Second, by virtue of the "offset" provision found in the policy of insurance, CIGNA's obligation to pay continuing disability benefits under the insurance policy is reduced (i.e. offset) by the initial monthly amount of the Social Security benefit that the insured thereafter receives from Social Security (including all amounts awarded to the insured's spouse and children).

113.    In addition to the direct economic benefit CIGNA recognizes when an insured is awarded Social Security benefits, CIGNA also recognizes an additional benefit by mandating that all its disability claimants simply file for SSDI. For every claim that CIGNA receives, CIGNA must create a reserve for the expected duration of each claim. This reserve can be offset by the amount of the estimated SSDI income. Relator alleges that CIGNA would from time to time diminish LTD reserves by a percentage of an estimated SSDI offset even where no SSDI award had yet been made. In other words, the mere fact that the SSDI application

27

had been filed was used by CIGNA to reduce its reserves and thereby improve its financial statement.

114.    CIGNA knew or should have known that many of the claims that they caused to be filed with the SSA were and are false and non-meritorious. Because there exists a high attrition rate of senior claims examiners at Social Security, as well as a lack of SSA resources to fully investigate the large volume of SSDI claims, CIGNA knows that a setting exists where non-meritorious claims for SSDI that CIGNA causes or has caused to be filed will inevitably, and improperly, be approved.

115.    By utilizing "social security specialists" – who are versed in the rules, methods, and preferences of social security claim examiners – to prepare the SSDI application form and to collect and submit the documentation filed in support of the SSDI claim, the likelihood that the claim will be approved increases substantially. Every SSDI claim approved erroneously for a CIGNA insured directly benefits CIGNA.

116.    Even after CIGNA has denied the insured's claim, CIGNA will continue to follow-up with Social Security and make inquiry as to whether Social Security ended up awarding SSDI benefits to the insured. In the event that such an award has been made, CIGNA will then contact the insured whose LTD claim they have denied (because the person was not even disabled from performing his or her own occupation) and will demand payment of the lump-sum retroactive SSDI award.

117.    As a result of CIGNA's conduct, the Federal Government has been, and is still being, inundated with false claims for SSDI benefits--claims that are caused to be presented by CIGNA despite the fact that CIGNA knows that the claims are false, that CIGNA has acted

in deliberate ignorance with regard to the truth or falsity of the claims, and/or that CIGNA has acted in reckless disregard of the truth or falsity of the information underlying those claims.

## V.    DAMAGES

118.    In the past six years the DI Trust Fund has spent between $5.6 billion and $6.2 billion denying claims for Social Security benefits.

119.    Many of the claims that Social Security has denied have been false claims that were submitted to Social Security by CIGNA insureds at the express direction, and with the assistance of, CIGNA.

120.    From at least 1997 to the present, CIGNA has intentionally, or with reckless disregard for or in deliberate ignorance of its insureds' eligibility for SSDI benefits, caused thousands of people insured by CIGNA: (1) to file applications for Social Security benefits despite the fact that they were not disabled under SSA's definition of disability; and, further, (2) to appeal denials of SSDI benefits despite the fact that the insureds were not disabled under the SSA's definition of disability.

121.    Every false claim filed at the direction of the Defendants that was denied cost the Government, on average, $1,364.

122.    Every false claim filed at the direction of the Defendants that was erroneously allowed not only cost the Government, on average, $1,364 to investigate, but also cost the Government the amount of the retroactive lump-sum award improperly granted on the basis of that claim, and each such claim is continuing to cost the Government the amount of the ongoing monthly SSDI payments being made to the claimant.

## COUNT I

123.    Plaintiff/Relator realleges and incorporates by reference the allegations contained in Paragraphs 1 through 122 of this Complaint.

124.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*

125.    Through the acts described above, Defendants knowingly presented, or caused to be presented to the United States Government false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1).

## COUNT TWO

126.    Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 122 of this Complaint.

127.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*

128.    Through the acts described above, Defendants knowingly made, used, and/or caused to be made and used, false records or statements to get false or fraudulent claims paid or approved by the United States Government in violation of 31 U.S.C.§ 3729(a)(2).

**WHEREFORE**, Plaintiff/Relator requests that judgment be entered against Defendants, ordering that:

a.    Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.*;

b.    Defendants pay an amount equal to three times the amount of damages the United States has sustained because of Defendant's actions, plus a civil penalty against the

Defendants of not less than $5,500, and not more than $11,000 for each violation of 31 U.S.C. § 3729;

      c.    Plaintiff/Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

      d.    Plaintiff/Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d); and

      e.    the United States and Plaintiff/Relator be granted such other and further relief as the Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff/Relator hereby demands trial by jury.

W. Mark Lanier
Kevin P. Parker
Judson A. Waltman
Aaron J. DeLuca
THE LANIER LAW FIRM, P.C.
P.O. Box 691408
Houston, TX 77269-1408
Tel.: (713) 659-5200
Fax: (713) 659-22204

Mary Louise Cohen
Peter W. Chatfield
PHILLIPS & COHEN LLP
2000 Massachusetts Avenue, NW
Washington, D.C. 20036
Tel.: (202) 833-4567
Fax: (202) 833-1815

Peter B. Krupp
B.B.O. #548112
Sara A. Laroche
B.B.O. #652479
LURIE & KRUPP, LLP
One McKinley Square
Boston, MA 02109
Tel: (617) 367-1970
Fax: (617) 367-1971 Attorney

Attorneys for Plaintiff

Dated: December 27, 2004