UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. DAWN BARRETT<br><br>Plaintiff,<br><br>v.<br><br>CIGNA CORPORATION and LIFE INSURANCE COMPANY OF NORTH AMERICA<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)   Civil Action No. 03-12382-MLW<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION TO DISMISS**

Relator Dawn Barrett filed this action against defendants CIGNA Corporation ("CIGNA

Corp.") and Life Insurance Company of North America ("LINA") for violations of the False

Claims Act, 31 U.S.C. § 3729(a)(1) and (2) (the "FCA").  LINA provides disability insurance

coverage and administers disability policies for employers. LINA is a wholly-owned subsidiary

of CIGNA Corp.

Barrett accuses both CIGNA Corp. and LINA of causing policyholders' employees to

submit false claims for disability benefits to the Social Security Administration ("SSA").  Her

claim is premised on the requirement in some policies that policyholders' employees must also

apply for other benefits to which they are entitled, including Social Security Disability Insurance

("SSDI") benefits, after they have made a claim for benefits under a disability policy.  She

claims that the defendants "make no good faith assessment or review to determine whether

claimants are likely to be entitled to SSDI benefits" and "recklessly require all claimants ... to apply for SSDI" despite their alleged knowledge "based on their own extensive experience in reviewing such claims, that most disability claimants do not meet the stringent disability requirements for SSDI." First Amended Complaint (hereinafter, "Complaint" or "Comp."), ¶ 4.

Barrett's Complaint does not meet the particularity requirements of Fed. R. Civ. P. 9(b) that apply to the False Claims Act. In addition, she has failed to allege facts that, if proven, would establish the required elements of an FCA claim. Finally, even if she could state such a claim against LINA, she could not state a claim against CIGNA Corp., because CIGNA Corp. is a holding company that does not engage in selling or administering insurance policies.

Defendants therefore move for dismissal, pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b), for failure to state a claim upon which relief may be granted.

## PROCEDURAL HISTORY

This *qui tam* complaint was filed under seal on November 25, 2003. Seven months later, on July 28, 2004, the United States declined to intervene. This Court, on September 8, 2004, ordered that the Complaint, the United States' Notice of Declination of Intervention, and the Court's order be unsealed and served on the Defendants. Barrett served the Complaint and a First Amended Complaint on Defendants on or about December 27, 2004.

## BARRETT'S ALLEGATIONS

For the purposes of this motion, Barrett's allegations must be taken as true, and they are outlined below. Nevertheless, Defendants contend that the Complaint does not properly allege fraud and fails to state a claim upon which relief can be granted.

As a preliminary matter, it should be noted that Barrett makes her allegations against both CIGNA Corp. and LINA together, claiming that "CIGNA" is the seller and administrator of

disability insurance policies, Comp., ¶ 6, and that "CIGNA" has forced policyholders' employees to submit false claims. *Id.*, ¶ 4. As stated above, only LINA, not CIGNA Corp., sells or administers disability insurance policies. *See* CIGNA Corp. U.S. Securities and Exchange Commission Form 10-K, Ex. 21 (attached hereto as Exhibit A).

For the purpose of reviewing her allegations, this memorandum ignores Barrett's confusion, which demonstrates her inability to make the specific allegations necessary in a False Claims Act complaint. Where the word "CIGNA" appears in quotation marks below, it is used solely to repeat Barrett's allegations for the purpose of this motion.

## 1.    The Parties

According to Barrett's Complaint, "CIGNA" sells employee benefits and services, including disability insurance,and also administers group disability plans for self-insured employers. *Id.*, ¶¶ 6, 8. LINA is a wholly-owned indirect subsidiary company of CIGNA Corp.. *Id.*, ¶ 6.

Barrett states that she has been employed by "CIGNA" since September 2000. *Id.*, ¶ 5. In reality, she has been employed by LINA, as she well knows.

## 2.    Social Security Disability Insurance ("SSDI")

SSDI is offered by the federal government to disabled wage earners and their families. Comp., ¶¶ 12-13. An SSDI claimant must "have a medically determinable physical or mental impairment that has lasted or is expected to last at least twelve months or result in death and that prevents him/her from performing any substantial gainful activity." *Id.*, ¶ 13.[1] An SSDI claimant must complete and file Disability Report Form SSA-3368-BK ("Form 3368"). *Id.*,

---

[1] Defendants concede that Barrett's quotation is substantially correct, though it does not precisely track the Social Security regulations and defendants are unable to identify the source of the quotation.

¶ 16. (Attached hereto as Exhibit B.) A claimant may choose to have a representative handle the SSDI claim on his or her behalf with the Social Security Administration ("SSA"). *Id.*, ¶ 17.

Form 3368 is a 10-page form that requires a claimant to identify the disability or disabilities; describe how the conditions limit the claimant's ability to work; and state whether the claimant suffers pain from the conditions. The claimant must answer the question: "When did you become unable to work because of your illnesses, injuries, or conditions?" Ex. B, p. 2. The instructions for Form 3368 state that this question is intended to ask when the claimant became disabled, defined as "unable to do any kind of work for which [the claimant is] suited and if [the claimant's] disability is expected to last (or has lasted) for at least a year or to result in death." Ex. B, instructions; Comp., ¶ 18. Form 3368 also requires the claimant to submit information about his or her work (including its physical demands); education; medical records (including contact information for medical professionals treating the applicant); and medical treatment received.

## 3.    "CIGNA's" Disability Benefits

Employers[2] may purchase both short-term disability ("STD") and long-term disability ("LTD") coverage for their employees. Comp., ¶ 53. "CIGNA" provides both types of coverage to employers. *Id.* These disability benefits plans typically are provided pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"). *Id.*, ¶ 54.

A policyholder's employee who is injured or ill may first be eligible for STD benefits, beginning a short time after the injury and running for three to six months under a "typical" policy. *Id.*, ¶¶ 56-57. At the conclusion of the STD period, the employee "typically" becomes eligible for LTD benefits. *Id.*, ¶ 60.

---

[2] Contrary to Barrett's allegations, LINA's disability insurance coverage is not provided solely to employers. In fact, LINA provides coverage to a variety of types of organizations and associations. To track Barrett's Complaint, however, Defendants herein refer to "employers" and "employees."

According to the Complaint, under the typical STD policy, a policyholder's employee is entitled to benefits if "the employee is unable to perform the usual and customary duties of his or her own occupation." *Id.*, ¶ 55. The same eligibility standard is used for LTD policies during the first twenty-four months of LTD benefits. *Id.*, ¶¶ 61-62. However, after twenty-four months the standard for LTD benefits changes. The employee must be "totally disabled from performing the material and substantial duties of 'any occupation' for which he or she is qualified by training, education, and experience." *Id.*, ¶ 62.

The policies under which "CIGNA" provides insurance and claims administration services provide that benefit payments may be offset by other income the policyholder's employee is receiving, including SSDI benefits payments. *Id.*, ¶¶ 65-66. The policies require that a policyholder's employee who applies for disability insurance benefits also must file for SSDI benefits, so that if the employee qualifies for SSDI, the claimed SSDI benefits may be offset. *Id.*, ¶ 67.[3] If the policyholder's employee does not apply for SSDI benefits the policies provide that "CIGNA" may "reduce the monthly benefit owed under the policy by the estimated Social Security benefit to which CIGNA determines the insured would be entitled if the insured applied for Social Security." *Id.*, ¶ 67.

"CIGNA" sends a Reimbursement Agreement to a policyholder's employee who has applied for benefits, which requires the employee to affirm that he or she has applied for SSDI. *Id.*, ¶ 77. This Agreement details "CIGNA's" right under the policies to offset benefits by amounts the policyholder's employee received from SSDI, or would have received from SSDI had the employee applied. *Id.* The Agreement also states that "CIGNA" will not reduce the benefit payments by the estimated amount of SSDI benefits if the policyholder's employee

---

[3] LINA reserves the right to offset for many such benefits, as detailed in the LINA policies. Further discussion of this provision begins on p. 33.

applies for SSDI, signs and submits the Reimbursement Agreement, and, under certain policies, agrees to appeal adverse rulings from SSA unless "CIGNA" determines that the appeal would not be successful. *Id.*, ¶ 78-79.

### 4. "CIGNA's" Provision of SSDI Application Assistance

From 1997 to 2000, LINA utilized in-house "Social Security Specialists" to ensure that a policyholder's employee who applied for benefits also applied for SSDI, to determine whether an SSDI claim would succeed at a hearing, and to provide assistance with a claimant's appeal. *Id.*, ¶¶ 86-87. From 2000 to mid-2002, "CIGNA" used in-house "Offset Specialists" to assure that the employee had applied for SSDI and to provide assistance in making that application. *Id.*, ¶¶ 89-91. The Offset Specialists typically would refer the claimant to one of several outside vendors who specialized in obtaining SSDI benefits for claimants. *Id.*, ¶ 92. "CIGNA" bore the cost of the vendor's representation of the claimant. *Id.*, ¶ 93. In mid-2002, according to the Complaint, "CIGNA" began exclusively to use Advantage 2000 Consultants, Inc. ("Advantage") to provide this claimant representation. *Id.*, ¶ 94. Once Advantage was retained, "CIGNA" allegedly directed its case managers to refer all claimants meeting "CIGNA's" Social Security Referral Guidelines to Advantage. *Id.*, ¶ 97.

### 5. The False Claims Allegations

In order to succeed in her FCA claim, Barrett would have this Court draw one of the following inferences from the facts alleged in her Complaint:

a) between 1997 and 2002, LINA knew that at least some SSDI claims were false merely because it required every claimant to file with SSDI, without evaluating whether the claimant was eligible for SSDI; or

b) where LINA ultimately declines to pay LTD benefits under a policy, it therefore knows that the employee's continuing SSDI application is false, and by allegedly causing the employee to continue to pursue the application thereafter LINA is liable for presentment of a false claim.

Defendants contend that neither of these inferences is valid.

Barrett makes the following allegations in support of the first inference:

CIGNA's a [sic] policy, practice and procedure thus (1) required all disability claimants to file for SSDI without regard to whether or not the claimant met the stringent SSDI any occupation definition of disability; (2) provided SSDI filing assistance for all disability claimants unless the disability were [sic] related to a simple pregnancy diagnosis or the claimant had a firm return to work date within nine months; and (3) threatened claimants that if they refused to file, they would lose a substantial portion of their disability benefits.

*Id.*, ¶ 73. She emphasizes that "CIGNA" required claimants to file for SSDI benefits without first making its own determination of whether the claimant met "the stringent '*any occupation*' definition of disability required for SSDI. *Id.* Allegedly, "CIGNA" forces employees to file for SSDI benefits, and, in some cases, pursue appeals "despite the fact that "CIGNA" knows or should know that many of these individuals do not, cannot and will not qualify for" SSDI. *Id.*, ¶¶ 83-84.

These are the Barrett's allegations in support of the second inference:

CIGNA does not advise the Federal Government of the fact that CIGNA does not consider the insured to be disabled, despite the fact that CIGNA has arranged for and is paying a vendor to represent insured before SSA and despite the fact that CIGNA is the true 'stakeholder' in the insured's Social Security disability claim.

*Id.*, ¶ 101.

In support of both claims, Barrett alleges that "CIGNA" and its vendor somehow overwhelm SSA and cause it to approve SSDI applications that it would not otherwise approve. She states because of a "high attrition rate of senior claims examiners at Social Security, as well as a lack of SSA resources to fully investigate" SSDI claims, "CIGNA knows that a setting exists where non-meritorious claims for SSDI that CIGNA causes or has caused to be filed will

inevitably and improperly, be approved." *Id.*, ¶ 114. "CIGNA" allegedly exploits SSA's

overwhelmed state, "[b]y utilizing 'social security specialists' – who are versed in the rules,

methods, and preferences of social security claims examiners[,]" *Id.*, ¶ 115. She does not explain

how these facts prove the submission of false claims.

**ARGUMENT**

1.    **Summary of Argument**

     Barrett's entire Complaint must be dismissed because she has not pleaded the alleged

fraud with the requisite particularity.  Nor can she do so, because the inferences she would draw

regarding LINA's conduct are not warranted on the facts alleged in the Complaint.  She has not

alleged any particular false claim, and the allegations regarding the only two examples offered

by Barrett fail to state that they were false or contained any falsehood.

     Barrett's Complaint also must be dismissed because she has failed to plead the elements

required by the False Claims Act.  She has not alleged the submission of a "claim" under the

False Claims Act.  Nor does she allege facts sufficient to establish that any submitted claim is

actually false, or that LINA requires claimants to make false statements in their SSDI claims.

The Court cannot infer that LINA knows an SSDI claim to be false merely because it has denied

coverage under one of the policies it administers.  As a matter of law, determinations by LINA or

anyone else on issues pertaining to disability are not relevant to SSA's decision to accept or deny

any claim.

     Barrett has not adequately alleged LINA's knowledge of the submission of any false

claims, and she cannot infer that LINA has this knowledge merely because it requires

policyholders' employees to make SSDI applications.  The alleged probability upon which she

relies is not enough.  The inference that claims are probably false is not supported by her

-8-

wholesale allegations of reckless conduct by LINA and, as a matter of law, the mere pleading of an alleged methodology by which false claims might be submitted is insufficient to support an FCA complaint. She also fails to establish that any alleged false statement is material to the payment of a claim. Finally, Barrett has failed to plead the "double falsity" necessary to establish a claim under 31 U.S.C. § 3729(a)(2).

Barrett also should be estopped from arguing that LINA's policy causes the submission of false claims because SSA follows the same policy as LINA, requiring SSDI claimants to seek compensation from other forms of insurance. Because she stands in the shoes of the SSA, her claim must be treated as an argument by SSA against the validity of its own practices, which would be impermissible.

Finally, Barrett's claims against CIGNA Corp. should be dismissed because she cannot make any specific allegations against CIGNA Corp. CIGNA Corp. is a holding company that does not sell or administer insurance and Barrett's allegations, although denied, apply only to LINA. Barrett may not maintain her suit against a parent company merely by alleging that the parent is responsible for the acts of its subsidiary.

## 2.    **The Applicable Legal Standard**

A claim should be dismissed under Fed. R. Civ. P. 12(b)(6) when it "appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Roeder Alpha Indus., Inc. v. Neves*, 814 F.2d 22, 25 (1st Cir. 1987). The Court is required to accept all well-pleaded factual allegations as true. *See Monahan v. Dorchester Counseling Ctr., Inc.*, 961 F.2d 987, 988 (1st Cir. 1992). Bald assertions, unsupported conclusions, and general allegations are not enough to satisfy Rule 12(b)(6). *See Aulson v.*

*Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996); *United States v. AVX Corp.*, 962 F.2d 108, 115 (1st Cir. 1992).

3.    **Barrett's Complaint Lacks the Specificity Required by Fed. R. Civ. P. 9(b).**

Barrett's complaint provides almost none of the particularized information required by Rule 9(b). "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). "Every circuit court ... has concluded that the heightened pleading requirements of Rule 9(b) apply to claims brought under the FCA ... We now join this consensus ...." *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 228 (1st Cir. 2004) (collecting cases); *see, e.g., United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 551-52 (D.C. Cir. 2002); *United States ex rel. La Corte v. SmithKline Beecham Clinical Labs., Inc.*, 149 F.3d 227, 234 (3d Cir. 1998); *Gold v. Morrison-Knudsen Co.*, 68 F.3d 1475-77 (2d Cir. 1995); *see also* John T. Boese, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS § 5.04 (2d. ed. & Supp. 2005) ("It is widely accepted by courts that because the essence of the False Claims Act is fraud, Rule 9(b) applies to FCA cases.").

"Rule 9(b) serves the purpose of enabling defendants to prepare meaningful defenses to charges of fraud, preventing conclusory allegations of fraud from serving as a basis for strike suits and fishing expeditions, and protecting defendants from groundless charges that may damage their reputations." *See United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 46 (D. Mass. 2001) (quoting *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 292 (1st Cir. 1987). As outlined below, Barrett's allegations are both groundless and conclusory, leaving the Court to speculate whether any of the claims at issue are false.

Rule 9(b) requires that the complaint state the "time, place, specific content of the false representations, and the identities of the parties participating in the fraud .... [It] must provide the 'who, what, when, where, and how of the alleged fraud.'" *United States ex rel. Karvelas v.*

*Melrose-Wakefield Hosp.*, No. Civ.A. 01-10583-DPW, 2003 WL 21228801, at *4 (D. Mass. May 21, 2003) (quoting *United States ex rel. Gublo v. Novacare, Inc.*, 62 F. Supp. 2d 347, 354 (D. Mass. 1999)). In addition, Rule 9(b) requires that a fraud complaint must "allege facts that give rise to a strong inference of fraudulent intent." *Suna v. Bailey Corp.*, 107 F.3d 64, 68 (1st Cir. 1997).

