UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| EX REL. DAWN BARRETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 03-12382-MLW |
| | ) | |
| CIGNA CORPORATION and | ) | |
| LIFE INSURANCE COMPANY OF | ) | |
| NORTH AMERICA, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**RELATOR'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT**

Pursuant to Fed. R. Civ. P. 7(b) and Local Rule 7.1, plaintiff and *qui tam* Relator Dawn Barrett opposes defendants' Motion to Dismiss the Complaint.

**INTRODUCTION**

This is a False Claims Act ("FCA") action alleging that CIGNA Corporation ("CIGNA") and its wholly-owned subsidiary, Life Insurance Company of North America ("LINA"), have unlawfully imposed tens of millions of dollars in unwarranted costs on the Social Security Administration ("SSA") by causing the filing of thousands of false and fraudulent claims for Social Security Disability ("SSDI") benefits.[1]  By causing SSDI claims to be submitted in reckless disregard to the truth or falsity of the claimant's eligibility for SSDI, CIGNA has violated the FCA.  See 31 U.S.C. § 3729(b)(3).

---

[1]    As used herein, "CIGNA" denotes both CIGNA Corporation and its wholly-owned subsidiaries.  First Amended Complaint ("Complaint") ¶¶ 6-8.  The numbered paragraphs of the Complaint are cited herein as "¶__."

As set forth in detail in the Complaint, since 1997, defendants have used economic duress to compel claimants on its disability insurance policies to apply for SSDI.  To qualify for SSDI, one must demonstrate a physical or mental impairment that is expected to last at least twelve months that prevents one from performing "any substantial gainful activity," i.e. "any occupation."  42 U.S.C. § 423(D)(1)(a).   CIGNA, however, makes <u>no</u> good faith assessment to determine whether claimants have a disability that is likely to make them eligible for SSDI.  Instead, as a matter of deliberate and uniform corporate policy, CIGNA recklessly requires <u>all</u> claimants (except for those with pregnancy-related claims) to apply for SSDI by threatening to reduce their disability benefits if they do not apply.  CIGNA knows, based on its extensive experience with disability claims, that most claimants cannot possibly meet SSDI's stringent definition of "disability."  These thousands of SSDI claims misrepresent claimants' eligibility for SSDI and are, therefore, false claims under the FCA.

Moreover, these claims are the result of a fraudulent scheme to reap financial benefit for CIGNA.  The purpose of CIGNA's Social Security Disability Referral program is to shift the costs of paying disability claims to SSDI.  Significantly, even if SSDI claims are ultimately rejected as meritless, CIGNA still gains.  Once a claimant applies for SSDI, CIGNA estimates the SSDI benefits the claimant would receive if a SSDI award is made.  CIGNA uses the estimated benefit to reduce its reserves for that claim while the claim is pending with SSA.  Reduction in reserves improves CIGNA's financial statement and allows it to write more policies and increase its profits.  Accordingly, even if SSA rejects every CIGNA-insured claim, CIGNA still benefits financially through its reduction in reserves during the pendency of the claims with SSA.  Meanwhile, CIGNA's fraudulent scheme imposes millions of dollars in wasted administrative costs on the already overburdened Social Security program.

Defendants' arguments in favor of dismissal of the Complaint are wholly without merit. As discussed herein, the Complaint pleads CIGNA's fraudulent scheme with the particularity required by Fed. R. Civ. P. 9(b). In addition, all material elements of a FCA action are pled. The Complaint alleges that, since 1997, CIGNA has implemented a deliberate and uniform corporate policy to cause false claims to be submitted to SSDI by knowingly misrepresenting claimants' eligibility. As a result, thousands of false claims for SSDI have been filed with SSA over the last eight years.

## SUMMARY OF ALLEGATIONS

This *qui tam* action was brought by Dawn Barrett, an employee of CIGNA since September 2000. Ms. Barrett has personal knowledge of the policy and practices alleged in the Complaint. CIGNA is a private insurance company that sells disability insurance products to employers and individuals to provide income protection for disabled workers.

**1.      CIGNA's Disability Insurance Policies**

Pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. CIGNA sells employers both short term ("STD") and long term ("LTD") disability insurance coverage. ¶¶ 52-64. Typically, STD policies cover between 13 and 26 weeks of disability after an elimination period of 7-30 days. ¶¶ 55-61. LTD coverage commences when short term ends and typically lasts until 24 months. ¶¶ 62-66. The definition of "disability" under the typical CIGNA STD and LTD policies is an inability to perform one's "own occupation." ¶¶ 59, 61. After 24 months, CIGNA's policies typically contain a "change in definition" provision. ¶ 62. Thereafter, to receive benefits under CIGNA's policies, the claimant must be totally disabled from performing the material and substantial duties of "any occupation" for which he or she is qualified by training, education and experience. Id.

3

CIGNA's Group Disability Income Insurance policies are written to provide much greater protection to the insured than would SSDI. ¶ 64.  Although Social Security pays nothing if the insured is merely disabled from performing his own occupation, CIGNA's policies are meant to provide the insured with up to 30 months of income protection for such disabilities.  Id. Put another way, many individuals who will qualify for benefits under CIGNA's policies could not possibly be eligible for SSDI, which requires that the claimant be unable to perform work in any occupation because of a medical condition that is expected to last at least twelve months or to result in death.  ¶¶ 60-62; see also Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987).

Under CIGNA's policies, weekly (STD) or monthly (LTD) benefits are paid at some percentage of pre-disability earnings.  ¶ 63.  CIGNA's policies typically also include an "offset" provision that allows monthly disability payments to be reduced by certain other income.  ¶¶ 65-67.  Under the offset, the claimant must apply for SSDI in the event that CIGNA determines, unilaterally, that they may be eligible for SSDI.  ¶ 67.[2]  If the claimant does not apply for SSDI, CIGNA is entitled to reduce the monthly benefit owed under the policy by the estimated Social Security benefit as determined by CIGNA.  Id.

---

[2]    The contractual duty to apply for offset income only arises if there is a good faith reasonable basis to believe the claimant is eligible for other income sources.

2.    **The SSDI Claims Process**

To qualify for SSDI benefits, a claimant must demonstrate "a medically determinable physical or mental impairment that has lasted or is expected to last at least twelve months or result in death and that prevents him or her from performing any substantial gainful activity." ¶ 13.  SSDI benefits are available after five months of disability and retroactive lump sum awards are made.  ¶¶ 14-15.

To apply for SSDI, a claimant must complete a SSA Application Form (SSA-3368-BK), see Exhibit A, and file it with a local Social Security Field Office.  ¶ 16.  Applicants for SSDI benefits may appoint a representative to handle their claim.  ¶ 17.  The SSDI Application requires information about a claimant's medical treatment and how their disability limits their ability to work.  ¶ 19.  The Application expressly sets forth the definition of "disability" under the Social Security Act and explains that the claimant must have been unable to perform "any kind of work for which you are suited" and that the disability must be expected to last "at least a year or result in death."  ¶ 18.  The SSDI Application Form concludes with a signature line preceded by the prominent warning that "Anyone Making A False Statement Or Representation Of A Material Fact For Use In Determining A Right To Payment Under The Social Security Act Commits A Crime Punishable Under Federal Law."  ¶ 20.  It is a felony to make a false statement or representation on an application for SSDI or to conceal or withhold information affecting the right to benefits or the amount of payment.  42 U.S.C. § 408.

There is a lengthy administrative process for each SSDI claim.  ¶¶ 24-43.   After an initial denial, claimants may appeal through three levels of administrative review and seek judicial review in federal district court.  ¶¶ 35-43.  This exhaustive review imposes substantial

administrative costs regardless of whether a claim is allowed or denied.  ¶ 44.  In 1999, SSA

spent between $1,364 -$1,645 on average processing SSDI claims.  ¶ 47.

### 3.    CIGNA's Fraudulent Scheme to Submit Meritless SSDI Claims

Starting in 1997, CIGNA implemented a uniform policy, practice and procedure of

requiring <u>all</u> claimants (except for those with pregnancy-related claims), without regard to the

nature or expected duration of their disability, to apply for SSDI.  ¶ 73.   Claimants were told that

if they did not file for SSDI benefits, their CIGNA benefits would be offset by the amount that

CIGNA determined they would have received had they applied for SSDI within a certain period.

¶ 71.  Even claimants who had firm "return to work" dates within nine months were told that

they still must file for SSDI.   ¶72.

