*In the*

## UNITED STATES COURT OF APPEALS

*for the Eighth Circuit*

---

*No. 04-4151*

*Criminal*

---

UNITED STATES OF AMERICA,

*APPELLEE,*

*v.*

DENISE MARIE HENDERSON,

*APPELLANT.*

---

*Appeal from the United States District Court for the*

*District of Minnesota*

---

*BRIEF OF APPELLEE*

---

*THOMAS B. HEFFELFINGER*
*United States Attorney*

*JOSEPH T. DIXON, III*
*Assistant U.S. Attorney*
*District of Minnesota*
*600 United States Courthouse*
*300 South Fourth Street*
*Minneapolis, MN 55415*
*(612) 664-5600*

*Attorneys for Appellee*

## SUMMARY OF THE CASE

Defendant Denise Marie Henderson was convicted by a jury of nine counts of Social Security Disability Insurance fraud: wire fraud, false statements, and concealment from the Social Security Administration.  Defendant challenges her conviction claiming that the evidence was insufficient, the criminal prosecution should have been required to wait until the conclusion of administrative proceedings, the indictment was vague and imprecise, the district court abused its discretion in the admission of certain evidence, the district court erred in its instruction of the jury regarding materiality, the district court erred in denying defendant's motion to suppress, and the district court erred in sentencing.

The issues are adequately addressed in the parties' briefs, and ten minutes of oral argument is sufficient.

# TABLE OF CONTENTS

PAGE

SUMMARY OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CONTENTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

STATEMENT OF THE ISSUES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xi

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

SUMMARY OF THE ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    I.    THE EVIDENCE WAS MORE THAN SUFFICIENT TO
        SUPPORT THE JURY'S CONVICTION ON ALL NINE
        COUNTS IN THE INDICTMENT . . . . . . . . . . . . . . . . . . . . . . . . . 30

    II.    THE DISTRICT COURT DID NOT ERR IN DENYING
        DEFENDANT'S MOTION TO REFER THE CRIMINAL CASE
        TO THE SOCIAL SECURITY ADMINISTRATION . . . . . . . . . . 43

    III.    THE INDICTMENT FAIRLY INFORMED THE DEFENDANT
        OF THE CHARGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

    IV.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION
        IN ADMITTING EVIDENCE OF DEFENDANT'S BUSINESS
        AND ACTIVITY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

V.    THE DISTRICT COURT PROPERLY INSTRUCTED THE JURY REGARDING MATERIALITY ...................... 54

VI.   THE DISTRICT COURT CORRECTLY DENIED DEFENDANT'S MOTION TO SUPPRESS EVIDENCE SEIZED PURSUANT TO A SEARCH WARRANT ................... 55

VII.  THE DISTRICT COURT CORRECTLY SENTENCED THE DEFENDANT ......................................... 58

CONCLUSION ................................................ 61

CERTIFICATE OF COMPLIANCE .................................. 61

iii

# TABLE OF AUTHORITIES

PAGE

## CASES:

Blackmon v. United States, 108 F.2d 572 (5th Cir. 1940) . . . . . . . . . . . . . . . . . . 33

Blakely v. Washington, 124 S. Ct. 2531 (2004) . . . . . . . . . . . . . . . . . . . . . . . . 3, 59

Board of Regents v. Roth, 408 U.S. 564 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . 47

Carroll v. United States, 16 F.2d 951 (2d Cir. 1927) . . . . . . . . . . . . . . . . . . . . . 33

Coolidge v. New Hampshire, 403 U.S. 443 (1971) . . . . . . . . . . . . . . . . . . . . . . 55

Gonzales v. United States, 286 F.2d 118 (10th Cir. 1961) . . . . . . . . . . . . . . . . . 33

Hamling v. United States, 418 U.S. 87 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Kungys v. United States, 485 U.S. 759 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Marano v. Seafarers Int'l Union, Civ. A No. 87-5646,
     1988 WL 98244, at *2 (E.D. La. Sept. 8, 1988) . . . . . . . . . . . . . . . . . . . . . 35

Marvin v. United States, 732 F.2d 669 (8th Cir. 1984) . . . . . . . . . . . . . . . . . . . 56

Neder v. United States, 527 U.S. 1, 184-41 (1999) . . . . . . . . . . . . . . . . . . . 42, 49

United States v. Kail, 804 F.2d 441 (8th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . 56

United States v. Adler, 623 F.2d 1287 (8th Cir. 1980) . . . . . . . . . . . . . . . . . . . . 37

United States v. Agofsky, 20 F.3d 866 (8th Cir. 1994) . . . . . . . . . . . . . . . . . . . . 30

