According to records of her appearances as Mrs. Minnesota as well as the defendant's daily calendars, the defendant repeatedly made those appearances on days she claimed to be suffering a disabling migraine headache. (Tr. at 1112-15; Gov't Exs. 406 & 408.) Indeed, she traveled to Tyler, Texas and competed in the Mrs. International competition even though she claimed to have been suffering from a disabling migraine headache the entire time. (Tr. at 1115.)

Defendant's 2000 Disability Update

On March 27, 2000, SSA sent the defendant a Report of Continuing Disability Interview, which the defendant completed and returned on April 11, 2000 to SSA (the "2000 Report"). (Tr. at 282-84, 290; Gov't Ex. 13 (Gov't App. at A-100).) In the 2000 Report, the defendant claimed that her condition had become worse since January 1999 and claimed that she was unable to return to work. Specifically, she claimed that she suffered from lack of concentration, dizziness, vertigo, chronic migraines and numbness in her fingers and hands, neckaches, backaches, and chronic pain. (Gov't Ex. 13.) One of the questions asked in the 2000 Report was "Since you became disabled have you done any work?" To this question, defendant responded "No." In the report, when asked about her social contacts (visits with friends, relatives, neighbors, church, social clubs), the defendant wrote that she tried to volunteer 1-2 times per week for 1-2 hours at a time. Defendant also indicated that

19

her only other activity was to drive her son to school or activities, but that driving more than 20 minutes caused back pain, numbness in her feet, and migraines. (Gov't Ex. 13.) At no time did the defendant disclose that she had competed in and won the Mrs. Minnesota competition, competed in another national beauty pageant or that she had made over 200 appearances (averaging four per week) all over the State of Minnesota as Mrs. Minnesota.

In the 2000 Report, defendant again agreed to notify SSA if her medical condition improved or if she went to work. She was also advised that making false statements in the report was criminal. (Gov't Ex. 13.)

Defendant's Continued Pageant Activities

In July and August of 2000, the defendant traveled to Las Vegas, Nevada on two separate occasions to compete in the Mrs. United States pageant and the Ms. U.S. Continental pageant. (Tr. at 637-38.) Again, she trained with her coach. (Tr. at 638.) For the Ms. U.S. Continental competition community service award, the defendant reported that she was committed to twenty hours of community service each week. (Tr. at 641-44; Gov't Ex. 128 (Gov't App. at A-130).)

In the fall of 2000, the defendant also traveled to Orlando, Florida to participate in the All American pageant. (Tr. at 649.)

In August 2001, the defendant traveled to Pigeon Forge, Tennessee to compete in the Mrs. International pageant, as the reigning Mrs. Iowa International (defendant's title as Mrs. Iowa was obtained by application).  (Tr. at 1164-65.)

Crowning Moments, Inc.

On September 22, 2001, the defendant and her husband, Ken Henderson, signed a contract to provide director services for the Mrs. Iowa International pageant (Tr. at 1167-68; Gov't Ex. 200 (Gov't App. at A-137).)  Under the terms of the contract, the defendant agreed to provide director services and was responsible for planning and executing, financing, promoting and producing the pageant. (Gov't Ex. 200.) As the director, the defendant was entitled to keep revenues from the pageant, including entry fees, ticket sales and advertising sales.  (Tr. at 1160-62.)  While pageants are not always profitable, they can be. (Tr. at 1161, 1260.)

On January 11, 2002, the defendant filed the articles of incorporation for Crowning Moments, Inc., a Minnesota for-profit corporation, with the Secretary of State. (Gov't Ex. 175 (Gov't App. at A-132).)  Although the entire document was filled out by the defendant, her husband signed it as the registered agent.  (Tr. at 1038-39.)  The defendant also filled out certificates of assumed name for the Mrs. Iowa International Pageant and Queen Bear's Closet, which were also signed by her husband. (Tr. at 1039-40; Gov't Ex. 175.)

