UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. DAWN BARRETT <br><br> Plaintiff, <br><br> v. <br><br> CIGNA CORPORATION and LIFE INSURANCE COMPANY OF NORTH AMERICA <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. 03-12382-MLW |

## DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS

Throughout her Opposition to Defendants' Motion to Dismiss the Complaint ("Opposition" or "Opp."), Dawn Barrett ("Barrett") repeats the mantra that because the Social Security Administration ("SSA") denies the majority of claims for Social Security Disability ("SSDI") benefits, the Defendants[1] knew, based on the probabilities, that the SSDI claims of their policyholders' employees were false. Her theory would apply even if all of the information provided in the form by the employee was true and Defendants had yet to make a determination as to coverage. Under this theory, every SSDI application that contains truthful and accurate statements, but is ultimately unsuccessful, would give rise to a False Claims Act ("FCA") violation. This is not what the law mandates.

Additionally, Barrett's reliance on probabilities instead of facts demonstrating actual false claims is insufficient to meet the requirements of Rule 9(b) of the Federal Rules of Civil

---

[1] As with Defendants' Memorandum of Law in Support of Their Motion to Dismiss ("Defendants' Brief" or "Defs' Brief"), Defendants maintain that Barrett cannot assert a claim against CIGNA (*See* Defs' Brief, pp. 2-3, 35), but for simplicity, refer to Defendants collectively, unless otherwise noted.

Procedure or to plead all the elements of an FCA violation. More importantly, Barrett admits in her First Amended Complaint ("Complaint" or "Compl.") and her Opposition that *at the time employees are referred to SSA*, Defendants do not know whether they ultimately will deny benefits. This concession undermines any contention by Barrett that Defendants somehow knew at the time of the referral that the employee was ineligible for SSDI. Barrett essentially wants Defendants to undertake an extensive pre-screening process for SSDI applicants and only if Defendants are absolutely certain that the policyholders' employee will be successful, should Defendants refer them to the SSA. Not only is this not what Defendants (and most other insurers) do, but it is not what the law requires.

## ARGUMENT

**A.     Barrett Has Failed To Plead Fraud With The Requisite Particularity.**

1.     Barrett's Complaint Does Not Warrant A Relaxation Of Rule 9(b)'s Requirements.

As acknowledged by Barrett, "the details of the actual presentation of false or fraudulent claims to the government can and must be pled with particularity in order to meet the requirements of Rule 9(b)." *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 228 (1st Cir. 2004) (cited at Opp. p. 12). While acknowledging this black letter law, Barrett attempts to excuse her failure to meet these standards by arguing she is exempt from these requirements because she pleads a "scheme" and a "pattern or practice." *See* Opp. p. 14-15. As a self-proclaimed insider[2] with intimate knowledge of Defendants' procedures, Barrett is not entitled to such an exemption. If she were so entitled, her Complaint falls well short of the allegations found in other cases where the requirements of Rule 9(b) have been relaxed.

---

[2] In Barrett's Opposition she details her various roles at LINA since 2000 and asserts that she "witnesses the referral of claims to SSA on a mass basis without regard to the claimant's eligibility." Opp., p. 21. Not only are these facts not alleged in the Complaint, but, if anything they demonstrate that, by Barrett's own admission, she had access to internal information and, therefore, should have been able to detail the alleged fraud with the requisite particularity. *See infra*, pp. 3-7.

The relaxed Rule 9(b) standard advocated by Barrett applies: (1) where the facts are uniquely within the possession of the defendant; or (2) where "the fraudulent scheme is so complex that offering detailed accounts of each individual's role in the fraud is virtually impossible." *See United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 339 (S.D.N.Y. 2004). Barrett has not alleged that the facts necessary to meet the pleading requirements of Rule 9(b) are exclusively within Defendants' knowledge. In fact, she asserts the opposite – by Barrett's own admission, she should know and have access to the claim-specific information that might support the conclusory allegations in her Complaint. *See* Opp., p. 21. She is a current employee of LINA and she asserts that "Relator's first hand experience has given her access to direct evidence of the alleged practices." *Id*, p. 21. "When a relator has access to the information regarding the alleged false claims, merely alleging a fraudulent scheme may not be sufficient." *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 49 (D. Mass. 2001). Despite Barrett's purported access, she only alleges a general scheme and has failed to provide any of the claim-specific information she promises. *Compare Parke-Davis*, 147 F. Supp. 2d at 49 (relator, who was insider, alleged both the framework for the purported scheme and more specific information regarding the individuals involved, the locations, the precise time frames and the statements involved), *with United States ex rel. Clausen v. Laboratory Corp. of America, Inc.*, 290 F.3d 1301, 1312 (11th Cir. 2002) (relator not an insider and allegations under relaxed Rule 9(b) standard not sufficient where relator failed to allege amounts charged, dates claims were submitted, or anything more than particular form used to submit claims). Barrett's assertion that *Defendants*, rather than the self-proclaimed insider, should identify the false claims through discovery is exactly the kind of fishing expedition that Rule 9(b) is designed to prevent. *See Parke-Davis*, 147 F. Supp. 2d at 46.

