UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>*EX REL*. DAWN BARRETT, )<br>PLAINTIFFS )<br> )<br>v. )<br> )<br> )<br>CIGNA COPRORATION and )<br>LIFE INSURANCE COMPANY )<br>OF NORTH AMERICA, )<br>DEFENDANTS ) | C.A. No. 03-12382-MLW |

**SECOND AMENDED COMPLAINT
AND DEMAND FOR JURY TRIAL**

**I.      INTRODUCTION**

1.      This is an action to recover damages and civil penalties on behalf of the United States of America arising from false or fraudulent claims made, or caused to be made, by the Defendant CIGNA Corporation ("CIGNA"), acting alone and in concert with its subsidiaries, agents and alter ego entities, to the United States of America in violation of the False Claims Act, 31 U.S.C. § 3729 *et seq*. ("the FCA").

2.      Originally enacted in 1863, the FCA was substantially amended by the False Claims Amendments Act of 1986, Pub.L. 99-562, 100 Stat. 3153.  The 1986 amendments enhanced the Government's ability to recover losses sustained as a result of fraud against the United States of America.

3.      The FCA provides that any person who knowingly presents, or causes to be presented to the government a false or fraudulent claim for payment or approval is liable for a

civil penalty ranging from $5,500 up to $11,000 for each such claim, and three times the amount of the damages sustained by the Government.

4.     Pursuant to the FCA, Plaintiff seeks to recover, on behalf of the United States of America, damages and civil penalties arising from a fraudulent scheme by CIGNA, acting alone and in concert with its subsidiaries, agents, and alter ego entities, to knowingly cause to be submitted to the United States Social Security Administration ("SSA") false or fraudulent claims for Social Security Disability Insurance ("SSDI") benefits.

5.     As a matter of uniform corporate policy, CIGNA requires all of the Long Term Disability (LTD) claimants on its disability policies and those written by its subsidiaries, to apply for SSDI as a condition of receiving the full LTD benefits which the claimants are entitled to receive.  CIGNA, acting alone and in concert with its subsidiaries, exerts significant coercion and duress and inducement to persuade LTD claimants to file claims for SSDI.

6.     CIGNA knows, based on its extensive experience in reviewing LTD claims and in light of the comprehensive medical and vocational record that it acquires for each insured, that most LTD claimants cannot possibly be eligible for SSDI benefits under well-established law.

7.     CIGNA causes the submission of thousands of claims for SSDI benefits without undertaking any good faith assessment or review to determine whether each LTD claimant could possibly be entitled to receive SSDI benefits.  Indeed, CIGNA causes submission of many such claims even when it has other evidence on hand that the claimant is not properly eligible for SSDI benefits.  CIGNA thus acts in deliberate indifference to the truth or falsity of the claimant's eligibility for SSDI.

8.     The fraudulent scheme to submit false or fraudulent claims takes several forms:

a.     First, CIGNA, acting alone and in concert with its agents, subsidiaries, and alter ego entities, requires all LTD claimants to file claims for SSDI once the claimant's entitlement to Short Term Disability (STD) expires and the claimant's file is transferred to CIGNA's LTD Case Managers.  CIGNA enforces the requirement that all LTD claimants apply for SSDI with reckless disregard to whether the LTD claimant could possibly be eligible for SSDI.

b.     Second, CIGNA acting alone and in concert with its agents, subsidiaries, and alter ego entities, requires LTD claimants to file claims for SSDI with actual knowledge of and deliberate indifference to their clear ineligibility for SSDI.  At the time of submission of the SSDI claim to SSA, CIGNA has extensive information in its files documenting that the individual LTD claimant cannot possibly qualify for SSDI based on the nature or expected duration of his or her disability and his or her residual work capacity.

c.     Third, CIGNA acting alone and in concert with its agents, subsidiaries, and alter ego entities, conceals information from SSA that is readily available in the claimant's files that would be material to the SSA's determination of the claimant's eligibility for SSDI.  Concealment of material information related to the claimant's SSDI eligibility violates CIGNA's obligation to disclose to SSA information that is material to SSA's determination of eligibility.  CIGNA's conduct violates 42 U.S.C. 408(4).

9.     Each claim for SSDI benefits that CIGNA causes to be submitted knowing that the claimant could not be eligible for SSDI is a false claim within the meaning of the federal FCA.

10.     The false claim is the affirmative misrepresentation on the SSDI Claim Form that the claimant is unable to perform work in any occupation expected to last at least twelve months or to result in death.  The claimant makes that representation, under penalty of perjury, in order to receive benefits under a federal program.

11.     Each claim for SSDI benefits that CIGNA causes to be submitted knowing that the claimant could not be eligible for SSDI is also a fraudulent claim within the meaning of the federal FCA whether or not the claim contains factually untrue information.

12.     Knowing submission of false claims is a central part of CIGNA's fraudulent scheme.  For each false claim submitted to SSA, CIGNA can reduce its reserves on that claim during the pendency of that claim with SSA, allowing it to improve its financial statements and to write more disability insurance policies.

13.     Affirmative misrepresentations that claimants are eligible for SSDI are material misrepresentations.  By claiming eligibility for benefits under the federal SSDI program, submission of the claim triggers an expensive administrative process by SSA to dispose of the claim.

14.     CIGNA causes thousands of such false or fraudulent claims to be submitted to SSA each year.   Submission of these false or fraudulent claims imposes many millions of dollars of additional administrative costs on the already heavily burdened Social Security system.  In addition, inundation of SSA of these false or fraudulent claims poses the attendant risk that SSA will make overpayments by granting claims that do not meet the statutory eligibility requirements.  See Office of the Inspector General, Social Security Administration, Congressional Response Report: Overpayments in the Social Security Administration's Disability Programs April 2006.

## II.    PARTIES

15.    Plaintiff and Relator, Dawn Barrett ("Barrett"), is a resident of Pittsburgh, Pennsylvania.  Barrett has been employed by Defendant LINA, a wholly owned subsidiary of CIGNA, since September 2000.  Barrett has first hand knowledge of the allegations in this Second Amended Complaint through her more than five years as an employee of LINA and in her capacity as a representative of CIGNA.

16.    Barrett has investigated the allegations in this Second Amended Complaint. Barrett has confirmed with current and former CIGNA and LINA employees that CIGNA's policy of directing LTD claimants to apply for SSDI is routine and uniform and results in actual false claims being submitted to SSA.

17.    Barrett, like all employees of CIGNA and its wholly owned subsidiaries, is trained and directed to hold herself out as a CIGNA employee and representative to the public.  Barrett's business card lists her as a CIGNA representative.  All of the communications Barrett has with insureds, with vendors and within LINA are sent on CIGNA letterhead.  When Barrett answers the phone, she must state "Thank you for calling CIGNA." All of the training materials Barrett has been given are titled CIGNA.

18.    CIGNA sells employee benefits and services, including group disability insurance policies, to employers and individuals all across the United States through its subsidiaries.

19.    In 2000, CIGNA was the third-largest seller of disability insurance policies in the country, with a market share of 8.7%.  CIGNA is headquartered in Philadelphia, Pennsylvania.

20.    CIGNA conducts its business through various wholly-owned subsidiary corporations including Life Insurance Company of North America ("LINA"), CIGNA Life Insurance Company of New York and Connecticut General Life Insurance Company.

21.    LINA is registered and qualified to do business in Massachusetts, and has sold disability insurance policies in Massachusetts.

22.    CIGNA treats its subsidiaries and agents as alter egos and uses employees and assets of LINA and its other subsidiaries to implement its policy and practice of requiring LTD claimants to file SSDI claims as a condition of receiving full LTD benefits.

23.    In addition to selling disability insurance, CIGNA also administers self-insured group disability benefits for large corporations, including for example, Mellon Bank and Marathon Oil.

24.    The allegations set forth in this Second Amended Complaint apply to policies written by CIGNA, LINA or any other CIGNA's subsidiaries.

25.    The allegations set forth in this Second Amended Complaint also apply to LTD disability claims administered by CIGNA for other companies under self-insured disability benefit plans.

## III.    JURISDICTION AND VENUE

26.    The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3729 *et seq*.  The false claims allegations of this complaint are not the subject of any public disclosure as defined in 31 U.S.C. § 3730(e)(4).

27.    The Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, and because the Defendants can be found in, and/or transacts business in, this District.

28.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because the

Defendants can be found in this District.

**IV.    BACKGROUND**

**A.    DISABILITY INSURANCE PROGRAMS**

29.     There are essentially two forms of disability insurance in the United States for

employees who suffer injuries or illnesses that affect their ability to perform work:  (1) Social

Security Disability Insurance and private Short Term Disability (STD) and (2) Long Term

Disability (LTD) policies.

