UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* DAWN BARRETT, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 03-121382-MLW |
| v. | ) ) | |
| CIGNA CORPORATION and LIFE INSURANCE COMPANY OF NORTH AMERICA, | ) ) ) | |
| Defendants. | ) ) ) | |

*REDACTED AND WITHOUT CERTAIN EXHIBITS*

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION TO DISMISS
PLAINTIFF'S SECOND AMENDED COMPLAINT**

Relator Dawn Barrett filed her original Complaint under seal against defendants CIGNA

Corporation ("CIGNA") and Life Insurance Company of North America ("LINA") for violations

of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2) (the "FCA") on November 25, 2003.

She amended her original complaint on December 27, 2004, shortly after the government

declined to intervene and the court ordered the pleadings unsealed. Defendants' Motion to

Dismiss Barrett's First Amended Complaint was allowed on May 20, 2005, and with leave to re-

file Barrett has submitted her Second Amended Complaint (hereinafter, "the Third Complaint").

In her Third Complaint Barrett pleads additional facts regarding the two examples of

alleged fraud contained in the First Amended Complaint, and she adds two new examples.

4082202v3

Barrett also adds a new cause of action in Count 3, charging that CIGNA conspired with its wholly-owned subsidiary LINA in violation of 31 U.S.C. § 3729(a)(3).

Defendants contend that the Third Complaint should be dismissed for the following reasons:

1) Barrett remains unable to allege fraud with the requisite particularity. The examples she offers do not support many of her allegations of fraud, most importantly her allegation that claimants "cannot possibly qualify" for Social Security Disability Insurance ("SSDI") at the time when they are referred to SSDI representatives or when they make their own SSDI filings. Third Complaint, ¶ 8(b). Thus, her allegations reduce the pleading of an alleged fraudulent methodology, which is insufficient under relevant False Claims Act ("FCA") law.

2) Barrett cannot establish any of the four elements of a FCA case under Count One of her complaint.

   a) There is no allegation sufficient to support the inference that LINA causes false claims to be filed, because LINA's conduct does not amount to duress, and because there are intervening, independent acts which cut off any responsibility on the part of LINA.

   b) The SSDI applications as alleged are not false or fraudulent. The Third Complaint does not allege that any SSDI application contains an objective falsehood or a false certification actually required for eligibility. Nor can Barrett allege that literally true applications are submitted as part of a fraudulent scheme, because SSA regulations provide that the allegedly withheld information – defendants' determination of eligibility under a different, private insurance regime - is not material to the SSA's determination of eligibility for benefits.

   c) Barrett cannot establish that any of the acts or omissions charged against defendants are material to the funding decisions made by SSA in the course of its extensive review of SSDI applications.

   d) Barrett's allegations do not establish that LINA knows any particular claim to be false merely based on its denial of the claim, because the SSDI insurance scheme is substantially different than the private insurance scheme administered by LINA.

3) Barrett fails to allege the "double falsity" required under 31 U.S.C. Section 3729(a)(2).

4)  Barrett's new conspiracy count (Count 3) fails as a matter of pleading and law. A parent corporation and its subsidiary cannot conspire with each other.

5)  Barrett's claims against CIGNA should be dismissed because the court lacks personal jurisdiction over CIGNA. In addition, Barrett may not maintain her suit against a parent company merely by alleging that the parent is responsible for the acts of its subsidiary.

## I.   THE APPLICABLE LEGAL STANDARD.

A claim should be dismissed under Fed. R. Civ. P.  12(b)(6) when it "appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Roeder Alpha Indus., Inc. v. Neves*, 814 F.2d 22, 25 (1st Cir. 1987). The Court is required to accept all well-pleaded factual allegations as true. *See Monahan v. Dorchester Counseling Ctr., Inc.*, 961 F.2d 987, 988 (1st Cir. 1992). Bald assertions, unsupported conclusions, and general allegations are not enough to satisfy Rule 12(b)(6). *See Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996); *United States v. AVX Corp.*, 962 F.2d 108, 115 (1st Cir. 1992).

## II.   BARRETT'S THIRD COMPLAINT LACKS THE SPECIFICITY REQUIRED BY FED. R. CIV. P. 9(b) AND RELEVANT FCA LAW.

"In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). "Every circuit court ... has concluded that the heightened pleading requirements of Rule 9(b) apply to claims brought under the FCA ... We now join this consensus ...." *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 228 (1st Cir. 2004) (collecting cases); *see, e.g., United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 551-52 (D.C. Cir. 2002); *United States ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc.*, 149 F.3d 227, 234 (3d Cir. 1998); *Gold v. Morrison-Knudsen Co.*, 68 F.3d 1475-77 (2d Cir. 1995); *see also* John T. Boese, CIVIL FALSE CLAIMS AND

QUI TAM ACTIONS § 5.04 (3d. ed. 2006) ("It is widely accepted by courts that because the essence of the False Claims Act is fraud, Rule 9(b) applies to FCA cases.").

"Rule 9(b) serves the purpose of enabling defendants to prepare meaningful defenses to charges of fraud, preventing conclusory allegations of fraud from serving as a basis for strike suits and fishing expeditions, and protecting defendants from groundless charges that may damage their reputations." *See United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 46 (D. Mass. 2001) (quoting *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 292 (1st Cir. 1987).

Rule 9(b) requires that the complaint state the "time, place, specific content of the false representations, and the identities of the parties participating in the fraud …. [It] must provide the 'who, what, when, where, and how of the alleged fraud.'" *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, No. Civ.A. 01-10583-DPW, 2003 WL 21228801, at *4 (D. Mass. May 21, 2003) (quoting *United States ex rel. Gublo v. Novacare, Inc.*, 62 F. Supp. 2d 347, 354 (D. Mass. 1999)). In addition, Rule 9(b) requires that a fraud complaint must "allege facts that give rise to a strong inference of fraudulent intent." *Suna v. Bailey Corp.*, 107 F.3d 64, 68 (1st Cir. 1997).

"Evidence of an <u>actual false claim</u> is 'the *sine qua non* of a False Claims Act violation.'" *Karvelas*, 360 F.3d at 225 (emphasis added); *see also United States ex rel. Walsh v. Eastman Kodak Co.*, 98 F. Supp. 2d 141, 147 (D. Mass 2000) (dismissing pursuant to Rule 9(b) because "the complaint does not identify or describe any specific hospital cost reports or transactions that allegedly give rise to violations of the FCA"). In *Karvelas*, the First Circuit upheld the dismissal of the relator's claims that the defendant health care provider had submitted false Medicare and Medicaid claims because he failed to: (1) specify the content or the dates of any particular false

claims; (2) provide specifics about identification numbers related to false claims; (3) give information on amounts charged for specific items; and (4) identify the individuals involved in the alleged improper billing. *See Karvelas*, 360 F.3d at 223. Similarly, in *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003), the dismissal of the relator's amended complaint was upheld because the complaint failed to describe the details of incidents allegedly known to the relator, did not specify the individuals participating in the fraud, and did not set forth dates on which the alleged fraudulent activities occurred. *See also Gublo*, 62 F. Supp. 2d at 354 (dismissing portion of case concerning over billing Medicaid and Medicare for prosthetic devices because plaintiff did not plead "a single instance of a false claim" concerning those items); *Eastman Kodak Co.*, 98 F. Supp. 2d at 147-48 (dismissal for failure to "cite a single instance of a false claim").

Barrett cannot satisfy Rule 9(b) merely by alleging a method by which false claims might be submitted. In *Eastman Kodak*, 98 F. Supp. 2d at 147-48, the district court dismissed the relator's claims with prejudice, holding that the relator merely stated a "methodology" of possible fraud. In *Gublo*, the relator's complaint was dismissed because they "simply allege[d] three methods by which [defendant] is said to have inflated its bills to the government, without citing a single instance of a false claim." 62 F. Supp. 2d at 354 (D. Mass. 1999); *see also United States ex rel. Butler v. Magellan Health Servs., Inc.*, 101 F. Supp. 2d 1365, 1369-70 (M.D. Fla. 2000) ("illustrative" allegations through which plaintiff alleges a "scheme of fraud" were insufficient under 9(b); "At no time did Plaintiff plead that a specific insurance claim form for any patient was fraudulent."); *United States ex rel. LaCorte v. SmithKline Beecham Clinical Labs.*, No. CIV. A. 96-1380, 2000 WL 17838 (E.D. La. Jan. 10, 2000) (relator's claims dismissed with prejudice because the relator merely provided the general framework for the

alleged fraudulent scheme, and provided no link between the allegedly fraudulent practices and the submission of fraudulent claims).

Nor can the mere statement that all claims submitted after a particular date are false satisfy the requirements of Rule 9(b). *See United States ex rel. Sikkenga v. Regence Blue Cross/Blue Shield of Utah*, No. 2:99CV86K, 2001 U.S. Dist. LEXIS 25717, at *16 (D. Utah Nov. 28. 2001) ("[S]tating that all claims after a certain date are false is not an adequate substitute for providing a detailed list that would provide defendants with sufficient specificity to dispute the claims.") *See also Shamsi v. Dean Witter Reynolds, Inc.*, 743 F. Supp. 87, 90 (D. Mass. 1989) ("[T]he plaintiff may not delay setting out facts to support his claim pending discovery, but must detail them in the complaint or face dismissal.").

