UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel*. DAWN BARRETT | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 03-12382-MLW |
| v. | ) ) | |
| CIGNA CORPORATION and LIFE INSURANCE COMPANY OF NORTH AMERICA | ) ) ) ) | |
| Defendants | ) ) ) ) | |

## <u>DEFENDANTS' MEMORANDUM IN SUPPORT OF PHASED DISCOVERY</u>

Pursuant to this Court's order of November 30, 2006, defendants CIGNA Corporation ("CIGNA") and Life Insurance Company of North America ("LINA") (collectively, the "Defendants"), hereby submit this Memorandum in Support of Phased Discovery, as outlined in their proposal contained in the parties' Joint Statement Pursuant to Local Rule 16.1 dated November 27, 2006 (the "Statement").[1]  As more fully set out below, the Defendants' proposal for phased discovery is appropriate because: (1) there are clearly defined threshold issues that are appropriate for targeted and summary disposition, which could dispose of the case in its entirety; (2) the proposed discovery plan would not unduly delay the proceedings; and (3) the proposed plan potentially would avoid the reviewing of thousands of LINA's claims files, which would inevitably impinge upon the privacy of thousands of individuals who are not parties to this action. In contrast, the Plaintiff's proposal would require an extensive expenditure of time, money and

---

[1] For the Court's convenience, a copy of the Statement is annexed hereto as <u>Exhibit A</u>.

effort by the parties and this Court to provide even minimal privacy protection to those otherwise uninvolved individuals whose personal information may be subject to such discovery.

## I.    **Background.**

### A.    Proceedings To Date.

Relator Dawn Barrett ("Barrett") filed her original complaint under seal on or about November 25, 2003.[2]  As set out more fully in the Defendants' motions to dismiss and supporting memoranda, Barrett's Second Amended Complaint (the "Complaint" or "Compl.") alleges that the Defendants violated the False Claims Act, 31 U.S.C. §§ 3729(a)(1) and (2) (the "FCA"), by causing false or fraudulent claims for Social Security Disability Insurance ("SSDI") benefits to be presented to the Social Security Administration ("SSA") for payment or approval.[3]  *See* Compl., ¶¶ 4-14, 228-33.  Specifically, the fundamental allegation in the Complaint is that "[a]s a matter of uniform corporate policy, CIGNA requires all of the [LTD] claimants on its disability policies and those written by its subsidiaries, to apply for SSDI as a condition of receiving the full LTD benefits which the claimants are entitled to receive."  Compl., ¶¶ 5, 8, 14.

Following the denial of the Defendants' most recent motion to dismiss at a hearing on October 5, 2006 (the "October Hearing"), the parties conferred as required by applicable rules and filed the Statement, which sets out the parties' respective positions regarding discovery.  In the Statement, the Defendants proposed that issues and discovery be bifurcated in order to first resolve issues which would be controlling of the liability, if any, of the Defendants.  These issues

---

[2] Barrett amended her original complaint twice.  The first amended complaint was dismissed, but she was given leave to amend.  The Second Amended Complaint survived the Defendants' most recent motion to dismiss.  *See* Transcript of October 5, 2006 Hearing ("Oct. Trans."), pp. 65:11-79:13.

[3] This most recent Complaint also includes a count alleging that CIGNA and LINA conspired in violation of 31 U.S.C. § 3729(a)(3).  *See* Compl., ¶¶ 234-36.

2

include: (1) whether the Court lacks subject matter jurisdiction based upon a "public disclosure"
of "allegations or transactions" within the meaning of the FCA; and (2) whether the SSA
Application Form (the "Application") is not "material" within the meaning of the FCA and
whether it does not constitute a "claim" within the meaning of the FCA. Addressing these issues
first would focus discovery primarily upon the SSA and would provide a path to resolving the
case without invading the privacy of thousands of claimants, which would result from the
production and review of thousands of individual claims files.[4]

In contrast, Barrett proposed no formal phasing of discovery. Rather, she proposed
examining Defendants' individual claims files to identify a subset of claims where: (1) the
individual was denied SSA benefits; and (2) the individual also was denied long term disability
("LTD") benefits. As noted in the Statement, the Defendants cannot accurately identify this
subset of claims files from the information they maintain in the ordinary course of their business.
Accordingly, in response to Barrett's proposal, the Defendants suggested a sampling procedure
that could be employed in Phase II if the case were not otherwise resolved on the threshold issues.
That sampling procedure would involve providing SSA with a list of claimants whom SSA would
then identify as having been awarded benefits through the appeal level.

B.    The UNUM Case.

After filing the Statement, the Defendants were informed that fact discovery in a similar
case, U.S. ex rel. Loughren v. UNUMPROVIDENT, et al., (Saris, J.), Civil Action No. 03-
11699-PBS, (the "UNUM Case") is coming to an end and would be focusing on discovery from
the SSA. The AUSA responsible for monitoring both cases, Jeffrey Cohen, informed the

---

[4]  Pursuant to the Defendants' proposal, Phase II would cover the remaining issues in the case should the Court not
decide summary judgment in Phase I in favor of the Defendants. In the event discovery must focus on the review of
claim files in Phase II, the Defendants agree with Barrett that this review should involve a streamlined approach to
identifying and reviewing claims files.

Defendants that, to the extent discovery is sought from the SSA in both cases, it is the government's preference to coordinate that discovery.[5]

      C.     <u>Actual Public Disclosures That The Complaint Is "Based Upon".</u>

Since the November 30, 2006 Conference, the Defendants have identified the following public disclosures (the "Public Information") on which, the Defendants contend, the allegations in the Complaint are based:

- In 1996, the U.S. General Accounting Office reported that "[a]lmost all private long-term disability insurance benefits are coordinated with DI benefits; that is, private benefits are reduced dollar for dollar by the amount of DI benefits . . . ..[R]educing private benefits dollar for dollar against DI benefits can lower disability insurance premiums. **As a result, it is common for private plans to require claimants to apply for DI benefits**." U.S. Gen. Accounting Office, <u>SSA Disability: Return-to-Work Strategies From Other Systems May Improve Federal Programs</u>, 22 (July 1996) (the "GAO Report"). A true and accurate copy of the GAO Report is annexed hereto as <u>Exhibit</u> <u>B</u>.