     **a.**    **The "Examples" in the Complaint Do Not Adequately Allege False Claims.**

In an apparent attempt to correct the deficiencies in her original complaint, Barrett's First Amended Complaint sets forth two – and only two – examples of policyholders' employees who filed for SSDI benefits. Yet, in neither case does she allege that the policyholder's employee submitted a false claim or made a false statement in connection with the claim. Nor does she allege that SSDI actually awarded benefits to either of these claimants. Comp., ¶¶ 102-110.

The first example appears at Paragraphs 102-106 of the Complaint. Barrett alleges that Advantage (the SSA representative provided to the employee by LINA) filed the claimant's SSDI application on March 30, 2004, Comp., ¶ 105, and received the claimant's medical records from LINA on April 13, 2004. *Id.* That same day, LINA denied that claimant's application for policy LTD benefits. *Id.*, ¶ 106.

The second example appears at Paragraphs 107-110 of the Complaint. Barrett alleges that Advantage filed an application for SSDI benefits for the claimant on March 10, 2004. *Id.*, ¶ 108. On April 14, 2004, LINA allegedly informed the employee that it denied the application for policy LTD benefits because LINA was "unable to verify [the claimant's] claimed disability." *Id.*, ¶ 109. Barrett then alleges that on May 13, 2004, Advantage requested the claimant's medical records from LINA. *Id.*, ¶ 110.

There is nothing more to these two examples - no allegation that the claims were false, that the claimants were not disabled within the meaning of SSA's definition, or that false statements were made by anyone in connection with the claims. In addition, there is no allegation that SSA approved the claims based on fraud, disapproved the claims, or determined that they were false or fraudulent. There is no allegation that Advantage did anything after LINA denied policy benefits or, if it did, whether it acted thereafter at LINA's behest. Barrett does not allege that either CIGNA Corp. or LINA participated in any part of the SSDI application process after the denial of policy LTD benefits. On these allegations, Barrett may not infer that these claimants falsely obtained SSDI benefits, much less that LINA was responsible.

In each of these examples, Barrett fails to provide the "who, what, when, where, and how of the alleged fraud." *Karvelas*, 2003 WL 21228801, at *4; *Gublo*, 62 F. Supp. 2d at 354. We are not told whose act or statement was fraudulent, what was false, when the falsehood was conveyed to SSA, or how any alleged representation was false. Without the particulars required by Rule 9(b), the Complaint should be dismissed.

**b.    The Remaining Allegations in the Complaint Do Not Satisfy Rule 9(b).**

These two inadequate examples are Barrett's only attempts to provide specific facts in support of the alleged eight-year pattern of thousands of false claims. Comp., ¶ 120. The Complaint does not allege any instance in which LINA forced a policyholder's employee to claim entitlement to SSDI benefits, even though the claimant was not disabled or did not believe he or she was disabled. Nor does Barrett describe any instance in which anyone claimed SSDI benefits to which they were not entitled. Despite her allegation of a pattern of economic duress,

*see* Comp., ¶ 85, not one person is identified who believed they were forced into filing an SSDI application or into misstating their level of disability on that application.

"Evidence of an <u>actual false claim</u> is 'the *sine qua non* of a False Claims Act violation.'" *Karvelas*, 360 F.3d at 225 (emphasis added); *see also Eastman Kodak Co.*, 98 F. Supp. 2d 141, 147 (D. Mass 2000) (dismissing pursuant to Rule 9(b) because "the complaint does not identify or describe any specific hospital cost reports or transactions that allegedly give rise to violations of the FCA"). Barrett has provided no such evidence and her complaint should be dismissed.

   c.    **Barrett Provides No Specific Dates of False Claims or Specific Persons Who Caused False Claims to Be Submitted.**

The mere statement that all claims submitted after a particular date are false does not satisfy the requirements of Rule 9(b). *See United States ex rel. Sikkenga v. Regence Blue Cross/Blue Shield of Utah*, No. 2:99CV86K, 2001 U.S. Dist. LEXIS 25717, at *16 (D. Utah Nov. 28. 2001) ("[S]tating that all claims after a certain date are false is not an adequate substitute for providing a detailed list that would provide defendants with sufficient specificity to dispute the claims."); *see also Shamsi v. Dean Witter Reynolds, Inc.*, 743 F. Supp. 87, 90 (D. Mass. 1989) (finding that the complaint in a securities fraud action must detail and provide sufficient facts to support the allegations of excessive trading) ("[T]he plaintiff may not delay setting out facts to support his claim pending discovery, but must detail them in the complaint or face dismissal."). Here, Barrett merely pleads that any claims LINA caused to be submitted after 1997 might be fraudulent. The Complaint alleges that "[f]rom at least 1997 to the present, CIGNA has … caused thousands of people insured by CIGNA" to file false claims with SSA. Comp., ¶ 120. Such allegations fail the Rule 9(b) standard.

Nor are we told who actually committed a fraud. A relator must "identify with specificity the individuals involved in the alleged fraud." *United States ex rel. Carroll v. JFK Med. Ctr.*

2002 WL 31941007, at *5 (S.D. Fla. Nov. 15, 2002). Broad references to categories of corporate personnel do not satisfy Rule 9(b). *Id.* at *5-*6; *see also Parke-Davis,* 147 F. Supp. 2d at 50 (dismissing count where "Relator's allegations [did] not specify which Parke-Davis personnel engaged in this conduct ... or which VA personnel were involved"); *United States of America ex rel. Stan Price v. J-M Mfg. Co., Inc.,* 2001 WL 823730, *2 (E.D.La. 2001) (dismissing relator's complaint, in part, for failure to "provide ... specific detail as to ... the exact governmental entities and J-M personnel involved"). Here, Barrett relies only on broad and unspecific references to LINA case managers, social security specialists, offset specialists, and LINA's vendors' employees who allegedly play a part in the submission of false claims to the SSA. Comp., ¶¶ 69-71, 86-99.

Barrett names only two people in her complaint. Each is a case manager for LINA. Each is mentioned only in the context of the two SSDI claims discussed in paragraphs 102 to 110 of the Complaint. Neither person is alleged to have any knowledge of a false claim being submitted. As discussed above, neither of these examples details a false claim submitted to the SSA.

Finally, Barrett does not even distinguish between the two defendants. After identifying the parties, she says nothing to distinguish between the two defendants other than her general claim that "CIGNA conducts this business through various wholly-owned subsidiary corporations including Life Insurance Company of North America ...." Comp., ¶ 6. The defendants are left to speculate whether they are both alleged to have committed the same fraud. Such vague allegations do not adequately permit either defendant to prepare a defense and, thus, violate Rule 9(b).

As in *Karvelas*, "[t]he present complaint demonstrates the proposition that a complaint can be long-winded, even prolix, without pleading with particularity. Indeed, such a garrulous style is not an uncommon mask for an absence of detail." *Karvelas*, 2003 WL 21228801, at *9 (internal quotation omitted). In *Karvelas*, the First Circuit upheld the dismissal of the relator's claims that the defendant health care provider had submitted false Medicare and Medicaid claims because he did not specify the content or the dates of any particular false claims, provided no specifics about identification numbers related to false claims, gave no information on amounts charged for specific items, and did not identify the individuals involved in the alleged improper billing. *See United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 223 (1st Cir. 2004). Similarly, in *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003), the dismissal of the relator's amended complaint was upheld because the complaint failed to describe the details of incidents allegedly known to the relator, did not specify the individuals participating in the fraud, and did not set forth dates on which the alleged fraudulent activities occurred. *See also Gublo*, 62 F. Supp. 2d at 354 (dismissing portion of case concerning over billing Medicaid and Medicare for prosthetic devices because plaintiff did not plead "a single instance of a false claim" concerning those items); *United States ex rel. Walsh v. Eastman Kodak Co.*, 98 F. Supp. 2d 141, 147-48 (D. Mass 2000) (dismissal for failure to "cite a single instance of a false claim").

Here, Barrett alleges that LINA is responsible for eight years of false claims submitted to the SSA. She has worked for LINA as a "Support Tech" for five of those years, reviewing claimant case files, tracking benefits award information, and assisting case managers in handling claimant cases, all on a daily basis. Yet she cannot provide the full details of even one false claim within that time.

### d.    Barrett May Not Merely Plead a "Methodology."

Barrett cannot satisfy Rule 9(b) merely by alleging a method by which false claims might be submitted.  In *Eastman Kodak*, 98 F. Supp. 2d  at 147-48, the district court dismissed the relator's claims with prejudice, holding that the relator merely stated a "methodology" of possible fraud.  In *United States ex rel. Gublo v. NovaCare, Inc.*, the relators' complaint was dismissed because they "simply allege[d] three methods by which [defendant] is said to have inflated its bills to the government, without citing a single instance of a false claim."  62 F. Supp. 2d 347, 354 (D. Mass. 1999); *see also United States ex rel. Butler  v. Magellan Health Servs., Inc.,* 101 F. Supp. 2d 1365, 1369-70 (M.D. Fla. 2000) ("illustrative" allegations through which plaintiff alleges a "scheme of fraud" were insufficient under 9(b); "At no time did Plaintiff plead that a specific insurance claim form for any patient was fraudulent."); *United States ex rel. LaCorte v. SmithKline Beecham Clinical Labs.*, No. CIV. A. 96-1380, 2000 WL 17838 (E.D. La. Jan. 10, 2000) (relator's claims dismissed with prejudice because the relator merely provided the general framework for the alleged fraudulent scheme, and provided no link between the allegedly fraudulent practices and the submission of fraudulent claims).  "Courts will dismiss FCA claims in which the plaintiff merely pleads 'by example,' where the complaint simply pleads a general methodology of alleged fraud and where the allegations fail to distinguish among defendants." John T. Boese, Civil False Claims and Qui Tam Actions 5-58.2 – 5-58.2-1 (2005 Supp.).

At most, Barrett pleads only that LINA's procedures might have resulted in fraud. According to Barrett's Complaint, LINA's method of causing false claims to be submitted to SSA was:  1) to require "all" of its claimants to apply for SSDI without reviewing whether the claimant met the "stringent 'any occupation' definition of disability required for SSDI"; 2) to provide assistance to these claimants in filing such claims; and 3) to maintain the right to offset

the claimant's benefits if they did not apply for SSDI.  Comp., ¶ 73.  In essence, Barrett merely

alleges that, because LINA requires "all claimants" to apply for SSDI benefits, "many of the

claims that they caused to be filed with SSA were and are false and non-meritorious."  *Id.*, ¶¶ 4,

114.  Without detailing specific claims, however, this amounts to nothing more than the

insufficient allegation of a methodology by which fraud could be committed.

> **e.**    **Plaintiff Has Not Sufficiently Alleged the Submission of a False Record or Statement.**

In Count II, Barrett makes the separate claim that LINA "made, used, and/or caused to be

made and used, false records or statements to get false or fraudulent claims paid or approved by

the United States Government," in violation of 31 U.S.C. § 3729(a)(2).  Comp., ¶ 128.  This

Count appears to be an afterthought, because none of the allegations detail the submission of any

false records or statements.  The Complaint does not identify SSDI applications or other

documents or records submitted to the SSA that contained false information.  Nor is any specific

statement to the SSA alleged to be false or fraudulent.  Once again, Barrett merely relies on the

syllogism that:  a) LINA requires claimants to submit SSDI forms; b) the SSA ordinarily rejects

large portions of claims; therefore c) some of these forms must have contained false information.

For all of the reasons stated above, Barrett's Complaint should be dismissed for failure to

comply with the requirements of Fed. R. Civ. P. 9(b).

**4.    Barrett's Allegations Do Not Establish the Elements of an FCA Claim.**

In addition to her failure to meet the requirements of Rule 9(b), Barrett's allegations do

not establish the requisite elements of an FCA claim.  To plead a violation of Section 3729(a)(1),

a relator must allege four essential elements:  1) that the defendant presented, or caused another

person to present, a "claim" for payment or approval to the United States; 2) the claim was "false

or fraudulent"; 3) the false claim or statement was material to the government's payment

decision; and 4) the defendant knew that the claim was false. *See, e.g., United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 50 (D. Mass. 2001).

Barrett makes sweeping generalizations about LINA's conduct, the alleged falsehood of vast numbers of SSDI claims, and LINA's alleged knowledge based on its denial of policy coverage. In sum, Barrett appears to contend that the policy requirement regarding application for SSDI benefits forces covered employees to falsely represent that they are disabled (within the SSA definition of disability) on their Form 3368. *See* Comp., ¶ 114 (alleging that "CIGNA knew or should have known that many of the claims that they caused to be filed with the SSA were false and non-meritorious"). She suggests that these claimants falsely represent to the SSA that they are unable to perform "any occupation" because of the LINA requirement. *See id.*, ¶ 73 (alleging that LINA "required all disability claimants to file for SSDI without regard to whether or not the claimant met the stringent SSDI any occupation definition of disability"). LINA allegedly knows of the falsehood because it knows that a statistically significant number of SSDI claims are denied annually, *see id.*, ¶ 4, or because, where LINA ultimately denies coverage and a claim proceeds thereafter, that denial signifies LINA's knowing prosecution of false claims through the outside vendors whose services LINA has arranged for covered employees. *See id.*, ¶ 101.

Barrett has failed to state a claim upon which relief may be granted because these allegations are not sufficient to establish any of the requisite elements of an FCA claim.

a.    **An SSDI Application Is Not A "Claim" Under the FCA.**

Barrett's claim should be dismissed because the commencement of the SSDI eligibility determination process may not be considered a claim under the False Claims Act.[4]  A "claim"

---

[4] This does not suggest that an applicant may submit false information in an SSDI application. To do so might subject the applicant to liability under other statutes, such as those prohibiting false statements to the government.

under the FCA must have "the practical purpose and effect" of causing the government to pay

when it otherwise would not have done so. *United States v. Rivera*, 55 F.3d 703, 710 (1st Cir.

1995); *see United States v. Pres. & Fellows of Harvard Coll.*, 2004 WL 1447307, at *19 (D.

Mass. June 28, 2004). For False Claims Act liability to attach, the defendant must subject the

government to an immediate, or virtually immediate, demand for payment. *See Dookeran v.*

*Mercy Hosp.*, 281 F.3d 105 (3d Cir. 2002); *United States ex. rel. Cooper v. Gentiva Health*

*Servs., Inc.*, 2003 WL 22495607, at *7 n.9 (W.D. Pa. Nov. 4, 2003).

For instance, in *Dookeran v. Mercy Hosp.*, the Third Circuit held that Mercy Hospital's

application to be designated by the federal government as a clinical center did not constitute a

claim. "The application was simply the first step in a process that ultimately might have led, but

in actuality did not lead, to the authorization of the payment of federal funds to Mercy."

Similarly, in *United States ex. rel. Cooper v. Gentiva Health Servs., Inc.*, 2003 WL 22495607, at

*7 n.9 (W.D. Pa. Nov. 4, 2003), the court held that an Enrollment Application to be designated a

Medicare Supplier was not a claim for payment. In both cases, the defendant had applied for a

determination of its status. Contrast this with the run-of-the-mill FCA claim concerning a

government contractor's or hospital's claim for payment for work already performed.

Starting the eligibility determination process by filing a Disability Report Form (Comp.,

¶ 16), should not be considered making a claim because there are many intervening steps before

a government payment is made, none of which is automatic. It is, instead, a request for an

adjudication regarding disability. It does not ripen into a claim until the SSA determines that the

claimant is disabled. *United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 336 (S.D.N.Y.

2004) ("A bid, by its very nature, does not request or demand monetary compensation. It is one

step removed from a request or demand for money ... even assuming that the unsuccessful

bidders falsely certified compliance with FCC regulations on their short-form applications, they did not "make" ... a "claim" within the meaning of the FCA."). Where an intervening act is necessary for the defendant's demand to trigger government payment or obligation to pay, liability does not attach until that act takes place. *See United States v. Van Oosterhout*, 96 F.3d 1491 (D.C. Cir. 1996) (allegedly false loan application became a "claim" only when the government became obligated to pay a third-party lender).

Because SSDI claims are subject to an adjudicatory process which may ultimately evolve into adversary proceedings, an SSDI application is much like a complaint in a court, designed to commence the adjudicatory proceedings. While the definition of "claim" under the FCA is necessarily broad, *see United States v. Neifert-White Co.,* 390 U.S. 228, 233 (1968), defendants have found no cases in which a petition to begin an adjudicatory process has been held to be a "claim" under the FCA.[5]  If, as Barrett suggests, an application for SSDI benefits could be considered a "claim" under the FCA, then every SSDI applicant later denied benefits could be found to have made a false claim. Clearly, this absurd result is not consistent with the purpose of the False Claims Act.