### a.    CIGNA's SSDI Referral Guidelines

To formalize this corporate policy, CIGNA instituted Social Security Referral

Guidelines.  ¶¶ 68-80.  Under the Guidelines, Case Managers contact the claimant to inform

them that they must file for SSDI and must appeal any SSDI denial.  If the claimant does not

apply for SSDI, CIGNA will reduce the claimant's disability benefit by an estimated benefit

amount.  The claimant must send the Case Manager his or her "Receipt for your claim for Social

Security Disability benefits."  After initial contact by Case Managers, CIGNA's Social Security

Assistance Team contacts the claimant.  ¶ 70.

Under the Guidelines, CIGNA's Case Managers are to monitor the SSDI application

process and to exert coercion and economic duress, where necessary, to cause each claimants to

file for SSDI.  Thus, Case Managers set their "Offset Diaries" to check that the claimant has

filed for SSDI.  ¶ 74.  Case Managers also play a critical role in calculating offsets to be taken

against company reserves for the claim.  ¶ 75.  Case Managers send claimants a Social Security

application and CIGNA's Reimbursement Agreement.  ¶ 76. The Reimbursement Agreement explains that the claimant must file for SSDI, must return the signed Reimbursement Agreement to CIGNA, and must pursue all appeals or CIGNA may reduce its payment by the amount of the estimated SSDI benefit.  ¶¶ 77-80.

As alleged in the Complaint, CIGNA's reason for threatening to reduce benefits is to cause its claimants to file for Social Security.  Only if the SSDI application is filed can CIGNA estimate the offset and reduce its reserves for that claim.  Most individuals receiving disability benefits are dependent on their benefit checks (which are usually less than 60% of pre-disability income).  ¶ 85.  CIGNA instructs these financially stressed individuals that it will reduce their payments unless they file for SSDI.  Id.  CIGNA makes no effort to distinguish between claimants based on the nature or expected duration of their disability in coercing them to apply for SSDI.  Under this scenario, most claimants have no choice but to file claims with SSA falsely representing that they are qualified for SSDI.  Id.

### b.    The Role of CIGNA Offset Specialists and Vendors in SSDI Claims

CIGNA's involvement in submitting false and ineligible claims for SSDI on behalf of its claimants has changed over the years.  From 1997 until 2000, Case Managers forwarded all newly-approved LTD claims to a CIGNA "Social Security Specialist."  ¶¶ 86-87.  Starting in 2000 until mid-2002, claims were referred to CIGNA "Offset Specialists." ¶ 88.

Consistent with CIGNA's guidelines, the "Offset Specialist" sends letters to claimants stating that they will provide information regarding Social Security Disability and "how I may be able to assist you in obtaining those benefits."  ¶ 89.  The form letter instructs claimants to apply for SSDI, to return proof of application to CIGNA, to sign a "Social Security Release of Information" for CIGNA, and to sign an Authorization so CIGNA can release information.  Id.

7

The form letter contains an implicit threat that benefits can be reduced by the amount estimated by CIGNA. The form letter encloses a fact sheet to "explain some of the advantages of receiving Social Security benefits" and promises that the Offset Specialist will remain in contact with the insured and can provide access to a "specialist in Social Security law . . . at no out of pocket cost to you." ¶ 90.

If the claimant has not applied for SSDI six weeks later, CIGNA's Offset Specialist sends a follow-up letter reminding the claimant that benefit reductions will occur if CIGNA does not receive proof of SSDI application within a month. ¶ 91. Until mid-2002, CIGNA Offset Specialists would typically refer the file to an outside vendor that specialized in obtaining SSDI benefits on a contingency fee. ¶ 92. In mid-2002, CIGNA contracted with Advantage 2000 Consultants, Inc., among others, on a contingency fee basis to pursue claims for CIGNA insureds. ¶¶ 94-96.

To increase the pace of SSDI applications, CIGNA holds periodic contests among Case Managers to see who can refer the greatest number of claimants to Advantage 2000. ¶ 98. Prizes also are given to Case Managers with the highest rate of estimation (or reduced benefits) because, until an estimation is calculated and entered into the system with the correct offset codes, CIGNA cannot adjust its reserves. Id. By September 2003, of the more than 2000 insureds sent by CIGNA, Advantage 2000 had filed for SSDI benefits in virtually every case. ¶ 99.

### c.    CIGNA's Reckless Disregard of Claimant's SSDI Eligibility

Frequently, after CIGNA causes its insured to file for SSDI and while the SSDI claim is pending, CIGNA denies or terminates the insured's LTD claim because the insured is not disabled from performing his or her "own occupation."  ¶ 101.  CIGNA does not advise SSA, however, that it does not consider the insured to be disabled.  Id.  The Complaint provides two examples of CIGNA claimants who were required by CIGNA to apply for SSDI and, within one to two months thereafter, CIGNA denied coverage under its "own occupation" LTD policies.  ¶¶ 102-110.

### 4.    Damages to the United States From CIGNA's Fraudulent Scheme

As a result of CIGNA's conduct, SSA is inundated with false SSDI claims that CIGNA caused to be submitted in reckless disregard of the insured's eligibility for SSDI benefits.  ¶¶ 117, 120.  Each meritless claim filed at the direction of CIGNA costs the government on average $1,364 (or $1,645 if appealed).  ¶ 121.  All told, resolving these largely meritless claims costs the government millions of dollars each year.  In the past six years, the DI Trust Fund spent between $5.6 billion and $6.2 billion denying claims for SSDI benefits.  ¶ 118.

## LEGAL STANDARD

### Federal Rule of Civil Procedure 12(b)(6)

On a motion to dismiss all facts alleged in the complaint and all reasonable inferences that fit plaintiff's theory of liability are assumed to be true.  Arruda v. Sears, Roebuck & Co., 310 F.3d 14, 18 (1st Cir. 2002).  "A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  A court must "accept as true the well-pleaded factual allegations in the complaint, draw all reasonable

inferences . . . in the plaintiff's favor and determine whether the complaint, so read, sets forth

sufficient facts to justify recovery on any cognizable theory." Giuliano v. Fulton, 399 F.3d 381,

386 (1st Cir. 2005). Allowing the plaintiff to amend the complaint is the typical remedy for

failure to plead fraud with particularity. See United States ex rel. Franklin v. Parke-Davis, 147

F. Supp. 2d 39, 48 (D. Mass. 2001).

## SUMMARY OF ARGUMENT

There is no basis for dismissal of this Complaint. Consistent with Fed. R. Civ. P. 9(b),

the Complaint pleads the circumstances of the fraud with the requisite particularity. The

Complaint sets forth in great detail CIGNA's fraudulent scheme to improve its financial health

by causing its claimants to file for SSDI with reckless disregard to their eligibility. The

Complaint explains the particular methods used by CIGNA to implement the scheme and

provides defendants with more than ample notice of Relator's claim so that they can prepare to

mount a defense. The allegations include two examples of false claims submitted by CIGNA's

agent Advantage 2000. Most importantly, the Complaint sets forth a detailed factual accounting

of how the scheme has been perpetrated over the past eight years, more than satisfying Rule

9(b)'s concern that an action alleging fraud not proceed on the basis of conclusory allegations.

So too, the Complaint alleges all the essential elements under 31 U.S.C. §§ 3729(a)(1)

and (a)(2). Under the FCA, any person who knowingly presents, or causes to be presented, to

an officer or employee of the United States Government a false or fraudulent claim, or

knowingly makes, uses or causes to be made or used a false record or statement to get a false

claim paid or approved by the United States, may be liable to the United States for civil penalties

and/or treble damages and costs. Since 1997, CIGNA has conducted a fraudulent scheme the

purpose of which was to improve its financial status by reducing the reserves on claims under its

policies.  To implement this scheme, CIGNA has flooded SSA with thousands of claims for

SSDI with reckless disregard to whether the claimants meet the stringent definition of disability

under the Social Security statute.  Once a SSDI claim is made, CIGNA can then estimate an

offset and reduce its reserves for that claim.