United States v. Apker, 705 F.2d 293 (8th Cir. 1983) . . . . . . . . . . . . . . . . . . . . 56

United States v. Baker, 200 F.3d 558 (8th Cir. 2000) . . . . . . . . . . . . . . 33, 37, 55

United States v. Barber, No. 04-30581, 2004 WL 2889918,
     at *1 (5th Cir. Dec. 14, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

United States v. Baumgardner, 85 F.3d 1305, 1307 n.1 (8th Cir. 1996) . . . 34, 39,
     45, 55

United States v. Bieganowski, 313 F.3d 264 (5th Cir. 2002) . . . . . . . . . . . . 49, 50

United States v. Booker, 125 S.Ct. 738 (2005) . . . . . . . . . . . . . . . . . . . . . . . 59

United States v. Brown, 763 F.2d 984 (8th Cir. 1985) . . . . . . . . . . . . . . 34, 46, 52

United States v. Cuervo, 354 F.3d 969 (8th Cir. 2004) . . . . . . . . . . . . . . . . . 54

United States v. Culliton, 328 F.3d 1074 (9th Cir. 2003) . . . . . . . . . . . . . . . . 45

United States v. Dolan, 120 F.3d 856 (8th Cir. 1997) . . . . . . . . . . . . . . . . . 48, 49

United States v. Evans, 272 F.3d 1069 (8th Cir. 2001) . . . . . . . . . . . . . . . . . 51

United States v. Falls, 117 F.3d 1075 (8th Cir. 1997) . . . . . . . . . . . . . . . . . . 58

United States v. Fernandez, 282 F.3d 500 (7th Cir. 2002) . . . . . . . . . . . 42, 49, 50

United States v. Ferro, 252 F.3d 964 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . 50

United States v. Frost, 321 F.3d 738 (8th Cir. 2003) . . . . . . . . . . . . . . . . . . 42

United States v. Gallant, 306 F.3d 1181 (1st Cir. 2002) . . . . . . . . . . . . . . . . . 45

United States v. General Dynamics Corp., 828 F.2d 1356 (9th Cir. 1987) . . 43, 44

United States v. Goodson, 155 F.3d 963 (8th Cir. 1998) . . . . . . . . . . . . . . . . 45

United States v. Gordon, 548 F.2d 743 (8th Cir. 1977) . . . . . . . . . . . . . . . . . 34

United States v. Gray, 367 F.3d 1263, 1271-72 & n.19 (11th Cir. 2004) ...... 42

United States v. Henson, 848 F.2d 1374 (6th Cir. 1988) ................. 57

United States v. Koonce, 485 F.2d 374 (8th Cir. 1973) ................. 33

United States v. Lardieri, 497 F.2d 317 (3d Cir. 1974) ................. 33

United States v. Lee, 374 F.3d 637 (8th Cir. 2004) ................. 51

United States v. Leon, 468 U.S. 897 (1984) ................. 57

United States v. McDonnell Douglas Corp., 751 F.2d 220 (8th Cir. 1984) . 43, 45, 47

United States v. Pasquantino, 336 F.3d 321 (4th Cir. 2003) ............... 42

United States v. Pennington, 168 F.3d 1060 (8th Cir. 1999) ............... 48

United States v. Rashid, 383 F.3d 769 (8th Cir. 2004) ................. 33, 37

United States v. Reed, 297 F.3d 787 (8th Cir. 2002) ................. 41

United States v. Rettenberger, 344 F.3d 702 (7th Cir. 2003) ....... 36, 45, 53, 59

United States v. Richmond, 700 F.2d 1183 (8th Cir. 1983) ........... 34, 37, 54

United States v. Schandl, 947 F.2d 462 (11th Cir. 1991) ................. 57

United States v. Snelling, 862 F.2d 150 (8th Cir. 1988) ................. 40

United States v. Stelten, 867 F.2d 446 (8th Cir. 1988) ................. 57

United States v. Streebing, 987 F.2d 368 (6th Cir. 1993) ................. 45

United States v. Sykes, 977 F.2d 1242 (8th Cir. 1992) ................. 30

vi

United States v. Taghizadeh, 98 F. Supp. 2d 1269 (D. Kan. 2000) . . . . . . . . . . . 35

United States v. Thompson, – F.3d –, 2005 WL 763313
        (8th Cir. Apr. 6, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 60

United States v. Turner, 189 F.3d 712 (8th Cir. 1999) . . . . . . . . . . . . . . . . . . . 54

United States v. Vazquez, 53 F.3d 1216 (11th Cir. 1995) . . . . . . . . . . . . . . . . . 41