21

As director, the defendant hired and directed numerous components of the pageant, including a pageant photographer, hotel space, event space and printing services. (Tr. at 590-91, 1343-47, 1352-53, 1360; Gov't Ex. 251.) While both the defendant and her husband signed the contract to be directors of the various pageants, the defendant was the principal contact for vendors, such as the hotel, pageant site, and program printer. (Tr. at 591, 1343-44, 1351-53, 1358-61.) She was observed actively managing her pageants. (Tr. at 595-96, 1309-10.) The defendant was also the principal contact for contestants, responding to inquiries and providing assistance. (Tr. at 1303-07.) Indeed, her nickname was the "Energizer Bunny," because she was always so busy. (Tr. at 597, 660.)

Providing director services for a pageant requires a great deal of organization and effort. (Tr. at 658-59.) In the off months, directors commonly put in 10 to 20 hours per month; as the pageant gets closer, directors often will work 40 to 60 hours per week. (Tr. at 1162.) Pageant directors are responsible for recruiting contestants, securing the pageant site and judges, making hotel arrangements, and obtaining sponsors. (Tr. at 1163.)

When a federal search warrant was executed at the defendant's residence,[6] investigators found business files relating to the defendant's pageant business: expense records, checks made out to Denise Henderson and Crowning Moments, ticket order forms, hotel invoices, theater invoices, budgets for the business, revenue projections, production contracts, press releases and other business documents addressed to, or sent from, the defendant. (Tr. at 1007, 1028-38; Gov't Exs. 160-76, 204-09, 231-35, 255-63, 265.) Crowning Moments had bank records and business ledgers. (Tr. at 1048-49.) The defendant had business credit cards and business cards. (Tr. at 1052-53, 1069.) During the course of nine months – June 2002 through February 2003 – the defendant sent hundreds of e-mails on her business e-mail accounts. (Tr. at 1104-05, 1108; Gov't Exs. 421A, 421B & 421C.) In 2002, Crowning Moments reported revenues of over $18,000. (Gov't Ex. 452.)

In September 2002, the defendant, along with her husband, again contracted to provide director services for the Mrs. Iowa International pageant. (Tr. at 1173; Gov't Ex. 201.) In July 2002, she contracted to provide director services for the Ms.

---

[6]On February 25, 2003, investigators for the Social Security Administration-Office of Inspector General and the Federal Bureau of Investigation executed a search warrant at the defendant's house seeking evidence of social security fraud. An earlier search warrant was executed by the local sheriff's department in 2000 seeking evidence of insurance fraud.

Teen Minnesota pageant. (Tr. at 1173-74; Gov't Ex. 250.) By the time of trial in July 2004, the defendant was the director of numerous different pageants: Ms. Teen Minnesota International, Mrs. Wisconsin International, Ms. Teen Wisconsin International, Mrs. Iowa International, Ms. Teen Iowa International, Mrs. South Dakota International and Ms. Teen South Dakota International. (Tr. at 590-91, 1158.) The defendant had contracted to provide director services for more pageants than any other individual in the International pageant system. (Tr. at 1173.)

Queen Bear's Closet

The defendant also operated a consignment shop, known as Queen Bear's Closet ("QBC"), out of her home. (Tr. at 653.) The defendant sold and rented used pageant wear. (Tr. at 654.)

The defendant signed consignment contracts in which she undertook contractual obligations to consign clothing items in exchange for a commission (25% for sales, 50% for rentals). (Tr. at 1044-45; Gov't Ex. 302 (Gov't App. at A-142).) Investigators also seized bank records for QBC (Gov't Ex. 307), mass mailings signed by the defendant soliciting sales (Gov't Ex. 309), wholesale purchase orders for QBC (Tr. at 1078-79; Gov't Ex. 313), and a business credit card (Gov't Ex. 308). The QBC business had a website, which marketed pageant gowns, interview suits,

24

and accessories. (Tr. at 1007-08.) The defendant responded to purchase inquiries. (Tr. at 1018; Gov't Ex. 317.)