3975871v4

In all of the cases cited by Barrett where a relaxed standard has been applied, the relator provided more specific information or was an outsider who did not have access to claim-specific information. *See, e.g., United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017, 1021 (S.D. Tex. 1998) (relator was not an employee of defendant, did not have access to information within defendants' possession and court considered information outside the pleadings in upholding complaint); *United States v. Kensington Hosp.*, 760 F. Supp. 1120, 1125 (E.D. Pa. 1991) (applying more relaxed Third Circuit standard under 9(b), noting it was a close question, but concluding that 9(b) was satisfied where complaint stated twelve examples of alleged kickback schemes and identified locations of fraud and dates of alleged fraud); *United States ex rel. Pogue v. Am. Healthcorp, Inc.*, 977 F. Supp. 1329, 1333 (M.D. Tenn. 1997) (relator identified series of contracts, which included names of physicians involved and dates, and identified the precise falsity in each contract).

For example, Barrett analogizes her Complaint to the allegations made by the relator in *United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313 (S.D.N.Y. 2004). *See* Opp., p. 16.[3] Unlike Barrett, however, the relator in *Gabelli* actually identified particular individuals involved in the purported violations and the ten government auctions in which false bids were submitted (and thereby the timing of the purportedly false statements) in the Complaint and also identified the manner in which the "claims" were false or fraudulent, *i.e.* the bids concealed relevant financial relationships and, thereby, falsely certified they were eligible for federal monies. 345 F. Supp. 2d at 336-37. Here, Barrett does not identify any particular individuals involved in the submission of false claims, merely relying on a "uniform policy", and she does not identify any

---

[3] Later in the Opposition (p. 26 n.5), Barrett argues that *Gabelli* is inapposite because, unlike the SSDI Application, the bids involved in *Gabelli* did not give rise to a claim unless accepted. The SSDI Application process is no different – the Application does not ripen into a claim unless it is determined that the claimant is disabled. *See infra*, pp. 8-12.

particular claims, by date or individual, which contained false information or failed to disclose material information.

Relying upon *United States v. Krizek*, 192 F.3d 1024 (D.C. Cir. 1999), Barrett asserts that "there can be no question that CIGNA's uniform corporate policy . . . results in submission of false claims." Opp., p. 20. Not only does Barrett fail to allege facts to support this bald assertion, but her reliance on *Krizek* is entirely misplaced. In *Krizek*, the false claims submitted totaled more than 24 hours for a given day. *Krizek*, 192 F.3d at 1029-30. Barrett has not alleged such a blatant impossibility, nor could she in light of the different definitions employed by the SSA and Defendants and the complex and lengthy process undertaken by the SSA (and detailed in the Complaint) to determine whether a particular claimant is eligible for benefits.

Finally, Barrett asserts that her case is most similar to *United States v. Morehouse Medical Assocs.*, No. 02-14429, 2003 WL 22019936 (11th Cir. Aug. 15, 2003), in which the Eleventh Circuit declined to dismiss the complaint under the more relaxed Rule 9(b) standard. As with Barrett, the relator in *Morehouse* was an insider working in the department where the alleged misconduct occurred. However, a close examination of the facts alleged in *Morehouse* only serves to highlight the glaring deficiencies in Barrett's Complaint. In *Morehouse*, the relator's allegations included the following: (1) a description of the coding process used by defendant to submit Medicare claims; (2) factual allegations detailing how codings were changed after rejection of claims by Medicare, identifying by name the specific individuals involved and their manager who directed the changes, as well as the frequency of such changes on a weekly basis; (3) factual allegations detailing how physicians clustered codings on a daily basis to receive larger reimbursement; and (4) factual allegations detailing the use of incorrect codes at least five times per week by physicians, including identifying particular codes that were incorrectly used, at particular locations by particular physicians. *Id.* at * 1-2. The relator also

alleged that she could not identify particular individual patients due to the confidentiality of

certain records that were within the exclusive control of the defendant. *Id.* at *2.