**1.    The Social Security Disability Insurance Program**

30.     The SSDI Program ("SSDI") was established in 1954 under Title II of the Social

Security Act, 42 U.S.C. § 401, *et seq*. ("the SS Act").  SSDI provides federally-funded

benefits to disabled wage earners and their families and functions essentially as a "safety net"

form of disability insurance.

31.     Individuals seeking to obtain SSDI benefits must be severely disabled.  SSDI

does not pay for partial disability or for short-term disability.  Under the SS Act, disability is

defined as "hav[ing] a medically determinable physical or mental impairment that has lasted

or is expected to last at least twelve months or result in death and that prevents him/her from

performing ***any*** substantial gainful activity."  42 C.F.R. 405.1505.  Substantial gainful activity

is defined as work resulting in earnings of at least $800.00 per month or equivalent activity.

32.     Even if a person meets SSA's stringent definition of "disability," SSA will not

begin paying disability benefits until the person is disabled for more than five months.

33.     Resolution of a claim for Social Security disability benefits typically takes many

months.  In recognition of this, if and when Social Security disability benefits are ultimately

awarded, the claimant is entitled to a lump-sum retroactive payment of benefits up to one year

prior to the date of submission of the claim.  This lump-sum retroactive payment includes

payment from the sixth month of disability up to the date of the award.

34.     In addition, even though a person will not be eligible for disability benefits until

after the fifth month of disability, Social Security regulations permit a claimant who believes

he or she may be eligible after the fifth month to file a claim before the fifth month.  Filing a

claim is a prerequisite for receiving SSDI benefits.  42 C.F.R. 404.603.

35.     Criminal sanctions are available for submission of false SSDI claims.

36.     Under 42 U.S.C. § 408, a felony is committed by whomever: (1) makes or

causes any false statement or representation for the purpose of causing an unauthorized SSDI

payment; (2) makes or causes to be made any false statement or representation of material fact

in any application for any payment or for a disability determination; or (3) makes or causes to

be made any false statement or representation of a material fact for use in determining rights

to an SSDI payment.

37.     The SSA statute imposes an obligation upon someone who files for SSDI--on

his or her own behalf or on behalf of another--to disclose "any event affecting" the "initial or

continued right" to SSDI payment.  Failure to disclose such an event, or the concealment of

such an event "fraudulently to secure payment either in a greater amount than is due or when

no payment is authorized," is a felony under 42 U.S.C.§ 408.

38.     "Fraud" is defined by SSA to include: (1) making false statements or

misrepresentations in applying for benefits; (2) making false statements or misrepresentations

of material facts at any time for use in determining benefit rights; and (3) concealing or failing

to reveal information about events effecting initial or continued right to benefits or the amount of payment.

39.     To submit a claim for SSDI benefits, the applicant (or "claimant") completes an SSA Application Form (Form SSA-3368-BK) and files that Form ("the Claim Form") with a local Social Security Field Office (a "Field Office").

40.     Social Security regulations provide that completion of the Form SSA-3368-BK and signature of the Claim Form makes it a "claim for benefits."  42 C.F.R. 404.610

41.     An applicant may file on his or her own behalf, or he or she may choose to have a representative handle his or her claim before SSA.  To appoint such a representative the applicant must file an "Appointment of Representative" Form (Form 1696, or "the Appointment Form") with SSA.  Once a representative is appointed it is the representative, rather than the applicant, who usually interacts with SSA.   Social Security regulations impose extensive duties and obligations on those acting as representatives of claimants before SSA including duties of candor and respecting the non-adversarial nature of the claims disposition process.  42 C.F.R. 404.1740.

42.     The Claim Form contains the prominent warning as part of its instructions that the SS Act's definition of disability is quite stringent.  Following the bold-faced, capital letters **"WHAT WE MEAN BY DISABILITY,"** the Claim Form explains that:

> Disability under Social Security is based on your inability to work.  For purposes of this claim we want you to understand that "disability" means that you are unable to work as defined by the Social Security Act.  You will be considered disabled if you are unable to do any kind of work for which you are suited and if your disability is expected to last (or has lasted) for at least a year or to result in death.  So when we ask, "when did you become unable to work," we are asking when you became disabled as defined by the Social Security Act.

43. When the applicant answers the question, "When did you become disabled?" he or she is answering when did they become unable to work under the statutory definition of disabled.

44. The Claim Form requires the applicant to provide information about medical treatment and records and asks the applicant to describe how his or her illness or injuries or conditions limit his/her ability to work. The Claim Form also includes a section for "Remarks" and invites the applicant to include "any added information you did not show in earlier parts of the form."

45. The Claim Form concludes with a signature line, which is immediately preceded by a prominently displayed warning that states in bold-faced, capital type:

> "**ANYONE MAKING A FALSE STATEMENT OR REPRESENTATION OF A MATERIAL FACT FOR USE IN DETERMINING A RIGHT TO PAYMENT UNDER THE SOCIAL SECURITY ACT COMMITS A CRIME PUNISHABLE UNDER FEDERAL LAW.**"

### 2.    Private (Non-Governmental) Disability Insurance

46. Private insurers, including CIGNA and its subsidiaries, sell disability insurance products that provide income protection for workers who become disabled. These private policies are typically broader in their definition of disability than the SS Act and cover those who are unable to perform their "own occupation" and not only those who are unable to perform "any occupation" as SSDI does.

47. CIGNA markets its private disability policies as "help[ing] to protect the lifestyle to which a person is accustomed."

48. CIGNA emphasizes in its sales literature that every person who becomes disabled from performing his or her ***own occupation*** is not necessarily disabled from performing ***any***

*occupation*.  CIGNA cautions its potential customers that they need disability insurance that will provide income replacement coverage in the event that the individual becomes disabled from performing his or her *own occupation* but does not qualify for SSDI because the disability is not severe enough so as to disable the individual from performing *any occupation*.  In exchange, CIGNA and its subsidiaries receive significant premium payments.

        **a.**        **Group Short Term (STD) and Long Term Disability (LTD) Income Policies**

49.      Many employers purchase Short Term Disability ("STD") and Long Term Disability ("LTD") insurance coverage for their employees.

50.      Other employers self insure for STD and/or LTD under policies administered for them by CIGNA or its subsidiaries.

51.      STD and LTD insurance coverage is typically provided to the employees through group employee welfare benefit plans established pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA").

52.      Under the typical STD policy written or administered by CIGNA or its subsidiaries, the employee is entitled to benefits in the event that the employee is unable to perform the usual and customary duties of his or her *own occupation* as a result of injury or sickness.

53.      Customarily, the STD coverage does not begin until after the employee is disabled for anywhere from 7 to 30 days.  This period is called the "Elimination Period." During the Elimination Period employees often receive income pursuant to employer sick leave plans and/or their vacation days.

54.     Once STD coverage begins, payments are made on a weekly basis.  The typical STD policy provides coverage for anywhere from 13 to 26 weeks (i.e. 3-6 months), after which time the STD coverage period ends.

55.     The amount of the benefit under the typical STD policy ranges from 50% - 60% of the employee's pre-disability earnings.

56.     The definition of disability applicable to the typical CIGNA STD policy never changes--so long as the employee is disabled from performing his or her ***own occupation***, the insurer must pay the benefits.  Thus, many individuals covered by an STD policy can receive disability benefits under that policy despite the fact that they do not qualify for benefits under the SS Act's ***"any occupation"*** definition.

57.     Long-Term Disability ("LTD") coverage typically begins once STD coverage ends.  Thus, the "Elimination Period" for the typical LTD policy is that period of time during which the employee is covered by the STD policy (i.e. 3-6 months).

58.     Although the employee's claim converts from an STD claim to an LTD claim, for a discrete period of time (typically 24 months) the definition of disability under the typical LTD policy remains the ***"own occupation"*** definition that was applicable to the STD benefit period.  Thus, during this initial 24 month period, as long as the employee remains unable to perform the customary duties of his or her ***own occupation***, he or she will be entitled to LTD benefits.

59.     After 24 months of coverage under LTD, CIGNA policies typically have a "change in definition" for disability from the ***"own occupation"*** definition to the ***"any occupation"*** definition.  Thereafter, in order to recover LTD benefits, the claimant must be

12

totally disabled from performing the material and substantial duties of *"any occupation"* for which he or she is qualified by training, education and experience.

60.    LTD benefits are paid on a monthly, rather than weekly basis.  The rate of payment is consistent with the STD coverage--income is replaced at the rate of anywhere from 50% to 66-2/3% of the pre-disability earnings level.  LTD coverage typically continues until the individual reaches age 65.

61.    CIGNA's disability insurance policies, therefore, provide much greater protection to the insured than does SSDI.  Although SSDI pays nothing in the event that the employee is merely disabled from performing his *own occupation*, CIGNA's products are designed typically to provide the employee 30 months of income protection for such disabilities (6 months of STD and 24 months of LTD).