Here, despite the additional information Barrett provides, her theory of liability is the same as before: that some claims LINA caused to be submitted after 1997 might be fraudulent because of the practices about which she complains. Third Complaint, ¶¶ 5-15. Yet neither defendants nor the Court can tell, based on these allegations, which claims are alleged to be false. Is it every SSDI claim allowed after a LINA denial? Is it every SSDI claim denied after a LINA denial? Will Barrett invite the court to second-guess SSDI decisions that allow benefits after the five-stage process outlined at paragraphs 148-167 of the Third Complaint, all because LINA reached a different conclusion under a different set of standards and procedures? This conundrum is precisely why the pleading of a mere methodology is not sufficient.

Many courts have dismissed complaints for failure to satisfy this very concrete requirement that actual false claims be identified. For example, in *Unites States ex rel. Carroll v. JFK* , 2002 WL 31941007 (S.D. Fla.), the plaintiff filed exhibits which were lists of pain management procedures billed as operating room services on a variety of dates from 1994-2000

in support of fraudulent billing claims. The exhibits provide the name of the service, the date it was provided, as well as the patient's date of birth, altered social security number, and JFK medical record number. Unlike Barrett, Carroll alleged that all of the listed claims were false. The court nevertheless dismissed the complaint.

> The exhibits say nothing about the locations or conditions under which the procedures were performed. They do not specify the costs of the procedures, much less demonstrate how the charges were inflated. Relators have identified patients who *could* have been used to perpetuate a fraudulent overbilling scheme, but have provided no facts to buttress their claims that Defendants actually used these patients for that purpose.

*Id. at* \*4. *See also Eastman Kodak* 98 F.Supp.2d at 147 ("Relator's First Amended Complaint, in essence, sets out a methodology by which the vendors might have produced false invoices, which in turn could have led to false claims. Without citing a single false claim arising from an allegedly false invoice, Relator has not met even a bare-bones Rule 9(b) test."); *Gublo,* 62 F. Supp. 2d at 354 (dismissing complaint under Rule 9(b) where relator alleged three methods by which the defendant inflated its bills to the government, but didn't cite a single instance of a false claim).

"[A] list which simply regurgitated all the claims that might contain unnecessary tests, without specifically identifying which claims and which tests were said to be unnecessary, would not satisfy the rule." *United States ex rel. Kneepkins v. Gambro Healthcare Inc.,* 115 F. Supp. 2d 35, 45 (D. Mass. 2000). *See also United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F. 3rd 899, 903 (5th Cir. 1997)* (statistical studies showing that 40 percent of claims were for unnecessary tests insufficient to meet Rule 9(b)).

### A.  The "Examples" in the Third Complaint Remain Deficient.

In an apparent attempt to correct the deficiencies in her first two complaints, Barrett has now made more extensive allegations regarding the two original examples she pleaded and

4082202v3

added two more, identifying claimants "A" through "D" in support of her fraud claims. Yet the additional data provided in these examples does not satisfy the pleading requirement of Fed. R. Civ. P. 9(b). In each case, her allegations do not support one or more conclusions essential to connect the example to her theory of fraud. More importantly, all four examples fail to support the allegation central to her case: that the claimants "cannot possibly qualify" for SSDI when LINA refers them to SSDI representatives. Third Complaint, ¶ 8(d).

### 1.    Barrett's Review of the Claim Files is Inaccurate.

Barrett repeats the same allegation for each exemplary claimant: that "[i]t was clear 'from the medical records before CIGNA that [the claimant] could not be eligible for benefits." Third Complaint, ¶ 177 (Claimant A); 188 (Claimant B, same); 196 (Claimant C, same): 209 (Claimant D – here, that "it was clear … that Claimant D would be able to perform the functions of other occupations".)

Barrett stakes out this ground in direct response to the Court's dismissal of the First Amended Complaint and its comments at the motion to dismiss hearing on March 16, 2006. The First Amended Complaint alleged only that defendants "know, based on their own extensive experience in reviewing such claims, that most disability claimants do not meet the stringent disability requirements for SSDI." First Amended Complaint, ¶ 4. There Barrett alleged that "CIGNA knows or should know that many of [the SSDI claimants] do not, cannot, and will not qualify for Social Security benefits." *Id.*, ¶ 83. In response to the Court's observation on March 16 that "'[s]hould have known' sounds like negligence", Tr. at 11, and Barrett's concession that an allegation of negligence is not sufficient, *id.* at 24, Barrett has resorted to a more damning position: defendants know that the claimants could not possibly be eligible at the time of referral or submission.

Yet the very files upon which she relies selectively do not support this allegation. This Court is entitled to consider other information from of those files at this stage of the case. Although material beyond that found in the complaint itself is not normally considered in assessing a Rule 12(b)(6) motion, it is well settled that when "a complaint's factual allegations are expressly linked to--and admittedly dependent upon--a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." *Perry v. New England Bus. Serv., Inc.,* 347 F.3d 343 (1st Cir. 2003*). Watterson v. Page,* 987 F.2d 1, 3 (1st Cir. 1993) (noting exception from general rule for "documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint"). "The exception to the rule is premised on the theory that when a complaint relies on a document, the plaintiff is clearly on notice as to its contents and the need for an opportunity to refute the evidence is diminished." *Rogan v. Giant Eagle, Inc.,* 113 F. Supp. 2d 777, 781 (W.D. Pa. 2000). Furthermore, where the documents are, as here, central to the plaintiff's claims they need not be referred to with specificity to be considered as incorporated by reference into the complaint. *Kling v. Fidelity Management Trust. Co.,* 270 F. Supp. 2d 121, 128 (D. Mass. 2003) (holding that even where the plaintiff refers to documents only "in the broadest of terms" they may still be considered if they are "central to [plaintiff's] claim.").

Indeed, where the Plaintiff is required to satisfy Rule 9(b)'s particularity requirement, a court "need not credit a complaint's bald assertions or legal conclusions." *Meyer v. Biopure Corp.,* 221 F. Supp. 2d 195, 205 (D. Mass. 2002) (*quoting Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1216 (1st Cir. 1996)). In *Meyer,* Judge Harrington reviewed documents "integral to or

incorporated in the amended complaint" to determine whether the documents "provide a sufficient factual basis to meet the standards of . . . Rule 9(b)." *Id.* at 199, 205. In *Meyer*, Judge Harrington granted Defendant's Motion to Dismiss where he found that the documents failed "to provide a sufficient factual basis to satisfy the . . . Rule 9(b) pleading standards." *Id.* at 206.

In an attempt to remedy the deficiencies pointed out by the Court regarding her prior pleading, Barrett now makes factual allegations which are "expressly linked to—and admittedly dependent upon" the claim files of the four exemplary claimants. Defendants contend that Barrett's description of the contents of these files is inaccurate and misleading. However, because these records contain private health information about the claimants, this information should not be placed in the public domain. 31 Pa. Code § 146b.11(a); Ariz. Rev. Stat. § 20-2113(1); Ga. Code Ann. §33-39-14(1).[1]

Although she refers to them as Claimants A through D, Barrett's Third Complaint contains information sufficient to identify these individuals. For these reasons, defendants have referred to additional information in the claim files as indicated below but redacted the actual quotation of the information contained in those files. Defendants also have filed separately their Motion for Leave to File Under Seal an Unredacted Memorandum of Law in Support of Their Motion to Dismiss Relator's Second Amended Complaint, seeking permission to file an unredacted version of this Memorandum under seal.[2]

### 2.    Defects in Each of Barrett's Examples.

For the reasons set forth below, Barrett's allegations about claimants A through D are deficient as examples in support of her FCA complaint.

---

[1] It appears from the relevant claim files, that the "exemplary" claimants reside in Georgia, Arizona, and Pennsylvania.
[2] Referenced exhibits containing personal private health information also have been omitted until a ruling on this motion.

### a.   *Claimant A*

Claimant A is a 42 year old operations assembler who suffered a knee injury and lower back pain. Barrett's own allegations about Claimant A do not support her theory of fraud under the FCA, and a complete review of Claimant A's file belies her contention that Claimant A could not have been eligible for SSDI benefits.