- A July 1, 2002 article in ManagedHealthCare.Info reported that CIGNA case managers use a "focused, proactive approach" in helping claimants apply for SSDI benefits "early in the process." <u>Disability: CIGNA announces enhancements to speed payment of Social Security benefits</u>, ManagedHealthcare.Info, July 1, 2002 (the "News Article"). The News Article notes that within 7 days of receiving an LTD claim, CIGNA Group Insurance case managers make a determination whether an insured is "unable to work for 12 months or more because of a disability." If so, the insured is "**notified at that point that CIGNA will assist them in processing their Social Security benefits**." The article explains that CIGNA Group Insurance is able to assist LTD insureds apply for SSDI because of it's "alliance with Allsup, Inc. and Advantage 2000 Consultants, two companies that specialize in obtaining Social Security benefits payments for ill or injured employees who cannot return to work." A true and accurate copy of the News Article is annexed hereto as <u>Exhibit</u> <u>C</u>.

- In July, 2001, a paper written by D. Gregory Rogers was included in the Annual Convention Reference Materials of the Association of Trial Lawyers of America. In this paper, Mr. Rogers stated: "[T]he great majority of long-term disability insurance policies and/or ERISA plans contain an offset for the amount awarded by the Social Security Administration. **The insurance company and/or employer … will insist upon your client obtaining Social Security benefits so that it may reduce its payments by that amount. The language of the policy**

---

[5] Should the Court agree with the Defendants' proposed phasing of discovery, the Defendants would have no objection to Barrett conducting discovery of the SSA at the same time.

**usually states that the long-term disability benefits will be offset by that amount the claimant and his or her family members 'receives or is entitled to receive' from the Social Security Administration.  The LTD benefit providers sometimes even go so far as to provide representation from their in-house attorneys for the claimant in his or her Social Security case**."  1 Ann.2001 ATLA-CLE 1117, D. Gregory Rogers, The Effect of Social Security Awards on Long-Term Disability Claims (2001) (the "Rogers Paper").  By way of example, Mr. Rogers states, "GENEX, a corporation which provides Social Security attorneys to long-term disability claimants, is a wholly owned subsidiary of UNUM, the largest disability insurance provider in the country." Id.  Mr. Rogers also states, "after the LTD carrier pays benefits under the 'own occupation' provision, the plan administrator then assists the claimant in his or her Social Security disability claim by providing representation in the Social Security case; the provider then demands and receives the 'overpayment' amount from the claimant once Social Security benefits are obtained; the LTD provider then rejects the disabled person for benefits for the 'any occupation' period." Id.  A true and accurate copy of the Rogers Paper is annexed hereto as Exhibit D.[6]

- On June 20, 2002, Paul Verkuil, a professor of law at the Benjamin N. Cardozo School of Law submitted a statement to the Subcommittee on Social Security of the U.S. House of Representatives Committee on Ways and Means (the "Verkuil Statement") in which he stated that the number of disability claims was expected to rise in the future for a number of reasons, one of which was "**the increasing tendency of private insurance companies to require as a condition of payment that claimants pursue their offsetting SSA benefits**."  Excerpt from the Hearing Before the Subcommittee on Social Security of the Committee on Ways and Means, House of Representatives, One Hundred Seventh Congress, Second Session, June 11 and 20, 2002, Serial 107-86, at p. 118.  A true and accurate copy of the Verkuil Statement is annexed hereto as Exhibit E.

- Subsequently, in 2003, Mr. Verkuil and his colleague Jeffrey Lubbers submitted a follow up to the Verkuil Statement to the Subcommittee on Social Security in a research paper entitled, Alternative Approaches to Judicial Review of Social Security Disability Cases: A Report to the Social Security Advisory Board, Paul Verkuil & Jeffrey Lubbers, p. 2, Research Paper No. 71, 2003 (the "Research Paper").  This paper again stated that the number of disability claims was expected to rise in the future, in part due to "**the increasing tendency of private insurance companies to require as a condition of payments that claimants pursue their offsetting disability benefits**." Id.  A true and accurate copy of the Research Paper is annexed hereto as Exhibit F.

- This practice has also been disclosed in the course of civil suits against disability insurers.  In Estades Negroni v. Assocs. Corp. of No. Am., 208 F. Supp.2d 144

---

[6] It is worth noting that Barrett's counsel is also plaintiff's counsel in the UNUM Case.  The Rogers Paper is clearly a "public disclosure".  Compare U.S. ex rel. Fine v. Advanced Sciences, Inc., 99 F.3d 1000, 1006 (10th Cir. 1996) (memoranda given to representative of American Association of Retired Persons constitute public disclosure).

(D.P.R. 2002), the court described the SSDI referral practices of the disability insurer Prudential Healthcare Group.  As the court related, Prudential informed Negroni that "she was required to file for SSDI and must provide them with proof of application." *Id.* at. 146. The court also noted that the disability insurer informed Negroni that **failure to apply for SSDI would result in suspension or termination of LTD benefits**. *Id.*  Similarly, in <u>Ladd v. ITT Corp.</u>, 148 F.3d 753 (7th Cir. 1998), Judge Posner noted that MetLife's disability plan "**entitles it to offset benefits under the plan by any social security benefits received by the employee**."  Copies of these cases are annexed hereto as <u>Exhibit G</u>.