Here, the acts which set in motion the SSDI eligibility determination process – the alleged false claims – are not immediate or virtually immediate demands for payment. Rather, they are requests that the SSA begin the process of adjudicating the claimants' status as disabled persons. In fact, the two most recent versions of SSA's Disability Report Form 3368-BK bear the disclaimer, in bold letters on the first page, "This is not an application." Ex. B. After the filing of Form 3368, SSA first "compil[es] the non-medical and preliminary medical

---

[5] In fact, Defendants have found only one instance in which an applicant for SSDI was accused of violating the FCA. In *United States v. Henderson*, 2004 WL 540278 (D. Minn. Mar. 14, 2004), the defendant made repeated false statements regarding her alleged disability during several stages of SSDI adjudicatory proceedings. She was awarded SSDI benefits. The court dismissed the government's claim for failure to plead with particularity as required by Fed. R. Civ. P. 9(b). *Id.* at *3. The government did not resubmit its complaint.

information" regarding the disabled person. Comp., ¶ 25. It then refers the case to a state

Disability Determination Center, which compiles the medical evidence from the claimant's

treating physicians. *Id.*, ¶¶ 27-29. The state agency may then conduct its own medical

determination. *Id.*, ¶¶ 30-31. It may also obtain a vocational or occupational consultation,

performed by consultants. *Id.*, ¶ 32. After this investigation, a first determination of eligibility is

made. *Id.*, ¶ 33. Thereafter, a denied applicant may file for reconsideration by the state agency

(Comp., ¶¶ 35-36), then appeal to the Office of Hearing and Appeals for a hearing before an

Administrative Law Judge who can call on experts for additional evidence and assistance. *Id.*, ¶

38. As Barrett explains, "[f]requently, at the ALJ level, new evidence is introduced ... often at

the hearing itself." *Id.*, ¶ 40. After the ALJ makes an eligibility determination, two more levels

of appeal are available to the disabled person: an appeal to the Appeals Council (*Id.*, ¶ 41) and

finally an appeal to the Federal District Court. *Id.*, ¶ 43. Only after an extensive investigation

and after a favorable determination by one of these decision makers will the person begin to

receive benefits.

Barrett is well aware of the extensive claim investigation process undertaken by the SSA

before benefits are awarded. She admits that the SSA's decision to pay benefits turns on SSA's

own investigation. *See* Comp., ¶ 33 ("Once the investigation is completed, the DDS [Disability

Determination Service Center] makes a claim decision whereupon the applicant's claim for SSDI

benefits is either allowed or denied."). She also admits that the filing of a Form 3368 does not

trigger an automatic or immediate payment from the government. As Barrett herself alleges, a

substantial portion of SSDI claims are denied, despite the information submitted by or collected

from claimants. Comp., ¶¶ 51 ( "The average percentage of denied claims per applications filed

during this [1997-2002] period is 51.51%").

Thus, initiating the SSDI eligibility determination process should not be considered a "claim" under the FCA, and therefore, even if CIGNA caused the SSDI application to be filed, CIGNA's actions would not give rise to FCA liability.

### b.    The Facts Alleged Do Not Support an Inference That Any Particular SSDI Claim is False.

The Complaint does not allege any facts establishing that a person knowingly included false information in his or her application for SSDI benefits. Instead, Barret plays a game of numbers, suggesting that, because LINA requires "all" of its claimants to apply and because LINA "know[s] ... that most disability claimants do not meet the stringent disability requirements for SSDI," therefore some of these claims must have been false. Comp., ¶ 4. This allegation fails to satisfy Rule 9(b) as described above. It also fails to adequately allege the element of falsity for the purpose of the FCA.

Barrett must allege that the claims at issue were false at the time they were submitted. She may not merely suggest that SSA's adverse adjudication of a high percentage of claims implies that any given claim was false from the outset. Claimants may recover from their disability during the often lengthy pendency of their SSDI application. Medical records regarding an injury or illness, though completely valid, may not ultimately sustain the judgment that there is a disability as defined by the SSA. In such circumstances, the employee who initiates an SSDI application process, even if required to do so under a LINA-administered policy, does not commit an FCA violation. A valid claim cannot be transformed into false claim by subsequent events. *See United States ex rel. Quinn v. Omnicre, Inc.*, 382 F.3d 432 (3rd Cir. 2004) (where pharmacy billed for medicine delivered, claim was not false even though medicine was returned). Barrett's wholesale allegations do not permit the determination that any of these other valid reasons for a claim do not apply.

Barrett also must allege that the claimant was aware that the claim was false when submitted. An applicant who believes that he or she is disabled under the SSDI definition, but who ultimately is denied by the SSA as ineligible, has not submitted a false claim. "At a minimum, the FCA requires proof of an objective falsehood." *United States ex rel. Roby v. Boeing Co.*, 100 F. Supp. 2d 619, 625 (S.D. Ohio 2000). A mistaken belief that one fits the definition of SSDI is not an objective falsehood. Otherwise, the SSA could bring a False Claims Act suit against any person who was denied benefits.

In fact, Barrett concedes that the claims at issue comply with certain objective criteria for eligibility, and that LINA undertakes to assure that is the case. According to the Complaint, LINA's referral guidelines required LINA case managers to:

> determine whether the claimant's age and income preclude a claim for SSDI benefits, or whether there was some other contract exclusion that may be a basis for CIGNA denying coverage for the claim .... If not, the Guidelines required that the [case manager] determine whether the claimant is pregnant or the claimant had a firm 'return to work' date within nine months of the time the disability was incurred. If the claimant was neither pregnant nor had a firm 'return to work' date within the nine months, the claim qualified for SS referral.

Comp., ¶ 69; *see also* ¶ 73 (admitting that LINA did not give SSDI filing assistance to claimants who were pregnant or who had a firm return to work date within nine months).[6]

Barrett may not claim that an SSDI application was false when submitted merely because the claimant did not then meet the SSDI definition of disability. SSA regulations specifically permit an SSDI applicant to apply for benefits before he or she meets all of the eligibility criteria for SSDI benefits. *See* 20 CFR § 416.330 (entitled "Filing before the first month you meet the

---

[6] Barrett alleges that CIGNA instructed its Case Managers to contact all non-pregnant claimants and tell them that CIGNA's policy required the claimant to apply for SSDI. *See* Comp., ¶ 69. Even if this allegation were true, it would be of no consequence, as Barrett also alleges that the first thing that an SSA claims representative does with an SSDI application is to "immediately make[] the determination whether the claimant satisfies the non-medical eligibility for SSDI ... If not the claim is denied." Comp., ¶ 26.

requirements for eligibility"). The SSA specifically contemplates that some applicants will file

for benefits before they know whether they will ultimately be eligible, and actually encourages

those applications. *See* Social Security Administration, "Answers to Your Questions," *available*

*at* http://ssa-custhelp.ssa.gov/cgi-bin/ssa.cfg/php/enduser/std_adp.php?p_faqid=455&p_created=

974211653&p_sid (last modified Oct. 21, 2004) ("[Y]ou do not have to wait a year after you

become disabled to file for disability benefits. In fact, you should apply as soon as you [ ]

believe you are unable to work.").

     **c.**     **Barrett's Allegations Do Not Establish LINA's Knowledge of Falsity.**

Barrett alleges that LINA "recklessly requires" policyholders' employees to apply for

SSDI. Comp., ¶ 4. She does not allege, however, that LINA causes them to make false

statements in any submission related to SSDI, that they make such false statements, or that LINA

knows that they do so. Her claim should be dismissed as a result.

Barrett relies on the inference that, where LINA determines that a policyholder's

employee is ineligible for policy LTD benefits, the prosecution of the SSDI claim thereafter must

be false. Comp., ¶ 101. LINA's determination of an applicant's disability status under its own

policies does not establish that the applicant's SSDI application was a false claim.

First, there is no allegation that the standards for determining eligibility are the same for

policy LTD benefits and SSDI benefits. In fact, they are quite different. For instance, under the

LINA Disability Policy referenced in Paragraph 102 of Barrett's Complaint (attached hereto as

Exhibit C, p. 15), benefits will not be paid for disability due to mental illness after the first 24

months of disability. Under SSA regulations, mental disability is covered for the entire period of

disability. 20 C.F.R. § 416.929 ("We will develop evidence regarding the possibility of a

medically determinable mental impairment when we have information to suggest that such an

impairment exists...."). Similarly, under this LINA Disability Policy, benefits will be paid for

disability due to drug or alcohol abuse for 24 months. *See* Ex. C, p. 15. SSA will not pay

benefits for disabilities due solely to drug or alcohol abuse. 20 C.F.R. § 416.925(e) ("If you have

a condition diagnosed as addiction to alcohol or drugs, this will not, by itself, be a basis for

determining whether you are, or are not, disabled."). As a final example, the LINA Disability

Policy does not include age as a factor in determining whether a policyholder's employee is

unable to perform "the material duties of any occupation ...." Ex. C, p. 9 ("for which he or she

may reasonably become qualified based on education, training, or experience"). SSA does

consider age as a factor in determining what occupations an applicant may be able to perform.

20 C.F.R. § 416.963 ("When we decide whether you are disabled under §416.920(g)(1), we will

consider your chronological age in combination with your residual functional capacity,

education, and work experience.").

Second, and more importantly, there is no requirement that LINA and SSA apply the

same eligibility criteria or procedures for making disability determinations. In fact, private long

term disability insurance plans and SSDI are very different schemes.

The Supreme Court has recognized the "large leeway" employers have in the design of

employee benefit plans, such as the disability plans LINA administers for employers. *Black &*

*Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003). In *Nord*, the claimant sought to

overturn a private disability plan's decision to deny him benefits. *Id.* at 828-29. He argued that,

under ERISA, the private plan should have applied the "treating physician rule" which is

followed in SSDI determinations. *Id.* That rule requires the SSA to accord deference to a

claimant's treating physician when analyzing the claimant's eligibility for disability benefits.

The Supreme Court held that ERISA-governed disability plans need not follow the

disability determination procedures used by the SSA. "In determining entitlement to Social

Security benefits, the adjudicator measures the claimant's condition against a uniform set of federal criteria. The validity of a claim to benefits under an ERISA plan, on the other hand, is likely to turn, in large part, on the interpretation of terms in the plan at issue." *Id.* at 833. In fact, the Court deferred to the view of the Secretary of Labor that disability determinations are "best served by 'preserv[ing] the greatest flexibility possible for ... operating claims processing systems consistent with the prudent administration of a plan." *Id.* at 833-34. Thus, it is entirely appropriate that the SSA and LINA may come to different conclusions regarding the disability of a claimant, and therefore the determination of LINA says nothing about the eligibility of a claimant to SSDI.

Third, SSA regulations specifically state that LINA's determination of a claimant's disability is irrelevant to SSA's determination:

> A decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind. We must make a disability or blindness determination based on social security law. Therefore, a determination made by another agency that you are disabled or blind is not binding on us.

20 C.F.R. § 416.904 (entitled "Determinations by other organizations and agencies"). Through this regulation, SSA has informed disability insurers such as LINA that the insurer's determination of eligibility or ineligibility for disability benefits has no bearing on the SSDI determination. When SSA has declared that LINA's determination has no bearing on its own determination, LINA cannot be held to have knowledge that a policyholder's employee's claim is false merely because LINA has made an adverse disability determination.

LINA's determination that an employee is not eligible for policy LTD benefits does not instruct any particular determination by the SSA. Therefore, LINA's knowledge that

policyholders' employees who have been denied coverage proceed with their claims thereafter does not suggest that LINA has knowingly caused the prosecution of false claims.

### d.     Barrett Has Not Alleged Causation.

Barrett attempts to gloss over the difference between requiring employees to submit SSDI claims and causing them to make false statements in support of those claims. Only the latter would establish FCA liability, yet Barrett alleges only the former. There is no allegation that a LINA insured has been coerced into making false representations when applying for SSDI benefits. Without such an allegation – made with a good faith basis to believe that it is true – Barrett has failed to plead that LINA caused the submission of a false claim.

Barrett states that "CIGNA uses economic duress to cause claimants to file for Social Security." Comp., ¶ 85. She dramatically alleges that because "CIGNA instructs these financially stressed individuals that unless they file for Social Security, their disability checks will be reduced by the estimated Social Security benefit … most insureds [have] no real option other than to file false claims with the Government …. Most monthly disability insurance checks, if reduced by the estimated Social Security disability benefit for the insured and his or her spouse and children, would reduce the monthly benefit down to a level upon which the insured could not survive." *Id.*

This allegation is doubly defective. First, the filing of false claims does not logically follow from the requirement that claimants file for Social Security. In *Franklin*, the court held that language of Section 3729(a)(1) requires a causal connection between a defendant's actions and the alleged false claims, and applied a common-law causation standard. 2003 WL 22048255, at *4. This standard requires Barrett to show that: 1) LINA's conduct was a "substantial factor" in producing the harm and 2) the outcome was foreseeable. Here, if a policyholder's employee does misrepresent his or her disability status, or some fact offered in

support of that assertion, that decision by that employee constitutes an unforeseeable intervening force that breaks the causal connection. *See United States ex rel. Cantekin v. Univ. of Pittsburgh*, 192 F.3d 402, 416 (3d Cir. 1999) *quoted in United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 52 (D. Mass. 2001).

This defect in Barrett's case is similar to the fatal defect found in *United States ex rel. Kinney v. Hennepin Cty. Med. Ctr.*, 2001 WL 964011 (D. Minn. 2001). In *Kinney*, the relator alleged that the defendant doctor group, HFA, caused the submission of false claims by the hospital, HCMC, for reimbursement of ambulance services by certifying that such services were medically necessary. The court, however, found that the doctor group had not caused the submission of the false claims because "there [was] no evidence that HFA *instructed* HCMC to use" false Medicare codes for the ambulance runs, and no evidence that the doctors' certification of medical necessity triggered the decision of HCMC to falsely represent the eligibility of the ambulance runs for reimbursement. *Id.* at * 10.

In *Kinney*, HCMC's treatment of the claims for reimbursement was an intervening factor in the claims process which precluded a finding against HFA. 2001 WL 964011, at * 10. Here, Barrett has not alleged that policyholders' employees are instructed to misrepresent their disability status. Nor has she alleged any good faith reason to believe that a policy of requiring policyholders' employee's to file SSDI applications caused the policyholders' employees to falsely represent their disability status in those applications. Instead, the decision of a policyholder's employee to misrepresent his or her disability status (if in fact this has happened) would be an intervening factor, and LINA cannot be held liable for such conduct.

As Barrett well knows, Form 3368 "requires the applicant to provide information about medical treatment and records and asks the applicant to describe how his or her illness or injuries

limit his/her ability to work." Comp., ¶ 19. The "SSDI Disability Report Form concludes with

... a prominently displayed warning that states in bold-faced capital type" the prohibition against

making a false statement. Comp., ¶ 20. It is not foreseeable that claimants will misrepresent

facts on Form 3368 merely because the policies administered by LINA require the application –

by definition, the requirement applies only when the policyholder's employee has made the same

claim to LINA. It is reasonable for LINA to foresee only that the employee will make the same

claim to SSA that he or she makes to LINA.

Second, LINA provides insurance and claims administration for disability benefits

offered by employers to employees. The negative economic consequence of failure to comply

with a provision of these insurance plans does not constitute duress and thereby transfer liability

for a false SSDI claim, if one is submitted, from a policyholder's employee to LINA. *See*

*Melanson v. Browning Ferris Indus.*, 281 F.3d 272, 277 (1st Cir. 2002) ("Nor may ... duress,

without more, be inferred from merely the emotional and financial stress associated with loss of

a job."). Barrett, however, alleges that the economic constraints caused by a *potential partial*

reduction in disability benefits imposes a condition of duress that forces a policyholder's

employee to falsely represent his or her disability status to the SSA. None of her allegations

establish a level of duress that would transfer liability for such an act from the fraudulent

employee to LINA. *See United States v. Sachdev*, 279 F.3d 25, 28 (1st Cir. 2002) ("The duress

defense to criminal liability is strict and is unavailable unless there is no reasonable legal

alternative to violating the law that would also avoid the threatened harm.").

Moreover, the policies do not contemplate a reduction in benefits if a policyholder's

employee's SSDI claim ultimately is denied, but only if the SSDI claim is not filed when

appropriate. Comp., ¶ 67. Barrett does not, and cannot, allege to the contrary. The employee is

not forced to make false statements to SSDI on the threat that a failed SSDI claim will result in

denial of policy benefits, and, therefore, there is no duress present here.

Thus, Barrett's allegations fall well short of establishing causation. There is no causal

link which may be recognized at law between a policy requirement and alleged falsehoods in

SSDI applications in this context, nor is there conduct constituting duress. Barrett's claim should

be dismissed for failing to allege sufficiently that LINA caused the submission of false claims.