Many of these claims for SSDI are "false or fraudulent claims," even assuming they do

not contain untrue factual information.  The claim misrepresents that the claimant is eligible for

SSDI.  Being disabled within the statutory definition of disability  –  unable to perform "any

occupation"expected to last at least a year or result in death – is a precondition to payment of

SSDI benefits.  Very few of those who apply for LTD benefits, however, qualify for SSDI.   By

requiring all of its LTD claimants to apply for SSDI, CIGNA causes a great number of false

claims to be submitted where the claimant is plainly ineligible for SSDI.  Moreover, CIGNA

conceals from SSA its own determination that the claimant is not eligible for coverage even

under the LTD policy's definition of disability – unable to work in one's own occupation.  These

claims are undoubtedly "false or fraudulent."

That CIGNA acts knowingly can be inferred from its entire course of conduct.  Under the

FCA,  "knowing" includes acting with reckless disregard to the truth or falsity of the information

submitted to the government.  CIGNA's conduct readily meets the reckless disregard standard.

CIGNA's submission of such false and fraudulent claims is a deliberate and systematic corporate

policy aimed at reducing reserves.  CIGNA rewards its Case Managers and Offset Specialists for

using coercion and duress to cause all of its claimants (except those with pregnancy-related

claims) to apply for SSDI.   CIGNA follows this reckless course even though it has extensive

experience working with disabled claimants, knows that the majority do not qualify for SSDI,

and has information available to it to permit it to limit its requirement of SSDI applications only

to those who are genuine candidates for SSDI benefits.  It is reasonably foreseeable by CIGNA that its conduct causes false SSDI claims to be submitted.

CIGNA's additional arguments for dismissal are also unpersuasive.  That Congress requires offset of SSDI benefits by other sources of income does not estop these allegations of a knowing fraudulent scheme to submit false claims to the United States.  So too, even if the conduct turns out to be that of CIGNA's subsidiary, LINA, as defendants suggest, "veil piercing" is available under First Circuit jurisprudence for fraudulent conduct.  Finally, liberal amendment of pleadings is permitted.  It would be an abuse of discretion to dismiss this case without granting Relator leave to amend, if necessary.

## ARGUMENT

### I.    The *Qui Tam* Complaint Pleads The Circumstances Of Fraud With Specificity As Required By Fed. R. Civ. P. 9(b).

Rule 9(b) requires that averments of fraud be stated with particularity.  See United States ex rel. Karvelas v. Melrose-Wakefield Hospital, 360 F.3d 220, 226 (1st Cir. 2004); Parke-Davis, 147 F. Supp. 2d at 46.  To meet this requirement, the Complaint must plead with particularity the "time, place, and content" of the alleged false or fraudulent representations.  Karvelas, supra.  In a FCA action, "the details of the actual presentation of false or fraudulent claims to the government can and must be pled with particularity in order to meet the requirements of Rule 9(b)."  Id. at 228.

The purpose of Rule 9(b) is to "give notice to defendants of the plaintiffs' claim, . . . protect defendants whose reputation may be harmed by meritless claims of fraud, . . . discourage 'strike suits,' and . . . prevent the filing of suits that simply hope to uncover relevant information during discovery."  Id. at 226 (citing Doyle v. Hasbro, Inc., 103 F.3d 186, 194 (1st Cir. 1996)).

At the same time, the requirements of Rule 9(b) must be read in conjunction with Fed. R. Civ. P. 8(a). Relator is not required to plead all of the evidence or facts supporting the circumstances of the fraud. Parke Davis, 147 F. Supp. 2d at 47 (citing 5 C.A. Wright & A.R. Miller, Federal Practice and Procedure § 1298, at 625-26 (2d ed. 1990) (Rule 9(b) does not require plaintiff to resort to "fact pleading")). Relator need not plead every false claim submitted. "Rule 9 may be relaxed where the fraudulent scheme is so complex that offering detailed accounting of each individual's role in the fraud is virtually impossible." See United States ex rel. Taylor v. Gabelli, 345 F. Supp. 2d 313, 339 (S.D.N.Y. 2004).

Whether a complaint has met the requisite particularity required by Rule 9(b) is a fact-specific inquiry. The trial court exercises discretion to determine if the averments of fraud are adequate under the circumstances. See Karvelas, 360 F.3d at 233 (noting that there is no "checklist of mandatory requirements that must be satisfied by each allegation included in a complaint"). The adequacy of the allegations must be determined in light of the need to plead sufficient facts to give notice to defendants of the fraudulent conduct, the "main purpose of the [9(b)] rule." Hayduk v. Lanna, 775 F.2d 441, 444 (1st Cir. 1985).

**A.    The Complaint Pleads A Scheme To Submit False And Fraudulent Claims To SSA  With Requisite Particularity**.

CIGNA's charge that the allegations in this case are "groundless," "conclusory," and provide "almost none" of the particularized information required by Rule 9(b), gravely mischaracterizes the Complaint.  See Memorandum in Support of Defendants' Motion to Dismiss ("Memo.") at 10.  As required,  the Complaint avers the "time, place, and  content of the alleged false or fraudulent representations" and the relevant circumstances surrounding the fraud perpetrated by CIGNA.   Specifically, the Complaint alleges that, since 1997, CIGNA has had a uniform policy, practice and procedure of causing all of the claimants on its disability policies (except those with pregnancy-related claims) to apply for SSDI, whether or not the insured meets the stringent "any occupation" definition of disability and in reckless disregard of the claimant's entitlement for benefits.  ¶¶ 73, 85.   Under CIGNA's Social Security Referral Guidelines, CIGNA coerces, pressures and induces its insureds to file claims for SSDI in utter disregard to the claimant's eligibility.  ¶¶ 68-80, 86-99.  This conduct results in submission of thousands of meritless claims for SSDI, imposes millions of dollars in administrative costs, and increases the risk that SSDI will pay benefits for ineligible claimants.

In addition, the Complaint alleges facts that "give rise to a strong inference of fraudulent intent."  See Suna v. Bailey Corp., 107 F.3d 64, 68 (1st Cir. 1997).   After describing the SSDI claims process, the Complaint details CIGNA's fraudulent scheme.  The Complaint recounts the communications from CIGNA's Case Managers and Offset Specialists to claimants, including numerous form letters and phone calls cajoling and coercing insureds to apply for SSDI.  ¶¶ 68-80, 86-99.  The Complaint sets forth the Reimbursement Agreement that CIGNA distributes to

its insureds which requires claimants to promise to repay CIGNA with SSDI benefits or to consent to a reduction in their benefits based on CIGNA's estimation.  ¶¶ 77-80.

Moreover, the Complaint describes the core allegations of a knowing fraud: whileCIGNA is actively pursuing the insured's claim for SSDI benefits, CIGNA is documenting its decision to deny or terminate LTD benefits.  No attempt is made by CIGNA to ensure that those insureds for whom it will deny LTD benefits do not apply for SSDI.  ¶ 101.  Even though CIGNA is under an affirmative duty to disclose to SSA any material facts that pertain to the application, CIGNA does not reveal to SSA its decision to deny coverage under the LTD policies to the same claimants that recently had filed SSDI claims.  Id.

Thus, the Complaint pleads the "time" false or fraudulent claims were submitted  – from 1997 to the present with the scheme changing somewhat in mid-2002.  ¶¶ 86-88.   Since the scheme is nationwide, the Complaint alleges "place" generically, but describes with specificity the identities of CIGNA's agents in different jurisdictions and their specific roles. ¶ 94.   The Complaint describes in detail the role played by Advantage 2000 in representing claimants before SSA and its contingency fee arrangement with CIGNA.  ¶¶ 98-99.

The Complaint also avers the "content" of the false representations made to SSA, namely that CIGNA causes the claimant to present a claim of total disability to the government while at the same time CIGNA has determined and advised the claimant that he or she does not even meet the LTD "own occupation" definition of disability.  ¶ 94.  In addition, the Complaint pleads that CIGNA conceals material information from the SSA about the claimant's medical condition and its own determination that the claimant is able to work.  ¶¶ 109-114.

For these reasons, defendants are plainly wrong that the Complaint does not specify any "actual false claims" or identify any false or fraudulent documents created or used by CIGNA. See Memo. at 11-13.   This entire case is about a scheme to enrich CIGNA by causing submission of false claims.  See Gabelli, 345 F. Supp. 2d at 339 (noting that complaint met Rule 9(b) in circumstances where "the fraudulent scheme was the submission of the claims themselves" and not only a "general scheme of fraud was alleged").   Like in Gabelli, the Complaint here focuses on CIGNA's scheme to cause false claims – tens of thousands of claims that CIGNA knew to be meritless – to be submitted to SSA.  CIGNA's uniform policy of requiring all of its claimants (except for those with pregnancy-related claims) to apply for SSDI provides a more than ample factual basis for Relator's allegations that CIGNA knowingly caused the submission of false claims for SSDI benefits.