United States v. Whitaker, 848 F.2d 914 (8th Cir. 1988) . . . . . . . . . . . . . . . . . . 33

United States v. White, 241 F.3d 1015 (8th Cir. 2001) . . . . . . . . . . . . . . . . . 48, 50

United States v. Wuagneaux, 683 F.2d 1343 (11th Cir. 1982) . . . . . . . . . . . . . . 56

United States v. X-Citement Video, Inc., 77 F.3d 491,
        1996 WL 5314 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

United States v. Yellow Freight System, Inc., 762 F.2d 737
        (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Weinstock v. United States, 231 F.2d 699, 701-02, n.6 (D.C. Cir. 1956) . . . . . . 33

## TABLE OF AUTHORITIES (cont.)

PAGE

**STATUTES:**

Title 18, United States Code, Section 1001 .............................. 33

Title 18, United States Code, Section 1341 ............................. 42

Title 18, United States Code, Section 1343 ........................... 1, 42

Title 18, United States Code, Section 1344 ........................... 33

Title 42, United States Code, Section 1383(e)(7)(A)(i) .................... 46

Title 42, United States Code, Section 1396h ........................... 34

Title 42, United States Code, Section 408 ........................... 44, 46

Title 42, United States Code, Section 408(a)(3) .................... 1, 32, 34

Title 42, United States Code, Section 408(a)(4) .................... 1, 39, 45

Title18, United States Code, Section 1001 ........................... 33, 34

Title18, United States Code, Section 1621 ........................... 33

Title18, United States Code, Section 1623 ........................... 33


**OTHER AUTHORITIES:**

Federal Rule of Criminal Procedure 12(b)(2) ........................... 48

Federal Rule of Criminal Procedure 52(a) ........................... 59

viii

United States Sentencing Guidelines, Section 2B1.1, app. note 3(A) . . . . . . . . . 58

United States Sentencing Guidelines, Section 2B1.1, App. No. 3  . . . . . . . . . . 58

United States Sentencing Guidelines, Section 2B1.1(b)(8) . . . . . . . . . . . . . . . . . 3

# STATEMENT OF THE ISSUES

**I.     Was the Evidence Sufficient To Support the Jury's Conviction on All Nine Counts?**

United States v. Sykes, 977 F.2d 1242 (8th Cir. 1992)
United States v. Baker, 200 F.3d 558 (8th Cir. 2000)
Kungys v. United States, 485 U.S. 759 (1988)

**II.     Did the District Court Err In Denying Defendant's Motion to Refer the Criminal Case to SSA?**

United States v. General Dynamics Corp., 828 F.2d 1356 (9th Cir. 1987)
United States v. McDonnell Douglas Corp., 751 F.2d 220 (8th Cir. 1984)
United States v. Culliton, 328 F.3d 1074 (9th Cir. 2003)

**III.     Did the Indictment Fairly Inform The Defendant of the Charges?**

United States v. White, 241 F.3d 1015 (8th Cir. 2001)
United States v. Bieganowski, 313 F.3d 264 (5th Cir. 2002)
United States v. Fernandez, 282 F.3d 500 (7th Cir. 2002)

**IV.     Did The District Court Abuse Its Discretion In Admitting Evidence of Defendant's Business and Activity?**

United States v. Brown, 763 F.2d 984  (8th Cir. 1985)
United States v. Rettenberger, 344 F.3d 702 (7th Cir. 2003)

**V.     Did The District Court Properly Instruct The Jury Regarding Materiality?**

United States v. Turner, 189 F.3d 712 (8th Cir. 1999)
United States v. Richmond, 700 F.2d 1183 (8th Cir. 1983)
United States v. Baker, 200 F.3d 558 (8th Cir. 2000)
United States v. Baumgardner, 85 F.3d 1305 (8th Cir. 1996)

x

## STATEMENT OF THE ISSUES cont.

**VI.    Did The District Court Correctly Deny Defendant's Motion To Suppress Evidence Seized Pursuant To A Search Warrant?**

United States  v. Kail, 804 F.2d 441 (8th Cir. 1986)
United States v. Henson, 848 F.2d 1374 (6th Cir. 1988)
United States v. Stelten, 867 F.2d 446 (8th Cir. 1988)

**VII.   Did The District Court Correctly Sentence The Defendant?**

United States v. Rettenberger, 344 F.3d 702 (7th Cir. 2003)
United States v. Thompson, – F.3d –, 2005 WL 763313 (8th Cir. Apr. 6, 2005)

## STATEMENT OF THE CASE

On December 16, 2003, a United States Grand Jury returned a nine-count indictment against Denise Marie Henderson, alleging Social Security Disability Insurance ("SSDI") fraud. Specifically, Counts 1 through 5 alleged wire fraud based on the wire transfers of SSDI benefits to the defendant from 1999 through 2003, in violation of 18 U.S.C. § 1343. Count 6 alleged concealment from the Social Security Administration ("SSA"), namely the defendant concealed her true physical condition and capabilities, her activities, and her ability to engage in work activity, in violation of 42 U.S.C. § 408(a)(4). Counts 7 through 9 alleged the defendant made false statements to SSA at her hearing before the administrative law judge on January 4, 1999; in her Report of Continuing Disability Interview dated April 11, 2000; and in her Report of Continuing Disability Interview dated May 5, 2002, in violation of 42 U.S.C. §408(a)(3).