Defendant's 2002 Disability Update

On February 11, 2002, SSA sent the defendant a short Disability Update Report, which the defendant completed and returned on March 8, 2002. (Tr. at 290; Gov't Ex 14.) In the report, the defendant did not disclose that she was self-employed as the director of beauty pageants and the principal operating a consignment store. Instead, she simply reported that "My husband & I are hosting a one day event in June in Iowa." In addition, she claimed that her husband had designed a website for her to sell used items. (Gov't Ex. 14.)

SSA followed up with another Report of Continuing Disability Interview, which the defendant completed and returned on May 5, 2002 with the SSA (the "2002 Report"). (Tr. at 293-94; Gov't Ex. 15 (Gov't App. at A-112).) In that report, the defendant claimed her condition had worsened and claimed that she was unable to return to work. Specifically, she claimed that she suffered from chronic migraines, neck and back pain, and numb fingers in her right hand. (Gov't Ex. 15.)

Again, the 2002 Report inquired of the defendant whether she had done any work since she became disabled. The report required defendant to detail the dates, number of hours, and type of business for "each work attempt, no matter how short

25

it was." To this inquiry, defendant responded "No, just volunteer work when I felt good." (Gov't Ex. 15 at 5.) In the report, defendant claimed that she volunteered 2 hours per week. (Id. at 6.) Defendant claimed that she rarely socialized outside the home and that she attended 1 to 2 hour neighborhood events on average once a month. With respect to her competition in pageants and her contractual obligation to direct and promote beauty pageants, the defendant simply reported "I attend pageants when I feel good."

<u>Defendant's 2003 Disability Update</u>

Following the federal search warrant in 2003, SSA sent the defendant a Work Activity Report, which the defendant completed on June 4, 2003 and returned via her attorney. (Tr. at 303-04; Gov't Ex. 16.) In the report, the defendant acknowledged she had been working 8 hours per week for her company Crowning Moments, Inc. (Queen Bear's Closet and Pageants). She also admitted she had continued working a few minutes per week for MTW until the business closed in June 2001: "In Ken's absence, I occasionally run an errand/sign a check/send a fax/return a phone call." Finally, she also acknowledged that when she had completed the 2002 Report, she had already committed to act as director of a beauty pageant in Iowa. She also admitted that in the summer of 2002, she had agreed to act as director for a beauty pageant in Minnesota. (Gov't Ex. 16.)

26

<u>SSDI Benefit Payments</u>

In total, SSA paid the defendant $193,509 in SSDI benefits. (Tr. at 1293; Gov't Ex. 19.) If the defendant had continued receiving SSDI benefits until the age of 67 she would have received $743,973 (without any future cost-of-living adjustments). (Tr. at 1293-94; Gov't Ex. 19.)

## SUMMARY OF THE ARGUMENT

Defendant's principal argument on appeal is that criminal prosecution of social security fraud must wait for the completion of the administrative proceedings regarding a beneficiary. (Def.'s Br. at 22.) This argument, and others, are premised on a fundamentally flawed misconception: defendant contends that her criminal convictions -- for false statements, concealment and fraud -- can stand only if the government can prove that she is not disabled (a determination she contends must be made in the first instance by the agency charged with that determination, SSA). In other words, so long as the defendant cannot be proven to be ineligible for SSDI benefits, whatever false statements or omissions she may have made, no matter how egregious, she has not committed a crime.

This contention, however, is plainly contrary to black-letter criminal law and this Court's precedent. Instead, "material", within the criminal context, has long been held, by this Court and others, to mean "a natural tendency to influence, or is capable of influencing, the decision of the agency." In plain terms, with respect to information that is used for making the relevant determinations, the agency in question is entitled to accurate information. It is a crime to provide federal agencies with false information on matters that <u>could</u> influence the agency's decision, even if that information does not affect the agency's determination.