Unlike the relator in *Morehouse*, Barrett fails to provide this same level of detail, even

though she works in the relevant department of CIGNA.[4] She makes no claim that any further

information she may require in support of her allegations is exclusively within Defendants'

knowledge and possession, and she does not claim that she has withheld further detail to protect

individual confidentiality.

As noted in Defendants' Brief, Barrett merely pleads that any claims Defendants caused

to be submitted after 1997 might be fraudulent. *See* Defs' Brief, pp. 13-15. The mere statement

that all claims submitted after a particular date are false does not satisfy the requirements of Rule

9(b). *See United States ex rel. Sikkenga v. Regence Blue Cross/Blue Shield of Utah*, No.

2:99CV86K, 2001 U.S. Dist. LEXIS 25717, at *16 (D. Utah Nov. 27. 2001) ("[S]tating that all

claims after a certain date are false is not an adequate substitute for providing a detailed list that

would provide defendants with sufficient specificity to dispute the claims."). *See also Shamsi v.*

*Dean Witter Reynolds, Inc.*, 743 F. Supp. 87, 90 (D. Mass. 1989) (finding that the complaint in a

securities fraud action must detail and provide sufficient facts to support the allegations of

excessive trading) ("[T]he plaintiff may not delay setting out facts to support his claim pending

discovery, but must detail them in the complaint or face dismissal."). Moreover, such allegations

are not sufficient, even under the relaxed Rule 9(b) standard advocated by Barrett. *See Clausen*,

290 F.3d at 1311.

"Rule 9(b) . . . does not permit [an FCA] plaintiff merely to describe a private scheme in

detail but then to allege simply and without any stated reason for his belief that claims requesting

---

[4] Barrett names only two people in her Complaint. Each is a case manager for Defendants and each is mentioned only in the context of the two examples discussed in Paragraphs 102-110 of the Complaint. Neither is alleged to have any knowledge of a false claim being submitted.

illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *Id. See also United States ex rel. Gublo v. NovaCare, Inc.*, 62 F. Supp. 2d 347, 354 (D. Mass. 1999) (relators' complaint was dismissed because they "simply allege[d] three methods by which [defendant] is said to have inflated its bills to the government, without citing a single instance of a false claim."); *United States ex rel. Walsh v. Eastman Kodak Co.*, 98 F. Supp. 2d 141, 147-48 (D. Mass. 2000); *see also United States ex rel. Butler v. Magellan Health Servs., Inc.*, 101 F. Supp. 2d 1365, 1369-70 (M.D. Fla. 2000) ("illustrative" allegations through which plaintiff alleges a "scheme of fraud" were insufficient under 9(b); "At no time did Plaintiff plead that a specific insurance claim form for any patient was fraudulent."); *United States ex rel. LaCorte v. SmithKline Beecham Clinical Labs.*, No. CIV. A. 96-1380, 2000 WL 17838, at *3 (E.D. La. Jan. 10, 2000) (relator's claims dismissed with prejudice because the relator merely provided the general framework for the alleged fraudulent scheme, and provided no link between the allegedly fraudulent practices and the submission of fraudulent claims).[5] Rule 9(b) requires more than Barrett's speculation about what might have been false or fraudulent.[6]

2.    The Two Examples Cited By Barrett Do Not Adequately Allege False Claims.

In a vain attempt to buttress her conclusory allegations, Barrett points to two examples of purported "false" claims. *See* Compl., ¶¶ 102-110; Opp., pp. 16-18. As noted in Defendants'

---

[5] *See also* John T. Boese, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS 5-58.2 – 5-58.2-1 (2005 Supp.) ("Courts will dismiss FCA claims in which the plaintiff merely pleads 'by example,' where the complaint simply pleads a general methodology of alleged fraud and where the allegations fail to distinguish among defendants.").