### b.    Offsets for Other Income Under LTD Policies

62.    The typical CIGNA disability policy contains an "offset" provision requiring that monthly disability payments be reduced by certain other income received by the LTD claimant.

63.    CIGNA's policies define SSDI payments received by the LTD claimant (or by his or her spouse and children) as "offset income."  Accordingly, CIGNA policies entitle CIGNA to reduce the LTD claimant's LTD benefits by the amount the LTD claimant is receiving for SSDI (including all amounts paid to the claimant's spouse and children).

64.    CIGNA's policies also mandate that the LTD claimant applies for SSDI benefits in the event that CIGNA determines, unilaterally, that the LTD claimant may be eligible for SSDI benefits.  If the LTD claimant does not apply for SSDI benefits after CIGNA directs the LTD claimant to apply, CIGNA's policies provide that CIGNA is entitled to reduce the

monthly benefit owed under the policy by the *estimated* SSDI benefit to which CIGNA determines the LTD claimant would be entitled if the LTD claimant applied for SSDI.

65.    Typically, self-insured plans administered by CIGNA are modeled on CIGNA policies and also contain an "offset provision" providing that the LTD claimant's benefits under the policy will be reduced by any amount the LTD claimant receives for SSDI (including all amounts paid to the claimant's spouse and children).

66.    Self-insured plans administered by CIGNA also typically mandate that LTD claimants apply for SSDI benefits in the event that CIGNA determines, unilaterally, that the LTD claimant may be eligible for SSDI.  If the LTD claimant does not apply for SSDI after CIGNA directs the LTD claimant to apply, CIGNA's policies provide that CIGNA is entitled to reduce the monthly benefit owed under the policy by the *estimated* SSDI to which CIGNA determines the LTD claimant would be entitled if the insured applied for SSDI.

## V.    ALLEGATIONS

### A.    CIGNA HAS A UNIFORM POLICY AND PRACTICE OF CAUSING LTD CLAIMANTS TO FILE CLAIMS FOR SSDI BENEFITS

67.    Since 1997, CIGNA has had a uniform policy and practice of (1) requiring all LTD claimants (except those with simple pregnancy claims) to file for SSDI in reckless disregard as to whether or not the claimant could possibly meet the stringent SSDI *any occupation* definition of disability; (2) providing SSDI filing assistance for all LTD claimants unless the disability is related to a simple pregnancy diagnosis or the claimant has a firm return to work date within nine months; and (3) threatening claimants that if they refuse to file, they will lose a substantial portion of their disability benefits.  Prior to making these threats and demands that the LTD claimant file a claim for SSDI, CIGNA performs no review

of whether or not the claimant can meet the stringent "*any occupation"* definition of disability required for SSDI although it has medical records and other information available to it that is relevant to that determination.

68.    CIGNA routinely directs its insureds that they should apply for SSDI even if it is known or readily foreseeable that they are or will be eligible to return to work shortly after their SSDI claim is filed.  CIGNA routinely causes such claims to be submitted to SSA even though CIGNA knows that one of the requirements to qualify for SSDI benefits is that the disability prevents a return to work for at least one year or result in death.

69.    Since 1997, even if a claim does not meet the Social Security Assistance Referral Guidelines set forth in Paragraphs – through --, CIGNA still instructs its LTD Case Managers to direct LTD claimants to file for SSDI benefits.  Claimants are told that if they do not file for SSDI benefits, their CIGNA benefits will be offset by the amounts CIGNA determines they would have received had they applied for those benefits.

70.     If the LTD claimant has filed for SSDI benefits, he or she is asked to send the "Receipt of Claim for Social Security Disability Benefits" to CIGNA.

71.    Internal CIGNA documents show that even claimants who have firm "return to work" dates within nine months are told that they still must file SSDI claims in case return to work is not possible.  LTD Case Managers are advised to "advise claimant that he or she should still apply for SSDI as protection in case RTW is not possible."  The LTD Case Managers are instructed to give these claimant the Social Security toll-free "800" telephone number.

72.    Internal CIGNA documents show that even pregnancy claimants are advised by CIGNA that "if there are complications that take her beyond the normal post partum period, she will be required to file for SSDI."

73.    CIGNA's entire motivation in causing its LTD claimants to file for, and to be awarded, Social Security disability benefits is to promote and benefit its own economic interests.

74.    If a claimant receives LTD benefits, CIGNA receives the financial benefit through the payment of any lump-sum retroactive award of benefits.  Also, CIGNA's obligation to pay continuing disability benefits under the insurance policy is reduced (i.e. offset) by the monthly amount of the SSDI benefits that the LTD claimant receives.

75.    In addition to the direct economic benefit CIGNA recognizes when an insured is awarded SSDI benefits, CIGNA recognizes an additional benefit whether or not SSDI is awarded.  For every claim that CIGNA receives, CIGNA must create a reserve under state regulations to cover its liability for the expected duration of the claim.

76.    Reserves for a pending LTD claim can be offset by the amount of the estimated SSDI benefits.  CIGNA diminishes the reserves on each of its LTD claims by a percentage of estimated SSDI benefits even where no SSDI award had yet been made.  In other words, CIGNA reduces its reserves when the SSDI claim is filed even if the SSDI claim is later denied.  This reduction in reserves improves CIGNA's financial statements, even temporarily, allowing it to write more insurance policies and reap more premiums.

77.    The opportunity to reduce reserves provides a significant motivation for CIGNA LTD Claims Managers to require every LTD claimant to file a claim for SSDI benefits with deliberate indifference, actual knowledge, and reckless disregard to the claimant's eligibility.

1.      **CIGNA Knowingly Causes The Submission of False or Fraudulent Claims.**

78.     At the time CIGNA causes the submission of claims for SSDI benefits, CIGNA has relevant information in each of the LTD claimants' filed that demonstrates that many thousands of LTD claimants are not eligible for SSDI under well established law. Documentation in the LTD claimant's file includes medical records, a diagnosis of the claimant's impairment, the claimant's vocational history, and, often a projected return to work date for the claimant.

79.     Documentation of the claimant's medical record and vocational qualifications begins with the filing of the initial claim for STD insurance.

80.     When an insured files an initial disability claim with CIGNA, the claim is assigned initially to a Short Term Disability (STD) Claims Manager who records the claimant's impairment using an ICD-9 code and the claimant's occupation.

81.     CIGNA requires all claimants to provide background information to allow CIGNA to assess the claimant's eligibility for STD and LTD benefits based on standardized criteria and to predict a "return to work" date for that claimant. CIGNA requires all STD claimants to complete a Disclosure Authorization form so that CIGNA may obtain the claimant's medical records.

82.     STD Case Managers consult CIGNA's on-line Medical Directory which provides General Recovery Guidelines for each type of illness or injury. For example, a sprained ankle has an anticipated recovery of two weeks and removal of a benign cyst has an anticipated recovery of seven days.

83.    STD Case Managers are also responsible for coding the type of work a claimant has performed as heavy duty, medium duty or light duty.

84.    By evaluating the type of work the claimant performs and the generally recognized guidelines for his or her injury or illness, CIGNA Case Managers can predict the period the claimant is likely to be disabled from performing his or her "own occupation" and can set an anticipated Return to Work date.

85.    STD Case Managers are responsible for continued communications with the claimant to ensure that the claimant returns to work in a timely fashion if able to do so.

86.    STD Case Managers are responsible for requesting updated medical records for the claimant every four to six weeks.

87.    As the STD period of 3-6 months begins to reach termination, the STD Case Manager is responsible for preparing the claim file for transfer to a LTD Case Manager thirty five days prior to the termination of STD.   CIGNA STD and LTD Case Managers both work in teams and they work in the same building.

88.    When the claimant's file is transferred from a STD Case Manager to an LTD Case Manager, the claims file usually contains an updated Disclosure Authorization,  medical records, and a copy of a request sent to physicians to provide a narrative report of the claimant's function and to complete the Physical Abilities Assessment Form.

89.    Although each claim file may vary, the claim file typically includes information on the nature and expected duration of the claimant's disability, some kind of vocational assessment of the claimant's ability to perform their own occupation and a ranking of whether their own occupation was heavy duty, medium duty or light duty, medical records, a projected Return to Work date, and the projected cost to CIGNA if LTD is approved.

90.    STD Case Managers are charged with making sure the claim file is "well documented" when transferred to the LTD Case Managers.

91.    If the LTD Case Manager anticipates that the claimant is likely to return to work within ninety days of referral to the LTD Case Manager, that information will typically be recorded in the claim file.

92.    When the LTD Case Manager receives the claim file, the LTD Case Manager sends the claimant an updated Authorization to Release Information to obtain updated medical information.

93.    Next, the LTD Case Manager assesses whether to refer the LTD claimant for assistance with submission of a claim for SSDI benefits.