> i. Barrett's incomplete review of the medical record. Barrett alleges that CIGNA knew Claimant A's claim for SSDI benefits was false when it was submitted on March 30, 2004. She supports this allegation by incorporating and relying on "CIGNA's internal records," "claimant's medical and vocational history," claimant's "LTD case file" and claimant's "medical records." Barrett makes the following allegations concerning the content of CIGNA's files on Claimant A:
>
> - "[C]laimant's medical and vocational history supported the conclusion that Claimant A could not be eligible for SSDI benefits." Third Complaint. ¶173.
>
> - "[N]othing in the LTD case file suggests that Claimant A could not perform sedentary or even medium duty work." *Id.* ¶ 173.
>
> - "It was clear from the medical records before CIGNA that Claimant A could not be eligible for benefits. CIGNA knew Claimant A's claim for SSDI benefits was false when it was submitted." *Id.* ¶ 177.
>
> In fact, the claim file referenced by Barrett belies her allegation concerning Claimant A. The following entries in Claimant A's "medical records before CIGNA" contradict Barrett's allegation that "nothing in the LTD case file suggests that Claimant A could not perform sedentary or even medium duty work":
>
> - a medical report from Claimant A's physician, [REDACTED]
>
>   Exhibit A
>
> - a report from a second physician [REDACTED]
>
>   Exhibit B

4082202v3

- Claimant A's Disability Questionnaire, a part of which is referenced in ¶172 of the Third Complaint, which states ███████████ ███████████████████████████████████████ Exhibit C

ii.  Differences in Medical Records Available to Defendants and SSDI.  According to Barrett, Claimant A filed a claim for SSDI benefits on March 30, 2004, and on April 13, 2004, defendants denied benefits under the private policy.  However, Barrett alleges that on the very same day defendants denied benefits, Advantage 2000, Claimant A's representative before the SSA, received additional medical records for the claimant.  There is no allegation regarding the content of those records, and no allegation that those records were available to defendants.  Nor is there any allegation regarding the ultimate ruling of SSA on Claimant A's application.  In addition, Barrett's contention that "but for CIGNA's assistance" the claim would not have been filed, is not supported by any specific factual allegation.

iii.  No Specifics Regarding Private Policy Terms vs. SSDI Regulations.  Barrett fails to make any particular allegations about the policy covering Claimant A, and her allegations regarding the other claimants suffer from the same defect.  We are not told what the relevant coverage provisions are, and therefore there is no specific pleading that a determination of ineligibility under the private policy reasonably predicts any result under SSDI regulations.   At the hearing on defendants' first motion to dismiss, the court specifically noted that Barrett should make sufficient specific allegations to survive a motion to dismiss on this issue.  Tr. 11, 14.

iv.  This and Other Examples do Not Address Why SSDI Allows Certain Claims. The allegations about Claimant A and the other claimants fail to address how Barrett's theory of fraud applies to those claims which SSA ultimately allows. Presumably, since Barrett contends that Claimants A through D could not have been eligible for SSDI benefits, at the end of the day their claims would have been denied. (In fact, plaintiff concedes that at least one of them, Claimant C, withdrew her claim). None of these examples addresses how a claimant who is ineligible for SSDI benefits could nevertheless be granted benefits by SSA.  In light of the exhaustive, five-level SSDI review procedure outlined in the Third Complaint at ¶¶ 148-157, Barrett must offer some palpable reason why SSA would allow benefits to a claimant not actually entitled to them.

### *b.*    ***Claimant B***

Claimant B is a 48 year old respiratory therapist who suffered heart attacks and from

diabetes.  Once again, Barrett's own allegations about Claimant B do not support her theory of

fraud under the FCA, and a complete review of Claimant B's file belies her contention that

Claimant B could not have been eligible for SSDI benefits.

4082202v3

i.  Claimant B Applied On His Own For SSDI Benefits.  The most startling omission made by the plaintiff regarding Claimant B is that the records directly contradict her claim that "[b]ut for CIGNA's assistance with submission of the SSDI claim through referral of Claimant B to Advantage 2000, Claimant B's claim would not have been submitted." The files referenced in her complaint which state that Claimant B ███

- • a claim file note dated 2/13/2004, recording the fact that Claimant B told CIGNA that ██████████████████████████ Exhibit D.

- • the Advantage 2000 referral form for Claimant B, dated 2/16/2004, which confirms that Claimant B ████████████████████ Exhibit E.

Thus, the allegations about Claimant B do not support the theory that defendants caused any claim, much less a false claim, to be made.  Notably, with regards to Claimants A, C and D, plaintiff makes the allegation that "but for" defendants conduct, the claims would not have been filed.  Third Complaint at ¶¶ 177, 196 and 209.  That allegation is missing from the discussion of Claimant B, presumably because the plaintiff has reviewed this file and knows that Claimant B ██████████ ████

ii.  Barrett's Incomplete Review of the Medical Record.   In addition, the medical information in Claimant B's file does not support Barrett's assertion that he could not have been eligible for SSDI benefits. Barrett alleges that CIGNA knew Claimant B's claim for SSDI benefits was false when it was submitted on March 10, 2004, because "[i]t was clear from the medical records before CIGNA that Claimant B could not be eligible for benefits because he could perform the functions of his own occupation." Id. ¶ 188.  The following entries in CIGNA's file on Claimant B clearly contradict this allegation:

- • an internal note dated 11/17/2003, which records a conversation in which Claimant B stated ████████████████████ Exhibit F

- • a CIGNA document dated 2/5/2004, titled "STD to LTD transition sheet," which lists Claimant B's ████████████████ Exhibit G.

- • an internal note dated 2/13/2004 which records a conversation in which Claimant stated ████████████████████ Exhibit D.

iii.  No Specifics Regarding Private Policy Terms vs. SSDI Regulations.  Once again, this is the same defect found in all of the examples.  See Claimant A.

iv.  This and Other Examples do Not Address Why SSDI Allows Certain Claims. This is the same defect found in all other examples. *See* Claimant A.

*c.*   ***Claimant C***

Claimant C is identified as a 53 year old therapist, receiving chemotherapy treatment.

Barrett's allegations here are deficient for many of the same reasons offered above. In addition,

Barrett's claim that the representatives of claimants are defendants' agents is not supported by

this example.

i.  Insufficient Allegations of Agency.  Although Barrett contends that CIGNA forced all claimants to apply to SSA after 2002 through its agent, Advantage 2000, she alleges that Claimant C was referred to Allsup on October 27, 2003.  Third Complaint, ¶ 190.  Barrett identifies Allsup only as an entity to which CIGNA referred claims prior to 2002.  ¶ 108.  She makes none of the specific allegations regarding indicia of agency made as to Advantage 2000 (see paragraphs 109 through 122) regarding Allsup, and therefore Barrett has no basis for asserting that defendants are responsible for the acts or omissions to act of Allsup.  Moreover, despite plaintiff's admission that this claimant left work suffering from cancer and undergoing chemotherapy in September 2003 (¶ 89) and was referred to Allsup just one month thereafter (¶ 190), she offers no support for her contention that Claimant C would not have applied for SSDI Benefits "but for CIGNA's assistance".  ¶ 196.

ii.  Incomplete Review of Medical Records.  As in the case of the other claimants, additional data in the file belies Barrett's contention that Claimant C could not have been eligible for SSDI benefits.  Barrett alleges that CIGNA knew Claimant C's claim for SSDI benefits was false when it was submitted "shortly after" October 27, 2003, Third Complaint, ¶ 190, and that "[i]t was clear from the medical records before CIGNA that Claimant C could not be eligible for benefits because she could perform the functions of her own or another occupation." *Id.* ¶ 196.  In fact, the CIGNA records upon which she relies contain another side to the story:

- CIGNA's STD to LTD Referral Form for Claimant C, dated 10/21/2003, lists her ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Exhibit H.

- an internal note dated 11/19/2003 in which the CIGNA LTD case manager for Claimant C summarizes the LTD Case Plan as follows: ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[3] Cx is shorthand notation for claimant.

████████████████████████████ Exhibit I.

iii.  No Specifics Regarding Private Policy Terms vs. SSDI Regulations.  Once again, this is the same defect found in all of the examples.  *See* Claimant A.

iv.  This and Other Examples do Not Address Why SSDI Allows Certain Claims.  This is the same defect found in all other examples.  *See* Claimant A.

> ### d.    *Claimant D*

Claimant D is a 24 year old construction worker who suffered a fractured leg. This

example fails for some of the same reasons and, in addition, because Barrett simply ignores

Claimant D's entitlement to benefits for a closed period of disability.

i.  Barrett Ignores Claimant D's Right to Apply Early and Obtain Benefits for a Closed Period of Disability.  Here Barrett ignores a basic rule of Social Security Disability practice:  that claimants may apply in advance of their estimated return to work date, even if they ultimately return to work, and that they may be eligible for even a few months' benefits before actually returning to work. 20 CFR §416.330.  Barrett admits that Claimant D had an expected return to work day of December 11, 2003 but did not return to work until February 9, 2004, 13 months after his disability, which therefore lasted more than one year and would have qualified him for at least seven months of SSDI benefits.  Third Complaint, ¶ 42.  Moreover, the plaintiff alleges that Claimant D's claim was withdrawn.

ii.  Insufficient Allegations of Agency.  In addition, this claimant was represented by Allsup, not Advantage 2000, ¶ 202, and therefore Barrett's allegations of agency are deficient.

iii.  Incomplete Review of Medical Records.  Barrett alleges that CIGNA knew Claimant D's claim for SSDI benefits was false when it was submitted.  She alleges that Claimant D left work in January 2003 with a broken leg, he was referred to Allsup, Inc. on June 12, and he applied for SSDI benefits on July 29.  Yet additional facts in the file indicate that

████████████████████████████████ therefore suggesting that he was indeed qualified for SSDI benefits.  *Cf. Cleveland v. Policy Management*, 526 U.S. 795, 802 (1999) ("[SSA] does not take the possibility of 'reasonable accommodations' into account, nor need an applicant refer to the possibility of reasonable accommodation when [he] applies for SSDI.").   The files relied upon by Barrett state:

- Claimant D's ████████████████████ (Exhibit J)██
  ██ (Exhibit K).