▪    On or about June 17, 2004, the Subcommittee on Social Security of U.S. House of Representatives Committee on Ways and Means wrote to the Commissioner of Social Security (the "Subcommittee Letter"), stating in pertinent part:  "The subcommittee has received information that **some private insurers, in particular, routinely require insureds – under the threat of a financial penalty – to file for SSDI benefits even when the insurer knows the insured individual does [not] meet the strict definition of disability under the Social Security Act.  In some cases, individuals are required to file even while the private insurer is in the process of denying disability benefits to them**.  In addition, these insured individuals are also required by private insurers to appeal all denials."  A true and accurate copy of the Subcommittee Letter is annexed hereto as <u>Exhibit H</u>.

## II.    <u>Authority of the Court to Order Phased Discovery.</u>

Pursuant to Fed. R. Civ. P. 26, the Court has broad discretion in fashioning discovery in any given case.  *See* <u>Aponte-Torres v. Univ. of Puerto Rico</u>, 445 F.3d 50, 59 (1st Cir. 2006).  This includes the authority to bifurcate discovery to address some issues separately from others. <u>Perotta v. Summit Home Loans</u>, No. Civ.A.03-CV-10756, 2005 WL 352859, at *1 (D. Mass. Feb. 11, 2005) (bifurcating jurisdictional discovery from other discovery).  For example, courts may bifurcate discovery as to issues bearing on liability from issues bearing on damages.  *See, e.g.*, <u>Washburn v. Lavoie</u>, 437 F.3d 84, 93-94 (D.C. Cir. 2006) (affirming order bifurcating discovery on liability and damages issues); <u>Kisteneff v. Tiernan</u>, 514 F.2d 896, 897 (1st Cir. 1975) ("Separation of the issues of liability and damages is an obvious use for Rule 42, since logically liability must be established before the amount of damages can be determined").  Likewise, "the court enjoys broad authority to order discovery, consider extrinsic evidence, and hold evidentiary

6

hearings in order to determine its own jurisdiction." Valentin v. Hospital Bella Vista, 254 F.3d 358, 363 (1st Cir. 2001).  *See also* Hawes v. Club Ecuestre El Comandante, 598 F.2d 698, 699 (1st Cir. 1979); U.S. *ex rel.* Johnson v. Shell Oil Co., 33 F. Supp.2d 528, 534 (E.D. Tex. 1999) (conducting discovery in connection with issues of public disclosure and original source).

Moreover, the issues identified by Defendants' are precisely the types of issues that are amenable to summary disposition.  *See, e.g.*, McBee v. Delica Co., 417 F.3d 107, 122 (1st Cir. 2005) (affirming the resolution of subject matter jurisdiction on summary judgment record); United States v. Pres. & Fellows of Harvard Coll., 323 F. Supp.2d 151, 181-82 (D. Mass. 2004) (materiality is a mixed question of law and fact that may be resolved at the summary judgment stage).  The issues identified by Defendants, therefore, are threshold issues that, if decided in Defendants' favor, will resolve the case without any need to address the remaining issues in the case.

### III.     Discovery Initially Targeted at the SSA Will Demonstrate Whether There Has Been A Public Disclosure of Allegations or Transactions Within the Meaning of the FCA, Which May Deprive the Court of Jurisdiction.

A.     The Public Disclosure Standard.

Section 3730(e)(4) of the FCA states:

> (4)(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

> (B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4).  *See also* U.S. *ex rel.* LeBlanc v. Raytheon Co., Inc., 913 F.2d 17, 20

(1st Cir. 1990) ("logical reading is that [this] subsection serves to prohibit courts from hearing *qui tam* actions based upon information made available to the public during the course of a government hearing, investigation or audit or from the news media."). "The satisfaction of 31 U.S.C. § 3730(e)(4) is, as the language indicates, an issue of subject matter jurisdiction." U.S. *ex rel* Precision Co. v. Koch Indus., Inc., 971 F.2d 548, 551 (10th Cir. 1992). Where there has been a public disclosure of the allegations forming the basis of a relator's fraud claims, "Section 3730(e) of the FCA deprives this Court of jurisdiction over the . . . *qui tam* action." U.S. *ex rel.* O'Keefe v. Sverdrup Corp., 131 F. Supp.2d 87, 90-91 (D. Mass. 2001).

Section § 3730(e)(4) requires a three-prong analysis. First, the court must determine whether the allegations of fraud, as set out in the complaint, were "publicly disclosed" within the meaning of the statute before the plaintiff filed the action. *See, e.g.*, U.S. *ex rel.* Rost v. Pfizer, Inc., 446 F. Supp.2d 6, 15 (D. Mass. 2006); U.S. *ex rel.* LaValley v. First Nat'l Bank of Boston, 707 F. Supp. 1351, 1366 (D. Mass. 1988) (Wolf, J.). Second, the court must determine whether the plaintiff's allegations are "based upon" that public disclosure. *See* Rost, 446 F. Supp.2d at 15; LaValley, 707 F. Supp. at 1366. Finally, if the court answers the first two inquiries in the affirmative, then the plaintiff must demonstrate that she is an original source of the information in the complaint. Rost, 446 F. Supp.2d at 15; LaValley, 707 F. Supp. at 1366. If the plaintiff cannot prove that she is an "original source," then the court lacks subject matter jurisdiction and the action must be dismissed. *See* 31 .U.S.C. § 3730(e)(4). *See also* O'Keefe, 131 F. Supp.2d at 95.

     1.    The Public Information Constitutes a Public Disclosure of Allegations or Transactions upon which the Complaint is Based.