### e.    Barrett Cannot Show Materiality as a Matter of Law.

To prove a False Claims Act violation, Barrett must show that the false statement or

claim was material to the government's funding decision. *See United States ex rel. Franklin v.*

*Parke-Davis*, 147 F. Supp. 2d 39, 50 (D. Mass. 2001) (listing materiality as element of an FCA

claim). A false statement that is not material does not give rise to FCA liability. *See United*

*States v. Data Translation, Inc.*, 984 F.2d 1256, 1257 (1st Cir. 1992) (false statement that was

not material did not give rise to liability under the FCA); *Harrison v. Westinghouse Savannah*

*River Co.*, 176 F.3d 776, 785 (4th Cir. 1999) ("[L]iability under each of the provisions of the

False Claims Act is subject to the further, judicially-imposed requirement that the false statement

or claim be material.") (cited in *Franklin*); *Pres. & Fellows of Harvard Coll.*, 323 F. Supp. 2d at

181-82 ("In addition to the FCA's explicit requirements, courts have inferred a requirement that

the false statement or claim be material."); *United States ex rel. Stebner v. Stewart & Stevenson*

*Servs., Inc.*, 305 F. Supp. 2d 694, 698 (S.D. Tex. 2004) ("FCA liability does not exist if the

alleged fraudulent act had no bearing on the Government's payment decision."); *United States*

*ex. rel. Wilkins v. North Am. Constr. Corp.*, 173 F. Supp. 2d 601, 635-38 (S. D. Tex. 2001)

(applying a materiality requirement to claims under Sections 3279(a)(1), (2) and (3)).

A relator can show materiality in one of three ways: "(1) that the alleged false statement

or claim was essential to the government's funding decision; (2) that the government specifically

relied on the falsity; or (3) that the falsity caused the government to pay out sums it otherwise would not have paid. Without proving these additional factors, no FCA liability is found." Boese, John T., CIVIL FALSE CLAIMS AND QUI TAM ACTIONS, 2-140.24 (2d ed., 1999 & Supp. 2005).

Barrett fails to establish materiality on either of her theories of liability. First, she cannot show that a policyholder's employee's hypothetical misrepresentation of his or her disability status on the Form 3368 meets any of the three definitions of materiality above. As she sets forth in detail, almost one-half of all SSDI claimants each year are turned down for SSDI benefits. *See* Comp., ¶ 51. Presumably, each of these claimants filed a Form 3368 stating they were disabled. Barrett cannot argue that SSA relies on the claimant's statement of disability or that the claimant's statement caused the government to pay out sums it otherwise would not have paid. The SSDI application merely begins a quite extensive investigation by SSA into the true nature of the claimant's disability status followed by several phases of an adjudicatory process in which the ultimate determination of eligibility is made. *See* Comp., ¶¶ 27-33, 35-43. The SSA only pays benefits to claimants after it has satisfied itself that the person meets the SSA's eligibility standards through medical sources and investigation.

Barrett's second theory is that there are false claims because LINA fails to inform SSA about its own determination of ineligibility. "CIGNA does not advise the Federal Government of the fact that CIGNA does not consider the insured to be disabled despite the fact that CIGNA has arranged for and is paying a vendor to represent insured before SSA ...." Comp., ¶ 101. The inference is that this somehow would be material to the SSA's determination.

As discussed above, *see* Argument *supra*, at section 5.c, SSA regulations specifically state that LINA's determination of a claimant's disability is *not* material to SSA's determination.

-31-

*See* 20 C.F.R. § 416.904. As a result of this regulation, LINA's disability determination has no bearing on the SSA's disability determination. Thus, LINA's "failure" to report its adverse determination to the SSA is immaterial and cannot give rise to FCA liability.

        **f.**      **Barrett Has Failed to Plead the Double Falsity Required for a Section 3729(a)(2) Claim.**

Barrett has also failed to plead a Section 3729(a)(2) claim on which relief may be granted. To show a violation under Section 3729(a)(2), a relator must show two falsehoods: 1) that a record supporting a claim is false, and 2) that the record was made or used for the purpose of causing the false claim to be paid. *See United States ex. rel. Franklin v. Parke-Davis*, 2003 WL 22048255, at *1 (D. Mass. Aug. 22, 2003) (acknowledging that Section 3729(a)(2) contains a "double falsehood requirement"); *United States ex. rel. Bustamante v. United Way/Crusade of Mercy, Inc.*, 2000 WL 690250, at *4 (N.D. Ill. May 25, 2000) (violation under (a)(2) requires proof that both the record and the claim were false and that the defendant *knew* that both the record and the claim were false).

Barrett has not alleged either of the falsehoods necessary to establish an (a)(2) claim. She has not alleged that LINA knowingly caused a policyholder's employee to create a particular false record. Nor has she alleged that LINA caused a policyholder's employee to use a specific record for the purpose of causing a false claim to be paid. In order to plead an (a)(2) violation, Barrett would have had to show that a false record was used to get SSDI benefits paid, not just that the record was submitted to the SSA. *See Dookeran*, 281 F.3d at 109 (allegedly false application for federal funds which was rejected by the federal government did not create (a)(2) liability). She does not attempt to make such an allegation.

**5.    Barrett Should Be Estopped From Arguing that LINA's Policy Causes the Submission of False Claims Because the SSA Has a Similar Policy.**

Barrett should be estopped from arguing that LINA's policy requirement causes false claims to be submitted to the SSA because the SSA itself follows a similar policy.  As a relator, Barrett stands in the shoes of the SSA.  "It is hornbook law that an administrative agency is bound by its own regulations and cannot maintain a position contrary to those regulations." *Mercy Hosp. v. Sullivan*, 1991 WL 104090 (D. Me. Apr. 25, 1991) (holding that Department of Health & Human Servs. could not argue that GAAP should not apply, in contravention of its own regulations); *see also Charlotte Memorial Hosp. v. Bowen*, 665 F. Supp. 455 (W.D.N.C. 1987) (same).

Here, the SSA has promulgated regulations which require SSDI applicants to apply for benefits from all other possible sources.  20 C.F.R. § 416.210(a)-(b) states: "You are not eligible for SSI benefits if you do not apply for all other benefits for which you may be eligible" including "veterans' compensation and pensions, workers' compensation payments, Social Security insurance benefits and unemployment insurance benefits."  SSA advises claimants that their failure to apply for these benefits within thirty days will results in loss of eligibility for SSDI.  20 C.F.R. § 416.210(e).  These requirements are based on 42 U.S.C. § 1382(e)(2), which states that:

> No person shall be an eligible individual ... for purposes of this title if, after notice to such person by the Secretary that it is likely that such a person is eligible for any payment of the type enumerated in [42 U.S.C. § 1382a(a)(2)(B), as listed above], such person fails within 30 days to take all appropriate steps to *apply for and (if eligible) obtain* any such payments. [emphasis added][7]

Thus, the SSA has promulgated its regulation in response to a clear statutory mandate.

---

[7] Note that, in this statutory section, Congress itself has created a system requiring claimants to apply for benefits first and then receive them only if eligible.  If Congress had intended to require a determination of the eligibility for those benefits prior to applying for them – as Barrett argues should be the case – it would not have worded this statute as it did.

The SSA would, therefore, be estopped from arguing that LINA's policies are unlawful, because courts preclude administrative agencies from taking positions directly contrary to their own regulations. Because Barrett stands in the shoes of the SSA in this *qui tam* case, she should be estopped from making this argument against LINA. Otherwise, Barrett would be permitted to argue that SSA may require applicants to apply for other benefits without causing the submission of false and fraudulent claims, while LINA may not.

Moreover, Barrett may not argue that LINA's policy is unlawful. The SSA would be judicially estopped from taking such a position in light of its previous application of § 416.210 in its own administrative proceedings. Courts preclude parties from taking inconsistent positions in subsequent proceedings. "Equitable doctrines of estoppel apply in administrative and judicial fora" and "preclude[] a party from asserting a position in a legal proceeding which is contrary to a position it has already asserted in another." *Portela-Gonzalez v. Sec'y of the Navy*, 109 F.3d 74, 78 (1st Cir. 1997).

SSA has enforced § 416.210 against SSDI applicants who failed to apply for other benefits. It has successfully defended that statute and regulation in federal court. *See Hudsinus v. Heckler, Sect'y of Health & Human Servs.*, 587 F. Supp. 814, 822 (Department of Health & Human Services successfully defended the constitutionality of the statutory and regulatory requirements to apply for other benefits). Thus, the SSA would be judicially estopped from arguing that LINA could not follow a similar policy. *See Alternative Sys. Concepts, Inc. v. Synopsis, Inc.*, 374 F.3d 23, 33 (1st Cir. 2004) ("estoppel applies when a party has adopted one position, secured a favorable decision, and then taken a contradictory position in search of legal advantage") (internal quotation omitted). As Barrett stands in the shoes of the SSA, she too

-34-

should be estopped from arguing that LINA's policy is unlawful where SSA enforces a similar policy.

6. **Barrett May Not Maintain Suit Against CIGNA Corp. Based on Allegations About LINA.**

Barrett defines CIGNA Corp. and LINA collectively as "CIGNA" and makes all of her allegations against "CIGNA." The only allegation against CIGNA Corp. itself is that CIGNA Corp. owns LINA. Comp., ¶ 6. This link between CIGNA Corp. and LINA is not sufficient to maintain a False Claims Act case against CIGNA, and Barrett's Complaint against CIGNA Corp. should be dismissed for that reason alone.

"Ownership--even total ownership--of a corporation does not by itself impart the corporation's liabilities to the owner, and that rule is not abated simply because the owner happens to be another corporation." *United States ex rel. Kneepkins v. Gambro Health Care, Inc.*, 115 F. Supp. 2d 35, 39 (D. Mass 2000) (rejecting veil piercing argument in FCA case). The First Circuit has held that the corporate veil "may be pierced only if the parent and subsidiary lacked independence, the principals conducted their affairs with a requisite degree of "fraudulent intent," and failure to pierce the veil would work substantial injustice." *Id.; see also United Elec., Radio and Machine Workers v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1093 (1st Cir. 1992); *Schaefer v. Cybergraphic Sys., Inc.*, 886 F. Supp. 921, 925 (D. Mass. 1994).

Barrett must allege the facts upon which she relies to prove CIGNA Corp.'s liability. Because FCA allegations sound in fraud they must provide, if pled on information and belief, "the source of the information and the reasons for the belief." *Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 878 (1st Cir. 1991). Barrett seems to have ignored these requirements entirely.

7.    **Barrett Should Not Be Allowed to Amend Her Complaint Again.**

Barrett already has amended her Complaint once.  She did not do so until several months after the government declined to intervene, and the Court ordered that the original complaint be unsealed and served.  The First Amended Complaint was not served until  December 27, 2004, just before the deadline set by Fed. R. Civ. P. 4(m).

Barrett's only attempt to specify examples of false claims appears in the First Amended Complaint.  These deficient examples describe SSDI claims made in the Spring of 2004, well after the her original Complaint was filed in November 2003.  They were not added until after the government declined to intervene.

Fed. R. Civ. P. 9(b) was enacted "to prevent the filing of suits that simply hope to uncover relevant information during discovery." *Karvelas*, 360 F.3d at 226 (internal citation omitted).  "[A]llowing a relator to plead generally at the outset and amend the complaint at the 12(b)(6) stage after discovery would be at odds with the FCA's procedures for filing a *qui tam* action and its protections for the government....[A] *qui tam* relator may not present general allegations in lieu of the details of actual false claims in the hope that such details will emerge through subsequent discovery." *Karvelas*, 360 F.3d at 231.

Barrett already has taken the opportunity to amend her claim after one and a half years of undisclosed investigation by the government into her allegations.  She has been granted ample opportunity to have met her Rule 9(b) and 12(b)(6) obligations.  *See United States ex. rel. Adrian v. Regents of the Univ. of Cal.*, 363 F.3d 398, 403-04 (5th Cir. 2004) (one opportunity to amend a complaint was sufficient); *United States ex rel. Riley v. Alpha Therapeutic Corp.*, No. C-96-0704 DLJ, 1997 WL 818593, at *4 (N.D. Cal. Nov. 10, 1997) (dismissing complaint after one opportunity to amend in which plaintiff "failed to plead . . . with the particularity required under

Rule 9(b)."). Her failure to plead adequately the second time around warrants dismissal of her Complaint with prejudice. *See Shamsi*, 743 F. Supp. at 90.

**CONCLUSION**

Barrett's Complaint fails to plead a False Claims case with sufficient particularity and does not contain allegations sufficient to establish the elements of such a claim. For these reasons, Barrett's First Amended Complaint should be dismissed with prejudice.

Respectfully submitted,

R. J. Cinquegrana, P.C. (BBO # 084100)
Marc J. Jones (BBO # 645910)
Karen Collari Troake (BBO # 566922)
CHOATE, HALL & STEWART
Exchange Place, 53 State Street
Boston, Massachusetts 02109
(617) 248-5000

Dated: _____, 2005

*Attorneys for Defendants CIGNA Corporation and Life Insurance Company of North America.*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document was served upon the attorney of record for the Plaintiff and upon the United States Attorney, by first-class mail, on May 20, 2005.

Marc J. Jones

3897041v6

# Exhibit A

Exhibit 21

**SUBSIDIARIES OF THE REGISTRANT**

Listed below are subsidiaries of CIGNA Corporation as of December 31, 2004 with their jurisdictions of organization shown in parentheses. Those subsidiaries not listed would not, in the aggregate, constitute a "significant subsidiary" of CIGNA Corporation, as that term is defined in Rule 1-02(w) of Regulation S-X.

CIGNA Holdings, Inc. (Delaware)

I.    Connecticut General Corporation (Connecticut)

    A.    CIGNA Dental Health, Inc. (Florida)

        (1)    CIGNA Dental Health of California, Inc. (California)

        (2)    CIGNA Dental Health of Colorado, Inc. (Colorado)

        (3)    CIGNA Dental Health of Delaware, Inc. (Delaware)

        (4)    CIGNA Dental Health of Florida, Inc. (Florida)

        (5)    CIGNA Dental Health of Kansas, Inc. (Kansas)

        (6)    CIGNA Dental Health of Kentucky, Inc. (Kentucky)

        (7)    CIGNA Dental Health of Maryland, Inc. (Delaware)

        (8)    CIGNA Dental Health of Missouri, inc. (Missouri)

        (9)    CIGNA Dental Health of New Jersey, Inc. (New Jersey)

        (10)    CIGNA Dental Health of New Mexico, Inc. (New Mexico)

        (11)    CIGNA Dental Health of North Carolina, Inc. (North Carolina)

        (12)    CIGNA Dental Health of Ohio, Inc. (Ohio)

        (13)    CIGNA Dental Health of Pennsylvania, Inc. (Pennsylvania)

        (14)    CIGNA Dental Health of Texas, Inc. (Texas)

        (15)    CIGNA Dental Health of Virginia, Inc. (Virginia)

        (16)    CIGNA Dental Health Plan of Arizona, Inc. (Arizona)

    B.    CIGNA Health Corporation (Delaware)

        (1)    Healthsource, Inc. (New Hampshire)

            (a)    CIGNA Healthcare of North Carolina, Inc. (North Carolina)

            (b)    CIGNA Healthcare of South Carolina, Inc. (South Carolina)

            (c)    Healthsource Indiana, Inc. (New Hampshire)

                (i)    CIGNA Healthcare of Indiana, Inc. (Indiana)

            (d)    CIGNA Insurance Group, Inc. (New Hampshire)

            (e)    CIGNA Insurance Services Company (South Carolina) (72% with balance owned by affiliate)

            (f)    CIGNA Healthcare of Maine, Inc. (Maine)

            (g)    Healthsource Management, Inc. (New Hampshire)

                (i)    CIGNA Healthcare of New York, Inc. (New York)

                (ii)    CIGNA Healthcare of Tennessee, Inc. (Tennessee)

            (h)    CIGNA Healthcare of Massachusetts, Inc. (Massachusetts)

            (i)    CIGNA Healthcare of New Hampshire, Inc. (New Hampshire)

(j)    Healthsource South, Inc.