### B.    The Complaint Pleads Two Examples Of Actual False Claims For SSDI.

In addition, the Complaint sets forth two false claims as examples of the many thousands of meritless claims that CIGNA caused to be submitted to SSA.   ¶¶ 102-110.  For both false claims, Advantage 2000 filed a claim for SSDI benefits for the claimant and, within one to two months, CIGNA denied the claims made by the claimants for disability coverage under their LTD policies. ¶¶ 106, 109-109.   In both instances, CIGNA wrote the claimants that it had determined they were not entitled to LTD coverage after a "thorough review" of the claimant's file including medical reports.  ¶¶ 106, 109.  In other words, once CIGNA achieved its objective of having the claimant file for SSDI, CIGNA terminated disability coverage under its own LTD policies.

The two claims pled as examples in the Complaint are "false claims" within the meaning of the FCA and are illustrative of the thousands of other claims that CIGNA could easily identify

through Fed. R. Civ. P. 26 disclosures and discovery. It is not necessary that the claims themselves contain untrue factual information or that SSA actually awarded benefits to the claimants as defendants assert. See Memo. at 11-12. The SSDI Application is, in and of itself, a misrepresentation to SSA. The claim misrepresents that the claimant is eligible for benefits under SSDI's "any occupation" definition of disability.

For these reasons, CIGNA is absolutely wrong that inclusion of these two examples counsels in favor of dismissal of this Complaint. See Memo. at 12. These claims are the quintessential "actual false claims" described by Karevlas, Parke Davis and other Rule 9(b) authorities. Moreover, it is reasonable to infer that a claim that is not eligible for coverage under CIGNA's "own occupation" definition of disability could not have been eligible one or two months prior for an award of benefits under SSDI's "any occupation" definition of disability.

Defendants' intimation that pleading "only two" examples of false claims is inadequate, is also incorrect. Memo. at 11. Where the alleged fraud scheme is complex and far-reaching as it is here, pleading every instance of fraud would be near impossible and is not required. See Parke Davis, 147 F. Supp. 2d at 49 (Rule 9(b) does not require the identification of every ineligible prescription submitted to the government for payment); see also United States ex rel. Clausen v. Laboratory Corp., 290 F.3d 1301, 1314 n.25 (11th Cir. 2002) (Rule 9(b) may be relaxed "in appropriate circumstances to aid those alleging prolonging multi-act schemes"); United States ex rel. Thompson v. Columbia/HCA Healthcare Corp, 20 F. Supp. 2d 1017, 1049 (S.D. Tex. 1998) (Rule 9(b) satisfied by alleging the "basic framework, procedures, the nature of fraudulent scheme, and the financial arrangements and inducements among the parties and physicians that gave rise to Relator's belief that fraud had occurred"); United States v. Kensington Hospital, 760

F. Supp. 1120, 1125 (E.D. Pa. 1991) (Rule 9(b) requires pleading only the time-frame, the clinics involved and the type of kickbacks involved); United States ex rel. Pogue v. American Healthcorp, Inc., 977 F. Supp. 1329, 1332-33 (M.D. Tenn. 1997) (Rule 9(b) permits relator to omit allegations concerning each instance of fraudulent conduct).

### C.     The Fraudulent Scheme Is Sufficiently Described In This "Pattern Or Practice" Case.

In any event, contrary to defendants' argument at 12-13, even if the two examples at paragraphs 102-110 had not been pled, the Complaint satisfies Rule 9(b) because the Complaint avers the submission of "actual false claims" as a matter of CIGNA's uniform corporate policy. See Karvelas, 360 F.3d at 225 (requiring evidence of "actual false claim" in hospital billing case). As a matter of uniform corporate policy to improve its financial status by reducing reserves, CIGNA chooses to flood SSA with meritless claims for SSDI benefits.  Defendants have identified no authority suggesting that Rule 9(b) somehow forbids prosecution of such a "pattern and practice" case under the FCA.

Because this case concerns a uniform corporate policy, the cases cited by CIGNA present wholly different fact patterns and are inapposite.  See Memo. at 13-15.  In each case, the allegation of submission of actual false claims lacked the indicia of reliability needed to survive a motion to dismiss under Rule 9(b).  For example, in Karvelas, oft-cited by defendants, the complaint focused on alleged violation of federal Medicare regulations and procedures by which claims might have been submitted.  360 F.3d at 232-35.  In dismissing the Complaint, Karvelas found that the allegations that false claims had been submitted was speculative and that the alleged hospital practices might, or might not have, resulted in false claims.  Id.

Similarly, in <u>Clausen</u>, plaintiff alleged that defendant LabCorps had engaged in medically unnecessary lab tests. 290 F.3d at 1303-07. The relator in <u>Clausen</u> could not aver whether actual false claims were submitted to a federal health care program. <u>Id.</u> at 1312. In <u>United States ex rel. Walsh v. Eastman Kodak</u>, 98 F. Supp. 2d 141, the complaint did not identify <u>any</u> hospital cost reports or transactions that gave rise to FCA liability. In granting the motion to dismiss, the district court rejected the argument that one could simply infer that false claims had been submitted by hospitals based on inflated invoices issued by vendors. <u>Id.</u> at 147.[3]

Other district court cases cited by CIGNA similarly made only vague allegations about false billings without providing <u>any</u> concrete examples of a false claim. In <u>United States ex rel. Michael Gublo v. Novacare, Inc.</u>, 62 F. Supp. 2d 347 (D. Mass. 1999), the complaint did not identify even a single instance of a false claim for billing, but merely a methodology by which bills might have been inflated. <u>Id.</u> at 354. In <u>United States ex rel. Carroll v. JFK Medical Center</u>, 2002 WL 31941007 (S.D. Fla. Nov. 15, 2002), the complaint made allegations about billing for pain management services, unnecessary sedation, and overuse of dye procedures but did not provide "concrete" examples. <u>Id.</u> at **3-6. In none of these cases, did the Complaint plead a uniform policy, pattern and practice of submission of thousands of actual claims for government benefits with reckless disregard to the veracity of the claim as part of a deliberate, fraudulent scheme.

---

[3]    <u>United States ex rel. Bledsoe v. Community Health Systems</u>, 352 F.3d 634 (6th Cir. 2003), cited by defendants, is an unusual case. In <u>Bledsoe</u>, Relator thought Rule 9(b) did not apply to FCA actions and did not detail any false claims. <u>Id.</u> at 543-45. The Sixth Circuit permitted Relator to amend his complaint. <u>Id.</u>

For the same reasons, CIGNA's reliance on cases where the Complaint was dismissed for pleading only a "methodology" by which fraud may have been committed, is completely misplaced. See Memo. at 16-17. In those cases, similar to the ones discussed supra, the relator had failed to identify any false claims. See Gublo, 62 F. Supp. 2d at 354; United States ex rel. Butler v. Magellan Health Servs., Inc., 101 F. Supp. 2d 1365, 1369-70 (M.D. Fla. 2000) (relator alleged rescission of discharge orders and unnecessary patient admissions, but failed to allege actual false claims submitted or false documents used to submit claims); United States v. SmithKline Beecham Clinical Laboratories, Inc., 2000 WL 17838 **3-4 (E.D. La. Jan. 10, 2000) (relator failed to allege how suspicious practices led to fraudulent performance of urinalysis tests).

Here, unlike the authorities relied on by defendants, there is no question that CIGNA's uniform corporate policy to coerce all disability claimants to apply for SSDI (with the exception of pregnancy-related claims) results in submission of false claims. See United States v. Krizek, 192 F.3d 1024 (D.C. Cir. 1999) (reasonable inference of FCA liability where defendant submitted psychiatric bills totaling more than 24 hours per day even though could not prove which claims were fraudulent without discovery). CIGNA's policy was formalized in its SSDI Referral Guidelines. ¶¶ 68-80. Even claimants with a return to work date within nine months and claimants who could not possibly qualify for SSDI benefits must apply under CIGNA's uniform policy and practice. ¶¶ 72, 101. CIGNA set up a comprehensive administrative apparatus to ensure filing of as many SSDI claims as possible. ¶¶ 86-90. Case Managers and Offset Specialists were given incentive compensation to boost the number of referrals of claimants to Social Security. ¶ 98. Case Managers and Offset Specialists were responsible for estimating

SSDI benefits to calculate offsets and reduce reserves after claims were filed with SSA.  ¶¶ 75, 98.  CIGNA even contracted with private consulting firms, including Advantage 2000, to assist claimants with filing SSDI claims.  ¶¶ 94-96.  In 2003, Advantage 2000 reported that it had filed a claim or pursued an appeal for virtually all of CIGNA's referred claimants.  ¶ 99.