On February 26, 2004, the defendant filed numerous pretrial motions, including a motion to suppress the evidence seized during a search warrant executed on February 25, 2003 and a motion to refer the matter to the SSA pursuant to the doctrine of primary jurisdiction. On March 23, 2004, Magistrate Judge Janie S. Mayeron held a hearing to address the pretrial motions. On June 30, 2004, Magistrate Judge Mayeron issued a Report and Recommendation (the "R&R"), recommending

1

that defendant's motion to suppress and motion to refer the matter be denied. On July

12, 2004, the defendant filed objections to the R&R. The R&R was adopted by

Senior Judge David S. Doty in an order dated July 19, 2004.

A jury trial commenced on July 19, 2004. A jury charge conference was held

on August 3, 2004. During the jury charge conference, defense counsel contended,

for the first time, that Count 7 was too vague. (Tr. at 2144-45.) On August 4, 2004,

the United States filed a Bill of Particulars with respect to Count 7. Thereafter, the

district court ruled the Bill of Particulars addressed any constitutional considerations.

(Tr. at 2186-87.) The parties rested and made closing arguments on August 4, 2004.

The district court instructed the jury on August 5, 2004, and deliberations began. On

August 9, 2004, the jury[1] returned guilty verdicts on all counts. The jury also

returned a special verdict finding that the actual loss was $193,509 and the intended

loss was $743,973.

On December 10, 2004, the defendant was sentenced to 46 months

imprisonment. The district court adopted the guideline set forth in the Presentence

Investigation Report ("PSI"), 46 to 57 months. In so doing, the district court rejected

the government's contention that the offense level was subject to a two-level

---

[1]In her Statement of Facts, defendant states that an eleven-member jury
delivered the verdict. (Def.'s Br. at 17.) In fact, twelve jurors returned the
unanimous verdict. (Tr. at 2456-57.)

enhancement under Section 2B1.1(b)(8) for use of sophisticated means and rejected defendant's objections to the calculation of the loss amount, the two-level enhancement for obstruction of justice, and the absence of a downward adjustment for acceptance of responsibility. (Sent. Tr. at 45-47.) The district court also rejected defendant's motion for a downward departure on numerous grounds. With regard to defendant's objection pursuant to <u>Blakely v. Washington</u>, 124 S. Ct. 2531 (2004), the district court noted "if the guidelines are held to be constitutional by the [Supreme] Court, then this will be a guideline sentence. If they're held to be unconstitutional by the Court, then I'm using the guidelines only as a guide . . .." (Sent. Tr. at 42.)  On December 13, 2004, a notice of appeal was filed.

Parallel Administrative/Civil Proceedings

In May 2003, the defendant was notified by the Office of Hearings and Appeals for the SSA that her case was going to be reopened based on allegations of fraud. PSI ¶41. On August 11, 2003, SSA suspended defendant's benefits based on her work activity. <u>Id.</u> On August 19, 2003, a hearing was held before an administrative law judge. <u>Id.</u> On December 11, 2003, the administrative law judge issued a decision that the defendant had committed fraud and was not entitled to the $193,509 in benefits that she had received. <u>Id.</u> The defendant appealed that decision. PSI ¶ 42. After her administrative appeal was denied, on January 31, 2005, defendant filed suit

3

challenging the determination in United States District Court. (Denise Marie Henderson v. Comm'r of Social Security, 05-CV-215 (JNE/RLE).) That case is now pending.

In addition, on August 25, 2003, the United States filed a civil complaint against the defendant alleging claims under the False Claims Act. (United States v. Denise Marie Henderson, 03-CV-5060 (MJD/JGL).) On September 15, 2003, the defendant filed an answer and counterclaims against the United States. By order dated March 16, 2004, United States District Court Judge Michael J. Davis dismissed the defendant's counterclaims and dismissed the government's complaint for lack of specificity with leave to refile. On April 14, 2004, the United States refiled an amended complaint. (United States v. Denise Marie Henderson, 04-CV-1584 (MJD/JGL).) By order dated October 5, 2004, Judge Davis denied defendant's motion to dismiss and stayed the civil action pending the defendant's appeal of her criminal conviction.