28

In this case, as set forth above, the evidence was more than sufficient to prove the defendant made material misrepresentations, omissions and committed fraud. Although SSA had determined the defendant was not entitled to SSDI benefits prior to the trial (a determination defendant is still challenging in a civil action), the district court properly permitted the Department of Justice to prosecute the defendant for social security fraud under the criminal statutes enacted by Congress. The indictment was not challenged prior to trial and more than adequately provided the defendant with fair notice of the charges against her. The jury was properly instructed by the district court with respect to the long-accepted definition of materiality. The district court properly admitted relevant evidence regarding the defendant's businesses and activities as proof that her claims to SSA were false. The district court also properly denied defendant's motion to suppress evidence seized during a duly authorized search warrant.

Finally, although the defendant was sentenced in accordance with the Sentencing Guidelines, the district court stated on the record that in the case the Guidelines were held to be unconstitutional, he was utilizing them as a guide, making remand futile and unnecessary.

29

## ARGUMENT

I.   **THE EVIDENCE WAS MORE THAN SUFFICIENT TO SUPPORT THE JURY'S CONVICTION ON ALL NINE COUNTS IN THE INDICTMENT**

Defendant contends the evidence against her was insufficient to support the jury's guilty verdicts. (Def.'s Br. at 40-52.) "A jury verdict should not be overturned lightly." United States v. Sykes, 977 F.2d 1242, 1247 (8th Cir. 1992). The Court must "view the evidence in the light most favorable to the guilty verdict, giving the government the benefit of all reasonable inferences that may be drawn from the evidence." United States v. Agofsky, 20 F.3d 866, 869 (8th Cir. 1994). An appellate court can reverse a conviction only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt. Sykes, 977 F.2d at 1247.

As set forth above in more detail, the evidence at trial proved beyond a reasonable doubt that the defendant made false statements to SSA and purposely concealed facts from SSA. The defendant made false statements regarding her work activity. For example, the defendant claimed she had turned over all responsibilities for MTW following her car accident. (Gov't Ex. 1.) The evidence proved that the defendant not only worked to set up the clinic, but operated the marketing agency from her home. (Tr. at 378, 382, 492-93, 1684-85.) The defendant made false statements regarding her medical condition. She claimed to suffer from disabling

30

migraine headaches 4 to 5 times per week causing her to lose the entire day. (Gov't Ex. 3.) The evidence showed she took migraine medication (Imitrex) "as needed," which was 1 to 2 times per month. (Gov't Ex. 432.) Moreover, witnesses testified that, although the defendant suffered from occasional headaches, she could continue with her activities. (Tr. at 615.) Indeed, far from being disabled on days when she suffered from migraine headaches, the defendant's own calendars proved she maintained her activity level even while she was suffering from a migraine headache. (Gov't Exs. 406 & 408.) The defendant also made false statements regarding her activities. In January 1999, the defendant represented to the administrative law judge that she did not attend any groups or have any hobbies. (Gov't Ex. 11C.) At the same time, she was actively training to compete in the Mrs. Minnesota International competition. (Tr. 622-23.)

In April 2000, the defendant reported that her social contacts were limited to volunteer work 1 to 2 times per week for 1 to 2 hours per week. This claim was a gross misrepresentation of reality. Defendant made no mention of the Mrs. Minnesota International competition or the Mrs. International competition in Texas or her 200 appearances all over the State of Minnesota. Far from two to four hours of volunteer work, the defendant was committed to 20 hours per week of volunteer work. (Gov't Ex. 128.)

31

In May 2002, the defendant claimed that she did not work and that she only volunteered when she felt good. (Gov't Ex. 15.) When she made that representation, she was actively engaged in her capacity as state director for the Mrs. Iowa International pageant. She had incorporated a new for-profit business, Crowning Moments, Inc., and she was operating a consignment shop out of her home.

A.    The False Statement Counts: Counts 7 through 9

Counts 7 through 9 allege false statements to SSA on January 4, 1999 at the administrative hearing, in the 2000 Report and in the 2002 Report.[7] Section 408(a)(3) of Title 42 prohibits making a causing to be made "any false statement or representation of a material fact for use in determining rights to payment [of Social Security Disability Insurance benefits]."