[6] Barrett also makes much of the fact that, in her view, the facts alleged in the Complaint, "give rise to a strong inference of fraudulent intent." Opp., p. 14 (quoting *Suna v. Bailey Corp.*, 107 F.3d 64, 68 (1st Cir. 1997)). As noted in *Suna*, however, "Rule 9(b)'s relaxation of the scienter requirement is not intended to allow plaintiffs to base claims of fraud on speculation and conclusory allegations." *Suna*, 107 F.3d at 68. As noted *infra*, Barrett admits that Defendants do not know whether they ultimately will deny benefits at the time they refer claimants to the SSA and if they do deny benefits, Defendants notify the policyholders' employee. There is, therefore, no factual basis for an inference of fraudulent intent. In any event, even if Barrett's Complaint alleged specific facts supporting fraudulent intent, this, alone, is not sufficient to meet *all* of Rule 9(b)'s requirements, *i.e.* to plead the who, what, where, when and how of the alleged fraud. *See United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, No. Civ. A. 01-10583-DPW, 2003 WL 21228801, at *4 (D. Mass. May 21, 2003).

Brief, however, there is nothing in Barrett's allegations which demonstrates that any of the information provided to the SSA by the two insureds was actually false. *See* Defs' Brief, pp. 11-12. Barrett merely argues that because Defendants – months later – denied those two claims for LTD benefits, then Defendants must have known that the insureds would be rejected by the SSA at the time they were referred, *see* Opp., pp. 16-18, and that SSA's rejection proves that the claims were false. Her allegations regarding these examples do not indicate how or why Defendants should have known what the SSA might due after its lengthy investigation process or that Defendants concealed their decision on the employees' policy claims. Barrett concedes that Defendants notified the insureds of their decision months after they were referred to the SSA.

For the foregoing reasons, as well as those in Defendants' Brief, Barrett's Complaint fails to meet the pleading requirements of Rule 9(b) and should be dismissed.

**B.     Barrett's Allegations Do Not Establish The Elements Of An FCA Claim.**

1.     The SSDI Application Is Not A "Claim."

As acknowledged by Barrett, in order to be a "claim" for purposes of the FCA, the SSDI Application must have the "practical purpose and effect, and pose[] the attendant risk, of inducing wrongful payment." *See* Opp., pp. 22-23 (citing *United States v. Rivera*, 55 F.3d 703, 710 (1st Cir. 1995)). Moreover, the defendant must subject the government to an immediate, or virtually immediate, demand for payment. *See Dookeran v. Mercy Hosp*, 281 F.3d 105, 108-09 (3d Cir. 2002); *United States ex. rel. Cooper v. Gentiva Health Servs, Inc*, No. 01-508, 2003 WL 22495607, at *7 n.9 (W.D. Pa. Nov. 4, 2003).

According to Barrett, the mere fact that the policyholders' employee indicates on the Application that he or she *believes* they are eligible for SSDI benefits demonstrates not only the falsity of the claim, but also that the form is in fact a "claim" *See* Opp., pp. 22-26. This would be true only if the SSA effectively took the claimant's word for it and paid out the benefits

without further investigation. As demonstrated by the detailed description in the Complaint and in the Opposition regarding the eligibility determination undertaken by the SSA, clearly there is nothing to indicate that the SSA takes the Applicants at their word regarding their eligibility. *See, e.g.*, Opp., p. 5 ("There is a lengthy administrative process for each SSDI claim."); Compl., ¶¶ 24-43. Moreover, as pointed out by Barrett, the instructions on the forms state: "[t]he information that you give us on this form will be *used by the office that makes the disability decision* of your disability claim." Opp., p. 23 (emphasis added).[7] As this instruction reveals, the SSA makes its own determination regarding disability based on the information provided by the individual – it does not simply accept the individual's belief that he or she is "eligible".

Moreover, as stated in Defendants' Brief, starting the eligibility determination process by filing an SSDI Application, should not be considered making a claim under the FCA because there are many intervening steps before a government payment is made, none of which is automatic. *See* Defs' Brief, pp. 19-20. The Application is, instead, a request for an adjudication regarding disability. It does not ripen into a claim under FCA until the SSA determines that the individual is disabled. *Compare United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 335-36 (S.D.N.Y. 2004) ("A bid, by its very nature, does not request or demand monetary compensation. It is one step removed from a request or demand for money ... even assuming that the unsuccessful bidders falsely certified compliance with FCC regulations on their short-form applications, they did not "make" ... a "claim" within the meaning of the FCA."). Where an intervening act is necessary for the defendant's demand to trigger government payment or obligation to pay, liability to make the payment does not attach until that act takes place. *See*

---

[7] Although Barrett relies on these instructions, she points out that the form attached to Defendants' Brief contains two pages of instructions, including the statement "This Is Not An Application", and that those instructions somehow have no bearing on the analysis, while the instructions relied upon by Barrett do. *See* Opp., p. 24 n.4. In any event, Barrett acknowledges that the form "requests medical and vocational history material to *whether the claim should be granted.*" *Id.* (Emphasis added.)