> **2.    CIGNA's Social Security Referral Program and Social Security Referral Guidelines**

94.    Since 1997, CIGNA has provided increased assistance to claimants in filing SSDI claims through its Social Security Referral Guidelines and Social Security Assistance Programs.

95.    CIGNA's policy and practice of referring claimants for assistance with SSDI is an integral part of its management of disability claims.  One CIGNA training manual instructs that CIGNA's primary "cost containment services" includes "helping claimants obtain SSDI benefits and helping claimants return to work."

96.    For some period between 1997 until 2000, Case Managers (then known as "Benefit Analysts" or "BAs") were instructed to forward all newly approved LTD claims to a CIGNA "Social Security Specialist" for review.

97.    The Social Security Specialist was to ensure that the claimant either had filed or was able to file the SSDI claim, to determine whether or not the claim had the potential to succeed at the hearing level, and where appropriate to provide assistance at the appeal level.

98.    Starting in 2000, CIGNA developed the Social Security Referral Guidelines ("Guidelines") and imposed additional requirements on LTD Case Managers to begin the process for referral for filing of SSDI claims no more than seven business days of receipt of an LTD claim.

99.    The Guidelines increase the number of claimants for whom CIGNA provides assistance with preparation and submission of the SSDI claim.

100.    The Guidelines instruct LTD Case Managers to determine whether the claimant's age and income preclude a claim for SSDI benefits, or whether there is some other contract exclusion that may be a basis for CIGNA denying coverage for the claim (for example, the disability arises from an excluded, pre-existing medical condition).  If not, the Guidelines require that the Case Manager determine whether the claimant is pregnant or whether the claimant had a firm "return to work" date within nine months of the time the disability was incurred.  If the claimant is neither pregnant nor has a firm "return to work" date within the nine months, the Guidelines require that the claimant be referred for assistance with submission of a SSDI claim.  The Guidelines do not assess whether the expected duration or nature of the claimant's disability meets SSDI eligibility.

101.    As a next step for claims that meet the Guidelines, the CIGNA LTD Case Manager contacts the claimant, by letter and/or by telephone, and makes the following points to the claimant:

* the disability policy requires the LTD claimant file for SSDI (and may also require the LTD claimant appeal any SSDI denial);

* if the claimant refuses to cooperate with CIGNA and does not apply for SSDI, CIGNA will assume that the claimant has received SSDI benefits and will offset an estimated benefit amount from the claimant's disability benefit.   This offset will apply on a date that is the later of: (1) 60 days from the date of the contact by CIGNA; or (2) six months from the onset of the underlying disability.

* if SSDI pays the claimant, the claimant must notify CIGNA and will owe that "overpayment" to CIGNA.  The claimant must sign a Reimbursement Agreement agreeing to send any overpayment to CIGNA.

* if the LTD claimant has already filed for SSDI on his or her own initiative, he or she is to send to CIGNA a copy of their "Receipt for your claim for Social Security Disability Benefits" to CIGNA; and

* if the LTD claimant has not yet filed for SSDI, the LTD Case Manager is to tell the LTD claimant that CIGNA will assist with the filing process, and that CIGNA is referring the claim to its Social Security Assistance Team.  The LTD claimant is to be told that he or she will soon be contacted by the Team.

102.    Between 2000 and 2002, when claims met the Guidelines (which are inappropriately based merely upon the anticipated duration of the disability rather than on whether the disability, in fact, rendered the claimant unable to engage in "substantial gainful activity" as is required by the SS Act's definition of disability), the LTD Case Manager sent the claim to an internal CIGNA "Offset Specialist" who worked with the claimant to ensure

filing of an SSDI claim in deliberate indifference to whether the claimant could possibly be eligible for SSDI under well established law.

103.    As a first step, the Offset Specialist would send a form letter to the LTD claimant informing the LTD claimant that "[y]our LTD claim was referred to me by your Case Manager to provide you with information regarding the Social Security Disability process and how I may be able to assist you in obtaining those benefits." The letter instructed the LTD claimant to file a claim for SSDI; to return proof of the submission of the claim; to sign an enclosed "Social Security Release of Information" to allow CIGNA to obtain information from the SSA about the claim; and to sign an Authorization to allow CIGNA to release information from its files to a legal representative for the claimant.

104.    The letter to the LTD claimant also would include, as an implicit threat, a reminder that CIGNA has the right to reduce LTD benefits by an estimated amount for SSDI benefits. The letter would enclose a fact sheet to "explain some of the advantages of receiving Social Security benefits." The Offset Specialist would also promise: "I will remain in contact with you throughout the application and/or appeal process. I may also be able to provide you access to legal services. If these services are necessary, I'll refer your case to a legal representative who is a specialist in Social Security law. *These services will be provided at no out of pocket cost to you.*" (Emphasis in original).

105.    If CIGNA did not receive proof of submission of the SSDI claim, the Offset Specialist would send a follow-up letter in six weeks reminding and/or threatening the LTD claimant that "[a]s I explained to you, your group Long-Term Disability policy allows us to reduce your benefits by an estimate of the amount you (and your dependents, if applicable) would be eligible to receive from Social Security." The letter would then warn that this

reduction in LTD benefits would occur if proof of submission of an SSDI claim was not received in a month.

### 3. CIGNA Uses Vendors to Submit False or Fraudulent Claims for SSDI Benefits

106.    Over the years, CIGNA has referred claim files to one of several outside vendors that specialize in obtaining SSDI benefits. These vendors acted as CIGNA's agent in implementing the fraudulent scheme to submit false or fraudulent claims to SSA.

107.    When a referral is made to a vendor for assistance with submission of an SSDI claim, CIGNA writes a referral letter asking that the vendor directly represent the claimant and that the vendor work on a 25% contingency fee, not to exceed $4,000 (or in later years $5300). The CIGNA letter then states "Again, we believe the claimant is entitled to Social Security Disability benefits. If you feel additional investigation is required, e.g., Independent Medical Examination, please contact me prior to incurring the expense."

108.    Prior to 2002, CIGNA used the Social Security Law Group which is located in Avon, Massachusetts; and ALLSUP which is located in Belleville, Illinois for SSDI claims submission. In addition, CIGNA referred SSDI claims to David Brown, an attorney located in Rancho Santa Margarita, California; the Coats & Todd law firm in Dallas, Texas; Jerry Zivic, located in Chicago, Illinois; and Integrated Benefits, Inc. located in Jefferson City, Missouri. If the outside vendor was successful in obtaining benefits, the vendor received a fee capped at the higher 25% of the retroactive benefits or $4,000 to $5,300 (depending on when the claim was filed). This fee was taken from the retroactive benefits paid to the claimant. CIGNA bore the cost of this representation.

109.    In the summer of 2002, CIGNA entered into an agreement with Advantage 2000 Consultants, Inc. to pursue SSDI claims for CIGNA claimants whose claims were processed through CIGNA's office in Pittsburgh, Pennsylvania.

110.    Advantage 2000 is a privately held consulting firm, staffed by former Social Security Administration personnel, that specializes in obtaining Social Security disability benefits for individuals.

111.    Under the agreement between Advantage 2000 and CIGNA, CIGNA pays Advantage 2000 a flat fee for successfully obtaining SSDI benefits: $1,250 if SSDI is obtained upon the initial application or at reconsideration, and $2,150 if SSDI is obtained at the ALJ level or some other level of appeal.

112.    Once Advantage 2000's agreement was in place, CIGNA terminated its Pittsburgh Offset Specialists.   LTD Case Managers now refer all claimants meeting the Guidelines to Advantage 2000 in deliberate indifference to whether the claimants could possibly be eligible for SSDI and often with actual knowledge that the claimant is not eligible for SSDI benefits.

113.    After referral of a LTD claimant to Advantage 2000, the LTD Case Manager sets his or her diary to track Advantage 2000's progress in getting the LTD claimant to file for SSDI.

114.    To increase the pace of SSDI claim submission, CIGNA has held periodic contests among the LTD Case Managers to determine who could refer the greatest number of claimants to Advantage 2000.  Prizes were awarded to the two LTD Case Managers with the highest numbers of referrals.  The contests also offered prizes for the LTD Case Managers with the highest estimation rates.  Until an estimation of SSDI benefits was calculated and

entered into the system with the correct offset codes, CIGNA could not adjust its reserves. These referral and estimation contests included both new incoming claims, and older claims that had never been referred to an outside vendor for SSDI assistance.

115. CIGNA rewards LTD Case Managers based on high rates of referral of claims for SSDI assistance knowing that many of the claims that will be submitted to SSA will be false or fraudulent claims.

116. Advantage 2000 reports back to CIGNA periodically on the status of each CIGNA referral. By September 2003, more than 2000 claimants had been referred from CIGNA to Advantage 2000. In virtually every case, Advantage 2000 had filed an SSDI application and/or had pursued an SSDI appeal.