4082202v3



- on ██████████████████████████████████ (Exhibit L).

- on ██████████████████████████████████ (Exhibit M); and

- ██████████████████████████████████ (Exhibits N & O).

Thus, on these facts Claimant D may well have been eligible for SSDI benefits for the period between ██████████████████████████████████ *See* 42 U.S.C. 423.

iv. No Specifics Regarding Private Policy Terms vs. SSDI Regulations. Once again, this is the same defect found in all of the examples. See Claimant A.

v. This and Other Examples do Not Address Why SSDI Allows Certain Claims. This is the same defect found in all other examples. *See* Claimant A.

## III.    BARRETT'S ALLEGATIONS UNDER COUNT ONE DO NOT ESTABLISH THE ELEMENTS OF A FALSE CLAIMS ACT CLAIM.

Barrett's allegations do not establish the elements of an FCA claim in Count One.  To

plead a violation of Section 3729(a)(1), a relator must allege four essential elements:  1) that the

defendant presented, or caused another person to present, a "claim" for payment or approval to

the United States; 2) the claim was "false or fraudulent"; 3) the false claim or statement was

material to the government's payment decision; and 4) the defendant knew that the claim was

false. *See, e.g., Franklin*, 147 F. Supp. at 50.

### A.    Barrett Has Not Alleged Facts Sufficient to Establish The First Element of an FCA Claim, Because Her Allegations Regarding Defendant's Alleged Causation Are Deficient.

Barrett attempts to gloss over the difference between requiring employees to submit SSDI

claims and causing them to make false statements in support of those claims.  Only the latter

would establish FCA liability, yet Barrett alleges only the former.  There is no allegation that a

LINA insured has been coerced into making false representations when applying for SSDI

benefits. Without such an allegation – made with a good faith basis to believe that it is true – Barrett has failed to plead that LINA caused the submission of a false claim.

Barrett states that "CIGNA uses economic duress to cause claimants to file for Social Security." Third Complaint, ¶ 123. She dramatically alleges that because "CIGNA instructs these financially stressed individuals that unless they file for Social Security, their disability checks will be reduced by the estimated Social Security benefit … most insureds [have] no real option other than to file false claims with the Government …. Most monthly disability insurance checks, if reduced by the estimated Social Security disability benefit for the insured and his or her spouse and children, would reduce the monthly benefit down to a level upon which the insured could not survive." *Id.*

This allegation is doubly defective. First, the filing of false claims does not logically follow from the requirement that claimants file for Social Security. In *Franklin*, the court held that language of Section 3729(a)(1) requires a causal connection between a defendant's actions and the alleged false claims, and applied a common-law causation standard. 2003 WL 22048255, at *4. This standard requires Barrett to show that: 1) LINA's conduct was a "substantial factor" in producing the harm and 2) the outcome was foreseeable. Here, if a policyholder's employee does misrepresent his or her disability status, or some fact offered in support of that assertion, that decision by that employee constitutes an unforeseeable intervening force that breaks the causal connection. *See United States ex rel. Cantekin v. Univ. of Pittsburgh*, 192 F.3d 402, 416 (3d Cir. 1999) (*quoted in Franklin*, 147 F. Supp. 2d at 52).

This defect in Barrett's case is similar to the fatal defect found in *United States ex rel. Kinney v. Hennepin Cty. Med. Ctr.*, 2001 WL 964011 (D. Minn. 2001). In *Kinney*, the relator alleged that the defendant doctor group, HFA, caused the submission of false claims by the

hospital, HCMC, for reimbursement of ambulance services by certifying that such services were medically necessary. The court, however, found that the doctor group had not caused the submission of the false claims because "there [was] no evidence that HFA *instructed* HCMC to use" false Medicare codes for the ambulance runs, and no evidence that the doctors' certification of medical necessity triggered the decision of HCMC to falsely represent the eligibility of the ambulance runs for reimbursement. *Id.* at * 10.

In *Kinney*, HCMC's treatment of the claims for reimbursement was an intervening factor in the claims process which precluded a finding against HFA. 2001 WL 964011, at * 10. Here, Barrett has not alleged that claimants are required to misrepresent facts regarding their disability status. She concedes that a mere application avoids an offset, and thus the prospect of an actual award of SSDI benefits is irrelevant. Third Complaint, ¶ 62-66. If a claimant chooses to misrepresent facts in support of an SSDI application, that would be an intervening factor for which defendants cannot be held liable.

As Barrett well knows, Form 3368 "requires the applicant to provide information about medical treatment and records and asks the applicant to describe how his or her illness or injuries limit his/her ability to work." Third Complaint, ¶ 44. The "SSDI Disability Report Form concludes with ... a prominently displayed warning that states in bold-faced capital type" the prohibition against making a false statement. *Id.*, ¶ 45. It is not foreseeable that claimants will misrepresent facts on Form 3368 merely because the policies administered by LINA require the application. In fact, Barrett does not allege that Defendant's have access to these forms once they are completed.

Second, Barrett's allegations do not amount to duress. LINA merely provides insurance and claims administration for disability benefits offered by employers to employees. The

negative economic consequence of failure to comply with a provision of these insurance plans does not constitute duress and thereby transfer liability for a false SSDI claim, if one is submitted, from a policyholder's employee to LINA. *See Melanson v. Browning Ferris Indus.*, 281 F.3d 272, 277 (1st Cir. 2002) ("Nor may ... duress, without more, be inferred from merely the emotional and financial stress associated with loss of a job."). Barrett, however, alleges that the economic constraints caused by a *potential partial* reduction in disability benefits impose a condition of duress that forces a policyholder's employee to falsely represent his or her disability status to the SSA. None of her allegations establish a level of duress that would transfer liability for such an act from the fraudulent employee to LINA. *See United States v. Sachdev*, 279 F.3d 25, 28 (1st Cir. 2002) ("The duress defense to criminal liability is strict and is unavailable unless there is no reasonable legal alternative to violating the law that would also avoid the threatened harm.").

In her First Amended Complaint, which was dismissed, Barrett conceded that defendants notify the insureds' representative when they determine the insureds are not eligible for LTD benefits. First Amended Complaint, ¶ 92. This allegation is conspicuously absent from her Third Complaint but her theory is the same: that defendants are liable under the FCA because they did not *directly* intervene and inform the SSA of their determination, despite the fact that the insureds are represented separately by an outside vendor, may have obtained their own counsel, or may be pursuing their SSDI claim on their own. The FCA does not require this much.[4]

---

[4] Barrett cites to SSA statutes and regulations which require representatives of SSDI applicants to disclose information to the SSA and prohibit false or misleading statements of material fact. Third Complaint ¶ 37. Yet defendants are not directly representing the applicant. *See* Third Complaint, ¶¶ 106-112; Opp., pp. 7-8. Defendants provide representation through a third-party should insureds wish to avail themselves of such assistance. Not every insured does and in many cases insureds represent themselves or obtain their own counsel. In any case, Defendants, as admitted by Barrett, inform the individual claimant when they deny benefits. *See* Compl., ¶¶ 175, 183, 194, 207. At that point it is the individual's or the individual's representative's responsibility to inform the SSA of the denial, if at

Thus, Barrett's allegations are not sufficient to establish causation or duress.

**B.** **Barrett Cannot Satisfy the Second Element Required Under the FCA, Because The Facts Alleged Do Not Support an Inference That Any Particular SSDI Claim is False or Fraudulent.**

Barrett must allege facts sufficient to establish that specific SSDI claims are false or fraudulent. Her Third Complaint fails to do so because she does not allege that any SSDI application, even if it is considered a claim under the FCA, contains an objective falsehood or false certification necessary for eligibility. Nor can she allege that literally true applications are submitted as part of a fraudulent scheme, because SSA regulations provide that the allegedly withheld information – defendants' determination of eligibility under a different, private insurance regime - is not material to the SSA's determination of eligibility for benefits.

**1.** **There is no Allegation of any Objective Falsehood or False Certification.**

Barrett alleges that each claim allegedly caused by defendants is fraudulent "whether or not the claim contains factually untrue information." Third Complaint, ¶ 11. Barrett relies on a tortured reading of the application form: "The false claim is the affirmative misrepresentation on the SSDI Claim Form that the claimant is unable to perform work in any occupation expected to last at least twelve months or result in death," ¶ 10, and that "[a]ffirmative misrepresentations that claimants are eligible are material misrepresentations." ¶ 13. Leaving aside her inartful attempt to summarize the legal standard – it is the disability which must last more than 12 months or result in death, not the work – this allegation misrepresents the content of the SSDI application.