Section 3730(e)(4)(A) sets out a list of the forums in which the public disclosure may be made. 31 U.S.C. § 3730(e)(d)(4). Those forums are: (i) civil hearing; (ii) criminal hearing;

(iii) administrative hearing; (iv) congressional report, hearing, audit or investigation;

(v) administrative report, hearing, audit or investigation; (vi) General Accounting Office (GAO)

report, hearing audit or investigation; or (vii) from the news media. *Id. See also* U.S. *ex rel.*

O'Keefe v. Sverdrup Corp., 131 F. Supp.2d 87, 91 (D. Mass. 2001). Although this list is

exhaustive, each category has been interpreted to include a wide variety of documents, including

but not limited to: (i) discovery materials; (ii) non-federal administrative reports and hearings;

(iii) FOIA requests; (iv) investigations by the U.S. Attorney's Office; (v) administrative warning

letters; and (vi) disclosures to members of the general public who had been previously

unconnected with the alleged fraud. *See, e.g.*, U.S. *ex rel*. Stinson, Lyons, Gerlin & Bustamante,

P.A. v Prudential Ins. Co., 944 F.2d 1149 (3d Cir. 1991) (discovery materials may qualify as

public disclosure in "civil hearing" even if never filed); O'Keefe, 131 F. Supp.2d at 91-92

("hearing" in 3730(e)(4)(A) "encompass[es] federal, state, and local administrative proceedings

that are open to the public and that receive public comments"); Hays v. Hoffman, 325 F.3d 982,

988-89 (8th Cir. 2003) (non-federal administrative reports may qualify as public disclosure); U.S.

*ex rel.* Mistick PBT v. Housing Authority of City of Pittsburgh, 186 F.3d 376, 383-84 (3d Cir.

1999) (FOIA request may qualify as public disclosure); Seal 1 v. Seal A, 255 F.3d 1154, 1161

(9th Cir. 2001) (investigations by U.S. Attorney's Office and Air Force Office of Special

Investigations qualify as public disclosures); U.S. *ex rel.* Gross v. Aids Research Alliance-

Chicago, No. 01-C-8182, 2004 WL 905952, at *20 (N.D. Ill. Apr. 26, 2004), *aff'd,* 415 F.3d 601

(7th Cir. 2005) (Food and Drug Administration warning letter citing regulatory violations

qualified as public disclosure); U.S. *ex rel.* Fine v. Advanced Sciences, Inc., 99 F.3d 1000, 1006

(10th Cir. 1996) (memoranda given to representative of American Association of Retired Persons

constitute public disclosure).

The public disclosure need not identify the defendant by name where it is reasonably clear from the disclosure that any further investigation would include the defendant. *See, e.g.*, U.S. ex rel Fine v. Sandia Corp., 70 F.3d 568, 571 (10th Cir. 1995) (prior GAO report and congressional hearing publicly disclosing alleged national fraud precluded FCA claim against particular laboratory); U.S. ex rel. Findley v. FPC-Boron Employees' Club, 105 F.3d 675, 687-88 (D.C. Cir. 1997).[7] "Furthermore, the public disclosure of the material elements of the fraudulent transaction bars *qui tam* actions even if the disclosure itself does not allege any wrongdoing." Fine, 70 F.3d at 572.

The majority of courts have held that an action is "based upon" a public disclosure "when the supporting allegations are similar to or 'the same as those that have been publicly disclosed … regardless of where the relator obtained his information.'" U.S. ex rel. O'Keefe v. Sverdrup Corp., 131 F. Supp.2d 87, 92 (D. Mass. 2001) (quoting U.S. ex rel. Doe v. John Doe Corp., 960 F.2d 318, 324 (2d Cir. 1992)).[8] *See, e.g.*, U.S. ex rel. Kreindler & Kreindler v. United Tech. Corp., 985 F.2d 1148, 1158 (2d Cir. 1993); U.S. ex rel. Mistick PBT v. Housing Auth., 186 F.3d 376, 386 (3d Cir. 1999), *cert. denied*, 529 U.S. 1018 (2000); U.S. ex rel. Federal Recovery Serv. v. Crescent City E.M.S., Inc., 72 F.3d 447 (5th Cir. 1995); U.S. ex rel. Dingle v. Bioport Corp., 388 F.3d 209, 215 (6th Cir. 2004); Minnesota Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp., 276 F.3d 1032, 1045 (8th Cir. 2002); U.S. ex rel. Biddle v. Board of Trustees of Leland

---

[7] According to Barrett, CIGNA was "the third-largest seller of disability insurance policies in the country, with a market share of 8.7%." Compl., ¶ 19. Moreover, the top-ten LTD providers service 82% of the market. *See* Insurance Information Institute, Top-Ten Long-Term Disability Carriers by Sales Premium, annexed hereto as Exhibit I. On this basis, general references to LTD insurance industry practices are sufficient to identify the Defendants since there are a limited number of insurers servicing the majority of the market. *Compare* Fine, 70 F.3d at 571 (general reference to national labs sufficient where limited number of labs involved nationally such that it was no mystery that Sandia may be involved and investigated).

[8] The minority view holds that "a *qui tam* action is 'based upon' a public disclosure only when the allegations supporting the action are 'derived from' the public disclosure." Rost, 446 F. Supp.2d at 19. *See* LaValley, 707 F. Supp. at 1366-67; LeBlanc v. Raytheon Co., 874 F. Supp. 35 (D. Mass. 1995). The First Circuit has yet to indicate support for either the majority or minority rule.

Stanford, Jr. Univ., 161 F.3d 533, 539-40 (9th Cir. 1998), *cert. denied*, 526 U.S. 1066 (1999);

U.S. *ex rel*. Grynberg v. Praxair, Inc., 389 F.3d 1038 (10th Cir. 2004), *cert. denied*, 125 S. Ct.