      (i)    CIGNA Healthcare of Texas, Inc. (Texas)

      (ii)    CIGNA Healthcare of Georgia, Inc. (Georgia)

(k)    CIGNA Healthcare Mid-Atlantic, Inc. (Maryland)

(l)    CIGNA Healthcare of Arizona, Inc. (Arizona)

(m)    CIGNA Healthcare of California, Inc. (California)

(n)    CIGNA Healthcare of Colorado, Inc. (Colorado)

(o)    CIGNA HealthCare of Connecticut, Inc. (Connecticut)

(p)    CIGNA HealthCare of Delaware, Inc. (Delaware)

(q)    CIGNA HealthCare of Florida, Inc. (Florida)

(r)    CIGNA HealthCare of Illinois, Inc. (Delaware) (99.60% with balance owned by non-affiliate)

(s)    CIGNA HealthCare of New Jersey, Inc. (New Jersey)

(t)    CIGNA HealthCare of Ohio, Inc. (Ohio)

(u)    CIGNA HealthCare of Pennsylvania, Inc. (Pennsylvania)

(v)    CIGNA HealthCare of St. Louis, Inc. (Missouri)

      (w)     CIGNA HealthCare of Utah, Inc. (Utah)

      (x)     CIGNA HealthCare of Virginia, Inc. (Virginia)

      (y)     CIGNA Insurance Services Company

      (z)     Temple Insurance Company Limited (Bermuda)

C.     CIGNA Behavioral Health, Inc. (Minnesota)

D.     CIGNA Life Insurance Company of Canada (Canada)

E.     CIGNA Life Insurance Company of New York (New York)

F.     Connecticut General Life Insurance Company (Connecticut)

G     International Rehabilitation Associates, Inc. d/b/a Intracorp (Delaware)

H.     Life Insurance Company of North America (Pennsylvania)

      (1)     CIGNA & CMC Life Insurance Company Limited (China) (50% with balance owned by a non-affiliate)

      (2)     LINA Life Insurance Company of Korea (Korea)

      (3)     Linatex, Inc. (Delaware)

II.     CIGNA Global Holdings, Inc. (Delaware)

A.     CIGNA Brazil Holdings, Inc. (Delaware)

      (1)     CIGNA Brasil Participacoes Ltda. (Brazil) (99.99% with balance owned by affiliate)

B.     CIGNA Servicos Ltda. (Brazil) (56.02% with balance owned by affiliate)

C.     CIGNA International Marketing (Thailand) Limited (Thailand) (99.98% with balance owned by affiliates)

D.     CIGNA Global Reinsurance Company, Ltd. (Bermuda)

      (1)     CIGNA Holdings Overseas, Inc. (Delaware)

         (a)     CIGNA Europe Insurance Company S.A.-N.V. (Belgium) (99.99% with balance owned by affiliate)

         (b)     CIGNA European Services (UK) Limited (United Kingdom)

         (c)     CIGNA International Marketing Australia Limited (Australia)

         (d)     CIGNA Life Insurance Company of Europe S.A.- N.V. (Belgium) (99.99% with balance owned by affiliate)

         (e)     CIGNA Life Insurance Company of New Zealand Limited (New Zealand)

         (f)     Empresa Guatemalteca CIGNA de Seguros, Sociedad Anonima (Guatemala) (97.38% with balance owned by non-affiliates)

         (g)     CIGNA Seguradora S.A. (Brazil) (85.59% with balance owned by affiliate)

         (h)     Inversiones CIGNA Limitada (Chile) (99% with balance owned by affiliate)

           (i)     CIGNA Asistencia Administrativa Limitada (Chile) (99.9% with balance owned by affiliate)

           (ii)     CIGNA Compania de Seguros de Vida (Chile) S.A. (Chile) (98.6% with balance owned by non-affiliates)

      (2)     CIGNA Worldwide Insurance Company (Delaware)

         (a)     CIGNA Global Insurance Company Limited (Guernsey, C.I.) (99% with balance owned by affiliate)

         (b)     PT. Asuransi CIGNA (Indonesia) (80% with balance owned by non-affiliate)

E.     CIGNA International Corporation (Delaware)

F.     CIGNA International Services, Inc. (Delaware)

G.     CIGNA Stu S.A. (Poland) (7.03% with balanced owned by non-affiliates)

III.     CIGNA Investment Group, Inc. (Delaware)

A.     CIGNA International Finance Inc. (Delaware)

      (1)     CIGNA International Investment Advisors, Ltd. (Delaware)

       (a)    CIGNA Fund Managers Limited (Bermuda)

       (b)    CIGNA International Investment Advisors Limitada (Chile) (99.5% with balance owned by affiliate)

       (c)    CIGNA International Investment Advisors K.K. (Japan)

B.    CIGNA Investments, Inc. (Delaware)

C.    CIGNA Investment Advisors, Inc. (Delaware)

IV.    CIGNA Intellectual Property, Inc. (Delaware)

# Exhibit B

# DISABILITY REPORT - ADULT - Form SSA-3368-BK

PLEASE READ ALL OF THIS INFORMATION BEFORE YOU BEGIN
COMPLETING THIS FORM

## THIS IS NOT AN APPLICATION

### IF YOU NEED HELP

If you need help with this form, do as much of it as you can, and your interviewer will help
you finish it. However, if you have access to the Internet, you may access the Disability
Report Form Guide at http://www.socialsecurity.gov/disability/3368/index.htm.

### HOW TO COMPLETE THIS FORM

The information that you give us on this form will be used by the office that makes the
disability decision on your disability claim. You can help them by completing as much of the
form as you can.

- Please fill out as much of this form as you can before your interview appointment.
- Print or type.
- **DO NOT LEAVE ANSWERS BLANK.** If you do not know the answers, or the answer is
  "none" or "does not apply," please write: "don't know," or "none," or "does not apply."
- **IN SECTION 4, PUT INFORMATION ON ONLY ONE DOCTOR/HOSPITAL/CLINIC
  IN EACH SPACE.**
- Each address should include a ZIP code. Each telephone number should include an area code.
- **DO NOT ASK A DOCTOR OR HOSPITAL TO COMPLETE THE FORM.** However,
  you can get help from other people, like a friend or family member.
- If your appointment is for an interview by telephone, have the form ready to discuss with us
  when we call you.
- If your appointment is for an interview in our office, bring the completed form with you or
  mail it ahead of time, if you were told to do so.
- When a question refers to "you," "your" or the "Disabled Person," it refers to the person who
  is applying for disability benefits. If you are filling out the form for someone else, please
  provide information about him or her.
- Be sure to explain an answer if the question asks for an explanation, or if you want to give
  additional information.
- If you need more space to answer any questions or want to tell us more about an answer,
  please use the "REMARKS" section on Pages 9 and 10, and show the number of the question
  being answered.

### ABOUT YOUR MEDICAL RECORDS

If you have any medical records and copies of prescriptions at home for the person who is applying
for disability benefits, send them to our office with your completed forms or bring them with you
to your interview. Also, bring any prescription bottles with you. If you need the records back,
tell us and we will photocopy them and return them to you.

**YOU DO NOT NEED TO ASK DOCTORS OR HOSPITALS FOR ANY MEDICAL
RECORDS THAT YOU DO NOT ALREADY HAVE.** With your permission, we will do that
for you. The information we ask for on this form tells us to whom we should send a request for
medical and other records. If you cannot remember the names and addresses of any of the doctors
or hospitals, or the dates of treatment, perhaps you can get this information from the telephone
book, or from medical bills, prescriptions and prescription bottles.

## WHAT WE MEAN BY "DISABILITY"

"Disability" under Social Security is based on your inability to work. For purposes of this claim, we want you to understand that "disability" means that you are unable to work as defined by the Social Security Act. You will be considered disabled if you are unable to do any kind of work for which you are suited and if your disability is expected to last (or has lasted) for at least a year or to result in death. So when we ask, "when did you become unable to work," we are asking when you became disabled as defined by the Social Security Act.

### The Privacy And Paperwork Reduction Acts

The Social Security Administration is authorized to collect the information on this form under sections 205(a), 223(d) and 1631(e)(1) of the Social Security Act. The information on this form is needed by Social Security to make a decision on the named claimant's claim. While giving us the information on this form is voluntary, failure to provide all or part of the requested information could prevent an accurate or timely decision on the named claimant's claim. Although the information you furnish is almost never used for any purpose other than making a determination about the claimant's disability, such information may be disclosed by the Social Security Administration as follows: (1) to enable a third party or agency to assist Social Security in establishing rights to Social Security benefits and/or coverage; (2) to comply with Federal Laws requiring the release of information from Social Security records (e.g., to the General Accounting Office and the Department of Veterans Affairs); and (3) to facilitate statistical research and such activities necessary to assure the integrity and improvement of the Social Security programs (e.g., to the Bureau of the Census and private concerns under contract to Social Security).

We may also use the information you give us when we match records by computer. Matching programs compare our records with those of other Federal, State, or local government agencies. Many agencies may use matching programs to find or prove that a person qualifies for benefits paid by the Federal government. The law allows us to do this even if you do not agree to it.

Explanations about these and other reasons why information you provide us may be used or given out are available in Social Security offices. If you want to learn more about this, contact any Social Security office.

**PAPERWORK REDUCTION ACT:** This information collection meets the requirements of 44 U.S.C. § 3507, as amended by Section 2 of the Paperwork Reduction Act of 1995. You do not need to answer these questions unless we display a valid Office of Management and Budget control number. We estimate that it will take about 60 minutes to read the instructions, gather the facts, and answer the questions. **SEND OR BRING THE COMPLETED FORM TO YOUR LOCAL SOCIAL SECURITY OFFICE. The office is listed under U. S. Government agencies in your telephone directory or you may call Social Security at 1-800-772-1213.** *You may send comments on our time estimate above to: SSA, 1338 Annex Building, Baltimore, MD 21235-0001. Send only comments relating to our time estimate to this address, not the completed form.*

**PLEASE REMOVE THIS SHEET BEFORE RETURNING THE COMPLETED FORM.**

SOCIAL SECURITY ADMINISTRATION

Form Approved
OMB No. 0960-0579

# DISABILITY REPORT
# ADULT

**For SSA Use Only**
Do not write in this box.

Related SSN _____

Number Holder _____

## SECTION 1- INFORMATION ABOUT THE DISABLED PERSON

**A. NAME** *(First, Middle Initial, Last)*

**B. SOCIAL SECURITY NUMBER**

**C. DAYTIME TELEPHONE NUMBER** *(If you have no number where you can be reached, give us a daytime number where we can leave a message for you.)*

| Area Code | Number | ☐ Your Number | ☐ Message Number | ☐ None |

**D.** Give the name of a **friend or relative** that we can contact (other than your doctors) **who knows about your illnesses, injuries or conditions** and can help you with your claim.

NAME _____   RELATIONSHIP _____

ADDRESS _____
*(Number, Street, Apt. No.(If any), P.O. Box, or Rural Route)*

| City | State | ZIP | DAYTIME PHONE | Area Code | Number |

**E.** What is your **height** without shoes? _____ feet _____ inches

**F.** What is your **weight** without shoes? _____ pounds

**G.** Do you have a **medical assistance card**? (For Example, Medicaid or Medi-Cal) If "YES," show the **number** here: _____   ☐ YES   ☐ NO

**H.** Can you **speak and understand English?** ☐ YES ☐ NO   If "**NO**," what is your preferred language?_____

NOTE: **If you cannot speak and understand English, we will provide an interpreter, free of charge.**

If you cannot **speak and understand English**, is there someone we may contact who speaks and understands English and will give you messages? ☐ YES ☐ NO   *(If "YES," and that person is the same as in "D" above show "SAME" here. If not, complete the following information.)*

NAME _____   RELATIONSHIP _____

ADDRESS _____
*(Number, Street, Apt. No.(If any), P.O. Box, or Rural Route)*

| City | State | ZIP | DAYTIME PHONE | Area Code | Number |

**I.** Can you **read and understand English?** ☐ YES ☐ NO

**J.** Can you **write more than your name in English?** ☐ YES ☐ NO

Disability Report-Adult-Form SSA-3368-BK

---

**SECTION 2**
**YOUR ILLNESSES, INJURIES OR CONDITIONS AND HOW THEY AFFECT YOU**

A. What are the **illnesses, injuries or conditions** that limit your ability to work? _____

_____

_____

B. How do your illnesses, injuries or conditions limit your ability to work? _____

_____

_____

C. Do your illnesses, injuries or conditions cause you **pain**  ☐ YES  ☐ NO
   or **other symptoms**?

D. When did your illnesses, injuries or
   conditions **first bother you**?

| Month | Day | Year |
|-------|-----|------|
|       |     |      |

E. When did you become **unable to work** because
   of your illnesses, injuries or conditions?

| Month | Day | Year |
|-------|-----|------|
|       |     |      |

F. Have you **ever worked**?   ☐ YES  ☐ NO   *(If "NO," go
                                               to Section 4.)*

G. Did you **work at any time** after the date your
   illnesses, injuries or conditions first bothered you?   ☐ YES  ☐ NO

H. If "YES," did your illnesses, injuries or conditions cause you to: *(check all that apply)*

   ☐ **work fewer hours?** *(Explain below)*

   ☐ **change your job duties?** *(Explain below)*

   ☐ **make any job-related changes such as your attendance, help needed, or employers?**
      *(Explain below)*

_____

_____

_____

_____

I. Are you **working now**?   ☐ YES  ☐ NO

   If "NO," when did **you stop working**?

| Month | Day | Year |
|-------|-----|------|
|       |     |      |

J. Why did you **stop working**? _____

_____

_____

---

## SECTION 3 - INFORMATION ABOUT YOUR WORK

A. List all the jobs that you had in the 15 years before you became unable to work because of your illnesses, injuries or conditions.

| JOB TITLE (Example, Cook) | TYPE OF BUSINESS (Example, Restaurant) | DATES WORKED (month & year) | | HOURS PER DAY | DAYS PER WEEK | RATE OF PAY (Per hour, day, week, month or year) | |
|---|---|---|---|---|---|---|---|
| | | From | To | | | | |
| | | | | | | $ | |
| | | | | | | $ | |
| | | | | | | $ | |
| | | | | | | $ | |
| | | | | | | $ | |
| | | | | | | $ | |
| | | | | | | $ | |

B. Which job did you do the longest? _____

C. Describe this job. What did you do all day? (If you need more space, write in the "Remarks" section.) _____

_____

D. In **this job**, did you:

Use machines, tools or equipment?                              ☐ YES  ☐ NO

Use technical knowledge or skills?                              ☐ YES  ☐ NO

Do any writing, complete reports, or perform duties like this?  ☐ YES  ☐ NO

E. In **this job**, how many total hours each day did you:

Walk? _____    Stoop? *(Bend down & forward at waist.)* _____    Handle, grab or grasp big objects? _____

Stand? _____   Kneel? *(Bend legs to rest on knees.)* _____      Reach? _____

Sit? _____     Crouch? *(Bend legs & back down & forward.)* _____   Write, type or handle small objects? _____

Climb? _____   Crawl? *(Move on hands & knees.)* _____

F. Lifting and Carrying *(Explain what you lifted, how far you carried it, and how often you did this.)*

_____

_____

G. Check **heaviest** weight lifted:
☐ Less than 10 lbs  ☐ 10 lbs  ☐ 20 lbs  ☐ 50 lbs  ☐ 100 lbs. or more  ☐ Other _____

H. Check weight **frequently** lifted: *(By frequently, we mean from 1/3 to 2/3 of the workday.)*
☐ Less than 10 lbs  ☐ 10 lbs  ☐ 25 lbs  ☐ 50 lbs. or more  ☐ Other _____

I. Did you supervise other people in this job?  ☐ YES (Complete items below.)   ☐ NO (If NO, go to J.)

How many people did you supervise? _____

What part of your time was spent supervising people? _____

Did you hire and fire employees?  ☐ YES  ☐ NO

J. Were you a lead worker?  ☐ YES  ☐ NO

## SECTION 4 - INFORMATION ABOUT YOUR MEDICAL RECORDS

A. Have you been seen by a **doctor/hospital/clinic** or anyone else for the illnesses, injuries or conditions that limit your ability to work?  ☐ YES  ☐ NO

B. Have you been seen by a **doctor/hospital/clinic** or anyone else for emotional or mental problems that limit your ability to work?  ☐ YES  ☐ NO

### If you answered "NO" to both of these questions, go to Section 5.

C. List **other names** you have used on your medical records. _____

_____

### Tell us who may have medical records or other information about your illnesses, injuries or conditions.

D. List each DOCTOR/HMO/THERAPIST/OTHER. Include your **next appointment**.

1.
| NAME | DATES |
|---|---|
| STREET ADDRESS | FIRST VISIT |
| CITY    STATE    ZIP | LAST SEEN |
| PHONE    *Area Code*    *Phone Number*    PATIENT ID # (If known) | NEXT APPOINTMENT |

REASONS FOR VISITS _____

WHAT **TREATMENT** WAS RECEIVED? _____

2.
| NAME | DATES |
|---|---|
| STREET ADDRESS | FIRST VISIT |
| CITY    STATE    ZIP | LAST SEEN |
| PHONE    *Area Code*    *Phone Number*    PATIENT ID # (If known) | NEXT APPOINTMENT |

REASONS FOR VISITS _____

WHAT **TREATMENT** WAS RECEIVED? _____

| SECTION 4 - INFORMATION ABOUT YOUR MEDICAL RECORDS |
|---|

## DOCTOR/HMO/THERAPIST/OTHER

3.

| NAME | | | | DATES |
|---|---|---|---|---|
| STREET ADDRESS | | | | FIRST VISIT |
| CITY | | STATE | ZIP | LAST SEEN |
| PHONE _____ _____<br>Area Code  Phone Number | | PATIENT ID # (If known) | | NEXT APPOINTMENT |
| REASONS FOR VISITS | | | | |
| | | | | |
| WHAT TREATMENT WAS RECEIVED? | | | | |
| | | | | |

**If you need more space, use Remarks, Section 9.**

E. **List each HOSPITAL/CLINIC.** Include your **next appointment.**

1.

| HOSPITAL/CLINIC | | | TYPE OF VISIT | DATES | |
|---|---|---|---|---|---|
| NAME | | | ☐ INPATIENT STAYS (Stayed at least overnight) | DATE IN | DATE OUT |
| STREET ADDRESS | | | ☐ OUTPATIENT VISITS (Sent home same day) | DATE FIRST VISIT | DATE LAST VISIT |
| CITY | STATE | ZIP | | | |
| PHONE ____ _____<br>Area Code  Phone Number | | | ☐ EMERGENCY ROOM VISITS | DATE OF VISITS | |

Next **appointment** _____ Your hospital/clinic **number** _____

**Reasons** for visits _____

_____

What **treatment** did you receive? _____

_____

What **doctors** do you see at this hospital/clinic on a regular basis? _____

_____

## SECTION 4-INFORMATION ABOUT YOUR MEDICAL RECORDS

## HOSPITAL/CLINIC

2.

| HOSPITAL/CLINIC | TYPE OF VISIT | DATES | |
|---|---|---|---|
| NAME | ☐ **INPATIENT STAYS** *(Stayed at least overnight)* | DATE IN | DATE OUT |
| STREET ADDRESS | ☐ **OUTPATIENT VISITS** *(Sent home same day)* | DATE FIRST VISIT | DATE LAST VISIT |
| CITY    STATE  ZIP | | | |
| PHONE<br>*Area Code    Phone Number* | ☐ **EMERGENCY ROOM** VISITS | DATE OF VISITS | |

Next **appointment** _____ Your hospital/clinic **number** _____

**Reasons** for visits _____

_____

What **treatment** did you receive? _____

_____

What **doctors** do you see at this hospital/clinic on a regular basis? _____

_____

**If you need more space, use Remarks, Section 9.**

F. Does **anyone else have medical records or information** about your illnesses, injuries or conditions (Workers' Compensation, insurance companies, prisons, attorneys, welfare), or are you scheduled to see anyone else?