Pleading individual identity or dates for each of those who were coerced into filing meritless claims with SSA would add nothing of value at this stage because CIGNA's policy and practice of filing false claims was a uniform one.  Memo. at 12-13.  Relator intends to use the uniformity of CIGNA's policy to support an inference of knowing submission of false claims.

Moreover, Relator's position as an insider employee at CIGNA gives her allegations of corporate misconduct an indicia of reliability not available in cases like Karvelas and Clausen.  Ms. Barrett has worked for LINA as a "support tech" from September 2000 until May 2002.  From May 2002, Ms. Barrett was a Vendor Coordinator for the SSA Process.  From July 2003 to February 2005, Ms. Barrett was the Disability Claims Administrator for LTD Pre-Sam claims.  Since February 2005, Ms. Barrett has been a STD Claims Manager.  During her employment with CIGNA/LINA, Ms. Barrett's responsibilities have included reviewing claimant case files, tracking benefits award information, and assisting case managers in handling claimant cases on a daily basis.  Ms. Barrett witnessed the referral of claims to SSA on a mass basis without regard to the claimant's eligibility.  Memo. at 15.  Accordingly, Ms. Barrett's allegations carry a high degree of reliability.

Relator's first hand experience has given her access to direct evidence of the alleged practices.  Accordingly, this case may most resemble the situation in United States v. Morehouse Medical Associates, 2003 WL 22019936 (Aug. 15, 2003) where the Eleventh Circuit clarified

post-Clausen that, in many instances, it is appropriate to relax Rule 9(b) standards where an insider can provide detailed facts about billing practices resulting in false claims even when actual false claims are not identified.  Id. at **4-5.  In sum, the Complaint more than adequately alleges with particularity the fraudulent scheme conducted by CIGNA and the filing of actual false claims with SSA.

## II.    The Qui Tam Complaint Pleads All Elements Of A FCA Violation.

Defendants' contention that the Complaint fails to allege material elements of a FCA violation, is also lacking in foundation.  Memo. at 17-18.  To state a claim under section 3729(a)(1), a plaintiff must allege that the defendant (1) made a claim to the government (2) that is false or fraudulent, (3) knowing of its falsity, and (4) seeking payment from the federal treasury.  To state a claim under section 3729(a)(2), a plaintiff must aver that the defendant (1) created, used, or caused to be used, a record or statement to the government, (2) that is false or fraudulent, (3) knowing of its falsity, and (4) to get a false or fraudulent claim paid or approved by the government.  All necessary elements under subsections (a)(1) and (a)(2) are alleged.

### A.    Applications For SSDI Benefits Are "Claims" Under The FCA.

Defendants' argument that the SSDI Application Form (Form SSA-3368-BK) is not a "claim" is patently absurd.  Memo. at 18-21.  Under the FCA, a "claim" includes any "request or demand" for money or property.  See 31 U.S.C. § 3729(c).  Applications for government benefits are "claims" under the FCA.  See United States v. Neifert-White, 390 U.S. 228, 230 (1968); see also United States ex rel. Kneepkins v. Gambro Heathcare, Inc., 115 F. Supp. 2d 35, 42 (D. Mass. 2000) ("submitting a claim for program benefits under the false pretense of entitlement is fraudulent").  One need not plead that the government actually paid the ineligible claim.  The key

inquiry is whether the "claim" has the "practical purpose and effect, and poses the attendant risk, of inducing wrongful payment." United States v. Rivera, 55 F.3d 703, 710 (1st Cir. 1995). Even unsuccessful attempts to defraud the United States can trigger FCA liability. Id. at 709.

Here, the Application Form requests the United States to pay money (benefits) to the claimant. CIGNA attaches a modified version of the Application Form described by Relator. See Memo, Exhibit B. Attached as Exhibit A to this Opposition is the "Disability Report, Form SSA-3368-BK" that was used by the SSA during much of the time period covered by the allegations in the Complaint (starting in 2001). The SSDI Application Form is a "claim" under the FCA.

The two Forms are not significantly different. Both Forms explain "What We Mean By Disability." They explain:

> For purposes of this claim, we want you to understand that 'disability' means that you are unable to work as defined by the Social Security Act. You will be considered disabled if you are unable to do any kind of work for which you are suited and if your disability is expected to last (or has lasted) for at least a year or to result in death. So when we ask, 'when did you become unavailable to work,' we are asking when you became disabled as defined by the Social Security Act.

Both Forms ask the claimant to represent when he or she became unable to work and eligible for SSDI within the meaning of the Social Security definition of disability.

Both the current and modified Forms make clear that the Form is a claim for federal benefits. Page 1 of the instructions state "[t]he information that you give us on this form will be used by the office that makes the disability decision of your disability claim." Page 2 of the instructions state "[t]he information on this form is needed by Social Security to make a decision on the named claimant's claim. While giving us the information on this form is voluntary, failure to provide all or part of the requested information could prevent an accurate or timely decision on the named claimant's claim." (Emphasis added).

Upon submission of Form SSA-3368-BK, SSA initiates an administrative process for disposing of the claimant's claim. There is no other claim form for SSDI benefits. The next official communication between SSA and the claimant (other than requests for additional information) would be a letter from SSA either awarding benefits or explaining the procedures for filing an appeal.[4]

Taken to its logical extreme, CIGNA's argument that the SSA Form is not a "claim," Memo. at 18-22, would mean that the United States could not pursue civil damages and penalties under the FCA even against a claimant who admittedly lies about factual information. In fact, CIGNA suggests such intentional deceit could only be punished under false statement laws and that the United States would be helpless to recover FCA damages. Memo. at 18 n.4. Such a result obviously would be ridiculous. The United States uses the FCA to pursue actions against individuals who knowingly misrepresent eligibility for SSDI. See Exhibit B. Knowing misrepresentations of one's eligibility for benefits or factual misrepresentations in the SSDI Application Form may be prosecuted as a false "claim."

That the SSA investigates the claim for eligibility before money is actually paid out also is of no moment to the "claim" analysis. Memo. at 19-21. Liability attaches when a request or demand for payment occurs even if the government's liability to pay the claim does not ripen until subsequent conditions occur. Rivera, 55 F.3d at 710. Otherwise, no claims for governmental benefits would be subject to the FCA. Most claims for government programs,

---

[4]    Defendants point out that the current Claim Form has a two page attachment entitled "This Is Not An Application." Memo. at 20-21. But, these pages are clearly instructions and state "Please Remove This Sheet Before Returning The Completed Form." After the first two pages of instructions, the current Form consists of ten pages. The Form requests medical and vocational history material to whether the claim should be granted.

including claims for reimbursement from Medicare, are subject to investigation by the federal program officers. CIGNA's proposed standard that claims must be "immediately enforceable" would lead to a result not intended by Congress. Memo. at 19-20.

For these reasons, courts have recognized a great variety of "claims" within the meaning of the FCA. See, e.g., United States v. TDC Management, 288 F.3d 421 (D.C. Cir. 2002) (progress and expenditure reports submitted to support payment under program to encourage minority participation in large transportation construction projects); Ab-Tech Const., Inc., v. United States, 31 Fed. Cl. 429, aff'd, 57 F.3d 1084 (Fed. Cir. 1995) (claims made under project intended for minority businesses); United States v. Cooperative Grain & Supply Co., 476 F.2d 47 (8th Cir. 1973) (false representation in claim to obtain price supports for purchased grain); Sell v. United States, 336 F.2d 467, 474 (10th Cir. 1964) (fraudulent claim for federal assistance under the Emergency Feed Program); United States ex rel. King v. F.E. Moran, Inc., 2002 WL 2003219 (N.D. Ill. Aug. 29, 2002) (claims made under project intended for minority businesses).