4

## STATEMENT OF THE FACTS

<u>The Defendant's Car Accident</u>

On December 19, 1995, the defendant was in a car accident. (Gov't Ex. 1 (Gov't App. at A-1)). Prior to the December 1995 accident, Henderson was self-employed as a marketing consultant for a company she owned called Marketing That Works, Inc. ("MTW"). (Tr. at 1731-32.) MTW did not do well and lost almost $10,000 in 1995. (Tr. at 1891-94; Gov't Ex. 469.)

<u>Doctor's Diet Clinic</u>

Six months following the accident, in the spring of 1996, the defendant and her husband Ken Henderson set up a diet clinic known as the Doctor's Diet Clinic, which was owned by the defendant's company, MTW.[2] (Tr. at 1607.) The defendant participated in setting up the business, interviewing prospective employees and providing them with materials including the terms of their employment. (Tr. at 378, 382, 492-93; Gov't Ex. 48.) During the first months of operation, the defendant's husband had another job out of state (Tr. at 1679-80), and was not at the clinic often (Tr. at 379, 494). During this time frame, the defendant was at the clinic frequently.

---

[2]In 1996, MTW was wholly owned by the defendant. (Tr. at 1937-38.) At some point in 1997, fifty percent ownership was transferred to her husband. (Gov't Ex. 470.) The defendant filed the certificate of assumed name for Doctor's Diet Clinic. (Tr. at 1909.)

5

(Tr. at 379-80, 494.) She did such things as contract for telephone service, claiming to be the general manager. (Tr. at 814-16; Gov't Ex. 25.) She did employee scheduling. (Tr. at 383-84, 495-96; Gov't Ex. 49.) (At some point, employee hiring and scheduling duties were transferred to other employees. (Tr. at 383, 496-97.))

During the day, the diet clinic receptionist would get telephone calls, both personal and business calls, for the defendant. (Tr. at 385, 497.) Employees were instructed by the defendant and her husband to advise callers that defendant did not work there. (Tr. at 385, 498.) The defendant explained that she was not supposed to be there working. (Tr. at 498.)[3]

During this time frame, the defendant's employees did not observe any physical limitations, other than the defendant sometimes complained about an occasional headache. (Tr. at 392-93, 502-03.) On one occasion, the defendant wanted her husband to unload boxes from her car, and explained that she felt like people were watching her based on her claim relating to the car accident. (Tr. at 503-04.)

From approximately 1996 through approximately 1998, Henderson was also the principal advertising contact on behalf of the diet clinics with various media sources, including newspapers, radio and television; she had frequent, sometimes

_____

[3]Defendant had also filed a claim on a private disability insurance policy. (Tr. at 1739.)

weekly, contact to contract advertising space and place and edit advertising. (Tr. at 551-52, 563-65, 684-87; Gov't Exs. 33, 34, 54, 55.) In effect, Henderson operated her advertising business, MTW, as an "in-house" advertising agency for the diet clinics. (Tr. at 566-67.) Henderson was also the principal contact dealing with the graphic designer who produced advertising and materials for the diet clinic. (Tr. at 518-20.) The defendant received business faxes at the diet clinic and sent faxes relating to the advertising work for the diet clinics. (Tr. at 499-500; Gov't Exs. 37-47 (Gov't Ex. 38 is included in Gov't App. at A-122.)) Indeed, even the defendant's husband acknowledged that the defendant ran the advertising agency from the home. (Tr. at 1684-85; Gov't Ex. 462.)

The defendant also received substantial payments from the diet clinics: The check register and checks for one period showed payments (e.g., $20,000 and $9,924.71) to the defendant as well as her company, MTW. (Tr. at 816-20, 1939-44; Gov't Exs. 27, 28 & 471.)

Independent Observations of the Defendant's Physical Condition

In the summer of 1996, six months following the accident, the defendant applied to adopt a child. As part of the process, a social worker conducted a home study at the defendant's house and interviewed the defendant. (Tr. at 774-75; Gov't Ex. 381.) A draft report was provided to the prospective parent for review; to the

7

extent there were errors, they were corrected before the report was finalized. (Tr. at 779-80.) Based on her home study and interview, the social worker reported that the defendant was employed by her own successful, home-based consulting firm, MTW, and worked out of the home. (Tr. at 777-78; Gov't Ex. 381.) The social worker also reported the defendant loved the outdoors, hiking and cross-country skiing. (Id.) The defendant indicated that she was in good health and was physically active. (Tr. at 779.) In her application, the defendant reported that she had no "chronic or disabling conditions that limit[ed] [her] daily activities" and took no medications on a regular basis. (Gov't Ex. 380.)