Defendant's appeal is largely premised, both in her analysis of the evidence as well as many of her other claims on appeal, on a fundamentally flawed misconception: Defendant argues that "[t]o show materiality, the Government had to

---

[7]Defendant addresses the false statements set forth in the Bill of Particulars. Def.'s Br. at 41. The Bill of Particulars specified the false statements to the administrative law judge addressed in Count 7. Count 8 alleged false statements in her Report of Continuing Disability Interview dated April 11, 2000, namely her claims that she had not worked and did volunteer work only 2 hours per week, and her description of her physical capabilities and activities. Count 9 alleged false statements in her Report of Continuing Disability Interview dated May 5, 2002, namely her claims that she had not worked and did volunteer work only 2 hours per week, and her description of her physical capabilities and activities.

32

prove beyond a reasonable doubt that Henderson was ineligible from receiving the requested benefits." (Def.'s Br. at 45.) This assertion is plainly contrary to black-letter criminal law.

Within the context of criminal law, a statement is material if it has a natural tendency to influence or is capable of influencing the government agency or official. United States v. Baker, 200 F.3d 558, 561 (8th Cir. 2000) (in context of 18 U.S.C. § 1001). The Supreme Court has noted that federal courts have long recognized this formulation as the definition of "materiality" in the context of criminal statutes. Kungys v. United States, 485 U.S. 759 (1988) (citing Gonzales v. United States, 286 F.2d 118, 122 (10th Cir. 1961) (construing 18 U.S.C. § 1001); Weinstock v. United States, 231 F.2d 699, 701-02, n.6 (D.C. Cir. 1956) (same); Blackmon v. United States, 108 F.2d 572, 573 (5th Cir. 1940) (construing language now codified at 18 U.S.C. § 1621); Carroll v. United States, 16 F.2d 951, 953 (2d Cir. 1927) (same); United States v. Lardieri, 497 F.2d 317, 319 (3d Cir. 1974) (construing 18 U.S.C. § 1623); United States v. Koonce, 485 F.2d 374, 380 (8th Cir. 1973) (same)). Indeed, this Court has affirmed  that construction of materiality for the prosecution of criminal false statements in many different contexts involving many different statutes. See, e.g., United States v. Rashid, 383 F.3d 769, 778 (8th Cir. 2004) (§ 1344 bank fraud prosecution); United States v. Whitaker, 848 F.2d 914, 916 (8th Cir. 1988) (§

33

1001 prosecution for false statements to FDIC); United States v. Brown, 763 F.2d 984, 993 (8th Cir. 1985) (42 U.S.C. § 1396h prosecution for false statements to medicaid); United States v. Richmond, 700 F.2d 1183, 1188 (8th Cir. 1983) (§ 1001 prosecution for false statements to Fed. Highway Admin.). Moreover, this Court has even applied that construction of "materiality" in the context of a criminal prosecution for social security fraud. United States v. Baumgardner, 85 F.3d 1305, 1307 n.1 (8th Cir. 1996) (affirming conviction under 42 U.S.C. § 408(a)(4), but reversing conviction under 18 U.S.C. § 1001 because issue of materiality was decided by judge not jury).[8]

The evidence at trial proved beyond a reasonable doubt that defendant's false information was exactly the kind of information that is utilized by SSA to make the eligibility determination. Information regarding an applicant's work activities and daily activities is "critical" to the SSDI determination because SSA needs to know

_____

[8] The Baumgardner decision addressed the concept of materiality in a prosecution of social security fraud under the general false statement provision, 18 U.S.C. § 1001. In this case, the prosecution was brought under the specific provision, 42 U.S.C. § 408(a)(3). There is nothing in the language of 42 U.S.C. § 408(a)(3) – which makes it an offense to "[make] or cause[s] to be made any false statement or representation of a material fact for use in determining rights to payment [of Social Security Disability Insurance benefits]" – that would add additional elements or suggest a different definition of materiality. This Court has recognized the overlapping nature of 18 U.S.C. § 1001. United States v. Gordon, 548 F.2d 743, 744-45 (8th Cir. 1977).