*United States v. Van Oosterhout*, 96 F.3d 1491, 1494 (D.C. Cir. 1996) (allegedly false loan application became a "claim" only when the government became obligated to pay a third-party lender). Here, the acts which set in motion the SSDI eligibility determination process – the alleged false claims – are not immediate or virtually immediate demands for payment. Rather, they are requests that the SSA begin the process of adjudicating the claimants' status as disabled persons – a process that cannot be reasonably viewed as anything other than an intervening act. Thus the initiation of the adjudication process by the filing of the SSDI Application, which is the event identified by Barrett as a false claim, cannot be the basis for FCA liability.

Because SSDI claims are subject to an adjudicatory process which may ultimately evolve into adversary proceedings, an SSDI application is much like a complaint in a court, designed to commence the adjudicatory proceedings. While the definition of "claim" under the FCA is necessarily broad, *see United States v. Neifert-White Co.*, 390 U.S. 228, 233 (1968), Defendants have found no cases in which a petition to begin an adjudicatory process has been held to be a "claim" under the FCA.[8] Nor does Barrett cite to any cases in which a petition for an adjudicatory process has been held to be a "claim" under the FCA.

In fact, none of the cases cited by Barrett involve an adjudicatory process and all are clearly distinguishable from the context at issue here. *See* Opp. pp., 25-26. Specifically, in

---

[8]  In fact, Defendants have found only one instance in which an applicant for SSDI was accused of violating the FCA. In *United States v. Henderson*, No. Civ.03-5060(MJD/JDL), 2004 WL 540278 (D. Minn. Mar. 16, 2004), the defendant made repeated false statements regarding her alleged disability during several stages of SSDI adjudicatory proceedings. She was awarded SSDI benefits, and the government sued her under the FCA. The court dismissed the complaint for failure to comply with Fed. R. Civ. P. 9(b) because the government failed to identify which of Henderson's representations were false, when those statements were made and how they were conveyed. *Id.* at *3.

The Defendants cited *Henderson* in their Brief, and thereafter discovered that the government had re-filed against Henderson on April 14, 2004 (Civil Action No. 04-1584 (MJD/JGL), alleging the same FCA violations. *See* Memorandum of Law & Order (dated October 25, 2004), annexed hereto as <u>Exhibit A</u>. Henderson moved to dismiss a second time, on several grounds, including Rule 9(b). *See id.* at 2-3. The court denied her second motion because the government had corrected its earlier deficiencies by identifying false statements made by Henderson in the Application, hearing testimony, and subsequent written submissions to SSA, *id.* at 9, satisfying the court's earlier rquirement that it "state which statements were false, when Henderson made those statements, to whom those statements were made, and how those statements were conveyed." *Id.* at 4. The court did not analyze, nor did the defendant argue, that her request for SSDI benefits was not a "claim" within the meaning of the FCA. *See generally id.*

neither *United States v. TDC Management*, 288 F.3d 421 (D.C. Cir. 2002) nor *United States v. Cooperative Grain & Supply Co.*, 476 F.2d 47 (8th Cir. 1973), did the court assess whether the particular request at issue was a "claim" under the FCA. Neither case involved an adjudicatory process at all, or even one remotely similar to that undertaken by the SSA to determine eligibility for SSDI benefits. Likewise, the other cases cited by Barrett did not involve an adjudicatory process akin to the SSA process, and in all of those cases the defendants had withheld material information upon which the government's determination to pay was based, which was critical to the court's conclusion that the requests were "claims". *See Ab-Tech Const., Inc. v. United States*, 31 Fed. Cl. 429, 433-34, *aff'd*, 57 F.3d 1084 (Fed. Cir. 1995) (progress payment vouchers were "claims" where defendant withheld information regarding prohibited contracts and government would not have made payment had it known of prohibited contracts); *Sell v. United States*, 336 F.2d 467, 474 (10th Cir. 1964) (application for assistance under grain feed program would not have been granted had defendant disclosed certain information); *United States ex rel. King v. F.E. Moran, Inc.*, No. 00 C 3877, 2002 WL 2003219, * 4 (N.D. Ill. Aug. 29, 2002) (statements on application were more than amounts actually paid to minority owned businesses); *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 324 (D. Conn. 2004) (requests for Medicare payment for devices not approved by FDA stated FCA claim where no payment would have been made had use of non-approved devises been disclosed).[9] Here, there is no allegation that SSDI applicants either withhold or falsely state facts which are material to the SSA's ultimate decision regarding benefits.