117. When Advantage 2000 receives a CIGNA referral it sends a form letter to the CIGNA LTD claimant. In that letter Advantage 2000 informs the LTD claimant that the case has been referred, that CIGNA will pay for Advantage 2000's services and that Advantage 2000 will provide professional representation by "completing all necessary paperwork, answering questions and managing the presentation of your case to Social Security." Advantage 2000 promises that their services will "minimize contact between you and the Social Security Administration...."

118. Advantage 2000 receives all of the information available in CIGNA's case file at the time of referral of the claimant for SSDI application including medical records, diagnostic information, any vocational assessment and description of own occupation, and anticipated Return to Work date.

119.    Advantage 2000 obtains additional medical record information for the LTD claimant on its own initiative and notifies CIGNA's LTD Case Manager of the progress of the case toward SSDI claim submission and at each stage of the SSDI process.

120.    Both before and after May 2002, once the initial contact has been made with the LTD claimant directing them to file a claim for SSDI benefits, LTD Case Managers are instructed to "Set all applicable Offset Diaries" according to the "Diary Checklist." The Diary Checklist requires that the LTD Case Manager set his or her diary to monitor proof that the claimant filed for SSDI and returned an executed "Reimbursement Agreement." The Checklist also requires that the claim be referred for a calculation of estimated SSDI benefits at the eighth month.

121.    LTD Case Managers are responsible for entering the appropriate offset code for SSDI benefits. These offset codes are used to calculate offsets that may be taken against reserves held by the company for that claim.

122.    LTD Case Managers are also required to follow up to ensure SSDI application has occurred. If the claimant refuses to apply for SSDI, the LTD Case Manager is responsible for estimating the SSDI benefit that might have accrued if the claimant had applied and notifying the LTD claimant that CIGNA will reduce his or her LTD benefits by the amount of the estimated offset. No effort is made to ensure that reductions in LTD benefits are made only for those claimants who could be eligible for SSDI under well established law.

**4.    CIGNA Places Duress and Coercion on LTD Claimants to Force the Filing of SSDI Claims**

123.    CIGNA uses economic duress to cause its claimants to file for SSDI. Individuals who are receiving CIGNA benefits have ceased to receive income from their

employment.  Most are dependent upon their disability insurance checks (which are usually only 60% or less of their pre-disability income).  CIGNA instructs these financially stressed individuals that, unless they file for Social Security, their disability checks will be reduced by the *estimated* Social Security benefit.  This leaves most insureds with no option other than to file false or fraudulent claims with the Government.  Most monthly disability insurance checks, if reduced by the *estimated* Social Security disability benefit, would reduce the monthly benefit down to a level upon which the insured could not survive.

124.    LTD Claimants who resist filing are routinely contacted and pressured by CIGNA LTD Case Managers and representatives of the outside vendors.

125.    In addition to using economic duress to achieve its goal of having its LTD claimants file for SSDI, CIGNA coerces its insureds to file for SSDI by instructing CIGNA, LINA and other subsidiary employees to advise the LTD claimants that filing is in their best interest, by encouraging the insureds to file for SSDI, and by providing the insureds with "free" Social Security advocacy.

126.    One method of coercing LTD claimants to file false claims for SSDI is by forcing them to execute a Reimbursement Agreement with CIGNA.

127.    The Reimbursement Agreement requires that the LTD claimant affirm that he or she has applied for a benefit under a STD or LTD policy, and that he or she understands that under the terms of the policy, benefits may be reduced by amounts received from SSDI.  The Reimbursement Agreement provides that the LTD claimant understands that CIGNA "has the right to immediately reduce benefits by an amount it estimates will be received, but by signing this agreement and complying with its terms the Insurance Company will not reduce my benefits."

128.    The Reimbursement Agreement also provides that the claimant has applied or will apply for SSDI, and typically provides that the claimant understands that CIGNA's agreement not to reduce benefits is valid only if the claimant provides proof that: (1) he or she has applied for benefits; (2) the signed Reimbursement Agreement has been submitted to CIGNA; and (3) "any and all appeals were made for these benefits, or the Insurance Company has determined that further appeals will not be successful."

129.    The "Reimbursement Agreement" ends with the following:

> **"Note: As a service to you, we have created this agreement so that you are able to receive your Net STD/LTD Benefit while waiting for      your Other Benefits award or denial.  If you choose not to sign and   return this form, we will estimate Other Benefits and deduct the    amount from your STD/LTD benefits according to the provisions of the contract."**

130.    CIGNA has a policy, practice and procedure of conditioning receipt of full LTD benefits upon the LTD claimant's compliance with CIGNA's demand that the LTD claimant file a claim for SSDI regardless of the claimant's own understanding or belief as to whether he or she is properly eligible for SSDI benefits.

131.    Many CIGNA policies, including policies issued by CIGNA subsidiaries, also require that LTD claimants not only file for SSDI benefits, but that they continue to appeal if the SSDI claim is denied. CIGNA imposes this requirement despite the fact that it knows or should know that denial was appropriate because the claimant is not "disabled" because he or she is able to perform work in an occupation even if not his or her own occupation.

132.    These allegations apply equally to self insured policies administered by CIGNA where that policy also requires that LTD claimants file claims for SSDI regardless of whether they can possibly be eligible for SSDI benefits.

**5.      CIGNA Acts with Actual Knowledge, Deliberate Indifference and Reckless Disregard in Causing the Submission of Thousands of False or Fraudulent Claims for SSDI Benefits.**

133.    CIGNA knowingly causes false or fraudulent claims to be submitted to SSA.  CIGNA's knowledge is evident in several ways.

134.     First, at the time of transfer of each claimant's file from CIGNA's LTD Case Manager to an Offset Specialist or vendor like Advantage 2000, CIGNA has actual knowledge that many thousands of claimants cannot possibly qualify for SSDI based on the nature and expected duration of their disability and are false claims.

135.    Second, by instructing LTD Case Managers to instruct all LTD claimants even those with Return to Work dates within nine months or those with complicated pregnancy claims to file claims for SSDI, CIGNA acts with reckless indifference to the falsity of the SSDI claim.

136.    Third, by instructing LTD Case Managers to follow CIGNA's Social Security Referral Guidelines which require automatic referral of all claimants for SSDI application – without regard to whether the claimant's disability could possibly limit them from performing any gainful work – CIGNA acts in reckless disregard of the falsity of the claims submitted to SSA.

137.    Fourth, by not sharing with SSA professional opinions from doctors, nurses, and licensed vocational consultants that CIGNA obtains and while the SSDI claim is pending, CIGNA acts with deliberate indifference to the falsity of the claims submitted to SSA.  The professional opinions by these doctors, nurses and/or vocational rehabilitation consultants are material to CIGNA's determination of whether the LTD claimant is disabled from performing his or her "own occupation."  These opinions would surely be material to SSA's determination of

whether the LTD claimant was disabled from performing "any occupation."  CIGNA has a deliberate policy of not sharing with Advantage 2000 or other vendors or with SSA.

138.    Finally, after CIGNA causes its LTD claimants to file claims for SSDI benefits, and while the SSDI claim is pending, CIGNA frequently denies or terminates the insured's LTD claim on the basis of the opinions of its employee physicians, nurses and vocational rehabilitation consultants that the LTD claimant is, in fact, not disabled from performing either (1) their ***own occupation*** or (2) ***any occupation***.   CIGNA does not inform SSA of its decision to terminate LTD benefits even under the "own occupation" standard or the underlying medical record and vocational record documentation in its files supporting its decision.  By concealing from SSA such information and documentation, CIGNA knowingly causes SSA to review a claim for SSDI that it has actual knowledge is extremely likely not to be eligible for SSDI.

### 6.    CIGNA Conceals Claimants' Ineligibility for SSDI Benefits

139.    CIGNA knowingly conceals material information from SSA about the eligibility of claimants for SSA.

140.    As discussed above, CIGNA does not inform SSA when it terminates or refuses to grant LTD benefits to a LTD claimant who has filed a claim for SSDI.

141.    Each LTD Case Manager has a quota for closing files that must be met to achieve CIGNA's goals of maintaining reserves at a certain level.

142.    When CIGNA denies LTD benefits from a LTD claimant it does not advise SSA of the fact that CIGNA does not consider the LTD claimant to be disabled even under an "own occupation" standard, despite the fact that CIGNA has arranged for and is paying a vendor to represent the LTD claimant before SSA.

143.    In addition, CIGNA often on its own, or through its agents or subsidiaries, will cause the LTD claimant to continue pursuing its claim for SSDI even up to a year after denial or termination of LTD benefits.  CIGNA or its representatives will repeatedly call the LTD claimant, require him or her to submit additional documentary material, and will continue the SSDI appeals process on behalf of the LTD claimant.