The Claim Form, appended hereto as Exhibit P, asks four questions about the claimant's condition:

---

all. More importantly, even if Defendants could be classified as "representatives" of SSDI applicants (which they are not), this does not transform immaterial facts into material ones.

4082202v3

1. What are the illnesses, injuries or conditions that <u>limit your ability</u> to work?

2. How do your illnesses, injuries or conditions <u>limit your ability</u> to work?

3. Do your illnesses, injuries or conditions <u>cause you pain</u> or other symptoms?

4. When did your illnesses, injuries or conditions <u>first bother you</u>?

5. <u>When did you become unable to work</u> because of your illnesses, injuries or conditions?

(Emphasis added.)  Contrary to Barrett's assertion, the responses to these questions do not amount to a certification that the claimant is eligible for benefits.  The questions refer to "limits" on ability to work, the existence of "pain or other symptoms," and the entry of a date in a box in response to the last question about inability to work.

Barrett places great reliance on this introductory statement in the SSDI application form:

WHAT WE MEAN BY "DISABILITY"

"Disability" under Social Security is based on your inability to work.  For purposes of this claim, we want you to understand that "disability" means that you are unable to work as defined by the Social Security Act.  You will be considered disabled if you are unable to do any kind of work for which you are suited and if your disability is expected to last (or has lasted) for at least a year or to result in death.  So when we ask, "when did you become unable to work" we are asking when you became disabled as defined by the Social Security Act.

Exhibit P.  This disclaimer does not place the burden on claimants to determine for themselves and certify that they meet the complex criteria applied by SSA to determine disability.  Fairly read, it warns claimants that the SSA definition will be applied, and that they "will be considered disabled" only after application of that test.  There is no question on the form regarding the length of the illness at issue, and there is no request that claimants certify that disability will last more than a year.  The questions do not call for an assertion that claimants cannot perform "any kind of work for which he is suited."

Barrett must allege that the claims at issue were false at the time they were submitted. She may not merely suggest that SSA's adverse adjudication of a high percentage of claims implies that any given claim was false from the outset. Claimants may recover from their disability during the often lengthy pendency of their SSDI application. Medical records regarding an injury or illness, though completely valid, may not ultimately sustain the judgment that there is a disability as defined by the SSA. In such circumstances, a claimant who initiates an SSDI application process, even if required to do so under a LINA-administered policy, does not commit an FCA violation. A valid claim cannot be transformed into false claim by subsequent events. *See United States ex rel. Quinn v. Omnicre, Inc.*, 382 F.3d 432 (3rd Cir. 2004) (where pharmacy billed for medicine delivered, claim was not false even though medicine was returned).

Barrett also must allege that the claimant was aware that the claim was false when submitted. An applicant who believes that he or she is disabled under the SSDI definition, but who ultimately is denied by the SSA as ineligible, has not submitted a false claim. "At a minimum, the FCA requires proof of an objective falsehood." *United States ex rel. Roby v. Boeing Co.*, 100 F. Supp. 2d 619, 625 (S.D. Ohio 2000). SSA regulations specifically permit an SSDI applicant to apply for benefits before he or she meets all of the eligibility criteria for SSDI benefits. *See* 20 CFR § 416.330 (entitled "Filing before the first month you meet the requirements for eligibility"). As Barrett acknowledges in her Third Complaint ¶34, SSA specifically contemplates that some applicants will file for benefits before they know whether they will ultimately be eligible, and actually encourages those applications. *See* Social Security Administration, "Answers to Your Questions," *available at* http://ssa-custhelp.ssa.gov/cgi-bin/ssa.cfg/php/enduser/prnt_adp.php?p_faqid=455&p_created

=974211653&p_sid=htddaK7i (last accessed May 17, 2006) ("[Y]ou do not have to wait a year after you become disabled to file for disability benefits. In fact, you should apply as soon as you [ ] believe you are unable to work.").

Thus, the assertion of a mistaken belief that one may be eligible for SSDI benefits is not an objective falsehood. Otherwise, every claimant whose SSDI application ultimately is denied would be subject to FCA liability.

### 2.    True Applications Cannot be Part of A Fraudulent Scheme.

Finally, to the extent Barrett's Third Complaint is based on the theory that true applications are submitted in connection with a fraudulent scheme, it fails because SSA regulations provide that the information allegedly withheld is not material to the government's decision. "[A] claim is 'false' only if the Government or other customer would not pay the claim if the facts about the misconduct alleged to have occurred were known." Clarence T/ Kipps. Jr. et al, Materiality as an Element of Liability Under the False Claims Act, A.B.A. Center for Continuing Legal Education National institute (1998), WL N98CFCB ABA-LGLED B-37, B-46, cited with approval in *United States ex rel Mikes v. Straus,* 274 F. 3d 687, 696 (2nd Cir. 2001). As set forth in Part C below, the decision of LINA regarding a disability claim is expressly disavowed by SSA as relevant to its own benefits determination process. Thus a claimant's assertion of entitlement to SSDI benefits is not impeached by LINA's denial of private benefits, and there can be no fraudulent scheme on this basis.

### C.    Barrett Cannot Establish the Third Element of a FCA Claim, Because the Assertion of Disability by Claimants is Not Material to SSA, Nor is LINA's Decision Regarding the Award of Private Policy Benefits.

To prove a FCA violation, Barrett must show that the false statement or claim was material to the government's funding decision. *See Franklin*, 147 F. Supp. at 50 (listing materiality as element of a FCA claim). A false statement that is not material does not give rise

to FCA liability. *See United States v. Data Translation, Inc.*, 984 F.2d 1256, 1257 (1st Cir. 1992); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999) ("[L]iability under each of the provisions of the False Claims Act is subject to the further, judicially-imposed requirement that the false statement or claim be material.") (cited in *Franklin*, 147 F. Supp. at 46); *United States v. Pres. & Fellows of Harvard Coll.*, 323 F. Supp. 2d 151, 181-82 (D. Mass. 2004) ("In addition to the FCA's explicit requirements, courts have inferred a requirement that the false statement or claim be material."); *United States ex rel. Stebner v. Stewart & Stevenson Servs., Inc.*, 305 F. Supp. 2d 694, 698 (S.D. Tex. 2004) ("FCA liability does not exist if the alleged fraudulent act had no bearing on the Government's payment decision."); *United States ex rel. Wilkins v. North Am. Constr. Corp.*, 173 F. Supp. 2d 601, 635-38 (S. D. Tex. 2001) (applying a materiality requirement to claims under Sections 3279(a)(1), (2) and (3)).

"[P]laintiffs must show that the government would not have paid had it known of the falsity or violation, that the government actually relied on the falsity, or that the falsity caused the government to pay out sums it otherwise would not have. The government's decision to provide federal benefits or federal funding despite an alleged falsity or legal violation therefore raises issues not only of heightened materiality, but also of reliance and causation." John T. Boese, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS § 2.04 (3d ed. 2006).

### 1. FCA Cases Defining Materiality.

A false claim under the FCA must have "the practical purpose and effect" of causing the government to pay when it otherwise would not have done so. *United States v. Rivera*, 55 F.3d 703, 710 (1st Cir. 1995); *see Pres. & Fellows of Harvard Coll.*, 323 F.Supp.2d at 178. For FCA liability to attach, the defendant must subject the government to an immediate, or virtually immediate, demand for payment. *See Dookeran v. Mercy Hosp.*, 281 F.3d 105 (3d Cir. 2002);

*United States ex. rel. Cooper v. Gentiva Health Servs., Inc.,* 2003 WL 22495607, at *7 n.9 (W.D. Pa. Nov. 4, 2003).

The First Circuit has had occasion to discuss the required effect of a claim to establish FCA liability. In *Rivera,* the alleged claims were documents used to draw down funds on a HUD guaranteed loan. *Rivera,* 55 F.3d 703. The First Circuit reviewed Supreme Court precedent on the subject.

> In *McNinch,* the Supreme Court indicated that a 'claim' under the FCA is a 'demand for money' that induces the government to disburse funds or to "otherwise suffer immediate financial detriment. … In *Neifert-White,* the Court further elaborated, defining a claim to be 'a false statement made with the purpose and effect of inducing the Government immediately to part with money.' … Thus, in deciding whether a given false statement is a claim or demand for payment, a court should look to see if, within the payment scheme, the statement has the <u>practical purpose and effect, and poses the attendant risk, of inducing wrongful payment.</u>

*Id.* at 709-10, quoting *McNinch v. United States,* 356 U.S. 595, 599 (1958) and *United States v. Neifert-White,* 390 U.S. 228, 230 (1968) (emphasis added). "The key inquiry is thus whether the demand for payment, whether or not it gives rise to an unconditional legal obligation to pay right away, has the practical effect of inducing the government to suffer immediate financial harm." *Id.* at 712. Comparing the documents at issue to the usual invoices which form the basis of FCA claims, the First Circuit observed:

> "The FCA attaches liability to an invoice, not because it triggers an obligation to pay (though it may well do so), but because it poses a risk that the government may, in reliance upon the false statements contained in the invoice, wrongly pay out funds. Claims that trigger a legal obligation to pay merely constitute a special subset of claims posing a particularly high risk of mistaken payment."