2964 (2005); U.S. *ex rel*. Kennard v. Comstock Res. Inc., 363 F.3d 1039, 1043 (10th Cir. 2004);

U.S. *ex rel*. Cooper v. Blue Cross & Blue Shield of Fla., Inc., 19 F.3d 562, 567 (11th Cir. 1994);

U.S. *ex rel*. Findley v. FPC-Boron Employees' Club, 105 F.3d 675, 682-84 (D.C. Cir. 1997).[9]  A

court should "should inquire only as to whether the publicly disclosed information could have

formed the basis for a governmental decision on prosecution, or could at least have alerted law

enforcement authorities to the likelihood of wrongdoing." U.S. *ex rel* Settlemire v. District of

Columbia, 198 F.3d 913, 918 (D.C. Cir. 1999).  There is no requirement that the allegations of

fraud be explicitly stated in the public disclosure in order for the jurisdictional bar to apply. U.S.

v. Alcan Elec. And Engr., Inc., 197 F.3d 1014, 1019-20 (9th Cir. 1999); Findley, 105 F.3d at 688

("relator's ability to recognize the legal consequences of a publicly disclosed fraudulent

transaction does not alter the fact that the material elements of the violation already have been

publicly disclosed").  Merely including additional details in the complaint that were not publicly

disclosed does not alter the conclusion that the claims are "based upon" a public disclosure. *See*

Settlemire, 198 F.3d at 919 ("Fact that [relator] is able to provide more specific details about

what happened to the allegedly misspent funds does not matter.").

Clearly, the allegations in the Complaint are "similar to or the same as those that have

been publicly disclosed" in the Public Information.  For example, Paragraphs 5, 7-8, 62-77 and

94-122 of the Complaint detail the Defendants' practice of routinely referring claimants to apply

---

[9]  Some of these cases, including O'Keefe, employ a mathematical test – $X + Y = Z$ – as a guide in determining whether the allegations or transactions have been publicly disclosed. *See, e.g.*, O'Keefe, 131 F. Supp.2d at 94.  In this formulation, Z represents the allegation of fraud and X and Y represent its essential elements. *See id.*  Even applying this calculation, it is clear that Barrett's allegation of fraud (Z) have been disclosed where the industry practice (and Defendants' practice in particular) have been disclosed, as well as the practice of referring claimants to SSA without a detailed assessment of their eligibility.

for SSDI benefits, either on their own or through one of its Social Security vendors, without undertaking any specific review of their eligibility, and the practice of reducing LTD benefits to take account of SSDI benefits. *Compare* GAO Report, <u>Exhibit B</u> ("it is common for private plans to require claimants to apply for DI benefits."); News Article, <u>Exhibit C</u> (summarizing CIGNA's vendor relationships); Rogers Paper, <u>Exhibit D</u>; Subcommittee Letter, <u>Exhibit H</u> (insureds required to file for SSDI benefits even when insurer knows insured does not meet strict definition of disability under the Act). Likewise, the allegation that the Defendants force claimants to apply or risk a reduction of their benefits is also contained in the pre-Complaint Public Information. *Compare* Compl., ¶¶ 64, 67, 101 *with* Verkuil Statement, <u>Exhibit E</u>; Research Paper, <u>Exhibit F</u>; <u>Estades Negroni</u>, 208 F. Supp.2d at 146; <u>Ladd</u>, 148 F.3d at 755, <u>Exhibit G</u>; Subcommittee Letter, <u>Exhibit H</u> (noting threat of financial penalty).

The Public Information also squarely addresses at least one of the alleged motives that the Defendants have for perpetrating the alleged fraud – a reduction in the LTD benefit provided. *Compare* Compl., ¶¶ 12, 74-77 *with* GAO Report, <u>Exhibit B</u> ("private benefits are reduced dollar for dollar by the amount of DI benefits"); Research Paper, <u>Exhibit F</u>.

Moreover, the Subcommittee Letter, <u>Exhibit H</u>, indicates that shortly after the Complaint was filed, Congress requested that the SSA investigate the *precise* issue presented in the Complaint. At a minimum, therefore, the Court should permit the Defendants to discover what response the SSA provided to the Subcommittee Letter, as well as any related documents, which may pre-date the Complaint, since such information bears directly upon these issues.

2.    Original Source.

If there has been a public disclosure (as the Defendants believe there has) and the allegations of the Complaint are based upon that public disclosure (which they are), Barrett must demonstrate that she was an original source of information in the *qui tam* action. *See* O'Keefe, 131 F. Supp.2d at 95. "In order to qualify as an original source, a *qui tam* plaintiff need only have direct and independent knowledge of the alleged fraud and have disclosed that information to the government prior to bringing his or her *qui tam* action." Rost, 446 F. Supp.2d at 23. The burden falls on the relator to demonstrate that she is an original source, *i.e.*, that she has independent and direct knowledge of the alleged fraud. *See* U.S. *ex rel.* Grynberg v. Praxair, Inc., 389 F.3d 1038, 1052 (10th Cir. 2004) (burden is on the relator to show he or she is an original source by providing specific facts demonstrating that his or her direct and independent knowledge is "marked by the absence of an intervening agency" and "unmediated by anything but his own labor"). It is unclear at this stage in the proceedings whether Barrett would qualify as an "original source" given that the allegations in the Complaint do not address this issue.

B.    Discovery Targeted at This Issue.[10]

In addition to the Public Information identified above, the Defendants believe that the SSA, as well as state insurance administrative bodies, may have additional materials that would satisfy the statutory requirements of a public disclosure. Specifically, discovery focusing on the Subcommittee Letter, Exhibit H, although it post-dates the Complaint by six months, may reveal information that pre-dates the Complaint in the context of the SSA's own investigation or inquiry.

---

[10]  At this stage in the proceedings, Defendants have not determined the precise means by which they would seek to obtain this information, but expect that the request would be in the form of a Rule 30(b)(6) notice and request for documents. In section V, *infra*, the Defendants, however, have outlined the procedure for obtaining such discovery, whether it be a deposition or a request for documents, or both.

13

Additionally, to the extent that Barrett asserts she is an original source, the Defendants would focus discovery on that issue.