☐ YES *(If "YES," complete information below.)*          ☐ NO

| NAME | DATES |
|---|---|
| STREET ADDRESS | FIRST VISIT |
| CITY    STATE  ZIP | LAST SEEN |
| PHONE<br>*Area Code    Phone Number* | NEXT APPOINTMENT |
| CLAIM NUMBER (If any) | |
| REASONS FOR VISITS | |
| | |

**If you need more space, use Remarks, Section 9.**

## SECTION 5 - MEDICATIONS

Do you currently take any **medications** for your illnesses, injuries or conditions? ☐ YES

If "YES," please tell us the following: *(Look at your medicine bottles, if necessary.)* ☐ NO

| NAME OF MEDICINE | IF PRESCRIBED, GIVE NAME OF DOCTOR | REASON FOR MEDICINE | SIDE EFFECTS YOU HAVE |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**If you need more space, use Remarks, Section 9.**

## SECTION 6 - TESTS

Have you had, or will you have, any **medical tests** for illnesses, injuries or conditions?

☐ YES ☐ NO    If "YES," please tell us the following: *(Give approximate dates, if necessary.)*

| KIND OF TEST | WHEN DONE, OR WHEN WILL IT BE DONE? (Month, day, year) | WHERE DONE? (Name of Facility) | WHO SENT YOU FOR THIS TEST? |
|---|---|---|---|
| EKG (HEART TEST) |  |  |  |
| TREADMILL (EXERCISE TEST) |  |  |  |
| CARDIAC CATHETERIZATION |  |  |  |
| BIOPSY--Name of body part |  |  |  |
| HEARING TEST |  |  |  |
| SPEECH/LANGUAGE TEST |  |  |  |
| VISION TEST |  |  |  |
| IQ TESTING |  |  |  |
| EEG (BRAIN WAVE TEST) |  |  |  |
| HIV TEST |  |  |  |
| BLOOD TEST (NOT HIV) |  |  |  |
| BREATHING TEST |  |  |  |
| X-RAY--Name of body part _____ |  |  |  |
| MRI/CT SCAN Name of body part |  |  |  |

**If you have had other tests, list them in Remarks, Section 9.**

## SECTION 7-EDUCATION/TRAINING INFORMATION

A. Check the highest grade of **school** completed.

Grade school:                                                                College:

| 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | GED | 1 | 2 | 3 | 4 or more |
|---|---|---|---|---|---|---|---|---|---|----|----|----|-----|---|---|---|-----------|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐  | ☐  | ☐  | ☐   | ☐ | ☐ | ☐ | ☐         |

Approximate **date** completed: _____

B. Did you attend **special education** classes?   ☐ YES   ☐ NO   *(If "NO," go to part C)*

NAME OF SCHOOL _____

ADDRESS _____
*(Number, Street, Apt. No.(if any), P.O. Box or Rural Route)*

_____
*City          State          Zip*

DATES ATTENDED _____ TO _____

TYPE OF PROGRAM _____

C. Have you completed any type of **special job training, trade or vocational school?**

☐ YES ☐ NO  If "YES," what type?_____

Approximate date completed: _____

## SECTION 8 - VOCATIONAL REHABILITATION, EMPLOYMENT, or OTHER SUPPORT SERVICES INFORMATION

Are you participating in the Ticket Program or another program of vocational rehabilitation services, employment services or other support services to help you go to work?

☐ YES (Complete the information below)   ☐ NO

NAME OF ORGANIZATION _____

NAME OF COUNSELOR _____

ADDRESS _____
*(Number, Street, Apt. No.(if any), P.O. Box or Rural Route)*

_____
*City          State          Zip*

DAYTIME PHONE NUMBER _____ _____
*Area Code          Number*

DATES SEEN _____ TO _____

TYPE OF SERVICES OR TESTS PERFORMED _____
*(IQ, vision, physicals, hearing, workshops, etc.)*

## SECTION 9 - REMARKS

**Use this section for any added information you did not show in earlier parts of the form. When you are done with this section (or if you don't have anything to add), be sure to go to the next page and complete the blocks there.**

## SECTION 9 - REMARKS

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

| **Name** of person completing this form (*Please Print*) | **Date Form Completed** *(Month, day, year)* |
|---|---|
| **Address** *(Number and street)* | **e-mail address** *(optional)* |
| City                          State | Zip Code |

# Exhibit C

LIFE INSURANCE COMPANY OF NORTH AMERICA
1601 CHESTNUT STREET
PHILADELPHIA, PA 19192-2235
(800) 732-1603  TDD (800) 552-5744
A STOCK INSURANCE COMPANY

GROUP POLICY

| | |
|---|---|
| POLICYHOLDER: | Tyco International (US), Inc. |
| POLICY NUMBER: | LK-980001 |
| POLICY EFFECTIVE DATE: | January 1, 2003 |
| POLICY ANNIVERSARY DATE: | January 1 |

This Policy describes the terms and conditions of coverage. It is issued in New Hampshire and shall be governed by its laws. The Policy goes into effect on the Policy Effective Date, 12:01 a.m. at the Policyholder's address.

In return for the required premium, the Insurance Company and the Policyholder have agreed to all the terms of this Policy.

Robert J. Upton, Secretary

Gregory H. Wolf, President

TL-004700

97 v-1

TABLE OF CONTENTS

SCHEDULE OF BENEFITS ........................................................... 8

SCHEDULE OF BENEFITS FOR CLASS 1 ............................................. 9

SCHEDULE OF BENEFITS FOR CLASS 2 ............................................. 11

ELIGIBILITY FOR INSURANCE ..................................................... 13

EFFECTIVE DATE OF INSURANCE .................................................. 13

TERMINATION OF INSURANCE .................................................... 13

CONTINUATION OF INSURANCE ................................................... 14

DESCRIPTION OF BENEFITS ....................................................... 14

EXCLUSIONS ..................................................................... 19

CLAIM PROVISIONS .............................................................. 19

ADMINISTRATIVE PROVISIONS .................................................... 21

DEFINITIONS .................................................................... 23

SCHEDULE OF AFFILIATES ....................................................... 26

## SCHEDULE OF BENEFITS

**Premium Due Date**                    Premiums are due in arrears on the date coinciding with the day of the Policy
                                        Anniversary Date or the last day of the month, if earlier.

**Classes of Eligible Employees**

On the pages following the definition of eligible employees there is a Schedule of Benefits for each Class of Eligible
Employees listed below. For an explanation of these benefits, please see the Description of Benefits provision.

If an Employee is eligible under one Class of Eligible Employees and later becomes eligible under a different Class of
Eligible Employees, changes in his or her insurance due to the class change will be effective on the date of the change
in class.

Class 1        All active Full-time Employees of the Employer working a minimum of 20 hours per week; excluding
               ADT Security Systems Employees who are subject to a Collective Bargaining Agreement and who
               are not enrolled in the Tyco Benefits Plan.

Class 2        All active Full-time Employees of ADT Security Systems who are subject to a Collective Bargaining
               Agreement working a minimum of 20 hours per week and who are not enrolled in the Tyco Benefits
               Plan under Class 1.

8

## SCHEDULE OF BENEFITS FOR CLASS 1

**Eligibility Waiting Period**

For Employees hired on or before the Policy Effective Date:     After 30 days of Active Service or a period specified in a union negotiated agreement, whichever is later.

For Employees hired after the Policy Effective Date:     After 30 days of Active Service or a period specified in a union negotiated agreement, whichever is later.

**Definition of Disability/Disabled**

An Employee is Disabled if, because of Injury or Sickness,

1.     he or she is unable to perform all the material duties of his or her regular occupation, or solely due to Injury or Sickness, he or she is unable to earn more than 80% of his or her Indexed Covered Earnings; and

2.     after Disability Benefits have been payable for 24 months, he or she is unable to perform all the material duties of any occupation for which he or she may reasonably become qualified based on education, training or experience, or solely due to Injury or Sickness, he or she is unable to earn more than 80% of his or her Indexed Covered Earnings.

**Definition of Covered Earnings**

Covered Earnings means an Employee's annual wage or salary as reported by the Employer for work performed for the Employer as in effect just prior to the date Disability begins.  It includes earnings received from commissions, but not bonus, overtime pay or other extra compensation.  Covered Earnings are determined initially on the date an Employee applies for coverage.  A change in the amount of Covered Earnings is effective on the date of the change, if the Employer gives us written notice of the change and the required premium is paid.

Commissions will be averaged for the 24 months just prior to the date Disability begins, or the months employed, if less than 24 months.

Any increase in an Employee's Covered Earnings will not be effective during a period of continuous Disability.

**Benefit Waiting Period**     The later of 180 days or the end of any Employer sponsored Short Term Disability benefits or salary continuation.

A period of Disability is continuous even if the Employee can return to Active Service for up to 30 days during the Benefit Waiting Period.  The length of the Benefit Waiting Period will not be extended by the number of days the Employee can return to Active Service.

**Disability Benefit**     The lesser of 60% of an Employee's monthly Covered Earnings rounded to the nearest dollar or the Maximum Disability Benefit, reduced by any Other Income Benefits.

"Other Income Benefits" means any benefits listed in the Other Income Benefits provision that an Employee receives on his or her own behalf or for dependents, or which the Employee's dependents receive because of the Employee's entitlement to Other Income Benefits.

**Maximum Disability Benefit**     $10,000 per month

**Minimum Disability Benefit**     $100 per month

9

*Work Incentive Benefits*
For the first 12 months the Employee is eligible for a Disability Benefit, the Disability Benefit is as figured above. If for any month during this period, the sum of the Employee's Disability Benefit, current earnings and any additional Other Income Benefits exceeds 100% of his or her Indexed Covered Earnings, the Disability Benefit will be reduced by the excess amount.

After the first 12 months, the Disability Benefit is as figured above, reduced by 50% of his or her current earnings received during any month he or she returns to work. If the sum of the Employee's Disability Benefit, current earnings and any additional Other Income Benefits exceeds 80% of his or her monthly Indexed Covered Earnings, the Disability Benefit will be reduced by the excess amount figured above.

No Disability Benefits will be paid if the Insurance Company determines the Employee is able to work under a Transitional Work Arrangement or other modified work arrangement and he or she refuses to do so.

Current earnings include any wage or salary for work performed while Disability Benefits are payable. If an Employee is working for another employer on a regular basis when Disability begins, current earnings will include any increase in the amount he or she earns from this work during the period for which Disability Benefits are payable.

Additional Benefits

*Survivor Benefit*

| | |
|---|---|
| Amount of Benefit: | 100% of the sum of the last full Disability Benefit plus any current earnings by which the Disability Benefit was reduced for that month. |
| Maximum Benefit Period | A single lump sum payment equal to 3 monthly Survivor Benefits. |

Maximum Benefit Period
The later of the Employee's SSNRA* or the Maximum Benefit Period listed below.

| Age When Disability Begins | Maximum Benefit Period |
|---|---|
| Under Age 63 | The date the 48th Monthly Benefit is payable. |
| Age 63 | The date the 42nd Monthly Benefit is payable. |
| Age 64 | The date the 36th Monthly Benefit is payable. |
| Age 65 | The date the 30th Monthly Benefit is payable. |
| Age 66 | The date the 27th Monthly Benefit is payable. |
| Age 67 | The date the 24th Monthly Benefit is payable. |
| Age 68 | The date the 21st Monthly Benefit is payable. |
| Age 69 or older | The date the 18th Monthly Benefit is payable. |

*SSNRA means the Social Security Normal Retirement Age in effect under the Social Security Normal Retirement Act on the Policy Effective Date.

Initial Premium Rates

$.32 per $100 of Covered Payroll

Covered Payroll for an Employee will mean his or her Covered Earnings for the insurance month prior to the date the determination is made. However, an Employee's Covered Payroll will not include any part of his or her monthly Covered Earnings which exceed $16,666.

TL-004774 (980001)

10

## SCHEDULE OF BENEFITS FOR CLASS 2

### Eligibility Waiting Period

For Employees hired on or before the Policy Effective Date:

After 30 days of Active Service or a period specified in a union negotiated agreement, whichever is later.

For Employees hired after the Policy Effective Date:

After 30 days of Active Service or a period specified in a union negotiated agreement, whichever is later.

### Definition of Disability/Disabled

An Employee is Disabled if, because of Injury or Sickness,

1. he or she is unable to perform all the material duties of his or her regular occupation, or solely due to Injury or Sickness, he or she is unable to earn more than 80% of his or her Indexed Covered Earnings; and
2. after Disability Benefits have been payable for 24 months, he or she is unable to perform all the material duties of any occupation for which he or she may reasonably become qualified based on education, training or experience, or solely due to Injury or Sickness, he or she is unable to earn more than 80% of his or her Indexed Covered Earnings.

### Definition of Covered Earnings

Covered Earnings means an Employee's annual wage or salary as reported by the Employer for work performed for the Employer as in effect just prior to the date Disability begins. It does not include amounts received as bonus, commissions, overtime pay or other extra compensation. Covered Earnings are determined initially on the date an Employee applies for coverage. A change in the amount of Covered Earnings is effective on the date of the change, if the Employer gives us written notice of the change and the required premium is paid.

Any increase in an Employee's Covered Earnings will not be effective during a period of continuous Disability.

### Benefit Waiting Period

The later of 180 days or the end of any Employer sponsored Short Term Disability benefits or salary continuation.

A period of Disability is continuous even if the Employee can return to Active Service for up to 30 days during the Benefit Waiting Period. The length of the Benefit Waiting Period will not be extended by the number of days the Employee can return to Active Service.

### Disability Benefit

The lesser of 50% of an Employee's monthly Covered Earnings rounded to the nearest dollar or the Maximum Disability Benefit, reduced by any Other Income Benefits.

"Other Income Benefits" means any benefits listed in the Other Income Benefits provision that an Employee receives on his or her own behalf or for dependents, or which the Employee's dependents receive because of the Employee's entitlement to Other Income Benefits.

### Maximum Disability Benefit

$6,000 per month

### Minimum Disability Benefit

$100 per month

*Work Incentive Benefits*
For the first 12 months the Employee is eligible for a Disability Benefit, the Disability Benefit is as figured above. If for any month during this period, the sum of the Employee's Disability Benefit, current earnings and any additional Other Income Benefits exceeds 100% of his or her Indexed Covered Earnings, the Disability Benefit will be reduced by the excess amount.

After the first 12 months, the Disability Benefit is as figured above, reduced by 50% of his or her current earnings received during any month he or she returns to work. If the sum of the Employee's Disability Benefit, current earnings and any additional Other Income Benefits exceeds 80% of his or her monthly Indexed Covered Earnings, the Disability Benefit will be reduced by the excess amount figured above.