None of the cases cited by defendants (Memo. at 18-20) involve a claim for benefits under a federal benefit program equivalent to the claim here. Dookeran v. Mercy Hospital, 281 F.3d 105 (3d Cir. 2002), did not involve a request or demand for money from any federal grant program, but merely an application to be designated by a federal agency as a "clinical center" for a national clinical trial on the effectiveness of certain chemotherapy agents. Id. at 107-09. Similarly, in United States ex rel. Cooper v. Gentiva Health Servs., Inc. 2003 WL 22495607 (W.D. Pa. Nov. 4, 2003), the court found it "obvious" that a misrepresentation on an initial application to qualify for a Medicare provider identification number is not a claim for payment.

Id. at *7, n.9.   Neither Dookeran nor Gentiva Health remotely resembles a request for SSDI benefits.

Cases involving federal loan guarantees are also completely different from the representation for eligibility made on the application for SSDI benefits.  Memo. at 20.  For example, in United States v. Van Oosterhout, 96 F.3d 1491 (1996), cited by defendants, the D.C. Circuit considered when a "claim" had been submitted under a loan guarantee program for statute of limitations purposes.  Id.  The D.C. Circuit held that a "claim" arose when the United States became liable to reimburse third party lenders based on the debtor's default.  96 F.3d at 1494-95.

Van Oosterhout, however, has absolutely no bearing on this case.  Unlike a loan guarantee where no claim arises until the debtor's default triggers the government's legal obligation to pay, here the claim for benefits is not at all inchoate.  The claim for SSDI benefits triggers a costly administrative procedure which, at the end of the process, may result in an award of benefits or a denial of the claim.  The right to payment may not be yet enforceable but the claim itself – the demand for money or benefits – certainly is ripe.  In re Cardiac Devices Qui Tam Litigation, 221 F.R.D. 318 (D. Conn. 2004) (false annual cost reports constitute "claims"); Cantrell v. New York University, 326 F. Supp. 2d 468 (S.D.N.Y. 2004) (each financial report submitted by hospital that failed to report income were "claims").  Whether payment is immediate or delayed does not change the fact that, under either scenario, a request or demand for money or property – a claim – has been made to the federal government.[5]

---

[5]      Defendants cite Gabelli where unsuccessful bids on FCC auctions were not "claims."   Gabelli noted, however, that the bids were not requests or demands for monetary compensation.   "A bid unless accepted does not create a contract which would give rise to a claim." 345 F. Supp. 2d at 335 & nn.130-31.  Gabelli is not applicable here.  The SSDI Form is expressly a claim for benefits under a federal program.

**B.    Meritless Claims For SSDI Benefits Are False And Fraudulent.**

Throughout its memorandum, defendants repeat an argument that the SSDI claims are not "false or fraudulent" because they do not contain untrue factual information.  See Memo. at 22-24.  This argument misunderstands the meaning of "false or fraudulent" under the FCA.  To satisfy the "falsity" requirement, a false claim need not contain factually untrue information.  Both affirmative misstatements and omissions of fact can render a claim "false" or "fraudulent" for purposes of the FCA.  See, e.g., Lucky v. Baxter Healthcare Corp., 183 F.3d 730, 732-33 (7th Cir. 1997).  For an omission to give rise to FCA liability, it must be material to the decision to pay.  Ab-Tech Construction, 31 Fed. Cl. at 434.  Defendant must have an affirmative duty to disclose the withheld information to the government.  See United States ex rel. Berge v. Board of Trustees, 104 F.3d 1453, 1461 (4th Cir. 1997).

Thus, a false claim is simply "a knowing presentation of what is known to be false."  See United States ex rel. Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1421 (9th Cir. 1991).  Here, the representation on the SSDI claim form is that the claimant was eligible for SSDI.  In the vast majority of cases, however, eligibility for SSDI is foreclosed by the claimant's residual work abilities, rendering these claims legally false.[6]  In addition, as observed by the Second Circuit in Mikes v. Straus, 274 F.3d 687 (2001), and the Third Circuit in United States ex rel. Quinn v. Omnicare, 382 F.3d 432 (2004), "false and fraudulent" have independent meanings.

---

[6]    Defendants rely on United States ex rel. Roby v. Boeing Company, 100 F. Supp. 2d 619 (S.D. Ohio 2000) for the proposition that the FCA requires "proof of an objective falsehood."  Id. at 625-26.  See Memo. at 23.  Courts differ over whether one must show a "lie" given the FCA's concept of "knowing" includes deliberate ignorance or reckless disregard.  See United States ex rel. Plumbers and Steamfitters Local Union No. 38 v. C.W. Roen Const. Co., 183 F.3d 1088, 1092 (9th Cir. 1999) (cases should not be read to require an "intentional lie").

> A common definition of 'fraud' is an intentional misrepresentation, concealment, or nondisclosure for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to him or to surrender a legal right. 'False' can mean 'not true,' 'deceitful,' or 'tending to mislead.' The juxtaposition of the word 'false' with the word 'fraudulent,' plus the meanings of the words comprising the phrase 'false claim,' suggest an improper claim is aimed at extracting money the government otherwise would not have paid.

Omnicare, 382 F.3d at 438; Mikes, 274 F.3d at 695. For this reason, courts have held that a complaint alleging that a defendant engaged in a course of conduct to induce the government to pay medical benefits to persons whom the government did not intend to benefit, even though the defendant never made an untrue statement, states a claim under section 3729(a)(1). See United States ex rel. Pogue, 914 F. Supp. at 1338-39 & n.7; United States v. Incorporated Village of Island Park, 888 F. Supp. 419, 439 (E.D.N.Y. 1995) (FCA violated "not only by a person who makes a false statement or a false record to get the government to pay a claim, but also by one who engaged in a fraudulent course of conduct that causes the government to pay a claim for money").

The false representation in this case on the SSDI Application Form is that the claimant meets the SSDI definition of disability and is eligible for SSDI benefits. That claim of eligibility for SSDI is false for most of CIGNA's claimants on its LTD policies. In most cases, CIGNA denies coverage on its own, more lenient, LTD policies within a few months of causing the SSDI claim to be filed. Even though CIGNA has determined that the claimant is not disabled from even his "own occupation," CIGNA nevertheless forces its insureds to file for SSDI benefits and falsely represent that he or she is disabled from performing "any occupation." CIGNA's submission of the SSDI Application Form is the also culmination of a fraudulent scheme under

which CIGNA deliberately induces and coerces claimants to file knowingly false claims.

Therefore, the claims are also "fraudulent" within the meaning of the FCA.  See Mikes, supra.

Relator does not simply rely on the fact that SSA denies a high number of SSDI claims to deduce that the claims submitted by CIGNA were false, as defendants accuse.  See Memo. at 22. Instead, Relator alleges, based on her first hand knowledge as a company insider, that CIGNA's uniform practice of 100% SSDI referral necessarily resulted in the submission of large numbers of false and fraudulent claims.  ¶¶ 114-117.[7]  False representations of eligibility for SSDI were neither mistaken nor unintentional on CIGNA's part, as defendants suggest.  See Memo. at 22-23. Even if the claimant might not have understood that the representation that they made on the SSDI Form that they were disabled was false, it is fair to infer that CIGNA, with its superior knowledge and extensive experience in the disability insurance business, knew that such a representation of eligibility was at odds with the SSDI disability definition.

Finally, defendants' argument that any false claims were innocently submitted because SSA regulations permit a claimant to apply for SSDI before he or she is off work for a full year is no excuse.  See Memo. at 23-24.  Whether the applicant has been off work a full year or only a few months, the nature of their disability must be such that they are unable to work in "any occupation."  By instructing applicants to "apply as soon as you believe you are unable to work," SSA is not suggesting that applicants may file claims even if they do not meet the statutory definition of disability.  Eligibility under the statutory definition of disability is a precondition to payment of the SSDI claim.  Knowing submission of claims that do not meet the eligibility

---

[7]        CIGNA misstates the allegations about whether claimants with a return to work date within nine months were required to apply for SSDI.  Memo. at 23.  Although CIGNA's Social Security Referral Guidelines direct that these claimants not be referred to SSA, ¶ 69, the Complaint alleges that, in fact, CIGNA coerces these claimants to apply for SSDI.  ¶ 72.

criteria are false claims.  See Clausen, 290 F.3d at 1311 (FCA liability when a "provider knowingly asks the Government to pay amounts it does not owe").