The following year, from March 1997 through August 1997, Dan Eason lived with the Hendersons and worked to help open new diet clinic centers for Doctor's Diet Clinic. (Tr. at 432-33.) During that time frame, MTW was the "marketing arm" of Doctor's Diet Clinic. (Tr. at 433.) Eason observed the defendant assist in the marketing for the clinics, reviewing ads, creating ads, and placing ads with media sources, and assist with mass mailings. (Tr. at 433-35.) Eason also remembered that clinic employees were instructed to tell people that the defendant did not work at the clinic. (Tr. at 438.) Eason's best recollection from the March to August 1997 time frame was that the defendant suffered from migraine headaches approximately four

8

to five times while he lived there; she had a full schedule taking care of her family and was a normal stay-at-home mother. (Tr. at 442-43.)

The Defendant Applies for SSDI Benefits

Approximately eighteen months after her accident, on April 15, 1997, the defendant first contacted the SSA regarding SSDI benefits.[4] (Tr. at 247-48.) During the telephonic contact, Henderson claimed that she was disabled and no longer able to work as a result of her December 19, 1995 car accident. (Tr. at 248.) The defendant represented that although she was the president of MTW, she had not worked at all since the accident and her husband had assumed all responsibilities of her consulting company. (Tr. at 250-51.)

SSA then provided a typed, completed application containing this information. On August 31, 1997, Henderson signed the application affirming it to be the truth. (Tr. at 252; Gov't Ex. 1 (Gov't App. at A-1.).) In the application, Henderson also promised to advise SSA if her medical condition improved or if she went to work as an employee or self-employed person. (Gov't Ex. 1.)

---

[4] The defendant had two privately purchased "own occupation" disability insurance policies. (Tr. at 868.) Under the base policy, she was not required to apply for SSDI benefits. (Tr. at 876.) The defendant also had a "Social Security Agreement" which provided some level of benefits (a fraction of actual SSDI benefits) to the extent she could not perform her "own occupation" but had been denied SSDI benefits. (Tr. at 877-78, 880-81.)

9

An Independent Medical Evaluation

In the summer of 1997, weeks before she signed and submitted her application for SSDI, the defendant sought cosmetic surgery. (Tr. at 710-11.) During her first consultation with the cosmetic surgeon, on July 28, 1997, the defendant completed a medical information questionnaire, signed it, and affirmed the information to be accurate. (Tr. at 710-11; Gov't Ex. 432 (Gov't App. at A-121).) In the questionnaire the defendant indicated she had no significant past or current medical illnesses. (Tr. at 712; Gov't Ex. 432.) She also reported taking Imitrex for her migraines one to two times per month. (Tr. at 713-14.) Although the defendant had noted pain resulting from a car accident, she indicated that she simply took Aleve. (Tr. at 719-20; Gov't Ex. 431.) During a second consultation on August 4, 1997, based on his review, the doctor determined that the defendant had no significant medical problems and was a good candidate for surgery. (Tr. at 719.)

The Defendant's Claims of Disability

In the fall of 1997, as part of the process to obtain SSDI benefits, Henderson completed and submitted numerous reports to SSA, including a Disability Report (Tr. at 253; Gov't Ex. 2 (Gov't App. at A-4)); a Pain Report (Tr. at 256-57; Gov't Ex. 3 (Gov't App. at A-25)); a Function Report (Tr. at 264; Gov't Ex. 4 (Gov't App. at A-34)), and a Work History Report (Tr. at 270; Gov't Ex. 5). In these submissions to

10

the SSA, Henderson made many, wide-ranging representations regarding her physical capabilities and activities.

For example, in the Disability Report, the defendant identified her disabling injuries as follows: TMJ (temporomandibular) problems cause headaches; numbness in right arm and hand; migraine headaches; neck and back pain, lower back pain; numbness/tingling in foot; and vertigo. She claimed that her injuries prevented her from working as follows: any activity using right hand causes numbness in hand; talking on the phone causes knob in neck and back; any activity requiring sitting causes pain in neck, back and lower back; bending over causes dizziness; standing causes lower back pain; knob in neck and back causes migraines. (Gov't Ex. 2.)

In her Pain Report, the defendant claimed that writing and typing made her pain worse; lifting a gallon of milk or anything heavier made her pain worse; sitting for more than 20 minutes made her pain worse. The defendant also claimed that she suffered from debilitating migraine headaches 4-5 times per week which caused her to lose an entire day and some of the next; she also claimed to suffer continuously from right arm pain and back pain, as a result of which she claimed that she could hardly use her right arm or hand for anything and that she could not sit, stand or lie down without severe pain. Defendant also claimed that every movement made her pain worse. (Gov't Ex. 3.)