exactly what the applicant does – and therefore what the applicant is capable of doing – in order to evaluate whether an individual is engaged in substantial gainful activity as well as her residual functionality. (Tr. at 913-16.) Accordingly, the information provided by an applicant in the questionnaires, such as the Disability Report, the Function Report, and the Pain Report, is critical to SSA's determination. (Tr. at 913-15.) Similarly, the information provided in the update reports regarding work activity and daily activities is also necessary to SSA's ability to make ongoing eligibility determinations. (Tr. at 937.)

In the face of this extensive body of law, defendant cites to two civil cases to support her definition of materiality: United States v. Taghizadeh, 98 F. Supp. 2d 1269, 1273 (D. Kan. 2000) (defining "material" in context of summary judgment standard of review), and Marano v. Seafarers Int'l Union, Civ. A No. 87-5646, 1988 WL 98244, at *2 (E.D. La. Sept. 8, 1988) (dismissing state claims as preempted by ERISA). (Def.'s Br. at 45.) These cases are simply inapposite and do not support defendant's assertion regarding the meaning of "materiality" in the criminal context.

Citing United States v. Barber, No. 04-30581, 2004 WL 2889918, at *1 (5th Cir. Dec. 14, 2004) (per curiam, unpublished opinion), defendant states that "Courts which have upheld Social Security fraud convictions have generally required that the Government, as part of its burden of proof, demonstrate that the claimant was

35

ineligible to receive benefits." (Def.'s Br. at 50.) Yet, the Fifth Circuit in <u>Barber</u> simply addressed defendant's contention that the government had failed to present evidence regarding the eligibility requirements by noting the government had adduced evidence that the representations had "affected" eligibility; importantly, it did not hold that the misrepresentations need to be the "proximate cause" for the eligibility determination benefits for a conviction to be sustained.

Contrary to defendant's claim, courts have upheld convictions for social security disability fraud based on evidence just like this case. In <u>United States v. Rettenberger</u>, the Seventh Circuit upheld the conviction of a husband and wife who claimed the husband was disabled and relegated to doing nothing other than sitting and watching television. 344 F.3d 702, 704 (7th Cir. 2003). In actuality, he was engaged in real estate development and extensive travels. <u>Id.</u> The Seventh Circuit found a rational juror could reject the defendant's claim that he had "bad days" when provided with evidence of extended stretches of activity coupled with the fact that the defendants did not disclose the extent of this activity to SSA. 344 F.3d at 705.

More to the point, an interpretation of the criminal offense that would require the government to prove a defendant is ineligible for benefits – and therefore that her misstatements were relied on in determining the eligibility for benefits – is plainly contrary to the law of this Circuit. "To establish materiality of a false statement it is

36

not necessary to show that a government agency actually relied on the statement, that the government suffered pecuniary loss as a result of the statement, or that the false statement was sufficient to induce a payment or benefit." United States v. Richmond, 700 F.2d 1183, 1188 (8th Cir. 1983), abrogated on other grounds, United States v. Raether, 82 F.3d 192 (8th Cir. 1996). Materiality does not require proof that the government actually relied on the statement. United States v. Baker, 200 F.3d 558, 561 (8th Cir. 2000) (§ 1001); see also United States v. Rashid, 383 F.3d 769, 778-79 (8th Cir. 2004) (rejecting contention that bank had to rely on false statement). The interpretation of materiality posited by the defendant is not only in sharp contrast to a large-body of jurisprudence, it is contrary to the purpose of the statutes: requiring individuals to provide truthful information to federal agencies. United States v. Adler, 623 F.2d 1287, 1291 (8th Cir. 1980) (declining to adopt interpretation of materiality that would require proof that false statement induced payment).