---

[9] Barrett also relies upon *Cantrell v. New York University*, 326 F. Supp. 468 (S.D.N.Y. 2004) in support of her argument that, even if the right to payment is not yet enforceable, the claim itself is ripe at the time the application is submitted, regardless of the adjudicatory and investigatory process that might follow. *See* Opp., p. 26. *Cantrell* does not mention, let alone analyze this issue. In fact, *Cantrell* merely notes that in a prior ruling the court determined that each invoice, not each line item, constituted a "claim" for FCA purposes, and then went on to discuss unrelated issues. Accordingly, *Cantrell* provides no support whatsoever for Barrett's argument.

Finally, Barrett's assertion that Defendants argument would leave the government without any remedy for outright "lies" on the form is unfounded. *See* Opp., p. 24. As noted in Defendants' Brief and conceded in the Opposition, such conduct would subject the applicant to liability under other statutes, such as those prohibiting false statements to the government. *See, e.g.*, 42 U.S.C. § 408(a)(3); 18 U.S.C. § 1001. *See also* Opp., p. 5 (citing 42 U.S.C. § 408).

2.    An Individual's Statement Of "Eligibility" And Defendants' Subsequent Denial Of Benefits Are Not Material.

To prove an FCA violation, Barrett must show that the false statement or claim was material to the government's funding decision. *See United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 50 (D. Mass. 2001) (listing materiality as element of an FCA claim). Even if a false statement is made, if it is not material it does not give rise to FCA liability. *See United States v. Data Translation, Inc.*, 984 F.2d 1256, 1257, 1267 (1st Cir. 1992) (false statement that was not material did not give rise to liability under the FCA); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999); *Pres. & Fellows of Harvard Coll.*, 323 F. Supp. 2d 151, 181-82 (D. Mass 2004); *United States ex rel. Stebner v. Stewart & Stevenson Servs., Inc.*, 305 F. Supp. 2d 694, 698 (S.D. Tex. 2004) ("FCA liability does not exist if the alleged fraudulent act had no bearing on the Government's payment decision."). Barrett has not alleged facts demonstrating that the purported falsity – the individual's alleged representation that he or she is eligible for SSDI benefits – is material to the SSA's determination to pay SSDI benefits. As noted above, the Complaint is devoid of any allegation that the SSA takes a claimant's word for it regarding the alleged disability or that it relies in any way upon an independent insurers determination of LTD benefits in assessing whether a claimant is eligible for SSDI. *See supra*, pp. 8-12. Nor does Barrett cite to any case law supporting her conclusory assertions that the insured's representation of eligibility is

-12-

material. Based on the extensive allegations in the Complaint regarding the eligibility process

undertaken by the SSA and the instructions relied upon by Barrett, the exact opposite is true.

Barrett alleges that the "falsity" may be inferred because Defendants force insureds to

apply for SSDI benefits even though Defendants have determined that the insureds are not

eligible for LTD benefits. *See* Opp. pp. 11, 15. However, Barrett concedes that *at the time*

*insureds are referred to the SSA*, Defendants have not yet made any determination regarding the

insureds' eligibility under policy provisions, let alone the insureds' eligibility under the SSA's

different and extensive regulations governing SSDI. *See* Opp., p. 16. A valid claim cannot be

transformed into a false claim by subsequent events. *See United State ex rel. Quinn v. Omnicare,*

*Inc.*, 382 F.3d 432, 438-39 (3rd Cir. 2004).

Barrett also concedes that Defendants notify the insureds when they determine the

insureds are not eligible for LTD benefits. *See* Opp., p. 16. Under Barrett's theory, therefore,

Defendants' liability attaches under the FCA because they did not *directly* intervene and inform

the SSA of their determination, despite the fact that the insureds are represented separately by an

outside vendor, may have obtained their own counsel, or may be pursuing their SSDI claim on

their own. The FCA does not require this much.[10] Furthermore, and as explained in Defendants'

Brief, SSA regulations specifically state that Defendants' determination of a claimant's disability

is irrelevant to SSA's determination. *See* Defs' Brief, pp. 26-27 (discussing 20 C.F.R.