144.    By pursuing a SSDI claim for the claimant even after having denied LTD benefits, CIGNA seeks to obtain a wrongful grant of SSDI benefits and to apply the retroactive lump sum award retroactively against amounts previously paid the claimant for STD or LTD.

145.    CIGNA continues to conceal the information that it has denied the claimant LTD benefits and the underlying medical record and vocational record documentation in its claims file as it advocates through its agents for a grant of the claimant's SSDI claim after denial of his or her LTD claim.

146.    CIGNA provides no explanation to its LTD Case Managers or its claimants how or why a LTD claimant might be eligible for SSDI when she or he cannot even qualify for benefits under CIGNA's LTD "own occupation" definition of disability.

147.     Concealment of material information from SSA violates CIGNA's duty to disclose such information to SSA.

**B.    CIGNA'S ACTUAL SUBMISSIION OF FALSE OR FRAUDULENT CLAIMS FOR SSDI**

**1.    The SSDI Claim Process is Costly For The United States**

148.    After submission of the Claim Form, the first step in the SSDI claim process is the initial consideration.  SSA determines if the applicant meets the non-medical eligibility requirements as well as the medical eligibility requirements.

149.    The SSDI Claim Form is received by the Field Office.  A SSA claims representative compiles the non-medical and preliminary medical information associated with the Claim.

150.    The SSA claims representative then immediately makes the determination whether the claimant satisfies the non-medical eligibility for SSDI, i.e., whether the claimant has paid enough taxes on his or her wages so as to be insured for SSDI benefits.  If not, the claim is denied.

151.    If the claimant meets the non-medical eligibility requirements, the folder is sent to a state Disability Determination Service Center ("a DDS") where the determination of whether the claimant meets the medical eligibility requirements is undertaken.

152.    In the DDS, a team composed of a disability examiner and a physician and/or a psychologist makes the disability determination based upon an evidentiary record.

153.    The evidentiary record includes "medical evidence of record" ("MER") which the DDS is to obtain from the claimant's treating physicians.  MER includes copies of medical records, laboratory reports, prescriptions, x-rays, ancillary tests, operative and pathology reports, consultative reports and other technical information.

154.    DDSs are required to make every reasonable effort to obtain MER from the claimants' treating sources.  SSA's instructions define "every reasonable effort" as: (1) making an initial request for MER from the treating source; (2) making a follow-up request any time between 10 and 20 calendar days after the initial request if the MER has not been

received; and (3) allowing a minimum of 10 calendar days from the follow-up request for the treating source to respond. However, if MER is not received within 10 calendar days of the follow-up request, the DDS can purchase a Consultative Examination (a "CE").

155. A CE is an examination performed on behalf of, and at the expense of, SSA by vendor physicians or psychologists. These include medical and psychological examinations of claimants, as well as performance and interpretation of x-rays and laboratory studies.

156. In addition, the DDS may supplement the MER by purchasing Vocational and/or Occupational Consultations performed by vendor consultants.

157. Once the investigation is completed, the DDS makes a claim decision, whereupon the applicant's claim for SSDI benefits is either allowed or denied.

158. The Disability Insurance Trust Fund ("the DI Trust Fund") incurs substantial administrative expenses investigating claims for SSDI benefits at the initial level. These costs include, but are not limited to, costs for personnel, supplies, telephone charges, collecting the claimant's medical record and other MER information, and hiring doctors, psychologists and vocational consultants to perform Consultative Medical and Vocational examinations.

159. Reconsideration review ("a Reconsideration") is the *first* administrative review for claimants who are denied benefits by the DDS. Within 60 days of the initial denial, the claimant must file a Form SSA-561-U2 ("Request for Reconsideration"), as well as a Form SSA-3441-F6 ("Reconsideration Disability Report") if the initial denial was based upon a finding that the claimant did not meet the medical or vocational requirements.

160. Reconsideration involves a *de novo* review of the claim (including any new evidence) by individuals at the DDS level who did not participate in the original

determination. The reviewers consider all the evidence and issue a Reconsideration Determination.

161.    The SSA incurs substantial administrative expenses performing Reconsiderations.

162.    Claimants whose claims are denied on Reconsideration may appeal the denial within 60 days to the Office of Hearing and Appeals ("OHA") by filing a Form HA-501 ("Request for Hearing By Administrative Law Judge").  This **second** level of administrative appeal is a *de novo* hearing before an Administrative Law Judge ("ALJ") who can call on medical or vocational experts, if needed, to help evaluate the evidence.

163.    In the event that the claim was denied at the DDS level because the claimant did not meet the medical or vocational requirements, the claimant must also file at the ALJ level a Form HA-4486 ("Claimant's Statement When Request for Hearing is Filed and the Issue is Disability").  The claimant must also file several copies of Form SSA-827 ("Authorization to Disclose Information to SSA").

164.    Frequently, at the ALJ level, new evidence is introduced by the claimant and his or her representative, often at the hearing itself.  Claimants are allowed to appear before the ALJ and to call witnesses.

165.    Claimants whose claims are denied at the ALJ level may request a review by the Appeals Council by filing a Form 520-HA ("Request for Review of Decision/Order of Administrative Law Judge") within 60 days of the ALJ's denial.  The Appeals Council is the **third** and final level of administrative appeal.  The Appeals Council may grant, deny, or dismiss a request for review of the ALJ decision.  It will grant review if the ALJ decision

contains an error of law, is not supported by substantial evidence, involves a broad policy issue, or if there appears to be an abuse of discretion by the ALJ.

166.    SSA incurs substantial administrative expenses with respect to adjudicating appeals at the Appeals Council level.

167.    If the Appeals Council denies or dismisses the request for review, or denies the claim after accepting review, the remedy for the claimant who is still dissatisfied is to file a civil action in Federal District Court within sixty days.  The District Court may affirm, modify or reverse SSA's decision, with or without remanding the case to SSA.

### 2.    Representative False or Fraudulent Claims for SSDI

168.    By way of example of the thousands of actual false claims Defendants have caused to be submitted, Barrett pleads the following four exemplary false OR fraudulent claims:

### a.    Claimant A: 42-Year-Old Operations Assembler, Knee Injury and Lower Back Pain

169.    Claimant A with LTD Policy # 198566174 under LINA policy LK980001 with Tyco was injured in a fall in June 2003.  Claimant A suffered an injury to his right knee and strained his back with pain in his lower lumbar and thoracic spine.  Claimant A was 42 years old at the time of the injury and had been working as an Operations Associate Assembler. Thereafter, Claimant A filed a claim for STD benefits and signed an authorization for CIGNA to obtain his medical records as part of his application for STD benefits.

170.    During his period of receiving STD benefits and again when transferred for a review of LTD eligibility in approximately December 2003, CIGNA obtained information from Claimant A's treating physicians.  CIGNA obtained information about Claimant A's July 2003 arthroscopic knee surgery.  According to CIGNA's internal records, the knee

surgery completely resolved Claimant A's knee injury.  CIGNA also obtained medical

information from treating physicians that Claimant A had begun to see for his back pain

starting in October 2003.

171.    Claimant A's treatment between October 2003 and January 2004 for his back

pain including steroid injection and administration of non steroid anti inflammatory drugs and

Prednisone.  The medical records state that Claimant A was not a surgical candidate.

172.    On December 31, 2003, shortly after Claimant A was transferred to an LTD

Case Manager, he was told he would have to file a claim for SSDI.  Claimant A signed a

"Reimbursement Agreement" acknowledging that CIGNA has the right to "immediately

reduce the benefits by an amount it estimates" he would receive from SSDI.  LTD benefits

began on January 6, 2004.

173.    On February 13, 2004, CIGNA referred Claimant A to Advantage 2000's Social

Security Assistance Program for submission of a claim for SSDI benefits even though

claimant's medical and vocational history supported the conclusion that Claimant A could not

be eligible for SSDI benefits.  Although CIGNA's records suggest that Claimant A might be

disabled from performing heavy duty work because of his back pain, nothing in the LTD case

file suggests that Claimant A could not perform sedentary or even medium duty work.

174.    On March 30, 2004, Advantage 2000 filed a claim for SSDI on behalf of

Claimant.

175.    Meanwhile, Cigna continued its investigation to terminate Claimant A from

LTD benefits.  On April 13, 2004, Susan Kerr, Case Manager for CIGNA Disability

Management Solutions, wrote a letter to Claimant informing him that "after a thorough review

of your file it has been determined that you are not eligible to receive Long Term Disability

benefits." Ms. Kerr told Claimant that CIGNA believed "based on the medical information in your file, there is no medical information to support your inability to perform your occupation as an Operations Associate Assemble I." Ms. Kerr also noted that "your benefits for Long Term Disability may have begun on January 6, 2004, but there is no evidence to support why you were and remain unable to perform the essential duties of your regular occupation, as required by the policy." On the same day, Advantage 2000 received additional medical records for Claimant.