*Id.*; *see also Pres. & Fellows of Harvard Coll.,* 323 F. Supp. 2d at 179 (the "practical purpose" of the forms at issue was "to induce and assure future disbursements.")[5]

---

[5] Because SSDI claims are subject to a lengthy review and hearing process which may ultimately evolve into adversary proceedings, an SSDI application is much like a complaint in a court, designed to commence an adjudicatory proceeding. While the definition of "claim" under the FCA is necessarily broad, *see Neifert-White Co.,*

Barrett contends that claimants essentially certify to SSA that they meet all the regulatory requirements for determining disability. This argument may be analogized to those cases in which relators have contended that false certification of compliance with regulatory standards constitutes a FCA violation. For example, in *Mikes*, the relator contended that defendants' request for reimbursement for tests were false claims because they had falsely certified that the tests were performed according to a relevant standard of care. *Mikes*, 274 F.2d at 696. However, the court rejected this contention. "Since the [False Claims] Act is restitutionary and aimed at retrieving ill-begotten [sic] funds, it would be anomalous to find liability when the alleged noncompliance would not have influenced the government's decision to pay." *Id.* at 697. "Liability under the Act may properly be found therefore when a defendant submits a claim for reimbursement whole knowing … that payment expressly is precluded because of some non-compliance by the defendant." *Id.* at 700.

The First Circuit has considered whether alleged non-disclosures may form the basis of FCA liability where the government's disclosure requirement is ambiguous. In *Data Translation*, the government contended that defendants' failure to disclose certain pricing information to GSA was in violation of elaborate disclosure requirements which the court found "virtually unintelligible if read literally." *Data Translation*, 984 F.2d at 1261. It applied a "practical interpretation" and held that "a reasonable supplier would not read the language, in connect, as calling for complete, literal disclosure." *Id.* at 1262. Having found that the GSA form did not reasonable require the disclosure at issue, it concluded that there was no FCA liability because the information was not material. *Id.* at 1267. *See also Pres. & Fellows of*

---

390 U.S. at 233, Defendants have found no cases in which a petition to begin an adjudicatory process has been held to be a "claim" under the FCA.

*Harvard Coll.*, 323 F. Supp. 2d 151 (D. Mass. 2004); *Franklin*, 147 F. Supp. 2d 39; *Wauzinski v. Shalala*, 1994 WL 725176 (D. Mass.); *Vital v. Shalala*, 1994 WL 548051 (D. Mass.).

Here, Barrett alleges that defendants fail to disclose their own determination of SSDI eligibility before referring claimants, ¶ 8(a) 67, 133-136; fail to share medical information they have collected with SSA, ¶ 8(c), 137; and do not inform SSA of their own determinations under the private insurance policies. ¶ 138. None of the acts or omissions is material to the SSDI determination process.

### 2.    The Alleged Non-Disclosures Are Not Material.

The SSDI Application does not require claimants to make a preliminary determination of eligibility for benefits. As set forth above, Barrett's tortured reading of a certification of eligibility into Form 3368-BK is not reasonable. Nor does the SSA does not rely on claimants to provide all relevant records – the instructions to the Application state that "[t]he information we ask for on this form tells us to whom we should send a request for medical and other records." Finally, as set forth below SSA regulations specifically state that LINA's determination of a claimant's disability is *not* material to SSA's determination. *See* 20 C.F.R. § 416.904. Thus, defendants alleged failure to pre-screen claimants for SSDI eligibility, to provide SSA with their own records, and to inform SSA of their private insurance decisions, all have no bearing on the SSA's disability determination.

Filing the form (Third Complaint, ¶ 39) merely starts a long eligibility determination process, and Barrett well knows that there are many intervening steps before a government payment is made, none of which is automatic. Barrett herself explains the process in paragraphs 148-167 of the Third Complaint. After the filing of Form 3368, SSA first "compil[es] the non-medical and preliminary medical information" regarding the disabled person. *Id.* ¶ 149. It then refers the case to a state Disability Determination Center, which compiles the medical evidence

from the claimant's treating physicians. The state agency may then conduct its own medical determination. It may also obtain a vocational or occupational consultation, performed by consultants. After this investigation, a first determination of eligibility is made. Thereafter, a denied applicant may file for reconsideration by the state agency, and then appeal to the Office of Hearing and Appeals for a hearing before an Administrative Law Judge who can call on experts for additional evidence and assistance. As Barrett explains, "[f]requently, at the ALJ level, new evidence is introduced ... often at the hearing itself." *Id.*, ¶ 164. After the ALJ makes an eligibility determination, two more levels of appeal are available to the disabled person: an appeal to the Appeals Council and finally an appeal to the Federal District Court. Only after an extensive investigation and after a favorable determination by one of these decision makers will the person begin to receive benefits.

Barrett is well aware of the extensive claim investigation process undertaken by the SSA before benefits are awarded. She admits that the SSA's decision to pay benefits turns on SSA's own investigation. *See* Third Complaint, ¶ 157 ("Once the investigation is completed, the DDS [Disability Determination Service Center] makes a claim decision whereupon the applicant's claim for SSDI benefits is either allowed or denied."). She also admits that the filing of a Form 3368 does not trigger an automatic or immediate payment from the government. As Barrett herself alleges, a substantial portion of SSDI claims are denied, despite the information submitted by or collected from claimants. Third Complaint ¶ 224 ( "The average percentage of denied claims per applications filed during this [1997-2002] period is 51.51%").

### D.   Barrett Cannot Establish the Fourth Element of a FCA Claim, Knowledge of Falsity.

Barrett alleges that defendants require claimants to file with SSA with "reckless disregard" for their eligibility. Third Complaint, ¶ 8(a). She relies on the inference that, where

defendants determine that claimants are ineligible for private benefits, the prosecution of the SSDI claim thereafter must be false. Third Complaint, ¶ 137.

Yet Barrett's allegations are insufficient to establish that the standards for determining eligibility are the same for policy LTD benefits and SSDI benefits. In fact, the two regimes are substantially different. For instance, under the LINA Disability Policy referenced in Paragraph 169 of the Third Complaint (attached hereto as Exhibit Q, p. 15), benefits will not be paid for disability due to mental illness after the first 24 months of disability. Under SSA regulations, mental disability is covered for the entire period of disability. 20 C.F.R. § 416.929 ("We will develop evidence regarding the possibility of a medically determinable mental impairment when we have information to suggest that such an impairment exists...."). Similarly, under this LINA Disability Policy, benefits will be paid for disability due to drug or alcohol abuse for 24 months. *See* Exhibit Q, p. 15. SSA will not pay benefits for disabilities due solely to drug or alcohol abuse. 20 C.F.R. § 416.925(e) ("If you have a condition diagnosed as addiction to alcohol or drugs, this will not, by itself, be a basis for determining whether you are, or are not, disabled."). As a final example, the LINA Disability Policy does not include age as a factor in determining whether a policyholder's employee is unable to perform "the material duties of any occupation ...." Exhibit Q, p. 9 ("for which he or she may reasonably become qualified based on education, training, or experience"). SSA does consider age as a factor in determining what occupations an applicant may be able to perform. 20 C.F.R. § 416.963 ("When we decide whether you are disabled under § 416.920(g)(1), we will consider your chronological age in combination with your residual functional capacity, education, and work experience.").

Second, and more importantly, private long term disability insurance plans and SSDI are very different schemes. The First Circuit has recognized that the SSDI eligibility criteria are

29

substantively different from those used by many private disability plans. *Pari-Fasano v. ITT Hartford Life & Acc.*, 230 F.3d 415, 420 (1st Cir. 2000). The Supreme Court has recognized the "large leeway" employers have in the design of employee benefit plans, such as the disability plans LINA administers for employers. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003).

In *Nord*, the claimant sought to overturn a private disability plan's decision to deny him benefits. *Id.* at 828-29. He argued that, under ERISA, the private plan should have applied the "treating physician rule" which is followed in SSDI determinations. *Id.* That rule requires the SSA to accord deference to a claimant's treating physician when analyzing the claimant's eligibility for disability benefits.

The Supreme Court held that ERISA-governed disability plans need not follow the disability determination procedures used by the SSA. "In determining entitlement to Social Security benefits, the adjudicator measures the claimant's condition against a uniform set of federal criteria. The validity of a claim to benefits under an ERISA plan, on the other hand, is likely to turn, in large part, on the interpretation of terms in the plan at issue." *Id.* at 833. In fact, the Court deferred to the view of the Secretary of Labor that disability determinations are "best served by 'preserv[ing] the greatest flexibility possible for ... operating claims processing systems consistent with the prudent administration of a plan." *Id.* at 833-34. Thus, it is entirely appropriate that the SSA and LINA may come to different conclusions regarding the disability of a claimant, and therefore the determination of LINA says nothing about the eligibility of a claimant to SSDI.