Accordingly the Defendants intend to seek discovery from the SSA, as well as state insurance administrative bodies, focused on the public disclosure issue, including but not limited to discovery on the following topics:

1.    All documents concerning the public disclosure of the allegations or transactions in the Complaint in any of the following forums:

   a.    Civil hearing;

   b.    Criminal hearing;

   c.    Administrative hearing;

   d.    Congressional report, hearing, audit or investigation;

   e.    Administrative report, hearing audit or investigation; or

   f.    Government Accounting Office (GAO) report, audit or investigation.

2.    All documents concerning CIGNA.

3.    All documents concerning LINA.

4.    All documents concerning the SSA's awareness of, views on and/or acknowledgement of, the practice of long term disability insurers of offsetting long term disability benefits to take account of SS benefits.

5.    All documents concerning any requests pursuant to the Freedom of Information Act regarding the SSA's awareness of, views on and/or acknowledgement of, the practice of long term disability insurers of offsetting long term disability benefits to take account of SS benefits.

6.    All documents concerning the letter from the Subcommittee on Social Security to the Commissioner of Social Security dated June 17, 2004.

7.    All documents concerning state insurance administrative bodies' awareness of, views on and/or acknowledgement of, the practice of long term disability insurers of offsetting long term disability benefits to take account of SS benefits.

8.    All documents concerning the GAO report.

14

In addition to this targeted discovery, the Defendants would seek documents and testimony from Barrett bearing on the issue of her status as an "original source."

**IV.    Discovery Initially Targeted at the SSA Will Demonstrate Whether the Application is "Material" and Whether it Constitutes a "Claim" Within the Meaning of the FCA.**

    A.    The Legal Standards.

        1.    What is a "Claim" Under the FCA.

A false claim under the FCA must have "the practical purpose and effect" of causing the government to pay when it otherwise would not have done so. United States v. Rivera, 55 F.3d 703, 710 (1st Cir. 1995); *see* Pres. & Fellows of Harvard Coll., 323 F. Supp.2d at 178. For FCA liability to attach, the defendant must subject the government to an immediate, or virtually immediate, demand for payment. *See* Dookeran v. Mercy Hosp., 281 F.3d 105 (3d Cir. 2002); United States *ex. rel.* Cooper v. Gentiva Health Servs., Inc., 2003 WL 22495607, at *7 n.9 (W.D. Pa. Nov. 4, 2003).

The First Circuit has had occasion to discuss the required effect of a claim to establish FCA liability. In Rivera, the alleged claims were documents used to draw down funds on a HUD guaranteed loan. Rivera, 55 F.3d 703. The First Circuit reviewed Supreme Court precedent on the subject:

> In *McNinch,* the Supreme Court indicated that a 'claim' under the FCA is a 'demand for money' that induces the government to disburse funds or to 'otherwise suffer immediate financial detriment. …' In *Neifert-White,* the Court further elaborated, defining a claim to be 'a false statement made with the purpose and effect of inducing the Government immediately to part with money.' … Thus, in deciding whether a given false statement is a claim or demand for payment, a court should look to see if, within the payment scheme, the statement has the *practical purpose and effect, and poses the attendant risk, of inducing wrongful payment.*

*Id.* at 709-10, (quoting McNinch v. United States, 356 U.S. 595, 599 (1958) and United States v. Neifert-White, 390 U.S. 228, 230 (1968) (emphasis added)). "The key inquiry is thus whether the

demand for payment, whether or not it gives rise to an unconditional legal obligation to pay right away, has the practical effect of inducing the government to suffer immediate financial harm." *Id.* at 712. Comparing the documents at issue to the usual invoices which form the basis of FCA claims, the First Circuit observed:

> The FCA attaches liability to an invoice, not because it triggers an obligation to pay (though it may well do so), but because it poses a risk that the government may, in reliance upon the false statements contained in the invoice, wrongly pay out funds. Claims that trigger a legal obligation to pay merely constitute a special subset of claims posing a particularly high risk of mistaken payment.

*Id. See also* <u>Pres. & Fellows of Harvard Coll.</u>, 323 F. Supp.2d at 179 (the "practical purpose" of the forms at issue was "to induce and assure future disbursements."). Because SSDI claims are subject to a lengthy review and hearing process which may ultimately evolve into adversary proceedings, an SSDI application is much like a complaint in a court, designed to commence an adjudicatory proceeding. While the definition of "claim" under the FCA is necessarily broad, *see* <u>Neifert-White Co.</u>, 390 U.S. at 233, Defendants have found no cases in which a petition to begin an adjudicatory process has been held to be a "claim" under the FCA.

At the March 16, 2006 hearing on Defendants' first motion to dismiss (the "March Hearing"), the Court, based solely on the allegations in the complaint, stated that it was "inclined to find that a Social Security report is a claim." March Hearing Transcript ("March Trans."), p. 8:18-19. The Court also stated, however, that it did not know whether any other information was required to be filed before the SSA denied or awarded benefits. *Id.*, p. 8:22-24. Subsequently, at the October Hearing, the Court, citing to <u>Rivera</u>, stated that "[t]here is some dispute about what role the disability report plays in the Social Security payment system. This is a fact-intensive inquiry." Oct. Trans., pp. 68:24 - 69:1. The Court concluded that, in the context of the motion to dismiss, the Plaintiff adequately alleged "a claim for purposes of the False Claims

16

Act, although it's possible that the factual evolution of this case could result in a different decision on that point." *Id.*, p. 70:20-24.

Based on this Court's assessment, as well as the case law discussed above, this issue clearly is an appropriate area of discovery.

      2.    <u>Materiality Within the Meaning of the FCA</u>.