No Disability Benefits will be paid if the Insurance Company determines the Employee is able to work under a Transitional Work Arrangement or other modified work arrangement and he or she refuses to do so.

Current earnings include any wage or salary for work performed while Disability Benefits are payable. If an Employee is working for another employer on a regular basis when Disability begins, current earnings will include any increase in the amount he or she earns from this work during the period for which Disability Benefits are payable.

## Additional Benefits

*Survivor Benefit*
| | |
|---|---|
| Benefit Waiting Period: | After 6 Monthly Benefits are payable. |
| Amount of Benefit: | 100% of the sum of the last full Disability Benefit plus any current earnings by which the Disability Benefit was reduced for that month. |
| Maximum Benefit Period | A single lump sum payment equal to 3 monthly Survivor Benefits. |

## Maximum Benefit Period
The later of the Employee's SSNRA* or the Maximum Benefit Period listed below.

| Age When Disability Begins | Maximum Benefit Period |
|---|---|
| Under Age 63 | The date the 42nd Monthly Benefit is payable. |
| Age 63 | The date the 36th Monthly Benefit is payable. |
| Age 64 | The date the 30th Monthly Benefit is payable. |
| Age 65 | The date the 24th Monthly Benefit is payable. |
| Age 66 | The date the 21st Monthly Benefit is payable. |
| Age 67 | The date the 18th Monthly Benefit is payable. |
| Age 68 | The date the 15th Monthly Benefit is payable. |
| Age 69 or older | The date the 12th Monthly Benefit is payable. |

*SSNRA means the Social Security Normal Retirement Age in effect under the Social Security Normal Retirement Act on the Policy Effective Date.

## Initial Premium Rates

$.32 per $100 of Covered Payroll

Covered Payroll for an Employee will mean his or her Covered Earnings for the insurance month prior to the date the determination is made. However, an Employee's Covered Payroll will not include any part of his or her monthly Covered Earnings which exceed $12,000.

TL-004774 (980001)

12

## ELIGIBILITY FOR INSURANCE

An Employee in one of the Classes of Eligible Employees shown in the Schedule of Benefits is eligible to be insured on the Policy Effective Date, or the day after he or she completes the Eligibility Waiting Period, if later. The Eligibility Waiting Period is the period of time the Employee must be in Active Service to be eligible for coverage. It will be extended by the number of days the Employee is not in Active Service.

Except as noted in the Reinstatement Provision, if an Employee terminates coverage and later wishes to reapply, or if a former Employee is rehired, a new Eligibility Waiting Period must be satisfied. An Employee is not required to satisfy a new Eligibility Waiting Period if insurance ends because he or she is no longer in a Class of Eligible Employees, but continues to be employed and within one year becomes a member of an eligible class.

TL-004710

## EFFECTIVE DATE OF INSURANCE

An Employee will be insured on the date he or she becomes eligible, if the Employee is not required to contribute to the cost of this insurance.

An Employee who is required to contribute to the cost of this insurance may elect to be insured only by authorizing payroll deduction in a form approved by the Employer and the Insurance Company. The effective date of this insurance depends on the date coverage is elected.

Insurance for an Employee who applies for insurance within 31 days after he or she becomes eligible is effective on the latest of the following dates.
1.    The Policy Effective Date.
2.    The date payroll deduction is authorized.
3.    The date the Insurance Company receives the Employee's completed enrollment request.

If an Employee's enrollment request is received more than 31 days after he or she is eligible for this insurance, the Insurability Requirement must be satisfied before this insurance is effective. If approved, this insurance is effective on the date the Insurance Company agrees in writing to insure the Employee.

If an Employee is not in Active Service on the date insurance would otherwise be effective, it will be effective on the date he or she returns to any occupation for the Employer on a Full-time basis.

TL-004712

## TERMINATION OF INSURANCE

The insurance on an Employee will end on the earliest date below.
1.    The date the Employee is eligible for coverage under a plan intended to replace this coverage.
2.    The date the Policy is terminated.
3.    The date the Employee is no longer in an eligible class.
4.    The day after the period for which premiums are paid.
5.    The date the Employee is no longer in Active Service.

TL-004714

## CONTINUATION OF INSURANCE

Disability Insurance continues if an Employee's Active Service ends due to a Disability for which benefits under the Policy are or may become payable. Premiums for the Employee will be waived while Disability Benefits are payable. If the Employee does not return to Active Service, this insurance ends when the Disability ends or when benefits are no longer payable, whichever occurs first.

If an Employee's Active Service ends due to an Employer approved unpaid leave of absence, layoff, military leave or family medical leave, insurance for that Employee will continue as follows:

1.     For an Employer approved unpaid leave of absence, up to 12 months.
2.     For layoff, up to 12 months.
3.     For military leave, up to 12 months.
4.     For an Employer approved family medical leave, up to 12 weeks.

TL-004716 (9300001)

## DESCRIPTION OF BENEFITS

The following provisions explain the benefits available under the Policy. Please see the Schedule of Benefits for the applicability of these benefits to each class of Insureds.

### Disability Benefits

The Insurance Company will pay Disability Benefits if an Employee becomes Disabled while covered under this Policy. A Disabled Employee must satisfy the Benefit Waiting Period and be under the Appropriate Care of a Physician. Satisfactory proof of Disability must be provided to the Insurance Company, at the Employee's expense, before benefits will be paid.

The Insurance Company will require continued proof of the Employee's Disability for benefits to continue.

### Benefit Waiting Period

The Benefit Waiting Period is the period of time an Employee must be continuously Disabled before Disability Benefits may be payable. The Benefit Waiting Period is shown in the Schedule of Benefits.

The Insurance Company will waive the Benefit Waiting Period for an Employee if benefits under a Prior Plan were payable on the Policy Effective Date and the Employee returns to Active Service within 6 months after that date. The return to Active Service must be for more than 14 consecutive days but less than 6 months. The later Disability must be caused by the same or related causes for the Benefit Waiting Period to be waived.

### Termination of Disability Benefits

Disability Benefits will end on the earliest of the following dates.

1.     The date an Employee earns more than the percentage of his or her Indexed Covered Earnings which is used to determine if an Employee is Disabled.
2.     The date the Insurance Company determines an Employee is not Disabled.
3.     The end of the Maximum Benefit Period.
4.     The date an Employee dies.
5.     The date the Employee refuses to participate in rehabilitation efforts as required by the Insurance Company.
6.     The date the Employee is no longer receiving Appropriate Care.

### Successive Periods of Disability

Once an Employee is eligible to receive Disability Benefits under the Policy, separate periods of Disability resulting from the same or related causes are a continuous period of Disability unless the Employee returns to Active Service for more than 6 consecutive months.

14

A period of Disability is not continuous if separate periods of Disability result from unrelated causes or the later Disability occurs after coverage under the Policy ends.

The Successive Periods of Disability provision will not apply if an Employee is eligible for coverage under a plan that replaces this Policy.

## Mental Illness, Alcoholism and Drug Abuse Limitation

The Insurance Company will pay Disability Benefits on a limited basis during an Employee's lifetime for a Disability caused by, or contributed to by, any one or more of the following conditions. Once 24 monthly Disability Benefits have been paid, no further benefits will be payable for any of the following conditions.

1. Alcoholism
2. Anxiety disorders
3. Delusional (paranoid) disorders
4. Depressive disorders
5. Drug addiction or abuse
6. Eating disorders
7. Mental illness
8. Somatoform disorders (psychosomatic illness).

If, before reaching the lifetime maximum benefit, an Employee is confined in a hospital for more than 14 consecutive days, that period of confinement will not count against the lifetime limit. The confinement must be for the Appropriate Care of any of the conditions listed above.

## Pre-Existing Condition Limitation

The Insurance Company will not pay Disability Benefits for any period of Disability caused by or contributed to by, or resulting from, a Pre-Existing Condition. A "pre-existing condition" means any Injury or Sickness for which the Employee incurred expenses, received medical treatment, care or services including diagnostic measures, took prescribed drugs or medicines, or for which a reasonable person would have consulted a physician within 3 months before his or her most recent effective date of insurance.

The Pre-Existing Condition Limitation will apply to any added benefits or increases in benefits. It will not apply to a period of Disability that begins after an Employee is in Active Service for at least 12 months after his or her most recent effective date of insurance or the effective date of any added or increased benefits.

Except for any amount of benefit in excess of a Prior Plan's benefit, the Pre-Existing Condition Limitation will not apply to an Employee covered under a Prior Plan who satisfied the pre-existing condition limitation, if any, under that plan. If an Employee, covered under a Prior Plan, did not fully satisfy the pre-existing condition limitation of that plan, credit will be given for any time that was satisfied.

Time will not be credited for any day an Employee is not actively at work due to his or her Injury or Sickness. The Pre-Existing Condition Limitation will be extended by the number of days the Employee is not actively at work due to his or her Injury or Sickness.

## Disability Benefit Calculation

The Disability Benefit for any month Disability Benefits are payable is shown in the Schedule of Benefits. Disability Benefits are based on a 30 day period. They will be prorated if payable for any period less than a month.

## Work Incentive Benefit

If an Employee is covered for Work Incentive Benefits, he or she may return to work while Disabled and Disability Benefits will continue. The conditions under which an Employee may return to work and the amount of this benefit are shown in the Schedule of Benefits.

The Insurance Company will review the Employee's status and will require satisfactory proof of earnings and continued Disability.

Other Income Benefits

While an Employee is Disabled, he or she may be eligible for benefits from other income sources. If so, the Insurance Company may reduce the Disability Benefits payable by the amount of such Other Income Benefits. The extent to which Other Income Benefits will reduce any Disability Benefits payable under the Policy is shown in the Schedule of Benefits.

Other Income Benefits include:

1.    any amounts which the Employee or any dependents, if applicable, receive (or are assumed to receive*) under:

      a.    the Canada and Quebec Pension Plans;

      b.    the Railroad Retirement Act;

      c.    any local, state, provincial or federal government disability or retirement plan or law as it pertains to the Employer;

      d.    any sick leave plan of the Employer;

      e.    any work loss provision in mandatory "No-Fault" auto insurance;

      f.    any Workers' Compensation, occupational disease, unemployment compensation law or similar state or federal law, including all permanent as well as temporary disability benefits. This includes any damages, compromises or settlement paid in place of such benefits, whether or not liability is admitted.

2.    any Social Security disability or retirement benefits the Employee or any third party receives (or is assumed to receive*) on the Employee's behalf or for his or her dependents; or, if applicable, which his or her dependents receive (or are assumed to receive*) because of the Employee's entitlement to such benefits.

3.    any retirement plan benefits funded by the Employer. "Retirement plan" means any defined benefit or defined contribution plan sponsored or funded by an employer. It does not include an individual deferred compensation agreement; a profit sharing or any other retirement or savings plan maintained in addition to a defined benefit or other defined contribution pension plan, or any Employee savings plan including a thrift, stock option or stock bonus plan, individual retirement account or 401(k) plan.

4.    any proceeds payable under any franchise or group insurance or similar plan. If there is other insurance that applies to the same claim for Disability, and contains the same or similar provision for reduction because of other insurance, the Insurance Company will pay its pro rata share of the total claim. "Pro rata share" means the proportion of the total benefit that the amount payable under one policy, without other insurance, bears to the total benefits under all such policies.

5.    any amounts paid on account of loss of earnings or earning capacity through settlement, judgment, arbitration or otherwise, where a third party may be liable, regardless of whether liability is determined.

6.    any wage or salary for work performed. If an Employee is covered for Work Incentive Benefits, the Insurance Company will only reduce Disability Benefits to the extent provided under the Work Incentive Benefit in the Schedule of Benefits.

Dependents include any person who receives (or is assumed to receive) benefits under any applicable law on account of an Employee's entitlement to benefits.

    * See the Assumed Receipt of Benefits provision.

*Increases in Other Income Benefits*

After the first deduction for any Other Income Benefit (except wage or salary) is made, benefits will not be further reduced during that period of Disability due to any cost of living increase in that Other Income Benefit.

*Lump Sum Payments*

Other Income Benefits or earnings that are paid in a lump sum will be prorated over the period for which the sum is given. If no time is stated the lump sum will be prorated monthly over a five year period.

If no specific allocation of a lump sum payment is made, then the total payment will be an Other Income Benefit.

*Assumed Receipt of Benefits*

The Insurance Company will assume the Employee (or his or her dependents, if applicable) are receiving Other Income Benefits if they may be eligible for them. These assumed benefits will be the amount the Insurance Company estimates the Employee (or his or her dependents, if applicable) may be eligible to receive. Disability Benefits will be reduced by the amount of any assumed benefits as if they were actually received.

Except for any wage or salary for work performed while Disability Benefits are payable, this assumption will not be made if the Employee gives the Insurance Company proof of the following events.
1.      Application was made for these benefits.
2.      A Reimbursement Agreement is signed.
3.      Any and all appeals were made for these benefits or the Insurance Company determines further appeals will not be successful.
4.      Payments were denied.

The Insurance Company will not assume receipt of, nor reduce benefits by, any elective, actuarially reduced, or early retirement benefits under such laws until the Employee actually receives them.

*Social Security Assistance*

The Insurance Company will, at its discretion, assist the Employee in applying for Social Security Disability Income (SSDI) benefits. Disability Benefits will not be reduced by the assumed receipt of SSDI benefits while the Employee participates in the Social Security Assistance Program.

The Insurance Company may require the Employee to file an appeal if it believes a reversal of a prior decision is possible. If the Employee refuses to participate in, or cooperate with, the Social Security Assistance Program, the Insurance Company will assume receipt of SSDI benefits until the Employee gives us proof that all administrative remedies are exhausted.

Minimum Benefit
The Insurance Company will pay the Minimum Benefit regardless of any reductions made for Other Income Benefits. However, if there is an overpayment due, this benefit may be reduced to recover the overpayment.

Recovery of Overpayment
If benefits are overpaid, the Insurance Company has the right to recover the amount overpaid by either of the following methods.
1.      A request for lump sum payment of the overpaid amount.
2.      A reduction of any amounts payable under the Policy.

If there is an overpayment due when an Employee dies, any benefits payable under the Policy will be reduced to recover the overpayment.

TL-004771

17

## ADDITIONAL BENEFITS

**Rehabilitation During A Period of Disability**

If, while an Employee is Disabled, the Insurance Company determines that he or she is a suitable candidate for rehabilitation he or she may participate in a Rehabilitation Plan. The terms and conditions of the Rehabilitation Plan must be mutually agreed upon by the Employee and the Insurance Company.

The Insurance Company may require an Employee to participate in a rehabilitation assessment or a Rehabilitation Plan at our expense. The Insurance Company will work with the Employee, the Employer and the Employee's Physician and others, as appropriate, to develop a Rehabilitation Plan. If the Employee refuses to participate in the rehabilitation efforts, Disability Benefits will not be payable.

The Rehabilitation Plan may, at the Insurance Company's discretion, allow for payment of the Employee's medical expense, education expense, moving expense, accommodation expense or family care expense while he or she participates in the program.

A "Rehabilitation Plan" is a written agreement between the Employee and the Insurance Company in which the Insurance Company agrees to provide, arrange or authorize vocational or physical rehabilitation services.

TL-005105

**Survivor Benefit - Applies to Class 1 Only**

The Insurance Company will pay a Survivor Benefit if an Employee dies while Monthly Benefits are payable. These benefits will be payable for the Maximum Benefit Period for Survivor Benefits.

Benefits will be paid to the Employee's Spouse. If there is no Spouse, benefits will be paid in equal shares to the Employee's surviving Children. If there are no Spouse and no Children, no benefits will be paid.

"Spouse" means an Employee's lawful spouse. "Children" means an Employee's unmarried children under age 21 who are chiefly dependent upon the Employee for support and maintenance. The term includes a stepchild living with the Employee at the time of his or her death.

**Survivor Benefit - Applies to Class 2 Only**

The Insurance Company will pay a Survivor Benefit if an Employee dies while Monthly Benefits are payable. The Employee must have been continuously Disabled for the Survivor Benefit Waiting Period before the first benefit is payable. These benefits will be payable for the Maximum Benefit Period for Survivor Benefits.

Benefits will be paid to the Employee's Spouse. If there is no Spouse, benefits will be paid in equal shares to the Employee's surviving Children. If there are no Spouse and no Children, no benefits will be paid.

"Spouse" means an Employee's lawful spouse. "Children" means an Employee's unmarried children under age 21 who are chiefly dependent upon the Employee for support and maintenance. The term includes a stepchild living with the Employee at the time of his or her death.

TL-005107 (980001)

18

## EXCLUSIONS

The Insurance Company will not pay Disability Benefits for a Disability that results, directly or indirectly, from:

1.  suicide, attempted suicide, or whenever an Employee injures himself or herself on purpose.
2.  war or any act of war, whether or not declared.
3.  serving on full-time active duty in any armed forces. If the Employee sends proof of military service, the Insurance Company will refund the portion of the premium paid to cover the Employee during a period of such service.
4.  active participation in a riot.
5.  commission of a felony.
6.  revocation, restriction or non-renewal of an Employee's license, permit or certification necessary to perform the duties of his or her occupation unless due solely to Injury or Sickness otherwise covered by the Policy.