      **C.**     **CIGNA's Submission Of False Claims Was "Knowing."**

CIGNA's submission of false claims in this case was "knowing."  Memo. at 24-27.  To rise to the level of a "knowing" presentation of a false claim, defendant must have (1) actual knowledge of the information; (2) act in deliberate ignorance of the truth or falsity of the information, or (3) act in reckless disregard of the truth or falsity of the information.  No proof of specific intent to defraud is required.  31 U.S.C. § 3729(b).  See also Anton, 91 F.3d at 1267.

CIGNA's conduct here readily meets at least the "reckless disregard" standard.  As one of the leading disability insurers in the country, CIGNA has extensive and superior knowledge about disability insurance coverage and SSDI eligibility criteria.  Despite – or perhaps more accurately because of – this superior knowledge, CIGNA deliberately exploits the system to inundate SSA with thousands of meritless claims.  ¶¶ 112-117.  Such conduct certainly evinces a "reckless disregard" for the truth of the claims submitted to SSA.  See Krizek, supra (psychiatrist and spouse acted in reckless disregard in submitting incorrect billings and psychiatrist failed to review bills).

United States ex rel. Compton v. Midwest Specialties, Inc., 142 F.3d 296 (6th Cir. 1998) is analogous to this case.  In Compton, defendants submitted claims for payments to the government for brake shoe kits that has not been tested as required.  The Sixth Circuit held that defendants had acted with at least reckless disregard by submitting the claims and certifying that the kits conformed to contract requirements.  Id. at 304.  Likewise, CIGNA submits claims to SSA without performing any assessment to separate out those who could not be eligible from those

who could be.  Such conduct evinces, at a minimum, reckless disregard of truth or falsity.  The

frequency and volume of the false claims that CIGNA caused to be submitted to SSA also gives

rise to a reasonable inference that such conduct was not mere mistake but knowing misconduct.

See United States v. Russell, 19 F. 591, 592 (W.D. Tex. 1884) ("likelihood that the defendant

knew the true character of the account would be strengthened in proportion to the number of acts

of a similar character done at or about the same time").

That the eligibility criteria between SSDI claims and LTD claims is "quite different" as

defendants observe, see Memo. at 24-26, also reinforces the conclusion that CIGNA's conduct is

knowing.  CIGNA is well aware that SSA has a much more stringent definition of disability than

the definition of disability under its own LTD policies.  Because of these different definitions,

most claimants who qualify for LTD coverage will never qualify for SSDI coverage.  CIGNA

knows this and, nonetheless, persists in its corporate policy that 100% of LTD claimants must

apply for SSDI and then, within a few months, denies coverage under its LTD policies.

So too, CIGNA's lengthy argument that CIGNA and SSA are not required to apply the

same eligibility criteria, and that CIGNA's determination of a claimant's disability is irrelevant

(and not binding) on SSA's determination, is completely beside the point.  Memo. at 25-27.

Relator agrees that "private long term disability insurance plans and SSDI are very different

schemes" and that it is "entirely appropriate that the SSA [and CIGNA] come to different

conclusions regarding the disability of a claimant."  Memo. at 25-26.[8]  It is CIGNA's deliberate

---

[8]     The fundamental difference between SSDI and LTD coverage is in the definition
of disability – any occupation versus own occupation.  CIGNA seeks to confuse this issue by
identifying areas, like mental disabilities, where SSDI may provide greater coverage than its LTD
policies.  See Memo. at 24-25.  The point here is that CIGNA does not exercise any discretion to
determine whether a claimant meets SSDI's eligibility requirements.

manipulation of the SSDI process that fairly supports an inference that CIGNA acts knowingly in causing false and fraudulent claims to be submitted to SSA. CIGNA knows that most of the claims it causes to be submitted to SSA are meritless under SSDI standards. CIGNA has reason to know that the claimant is not likely to be covered even under the more generous LTD policy. Yet CIGNA exercises no discretion to screen out meritless claims from SSDI referral and allows and encourages false claims to be submitted.[9] The allegations of knowledge in the Complaint are sufficient.

**D.      CIGNA "Caused" False Claims To Be Submitted.**

Defendants' next contention – that the allegations of the Complaint are insufficient to show that CIGNA "caused" false claims to be submitted – also falls wide of the mark. Memo. at 27-30. The emerging standard in the case law for evaluating whether a causal connection exists between defendant's conduct and the alleged false claims is whether submission of the false claim was reasonably foreseeable. See Parke-Davis, 147 F. Supp. 2d at 52. Under this analysis, foreseeable intervening forces will not supersede the defendant's responsibility where defendant's conduct has been a substantial factor in producing the harm. Id. (citing Restatement (Second) of Torts § 443 (1965)).

Here, it was a foreseeable consequence of CIGNA's uniform corporate policy that thousands would submit claims to SSA representing that they were eligible for benefits even though the nature of their disability and residual work capacity foreclosed such a determination. It is not necessary to allege that claimants were coerced into filing claims with factually untrue

---

[9]      Determinations by another agency that a claimant is disabled does not bind SSA. Memo. at 26 (citing 20 CFR § 416.904). Citation of this regulation does not aid CIGNA's arguments. If anything, this regulation supports the allegation that a claimant must meet SSDI's disability definition and that a knowing false representation of eligibility is a false claim.

descriptions of their medical or vocational history as CIGNA argues. Memo. at 27. All that need

be alleged is that CIGNA caused the claimants to represent that they were disabled within the

meaning of that term under SSA's definition. ¶ 73. This is fairly alleged.

Similarly, each claimant's representation that he or she is eligible for SSDI is not an

"unforeseeable intervening force" interrupting the causal connection between CIGNA and the

false claims submitted to SSA. Memo. at 28. CIGNA threatens to reduce benefits unless SSDI

application is made while offering assistance with filing of SSDI claims. With such coercion,

duress, and inducement, it is foreseeable (and, indeed, specifically intended) that most claimants

will represent that they are disabled from performing work in any occupation. ¶ 85. See D.

Dobbs, et al., Prosser & Keeton on Torts § 44, at 303-04 (5th ed. 1984) ("courts are quite

generally agreed that [foreseeable intervening forces] will not supercede the defendant's

responsibility"); Parke-Davis, 147 F. Supp. 2d at 52-53 ("the participation of doctors and

pharmacists in the submission of false Medicaid claims was not only foreseeable, it was an

intended consequence of the alleged scheme of fraud").

CIGNA's role here resembles the role of the researcher charged with FCA violations in

United States ex. rel. Cantekin v. University of Pittsburgh, 192 F.3d 402 (3d Cir. 1999). In

Cantekin, the court of appeals found that a researcher's disclosure of industry funding to the

program administrator at his university did not absolve him of liability for failing to disclose

industry funding on NIH grant applications. Id. at 416. Because it was foreseeable that the

program administrator would not disclose the industry funding, the researcher was still liable for

the consequences of the tortious action he had set in motion. Id. ("It is a basic principle of tort

law that once a defendant sets in motion a tort, the defendant is generally liable for the damages ultimately caused, unless there are intervening causes.").

In any event, whether CIGNA's role in the submission of the claims – including the duress imposed on claimants – was sufficient to find that CIGNA caused submission of these ineligible claims is not capable of resolution at this pleading stage. Often, additional information will emerge through discovery that will aid the causation inquiry. For example, in United States ex rel. Drescher v. Highmark, Inc., 305 F. Supp. 2d 451 (E.D. Pa. 2004), the United States alleged that an insurer violated the FCA by declining claims for reimbursement it should have paid as the primary insurer. These claims were returned to providers and submitted to Medicare for payment. Id. at 458. The district court denied defendant's motion to dismiss and concluded that if the defendant insurer had directed providers to submit claims to Medicare, or otherwise suggested Medicare should pay, the United States could demonstrate causation. Id. at 461. Here, the complaint properly pleads that CIGNA's scheme caused claimants to file false SSDI claims.[10]

### E.    Misrepresentation of Eligibility for SSDI Benefits Is "Material."

Finally, CIGNA's suggestion that the misrepresentation of eligibility for SSDI benefits is not "material" to the government's decision to pay benefits must also fail. Memo. at 30-32. Under First Circuit case law, some showing of "materiality" must be made to support a FCA claim. See United States v. Data Translations, Inc., 984 F.2d 1256, 1267 (1st Cir. 1992). However, CIGNA misstates the standard for materiality under emerging case law. Memo. at 31.