11

In the Function Report, the defendant claimed that her purported injuries impacted her ability to take care of her personal grooming needs, such as bathing and dressing. She claimed that she was unable to do chores around the house and that her purported injuries impacted her ability to do personal errands, such as buying groceries, shopping for clothes and banking. The defendant claimed that her ability to pay bills had also been impacted and that she could not drive for over 20 minutes. Defendant also claimed that, among other things, her injuries impacted her ability to sit, stand, walk, kneel, squat, climb, bend, lift, reach, use her hands, and concentrate. Defendant claimed that she just sat and watched TV as activities were too painful. (Gov't Ex. 4.)

In the Work History Report, the defendant reported that prior to her accident she had been a marketing consultant working 40 hours per week and making $6,000 per month on a varied basis.[5]

On January 5, 1998, SSA denied defendant's application for SSDI benefits. (Tr. at 273; Gov't Ex. 6.)

On January 19, 1998, the defendant submitted a Request for Reconsideration with SSA. (Tr. at 273-74; Gov't Ex. 7.) In that Request, she claimed that she could

---

[5]In her application for adoption, the defendant reported that she had worked 15-20 hours per week prior to her accident. (Gov't Ex. 380.)

12

not perform sedentary work because she could not sit or stand for over 20 minutes and suffered from vertigo if she tilted her head at all. (Tr. at 274; Gov't Ex. 7.)

On February 20, 1998, the defendant submitted a Reconsideration Disability Report. (Tr. at 274-75; Gov't Ex. 8 (Gov't App. at A-39).)  In that report, the defendant claimed that her migraine headaches had become much more intense, occurring 5 to 6 times per week and requiring her to take medication that caused drowsiness. She also claimed, among other things, that she could not sit for more than 20 minutes; could not lift more than 5 to 7 pounds, and could not concentrate on anything when she was suffering from a migraine. (Gov't Ex. 8.)

On April 16, 1998, SSA denied defendant's Request for Reconsideration. (Tr. at 278; Gov't Ex. 9.)

On April 27, 1998, defendant submitted a Request for Hearing by Administrative Law Judge. (Tr. at 278; Gov't Ex. 10 (Gov't App. at A-43).) In that Request, the defendant claimed that there was no job that she could do and that she could not sit, stand or walk for over 20 minutes. (Gov't Ex. 10.)

The Defendant's Beauty Pageant Activities

On September 13, 1998, the defendant filed an application to compete in the Mrs. Minnesota International pageant. (Tr. at 1223-24; Gov't Ex. 82.) In her application, the defendant reported that she was balancing a fast-track career with

13

being a mom and wife, managing two distinct businesses. (Id.) In preparation for the pageant, the defendant made appearances as Mrs. Washington County at various events on October 10, 1998, November 11, 1998, November 28, 1998, February 9, 1999, February 10, 1999, February 28, 1999, and March 13, 1999. (Tr. at 1227-29.) In addition, in anticipation of the pageant, the defendant also had various cosmetic procedures and saw her cosmetic surgeon 21 different times between May 1, 1998 and October 29, 1999. (Tr. at 735-36.) The only physical limitation observed by the cosmetic surgeon was soreness that resulted from the elective procedures the defendant had performed. (Tr. at 738-39.) (Even though a subsequent report required the defendant to disclose all medical examinations and treatments and the names of her doctors, the defendant never disclosed her cosmetic surgeries or her surgeon to SSA. (Gov't Ex. 13; Tr. at 2211-12.)

Beginning in October 1998, the defendant started training with a pageant coach to compete in the Mrs. Minnesota International pageant. (Tr. at 622-23.) During the months leading up to the pageant, Henderson trained with her coach – on-stage walking, clothing selection, planning her community service platform – twice a week initially and more frequently as the pageant approached. (Tr. at 623-24.) Henderson was diligent and disciplined in her training regime, and although she would complain about headaches, she did not appear to have any physical limitations. (Tr. at 625-26.)

14

The Defendant's ALJ Hearing

On January 4, 1999, the defendant appeared at a hearing before an administrative law judge to reconsider her claim for SSDI benefits. (Tr. at 281-82; Gov't Exs. 11A, 11B, 11C (11C is included in Gov't App. at A-47).) During that hearing, the defendant reiterated her claims regarding her purported disabling condition, including that she suffered from migraines 5 times per week, she was unable to use her right arm without significant pain, and she suffered from vertigo. (Gov't Ex. 11C.) She also claimed she needed a railing to go up stairs as a result of vertigo, she had difficulty sitting in a car for more than twenty minutes, she was not working and had not been working since December 19, 1995, and she attended no meetings of any kind and had no hobbies of any sort. (Gov't Ex. 11C.)