Indeed, defendant suggests that the government was required to call the original administrative law judge to testify what his decision would have been if he had been provided with accurate information. (Def.'s Br. at 50.) This kind of speculative, after-the-fact reconstruction of a determination is not supported by precedent, nor is it practical. What if the original decision maker is unknown or unavailable to testify? Does the law permit any sort of false statement to federal

37

agencies no matter how egregious so long as the government cannot prove beyond a reasonable doubt that there was a direct consequence resulting?  The testimony actually elicited – that the false information provided by the defendant is exactly the type of information that is "critical" for SSA to make its determination – is what the law requires.

Finally, the government adduced evidence that the defendant's misrepresentations affected her payments:  Mark Moskop of SSA testified that a person who owned her own business, hired employees, scheduled employees and provided a service to the business by which the business made a significant savings (all of which were proven to be the case) could qualify as "substantial gainful activity" even if she did not collect a paycheck.  (Tr. at 934.)  Moskop also testified that information that a person who owned a company, held a franchise agreement that required her to perform functions and entitled her to collect revenues (all of which were proven to be the case) would be relevant to the disability determination, because it would go to self-employment even if the business were a money loser.  (Tr. at 935.) Moreover, when the investigation was disclosed to SSA, the defendant's benefits were terminated.  (Tr. at 1116-17.)

38

B.    Concealment from SSA: Count 6

With respect to Count 6, "[f]or a conviction under 42 U.S.C. § 408(a)(4), the government must prove the following: (1) the defendant had knowledge of an event affecting his right to receive or to continue to receive payments; (2) the defendant knowingly concealed or failed to disclose this event to the Social Security Administration; and (3) the defendant concealed or failed to disclose this event with the intent to fraudulently secure payment of Social Security disability benefits in an amount greater than was due him or when no payment to him was authorized." United States v. Baumgardner, 85 F.3d 1305, 1310-11 (8th Cir. 1996) (citing United States v. Phillips, 600 F.2d 535, 536 (5th Cir. 1979)). The Baumgardner Court affirmed a conviction under 42 U.S.C. § 408(a)(4), even though it reversed a false statement conviction because the issue of materiality had not been put to the jury. 85 F.3d at 1310-11.

In this case, among other things, the defendant was advised on multiple occasions that she was required to report any work, including self-employment. (Gov't Exs. 1, 13 & 15.) Starting in September 2001, the defendant entered into numerous franchise agreements in which she contracted to provide director services. (Gov't Exs. 200, 201, 230 & 250.) The defendant operated her own consignment store. (Tr. at 653-54.) The defendant set up a for-profit corporation, using her

39

husband as the nominee officer. (Tr. 1038-39; Gov't Ex. 175.) While defendant contends her husband "performed all manual labor associated with the business" (Def.'s Br. at 49 n.17), the evidence proved that the defendant operated the consignment store (Tr. at 653-54) and was the person who directed and managed the beauty pageant business (Tr. at 591, 1343-44, 1351-53, 1358-61). Indeed, even the defendant's husband acknowledged the beauty pageant business was his wife's thing. (Tr. at 1708.) Defendant's contention that she received no remuneration for her activities (Def.'s Br. at 49), is also inaccurate. The defendant received money from her consignment store, based on the services that she provided, and used the money to create her beauty pageant business. (Tr. at 1708-09.) The defendant also received fees from contestants. (Gov't Ex. 255.) While not profitable, Crowning Moments reported over $18,000 in revenues in 2002. (Gov't Ex. 452.) Not until nearly two years later, in June 2003, following a search warrant based on allegations of social security fraud, did the defendant disclose to the SSA the existence of Crowning Moments, the franchise agreements and Queen Bear's Closet. (Gov't Ex. 16.)