---

[10] Barrett cites to SSA statutes and regulations which require representatives of SSDI applicants to disclose
information to the SSA and prohibit false or misleading statements of material fact. Opp., p. 35. As acknowledged in
the Complaint and in the Opposition, however, Defendants are not directly representing the applicant. *See* Compl.,
¶¶ 92-97; Opp., pp. 7-8. Defendants provide representation through a third-party should insureds wish to avail
themselves of such assistance. Not every insured does and in many cases insureds represent themselves or obtain their
own counsel. In any case, Defendants, as admitted by Barrett, inform the individual claimant when they deny benefits.
*See* Compl., ¶¶ 102-110. At that point it is the individual's or the individual's representative's responsibility to inform
the SSA of the denial, if at all. More importantly, even if Defendants could be classified as "representatives" of SSDI
applicants (which they are not), this does not transform immaterial facts into material ones.

§ 416.904). Accordingly, neither of Barrett's purported "falsities" is material and cannot give rise to FCA liability.

3.    Defendants' Referral Of Insureds To The SSA Is Not A "Knowing" Submission Of "False Claims."

Even if the Court were to engage in the extrapolation Barrett invites based on her probability theory of liability, a necessary component of her theory is missing. She claims that most SSDI applicants are denied benefits, but she says nothing about the percentage of LTD claims which are denied by the Defendants. If the Defendants' omission to tell the SSA of their actions means anything, it must be based on the inference that they routinely deny claimants who are simultaneously referred to the SSA.

Barrett has not made this allegation. On this score, it is telling that, although Barrett suggests the existence of a scheme over a number of years and asserts that Defendants "frequently" deny benefits, she has failed to provide such information and points to only two instances where Defendants denied benefits following (and not prior to) a referral to the SSA.[11] Barrett's argument that the "frequency and volume of the false claims" supports a reasonable inference of "knowing misconduct" has no force because her Complaint contains no factual allegations regarding the number of LTD claims that Defendants denied following referral to the SSA.

Finally, Barrett's reliance upon *United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296 (6th Cir. 1998) does not assist her. The defendant in Compton was under a

---

[11] Barrett cannot appear to make up her mind regarding what it is Defendants allegedly should have disclosed to the SSA. At one point she suggests that Defendants must have known that the claims were false because a few months later Defendants denied benefits and, therefore, the falsity or fraudulent conduct was Defendants failure to disclose these denials. Opp., pp. 28, 32. Elsewhere in her Opposition, she asserts that Defendants acted with "reckless disregard" for the truth because Defendants should know that insureds who are *awarded* – not denied – benefits "will never qualify for SSDI coverage." Opp., p. 31. Barrett cannot have it both ways. Moreover, if, as Barrett claims, the definition of disability is more generous than the SSDI definition, then where Defendants award benefits, it is just as probable that the insured is eligible for SSDI as not.

contractual duty to perform certain testing of brake shoe kits. *Id. at 297-98.* The Defendant failed to undertake this testing, but represented to the government in its requests for payment that it had complied with the contracts requirements. *Id.* at 298. The *Compton* court held that the actions by defendants demonstrated a "reckless disregard" for the truth or falsity of the claims for payment. *Id.* at 304.

Unlike the defendant in *Compton*, however, Defendants are not subject to any contractual duty to the SSA to pre-screen claimants under the SSA's definition of disability. Accordingly, *Compton* is distinguishable from the case at bar.

## II.    CONCLUSION

For the foregoing reasons, as well as those stated in Defendants' Memorandum of Law In Support of Their Motion to Dismiss, Barrett's First Amended Complaint should be dismissed with prejudice.

Respectfully submitted,

*/s/Karen Collari Troake*
R. J. Cinquegrana, P.C. (BBO #084100)
Karen Collari Troake, Esq. (BBO #566922)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts  02110
(617) 248-5000

Dated: September 1, 2005                *Attorneys for Defendants CIGNA Corporation and*
*Life Insurance Company of North America*

## CERTIFICATE OF SERVICE

I hereby certify that on September 1, 2005, copies of Defendants' Reply Brief in Support of Their Motion for Summary Judgment, were served electronically and by first-class mail upon the attorneys of record for the Plaintiff and upon the United States Attorney.


                                        */s/ Karen Collari Troake*
                                        Karen Collari Troake

3975871v4