176. Advantage 2000 does not appear to have informed SSA of CIGNA's decision to terminate LTD benefits. Advantage 2000 does not appear to have disclosed to SSA additional medical records considered the limited nature of Claimant A's injury.

177. Claimant A's claim was a false claim for SSDI benefits. It was clear from the medical records before CIGNA that Claimant A could not be eligible for benefits. CIGNA knew Claimant A's claim for SSDI benefits was false when it was submitted. CIGNA's decision to terminate LTD benefits within two weeks of the submission of his SSDI claim confirms that the claim for SSDI benefits was a false claim. But for CIGNA's assistance with submission of the SSDI claim through referral of Claimant A to Advantage 2000, Claimant A's claim would not have been submitted. Submission of Claimant A's false claim is consistent with the fraudulent scheme described above.

**b. Claimant B: 48-Year-Old Respiratory Therapist, Post Myocardial Infarction and Diabetes**

178. Claimant B filed for LTD benefits with a claim number of 260743867 under Policy LK 8032 with Catholic Health East. Claimant C was a 48-year old respiratory therapist with post-myocardial infarction and diabetes with complications. Claimant C initially received

STD benefits.  After approximately five to six months, he was transferred to a LTD Case Manager.

179.    On February 11, 2004, David Ruffennach, Case Manager for CIGNA Disability Management Solutions, sent a letter informing Claimant B that his application for LTD benefits had been received.  Mr. Ruffennach also informed Claimant B that beginning with the sixth month of disability, his LTD benefits would be offset by estimated SSDI benefits unless Claimant B signed a Reimbursement Agreement and applied for SSDI.  Mr. Ruffennach told Claimant B that if he did not "fully cooperate" regarding the status of benefits, his disability benefits would be reduced by an estimated Social Security offset.

180.    The same February 11, 2004 letter that instructs Claimant B to apply for SSDI also informs Claimant B that he would be "expected to return to work as soon as you are safely able to do so."

181.    On February 15, 2004, CIGNA referred Claimant B to Advantage 2000.

182.    On March 10, 2004, Advantage 2000 filed an initial SSDI claim for Claimant B.

183.    Less than four weeks later, on April 14, 2004, Ruffennach sent a letter to Claimant B denying him LTD benefits.  Ruffennach reviewed information from Claimant's physicians, CIGNA concluded that on the basis of those reviews, "we are unable to verify your claimed disability and must deny your claim for benefits."  The April 2004 letter refers to, inter alia, medical records from September 2003 and laboratory blood work from December 2003 to support CIGNA's conclusion that Claimant B is able to return to work and to deny LTD benefits.

184.    The April 2004 letter informs Claimant B that he can appeal denial of his LTD benefits in writing.

185.    Very soon thereafter, Claimant B returned to work in his same job as a Respiratory Therapist and has remained in that job for the past two years without incident.

186.    Even after Claimant B returned to work, Advantage 2000 continued to pursue the SSDI claim for Claimant B.  On May 13, 2004, Burt Wikgren of Advantage 2000 sent an e-mail to Ruffennach seeking copies of medical reports relating to Claimant B.

187.    For up to a year after returning to work, Claimant B received requests from Advantage 2000 for additional information for his SSDI claim.   At some point thereafter, Claimant believes that Advantage 2000 withdrew his claim for SSDI.

188.    Claimant B's claim was a false claim for SSDI benefits.  It was clear from the medical records before CIGNA that Claimant B could not be eligible for benefits because he could perform the functions of his own occupation.  CIGNA knew Claimant B's claim for SSDI benefits was false when it was submitted.  CIGNA's decision to terminate LTD benefits four weeks after submission of the claim for SSDI application confirms that the claim for SSDI benefits was a false claim.  But for CIGNA's assistance with submission of the SSDI claim through referral of Claimant B to Advantage 2000, Claimant B's claim would not have been submitted.  Additionally, CIGNA, and its agent Advantage 2000, concealed material medical information from SSA and continued to pursue the SSDI claim for a period of time beyond denial of Claimant B's claim for LTD benefits.  Submission of Claimant B's false claim is consistent with the fraudulent scheme described above.

c.    **Claimant C: 53-Year-Old Therapist with PhD Receiving Chemotherapy Treatment**

189.    Claimant C filed a claim for benefits under Policy # LK 960097, a self-insured policy with National Mentor, Inc. administered by CIGNA.  Claimant C's diagnosis was anal

carcinoma. She was receiving chemotherapy treatment when she left work on September 19, 2003. She was 53 years old and working as a Clinical Coordinator providing therapy and other psychological services to foster children   Claimant C has an advanced degree in psychology.

190.    On or about October 27, 2003, Claimant C was referred to Allsup by CIGNA to apply for SSDI. Sometime shortly thereafter Allsup submitted a claim for SSDI benefits on her behalf.

191.    On November 19, 2003, CIGNA sent Claimant C a letter notifying her that she had been approved for LTD benefits and notifying her of her obligation to apply for SSDI benefits.

192.    On January 19, 2004, Claimant C returned to work after having received communications that she would not receive continued LTD coverage if she remained out from work.

193.    On March 10, 2004, SSA denied Claimant C's claim for SSDI because Claimant C had advised SSA that she was working full time. SSA sent a copy of this letter to Allsup, Inc. because Allsup had filed a form claiming to represent Claimant C before SSA.

194.    On May 19, 2004, CIGNA sent Claimant C a letter advising her that her LTD benefits had been terminated because she had returned to work and advising her that she could appeal the decision in writing.

195.    Claimant C now teaches at a private college.

196.    Claimant C's claim was a false claim for SSDI benefits. It was clear from the medical records before CIGNA that Claimant C could not be eligible for benefits because she could perform the functions of her own or another occupation. CIGNA knew Claimant C's claim for SSDI benefits was false when it was submitted. CIGNA's decision to inform

Claimant D that she would need to return to work after submission of the claim for SSDI

application confirms that the claim for SSDI benefits was a false claim. But for CIGNA's

assistance with submission of the SSDI claim through referral of Claimant C to Allsup,

Claimant C's claim would not have been submitted. Submission of Claimant C's false claim is

consistent with the fraudulent scheme described above.

### d.    Claimant D: 24-Year-Old Construction Worker, Fractured Leg

197.    Claimant D employed by Dunn-Edwards Corporation filed Claim # 600543732

through Policy LK # 030500. Claimant D was a 24 year old construction worker/mixer (heavy

duty work) and broke his leg in January 2003. He received STD benefits from January 2003 –

May 2003.

198.    By way of letter dated May 28, 2003, CIGNA benefit specialist Terry Maiale

informed Claimant D that his LTD benefits would expire on July 8, 2003 and that his claim

would be transferred to LTD Claims Manager Louise Cronin. The May 28, 2003 letter

requested the following information from Claimant D: completion of a Reimbursement

Agreement, completion of an Authorization for Release of Confidential Information,

completion of a Disability Questionnaire, proof of his age, and an Authorization to Release

Information "if you desire assistance with obtaining Social Security Disability."

199.    The May 28, 2003 letter also informs Claimant D that "[a]s you may be eligible

for Social Security Disability benefits, you must apply for these benefits now and send our

office proof of your receipt of application." The May 28, 2003 letter further states that "You

should call the Social Security Administration … to begin the application process. Please

remember that the Long Term Disability plan indicates that you must fully cooperate with us

regarding the status of these benefits.  Failure to cooperate could result in the closure of your claim."

200.    CIGNA requested that Claimant D complete a Reimbursement Agreement stating that CIGNA would reduce his benefits by an estimated amount of SSDI unless he provided proof that he had applied for SSDI.   Claimant E signed the Reimbursement Agreement on June 8, 2003.

201.    On  June 10, 2003, LTD Case Manager Louise Cronin sent Claimant D a letter informing him that he may be eligible for LTD benefits and that they were requesting "additional medical information" to make a decision on the LTD claim.  Ms. Cronin warned Claimant D "[i]f we do not receive your information by July 24, 2003, we will make a decision based upon the information in our file at that time."   The June 10 letter also states "You are eligible for Social Security benefits and you need to apply for these benefits now.  If you are not sure you would qualify, we can help.  One of our Technical Consultants who are experts on Social Security may contact you to discuss your case.  By returning proof of application and the signed Reimbursement Agreement … no estimate will be placed on your Long Term Disability benefit."  The June 10 letter also cautioned "Please remember that your policy indicates you must cooperate with us regarding the status of those benefits.  Your lack of cooperation may result in a reduction of your disability payments by an estimated amount that we will assume you are receiving."  No explanation was provided in the letter how a 24 year old with a fractured leg who had been working construction could now be disabled from performing any work in any occupation and be eligible for SSDI.