Third, SSA regulations specifically state that LINA's determination of a claimant's disability is irrelevant to SSA's determination:

> A decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind. We must make a disability or blindness determination based on social security law. Therefore, a determination made by another agency that you are disabled or blind is not binding on us.

20 C.F.R. § 416.904 (entitled "Determinations by other organizations and agencies"). Through this regulation, SSA has informed disability insurers such as LINA that the insurer's determination of eligibility or ineligibility for disability benefits has no bearing on the SSDI determination. When SSA has declared that LINA's determination has no bearing on its own determination, LINA cannot be held to have knowledge that a policyholder's employee's claim is false merely because LINA has made an adverse disability determination.

LINA's determination that an employee is not eligible for policy LTD benefits does not instruct any particular determination by the SSA. Therefore, LINA's knowledge that policyholders' employees who have been denied coverage proceed with their claims thereafter does not suggest that LINA has knowingly caused the prosecution of false claims.

## IV.    BARRETT HAS FAILED TO PLEAD THE DOUBLE FALSITY REQUIRED FOR A § 3729(a)(2) CLAIM UNDER COUNT TWO.

Barrett has also failed to plead a § 3729(a)(2) claim on which relief may be granted. To show a violation under § 3729(a)(2), a relator must show two falsehoods: 1) that a record supporting a claim is false, and 2) that the record was made or used for the purpose of causing the false claim to be paid. *See United States ex. rel. Franklin v. Parke-Davis*, 2003 WL 22048255, at *1 (D. Mass. Aug. 22, 2003) (acknowledging that § 3729(a)(2) contains a "double falsehood requirement"); *United States ex. rel. Bustamante v. United Way/Crusade of Mercy, Inc.*, 2000 WL 690250, at *4 (N.D. Ill. May 25, 2000) (violation under (a)(2) requires proof that

both the record and the claim were false and that the defendant *knew* that both the record and the claim were false).

Barrett has not alleged either of the falsehoods necessary to establish an (a)(2) claim. She has not alleged that LINA knowingly caused a policyholder's employee to create a particular false record. Nor has she alleged that LINA caused a policyholder's employee to use a specific record for the purpose of causing a false claim to be paid. In order to plead a violation, Barrett would have had to show that a false record was used to get SSDI benefits paid, not just that the record was submitted to the SSA. *See Dookeran*, 281 F.3d at 109 (allegedly false application for federal funds which was rejected by the federal government did not create (a)(2) liability). She does not attempt to make such an allegation.

## V.     THE CONSPIRACY CLAIM IN COUNT THREE FAILS TO STATE A CLAIM, AND CIGNA AND LINA CANNOT CONSPIRE AS A MATTER OF LAW.

Barrett alleges in Count III that the defendants conspired with each other to defraud the Government in violation of 31 U.S.C. § 3729(a)(3). This new addition to her complaint fails because Barrett has not made allegations sufficient to support it, and because CIGNA and LINA, a parent corporation and its wholly-owned subsidiary, cannot conspire with each other as a matter of law.

### A.     Barrett's Allegations are Not Sufficient to Support a Conspiracy Claim.

A conspiracy in violation of the FCA must be based on facts showing that "the defendant[s] conspired with one or more persons to get a false or fraudulent claim allowed or paid by the United States...." *Pres. and Fellows of Harvard Coll.*, 323 F. Supp. at 196. Requisite agreement may be found when "the conspirators had a unity of purpose or a common design or understanding, or a meeting of the minds." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984). A specific intent to defraud must be proved, *United States ex*

*rel. Reagon v. E. Tex. Medical Center Regional Healthcare System*, 274 F. Supp. 2d 824,

857 (S.D. Tex. 2003), and general allegations of conspiracy do not meet the particularity

requirements of Rule 9(b). *Capella v. Norden Systems, Inc.,* 2000 WL 1336487, *11 (D. Conn.).

The theory of Barrett's case is that defendants acted with reckless disregard, ¶ 8(a), 136,

or "reckless indifference," ¶ 135. She does not allege facts indicating a specific intent to

defraud. Nor does she make factual allegations regarding the existence of a conspiratorial

agreement or acts in furtherance of such a conspiratorial agreement. Her conclusory allegation

of a conspiracy at ¶ 236 is insufficient.

**B.    CIGNA and LINA Cannot Conspire as a Matter of Law.**

The United States Supreme Court has determined that "a parent and its wholly owned

subsidiary have a complete unity of interest" that results in a "single enterprise." *Copperweld,*

467 U.S. at 771. Because a parent and wholly owned subsidiary share an inherent unity of

interest, as a matter of law they cannot reach the "meeting of the minds" required to establish

conspiracy. *Id.* Thus, the so-called "intracorporate conspiracy" doctrine provides that a

corporation cannot conspire with itself - i.e., with its subsidiaries, agents, or employees. *Id.;*

*Platten v. HG Bermuda Exempted Limited,* 437 F.3d 118, 131 (1st Cir. 2006); *Rice v. President*

*and Fellows of Harvard College,* 663 F.2d 336, 338 (1st Cir. 1981)(extending inter-corporate

conspiracy doctrine to conspiracy claim under 41 U.S.C. § 1985(3)). Specifically, the

intracorporate conspiracy doctrine has been applied consistently in the context of FCA

conspiracy claims. *See, e.g., U.S. v. Tyrone Hospital, Inc.,* 234 F.R.D. 113, 12728 (W.D. Pa.

2006) (dismissing Medicare/Medicaid FCA conspiracy claim on basis of intracorporate

conspiracy doctrine*); U.S. v. Custer Battles, LLC,* 376 F. Supp. 2d 617, 651 (E.D. Va. 2005)

(dismissing FCA conspiracy claim on basis of intracorporate conspiracy doctrine*); U.S. v. East*

*Texas Medical Center Regional Healthcare System,* 274 F. Supp. 2d 824, 856 (S.D. Tex. 2003).

CIGNA and LINA are considered one entity for the purposes of a conspiracy analysis. Since they cannot conspire to act, Barrett's conspiracy claim cannot stand.

## VI.    BARRETT MAY NOT MAINTAIN SUIT AGAINST CIGNA.

### A.    This Court Lacks Personal Jurisdiction Over CIGNA.

CIGNA is a Delaware corporation with its principal office located in Philadelphia, Pennsylvania. *See* Exhibit R, Declaration of Frank Barlow (the "Declaration"). CIGNA is qualified to do business only as a general business corporation – not as a health care provider or an insurance company – in Delaware, Pennsylvania, New York, Connecticut and the District of Columbia. Declaration at ¶ 2. It has no office or place of business in Massachusetts and has not conducted a business or business venture in Massachusetts. Declaration at ¶ 4. It is not licensed to conduct business of any kind in Massachusetts, does not own or rent any real property in Massachusetts, has no agents in Massachusetts, and has no employees in Massachusetts. Declaration at ¶ 4. It is not a party to any contract or disability benefit policy at issue in this matter. Declaration at ¶ 6. It has not and does not engage in any substantial activity within Massachusetts, whether inter-state, intra-state, or otherwise, that would justify this Court's exercise of jurisdiction over it.

CIGNA is the indirect parent corporation of LINA. Declaration at ¶ 4. The relationship of CIGNA to its indirect subsidiaries, however, is that of separate and distinct corporate entities. Declaration at ¶ 10. CIGNA does not control or involve itself in the day-to-day claim decisions of LINA. Declaration at ¶ 10. CIGNA maintains separate accounts, books, employees, agents and operations from those of LINA. Declaration at ¶ 10. CIGNA had no role in the processing of the claims at issue in this matter. Declaration at ¶ 6.

4082202v3

### 1.    This Court Lacks General Jurisdiction Over CIGNA.

To hear a case against a party, a court must have personal jurisdiction over the party, *i.e.* the power to require the party to obey its decrees. *United States v. Swiss Am. Bank, Ltd.*, 191 F.3d 30, 35 (1st Cir. 1999). Once jurisdiction is challenged, the plaintiff bears the burden of proving the court's authority to exercise personal jurisdiction over a defendant. *Sawtelle v. Farrell*, 70 F.3d 1381, 1387 (1st Cir. 1995).

A court's exercise of personal jurisdiction over a non-resident defendant must comply with the Fifth Amendment Due Process Clause, which requires minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. U.S.C.A. Const. Amend. 14; *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *Killion v. Commonwealth Yachts*, 421 F.Supp.2d 246, 253 (D. Mass. 2006).

General jurisdiction is found only where the defendant has continuous and systematic general business contacts within the forum. See, *Helicopteros Nacionales De, Columbia, S.A. v. Hall,* 466, U.S. 408, 416 (1984). Without continuous and systematic contacts with the forum, jurisdiction can arise only from a case's sufficient relation to a significant subset of contacts between the defendant and the forum, *i.e.* specific jurisdiction. *Phillips Exeter Acad. V. Howard Phillips Fund, Inc.*, 196 F.3d 284, 288 (1st Cir. 1999). Because CIGNA has no continuous or systematic contacts with Massachusetts and no contacts other than those related to plaintiffs' allegations, jurisdiction could only lie under a theory of specific jurisdiction. *See generally Helicopteros Nacionales*, 466 U.S. at 414.