Not only must Barrett demonstrate that the Application is a "claim," but she must also show that the false statement or claim was "material." <u>Pres. & Fellows of Harvard Coll.</u>, 323 F. Supp.2d at 181-82 (also noting that materiality is a mixed question of law and fact). Specifically, to prove an FCA violation, Barrett must show that the false statement or claim was material to the government's funding decision. *See* <u>U.S. *ex rel.* Franklin v. Parke-Davis, Div. of Warner-Lambert Co.</u>, 147 F. Supp.2d 39, 50 (D. Mass. 2001) (listing materiality as element of an FCA claim). A false statement that is not material does not give rise to FCA liability. *See* <u>United States v. Data Translation, Inc.</u>, 984 F.2d 1256, 1257 (1st Cir. 1992); <u>Harrison v. Westinghouse Savannah River Co.</u>, 176 F.3d 776, 785 (4th Cir. 1999) ("[L]iability under each of the provisions of the False Claims Act is subject to the further, judicially-imposed requirement that the false statement or claim be material.") (cited in <u>Franklin</u>, 147 F. Supp.2d at 46); <u>Pres. & Fellows of Harvard Coll.</u>, 323 F. Supp.2d at 181-82 ("In addition to the FCA's explicit requirements, courts have inferred a requirement that the false statement or claim be material."); <u>United States *ex rel.* Stebner v. Stewart & Stevenson Servs., Inc.</u>, 305 F. Supp.2d 694, 698 (S.D. Tex. 2004) ("FCA liability does not exist if the alleged fraudulent act had no bearing on the Government's payment decision."); <u>United States *ex. rel.* Wilkins v. North Am. Constr. Corp.</u>, 173 F. Supp.2d 601, 635-38 (S. D. Tex. 2001) (applying a materiality requirement to claims under Sections 3279(a)(1), (2)

and (3)).[11]  "In general, a false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it is addressed."  Neder v. U.S., 527 U.S. 1, 16 (1999).

At the March Hearing, the Court expressed skepticism regarding "whether that form constitutes an express assertion that an applicant is disabled."  March Trans., p. 9:7-9.  The Court also noted that the Application and the applicable regulations encourage individuals to apply as early as possible and when they believe they may be (not are) eligible.  Id., pp. 9:15-18, 10:6-9, 26:2-8.

B.    Discovery Targeted at this Issue.

How the SSA uses the Application upon its receipt and how it assesses the merits of the Application bear on the determination of whether the Application is a "claim" and whether the statements contained therein are material to the SSA's benefit determination.  Accordingly, the Defendants intend to seek discovery from the SSA focused on these issues, including but not limited to discovery on the following topics:

1.    All documents that refer or relate to the submission of false or fraudulent claims for Social Security Disability Insurance benefits.

2.    All documents that refer or relate to the extent to which employees of the SSA are to rely or not rely on information contained in applications for Social Security Disability Insurance benefits.

3.    All documents that refer or relate to how applicants or others understand the term "unable to work" as used in the application form for Social Security Disability Insurance benefits.

4.    All documents that refer or relate to any ambiguities in the application for Social Security Disability Insurance benefits.

---

[11]  "[P]laintiffs must show that the government would not have paid had it known of the falsity or violation, that the government actually relied on the falsity, or that the falsity caused the government to pay out sums it otherwise would not have.  The government's decision to provide federal benefits or federal funding despite an alleged falsity or legal violation therefore raises issues not only of heightened materiality, but also of reliance and causation."  John T. Boese, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS § 2.04  (3d ed. 2006).

18

5.  All documents that refer or relate to the use of so-called social insurance riders in private disability insurance policies. (A "social insurance rider" is a term of a private insurance policy providing for the payment of a benefit to an insured if the insured is disabled under the terms of the private insurance policy, but denied Social Security Disability Insurance benefits.)

6.  All documents that refer or relate to the question whether an application for Social Security Disability Insurance benefits will be considered by the SSA to be false or fraudulent.

7.  All documents that refer or relate to practices of private disability insurance carriers to cause or encourage their insureds to apply for Social Security Disability Insurance benefits.

8.  Documents sufficient to determine the percentage of claims for Social Security Disability Insurance benefits that are:

    a.  Granted solely on the basis of information supplied in the original application;

    b.  Granted without any hearing;

    c.  Granted following hearing;

    d.  Granted following an appeal;

    e.  Granted following litigation;

    f.  Denied altogether.

9.  Documents that refer or relate to the ability of applicants to understand the directions for completing the application for Social Security Disability Insurance benefits.

10.  Documents that refer or relate to this civil action.

11.  Studies or analyses of the prevalence or nature of fraud committed by applicants for Social Security Disability Insurance benefits.

## V.    **Timing and Mechanics of Discovery Targeted at the SSA.**

The SSA's regulations provide procedures for seeking discovery from SSA employees.

These procedures would not cause excessive delay in this case for two reasons: (1) the timing

pursuant to the regulations will likely lead to a response from the SSA within thirty (30) days of a

request; and (2) the AUSA responsible for this case and the UNUM Case has already indicated a

4152737v1

desire to coordinate discovery from the SSA for both cases.  Furthermore, this Court has

authority to compel the SSA to comply with a properly issued subpoena under Rule 45 of the

Federal Rules of Civil Procedure.

      A.     Request for Testimony of an SSA Employee Under 20 C.F.R. §403.120

Section 301 of 5 U.S.C. provides:

> The head of an Executive department . . . may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers and property.  This section does not authorize withholding information from the public or limiting the availability of records to the public.

Regulations promulgated pursuant to this section are often referred to as *Touhy*

regulations after the Supreme Court case U.S. *ex rel* Touhy v. Ragen, 340 U.S. 462 (1951).  In

Touhy, the Supreme Court upheld regulations promulgated under the predecessor to §301 which

prohibited agency employees from releasing documents without the consent of the agency head.