The Insurance Company will not pay Disability Benefits for any period of Disability during which the Employee:

7.  is incarcerated in a penal or corrections institution.
8.  is not receiving Appropriate Care.
9.  fails to cooperate with the Insurance Company in the administration of the claim. Such cooperation includes, but is not limited to, providing any information or documents needed to determine whether benefits are payable or the actual benefit amount due.
10. refuses to participate in rehabilitation efforts as required by the Insurance Company.
11. refuses to participate in a Transitional Work Arrangement or other modified work arrangement.

"Transitional Work Arrangement" means any work offered to the Employee by the Employer or an affiliated company while the Employee is Disabled and which may be his or her own or any occupation. The term includes but is not limited to reassigned duties, work site modification, flexible work arrangements, job adaptation or special equipment.

TL-004772

## CLAIM PROVISIONS

### Notice of Claim
Written notice, or notice by any other electronic/telephonic means authorized by the Insurance Company, must be given to the Insurance Company within 31 days after a covered loss occurs or begins or as soon as reasonably possible. If written notice, or notice by any other electronic/telephonic means authorized by the Insurance Company, is not given in that time, the claim will not be invalidated or reduced if it is shown that notice was given as soon as was reasonably possible. Notice can be given at our home office in Philadelphia, Pennsylvania or to our agent. Notice should include the Employer's Name, the Policy Number and the claimant's name and address.

### Claim Forms
When the Insurance Company receives notice of claim, the Insurance Company will send claim forms for filing proof of loss. If claim forms are not sent within 15 days after notice is received by the Insurance Company, the proof requirements will be met by submitting, within the time required under the "Proof of Loss" section, written proof, or proof by any other electronic/telephonic means authorized by the Insurance Company, of the nature and extent of the loss.

### Claimant Cooperation Provision
Failure of a claimant to cooperate with the Insurance Company in the administration of the claim may result in termination of the claim. Such cooperation includes, but is not limited to, providing any information or documents needed to determine whether benefits are payable or the actual benefit amount due.

**Insurance Data**
The Employer is required to cooperate with the Insurance Company in the review of claims and applications for coverage. Any information the Insurance Company provides in these areas is confidential and may not be used or released by the Employer if not permitted by applicable privacy laws.

**Proof of Loss**
Written proof of loss, or proof by any other electronic/telephonic means authorized by the Insurance Company, must be given to the Insurance Company within 90 days after the date of the loss for which a claim is made. If written proof of loss, or proof by any other electronic/telephonic means authorized by the Insurance Company, is not given in that 90 day period, the claim will not be invalidated nor reduced if it is shown that it was given as soon as was reasonably possible. If written proof of loss, or proof by any other electronic/telephonic means authorized by the Insurance Company, is provided outside of these time limits, the claim will be denied. These time limits will not apply while the person making the claim lacks legal capacity.

Written proof, or proof by any other electronic/telephonic means authorized by the Insurance Company, that the loss continues must be furnished to the Insurance Company at intervals required by us. Within 30 days of a request, written proof of continued Disability and Appropriate Care by a Physician must be given to the Insurance Company.

**Time of Payment**
Disability Benefits will be paid at regular intervals of not less frequently than once a month. Any balance, unpaid at the end of any period for which the Insurance Company is liable, will be paid at that time.

**To Whom Payable**
Disability Benefits will be paid to the Employee. If any person to whom benefits are payable is a minor or, in the opinion of the Insurance Company, is not able to give a valid receipt, such payment will be made to his or her legal guardian. However, if no request for payment has been made by the legal guardian, the Insurance Company may, at its option, make payment to the person or institution appearing to have assumed custody and support.

If an Employee dies while any Disability Benefits remain unpaid, the Insurance Company may, at its option, make direct payment to any of the following living relatives of the Employee: spouse, mother, father, children, brothers or sisters; or to the executors or administrators of the Employee's estate. The Insurance Company may reduce the amount payable by any indebtedness due.

Payment in the manner described above will release the Insurance Company from all liability for any payment made.

For plans subject to the Employee Retirement Income Security Act (ERISA), the Plan Administrator of the Employer's employee welfare benefit plan (the Plan) has appointed the Insurance Company as the Plan Fiduciary under federal law for the review of claims for benefits provided by this Policy and for deciding appeals of denied claims. In this role the Insurance Company shall have the authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact. All decisions made by the Insurance Company in this capacity shall be final and binding on participants and beneficiaries of the Plan to the full extent permitted by law.

The Insurance Company has no fiduciary responsibility with respect to the administration of the Plan except as described above. It is understood that the Insurance Company's sole liability to the Plan and to participants and beneficiaries under the Plan shall be for the payment of benefits provided under this Policy.

**Physical Examination and Autopsy**
The Insurance Company, at its expense, will have the right to examine any person for whom a claim is pending as often as it may reasonably require. The Insurance Company may, at its expense, require an autopsy unless prohibited by law.

**Legal Actions**
No action at law or in equity may be brought to recover benefits under the Policy less than 60 days after written proof of loss, or proof by any other electronic/telephonic means authorized by the Insurance Company, has been furnished as required by the Policy. No such action shall be brought more than 3 years after the time satisfactory proof of loss is required to be furnished.

**Time Limitations**
If any time limit stated in the Policy for giving notice of claim or proof of loss, or for bringing any action at law or in equity, is less than that permitted by the law of the state in which the Employee lives when the Policy is issued, then the time limit provided in the Policy is extended to agree with the minimum permitted by the law of that state.

**Physician/Patient Relationship**
The Insured will have the right to choose any Physician who is practicing legally. The Insurance Company will in no way disturb the Physician/patient relationship.

TL-004724

## ADMINISTRATIVE PROVISIONS

**Premiums**
The premiums for this Policy will be based on the rates currently in force, the plan and the amount of insurance in effect.

**Changes in Premium Rates**
The premium rates may be changed by the Insurance Company from time to time with at least 31 days advance written notice. No change in rates will be made until 36 months after the Policy Effective Date. An increase in rates will not be made more often than once in a 12 month period. However, the Insurance Company reserves the right to change the rates even during a period for which the rate is guaranteed if any of the following events take place.

1.  The terms of the Policy change.
2.  A division, subsidiary, affiliated company or eligible class is added or deleted from the Policy.
3.  There is a change in the factors bearing on the risk assumed.
4.  Any federal or state law or regulation is amended to the extent it affects the Insurance Company's benefit obligation.
5.  The Insurance Company determines that the Employer has failed to promptly furnish any necessary information requested by the Insurance Company, or has failed to perform any other obligations in relation to the Policy.

If an increase or decrease in rates takes place on a date that is not a Premium Due Date, a pro rata adjustment will apply from the date of the change to the next Premium Due Date.

**Reporting Requirements**
The Employer must, upon request, give the Insurance Company any information required to determine who is insured, the amount of insurance in force and any other information needed to administer the plan of insurance.

**Payment of Premium**
The first premium is due on the Policy Effective Date. After that, premiums will be due monthly unless the Employer and the Insurance Company agree on some other method of premium payment.

If any premium is not paid when due, the plan will be canceled as of the Premium Due Date, except as provided in the Policy Grace Period section.

21

**Notice of Cancellation**
The Policyholder may cancel the Policy as of any Premium Due Date by giving the Insurance Company 31 days advance written notice.

The Insurance Company may cancel the Policy as of any Premium Due Date by giving the Policyholder advance written notice if during any 9 month period before the Policy Anniversary Date the sum of all benefits paid and incurred is more than 70% of the earned premium for that period.

If a premium is not paid when due, the Policy will automatically be canceled as of the Premium Due Date, except as provided in the Policy Grace Period section.

**Policy Grace Period**
A Policy Grace Period of 31 days will be granted for the payment of the required premiums under this Policy. This Policy will be in force during the Policy Grace Period. The Policyholder is liable to the Insurance Company for any unpaid premium for the time this Policy was in force.

**Grace Period for the Insured**
If the required premium is not paid on the Premium Due Date, there is a 31 day grace period after each premium due date after the first. If the required premium is not paid during the grace period, insurance will end on the last day for which premium was paid.

**Reinstatement of Insurance**
An Employee's insurance may be reinstated if it ends because the Employee is on an unpaid leave of absence.

An Employee's insurance may be reinstated only if reinstatement occurs within 6 months from the date insurance ends due to an Employer approved unpaid leave of absence. For insurance to be reinstated the following conditions must be met.
1. An Employee must be in a Class of Eligible Employees.
2. The required premium must be paid.
3. A written request for reinstatement must be received by the Insurance Company within 31 days from the date an Employee returns to Active Service.

Reinstated insurance will be effective on the date the Employee returns to Active Service. If an Employee did not fully satisfy the Eligibility Waiting Period or the Pre-Existing Condition Limitation (if any) before insurance ended due to an unpaid leave of absence, credit will be given for any time that was satisfied.

TL-004720

## GENERAL PROVISIONS

**Entire Contract**
The entire contract will be made up of the Policy, the application of the Employer, a copy of which is attached to the Policy, and the applications, if any, of the Employees.

**Incontestability**
All statements made by the Employer or by an Employee are representations not warranties. No statement will be used to deny or reduce benefits or be used as a defense to a claim, unless a copy of the instrument containing the signed statement has been furnished to the claimant. In the event of death or legal incapacity, the beneficiary or representative must receive the copy.

After two years from an Employee's effective date of insurance, or from the effective date of any added or increased benefits, no such statement will cause insurance to be contested except for fraud or eligibility for coverage.

**Misstatement of Age**

If an Employee's age has been misstated, the Insurance Company will adjust all benefits to the amounts that would have been purchased for the correct age.

**Policy Changes**

No change in the Policy will be valid until approved by an executive officer of the Insurance Company. This approval must be endorsed on, or attached to, the Policy. No agent may change the Policy or waive any of its provisions.

**Workers' Compensation Insurance**

The Policy is not in lieu of and does not affect any requirements for coverage under any Workers' Compensation Insurance Law.

**Certificates**

A certificate of insurance will be delivered to the Employer for delivery to Employees. Each certificate will list the benefits, conditions and limits of the Policy. It will state to whom benefits will be paid.

**Assignment of Benefits**

The Insurance Company will not be affected by the assignment of an Employee's certificate until the original assignment or a certified copy of the assignment is filed with the Insurance Company. The Insurance Company will not be responsible for the validity or sufficiency of an assignment. An assignment of benefits will operate so long as the assignment remains in force provided coverage under the Policy is in effect. This insurance may not be levied on, attached, garnisheed, or otherwise taken for a person's debts. This prohibition does not apply where contrary to law.

**Clerical Error**

A person's insurance will not be affected by error or delay in keeping records of insurance under the Policy. If such an error is found, the premium will be adjusted fairly.

**Agency**

The Employer and Plan Administrator are agents of the Employee for transactions relating to insurance under the Policy. The Insurance Company is not liable for any of their acts or omissions.

TL-004726 (NH)

# DEFINITIONS

Please note, certain words used in this document have specific meanings. These terms will be capitalized throughout this document. The definition of any word, if not defined in the text where it is used, may be found either in this Definitions section or in the Schedule of Benefits.

**Active Service**

An Employee will be considered in Active Service with the Employer on a day which is one of the Employer's scheduled work days if either of the following conditions are met.

1.  He or she is actively at work. This means the Employee is performing his or her regular occupation for the Employer on a Full-time basis, either at one of the Employer's usual places of business or at some location to which the Employer's business requires the Employee to travel.

2.  The day is a scheduled holiday, vacation day or period of Employer approved paid leave of absence.

An Employee is considered in Active Service on a day which is not one of the Employer's scheduled work days only if he or she was in Active Service on the preceding scheduled work day.

**Appropriate Care**

Appropriate Care means the determination of an accurate and medically supported diagnosis of the Employee's Disability by a Physician, or a plan established by a Physician of ongoing medical treatment and care of the Disability that conforms to generally accepted medical standards, including frequency of treatment and care.

**Consumer Price Index (CPI-W)**

The Consumer Price Index for Urban Wage Earners and Clerical Workers published by the U.S. Department of Labor. If the index is discontinued or changed, another nationally published index that is comparable to the CPI-W will be used.

**Employee**

For eligibility purposes, an Employee is an employee of the Employer in one of the "Classes of Eligible Employees." Otherwise, Employee means an employee of the Employer who is insured under the Policy.

**Employer**

The Policyholder and any affiliates or subsidiaries covered under the Policy. The Employer is acting as an agent of the Insured for transactions relating to this insurance. The actions of the Employer shall not be considered the actions of the Insurance Company.

**Full-time**

Full-time means the number of hours set by the Employer as a regular work day for Employees in the Employee's eligibility class.

**Indexed Covered Earnings**

For the first 12 months Monthly Benefits are payable, Indexed Covered Earnings will be equal to Covered Earnings. After 12 Monthly Benefits are payable, Indexed Covered Earnings will be an Employee's Covered Earnings plus an increase applied on each anniversary of the date Monthly Benefits became payable. The amount of each increase will be the lesser of:
1.    10% of the Employee's Indexed Covered Earnings during the preceding year of Disability; or
2.    the rate of increase in the Consumer Price Index (CPI-W) during the preceding calendar year.

**Injury**

Any accidental loss or bodily harm which results directly and independently of all other causes from an Accident.

**Insurability Requirement**

An eligible person will satisfy the Insurability Requirement for an amount of coverage on the day the Insurance Company agrees in writing to accept him or her as insured for that amount. To determine a person's acceptability for coverage, the Insurance Company will require evidence of good health and may require it be provided at the Employee's expense.

**Insurance Company**

The Insurance Company underwriting the Policy is named on the Policy cover page.

**Insured**

A person who is eligible for insurance under the Policy, for whom insurance is elected, the required premium is paid and coverage is in force under the Policy.

**Physician**

Physician means a licensed doctor practicing within the scope of his or her license and rendering care and treatment to an Insured that is appropriate for the condition and locality. The term does not include an Employee, an Employee's spouse, the immediate family (including parents, children, siblings or spouses of any of the foregoing, whether the relationship derives from blood or marriage), of an Employee or spouse, or a person living in an Employee's household.

**Prior Plan**

The Prior Plan refers to the plan of insurance providing similar benefits sponsored by the Employer in effect directly prior to the Policy Effective Date.

**Sickness**

The term Sickness means a physical or mental illness. It also includes pregnancy.

TL-004708

## SCHEDULE OF AFFILIATES

The following affiliates are covered under the Policy as of January 1, 2003.

Affiliate Name

 A&E Products
 ADT
 AFC Cable
 Allied
 Ansul
 Carlisle Films
 Corporate
 Earth Tech
 Grinnell Fire Protection
 Ludlow Coated Products
 M/A Com
 Sensormatic
 Simplex/Grinnell
 Sonitrol
 TEPG/Simplex
 Tyco Electronics
 Tyco Fire Products
 Tyco Flow Control
 Tyco Healthcare
 Tyco Plastics LP
 Tyco Printed Circuit Group
 Tyco Safety Products
 Tyco Telecommunications
 Tyco Thermal Controls
 Tyco Valves & Controls
 Unistrut

TL-004776

 

### LIFE INSURANCE COMPANY OF NORTH AMERICA
### PHILADELPHIA, PENNSYLVANIA

We, Tyco International (US), Inc., whose main office address is Exeter, NH, hereby apply to the Life Insurance Company of North America for Policy Number LK-980001.

We approve and accept the terms of this Policy.

This application is to be signed in duplicate. One part is to be attached to the Policy; the other part is to be returned to the Life Insurance Company of North America.

This application supersedes any previous application for this Policy.

Tyco International (US), Inc.
(Full or Corporate Name of Applicant)

Signed at_____ By _____
(Signature and Title)

On_____ Witness_____
(To be signed by Licensed Resident Agent where required by law)

TL-004771                (This Copy Is To Remain Attached To The Policy)

---

### LIFE INSURANCE COMPANY OF NORTH AMERICA
### PHILADELPHIA, PENNSYLVANIA

We, Tyco International (US), Inc., whose main office address is Exeter, NH, hereby apply to the Life Insurance Company of North America for Policy Number LK-980001.

We approve and accept the terms of this Policy.

This application is to be signed in duplicate. One part is to be attached to the Policy; the other part is to be returned to the Life Insurance Company of North America.

This application supersedes any previous application for this Policy.

Tyco International (US), Inc.
(Full or Corporate Name of Applicant)

Signed at_____ By _____
(Signature and Title)

On_____ Witness_____
(To be signed by Licensed Resident Agent where required by law)

TL-004771                (This Copy Is To Be Returned To Us)