---

[10]    CIGNA's reliance on United States ex rel. Kinney v. Hennepin Cty. Med. Ctr., 2001 WL 964011 (D. Miss. Aug. 22, 2001) is misplaced. Memo. at 28. In Kinney, physicians had signed false certificates of medical necessity for ambulance transport. Id. at *11. The district court did not decide the case on "causation" grounds, but held that the government did not rely on the physician's signature. Id. at *11.

Relator need not show that the falsity was "essential" to the government's decision to pay.  Id.

Instead, most courts have held that the materiality inquiry is whether the information presented

could have influenced the decisionmaker not whether the decisionmaker was, in fact, influenced

by or granted relief based on the information.  See United States v. Southland Management Corp.,

288 F.3d 665 (5th Cir. 2002), on reh'g en banc, 326 F.3d 669 (5th Cir. 2003) (en banc) (discussing

different materiality standards); see also Restatement (Second) of Torts § 538 (1976) (whether

"recipient of information . . . likely to regard matter as important in determining choice of

action").

 Here, the claimant's representation that he or she is unable to work and is disabled within

the meaning of the SSA definition for disability is a material representation that could influence a

decisionmaker.  Even though SSA will conduct an investigation of each claim to determine

eligibility, the existence of this administrative process does not render the representation of

statutory eligibility immaterial under the law.  The false representation of eligibility is certainly

material to initiating the administrative process resulting in the harm to the government of wasted

administrative expenses.

 CIGNA is simply wrong that its concealment of its decision to deny LTD benefits was

somehow immaterial to SSA's determination of the claimant's eligibility.  Memo. at 31-32.  In

many instances, CIGNA, or its agent Advantage 2000, is the claimant's representative before

SSA.  In that capacity, CIGNA has a duty to disclose material information in its possession that

may be relevant to the SSDI determination of eligibility.  42 U.S.C.§ 408(4);  42 U.S.C. § 1320a-

8; see also 20 C.F.R. § 404.1740 (imposing affirmative duties on representatives of SSDI

applicants and prohibiting false or misleading statements about a material fact).  Accordingly,

concealment of such information is also a material omission capable of influencing SSDI's determination of eligibility.

### F.     Allegations Are Proper Under Section 3729(a)(2).

Defendants' arguments for dismissal of Count II are essentially the same as Count I:  that Relator has not identified "false" statements or records.  Memo. at 32.  As discussed <u>supra</u> at 27-30, Relator need not show that the details of the medical and vocational history on the Application Form were factually untrue.  It is enough that Relator has alleged that the representation of eligibility for SSDI was a false one.  The misrepresentation of eligibility on the SSDI Application Form serves as both the false claim and the false statement or report supporting the false claim.  <u>See</u> <u>United States ex rel. Thompson</u>, 20 F. Supp. 2d at 1048 (annual cost reports that contained allegedly false certification of compliance with federal laws stated a claim under subsection (a)(2) as false records or statements used to obtain payment or approval); <u>United States ex rel. Lamers v. City of Green Bay</u>, 998 F. Supp. 971, 986, 989 (E.D. Wis. 1998), <u>aff'd</u>, 168 F.3d 1013, 1017 (7th Cir. 1999) (standard assurances of compliance with grant requirements as well as letters in support of application could constitute false statements or records to get claims paid).

Defendants' argument that one must show that a false statement was used to get a false claim actually paid, is also mistaken.  Memo. at 32.  The First Circuit does not require a showing that the false claim was actually paid to establish liability under either section (a)(1) or (a)(2).  <u>See</u> <u>Rivera</u>, 55 F.3d at 709.

**III.    CIGNA's Additional Arguments In Favor Of Dismissal Are Wholly Without Merit.**

CIGNA makes three final arguments.  None counsel dismissal of this action.  First, defendants assert that the allegations in this action are estopped because federal benefits programs also contain offset requirements.  Memo. at 33-35.  This argument, albeit creative, is completely misguided.  SSA regulations requiring that claimants for SSDI apply for benefits from other federal programs do not estop Relator from bringing forth these allegations of a knowing fraud committed on SSA.  Id. (citing 20 CFR 416.210(a)-(b)).  SSA regulations were promulgated pursuant to a statutory mandate that individuals eligible for SSDI apply for benefits if they are "likely" to be eligible for these other benefit programs.  Congress's decision to offset the burden of supporting a disabled individual between different federal and state government programs is an appropriate legislative judgment.  It serves important public goals of preserving monies in the federal Social Security Disability Insurance trust fund.

CIGNA's scheme is not simply an offset requirement, however.  If CIGNA's Social Security Referral program were simply a legitimate offset, CIGNA would make an effort to identify eligible claimants on its LTD disability policies to apply for SSDI; would not give its Offset Specialists and Case Managers and contractors financial incentives to ensure SSDI referral; would not require that those with return to work dates within nine months apply for SSDI; and would not conceal from SSA its decision to deny benefits under the more limited LTD policies.  CIGNA's scheme, unlike SSA's, has all of the earmarks of a knowing fraudulent scheme to submit false claims.

In any event, it is hornbook administrative law that in general there is no estoppel against the federal government.  See Office of Personnel Management v. Richmond, 496 U.S. 414, 419-

20 (1990) (citing cases).   And, the federal government has never taken the position that CIGNA's conduct is acceptable.  See United States v. Simmons, 247 F.3d 118, 124 (4th Cir. 2001) (doctrine of judicial estoppel precludes taking opposite position previously taken in litigation).  There is nothing inconsistent with SSA's enforcement of its Congressionally-mandated offset regulations in other fora, see Memo. at 34 (citing cases), and Relator's pursuit of this FCA case against CIGNA for a wholly separate fraud scheme.  See Pacific Frontier v. Pleasant Grove City, – F.3d –, 2005 WL 1625238 *5 n.6 (10th Cir. July 12, 2005).  The equitable doctrine of judicial estoppel is plainly not applicable here.

      Second, defendants' contention that CIGNA as a parent corporation cannot be held liable for the actions of its subsidiary, LINA, lacks precedential support.  Numerous allegations in the Complaint make clear that CIGNA is sued in its own capacity.  In any event, the allegations against CIGNA as a parent corporation are adequate.  See ¶¶ 6-7. Even if later developments bear out defendants' suggestion that LINA was the main actor in this scheme, courts will "pierce the corporate veil" if the parent and subsidiary lacked independence, the principals conducted their affairs with a requisite degree of fraudulent intent, and failure to pierce the veil would work substantial injustice.  See Gambro Healthcare., 115 F. Supp. 2d at 39 (citing cases).

      Finally, contrary to defendants' argument at 36-37, if this Court deems it necessary, Relator should be permitted to amend the Complaint.  Well-settled case law directs that permission to amend pleadings under Fed. R. Civ. P. 15(a) be liberally granted.  United States ex rel. Adrian v. Regents of the Univ. Of California, 363 F.3d 398 (5th Cir. 2004), cited by defendants, holds that "outright refusal to grant leave to amend without a justification such as 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure

deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.' is considered an abuse of discretion." Id. at 403-04 (citing Foman v. Davis, 371 U.S. 178, 182 (1962)); see also Gonzalez-Perez v. Hospital Interamericano de Medicina Avanzada, 355 F.3d 1, 5-6 (1st Cir. 2004) (same).  Under the circumstances, dismissal with prejudice would be an abuse of discretion.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(D), Relator Barrett requests oral argument.

## CONCLUSION

For the foregoing reasons, defendants' Motion to Dismiss should be denied.

Date:   August 1, 2005                    Respectfully submitted,

                                          / S /  Peter B. Krupp

W. Mark Lanier                            Peter B. Krupp, B.B.O. #548112
Kevin P. Parker                           LURIE & KRUPP, LLP
Judson A. Waltman                         One McKinley Square
Aaron J. Deluca                           Boston, MA  02109
THE LANIER LAW FIRM, P.C.                 Tel.: (617) 367-1970
P.O. Box 691408                           Fax: (617) 367-1971
Houston, TX  77269-1408
Tel.: (713) 659-5200                      Mary Louise Cohen
Fax: (713) 659-2204                       Peter Chatfield
                                          Colette G. Matzzie
                                          Phillips & Cohen LLP
                                          2000 Massachusetts Avenue, NW
                                          Washington, DC 20036
                                          Tel.: (202) 833-4567
                                          Fax: (202) 833-1815