On January 27, 1999, the defendant traveled to Hawaii. (Tr. at 1197.) While she was there, she was observed and videotaped by insurance company investigators loading luggage, sight seeing, walking up steep stairs without the assistance of a railing and snuba diving. (Tr. at 1197-98, 1205-06; Gov't Ex. 355.)

Following the hearing, SSA granted the defendant SSDI benefits. (Tr. at 282.) SSA paid the defendant lump sums totaling approximately $68,715.00 representing a back payment of SSDI benefit payments from the time of her first application. (Tr. at 1291-92; Gov't Ex. 19.) SSA also started paying the defendant monthly SSDI

15

benefits of approximately $2,000 each month. (Tr. at 1292; Gov't Ex. 19.) Payments were made by wire transfer from Philadelphia, Pennsylvania to the defendant's bank account in Minneapolis, Minnesota. (Tr. at 1301-02.)

SSA's Disability Determination

SSDI benefits are intended for those who cannot do any work in the national economy. (Tr. at 911.) Irrespective of a person's actual medical condition (e.g., wheelchair bound), if a person is engaging in "substantial gainful activity" they are not entitled to SSDI benefits. (Tr. at 912.)

Information regarding an applicant's daily activities is "critical" to the SSDI determination because the SSA needs to know exactly what the applicant does – and therefore what the applicant is capable of doing – in order to evaluate their ability to function. (Tr. at 913.) Accordingly, the information provided by an applicant in the questionnaires, such as the Disability Report, the Function Report, and the Pain Report, is critical to SSA's determination. (Tr. at 913-15.) Even after a person receives SSDI benefits, information regarding their ongoing activities is utilized by the SSA to evaluate their continued eligibility. (Tr. at 937.)

First, SSA (or its surrogate) must determine whether an applicant is engaging in "substantial gainful activity." (Id.) For an employed person, substantial gainful activity means earning $810 each month. (Tr. at 922.) For a self-employed person,

16

the analysis is necessarily different because a business can lose money: instead, the focus is on whether the applicant's activity generates income as well as a comparison of the activity to other persons working in a comparable job. (Tr. at 922-23.) SSA obtains its information regarding self-employment from the applicant. (Tr. at 923-24.) If the applicant is engaged in substantial gainful activity, she is not eligible for SSDI benefits.

If the applicant is not engaged in substantial gainful activity, the next question becomes whether the applicant suffers from a severe impairment. (Tr. at 918.) If the applicant does not suffer from a severe impairment, she is not eligible for SSDI benefits.

If the applicant suffers from a severe impairment, the next question is what is the applicant's residual functional capacity, taking into consideration the impairment. (Tr. at 919.) Once an applicant's residual capacity is determined, she is eligible for SSDI benefits only if she cannot return to her previous employment or any other employment in the national economy. (Tr. at 920, 927.) In determining whether a person can return to her previous employment, the number of hours actually worked by that individual is a key component. (Tr. at 927-28.) Information regarding an applicant's activity level is very significant to determining the individual's residual capacity. (Tr. at 921.)

Mrs. Minnesota International

In March 1999, the defendant rehearsed for, competed in, and won the Mrs. Minnesota International pageant in St. Cloud, Minnesota. (Tr. at 631-33.) It is a busy weekend, with rehearsals, interviews and different events. (Tr. at 631-32.)

In August 1999, the defendant traveled to Texas to compete in the Mrs. International pageant. (Tr. at 633-34.) Again she trained with her coach one to two times per week. (Tr. at 634.)

During the twelve-month period from March 1999 through March 2000, the defendant made over 200 separate appearances all over the State of Minnesota. (Tr. at 841; Gov't Ex. 93 (Gov't App. at A-124).) For example, on one occasion, the defendant appeared at the Women's Expo in January 2000, signing autographs and promoting the pageant for two and a half days. (Tr. at 656-57, 1249-51.) These appearances were throughout the State of Minnesota and required extensive travel. (Tr. at 1270-71; Gov't Ex. 105.) The defendant was so busy making appearances that she wrote her pageant director she needed her own plane. (Gov't Ex. 105 (Gov't App. at A-126).)

As part of her claim for private disability insurance, the defendant logged days that she suffered from disabling migraine headaches during the mid-July through October 1999 time frame. (Tr. at 873-74; Gov't Ex. 406 (Gov't App. at A-149).)

18