Defendant argues the government failed to present evidence of fraudulent intent. (Def.'s Br. at 51.) Fraudulent intent may be inferred from a series of acts and relevant circumstances. See United States v. Snelling, 862 F.2d 150, 154 (8th Cir. 1988). As set forth above, the falsity of defendant's many representations to SSA

40

over a period of many years are themselves evidence of fraudulent intent. The defendant also engaged in half-truths: Instead of advising SSA of her company, Crowning Moments, Inc. and her consignment business, Queen Bear's Closet, she reported only that she was "hosting a one day event" (Gov't Ex. 14) and was "forced to sell much of [her] personal wardrobe in effort [sic] to help offset the costs of medical bills and medication." (Gov't Ex. 15.) In addition, although she filled out the state filings for her Crowning Moments business, the defendant had her husband sign as the nominee owner. (Tr. at 1038-39.) There was also direct evidence of fraudulent intent: witnesses testified that the defendant was trying to hide her work activity at MTW. (Tr. at 392-93, 502-04.)

Finally, defendant argues that "[t]he record shows unequivocally that Henderson honestly believed she was entitled to the benefits she received." (Def.'s Br. at 51.) Henderson testified in her own defense. Clearly, the jury rejected her testimony.[9] While the government may not rely solely on a defendant's denials to meet its burden of proof, "[w]hen there is other corroborative evidence of guilt the jury can properly draw an inference of guilt from its disbelief of the defendant's denials." United States v. Reed, 297 F.3d 787, 789 (8th Cir. 2002); see also United

---

[9]As did the trial judge who imposed a two-level enhancement for lying on the stand. (Sent Tr. at 46-47.)

41

States v. Vazquez, 53 F.3d 1216, 1225 (11th Cir. 1995) (particularly on issue of defendant's knowledge or intent, "when a defendant takes the stand in a criminal case and exposes his demeanor to the jury, the jury may make adverse determinations about his credibility . . . and may view defendant's false explanatory statement as substantive evidence proving guilt.").

C.    Wire Fraud: Counts 1 through 5

With respect to Counts 1 through 5, the essential elements of wire fraud are (1) a scheme to defraud, (2) the use of interstate wires incident to the scheme, and (3) an intent to cause harm. United States v. Frost, 321 F.3d 738, 741 (8th Cir. 2003). The concept of material false statements is incorporated in, and part of, the "scheme to defraud." Neder v. United States, 527 U.S. 1, 184-41 (1999). As with other criminal offenses, courts have uniformly employed the same definition of materiality for wire fraud as for false statement offenses. See, e.g., United States v. Gray, 367 F.3d 1263, 1271-72 & n.19 (11th Cir. 2004) (citing Neder and affirming standard definition of materiality for § 1341); United States v. Pasquantino, 336 F.3d 321, 332-33 (4th Cir. 2003) (§ 1343); United States v. Fernandez, 282 F.3d 500, 508 (7th Cir. 2002) (§ 1341). Based on the evidence of false statements regarding information that is critical to SSA's determination, and the evidence of fraudulent intent set forth above, the evidence was more than sufficient.

II.    THE DISTRICT COURT DID NOT ERR IN DENYING DEFENDANT'S MOTION TO REFER THE CRIMINAL CASE TO THE SOCIAL SECURITY ADMINISTRATION

Prior to trial, the defendant made a motion to "refer the matter" to SSA under the doctrine of primary jurisdiction. The district court correctly denied that motion.

In a limited number of cases, where interpretation of a particular regulation is essential to the case, district courts have invoked the doctrine of primary jurisdiction. See, e.g., United States v. Yellow Freight System, Inc., 762 F.2d 737 (9th Cir. 1985). Yet, recognizing that this doctrine interferes with the executive branch's legitimate authority to prosecute criminal offenses, courts have limited the application of the doctrine to cases in which the resolution will necessarily resolve a regulatory issue that has been placed by Congress in the jurisdiction of an administrative body (which has particular expertise and regulatory authority for a comprehensive scheme). See United States v. General Dynamics Corp., 828 F.2d 1356, 1366-67 (9th Cir. 1987) (reversing district court's stay of criminal prosecution). Similarly, this Court has held that courts "should be reluctant to invoke the doctrine of primary jurisdiction." United States v. McDonnell Douglas Corp., 751 F.2d 220, 224 (8th Cir. 1984).

There are four factors uniformly present in cases where the doctrine properly is invoked: (1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3)

43