202. On June 12, 2003, Tonya Gaona of CIGNA referred Claimant D to Allsup, Inc. for SSDI representation. By e-mail, Audrey McIntyre of Allsup Inc. confirmed receipt of the referral and requested that CIGNA forward them all supporting medical documentation.

203. Significantly, the referral documentation sent from Allsup to CIGNA notes that Claimant D is a 24 year old man who had a "tibia/fibia fracture" and had been working as a mixer. The documentation also notes that Claimant D has an expected Return to Work date of December 11, 2003, eleven months after Claimant E's date of disability.

204. On July 8, 2003, CIGNA approves Claimant D for LTD benefits.

205. On July 29, 2003, Allsup files a claim for SSDI on Claimant D's behalf.

206. On February 9, 2004, Claimant D returned to work as a carpenter (medium work) and has worked in the construction trades since that time.

207. On April 15, 2004, CIGNA informed Claimant D that he was not entitled to LTD benefits because based on a physical abilities form he was able to perform the material duties of his own occupation as a mixer (heavy duty).

208. Sometime thereafter, Claimant D believes that his SSDI claim was withdrawn from consideration by SSA.

209. Claimant D's claim was a false claim for SSDI benefits. It was clear from Claimant's age, nature of his illness (broken leg), former occupation (heavy duty construction) and expected Return to Work within one year that Claimant D would be able to perform the functions of other occupations. CIGNA knew Claimant D's claim for SSDI benefits was false when it was submitted. But for CIGNA's assistance with submission of the SSDI claim through referral of Claimant D to Allsup, Claimant D's claim would not have been submitted.

Submission of Claimant D's false claim is consistent with the fraudulent scheme described above.

210.    Thousands of other LTD claimants under CIGNA's policies have also submitted claims for SSDI at the direction of CIGNA similar to the exemplary claims from Claimants A, B, C, and D described herein even though the nature or expected duration of their disability precludes eligibility for SSDI.

### 3.    CIGNA's Fraudulent Conduct is Ongoing

211.    CIGNA knows or should have known that many of the claims that they caused to be filed with the SSA were and are false or non-meritorious.

212.    By utilizing "social security specialists" and vendors – who are versed in the rules, methods, and preferences of social security claim examiners – to prepare the SSDI claim and to collect and submit the documentation filed in support of the SSDI claim, the likelihood that the claim will stay in the SSDI claims review process and eventually be approved increases substantially.

213.    Even after CIGNA has denied the claimant's LTD claim, CIGNA continues to follow-up with SSA and to make inquiry as to whether SSA ended up awarding SSDI benefits to the claimant.  In the event that such an award is made, CIGNA contacts the claimant whose LTD claim they have denied (because the person was not even disabled from performing his or her own occupation) and demands payment of the lump-sum retroactive SSDI award.

214.    As a result of CIGNA's conduct, the Federal Government has been, and is still being, inundated with false or fraudulent claims for SSDI benefits--claims that CIGNA causes to be submitted even though CIGNA has actual knowledge that the claims are false, that CIGNA has acted in deliberate ignorance with regard to the truth or falsity of the claims,

and/or that CIGNA has acted in reckless disregard of the truth or falsity of the information underlying those claims.

## V.    DAMAGES

215.    In the past six years the Disability Insurance (DI) Trust Fund has spent between $5.6 billion and $6.2 billion denying claims for SSDI benefits.

216.    The DI Trust Fund referenced above expends substantial sums of money adjudicating claims.  These "administrative expenses" are incurred regardless of whether a claim is allowed (i.e. paid) or denied, due to the fact that SSA must investigate and adjudicate all claims.

217.    The DI Trust Fund also expends substantial sums of money paying SSDI claims.

218.    In the six-year period from 1997–2002, the total amount spent for "administrative expenses" and "benefit payments" were as follows (numbers in millions of dollars):

| Calendar Year | Total Expenditures | Benefit Payments | Administrative Expenses |
|---|---|---|---|
| 1997 | 47,034 | 45,695 | 1,280 |
| 1998 | 49,931 | 48,207 | 1,567 |
| 1999 | 53,035 | 51,381 | 1,519 |
| 2000 | 56,782 | 54,983 | 1,639 |
| 2001 | 61,369 | 59,618 | 1,741 |
| 2002 | 67,905 | 65,702 | 2,049 |
| **Totals** | **336,056** | **325,586** | **9,759** |

219.    A 2001 study commissioned by SSA estimated that the average cost per claim for adjudicating all claims (both meritorious and non-meritorious) submitted to the DI Trust Fund in 1999 was $1,364.00.  Obviously, each level of appeal increases the cost of a

particular claim.  The average estimated costs of processing claims for an ALJ proceeding

was $1,645.

220.    During the six-year period from 1997–2002, SSA received  8,061,148 new

applications for SSDI benefits as follows:

| Year | Number of Claims | Number Of Awards | Awards as % Of Applications |
|------|------------------|------------------|------------------------------|
| 1997 | 1,180,235 | 587,417 | 49.77% |
| 1998 | 1,169,255 | 608,131 | 52.01% |
| 1999 | 1,200,087 | 620,488 | 51.70% |
| 2000 | 1,330,558 | 621,650 | 46.72% |
| 2001 | 1,498,559 | 691,390 | 46.13% |
| 2002 | 1,682,454 | 750,464 | 44.61% |

222.    The "awards as a percentage of applications" column in the chart listed in the

paragraph above is a crude allowance rate.  This rate expresses the number of awards in a

given time period as a percentage of the number of Applications in the same time period.  The

rate is crude because some of the awards in any time period resulted from Applications in

previous time period(s).  Some of the awards made in 1997 were the result of Applications

filed in 1996.  Further, some of the Applications filed in late 2002 may in fact result in awards

in 2003, but the statistical fact of the award is not yet recorded.

223.    In any event, the *average* "awards as a percentage of applications" relating to all

applications filed during the six-year period from 1997–2002 was 48.49%.

224.    The average percentage of denied claims per applications filed during this same

six-year period is 51.51%.

225.    Many of the claims that Social Security has denied have been false claims that

were submitted to SSA by CIGNA claimants at the express direction, and with the assistance

of CIGNA, its agents, subsidiaries and alter ego entities. .

226.     From at least 1997 to the present, CIGNA has with actual knowledge of, reckless disregard for, or in deliberate ignorance of its LTD claimant's eligibility for SSDI benefits, caused thousands of people (1) to file applications for SSDI benefits even though they could not be eligible under the SS Act's definition of disability; and, further, (2) to appeal denials of SSDI benefits despite the fact that the claimants could not meet the SS Act's definition of disability.

227.     Every false claim filed at the direction of the Defendants that was denied cost the Government, on average, $1,364.

### COUNT I

228.     Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 227 of this Complaint.

229.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq*.

230.     Through the acts described above, Defendants knowingly presented, or caused to be presented to the United States Government false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1).

### COUNT II

231.     Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 227 of this Complaint.

232.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq*.

233.    Through the acts described above, Defendants knowingly made, used, and/or caused to be made and used, false records or statements to get false or fraudulent claims paid or approved by the United States Government in violation of 31 U.S.C.§ 3729(a)(2).

## COUNT III

234.    Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 227 of this Complaint.

235.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, et seq., as amended.

236.    Through the acts described above, Defendants conspired to defraud the Government by getting a false or fraudulent claim paid or approved by the United States Government in violation of 31 U.S.C.§3729(a)(3).

**WHEREFORE**, Plaintiff requests that judgment be entered against Defendants, ordering that:

a.    Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq*.;

b.    Defendants pay an amount equal to three times the amount of damages the United States has sustained because of Defendant's actions, plus a civil penalty against the Defendants of not less than $5,500, and not more than $11,000 for each violation of 31 U.S.C. § 3729;

c.    Plaintiff be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

d.    Plaintiff be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d); and

e.    the United States and Plaintiff be granted such other and further relief as the

Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands

trial by jury.

W. Mark Lanier
Kevin P. Parker
Judson A. Waltman
THE LANIER LAW FIRM, P.C.
P.O. Box 691408
Houston, TX  77269-1408
Tel.: (713) 659-5200
Fax:  (713) 659-22204

Mary Louise Cohen
Peter W. Chatfield
Colette G. Matzzie
PHILLIPS  & COHEN LLP
2000 Massachusetts Avenue, NW
Washington, D.C.  20036
Tel.: (202) 833-4567
Fax: (202) 833-1815

/ S /  Peter B. Krupp

Peter B. Krupp, B.B.O. #548112
LURIE & KRUPP, LLP
One McKinley Square
Boston, MA  021209
Tel.: (617) 367-1970
Fax: (617)367-1971

Dated: April 14, 2006

<u>CERTIFICATE OF SERVICE</u>

I, Peter B. Krupp, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on April 14, 2006.

/ S /  Peter B. Krupp

Peter B. Krupp