### 2.    This Court Lacks Specific Jurisdiction Over CIGNA.

The First Circuit test for specific jurisdiction contains three components:  (1) relatedness -- whether plaintiffs' claim arises out of, or relates to, defendant's in-forum activities; (2) purposeful availment -- whether defendant's contacts with the forum state represent a

purposeful availment by defendant of the privileges and benefits of the forum's laws; and (3) the "gestalt" factors -- whether being haled in front of a foreign tribunal is reasonable and fair to the defendant. *Sawtelle*, 70 F.3d at 1388-89. To satisfy Due Process, plaintiffs must establish all three components. *Ticketmaster-New York v. Alioto*, 26 F.3d 201, 206 (1st Cir. 1994).

Here, none of plaintiffs' claims specifically relate to Massachusetts. "For the extension of personal jurisdiction to survive constitutional scrutiny, a claim must arise out of, or be related to, the defendant's in-forum activities." *Mass. Sch. Of Law At Andover, Inc. v. Am. Bar. Assoc.*, 142 F.3d 26, 35 (1st Cir. 1998) (quotations and citations omitted). Moreover, "[t]he relatedness requirement is not met merely because a plaintiff's cause of action arose out of the general relationship between the parties; rather, the action must arise directly out of the specific contacts between the defendant and the forum state." *Sawtelle*, 70 F.3d at 1389. Because CIGNA does not conduct *any* substantial activities in Massachusetts, the claim can not "arise out of, or be related to," such activities.

Nor has CIGNA purposefully availed itself of Massachusetts Law. The purposeful availment component acts to protect defendants from jurisdiction premised solely upon random, isolated, or fortuitous contacts with the state. *LaForest v. Ameriquest Mortgage Co.*, 383 F. Supp. 2d 278, 286 (D. Mass 2005) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)). To show purposeful availment, plaintiffs must show that CIGNA's contacts with Massachusetts demonstrate a "purposeful availment of the privilege of conducting activities in Massachusetts thereby invoking the benefits and protections of its laws and making the involuntary presence before a Massachusetts' court foreseeable." *Id.* (quoting *Pritzker v. Yari*, 42 F.3d 53, 61 (1st Cir. 1994)).

36

As set forth in the attached Declaration, Exhibit R, Barrett cannot meet this second requirement. CIGNA Corporation has not purposefully availed itself of the privilege of conducting activities within the state of Massachusetts. Consequently, CIGNA is not subject to specific jurisdiction in the state of Massachusetts. *Publications Interim., Ltd. V. Burke/Triolo, Inc.,* 121 F.Supp.2d 1178 (N.D. IL 2000).

Because Barrett cannot satisfy the first two prongs of the test for specific jurisdiction over CIGNA, this court need not consider the reasonableness/"Gestalt" factors in its analysis. "The Gestalt factors come into play only if the first two segments of the test for specific jurisdiction have been fulfilled." *United Elec. Wkrs. v. 163 Pleasant St. Corp.*, 960 F.2d 1080 (1st Cir. 1992).

### B.    Barrett's Allegations Against LINA Do Not Permit Her to Sue the Parent Corporation CIGNA.

In her First Amended Complaint, Barrett defined CIGNA and LINA collectively as "CIGNA" and made all of her allegations against "CIGNA." The only allegation against CIGNA itself was that CIGNA owns LINA. First Amended Complaint, ¶ 6. In her new complaint, Barrett does little more to satisfy the high standard necessary to bring CIGNA into a suit over life insurance policies issued by LINA.

Barrett is employed by LINA. Third Complaint, ¶ 15. Her new allegations amount to nothing more than use of the CIGNA name in her daily work, *id.*, ¶ 17, plus the conclusory allegation that CIGNA "treats its subsidiaries and agents as alter egos and uses employees and assets of LINA and its other subsidiaries to implement its policy and practice of requiring LTD claimants to file SSDI claims as a condition of receiving full LTD benefits." *Id.* ¶ 22. Yet the policies covering Claimants A through D are all LINA policies (CIGNA does not issue policies, and the LINA policies are identified by their "LK" numbers in the Third Complaint. ¶¶ 168, 178, 189, 197.) Like Barrett herself, the individuals identified in the allegations about Claimants

A through D are all employed by LINA, not CIGNA (CIGNA Disability Management Solutions, referred to in the discussions of claimants C and D, is not a separate entity but only a business name used by LINA).

"Ownership--even total ownership--of a corporation does not by itself impart the corporation's liabilities to the owner, and that rule is not abated simply because the owner happens to be another corporation." *Kneepkins*, 115 F. Supp. 2d at 39 (rejecting veil piercing argument in FCA case). The First Circuit has held that the corporate veil "may be pierced only if the parent and subsidiary lacked independence, the principals conducted their affairs with a requisite degree of "fraudulent intent," and failure to pierce the veil would work substantial injustice." *Id.*; *see also United Elec., Radio and Machine Workers v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1093 (1st Cir. 1992); *Schaefer v. Cybergraphic Sys., Inc.*, 886 F. Supp. 921, 925 (D. Mass. 1994).

Barrett must allege the facts upon which she relies to prove CIGNA's liability. Because FCA allegations sound in fraud they must provide, if pled on information and belief, "the source of the information and the reasons for the belief." *Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 878 (1st Cir. 1991). Barrett seems to have ignored these requirements entirely. Despite the court's warning at the March 16, 2006 hearing that Barrett must "identify which defendant purportedly took certain actions," Tr. at 5, Barrett has failed to do so regarding CIGNA.

## VII. BARRETT SHOULD NOT BE ALLOWED TO AMEND HER COMPLAINT AGAIN.

Barrett already has amended her Complaint twice. Her latest attempt is made only after extensive briefing and argument before the Court, which decided that her First Amended Complaint was deficient. It should be clear by now that Barrett cannot articulate a coherent theory of liability against the defendants. Fed. R. Civ. P. 9(b) was enacted "to prevent the filing

of suits that simply hope to uncover relevant information during discovery." *Karvelas*, 360 F.3d at 226 (internal citation omitted). "[A]llowing a relator to plead generally at the outset and amend the complaint at the 12(b)(6) stage after discovery would be at odds with the FCA's procedures for filing a *qui tam* action and its protections for the government….[A] *qui tam* relator may not present general allegations in lieu of the details of actual false claims in the hope that such details will emerge through subsequent discovery." *Karvelas*, 360 F.3d at 231.

Barrett has been given ample opportunity to have met her Rule 9(b) and 12(b)(6) obligations. *See United States ex. rel. Adrian v. Regents of the Univ. of Cal.*, 363 F.3d 398, 403-04 (5th Cir. 2004) (one opportunity to amend a complaint was sufficient); *United States ex rel. Riley v. Alpha Therapeutic Corp.*, No. C-96-0704 DLJ, 1997 WL 818593, at *4 (N.D. Cal. Nov. 10, 1997) (dismissing complaint after one opportunity to amend in which plaintiff "failed to plead . . . with the particularity required under Rule 9(b)."). Her failure to plead adequately the second time around warrants dismissal of her Complaint with prejudice. *See Shamsi*, 743 F. Supp. at 90.

## CONCLUSION

For these reasons[6], Barrett's Third Complaint should be dismissed with prejudice.

---

[6] As defendants argued in their previous motion to dismiss the First Amended Complaint, Barrett also should be estopped from arguing that LINA's policy requirement causes false claims to be submitted to the SSA because the SSA itself follows a similar policy. The SSA has promulgated regulations which require SSI applicants to apply for benefits from all other possible sources. 20 C.F.R. § 416.210(a)-(b). SSA advises claimants that their failure to apply for these benefits within thirty days will results in loss of eligibility for SSI. 20 C.F.R. § 416.210(e). These requirements are based on 42 U.S.C. § 1382(e)(2). The SSA would, therefore, be estopped from arguing that LINA's policies are unlawful, because courts preclude administrative agencies from taking positions directly contrary to their own regulations. Because Barrett stands in the shoes of the SSA in this *qui tam* case, she should be estopped from making this argument against LINA.

4082202v3

Respectfully submitted,


/s/ R.J. Cinquegrana
R. J. Cinquegrana (BBO # 084100)
CHOATE, HALL & STEWART, LLP
Two International Place
Boston, Massachusetts 02110
(617) 248-5000

*Attorneys for Defendants CIGNA Corporation and
Life Insurance Company of North America.*

Dated:  May 19, 2006

4082202v3

## CERTIFICATION OF CONFERENCE

Pursuant to Local Rule 7.1(A)(2), I, R.J. Cinquegrana, hereby certify that I have made a good-faith effort to confer on this issue with Plaintiff's counsel prior to filing this motion but have been unable to resolve or narrow the issues.

*/s/ R.J. Cinquegrana*
R.J. Cinquegrana

## CERTIFICATION OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 19, 2006.

*/s/ R.J. Cinquegrana*
R.J. Cinquegrana

4082202v3