*Id.*

      The SSA's *Touhy* regulations provide that an SSA employee may only testify concerning

his knowledge of the SSA with the prior authorization of the Commissioner.  To request such

testimony, a party must submit to the SSA's Office of the General Counsel a written application

for testimony of an SSA employee which: (1) describes the nature and relevance of the testimony

sought; (2) explains why the party seeking the testimony needs it and cannot obtain it elsewhere,

and why providing the testimony would be in the SSA's interest; and (3) provide the date and

place where the testimony would be taken.  20 C.F.R. §403.120(a).  As a general rule, the

application must be submitted at least thirty (30) days prior to the requested testimony date. 20

C.F.R. §403.120(b).  If the application is submitted thirty (30) days prior to the requested

testimony date, the SSA "will make every reasonable effort to provide" a decision whether to authorize the testimony on or before the date specified in the request. 20 C.F.R. §403.145.

The Commissioner makes a decision whether to authorize the testimony of an SSA employee based on several factors, including: (1) whether providing the testimony would risk violating the law or risk compromising a government privilege; (2) whether granting the application would "unduly expend for private purposes the recourses of the United States"; and (3) whether providing the testimony would be in the SSA's interest. 20 C.F.R. §403.130. The regulations also permit the Commissioner to determine a less "burdensome" form of testimony than that requested. Unless the application justifies a particular form of testimony the SSA may "provide an affidavit or declaration rather than a deposition and a deposition rather than trial testimony." 20 C.F.R. §403.140.

B.    Request for Testimony of an SSA Employee by Subpoena

Recent cases suggest that the *Touhy* regulations may be limited by Rule 45, governing third-party subpoenas. In relevant part, Rule 45 provides for the issuance of a subpoena which shall "command each person to whom it is directed to attend and give testimony or to produce and permit inspection" of documentary or electronic information, or other tangible things in the custody of that person. Under Rule 45(c)(2)(B), "a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena" serve upon the party issuing the subpoena "written objection to inspection or copying of any or all of the designated materials on the premises." Under subpart (e) of Rule 45, "[f]ailure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued."

21

The D.C. Circuit is the only circuit to have considered the intersection between Rule 45 and the *Touhy* regulations.  In Yousuf v. Samantar, 451 F.3d 248 (D.C. Cir. 2006), the plaintiffs sought discovery from the U.S. Department of State by issuing a Rule 45 subpoena as well as a request pursuant to the Department's Touhy regulations. *Id.* at 250.  The Government objected to the subpoena and the plaintiff moved to compel compliance.  In opposition to this motion, the Government argued that it was not a "person" subject to subpoena under Rule 45.  The D.C. Circuit disagreed, reasoning that the Government is deemed a "person" under Rules 4 and 30, and that Rule 45 should be read "*in pari materia*" with the other rules.  Accordingly, the court held that "the Government is a 'person' subject to subpoena under Rule 45 regardless [sic] whether it is a party to the underlying litigation."  *Id.* at 257.

Furthermore, an agency's refusal to comply with a court order may subject the head of the agency to civil contempt charges. As this court has explained, while the *Touhy* regulations may validly be employed to protect an agency employee from contempt charges resulting from the employee's refusal to comply with a court order at the direction of his superior, they do not "immunize the ultimate decision maker, . . . from being held in civil contempt if the court decides that it is appropriate to compel disclosure of the information at issue."  U.S. v. Salemme, 978 F. Supp. 364, 371 (D. Mass. 1997) (Wolf, J.).

Moreover, while the *Touhy* regulations provide governmental agencies a means for asserting "substantive privileges" covering the requested testimony or discovery, the *Touhy* regulations are not themselves a substantive basis for refusing to comply with a facially valid subpoena or court order.

> The DOJ *Touhy* regulations do not themselves create privileges to protect information. In fact, in 1958, Congress amended 5 U.S.C. § 301 to explicitly emphasize that nothing in the statute itself, and, therefore, nothing in the *Touhy* regulations promulgated thereunder,

22

may 'authorize withholding information from the public or limiting the availability of records to the public.'

Puerto Rico v. United States, No. 06-1305, 2006 WL 2795576, at * 8 (D.P.R. Sept. 26, 2006).

Based on the foregoing, it is unlikely that Defendants' proposal would unduly delay the current proceedings and, it appears that this court could order that the SSA authorize an employee to provide testimony relevant to the matters in this proceeding pursuant to a properly served Rule 45 subpoena.

## VI.     Privacy Concerns.

At the October Hearing, the Court expressed concern regarding how discovery would progress and in particular expressed its concern that discovery "would involve the privacy interests of the claimants who even the plaintiff alleges are innocent intermediaries." Oct. Trans., p. 15:17-24. Not only would the Defendants' proposal lead to a possible expedited resolution of the case, it would do so with little or no impact upon the privacy of the individual claimants because review of individual claim files would not be required during this phase of the litigation. This is an additional (and not insignificant) reason to adopt the Defendants' proposal.

4152737v1

**Conclusion.**

For the foregoing reasons, Defendants respectfully request that this Court enter an order that discovery in this matter will be conducted in two phases, as set out in the Proposed Scheduling Order annexed hereto as <u>Exhibit J</u>.

Respectfully Submitted,

CIGNA CORPORATION and LIFE INSURANCE COMPANY OF NORTH AMERICA

By their attorneys,

<u>*/s/ R. J. Cinquegrana*</u>
R. J. Cinquegrana (BBO # 084100)
Karen Collari Troake (BBO # 566922)
Andrew D. Ziegler (BBO # 660419)
Christopher R. Blazejewski (BBO #665258)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts  02110
Tel: 617-248-5000

Date:   December 11, 2006

4152737v1

**CERTIFICATE OF SERVICE**

I hereby certify that on December 11, 2006, copies of Defendants' Memorandum in Support of Phased Discovery, were served electronically and by first-class mail upon the attorneys of record for the Plaintiff and upon the United States Attorney.


 */s/ Andrew D. Ziegler*
Andrew D. Ziegler

4152737v1