**EXHIBIT A**

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* DAWN BARRETT | ) ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 03-12382-MLW |
| v. | ) ) | |
| CIGNA CORPORATION and LIFE<br>INSURANCE COMPANY OF NORTH<br>AMERICA | ) ) ) ) ) | |
| Defendants | ) ) | |

## JOINT STATEMENT
## PURSUANT TO LOCAL RULE 16.1

Pursuant to Local Rule 16.1(D) and the Court's October 5, 2006 Order, relator Dawn

Barrett ("Barrett") and defendants CIGNA Corporation ("CIGNA") and Life Insurance Company

of North America ("LINA"), hereby submit the following Joint Statement:

1.   **Agenda of Matters to be Discussed at the November 30, 2006 Scheduling Conference.**

    a.   Pre-trial schedule and discovery matters;

    b.   Trial by magistrate judge; and

    c.   Report on settlement discussion status.

4142586v3

**2.    Rule 26(f) Conference.**

Pursuant to Fed. R. Civ. P. 26(f) and Local Rule 16.1(B), the parties held three (3)

teleconferences on November 2, 2006, November 14, 2006, and November 27, 2006, which were

attended by Jack Cinquegrana, Karen Collari Troake and/or Andrew Ziegler for LINA and

CIGNA, and Lawrence P. Wilson, Kevin Parker and/or Peter Krupp for Barrett.  This Joint

Statement reports the results of those conferences and, except where indicated, jointly proposes a

discovery plan and pre-trial schedule as set forth below.

**3.    Rule 26(a)(1) Initial Disclosures.**

The parties have agreed to exchange initial disclosures, required by Fed. R. Civ. P. 26(a)(1),

on or before January 5, 2007.

**4.    Discovery and Scheduling.**

The parties were unable to agree regarding whether formal phasing of discovery was

necessary or what parameters should govern discovery.  The following sections set out the

parties' respective proposals and note areas (if any) where the parties may agree.

a.    The Plaintiff's Proposal.

Plaintiff is tailoring discovery to focus on the following **Subject Areas**.

1.    Cigna's conduct as a substantial factor in causing people to file SSDI
      claims.
2.    Cigna's reckless disregard for the merits of the claim for SSDI.
3.    That many of the SSDI claims which Cigna recklessly caused to be filed
      constitute false or fraudulent claims by persons whose LTD claims were
      ultimately denied by Cigna and whose SSDI claims were likewise denied.
4.    The number of claims for which Cigna denied LTD benefits and for which
      Social Security also denied SSDI
5.    The cost to the government of a false or fraudulent SSDI claim.

The Plaintiff proposed **Phased Discovery**, as follows

Plaintiff will initially send Interrogatories which seek to identify and quantify those
persons who fit the following criteria: (1) Cigna encouraged the person to file for
SSDI, (2) the person's SSDI claim was denied, and (3) Cigna denied LTD

benefits. Hereinafter, this group is referred to as the population.

After identifying the population of potential false claims above, Plaintiff will seek to begin a file review limited to a sub-group (randomly selected by perhaps date of filing or the first letter of the last name) to allow for a statistical sampling of the percentage of false claims that are likely to exist within the population identified through interrogatory responses. Plaintiff would intend for this review to be able to be accomplished within a single month after gaining access to the selected sub-group. This would not halt further file reviews but would allow the parties to know what Plaintiff contends that the total number of false claims is likely to be. This could be used for purposes of settlement or for purposes of a stipulation (for use at trial) as to the number of persons fitting certain criteria.

Accomplishing the above will depend on the ease with which Plaintiff is able to identify the population that meet the criteria in the first paragraph above. But Plaintiff hopes that the identification could occur in five months. The review of a sub-group could occur in one month. Then the remaining review would take an estimated five months.

Plaintiff will utilize requests for production to discover the practice of Cigna as it relates to encouraging people to apply for SSDI and as it relates to doing so recklessly.

| | |
|---|---|
| **Discovery Completion:** | September 14, 2007. |
| **Experts for Plaintiff:** | July 6, 2007 |
| **Experts for Defendant:** | August 3, 2007 |
| **Proposed Schedule for Filing Motions:** | |
| **Motions for Leave to Amend Pleadings:** | By May 4, 2007 |
| **Case Dispositive Motions:** | By September 21, 2007 |
| **Response to Case Dispositive Motions:** | By October 22, 2007 |
| **Non-Dispositive Motions:** | By September 28, 2007 |

b.    The Defendants' Proposal.

The Defendants propose that issues and discovery be bifurcated in order to first address

and resolve issues which would be controlling of the liability, if any, of the Defendants and,

therefore, could resolve the case in its entirety. These issues include: (1) whether the Court lacks

4142586v3

subject matter jurisdiction based upon a public disclosure within the meaning of the False Claims

Act ("FCA"); and (2) whether the Social Security Administration ("SSA") Application Form (the

"Application") is not "material" within the meaning of the FCA and whether it does not constitute

a "claim" within the meaning of the FCA. Addressing these issued first would focus discovery

primarily upon the SSA and would provide a path to resolving the case without invading the

privacy of thousands of claimants, which would result from the review of thousands of claims

files.

Based on the foregoing, the Defendants propose formal phasing of discovery as follows:

**PHASE I**

Scope: Discovery during this phase would be limited to the following issues: (1) whether

this Court lacks subject matter jurisdiction due to a public disclosure within the meaning of the

FCA; and (2) whether the Application is "material" and/or constitutes a "claim" within the

meaning of the FCA. Additionally, subject to a mutually agreed upon protective order, the

Defendants would provide Barrett with copies of the claims files for the individuals referred to in

the Second Amended Complaint as Claimants A through D during this phase of discovery. *See*

Second Amended Complaint and Demand for Jury Trial (the "Complaint"), ¶¶ 168-210.

Limitations: The following limitations would apply to Phase I only and would be subject

to modification upon motion by either party and by leave of Court:

- Five (5) depositions per side pursuant to Fed. R. Civ. P. 30(d)(2);
- Ten (10) interrogatories per side;
- Ten (10) requests to admit per side;
- Two (2) sets of requests for production of documents per side; and
- The deposition of each proposed expert pursuant to Fed. R. Civ. P. 30(d)(2).

Schedule: The proposals set forth below are subject to further motion by the parties, either

jointly or individually.

| Event | Proposed Deadlines |
|---|---|
| Production of Claim Files for Claimants A through D | January 12, 2007 |
| Amendment of Pleadings | January 26, 2007 |
| Completion of Fact Discovery | March 30, 2007 |
| Initial Expert Reports | April 20, 2007 |
| Rebuttal Expert Reports | May 4, 2007 |
| Close of Expert Discovery | June 1, 2007 |
| Filing of Dispositive Motions and Opening Briefs | June 29, 2007 |
| Response Briefs on Dispositive Motions | July 27, 2007 |
| Reply Briefs on Dispositive Motions | August 10, 2007 |
| Oral Argument on Dispositive Motions | To be set by Court |

### PHASE II

Scope: Discovery during this phase would cover the remaining issues in the case should the Court not decide summary judgment in Phase I of the case in favor of the Defendants. In the event discovery must focus on the review of claimants' claim files, the Defendants agree with Barrett that this phase of the case should involve, as part of the overall discovery, a streamlined approach to identifying and reviewing claims files.[1] According to Barrett, the relevant universe of claims files are those files where SSA denied benefits and LINA denied long term disability ("LTD") benefits. *See* Plaintiff's Proposal, *supra*. The Defendants cannot accurately identify this group of claim files from the information they maintain in the ordinary course of their business. Therefore, Defendants propose to identify the claimants who were referred to SSA vendors Allsup Inc. or Advantage 2000 Consultants, Inc. to assist in applying for SSDI benefits (the "Referrals"). From this group, a random subset would be identified through a procedure agreed

---

[1] The Defendants do not concede that any of these claims files are relevant. Moreover, the Defendants reserve their rights to object to the relevance and admissibility of these claims files at trial.

upon by the parties (the "Sample"). The sample would be provided to SSA, which would then (pursuant to Court order, if necessary) identify the claimants in the Sample who have been awarded benefits through the appeal level, including any closed period benefit. The claim files of the remainder of the Sample (the "Denials") would be produced for review by the Plaintiff, pursuant to an appropriate protective order.

Schedule: Following resolution of Phase I, the parties would meet and confer regarding proposed discovery limitations and scheduling that would apply to Phase II.

A Proposed Scheduling Order reflecting this proposal is annexed hereto as Exhibit A.

**5.    Protective Order.**

The parties have agreed to file a stipulated protective order governing the handling of confidential and proprietary materials produced in either phase of discovery.

**6.    Trial by Magistrate Judge.**

The parties do not consent to trial by Magistrate Judge.

**7.    Settlement.**

Pursuant to Local Rule 16.1(C), Barrett made a written settlement demand on the Defendants. The Defendants rejected that settlement demand. The Defendants believe that, at present, a settlement does not appear likely.

**8.    Certifications Pursuant to Local Rule 16.1(D)(3).**

a.    Barrett's certification is attached hereto as Exhibit B.

b.    The Defendants' certification is attached hereto as Exhibit C.

4142586v3

Respectfully Submitted,

DAWN BARRETT

By her attorneys,

CIGNA CORPORATION and LIFE
INSURANCE COMPANY OF NORTH
AMERICA

By their attorneys,

/s/ Peter B. Krupp
Peter B. Krupp (BBO # 548112)
LURIE & KRUPP LLP
One McKinley Square
Boston, Massachusetts  02109
Tel:  (617) 367-1970

/s/ R.J. Cinquegrana
R.J. Cinquegrana (BBO # 084100)
Karen Collari Troake (BBO # 566922)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts  02110
Tel: 617-248-5000

Date:   November 27, 2006

4142586v3

**EXHIBIT B**

United States General Accounting Office


GAO

Report to the Chairman, Special
Committee on Aging, U.S. Senate

July 1996

# SSA DISABILITY

# Return-to-Work Strategies From Other Systems May Improve Federal Programs







**United States**
**General Accounting Office**
**Washington, D.C. 20548**

**Health, Education, and**
**Human Services Division**

B-261785

July 11, 1996

The Honorable William S. Cohen
Chairman
Special Committee on Aging
United States Senate

Dear Mr. Chairman:

This report responds to your request that we identify (1) key practices used in the private sector to return disabled workers to the workplace and (2) examples of how other countries implement return-to-work strategies for people with disabilities. Such information could assist the Congress and the Social Security Administration as they explore ways to improve the success of federal disability programs in returning people with disabilities to the workplace.

We will send copies of this report to the Commissioner of Social Security, the Secretary of Education, the Secretary of Health and Human Services, and other interested parties. We will also make copies available to others upon request.

Please contact me on (202) 512-7215 if you or your staff have any questions concerning this report. Other GAO contacts and contributors to this report are listed in appendix VI.

Sincerely yours,

Jane L. Ross
Director, Income Security Issues

# Executive Summary

The Social Security Administration (SSA) operates the Disability Insurance (DI) and Supplemental Security Income (SSI) programs—the nation's two largest federal programs providing cash benefits to people with disabilities. SSA data show that between 1985 and 1994, the number of working-age people in these disability programs increased 59 percent, from 4 million to 6.3 million. Such growth has raised concerns that are compounded by the fact that less than half of 1 percent of DI beneficiaries ever leave the disability rolls by returning to work. In a recent report, GAO recommended that SSA place more emphasis on return-to-work efforts.[1] If an additional 1 percent of the 6.3 million beneficiaries were to leave SSA's disability rolls by returning to work, lifetime cash benefits would be reduced by an estimated $2.9 billion.[2]

The magnitude of disability costs in the workplace has caused growing concern in the private sector as well. As a result, businesses have begun developing strategies to control costs by intervening early and emphasizing measures to return people to work. By helping disabled workers return to the workplace, businesses are able to reduce costs such as disability benefit payments and disability insurance premiums. Also, social insurance programs in other countries focus on return to work and have implemented practices similar to those in the U.S. private sector.

The Chairman of the Senate Special Committee on Aging asked GAO to report on ways to improve SSA's return-to-work efforts. To develop this information, GAO identified (1) key practices used in the U.S. private sector to return disabled workers to the workplace and (2) examples of how other countries implement return-to-work strategies for people with disabilities (see chs. 2, 3, and 4). GAO surveyed individuals in the private sector generally recognized as leaders in developing disability management programs that focus on return-to-work efforts. GAO also did an extensive review of the literature on disability management in the private sector and on disability programs in other countries. To develop further information from other countries, GAO interviewed officials in Germany and Sweden because the disability programs in these countries have return-to-work policies and practices that have been identified by the U.S. private sector and other experts as being key to disability management.

---

[1] See SSA Disability: Program Redesign Necessary to Encourage Return to Work (GAO/HEHS-96-62, Apr. 24, 1996). See also Disability Insurance: Broader Management Focus Needed to Better Control Caseload (GAO/T-HEHS-95-164, May 23, 1995).

[2] GAO estimate based upon SSA actuarial estimates.

Executive Summary

## Background

Working-age adults with disabilities may obtain cash benefits and return-to-work services from a number of public and private programs. After the onset of a disabling condition, a worker with a temporary work incapacity may receive short-term cash benefits from an employer, private insurer, or workers' compensation program. When individuals cannot return to work, their last resort is long-term cash benefits provided by workers' compensation, private disability insurance, and/or DI. For people with disabilities who have low income and limited assets, long-term cash benefits are available through SSI, regardless of their participation in the labor force.

DI provides cash benefits to people with disabilities if they are covered under Social Security and SSA determines they are unable to work at gainful levels. After receiving DI benefits for 24 months, they become eligible for Medicare. According to SSA data, in 1994, about 3.96 million working-age people (aged 18 to 64) received DI benefits, which totaled about $33.7 billion. Included in the 3.96 million DI beneficiaries are 671,000 people who also received SSI disability benefits because of their low income and resources. SSI provides cash benefits for disabled, blind, and aged individuals whose income and resources are below a specified amount, and in most cases, SSI beneficiaries are eligible for Medicaid coverage. In 1994, about 2.36 million blind and disabled working-age people received SSI benefits only (and no DI benefits). Federal SSI benefits paid to blind and disabled people in 1994 totaled $18.9 billion.[3]

To be considered disabled by either program, a person must be unable to engage in substantial gainful activity because of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last 12 months or longer. Once a person is on the disability rolls, the individual continues to receive benefits until he or she dies, converts to Social Security retirement benefits at age 65, or is determined by SSA to no longer meet the earnings or medical eligibility requirements.

GAO's April report documented weaknesses in the design and implementation of DI and SSI program components that have limited SSA's ability to identify and expand beneficiaries' productive capacities to enable them to return to work. Eligibility requirements and the disability determination process give applicants the incentive to focus on their inabilities, not their abilities; beneficiaries receive little encouragement to

---

[3]The $18.9 billion consists of SSI payments to blind and disabled individuals, regardless of age, and to people eligible for both SSI and DI payments.

**Executive Summary**

use rehabilitation services; and work incentives offered by the programs are difficult to understand and do not overcome the financial risk of returning to work for many beneficiaries.

## Results in Brief

Return-to-work strategies and practices may hold the potential for improving federal disability programs by helping people with disabilities return to productive activity in the workplace and at the same time reduce program costs. GAO's analysis of practices advocated and implemented by the private sector in the United States and by social insurance programs in Germany and Sweden revealed three common strategies in the design of their return-to-work programs:

- Intervene as soon as possible after an actual or potentially disabling event to promote and facilitate return to work.
- Identify and provide necessary return-to-work assistance and manage cases to achieve return-to-work goals.
- Structure cash and medical benefits to encourage people with disabilities to return to work.

Disability managers emphasize that these return-to-work strategies are not independent of each other but work most effectively when integrated into a comprehensive return-to-work program. They spend money on return-to-work efforts because they believe these efforts are sound investments that reduce disability-related costs.

In comparison with the workers served by private sector programs, many people with disabilities served by SSA have little or no work history or current job skills. SSA also serves a population with a wide range of disabilities that often may be more severe than the disabilities of the average person served by private sector programs. Thus, SSA may face greater difficulty in returning some of its clients to the workplace. However, the experiences of Germany and Sweden show that return-to-work strategies are applicable to a broad and diverse population with a wide range of work histories, job skills, and disabilities. Although SSA faces constraints in applying these strategies, there are opportunities to better identify and provide the assistance that could enable more of SSA's clients to return to work. Even relatively small gains in return-to-work successes offer the potential for significant savings in program outlays.

# Principal Findings

## Intervene Early to Facilitate Return to Work

Advocates of early intervention believe that the longer an individual stays away from work, the less likely the individual is to return to work. Whether a person returns to work depends greatly on his or her personal motivation. Long absences from the workplace are believed to lead to a disability mindset—a condition of discouragement in which disabled workers, believing they will not be able to return to work, lose the motivation to try. Studies show that only one in two newly disabled workers who remain out on disability 5 months or more will ever return to work.

GAO's work shows that to encourage disabled workers and help them maintain motivation to work, return-to-work goals must be addressed from the onset of an emerging disability; return-to-work services, including medical and vocational rehabilitation services, should be provided at the earliest appropriate time; and employers should maintain communication with workers who are hospitalized or recovering at home.

Setting return-to-work goals soon after the onset of disability and providing timely rehabilitation services are believed to be critical in encouraging disabled workers to return to the workplace as soon as possible. Contacting a hospitalized worker soon after an injury or illness and then continuing to communicate with the worker recovering at home, for instance, helps reassure the worker there is a job to return to and that the employer is concerned about his or her recovery.

Rather than intervening early to facilitate return to work, the priority in the DI and SSI programs is to determine the eligibility of applicants to receive cash benefits, not to assess their return-to-work potential. Furthermore, return-to-work potential generally is addressed, if at all, only after benefits are awarded at the end of an often lengthy application process.

## Identify and Provide Necessary Return-to-Work Services and Manage Cases

By definition, disability management embodies a proactive approach to controlling disability costs while helping disabled employees return to work. This approach seeks to avoid unnecessary expenditures while investing in services tailored to individual circumstances that help achieve return-to-work goals for disabled workers. To do this, disability managers

strive to provide appropriate return-to-work services, closely manage cases when appropriate, provide transitional work opportunities, and coordinate with medical service providers.

In an effort to provide appropriate services, disability managers GAO interviewed strive to identify the individuals who are likely to be able to return to work and then identify the specific services that are needed to prepare each of those individuals. These disability managers believe that each person should be functionally evaluated after his or her medical condition stabilizes to assess potential for returning to work.

When appropriate, the disability managers GAO surveyed use case management techniques to coordinate the identification, evaluation, and delivery of disability-related services to individuals deemed to need such services to return to work. Transitional work allows workers with disabilities to ease back into the workplace in jobs that are less physically or mentally demanding than their regular jobs.

Disability experts also stress the need to ensure that physicians and other medical service providers understand the essential job functions of the disabled worker. Without this understanding, the worker's return to work could be delayed unnecessarily. Also, if an employer is willing to provide transitional work opportunities or other job accommodations, the treating physician must be aware of and understand these accommodations.

SSA, however, does not focus on identifying services that could enable individuals to return to the workplace. It does not functionally evaluate most beneficiaries; instead, SSA relies predominantly on matching an individual's medical symptoms, signs, and diagnostic results to a listing of impairments presumed to prevent work. Moreover, SSA's contacts with physicians are aimed at gathering medical evidence to determine work incapacity, not functional ability and return-to-work potential.

## Provide Incentives to Engage in Return-to-Work Efforts

Disability managers believe that a program's incentive structure can affect a disabled worker's decision on whether to attempt to return to work. The level of cash benefits paid to disabled workers can affect their attitude toward returning to work because, if disability benefits are too generous, they can create a disincentive for participating in return-to-work efforts. Disability managers also believe that retention of employer-sponsored medical benefits provides an incentive to return to work. Returning to

work is the way that disabled workers in the private sector can best ensure that they retain employer-sponsored medical benefits.

Although the structure of benefits plays a role in return-to-work decisions, disability managers emphasized that well-structured incentives are not sufficient in themselves to ensure a successful return-to-work program. Incentives must be integrated with other return-to-work practices. Disability managers also generally advocated including a contractual requirement for cooperation with a return-to-work plan as a condition of eligibility for benefits. They believe such a requirement helps motivate an individual with a disability to try to return to work.

In contrast, the current design of cash and medical benefits in the DI and SSI programs often presents more hindrances than incentives when beneficiaries consider returning to work. The structure of cash benefits can make it financially advantageous to remain on the disability rolls, and studies report that DI and SSI beneficiaries fear losing their premium-free Medicare or Medicaid benefits if they return to work.

## Recommendation to the Commissioner of SSA

In line with placing greater emphasis on return to work, GAO recommends that the Commissioner develop a comprehensive return-to-work strategy that integrates, as appropriate, earlier intervention, earlier identification and provision of necessary return-to-work assistance for applicants and beneficiaries, and changes in the structure of cash and medical benefits. The Commissioner should also identify legislative changes needed to implement such a program.

## Agency Comments

In commenting on a draft of this report, SSA agreed much can be learned from the return-to-work practices of the U.S. private sector and disability programs in Germany and Sweden. SSA cited several initiatives, such as expanding the pool of vocational rehabilitation service providers, as evidence that it places a high priority on return to work. However, GAO believes these steps, while in the right direction, do not constitute the fundamental redirection of goals and practices necessary to move the disability programs to a much greater emphasis on return to work. For example, increasing the number of vocational rehabilitation providers does not address the concern of earlier intervention.

SSA affirmed its interest in determining whether return-to-work strategies from other systems could be useful in the agency's attempts to improve

return-to-work outcomes. SSA emphasized that for such efforts to be fruitful, all players in the complex network of federal disability policy development and program execution would need to be involved. GAO agrees but believes SSA, as primary manager of the federal disability programs and as the entity with fiduciary responsibility for the trust funds, must take the lead in forging the partnerships and cooperation that will be needed in these redesign efforts.

# Contents

**Executive Summary** — 2

**Chapter 1**
**Introduction** — 12
Magnitude of Disability Costs Has Turned Private Sector's Attention to Improving Return-to-Work Programs — 13
SSA's Return-to-Work Efforts Have Been Static — 14
Private Sector Programs for Disabled Workers — 20
Disability Programs in Germany and Sweden — 22
Objectives, Scope, and Methodology — 25

**Chapter 2**
**Early Intervention Critical to Return to Work** — 28
Address Return-to-Work Goals Early — 29
Provide Return-to-Work Services at the Earliest Appropriate Time — 31
Maintain Communication With Disabled Workers — 33

**Chapter 3**
**Identifying and Providing Return-to-Work Services Effectively** — 35
Assess Return-to-Work Potential and Services Needed — 35
Offer Transitional Work Opportunities — 38
Use Case Management Techniques When Appropriate — 40
Ensure That Medical Service Providers Understand Essential Job Functions — 41

**Chapter 4**
**Work Incentives Facilitate Return to Work** — 43
Structure Cash Benefits to Provide Return-to-Work Incentive — 43
Maintain Medical Benefits for Disabled Employees Who Return to Work — 46
Require Cooperation With Return-to-Work Efforts — 47

**Chapter 5**
**Conclusions, Recommendation, and Agency Comments** — 48
Recommendation to the Commissioner of SSA — 49
Agency Comments — 50

**Appendixes**
Appendix I: Organizations Contacted During GAO's Review of U.S. Private Sector Disability Management Practices — 52
Appendix II: Survey on Disability Management Practices — 56

Contents

Appendix III: People and Organizations Contacted During GAO's
Review of Social Insurance Disability Programs in Germany and
Sweden                                                                    64

Appendix IV: Five-Step Sequential Evaluation Process for
Determining DI and SSI Disability                                         68

Appendix V: Comments From the Social Security Administration
and Our Evaluation                                                        70

Appendix VI: Major Contributors to This Report                           78

# Bibliography

79

# Related GAO Products

88

# Tables

Table 2.1: Key Early Intervention Practices                              28
Table 3.1: Key Practices in Identifying and Providing
Return-to-Work Services                                                  35
Table 4.1: Key Practices for Providing Incentives to Return to
Work                                                                     43

## Abbreviations

| | |
|---|---|
| ADA | Americans With Disabilities Act |
| CDR | continuing disability review |
| DDS | Disability Determination Service |
| DI | Disability Insurance |
| HHS | Department of Health and Human Services |
| RFC | residual functional capacity |
| SGA | substantial gainful activity |
| SSA | Social Security Administration |
| SSI | Supplemental Security Income |
| WBGH | Washington Business Group on Health |

Chapter 1

# Introduction

The Social Security Administration (SSA) operates the Disability Insurance (DI) and Supplemental Security Income (SSI) programs—the nation's two largest federal programs providing cash benefits to people with disabilities. From 1985 through 1994, the number of working-age DI and SSI beneficiaries (aged 18 to 64) increased 59 percent, from 4.0 million to 6.3 million, and cash benefits (adjusted for inflation) increased 66 percent.[4] This magnitude of growth has caused concerns that are compounded by the fact that less than half of 1 percent of DI beneficiaries ever leave the rolls by returning to work.

In our recent study of SSA's disability programs, we reported that despite the magnitude of program growth, SSA has not improved its emphasis and efforts in returning disability beneficiaries to the workplace.[5] By contrast, the private sector, in response to growth in disability, has begun developing and implementing strategies to improve return-to-work programs for disabled workers. Moreover, the emphasis on return to work is not limited to the private sector in the United States—disability programs financed by social insurance systems in other countries also focus on return to work and have implemented practices similar to those in the U.S. private sector.

This report focuses on identifying return-to-work practices in the private sector and other countries that may hold lessons for improving SSA's return-to-work efforts. Improving SSA's return-to-work efforts has important implications not only for the individuals who can return to productive activity in the workplace, but also for controlling the costs of federal disability programs. SSA estimates that lifetime cash benefit payments are reduced by about $60,000 when a DI beneficiary leaves the rolls by returning to work and by about $30,000 when an SSI disability beneficiary leaves the rolls by returning to work.[6]

---

[4]According to SSA data, from 1985 through 1994, the number of working-age disabled beneficiaries grew from 2.7 million to almost 4.0 million in the DI program and from 1.3 million to almost 2.4 million in the SSI program. Furthermore, DI beneficiaries who also qualified for SSI benefits increased from 324,000 to 671,000. To avoid duplicative counting, such people are included in the DI data but not in the SSI data. In 1994, working-age DI beneficiaries received $33.7 billion in DI payments; blind and disabled beneficiaries (including those of all ages and those dually eligible for SSI and DI) received $18.9 billion in federal SSI payments.

[5]See SSA Disability: Program Redesign Necessary to Encourage Return to Work (GAO/HEHS-96-62, Apr. 24, 1996). See also Disability Insurance: Broader Management Focus Needed to Better Control Caseload (GAO/T-HEHS-95-164, May 23, 1995).

[6]The estimated savings, provided by SSA's actuarial staff, are based on fiscal year 1994 data and represent the discounted present value of the cash benefits that would have been paid over a lifetime if the individual had not left the disability rolls by returning to work.

In comparison with the workers served by private sector programs, many people with disabilities served by SSA have little or no work history or current job skills. SSA also serves a population with a wide range of disabilities that often may be more severe than the disabilities of the average person served by private sector programs. For example, many workers served by private sector programs have short-term disabilities, which SSA's programs do not cover. SSA serves people with long-term disabilities, many of whom have not been successful in returning to work through private sector programs. Thus, SSA may face greater difficulty in returning some of its clients to the workplace.

However, the experiences of Germany and Sweden show that return-to-work strategies are applicable to a population with a wide range of work histories, job skills, and disabilities. Moreover, even relatively small gains in return-to-work successes offer the potential for significant savings in program outlays. For example, if an additional 1 percent of the 6.3 million beneficiaries were to leave SSA's disability rolls by returning to work, lifetime cash benefits would be reduced by an estimated $2.9 billion.[7]

## Magnitude of Disability Costs Has Turned Private Sector's Attention to Improving Return-to-Work Programs

The magnitude of disability costs has caused growing concern in the private sector. Some disability-related costs borne by the private sector are more obvious than others. The most apparent costs include insurance premiums, cash benefits, rehabilitation benefits, and medical benefits paid through workers' compensation and employer-sponsored disability insurance programs. Workers' compensation laws require employers to bear the cost of disabilities caused by an individual's job, and some employers offer short-term or long-term insurance or both for disabilities not caused by the individual's job. However, in addition to the costs of such programs, there may be other, less obvious costs such as payments to employees who must work overtime, the added expense of training and using temporary workers, and retraining disabled employees when they return to work. Taking such costs into account, studies have estimated that the employer's full cost of disability ranges from 6 to 12 percent of payroll.[8]

---

[7]GAO estimate based upon SSA actuarial estimates.

[8]UNUM, Disability Management: Costs and Solutions (Portland, Me.: UNUM Corporation, July 1994), p. 23; and Phillip L. Polakoff and John S. Tortarolo, "The Future of Disability Management Is ... Integration," Washington Business Group on Health, 1994 National Disability Management Conference (Washington, D.C.: WBGH, 1994), p. 2.

**Chapter 1**
**Introduction**

At one time, the common business practice was to encourage someone with a disability to leave the workforce. In recent years, however, concern has grown about the effect of disability on costs, productivity, competitiveness, and employee and customer relations. As a result, the private sector has begun to develop and implement strategies for helping disabled workers return to work as quickly as possible.[9] These efforts include intervening as soon as possible after a disabling event occurs, helping the worker set return-to-work goals, providing the services the worker needs to return to work, and offering incentives that encourage return to work. Similar approaches have also been implemented in the social insurance disability programs of other countries.

To develop information on private sector return-to-work practices for this report, we surveyed 21 people from the private sector recognized for their involvement in developing disability management programs that focus on return to work. As well as working to develop return-to-work programs within their own companies, all 21 have been actively involved in efforts by the Washington Business Group on Health or the Health Insurance Association of America to develop and promote such programs.[10] As a group, these 21 individuals represented extensive experience in managing disability under workers' compensation and disability insurance programs. We conducted in-depth interviews with five respondents to supplement the survey responses. (See app. I for a list of individuals contacted during our review.)

## SSA's Return-to-Work Efforts Have Been Static

Technological, medical, and societal changes have increased the potential for more people with disabilities to work, and some SSA data indicate that as many as 3 out of 10 persons on the disability rolls may be good candidates for return to work. However, few beneficiaries ever leave the rolls by returning to work. For example, less than half of 1 percent of the beneficiaries have left the DI program annually during the last several years because they returned to work, according to SSA data.

---

[9]Private sector disability managers also place great emphasis on efforts to prevent disabilities. Implementing safety and prevention programs requires direct access to workers and their workplace. While employers have such access, SSA does not; therefore, our report focuses on return-to-work efforts.

[10]The Washington Business Group on Health (WBGH) is a nonprofit organization of nearly 200 employers from all major segments of U.S. industry. In 1990, with funding from the U.S. Department of Education's National Institute on Disability and Rehabilitation Research, WBGH established the Institute for Rehabilitation and Disability Management. WBGH also sponsors an annual national disability management conference.

Chapter 1
Introduction

As we recently reported, SSA focuses little attention on returning beneficiaries to the workplace. SSA's capacity to identify and assist in expanding beneficiaries' productive capacities have been limited by weaknesses in the design and implementation of the DI and SSI programs. SSA does not have a system for functionally evaluating each individual's return-to-work potential and identifying the return-to-work services needed by those who have the potential to return to the workplace. Instead, SSA's primary focus is on processing disability applications to determine whether applicants meet disability criteria and then paying benefits to those found eligible.

## DI and SSI Program Structure

The DI and SSI programs pay disability benefits to people who have long-term disabilities. To be eligible for benefits, an adult must have a medically determinable physical or mental impairment that (1) is expected to last at least 1 year or result in death and (2) prevents the individual from engaging in substantial gainful activity. Regulations currently define substantial gainful activity as work that produces countable earnings of more than $500 a month for disabled individuals and $960 a month for individuals who are blind. Furthermore, to qualify, an individual not only must be unable to do his or her previous work, but—considering age, education, and work experience—the individual also must be unable to do any other kind of substantial work that exists in the national economy.

Although both programs use the same definition of disability, they differ in important ways. Established under title II of the Social Security Act, DI is an insurance program funded by payroll taxes paid by workers and their employers into a Social Security trust fund.[11] Similar to private long-term disability insurance programs, the DI program is for workers who have lost their source of income because of long-term disability. To be insured under DI, an individual must have worked for certain minimum periods with a specified minimum level of earnings in jobs covered by Social Security. Reflecting the program's long-term disability character, DI benefits generally cannot begin until 5 months after the onset of disability. Medicare coverage is provided to beneficiaries 24 months after entitlement to DI cash benefits commences.

By contrast, the SSI program, established under title XVI of the Social Security Act, is not an insurance program and has no prior work requirements. Financed from general tax revenues, SSI is a means-tested

---

[11]Federal Insurance Contribution Act payroll taxes are allocated among the Disability Insurance Trust Fund, Old Age and Survivors Trust Fund, and the Medicare Trust Fund.

Chapter 1
Introduction

income assistance program for disabled, blind, or aged individuals who have low income and limited resources, regardless of work history.[12] Unlike the DI program in which benefits generally cannot begin until 5 months after disability onset, SSI benefits begin immediately upon entitlement. In most cases, SSI entitlement makes an individual eligible for Medicaid benefits.

Because the SSI program is a means-tested income assistance program with no work history requirements, many of the beneficiaries it serves may have different characteristics than those served by private sector programs. By definition, individuals qualify for employer-sponsored disability benefits because they were employed at the time they became disabled. They therefore have recent work histories and current job skills when they apply for benefits. In contrast, many SSI applicants have little or no recent work history or current job skills. An SSA study in 1994 found that 42 percent of SSI applicants reported leaving their last job more than 12 months before applying for benefits, and another 27 percent said they did not know when they left their last job.[13]

When individuals apply for DI or SSI disability benefits, SSA relies on state Disability Determination Services, agencies that are funded by SSA, to determine the medical eligibility of applicants. If found disabled, the beneficiary receives benefits until he or she dies, converts to Social Security retirement at age 65, or is determined by SSA to be no longer eligible for benefits because of earnings or medical improvement. The law requires SSA to conduct a continuing disability review (CDR) at least once every 3 years to redetermine the eligibility of DI beneficiaries if medical improvement is possible or expected.[14,15] Otherwise, SSA is required to schedule a CDR at least once every 7 years.

---

[12]General revenues include taxes, customs duties, and miscellaneous receipts collected by the federal government that are not earmarked by law for a specific purpose.

[13]See U.S. Department of Health and Human Services (HHS), Social Security Administration, Results of 1994 Two-Day Field Office Survey of Disability Applicants, agency correspondence S5H, Mar. 22, 1994. In this study, Social Security field offices surveyed applicants for disability benefits on 2 days during 1994. Field office staff administered the survey after completion of the initial claims interview.

[14]For a more complete discussion of SSA's performance in completing CDRs, see GAO/T-HEHS-95-164, May 23, 1995.

[15]The Social Security Independence and Program Improvements Act of 1994 (P.L. 103-296) directed SSA to perform a minimum number of CDRs for SSI beneficiaries. As now required, SSA plans to conduct 100,000 CDRs on SSI adults and on one-third of SSI children turning age 18 for each of the 3 fiscal years beginning in 1996.

Chapter 1
Introduction

## Redesign of SSA's Disability Programs Needed to Encourage Return to Work

SSA's process for determining disability generally does not directly assess each applicant's functional capacity to work.[16] The Social Security Act defines disability in terms of the existence of physical or mental impairments that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. In implementing the act through its regulations, SSA has developed a Listing of Impairments (generally referred to as "the listings") identifying some medical conditions that are presumed to be sufficient in themselves to preclude individuals from engaging in substantial gainful employment.[17] The presumed link between inability to work and presence of such medical conditions establishes the basis for SSA's award of disability benefits.

According to SSA, the medical conditions identified in the listings serve as proxies for functional evaluations because such impairments are presumed to be severe enough to impose functional restrictions sufficient to preclude any substantial gainful activity. According to SSA data, about 70 percent of new awardees are found to be eligible because their conditions meet or equal listed impairments that serve as proxies for functional assessments of ability to work. Only the remaining 30 percent of new awardees are eligible because they have been further evaluated on the basis of separately developed nonmedical factors, including residual functional capacity, age, education, and vocational skills.

Relevant studies, however, indicate that the scientific link between medical condition and work incapacity is weak. While it is reasonable to expect that some medical impairments will completely prevent individuals from engaging in any minimal work activity (for example, those who are quadriplegic with profound mental retardation), it is less clear that some other impairments that qualify individuals for disability benefits completely prevent individuals from engaging in any substantial gainful activity (for example, those who are missing both feet). Moreover, while most medical impairments may have some influence over the extent to which an individual is capable of engaging in gainful activity, other factors—vocational, psychological, economic, environmental, and motivational—are often considered to be more important determinants of work capacity.

---

[16]App. IV describes the eligibility determination process in more detail.

[17]SSA has reported that "some, but not all, of the Listings consider functional consequences of an impairment ..." and that "functional considerations vary significantly among the Listings." See HHS, SSA, Plan for a New Disability Claim Process, SSA Pub. No. 01-0005 (Sept. 1994), p. 11. In addition, according to SSA, the reliability of the listings has not been rigorously evaluated.

**Chapter 1**
**Introduction**

Beyond the issue of whether SSA's eligibility determination process adequately assesses work capacity, the process itself diverts the applicant's attention from the possibility of returning to work. Instead, the process focuses the applicant's attention on proving that he or she is unable to work. From the moment an individual applies for disability benefits, SSA's eligibility determination process (which can take from a minimum of several months to 18 months or longer for individuals who initially are denied and appeal) focuses on proving or disproving that the individual meets SSA's disability definition, not on assessing how the individual could be helped to return to work.

The eligibility determination process itself may erode motivation to work. By the time applicants are approved to receive benefits, they have been through a lengthy process that requires them to prove an inability to work; they have testified about their disabilities before program officials and the health care community; family and friends may have helped to demonstrate their work incapacity; and being out of the workforce may have eroded their marketability. These factors are believed to reduce receptivity to any efforts aimed at returning to work.

The Social Security Act states that people applying for disability benefits should be promptly referred to state vocational rehabilitation agencies for services to maximize the number of such individuals who could return to productive activity. The Rehabilitation Act of 1973, as amended, authorizes the Department of Education's vocational rehabilitation program, which provides federal funds to a network of state vocational rehabilitation agencies, to operate the country's public vocational rehabilitation program. The federal share of funding for these services is about 80 percent; the states pay the balance.

Under current procedures, the Disability Determination Service in each state decides whether to refer DI and SSI applicants to state vocational rehabilitation agencies, which in turn decide whether to offer them services such as guidance, counseling, and job placement, as well as therapy and training. In practice, the Disability Determination Services refer, on average, only about 8 percent of DI and SSI beneficiaries to state vocational rehabilitation agencies, and we have estimated that less than 10 percent of those referred actually were accepted as clients.[18] In total, these state agencies have little impact on DI and SSI, successfully

---

[18]See Social Security: Little Success Achieved in Rehabilitating Disabled Beneficiaries (GAO/HRD-88-11, Dec. 7, 1987).

**Chapter 1**
**Introduction**

rehabilitating only about 1 out of every 1,000 beneficiaries, on average, each year.

State vocational rehabilitation agencies may be cautious about accepting DI beneficiaries because SSA does not contribute to the cost of services these agencies provide unless a beneficiary successfully returns to work.[19] For payment purposes, SSA defines success as returning to work for 9 continuous months with earnings at the substantial gainful activity level; whereas, state vocational rehabilitation agencies, on the basis of Rehabilitation Services Administration regulations, define success for all other clients as placing the individual in suitable employment, paid or unpaid, for 60 days. In early 1996, SSA began collecting information on the number of referrals from Disability Determination Services that the state vocational rehabilitation agencies accept. This step is the starting point of the SSA's implementation of new regulations allowing it to use vocational rehabilitation service providers other than state agencies.

Whether beneficiaries receive vocational rehabilitation services when such services would be most effective is also an issue. SSA does not have access to disabled workers until they come to SSA to apply for benefits. SSA survey results indicate that nearly half of DI and SSI applicants with work histories have not worked for more than 6 months immediately before applying to SSA for disability benefits. But even after they apply, vocational rehabilitation services can be delayed for long periods because, generally, SSA does not refer anyone for those services until he or she has been approved as a beneficiary—a process that can take several months and may take 18 months or longer.

DI and SSI disability beneficiaries may not view returning to work as an attractive option because, by doing so, they risk losing the security of a guaranteed monthly income and medical coverage. To reduce this risk, the Congress has established incentive provisions to safeguard cash and medical benefits while a beneficiary tries to return to work. However, because of weaknesses in design and implementation, these incentives have not encouraged many beneficiaries to attempt to return to work. The work incentives do not appear sufficient to overcome the prospect of a drop in income for many who face low-wage employment or to allay the fear of losing medical coverage and possibly other federal and state assistance.

---

[19]Through 1981, SSA allocated funds to state vocational rehabilitation agencies to finance services provided to beneficiaries regardless of rehabilitation outcome. According to SSA, success rates were not much higher under this system than under the current reimbursement program.

**Chapter 1
Introduction**

# Private Sector Programs for Disabled Workers

Private sector businesses underwrite all or part of two primary disability benefit programs for disabled workers: workers' compensation programs and employer-sponsored disability insurance plans. Growing concerns about the magnitude of disability costs have prompted many in the private sector to turn their attention to developing approaches to manage disability. Advocates of disability management stress the need to develop an integrated approach to manage all types of disability cases, including workers' compensation and employer-sponsored disability insurance.

## Workers' Compensation Programs

Workers' compensation programs are designed to provide medical care and cash benefits to replace lost earnings when workers are injured or become ill in connection with their jobs. Each state has enacted its own workers' compensation requirements for people employed in that state. As of 1992, workers' compensation laws covered about 88 percent of the nation's wage and salary workers.[20] Only in New Hampshire does the state law cover all jobs.[21]

Workers' compensation programs are financed almost exclusively by employers and are based on the principle that the cost of work-related accidents is a business expense. Most states permit employers to carry insurance against work accidents with commercial insurance companies or to qualify as self-insurers by giving proof of financial ability to carry their own risk. States also may impose requirements that affect how employers and insurers manage workers' compensation cases. For example, some states require that employers and insurers offer specified rehabilitation services, leaving disability managers with no discretion in deciding whether the services are needed.

A large majority of compensation cases involve temporary total disability, which means the worker is unable to work while recovering from an injury but is expected to recover fully. When it is determined that the worker is permanently and totally disabled for any type of gainful employment, then permanent total disability benefits are payable. Both temporary and permanent total disability are usually compensated at the same rate, which is usually calculated as a percentage of weekly earnings—most commonly two-thirds of earnings. All programs, however, place dollar maximums on weekly benefits payable.

---

[20]This figure of 88 percent includes federal workers' compensation laws that cover federal government employees, longshore and harbor workers, and coal miners with "black lung" disease.

[21]Among the workers not covered by other states' programs, the most common are those in domestic service, agricultural employment, and casual labor.

**Chapter 1
Introduction**

When people receiving workers' compensation benefits also qualify for DI benefits, SSA generally reduces their DI benefits by the amount of cash benefits they receive under workers' compensation. But the number of people with reduced DI benefits is relatively small—in 1992, about 103,000 out of about 3.2 million DI beneficiaries had their DI benefits reduced by the amount of their workers' compensation benefits, according to the National Academy of Social Insurance.

## Employer-Sponsored Disability Insurance Plans

While workers' compensation replaces income lost because of work-related injuries and illnesses, some employers sponsor disability insurance plans that replace income lost because of other injuries and illnesses. These plans can provide short-term or long-term disability coverage or both. Employers who sponsor disability insurance plans either self-insure or use commercial insurers to provide coverage.

### Short-Term Disability Insurance

About 44 percent of all private employees have some type of short-term disability insurance that is provided and paid for, at least in part, by employers, according to National Academy of Social Insurance estimates based on Department of Labor data. Five states—California, Hawaii, New Jersey, New York, and Rhode Island—have mandatory temporary disability insurance programs that are financed by employers and/or employees. These programs typically pay 50 percent of prior pay for 26 to 52 weeks when workers cannot perform regular or customary work because of a physical or mental condition.

Employers may purchase sickness and accident insurance from commercial insurers or they may self-insure. Under short-term disability insurance, disability generally is defined as the inability to perform one's own occupation, and generally benefit payments begin only a few days after the disability begins. Benefits usually last for up to 6 months and typically replace about 50 percent of the worker's prior earnings.

### Long-Term Disability Insurance

About 25 percent of all private employees have some type of private long-term disability insurance that is paid for, at least in part, by employers, according to National Academy of Social Insurance estimates based on Department of Labor data. Private long-term disability benefits usually do not begin until about 3 to 6 months after the onset of disability, or after short-term disability benefits are exhausted. The benefits usually are designed to replace a specified percentage of predisability earnings—most commonly 60 percent. Although long-term plans may initially pay benefits based on the recipient's inability to perform his or her

**Chapter 1**
**Introduction**

own occupation, after 2 years they generally pay benefits only if the individual is unable to perform any occupation.

Private employees who have no employer-sponsored long-term disability insurance generally must look to SSA's DI program as their primary source of disability assistance.[22] Although some individuals may purchase their own individual disability insurance coverage, most individuals rely on the DI program for long-term disability benefits and medical coverage. The DI program is the safety net for people who are unable to work and have no other source of benefits or assistance in returning to work.

Almost all private long-term disability insurance benefits are coordinated with DI benefits; that is, private benefits are reduced dollar for dollar by the amount of DI benefits. The rationale for reducing private benefits is to provide an incentive to return to work by paying only the targeted partial replacement of earnings. Also, reducing private benefits dollar for dollar against DI benefits can lower disability insurance premiums. As a result, it is common for private plans to require claimants to apply for DI benefits.

## Disability Programs in Germany and Sweden

The disability programs financed by the social insurance systems in Germany and Sweden employ policies and practices that have been identified by the U.S. private sector and other experts as being key to disability management. Programs in both Germany and Sweden offer an array of services, assistance, and incentives to help people with disabilities remain at or return to work. Germany has a long-standing tradition of emphasizing rehabilitation over granting permanent disability benefits (more commonly referred to as pensions), and Sweden has only recently adopted an emphasis on returning people with disabilities to work.

## Disability Programs in Germany Emphasize Rehabilitation Over Pensions

German laws and policies stress the goal of "rehabilitation over pension." This means that cash benefits are awarded only after it is determined that a person's earning capacity cannot be restored by rehabilitation or other interventions. Under German social law, rehabilitation is an entitlement for people with physical or mental disabilities and for those threatened by such disabilities.

In Germany, disability pensions, rehabilitation, and other forms of return-to-work assistance are provided by a complex system of pension,

---

[22]Besides long-term disability insurance, some individuals may work for employers who have pension and retirement plans that provide disability benefits.

**Chapter 1**
**Introduction**

employment, accident, and health (often referred to as sickness) insurance funds.[23] For people with disabilities that resulted from work-related accidents or occupational diseases, accident insurance finances disability pensions as well as medical and vocational rehabilitation. Although most non-work-related disability pensions are paid by the pension insurance funds, most of the return-to-work assistance provided to people with disabilities is financed by employment insurance. However, to reduce the number of people requiring permanent disability benefits, the pension insurance funds pay for medical and vocational rehabilitation for individuals meeting certain work requirements.[24] For those who have not worked, employment assistance is available from public social assistance and the employment office.

All disability pension applicants are considered for rehabilitation and for return to work. Those who are able to work in their former or similar occupations and earn at least half of the average income in that profession are not eligible for any pension, regardless of the disabling condition. If successful rehabilitation seems unlikely, or fails, the pension insurance funds may grant a full or partial pension on either a permanent or temporary basis to a person with reduced earnings capacity caused by a disability.

Most disability pensions awarded in Germany are full and permanent. Full or "total disability" pensions are granted to people who can no longer engage in gainful employment. Partial or "occupational disability" pensions may be awarded to people who, for health reasons, can only earn less than half of the amount earned by a healthy person in the same or comparable occupation. A temporary "fixed-term" pension—either full or partial—may be awarded if there are reasonable grounds to believe that the reduced earnings capacity can be remedied within a foreseeable period.

---

[23]Regulated by law, the organizations that administer these compulsory social insurance funds are autonomous bodies in that they are managed by employer and employee representatives. Because responsibility for rehabilitation is shared by the different social insurance funds and programs, standardization of benefits and interagency coordination have been mandated by law. The Federal Rehabilitation Council—composed of representatives of the various social insurances and programs—was founded to help coordinate the different insurance funds in lieu of government control. The Ministry of Labor and Social Affairs influences policy and provides general supervision.

[24]To receive vocational rehabilitation from the pension insurance funds, individuals must have been in covered employment or activity before their disabling conditions, and must have contributed to the pension insurance fund for at least 15 years; have contributed for 3 of the last 5 years and would receive a pension because of reduced working capacity; or have already received medical rehabilitation financed by the pension funds. People who do not meet the work requirements of the pension insurance funds and who have disabling conditions that are not work-related receive return-to-work assistance through the employment office, which administers the employment insurance funds.

**Chapter 1**
**Introduction**

## Disability Program in Sweden Now Emphasizes Return-to-Work Goal

The goal of Swedish disability policy is to provide people with disabilities the same opportunity as others for earning a living and participating in community life. Programs for assisting people with disabilities operate within the broader structure of the country's universal social insurance system—providing protection against sickness, work injury, disability, old age, and unemployment—and its health and employment programs.[25] Social insurance offices in Sweden are responsible for awarding disability benefits (or pensions) and, since 1992, for leading rehabilitation efforts.[26] To facilitate rehabilitation, the social insurance offices have been allocated special funds for purchasing return-to-work services and assistance from either public or private sources.[27]

Decision-making in Sweden's social insurance system starts with the identification of individuals who may need rehabilitation or other forms of employment assistance to return to work. If, however, an individual is deemed unlikely to return to work, or if rehabilitation is unsuccessful, then a disability pension may be granted.

Disability pensions are based on reduced work capacity, not the presence of a particular illness or injury. Under Swedish law, permanent or temporary disability pensions can be awarded to individuals between the ages of 16 and 64 and who because of illness or other reductions in physical or mental performance cannot support themselves by employment. If work capacity is permanently reduced by at least 25 percent, Swedish nationals may receive a basic disability pension, regardless of work history.

Full, three-quarters, half, or one-quarter basic pensions may be granted to individuals with disabilities, depending upon the extent to which work capacity is reduced.[28] In addition to a basic pension, an individual with a work history may also receive a supplementary pension based on

---

[25]The Swedish social insurance system also includes parental insurance, child allowances, and maintenance advances.

[26]Disability pensions are centrally administered and regulated by the National Social Insurance Board in Sweden; local and regional social insurance offices carry out day-to-day program operations and decision-making. The National Social Insurance Board is an independent governmental authority under the jurisdiction of the Ministry of Health and Social Affairs.

[27]Return-to-work assistance in Sweden is also financed by the labor market authorities.

[28]A full disability pension from the basic pension scheme is the same as a full old-age pension.

**Chapter 1**
**Introduction**

employment time and earnings. Sweden also grants temporary disability pensions if the reduction in work capacity is not considered permanent.[29]

A variety of other cash benefits may also be awarded in Sweden. Sickness benefits may be paid indefinitely to individuals with reduced work capacity. Pension supplements are available to those receiving only the basic pension or who have a low supplementary pension. Disability allowances provide compensation for extra costs that people incur from their disabilities. And rehabilitation allowances cover loss of earnings and certain kinds of expenditures for people participating in vocational rehabilitation.

## Objectives, Scope, and Methodology

The Chairman of the Senate Special Committee on Aging asked us to report on ways to improve SSA's return-to-work efforts. To develop this information, we (1) identified key practices used by U.S. private sector companies to return disabled workers to the workplace and (2) obtained examples of how other countries' social insurance programs approach returning people with disabilities to work (discussed in chs. 2, 3, and 4).

## U.S. Private Sector

To develop the information on the private sector in this report, we interviewed officials of selected employers, insurers, and other organizations known for their leadership in disability management (see app. I). We reviewed documents they provided, and we also performed an extensive review of literature on disability management.

In addition, through a mail survey, we obtained the views of 21 disability managers from companies or other organizations that are leaders in developing disability management programs.[30] As a group, these 21 individuals represented extensive experience in managing disability under workers' compensation and disability insurance programs. Of the 21 individuals, 8 had managed only disability insurance cases; 4 had managed only workers' compensation cases; and 9 had managed both. We did not verify that the information reported in the responses to our survey was factually accurate, but we conducted extensive interviews with five respondents to supplement the survey responses.

---

[29]The temporary pension is granted if the disability, while not permanent, is expected to continue for a considerable period—generally, a minimum of 1 year.

[30]We sent the survey instrument to disability managers of 26 companies, and 21 responded.

**Chapter 1**
**Introduction**

Our survey instrument presented the respondents with a list of disability management practices and asked whether their current programs incorporated each practice. We then instructed them to assume they were designing a model disability management program and asked them to assess how important they believed each practice would be in their model program. We asked them to assess the importance of each practice on a scale of 1 to 5, with 1 equaling "not important" and 5 equaling "very important," regardless of whether their current programs incorporated that practice.

Appendix II presents the survey instrument as well as data on how many respondents said their companies had incorporated each disability management practice in their programs. It also shows the mean rating of the importance that the respondents placed on including each practice in a model disability management program. The results of our survey represent the views of the disability managers who responded and should not be considered necessarily representative of the views of other disability managers. However, as we intended, the results illustrate what "leading edge" companies believe is important.

In addition, we obtained comments from disability managers of 15 companies on a summary of our analysis of private sector return-to-work practices. We asked them to assess the accuracy, completeness, objectivity, and soundness of our analysis. In general, they agreed with all aspects of our analysis, and we made only minor technical changes to this information based on their comments. A bibliography of the literature we used in our analysis of private sector disability management and a list of related GAO products are at the end of this report.

While many in the private sector believe that their proactive return-to-work efforts have resulted in net dollar savings, there have been no rigorous studies that present conclusive data on the cost-effectiveness of disability management, particularly with respect to the extent to which specific components of return-to-work programs may be responsible for cost savings.

## Germany and Sweden

To obtain examples of how other countries' social insurance programs approach returning people with disabilities to work, we did an extensive review of the literature on disability programs in other countries. To develop further information on return-to-work approaches in other countries, we interviewed a number of program officials and other experts

**Chapter 1**
**Introduction**

on disability programs in Germany and Sweden, and reviewed the documents they provided. For each country, we obtained information on (1) program goals, benefits, and incentives; (2) early intervention efforts; (3) the type of return-to-work measures and services offered as well as how the assistance is provided and funded; (4) the eligibility decision-making process; and (5) how cases are managed when return-to-work services are provided. Appendix III lists the people we interviewed in Germany and Sweden.

We selected disability programs in Germany and Sweden for review because (1) both countries have political structures and standards of living, including the use of technology, similar to those in the United States, and (2) their disability programs have policies and practices that have been identified by the U.S. private sector and other experts as being key to disability management: early intervention and an emphasis on return to work through the provision and management of services, incentives, and rehabilitation.

As with disability management programs in the U.S. private sector, social insurance programs in Germany and Sweden spend money on return-to-work efforts to reduce disability costs. However, in general, rigorous studies demonstrating the cost-effectiveness of programs in Germany and Sweden do not exist. Where appropriate, we discuss the few studies that have examined outcomes of certain practices.

We did not independently verify the accuracy of the data used in this report. Except for this, our work was performed in accordance with generally accepted government auditing standards between February 1995 and March 1996.

Chapter 2

# Early Intervention Critical to Return to Work

Respondents to our private sector survey generally indicated they believe that early intervention is of paramount importance in returning disabled workers to the workplace. Early intervention involves the initiation of stay-at-work or return-to-work efforts as soon as possible after a disabling, or potentially disabling, event occurs. The respondents to our survey stressed the importance of several early intervention practices in their return-to-work programs (see table 2.1).[31]

**Table 2.1: Key Early Intervention Practices**

|  | Intervene early |
| --- | --- |
| Practice 1 | Address return-to-work goals from the beginning of an emerging disability |
| Practice 2 | Provide return-to-work services at the earliest appropriate time |
| Practice 3 | Maintain communication with workers who are hospitalized or recovering at home |

Disability management literature supports the respondents' focus on early intervention, emphasizing that the longer an individual remains away from work because of a disabling condition, the less likely it is that the individual will ever return to work. One study emphasized that the timing of intervention is not a question of months, but of days or even hours after a disabling event occurs.[32,33] The literature emphasizes that disability cannot be explained solely by a person's medical condition and that the decision to return to work depends greatly on the disabled worker's personal motivation.

In this view, long absences from the workplace because of disability can lead to a disability mind-set—a condition of discouragement in which disabled workers, believing they will not be able to return to work, lose the motivation to try. Studies have shown that only one in two newly disabled workers who remain out on disability 5 months or more will ever return to work.[34] According to one study, a key to disability management

---

[31]Survey respondents we interviewed said that good return-to-work practices apply to all types of disabilities. The effectiveness of any given practice is independent of whether disabilities arise from work-related or non-work-related injuries or illnesses.

[32]H. Allan Hunt, Rochelle V. Habeck, Patricia Owens, and others, "Disability and Work: Lessons From the Private Sector," paper prepared for the Disability, Work, and Cash Benefits Conference, sponsored by the National Academy of Social Insurance and the National Institute for Disability and Rehabilitation Research, Santa Monica, Calif., Dec. 8-10, 1994, p. 32.

[33]SSA cannot intervene at such an early stage because it does not have access to disabled workers until they come to SSA to apply for benefits, which can be many months after the onset of disability.

[34]Sheila H. Akabas, Lauren B. Gates, Donald E. Galvin, and others, Disability Management: A Complete System to Reduce Costs, Increase Productivity, Meet Employee Needs, and Ensure Legal Compliance (New York: American Management Association, 1992), p. 11.

success is the immediate creation, or maintenance, of the expectation that an individual has the potential to work and will return to work.[35]

## Address Return-to-Work Goals Early

Of the 21 respondents to our private sector survey, 18 stated they address return-to-work goals from the beginning of an emerging disability. When we asked the respondents to rate the importance of including this practice in a model disability management program, they gave goal-setting a high mean rating of 4.7 (on a scale of 1 to 5, with 1 equaling "not important" and 5 equaling "very important").[36] By contrast, return-to-work goals for SSA's disability beneficiaries are not addressed, if at all, until the eligibility determination process is completed, which takes a minimum of several months and can take 18 months or longer for individuals who are initially denied benefits and appeal.

Addressing return-to-work goals early requires that injuries and illnesses be reported quickly to disability managers. One workers' compensation program manager, for example, told us that her company encourages reporting of injuries and illnesses within 24 hours. To encourage such prompt reporting, one of the company's divisions has a policy of not charging any disability expenses to the manager's profit and loss center if the injury or illness is reported within 24 hours. Another company instructs employees to report claims for all absences of more than 7 days to the company's disability management team. We were told that a team then begins the process of developing a return-to-work plan in consultation with the employee and his or her treating physician rather than waiting until the employee is regarded as disabled.

Some respondents said they use disability duration guidelines as a tool for evaluating the expected length of an individual's absence from work because of illness or injury. Such guidelines commonly are commercially produced compilations of medical data on the characteristic duration of different types of disabilities according to diagnoses, symptoms, and occupational factors. For employers or insurers with large databases, duration guidelines can reflect actual experience in combination with medical and vocational research. The employer or insurer can use this information to work with the disabled individual and his or her physician to set a target date for return to work.

---

[35]Hunt, Habeck, Owens, and others, p. 32.

[36]Respondents were asked to rate the importance of 32 practices. Their mean ratings of the importance of these practices ranged from 2.1 to 4.9. Eighteen of the 32 practices had mean ratings of 4.1 or higher. See app. II for a list of the practices and their mean ratings.

Chapter 2
Early Intervention Critical to Return to
Work

In Germany and Sweden, laws and policies require that an individual's return-to-work potential be assessed soon after the onset of a disabling condition. Consequently, people with disabilities are generally considered for rehabilitation and return to work at relatively early stages in their contacts with the social insurance offices. In Germany, the health insurance funds generally inquire about the appropriateness of rehabilitation for individuals drawing sickness benefits more than 10 weeks. In addition, vocational counselors often discuss rehabilitation and return-to-work plans with work accident or occupational illness victims while they are still in the hospital. And everyone applying for a disability pension in Germany is considered by the pension insurance funds for rehabilitation and return to work before being determined eligible for permanent benefits.[37]

Under Swedish laws and policies, both the private and public sectors are responsible for the early identification of candidates for rehabilitation and return to work. Since 1992, employers have been responsible for investigating whether employees who receive sickness benefits for 4 weeks or who are absent from work frequently because of illness need some type of rehabilitation. Employers are also responsible for arranging for a rehabilitation examination and reporting this to the social insurance office.

When employers disregard their responsibilities, Sweden's social insurance offices arrange for the examination and start planning rehabilitation for the disabled workers.[38] Because the social insurance offices monitor sickness benefits, they are able to identify who may need rehabilitation or other forms of employment assistance. After someone has received sickness benefits for about 4 weeks (28 to 30 days), a social insurance office begins the process of assessing whether the person will need vocational rehabilitation to return to work.[39]

---

[37]Germany's employment offices also play a significant role in identifying the vocational rehabilitation needs of individuals who are no longer employed and come to the employment offices seeking work. Of those receiving vocational assistance in 1992 in Germany, about 82 percent were provided services through the employment offices.

[38]Social insurance offices in Sweden have no mechanisms or sanctions to force employers to comply with their rehabilitation responsibilities. According to social insurance office surveys, employers do not arrange for rehabilitation examinations in about 40 to 50 percent of the cases.

[39]In Sweden, doctors are responsible for determining whether medical rehabilitation is necessary.

## Provide Return-to-Work Services at the Earliest Appropriate Time

Consistent with the early intervention emphasis, most respondents to our survey stated they believe it is important to provide rehabilitation services from the onset of disability. Such services, which are intended to restore an individual's health, functional capacities, or ability to engage in useful and constructive activity, fall into two basic categories: medical and vocational. Medical rehabilitation involves physical and mental care services, while vocational rehabilitation includes services such as vocational assessment, labor market surveys, developing alternative work plans, retraining, and assistance with job-seeking skills. Vocational rehabilitation focuses primarily on helping individuals with disabilities enter a different job or career.

The respondents to our survey tended to view medical rehabilitation as having more priority than vocational rehabilitation during the early stages of a disability. Of the 21 respondents, 18 said they provide medical rehabilitation services from the onset of disabilities, but only 12 said they provide vocational services from onset. Similarly, in rating the importance of rehabilitation services in a model disability management program, the respondents' mean rating for providing medical services from onset was 4.3, compared with a mean rating of 3.7 for providing vocational services from onset.

The respondents' preference for medical before vocational rehabilitation services in the early stages of disability is not surprising. All 21 respondents to our survey said that their initial goal is to return the worker to the same job he or she was doing before the disabling event. During follow-up interviews, several respondents stated that workers who have potential to return to their old jobs generally need only medical services to go back to work, but it is important that these medical services be provided as early as possible. When it appears the worker will be unable to return to the same job, disability managers turn to vocational services, which focus more on assisting the disabled employee to enter a different job or career.

Most individuals who apply to SSA for disability benefits are not working, but SSA's focus is not on returning them to work. The agency's efforts instead focus on determining their eligibility for cash benefits. Assessment for vocational rehabilitation services to enable return to work occurs, if at all, after the eligibility determination process is completed, which, as mentioned before, sometimes takes 18 months or longer.

Chapter 2
Early Intervention Critical to Return to
Work

In Germany and Sweden, laws and policies emphasize providing return-to-work services and assistance at the earliest appropriate time. Similar to the private sector in this country, a guiding principle of Germany's social insurance system is that intervention should occur at the earliest possible stage of disability to minimize the degree and effects of the disability. Intervention often begins when the treating physician, one of the insurance agencies, or the employer urges a person receiving sickness benefits to apply for medical rehabilitation.[40] Ability and capacity to work are assessed at this time. Following medical rehabilitation, in cases where it is warranted, the person will be referred to vocational rehabilitation or other types of return-to-work services and assistance.[41] Disability pensions are not awarded until it has been determined that the person's earning capacity cannot be restored through rehabilitation.

In Sweden, as mentioned before, employers are responsible for the early identification of workers who need rehabilitation and for taking early intervention steps. Employers often fail to do this, however, and the social insurance offices, which closely monitor the use of sickness benefits, intervene. After someone has received sickness benefits for about 4 weeks, the social insurance office collects information from the person's doctor or employer to determine whether vocational rehabilitation will be needed for return to work.[42] The goal of the social insurance office is to make this decision within the next 2 weeks. If such assistance is warranted, the social insurance office may purchase vocational rehabilitation and related employment services. If after receiving such services, the person does not return to work and still has the disabling condition, he or she can continue to receive sickness benefits. After 12 to 13 months of receiving these benefits, a decision is made to grant the person either a permanent disability pension or a temporary pension and possibly more vocational services.

An official at the National Social Insurance Board in Sweden has concluded early intervention pays for itself. His study found that early screening and contact with clients and employers, greater attention to diagnoses, and close cooperation among the social insurance offices and

---

[40]Except for work injury claimants, rehabilitation in Germany cannot begin without the individual applying for it.

[41]Before someone is referred to vocational rehabilitation in Germany, a physician ascertains whether the person could return to the original job or to a different job—through transfer, retraining, workplace accommodations, or assistive devices—with the same employer.

[42]As noted, doctors in Sweden are responsible for determining whether medical rehabilitation is necessary.

the medical and vocational rehabilitation providers reduced social insurance costs by returning people to the workplace sooner. The study noted that the reduction in sick leave and the probable accompanying increase in days worked was more than sufficient to pay for the increased administrative costs. This same official told us that just by intervening with phone calls at the 14th day of someone receiving sickness benefits saves the social insurance offices money.

## Maintain Communication With Disabled Workers

To help maintain motivation to return to work, respondents to our survey indicated they believe it is important to establish early contact and to stay in touch with disabled workers. Of the 21 respondents to our survey, 19 stated they maintained communication with workers who are hospitalized or recovering at home. When asked to rate the importance of including this type of communication in a model disability management program, the respondents gave it a mean rating of 4.7.

Contacting a worker soon after an injury or illness and then continuing to communicate with the worker is important because the worker needs to be reassured there is a job to return to and that the employer is concerned about his or her recovery. Such reassurances can help maintain motivation to return to work. One disability manager stated that her company contacts workers within 24 hours of a reported illness or injury and recontacts them every 2 weeks by telephone. Another stated her company's case managers are required to contact workers at least once a week.

The person responsible for maintaining communication varied from company to company. One respondent said in her company a registered nurse case manager contacts hospitalized workers before they return home, and the case manager maintains contact until the disabled worker returns to full duty. She said the first week after an injury is a window of opportunity that is critical to minimizing a worker's time lost from work. In other instances, one company uses a disability management vendor to maintain contact, and another stresses that the worker's supervisor maintain contact. Depending on whether a company is self-insured or insured by a commercial carrier, contacts with disabled workers may also be maintained by insurance company personnel.

By contrast, SSA's contacts with disability applicants are limited to efforts to obtain the evidence needed to determine eligibility for cash benefits. Rather than encourage the applicant to return to work, these contacts

**Chapter 2**
**Early Intervention Critical to Return to**
**Work**

probably serve only to strengthen the applicant's resolve to prove he or she is disabled.

In both Germany and Sweden, insurance offices contact individuals receiving sickness benefits to determine whether they will be able to return to work without intervention or whether they will need some type of assistance to do so. As mentioned, workers in Germany who draw sickness benefits longer than 10 weeks are generally contacted by the health insurance funds or their employer to inquire about the appropriateness of rehabilitation measures. In Sweden, social insurance offices telephone workers after they have received sickness benefits for 14 days to determine what, if anything, needs to be done to get them back to work.

# Identifying and Providing Return-to-Work Services Effectively

Not only must rehabilitation services be provided at the earliest appropriate time, but disability managers need to ensure that the services are appropriate for each individual. The respondents to our survey generally told us they attempt to provide return-to-work assistance that is tailored to the individual and that they manage disability cases with a view toward achieving return-to-work goals. This approach seeks to avoid unnecessary expenditures while investing in cost-effective techniques for achieving return-to-work goals for disabled workers. Respondents to our survey told us they employ several key practices in identifying and providing appropriate services and managing their return-to-work programs (see table 3.1).

**Table 3.1: Key Practices in Identifying and Providing Return-to-Work Services**

| | Identifying and providing services effectively |
|---|---|
| Practice 1 | Assess the individual's return-to-work potential and needs |
| Practice 2 | Offer transitional work opportunities that enable disabled workers to ease back into the workplace |
| Practice 3 | Use case management techniques when appropriate to help disabled workers return to work |
| Practice 4 | Ensure that medical service providers understand the essential job functions of the disabled worker |

## Assess Return-to-Work Potential and Services Needed

Of the 21 respondents to our survey, 20 stated that they assess return-to-work potential early in the process. As some respondents emphasized, return-to-work potential is not determined merely by a medical diagnosis showing the presence of an impairment but, rather, by functionally evaluating each individual's capacity to work after his or her medical condition has stabilized. When we asked the respondents to rate the importance of including early assessment of return-to-work potential in a model disability management program, they gave it a mean rating of 4.8 on a scale of 1 to 5.

By contrast, SSA's process for determining disability generally does not directly assess each applicant's functional capacity to work. Instead, as mentioned before, SSA's evaluation process presumes that certain medical conditions are in themselves sufficient to preclude work. SSA enumerates such medical conditions in its Listing of Impairments.[43] These listings serve as proxies for functional evaluations, identifying impairments that are presumed to impose functional restrictions sufficient to preclude any

---

[43]As mentioned, SSA has reported that "some, but not all, of the Listings consider functional consequences of an impairment ..." and that "functional considerations vary significantly among the Listings." See Plan for a New Disability Claim Process, p. 11.

gainful activity. About 70 percent of new awardees are eligible because their conditions meet or equal listed impairments that are presumed to be disabling. Only the remaining 30 percent of new awardees are eligible because they have been further evaluated on the basis of separately developed nonmedical factors, including residual functional capacity, age, education, and vocational skills.

Fifteen of the 21 respondents to our survey also stated their return-to-work programs attempt to provide services at the earliest appropriate time. In rating the importance of including vocational services in a model disability management program, the respondents gave this practice a mean rating of 4.4. However, 12 respondents said that as part of their effort to provide appropriate services, they provide these services only to individuals who are deemed likely to return to work.[44] The motivation for this approach is to avoid investing funds in vocational services when the risk is high that a disabled worker will not return to work even after receiving vocational services.[45]

Some companies have begun developing profiles of characteristics that help them identify the disabled workers who are most likely to benefit from vocational rehabilitation services and return to work. For example, two insurers we contacted had studied thousands of long-term disability cases and developed profiles that include, among other factors, age, gender, marital status, whether the disability was caused by accident or illness, whether the disability occurred on the job, and type of disability.

Using such a profile, one insurer categorizes each long-term disabled worker in one of three groups: (1) those who are unlikely to return to work regardless of whether they receive vocational rehabilitation services, (2) those who are likely to return to work but do not need rehabilitation services to do so, and (3) those who are likely to return to work but need rehabilitation services to do so. The company focuses its attention on individuals in the third group because they have the greatest potential for cost-effective use of rehabilitation resources. This approach results in a relatively small proportion of beneficiaries receiving rehabilitation

---

[44]In some states, workers' compensation laws require that specified vocational rehabilitation services be offered to all workers with occupational disabilities, regardless of whether disability managers believe the services should be provided.

[45]Many DI beneficiaries may be more severely impaired than the average beneficiary in employer-sponsored, long-term disability insurance programs. In the private sector, many companies require that claimants file for DI when they apply for private long-term disability benefits. Some of these individuals return to work through the companies' return-to-work programs, but those whose conditions are too severe to succeed in returning to work will likely become DI beneficiaries.

services. Officials of insurance companies we contacted estimated that about 3 to 7 percent of their long-term disability beneficiaries receive vocational rehabilitation services.

These companies expect to save more than they spend on their investment in rehabilitation services. For example, one insurance company reported that for every dollar spent on rehabilitation, it had saved an average of $10 in long-term disability reserves and expected the savings ratio to increase as the company gained experience in identifying the people most likely to benefit from rehabilitation services.[46] Another insurance company reported average savings of $35 in long-term disability reserves for every dollar spent on rehabilitation services.

In Germany and Sweden, return-to-work services and assistance are fairly extensive and tailored to meet individual needs. An individual may receive a combination of different benefits and services, such as medical or vocational rehabilitation, employment or social assistance, as well as cash assistance while applying for or participating in rehabilitation.

As noted in chapter 1, rehabilitation is an entitlement in Germany. Vocational assistance measures include assistance in retaining or obtaining a job (including grants to the employer); assistance in selecting an occupation (including work trials or sheltered workshops); basic training and retraining to prepare for an occupation (including basic education necessary to attend more advanced training courses); workplace adaptations; and wage subsidies for employees who are difficult to place. The duration of vocational assistance varies greatly and can last as long as 2 years for basic training or retraining programs. The person's aptitude, inclinations, and former occupations are taken into account as well as labor market conditions when accepting an individual into a vocational retraining program.

Providing appropriate return-to-work assistance to people with disabilities is viewed as a cost-effective investment in Germany. Officials we interviewed noted that placement rates for individuals who completed vocational retraining have been fairly high, although there are no quantitative data documenting overall cost-effectiveness. Surveys in Germany have found that about 80 percent of former trainees were working one year after completing their vocational retraining, and these results have remained steady over a number of years for a wide range of

---

[46]This insurance company defined disability reserves as amounts accrued on an actuarial basis to pay future long-term disability benefits.

**Chapter 3**
**Identifying and Providing Return-to-Work**
**Services Effectively**

occupations.[47] However, some retraining centers have waiting lists in certain vocational areas. For example, we were told that a Frankfurt retraining center had a 1- to 2-year waiting list for those to be retrained as office workers.

Swedish laws and policies that address people with disabilities as well as the country's generous package of noncash benefits and services are aimed at helping individuals remain at or go back to work. To make the workplace accessible, employers by law must adapt working conditions, including the organization of work, to suit the needs of those with functional impairments. Government subsidies may be disbursed to employers who adapt their workplaces to the special needs of a person with a functional disability, install technical aids, or engage a personal assistant for a worker with a disability. In addition, under a law that took effect January 1, 1994, people who have severe functional disabilities and who need help with certain daily activities are entitled to personal assistance.[48]

In Sweden, people with disabilities have, like others, the right to assistance from the regular employment office in finding employment. Employment assistance measures include assessment of working capacity, occupational rehabilitation, vocational guidance, subsidized employment, sheltered employment, on-the-job training, and probationary employment at companies that agree to such arrangements. Rehabilitation is not meant to be a lengthy process, but rather a short, intensive period of medical, social, and work-related training to help the individual to return to work as soon as possible.

## Offer Transitional Work Opportunities

All but one of the 21 respondents to our survey said they offer transitional work opportunities to help disabled workers ease back into the workplace. Transitional work (also known as modified work or light duty) involves changing the work environment to allow an employee who has been disabled to return to work at a job that is less physically or mentally demanding than his or her previous assignment. When asked to rate the importance of including transitional work opportunities in a model disability management program, the respondents gave it a mean rating of 4.8.

---

[47]Data we were able to obtain did not indicate the placement rate by severity of the disability. In addition, we were told that placement rates at some retraining centers have decreased in the last few years because of a faltering economy.

[48]Obtaining assistance under the Act Concerning Support and Service for Persons with Certain Functional Impairments is not dependent upon returning to work.

Workplace modifications that provide transitional work opportunities may include job restructuring, assistive devices, workstation modifications, reduced hours, or reassignment to another job. For example, one respondent said that reducing the worker's hours is typically her company's first approach. Another said that in her company's restaurant operations, employees are cross-trained so they can exchange positions or shift tasks if one of them, for instance, is experiencing back problems.

The Americans With Disabilities Act (ADA) requires an employer with 15 or more employees to make "reasonable accommodations" for the known disability of an applicant or employee unless doing so would impose an "undue hardship" on the employer. A reasonable accommodation could include reassigning an employee to another job.

Three insurance companies stated that although not obligated to do so under ADA, they had paid for workplace modifications for disabled beneficiaries formerly employed by firms that provided disability coverage through these insurance companies. The insurance companies viewed these expenditures as cost-effective investments because benefit payments to these beneficiaries were reduced or eliminated after the beneficiaries returned to work. One of these insurance companies often contracts to spend up to $2,000 on workplace modifications on behalf of a disabled beneficiary. In some circumstances, however, the company has spent more than $2,000 on modifications to help an individual return to work. By contrast, SSA does not promote the provision of job accommodations that could enable an individual to return to work.[49]

In both Germany and Sweden, transitional work opportunities may be arranged for people with disabilities. Such transitional work may be considered for people with disabilities who can return to work part-time and gradually increase their daily work hours until they reach their maximum work capacity. In Germany, such a gradual return to the original job is a formalized process known as stepwise reintegration, and it is implemented under the guidance of the treating physician and the company's doctor.[50] In Sweden, transitional opportunities include the adaptation of working conditions to suit the needs of people with

---

[49]However, SSA does not preclude state vocational rehabilitation agencies from pursuing job accommodations for the beneficiaries they serve.

[50]Stepwise reintegration in Germany also involves a written contract between the employer and the person attempting the gradual return to work. The contract must state, among other things, the beginning and end dates for the stepwise process, the timing of the various reintegration steps, and the salary the worker will receive at the various steps.

functional impairments, trial work, on-the-job training, and part-time work leading to full-time work.

## Use Case Management Techniques When Appropriate

Most respondents to our survey (20 of 21) said they use disability case management techniques, when appropriate, to help disabled workers return to work. When asked to rate the importance of including case management in a model disability management program, respondents to our questionnaire gave it a mean rating of 4.5. By contrast, under current procedures, SSA does not assess which cases may warrant case management.[51]

Although disability case management may be defined and implemented differently by different companies, it generally can encompass identifying, evaluating, and coordinating the delivery of return-to-work services, including social, health care, and rehabilitation services. The case manager may do such things as help the individual understand or obtain transitional work opportunities or assist in talking with the individual's doctor about treatment and recovery.

Although most respondents believe case management is important, they have implemented it in different ways. For example, some respondents employ their own staff of case managers, but others rely on the staffs of their disability insurers or third-party administrators. Furthermore, respondents differed in how they assign case managers. One self-insured employer, for example, assigns someone from its disability management team to act as case manager on every disability case, regardless of whether the case involves workers' compensation or short-term or long-term disability insurance. But in another instance, a disability insurance company determines on a case-by-case basis whether the case is complex enough to warrant a case manager.

Disability managers we contacted told us their case managers typically have caseloads of no more than 50 disabled workers. When workers are determined to have rehabilitation potential, case managers continue to manage their cases for extended periods, for example, up to 2 years.

In Germany, two national officials we interviewed stated that the accident insurance program (similar to workers' compensation in the United

---

[51]Although SSA generally does not use case management, SSA's Project NetWork demonstration has been studying the use of four case management models. See SSA's Rehabilitation Programs (GAO/HEHS-95-253R, Sept. 7, 1995). For beneficiaries served by state vocational rehabilitation agencies, agency personnel determine whether any case management is provided.

Chapter 3
**Identifying and Providing Return-to-Work**
**Services Effectively**

States) is viewed as being more effective than the pension insurance office in returning people with disabilities to work. The program is more successful, in part, because it assigns individual advisers (or case managers) soon after the onset of a disabling condition.

## Ensure That Medical Service Providers Understand Essential Job Functions

Almost all respondents to our survey (19 of 21) said they attempt to ensure that medical providers understand the disabled worker's essential job functions because the treating physician's decision to release the worker affects the timing of the worker's return to the workplace. When asked to rate the importance of this practice in a model disability management program, the respondents gave it a mean rating of 4.6. By contrast, SSA generally contacts treating physicians only to request medical information needed to determine whether applicants meet disability eligibility criteria.

In the view of private sector disability managers, it is important not only that the physician understand the disabled worker's essential job functions, but also that the physician understand the impact of any transitional work opportunities or other job accommodations that the employer is willing to provide. Otherwise, the physician may not release the individual to return to work until he or she can function at predisability levels. As some disability managers told us, actions taken to ensure that medical providers understand the essential job functions and focus on return-to-work issues should be viewed as part of the early intervention strategy.

At one of the respondents' companies, for example, a supervisor accompanied employees with occupational injuries on the first visit to a physician. And at some respondents' organizations, case managers communicate with treating physicians to make sure the physicians understand the essential job functions of disabled workers. Others said they try to direct disabled workers to physicians who are familiar with their companies' operations. Several respondents said their companies sometimes provide treating physicians with videotapes of the actual job functions that would be expected of disabled workers. Also, to provide physicians with general familiarity about the jobs performed by workers, two respondents said their companies take physicians on tours of company facilities.

Some disability managers told us they have concerns about the degree to which the medical community focuses on return-to-work issues. They believe physicians should proactively address the question of return to

**Chapter 3**
**Identifying and Providing Return-to-Work**
**Services Effectively**

work with injured and ill workers. However, in their view, medical training in the United States does not sufficiently emphasize the desirability of disabled workers' returning to work at the earliest appropriate time. As a result, these disability managers believe physicians generally give insufficient priority to return-to-work issues.

Most respondents to our survey believed that return-to-work efforts are enhanced by organized systems of care.[52] An organized system of care gives companies greater opportunity to educate physicians in the requirements of jobs performed by the companies' workers. As well as focusing on care, health care providers in an organized system of care can collaborate with employers on setting return-to-work expectations for members who become disabled. Of the 21 respondents, only 8 said they currently use an organized system of care as part of the strategy for returning disabled workers to the workplace. However, when asked to rate the importance of including an organized system of care in a model disability management program, 16 of the 21 respondents gave it a rating of 4 or 5.

In Germany, physician education plays an important role in the rehabilitation and return-to-work process. The Federal Rehabilitation Council issues guidelines for doctors to follow during the rehabilitation process. Among other things, the guidelines describe the duties of the doctor while his or her patient is undergoing rehabilitation (medical and vocational) and they inform the doctor about the various rehabilitation centers and specialized equipment that is available. Moreover, the guidelines stress the importance of working closely with employment office officials so that a disabled worker may keep a job or find a new one, depending on the person's residual functional capacities.

---

[52]An organized system of care is a group or network of health care providers that integrates the financing and delivery of a full continuum of care for its enrolled population and is held clinically and fiscally accountable for the outcomes and health status of its members.

Chapter 4

# Work Incentives Facilitate Return to Work

Respondents to our survey generally told us they believe it is important that the cash and medical benefits structure provide incentives for disabled workers to return to work. However, as some respondents emphasized, such work incentives by themselves are not sufficient to make a return-to-work program successful. Incentives must be part of an integrated strategy that includes effective early intervention and the identification, provision, and management of return-to-work services. The respondents to our survey indicated several key practices in providing work incentives (see table 4.1).

**Table 4.1: Key Practices for Providing Incentives to Return to Work**

|  | Use appropriate incentives |
|---|---|
| Practice 1 | Structure cash benefits to encourage disabled workers to rejoin the workforce |
| Practice 2 | Maintain medical benefits for disabled workers who return to work |
| Practice 3 | Include a contractual provision that can require the disabled worker to cooperate with return-to-work efforts |

As we reported recently, work incentives available to DI and SSI beneficiaries do not appear sufficient to make returning to work an attractive option. By returning to work, they risk losing the security of a guaranteed monthly income and medical coverage. Weaknesses in the design and implementation of the work incentives have made these provisions ineffective in overcoming the prospect of a drop in income for many who face low-wage employment or to allay the fear of losing medical coverage.

## Structure Cash Benefits to Provide Return-to-Work Incentive

When asked to rate how important it would be for a model program to include a cash benefit structure that encourages return-to-work, the respondents gave this practice a relatively high mean rating of 4.4; however, only 14 of the 21 respondents said that their current cash benefits structure actually provides an incentive to return to work. The following are examples of how some respondents' companies structure cash benefits to make returning to work more financially attractive than remaining away from work:

- While away from work, the disabled worker receives disability benefits equivalent to 60 percent of predisability earnings. If the individual returns to work, his or her earnings are supplemented by an incentive benefit amount so that total income can be considerably higher than the disability benefits the worker was receiving. The worker continues to receive an

Chapter 4
**Work Incentives Facilitate Return to Work**

incentive benefit until his or her earnings reach 80 percent of predisability earnings.

- If a disabled worker returns to work, he or she continues to receive unreduced disability benefits for 1 year, unless the total of earnings and benefits would be greater than the individual's predisability earnings. After 1 year, the worker continues to receive disability benefits, but these benefits are reduced by an amount equal to 70 percent of the worker's earnings.

- Disabled workers are allowed a trial work period, usually 6 months, during which long-term disability benefits can be reinstated without reapplication if the worker cannot remain at work.

- If a disabled worker returns to work, he or she can receive up to $350 per month for each family member to cover family care expenses. Under certain conditions, an insurance company will reimburse a claimant for moving expenses incurred in relocating to take a job.

As mentioned, the respondents indicated they believe it is highly important to structure cash benefits to provide an incentive to return to work; however, we noted that their mean rating for this practice was slightly lower than the mean ratings they gave to other return-to-work practices they considered important, such as maintaining communication, setting return-to-work expectations as early as possible, ensuring that medical service providers understand essential job functions, and providing transitional work opportunities. This highlights, as some respondents commented, that although financial incentives are important, a successful return-to-work program must effectively integrate financial incentives with other important practices.

Disability management literature supports the view that the cash benefits structure can affect the disabled worker's attitude toward returning to productive activity in the workplace. Short-term disability insurance generally replaces 40 to 70 percent of earnings for periods ranging from 30 days to 6 months; whereas, long-term disability insurance usually replaces about 60 percent of prior earnings, with maximum limits on monthly benefits, for periods that can extend to retirement or longer. Studies show that if disability benefits are too generous, the benefits can create a disincentive for participating in return-to-work efforts. For example, studies of workers' compensation programs have concluded that the larger the percentage of original wages that is paid to disabled workers, the more difficult it is to bring them back to work.[53]

---

[53]Akabas, Gates, Galvin, and others, p. 11.

Chapter 4
**Work Incentives Facilitate Return to Work**

In Germany, we found that the social insurance programs offer financial incentives to encourage individuals with disabilities to participate in rehabilitation programs and return to work. As mentioned before, individuals who are considered good candidates for rehabilitation are not awarded disability pensions. Instead, to encourage participation in rehabilitation, they can receive a cash benefit that is greater than unemployment or welfare allowances. Depending on individual circumstances, expenses for room and board, household assistance, travel, and other expenses incurred while undergoing medical or vocational rehabilitation may also be covered.[54] However, one official we interviewed stated that economic incentives are limited. In his view, the key to encouraging return to work is the individual's motivation and positive perspective, and the disability program's processes must be designed to reinforce that motivation. Germany's process is designed to identify individuals who are good candidates for rehabilitation before they are awarded disability pensions.

In Sweden, individuals with return-to-work potential may be awarded only a temporary disability pension. This time-limited benefit is awarded if the individual's reduced work capacity is not considered permanent but is expected to continue for a significant period (as a rule, a minimum of 1 year). To encourage such individuals to participate in vocational rehabilitation, Sweden provides a rehabilitation allowance, which includes a benefit to cover loss of earnings, and a special grant to cover certain kinds of expenses connected with rehabilitation.

Because Sweden's permanent disability pensions replace a high proportion of income, some workers may consider it more attractive to avoid rehabilitation and try to obtain a permanent pension. Currently, permanent disability pensions replace 65 to 70 percent of income for individuals who receive both a basic and a supplementary pension on the basis of having a work history. Supplemental, collective bargaining agreements add another 10 to 20 percent to the earnings replacement.

---

[54]There are limits to these benefits. For example, an individual cannot decline a job and return to training without a valid medical reason (for instance, a progressive or different illness), as determined by the financing insurance agency.

## Maintain Medical Benefits for Disabled Employees Who Return to Work

Discussions of SSA's return-to-work efforts often emphasize that beneficiaries are reluctant to return to work because they fear losing their premium-free Medicare or Medicaid benefits. By contrast, in the private sector, medical benefits provide an incentive to return to work because it is by returning to work that disabled workers can be most assured of retaining these benefits. Respondents to our survey, when asked to rate the importance of including continuation of medical benefits in a model disability management program, gave this practice a mean rating of 4.1.

In the private sector, disabled workers jeopardize their medical benefits by remaining away from work because employers eventually may terminate their employment. If terminated, such individuals may no longer be enrolled in the employer-sponsored health plan. If they later go back to work with a new employer, the new employer may not offer employer-sponsored medical benefits, or the employee may be excluded from coverage because of preexisting conditions.[55] These possibilities give a disabled worker an incentive to return to a job with his or her old employer. In contrast, in the DI and SSI programs, beneficiaries face the loss of premium-free Medicare or Medicaid benefits if they return to work, and moreover, the job they get may not offer medical benefits or may not provide coverage because of preexisting conditions. This discourages DI and SSI beneficiaries from returning to the workplace.

DI beneficiaries who return to work can receive premium-free Medicare benefits for 39 months following a trial work period; however, to retain coverage thereafter, they must pay the same monthly cost as uninsured retired beneficiaries. SSI beneficiaries can continue receiving Medicaid coverage after their earnings become too high to allow a cash benefit, but coverage ends when their earnings reach a higher threshold amount that varies from state to state. For example, the threshold amount in 1994 was $17,480 in Pennsylvania and $22,268 in California.

In Germany and Sweden, loss or retention of health care insurance is not an issue in a worker's decision on whether to participate in rehabilitation or attempt returning to work. The individual will continue to belong to the compulsory insurance system that provides sickness and disability protection.

---

[55]Under the Consolidated Omnibus Budget Reconciliation Act of 1986, a terminated employee may, at his or her own expense, maintain the medical coverage formerly provided under the employer-sponsored group plan for a specified period.

# Require Cooperation With Return-to-Work Efforts

Only 12 of the 21 respondents to our survey said their organizations have contractual provisions that can require disabled employees to cooperate in return-to-work efforts as a condition of eligibility for disability insurance benefits. When asked to rate the importance of including this requirement in a model disability management program, however, the respondents gave it a mean rating of 4.1. This relatively high rating is consistent with one study that found that return-to-work efforts cannot be nurtured in an environment in which, among other things, participation in a vocational rehabilitation program is entirely voluntary.

Some respondents stated that the ability to require cooperation as a condition of eligibility for benefits is important because it can help motivate an individual with a disability to try to return to work. At the same time, however, some respondents cautioned that such a requirement must be invoked carefully because a company could spend money on return-to-work efforts for individuals who participate because they feel compelled but ultimately do not return to work because of a basic lack of motivation. The Social Security Act provides for withholding benefits if a beneficiary refuses without good cause to accept rehabilitation services.

In Germany and Sweden, individuals may also be denied benefits for not participating in or cooperating with rehabilitation when it is recommended by one of the insurance offices. For example, the pension insurance funds in Germany can deny an individual rehabilitation benefits or a disability pension if they do not participate in or sufficiently cooperate with the recommended rehabilitation program. Similarly, if someone refuses to participate in training because that person would rather receive an unemployment benefit than undergo rehabilitation, the employment office can stop his or her benefits.[56] The social insurance offices in Sweden may also revoke benefits, including pension benefits, for those who refuse to participate in vocational rehabilitation. We do not have information on the extent to which these provisions are actually invoked in Germany and Sweden.

---

[56]Benefits are initially stopped for 3 months. If the individual still refuses to participate, the office can stop the benefits for another 3 months. After that, benefits may be stopped for 3 years.

# Conclusions, Recommendation, and Agency Comments

Disability managers we surveyed spend money on return-to-work efforts because they believe such efforts are good investments that reduce disability-related costs. Social insurance programs in Germany and Sweden also spend money on return-to-work efforts to reduce disability costs, and their goals stress the importance of work in integrating people with disabilities into the broader social community.

Improving the success of SSA's return-to-work efforts offers great potential for reducing federal disability program costs while helping people with disabilities return to productive activity in the workplace. If an additional 1 percent of the 6.3 million DI and SSI working-age beneficiaries were to leave the disability rolls by returning to work, lifetime cash benefits would be reduced by an estimated $2.9 billion.[57] With such large potential savings, return-to-work services could be viewed as investments rather than as program outlays.

In our current study of return-to-work practices, we identified three basic strategies employed in the U.S. private sector as well as in social insurance programs in Germany and Sweden. These strategies, which must be integrated to form a comprehensive return-to-work program, are as follows:

- Provide services and assistance sooner rather than later to promote and facilitate return to work.
- Identify and provide necessary return-to-work assistance and manage cases to achieve goals.
- Structure cash and medical benefits to encourage return to work.

Lessons from the private sector and other countries' social insurance programs argue for SSA placing greater priority on assessing return-to-work potential soon after individuals come to SSA and apply for disability benefits. Currently, when an individual comes to SSA and applies for DI or SSI benefits, SSA's priority is to determine eligibility for cash benefits. The need for medical and vocational rehabilitation is not addressed until after applicants have been approved to receive cash benefits, which can take up to 18 months or longer from the time an application is filed.

In conjunction with making an early assessment of return-to-work potential, SSA needs to place greater priority on identifying and providing, at the earliest appropriate time, the medical and vocational rehabilitation services needed to return to work. Currently, SSA bases 70 percent of its

---

[57]GAO estimate based upon SSA actuarial estimates.

awards on whether an individual's medical symptoms, signs, and diagnostic results match SSA's Listing of Impairments that are presumed to prevent work. It does not evaluate whether these people could return to work if given appropriate assistance. To improve return-to-work outcomes and to identify the services needed, SSA needs to place greater emphasis on functionally evaluating work capacity.

Under the current legislative design, SSA provides vocational rehabilitation services too late in the process. In addition, neither DI nor SSI applicants are eligible for medical rehabilitation benefits under Medicare or Medicaid, respectively, until they are approved for cash benefits through the lengthy eligibility determination process. And, in the DI program, the provision of medical rehabilitation is further delayed because Medicare eligibility does not begin until 24 months after applicants are approved to receive cash benefits.[58]

Finally, cash and medical benefits need to encourage beneficiaries to return to work. The current design of cash and medical benefits in the DI and SSI programs often presents more hindrances than incentives when beneficiaries consider returning to work. The structure of cash benefits can make it financially advantageous to remain on the disability rolls, and studies report that DI and SSI beneficiaries fear losing their premium-free Medicare or Medicaid benefits if they return to work.

The experiences of the social insurance programs in Germany and Sweden show that the utility of return-to-work strategies is not confined to the private sector. Although SSA faces constraints in applying these strategies, we believe steps should be taken earlier to better identify and provide appropriate return-to-work assistance to those who could return to work. Even relatively small gains in return-to-work successes offer the potential for significant savings in program outlays.

## Recommendation to the Commissioner of SSA

Our recent report, SSA Disability: Program Redesign Necessary to Encourage Return to Work, recommended that the Commissioner of SSA place greater priority on return to work, including designing a more effective means to identify and expand beneficiaries' work capacities and better implementation of existing return-to-work mechanisms. In line with placing greater emphasis on return to work, we recommend that the Commissioner develop a comprehensive return-to-work strategy that

---

[58]State vocational rehabilitation agencies may provide medical rehabilitation benefits to beneficiaries they serve and be reimbursed for these costs if beneficiaries return to work.

Chapter 5
Conclusions, Recommendation, and Agency
Comments

integrates, as appropriate, earlier intervention, earlier identification and provision of necessary return-to-work assistance for applicants and beneficiaries, and changes in the structure of cash and medical benefits. The Commissioner should also identify legislative changes needed to implement such a program.

## Agency Comments

In commenting on a draft of this report, SSA agreed much can be learned from the return-to-work practices of the U.S. private sector and disability programs in Germany and Sweden. SSA stated that it is already placing a high priority on return to work and cited a number of actions SSA has taken to implement its return-to-work initiative, such as expanding the pool of vocational rehabilitation service providers. Although these actions are in the right direction, we believe they do not constitute the fundamental redirection of goals and practices necessary to move the DI and SSI programs to a much greater emphasis on return to work. For example, increasing the number of vocational rehabilitation providers does not address the concern of earlier intervention. Fundamental redesign is needed because SSA's disability programs are designed to be cash benefits programs, not return-to-work programs.

Consistent with our recommendation that SSA should identify legislative changes needed to implement a return-to-work program, SSA noted that the law does not provide for, or even allow, many of the return-to-work strategies discussed in our report. Within this context, however, SSA affirmed that it is interested in determining whether the return-to-work practices of other systems could be useful in SSA's attempts to improve the return-to-work rate of its disability beneficiaries. SSA emphasized that, for such efforts to be fruitful, all players in the complex network of federal disability policy development and program execution would need to be involved, including several federal departments and agencies, state disability and rehabilitation programs, private sector providers, insurance representatives, and employer/union groups as well as the numerous congressional committees that have roles in the development of legislation or in budget approval for the kinds of solutions described in our report. We agree that it is important for all relevant parties to be involved in policy development and program execution. However, as the primary manager of multibillion-dollar programs and as the entity with fiduciary responsibility for the trust funds, SSA must take the lead in forging the partnerships and cooperation that will be needed in redesigning the federal disability programs. SSA also made a number of technical

**Chapter 5**
**Conclusions, Recommendation, and Agency**
**Comments**

comments, which we incorporated where appropriate. Appendix V contains the full text of SSA's comments and our evaluation.

Appendix I

# Organizations Contacted During GAO's Review of U.S. Private Sector Disability Management Practices

American Airlines, Inc./AMR Corporation

Lynn Swaim
Manager, Workers' Compensation

Sondra Napier
Senior Analyst, Workers' Compensation

American Rehabilitation Association

Tony Young
Director, Residential Services and Community Supports

Bausch & Lomb, Inc.

Kevin E. Flint
Director, Benefits Finance

Burlington Industries

Don Beusse
Director, Health and Safety Services

Chrysler Corporation

Kathleen Neal
Staff Specialist, Benefit Services
Corporate Group Insurance

John D. Wilson
Manager, Benefits Services

Commission on Accreditation of Rehabilitation Facilities

Dr. Donald Galvin
President and Chief Executive Officer

Digital Equipment Corporation

Karen Nelson
U.S. Disability Program Manager

**Appendix I**
**Organizations Contacted During GAO's**
**Review of U.S. Private Sector Disability**
**Management Practices**

DuPont Company

David B. Helms
Senior Consultant, Health Care

Federal Express

Janna Rogers
Benefits Advisor, Benefit Planning Analysis

Fortis Benefits Insurance Company

John Althoff
Rehabilitation Manager

General Electric Company

Shelly Wolff
Corporate Health Care, Disability Program Lead

HHRC Inc.

Marcia Carruthers
Director of Disability Management
(also serves as Executive Director,
Disability Management Employer Coalition, Inc.)

IBM Human Resources, USA

Ted Richards
Manager, Benefit Programs

Andrea M. Epps
Program Manager, Benefit Programs

John Hancock Mutual Life Insurance Company

Richard Quebec
Product and Network Services

**Appendix I**
**Organizations Contacted During GAO's**
**Review of U.S. Private Sector Disability**
**Management Practices**

L.L. Bean

Ted Rooney
Manager, Employee Health Management

Marriott International, Inc.

Rachel Ebert
Director, Occupational Health Services

Northwestern National Life

Mark C. Taylor
Senior Rehabilitation Case Manager, Disability Management Services

Owens-Corning Fiberglas Corporation

Amy Ahrens
Integrated Health Services Leader

Pepsico

Ellen Abisch
Manager, Workers' Compensation

Polaroid Corporation

Richard J. Williams
Senior Corporate Benefits Administrator

Proctor & Gamble

James Palmer
Associate Director for Employee Benefits, Human Resources

Don Freeland
Senior Manager

Southern California Edison

Suzanne Mercure
Benefits Administration Manager

John Stimson
Manager, Disability Management

Texas Instruments

Susan M. Nelson
Health Promotion and Benefits Manager

The Principal Financial Group

Catherine Bennett
Assistant Director
(also serves as Chair, Rehabilitation Subcommittee, Health Insurance
Association of America)

The Burns Group, Inc.

John Burns, President and Chief Executive Officer

UNUM Life Insurance Company of America

Patricia M. Owens
President, Integrated Disability Management

Washington Business Group on Health

Kathleen Kirchner
Director, Institute for Rehabilitation and Disability Management

Wells Fargo Bank

Bruce Flynn
Manager, Disability Management

Appendix II

# Survey on Disability Management Practices

This appendix presents the survey instrument that we used to obtain information from 21 people in the U.S. private sector generally recognized for their leadership in developing return-to-work programs. The first page of the survey instrument provided respondents with instructions for completing the survey, and the second page defined some of the terms in the survey instrument.

The remainder of the survey instrument listed various disability management practices. For each practice, we have inserted the number of respondents who answered "yes" or "no" when asked whether their current programs currently incorporated the practice. For some practices, not all respondents answered the question; therefore, the number of responses is less than 21 in some instances. Also, for each practice, we have inserted the mean rating that respondents gave when asked for their assessment of how important it is to include that practice in a model disability management program.[59]

---

[59]On the fifth page of the survey instrument, we did not provide any results data for practice number 9, "Pay private VR providers for every client served." Based on follow-up discussions with several respondents to our survey, we found that the wording of this practice was not sufficiently clear to ensure that accurate responses were elicited.

Appendix II
Survey on Disability Management Practices

**IMPORTANT NOTES ABOUT THIS QUESTIONNAIRE**

We have classified our list of disability management practices
according to two basic goals: (1) curbing the flow of workers
into long-term disability programs and (2) returning disabled
beneficiaries to the workplace.  For each disability management
practice, we ask whether your current program incorporates that
practice.

Also, as you think about each disability management practice in
our list, we ask you to consider the following question:  If you
were designing a model disability management program, how
important do you believe it would be to include that practice in
your model program?

Please assume that no constraints would be placed on the design
of your model program.  We recognize that legal requirements for
Workers' Compensation programs can vary from state to state and
that the scope and organization of disability management can vary
from company to company.  However, assume you were starting with
a clean sheet of paper to design a model program for managing all
types of disability cases.

If you believe our list omits any important practices, space is
provided for you to pencil them in.  Also, on page 2, we define
several terms that appear in the questionnaire.

Please provide the following information about the person who
completes the questionnaire:

Company/organization _____

Your name _____

Position _____

Telephone number _____

Which type(s) of disability cases do you manage?  (Check all that
apply)

  (4)  1.  Workers' Compensation

  (8)  2.  Disability Insurance

  (9)  3.  Other (specify [both workers' compensation disability
           insurance cases])

Appendix II
Survey on Disability Management Practices

DEFINITION OF TERMS[1]

Disability case management--A systematic approach to identifying,
evaluating, and coordinating the delivery of disability-related
services to individuals; the objective is to improve return-to-
work outcomes for employees who become disabled and financial
results for employers.[2]

**Employee Assistance Program** (EAP)--Employer-sponsored program
designed to help employees whose job performance is being
adversely affected by personal problems.  May involve wellness
and prevention efforts, counseling, and control of specific
conditions (e.g., alcoholism or smoking).  Some employers use
EAPs to address the psychological aspects of disabling injuries
or illnesses.

**Organized system of care** (OSC)--A group or network of health care
providers that integrates the financing and delivery of a full
continuum of care for its enrolled population and is held
clinically and fiscally accountable for the outcomes and health
status of its members.  OSCs focus on prevention as well as care
and collaborate with employers on setting return-to-work
expectations for members who become disabled.

**Transitional work**--Changes in the work environment to allow an
employee who has been disabled to return to work at a job that is
less physically or mentally demanding than his or her previous
assignment; modifications may include job restructuring;
assistive devices, workstation modifications; reduced hours, or
reassignment to another job.  Also known as modified work or
light duty.

**Wellness program**--Any of a range of employer-sponsored activities
designed to increase employees' overall quality of life, prevent
accidents and ill health, and reduce the associated costs.  May
include programs for fitness, smoking cessation, nutrition and
weight management, stress management, blood pressure screening,
health risk appraisals, etc.

---

[1]Definitions are taken from <u>The Language of Managed
Disability: A Glossary of Terms</u>. 1995.  Published by William M.
Mercer, Incorporated, and Metropolitan Life Insurance Company in
cooperation with the Washington Business Group on Health.

[2]Disability-related services can include a range of social,
health care, and rehabilitation services.

Appendix II
Survey on Disability Management Practices

**Disability Management Practices for Curbing
the Flow of Workers into Long-Term Disability Programs**

| GOAL:  CURB THE FLOW OF WORKERS INTO LONG-TERM DISABILITY PROGRAMS | | |
|---|---|---|
| **Practice** | **Does your current program incorporate this practice?** | **How important is it to include this practice in a model disability management program?**<br>1 = Not important<br>5 = Very important<br>(Circle one choice) |
| 1.  Employ safety and prevention strategies to avoid disabilities. | Yes  No<br>(21    (0) | 1   2   3   4   5<br>(Mean rating = 4.8) |
| 2.  Track illnesses and injuries to provide data needed to develop safety and prevention efforts. | Yes  No<br>(20)   (1) | 1   2   3   4   5<br>(Mean rating = 4.7) |
| 3.  Offer wellness programs. | Yes  No<br>(19)   (2) | 1   2   3   4   5<br>(Mean rating = 3.9) |
| 4.  Offer an Employee Assistance Program. | Yes  No<br>(20)   (1) | 1   2   3   4   5<br>(Mean rating = 3.9) |
| 5.  Maintain communication (by telephone or in-person) with workers who are hospitalized or recovering at home. | Yes  No<br>(19)   (1) | 1   2   3   4   5<br>(Mean rating = 4.7) |
| 6.  Modify jobs to enable impaired workers to remain on the job. | Yes  No<br>(20)   (1) | 1   2   3   4   5<br>(Mean rating = 4.9) |
| 7.  Train supervisors in disability management concepts and practices. | Yes  No<br>(14)   (6) | 1   2   3   4   5<br>(Mean rating = 4.5) |
| 8.  Make appropriate medical rehabilitation services available from the onset of impairments that could cause disability. | Yes  No<br>(18)   (3) | 1   2   3   4   5<br>(Mean rating = 4.3) |
| 9.  Assure that medical service providers understand the essential job functions of the impaired worker. | Yes  No<br>(18)   (2) | 1   2   3   4   5<br>(Mean rating = 4.6) |

**Appendix II**
**Survey on Disability Management Practices**

<table>
<tr>
<td colspan="3" align="center"><strong>GOAL:  CURB THE FLOW OF WORKERS<br>INTO LONG-TERM DISABILITY PROGRAMS</strong></td>
</tr>
<tr>
<td><strong>Practice</strong></td>
<td><strong>Does your current program incorporate this practice?</strong></td>
<td><strong>How important is it to include this practice in a model disability management program?</strong><br>1 = Not important<br>5 = Very important<br>(Circle one choice)</td>
</tr>
<tr>
<td>10.  Make appropriate vocational rehabilitation (VR) services available from the onset of impairments that could lead to disability.</td>
<td>Yes    No<br>(12)    (8)</td>
<td>1   2   3   4   5<br>(Mean rating = 3.7)</td>
</tr>
<tr>
<td>11.  Address return-to-work goals from the beginning of an emerging disability.</td>
<td>Yes    No<br>(18)    (2)</td>
<td>1   2   3   4   5<br>(Mean rating = 4.7)</td>
</tr>
<tr>
<td>12.  (In the spaces below, write in any practices you believe need to be added.)</td>
<td>Yes    No</td>
<td>1   2   3   4   5</td>
</tr>
<tr>
<td>13.</td>
<td>Yes    No</td>
<td>1   2   3   4   5</td>
</tr>
<tr>
<td>14.</td>
<td>Yes    No</td>
<td>1   2   3   4   5</td>
</tr>
</table>

Appendix II
Survey on Disability Management Practices

**Disability Management Practices
for Returning Disabled Beneficiaries to the Workplace**

| GOAL:  RETURN DISABLED BENEFICIARIES TO THE WORKPLACE | | |
|---|---|---|
| **Practice** | **Does your current program incorporate this practice?** | **How important is it to include this practice in a model disability management program?** 1 = Not important 5 = Very important (Circle one choice) |
| 1.  Assess return-to-work potential early in the process. | Yes (20)   No (1) | 1   2   3   4   5 (Mean rating = 4.8) |
| 2.  Use persons with appropriate skills/training to assess return-to-work potential. | Yes (20)   No (1) | 1   2   3   4   5 (Mean rating = 4.3) |
| 3.  Assess return-to-work potential by comparing beneficiary's characteristics with a profile of the characteristics of persons who are likely to return to work. | Yes (7)   No (14) | 1   2   3   4   5 (Mean rating = 2.7) |
| 4.  Assure that medical service providers understand the essential job functions of the disabled worker. | Yes (19)   No (2) | 1   2   3   4   5 (Mean rating = 4.6) |
| 5.  Provide VR services only to those who must have such services to return to work. | Yes (13)   No (7) | 1   2   3   4   5 (Mean rating = 3.6) |
| 6.  Offer VR services only to those who are deemed likely to return to work. | Yes (12)   No (9) | 1   2   3   4   5 (Mean rating = 3.8) |
| 7.  Provide appropriate VR services at the earliest appropriate time. | Yes (15)   No (6) | 1   2   3   4   5 (Mean rating = 4.4) |
| 8.  Offer appropriate VR services at a later time to beneficiaries who initially did not participate in a return-to-work plan. | Yes (15)   No (6) | 1   2   3   4   5 (Mean rating = 3.4) |
| 9.  Pay private VR providers for every client served.  (See footnote 59 above) | Yes   No | 1   2   3   4   5 |
| 10.  Use case management techniques when appropriate to help beneficiaries return to work. | Yes (20)   No (1) | 1   2   3   4   5 (Mean rating = 4.5) |
| 11.  Use case managers when appropriate to provide VR services. | Yes (15)   No (6) | 1   2   3   4   5 (Mean rating = 3.4) |

**Appendix II**
**Survey on Disability Management Practices**

| GOAL:  RETURN DISABLED BENEFICIARIES TO THE WORKPLACE | | |
|---|---|---|
| **Practice** | **Does your current program incorporate this practice?** | **How important is it to include this practice in a model disability management program?** 1 = Not important 5 = Very important (Circle one choice) |
| 12.  Allow beneficiaries to choose their own VR service providers. | Yes (7) No (14) | 1  2  3  4  5 (Mean rating = 2.1) |
| 13.  Include a contractual provision that can require the beneficiary to cooperate with return-to-work efforts. | Yes (12) No (9) | 1  2  3  4  5 (Mean rating = 4.1) |
| 14.  Return the disabled worker, if possible, to the same job with the same employer. | Yes (21) No (0) | 1  2  3  4  5 (Mean rating = 4.5) |
| 15.  Offer transitional work opportunities that enable the disabled worker to ease back into the workplace. | Yes (20) No (1) | 1  2  3  4  5 (Mean rating = 4.8) |
| 16.  Offer a cash benefit structure that gives beneficiaries an incentive to rejoin the workforce. | Yes (14) No (7) | 1  2  3  4  5 (Mean rating = 4.4) |
| 17.  Beneficiaries maintain their medical benefits by returning to work. | Yes (16) No (5) | 1  2  3  4  5 (Mean rating = 4.1) |
| 18.  Place time limits on benefits for certain impairments. | Yes (13) No (8) | 1  2  3  4  5 (Mean rating = 3.3) |
| 19.  The insurer in some instances pays for job accommodations to facilitate return to work. | Yes (14) No (6) | 1  2  3  4  5 (Mean rating = 3.6) |
| 20.  The insurer in some instances subsidizes a beneficiary's wages to facilitate return to work. | Yes (15) No (5) | 1  2  3  4  5 (Mean rating = 3.6) |

**Appendix II**
**Survey on Disability Management Practices**

| GOAL:  RETURN DISABLED BENEFICIARIES TO THE WORKPLACE | | |
|---|---|---|
| **Practice** | **Does your current program incorporate this practice?** | **How important is it to include this practice in a model disability management program?**<br>1 = Not important<br>5 = Very important<br>(Circle one choice) |
| 21.  Use an organized system of care (OSC) as part of the strategy for returning disabled workers to the workplace. | Yes    No<br>(8)    (13) | 1   2   3   4   5<br>(Mean rating = 3.9) |
| 22.  (In the spaces below, write in any practices you believe need to be added.) | Yes    No | 1   2   3   4   5 |
| 23. | Yes    No | 1   2   3   4   5 |
| 24. | Yes    No | 1   2   3   4   5 |

Appendix III

# People and Organizations Contacted During GAO's Review of Social Insurance Disability Programs in Germany and Sweden

## Germany

Dr. Rolf Bödege, Chief Administrator
Vocational Retraining Center—Frankfurt am Main
Bad Vilbel

Dr. Rainer G. Diehl, Leading Physician, Rehabilitation Department
Dr. Gunter Möbert, Psychiatrist, Rehabilitation Department
Jacob Brähler, Department Chief, Insurance and Pension Department
Petra Lee, Section Chief, Insurance and Pension Department
Regional Pension Office—Hessen
Frankfurt am Main

Dr. Ulrich Gehrke
Federal Rehabilitation Council
Frankfurt am Main

Dr. Harmut Haines, Ministry Advisor
Federal Ministry for Labor and Social Affairs
Bonn

Dr. Michael Nagy, Managing Director
Vocational Training Center Heidelberg
Heidelberg

Anke Paul, Advisor, Placement and Counseling
Regional Employment Office Hessen
Frankfurt am Main

Gisela Scherer, Rehabilitation Section Chief
Employment Office
Frankfurt am Main

Dr. Michael F. Schuntermann, Department of Rehabilitation Science
Uwe Rehfeld, Statistician
Federation of German Pension Insurance Carriers
Frankfurt am Main

## Sweden

Patsy Büchmann
U.S. Embassy
Labor Section
Stockholm

**Appendix III**
**People and Organizations Contacted During**
**GAO's Review of Social Insurance Disability**
**Programs in Germany and Sweden**

Dr. Edward Palmer, Head of Research Section
Rolf Westin, Head of Division for Rehabilitation and Disability Pension
Kristina Bengtsson, Rehabilitation Advisor
Peter Jusélius, Legal Advisor
Hannelotte Kindlund, Head of Statistical Division
Tommy Edlund, Statistics Analyst
National Social Insurance Board
Stockholm

Birgitta Magnusson, First Secretary, Disability Issues
Liso Sergo
Ministry of Health and Social Affairs
Stockholm

Lars Hultstrand, Secretary of the Social Committee
Standing Committee on Social Affairs
Parliament
Stockholm

Inger Lenas, Officer, Social Policy Issues
The Swedish Trade Union Confederation
Stockholm

Inga-Britt Lagerlöf, Deputy Assistant Under-Secretary
Anna Odhner, Section Head
Ministry of Labor
Stockholm

Leif Alm, Assistant Manager
Bertil Andersson
Samhall AB
Tullinge

Lisbeth Lidbom, Program Manager for Vocational Rehabilitation and
Handicap Issues
National Labor Market Board
Solna

Christina Ebbeskog, Swedish Confederation of Salaried Employees
Stockholm

**Appendix III**
**People and Organizations Contacted During**
**GAO's Review of Social Insurance Disability**
**Programs in Germany and Sweden**

Eva Lundin, Secretary for Disability Issues
Stockholm Social Services
Stockholm

Birgitta Rydberg, County Councillor
Stockholm County Council
Stockholm

Eva Sandborg, International Advisor
Office of the Disability Ombudsman
Stockholm

Nils Eklund, Senior Auditor
The Swedish National Audit Office
Stockholm

Hans Galvér
Helena Paulsson
Employability Institute
Uppsala

Håkan Eriksson
Working Life Services
Uppsala

Jan Åke Brorson, Secretary to the Committee
The Committee for a New Structure for Sickness and Occupational Injury
Insurance
Ministry of Health and Social Affairs
Stockholm

Gunilla Sahlin, Advisor on Education, Training, and Disability Policy
Dr. Eric Jannerfeldt
Swedish Employers' Confederation
Stockholm

Christer Johansson
The Swedish National Society for Persons with Mental Handicap
Stockholm

**Appendix III**
**People and Organizations Contacted During**
**GAO's Review of Social Insurance Disability**
**Programs in Germany and Sweden**

Anita Pettersson, Employment Officer
Annelie Österberg, Vocational Guidance Officer
Employment Office
Stockholm

Dr. Anders Gidlöf, Institute for Futures Studies
Stockholm

Ann-Kristin Olsson, Rehabilitation Counselor
Social Insurance Office
Stockholm

Appendix IV

# Five-Step Sequential Evaluation Process for Determining DI and SSI Disability

To determine whether an applicant qualifies for DI and SSI disability benefits, SSA uses a five-step sequential evaluation process. In the first step, an SSA field office determines if an applicant is working at the level of substantial gainful activity (SGA) and whether he or she meets the applicable nonmedical eligibility requirements (Social Security insured status, income and resources, residency, and citizenship, for example).[60] An applicant found to be not working or working but earning less than SGA (minus allowable exclusions) and who meets the nonmedical eligibility requirements has his or her case, including medical and vocational evidence, forwarded to a Disability Determination Service (DDS) office. Applicants who do not meet these requirements, regardless of medical condition, are denied benefits.

DDS offices gather medical and any additional vocational or other necessary evidence to determine if applicants are disabled under the Social Security law. In step two, the DDS office determines if the applicant has an impairment or combination of impairments that is severe and could be expected to last at least 12 months. According to SSA standards, a severe impairment is one that significantly limits an applicant's ability to do "basic work activities," such as standing, walking, speaking, understanding and carrying out simple instructions, using judgment, responding appropriately to supervision and dealing with change. The DDS office collects all necessary medical evidence, either from those who have treated the applicant or, if that information is insufficient, from an examination conducted by an independent source. Applicants with severe impairments that are expected to last at least 12 months proceed to the third step in the disability determination process; applicants without such impairments are denied benefits.

At step three, the DDS office compares the applicant's condition with the Listing of Impairments (referred to as "the listings") developed by SSA. The listings contain over 150 categories of medical conditions (such as the loss of both feet or an IQ score below 60) that, according to SSA, are severe enough ordinarily to prevent an individual from engaging in SGA. An applicant whose impairment is cited in the listings or whose impairment is equally as severe or more severe than those in the listings and who is not engaging in SGA is found disabled and awarded benefits. An applicant whose impairment is not cited in the listings or is not of equal or greater

---

[60]To be eligible for DI benefits, individuals must have worked long enough and recently enough under Social Security. To be eligible for SSI benefits, individuals must not have countable monthly income (earned and unearned income as defined by the SSI program, minus allowable exclusions) higher than the federal benefit rate, or countable real and personal property (including cash) worth more than $2,000.

severity is evaluated further to determine whether he or she can perform past work or other work.

In step four, the DDS office uses its physician's assessment of the applicant's residual functional capacity (RFC) to determine whether the applicant can still perform the functional demands of work he or she has done in the past. For physical impairments, an RFC is expressed in certain demands of work activity (for example, ability to walk, lift, carry, push, pull, and so forth); for mental impairments, an RFC is expressed in psychological terms (for example, whether a person can follow instructions and handle stress). If the DDS office finds that a claimant can perform work done in the past, benefits are denied.

In the fifth and last step, the DDS office determines if an applicant who cannot perform work done in the past can do other work that exists in the national economy.[61] Using SSA guidelines, the DDS considers the applicant's age, education, work experience, and RFC to determine what other work, if any, the applicant can perform. Unless the DDS office concludes that the applicant can perform work that exists in the national economy, benefits are allowed.

At any point in the sequential evaluation process, an examiner can deny benefits for reasons relating to insufficient documentation or to lack of cooperation by the applicant. Such reasons can include an applicant's failure to (1) provide medical or vocational evidence deemed necessary for a determination by the examiner, (2) submit to a consultive examination that the examiner believes is necessary to provide evidence, or (3) follow a prescribed treatment for an impairment. Benefits are also denied if the applicant asks DDS to discontinue processing the case.

---

[61]By definition, work in the national economy must exist in significant numbers in the region where the applicant lives or in several regions of the country. It is inconsequential whether (1) such work exists in the applicant's immediate area, (2) job vacancies exist, or (3) the applicant would actually be hired.

# Comments From the Social Security Administration and Our Evaluation

Note: GAO comments supplementing those in the report text appear at the end of this appendix.



## SOCIAL SECURITY
Office of the Commissioner

June 6, 1996

Ms. Jane L. Ross
Director, Income Security Issues
U.S. General Accounting Office
Washington, D.C.  20548

Dear Ms. Ross:

Thank you for the opportunity to comment on the draft report, "Social Security Disability Programs:  Return-To-Work Strategies From Other Systems Have Potential for Improving Federal Programs" (GAO/HEHS-96-133).  We appreciate the time and effort of the General Accounting Office in conducting this review.

As you know, I share your concern that people with disabilities who receive Social Security Disability Insurance (SSDI) and Supplemental Security Income (SSI) disability benefits face a number of barriers to entering or reentering the workforce.  The Social Security Administration has placed a high priority on helping its SSI and SSDI beneficiaries return to work, and we continue to work diligently within the agency, and with other federal departments and agencies, to find new and innovative ways to encourage work.

Enclosed are our specific comments on the report.  If you have any questions, please call me or have your staff contact Susan Daniels at (410) 965-3424.

Sincerely,

Shirley S. Chater
Commissioner
    of Social Security

Enclosure

SOCIAL SECURITY ADMINISTRATION  BALTIMORE MD 21235-0001

Appendix V
**Comments From the Social Security
Administration and Our Evaluation**

COMMENTS OF THE SOCIAL SECURITY ADMINISTRATION (SSA) ON THE
GENERAL ACCOUNTING OFFICE (GAO) DRAFT REPORT, "SOCIAL SECURITY
DISABILITY PROGRAMS:  RETURN-TO-WORK STRATEGIES FROM OTHER
SYSTEMS HAVE POTENTIAL FOR IMPROVING FEDERAL PROGRAMS" (GAO/HEHS-
96-133)

We appreciate the time and effort of GAO in conducting this
review.  The report provides some valuable information about
return-to-work strategies that are being used in other systems.
We agree that there is much to be learned from the disability
management practices of private insurance programs and some other
countries.

SSA continues to work diligently within the agency, and with
other Federal departments and agencies, to find and implement new
and innovative ways to encourage work.  These initiatives, which
are detailed below, will result in significant improvements in
the agency's return-to-work strategies.

GAO Recommendation

That the Commissioner develop a comprehensive return-to-work
strategy that integrates, as appropriate, earlier intervention,
earlier identification and provision of necessary return-to-work
assistance for applicants and beneficiaries, and changes in the
structure of cash and medical benefits.  The Commissioner should
also identify legislative changes needed to implement such a
program.

SSA Comment

See comment 1.

SSA has placed a high priority on helping its supplemental
security income (SSI) and Social Security disability insurance
(SSDI) beneficiaries go to work. SSA hopes to help people with
disabilities gain independence from the disability rolls through
innovative rehabilitation and employment initiatives.  SSA's
approach is two-fold:  (1) making the current SSA vocational
rehabilitation (VR) payment program more effective; and (2)
studying new ways to increase employment opportunity.  The goal
of these efforts is to expand the number of beneficiaries who can
receive quality rehabilitation and employment services in a
timely, cost-effective manner, thereby affording individuals with
a disability an improved quality of life and feeling of self-
worth.

In mid-1994, the agency began a thorough analysis of the SSA
disability programs to identify barriers and disincentives to
return to work for its beneficiaries with disabilities, and it
has already achieved a number of important milestones in
implementing its return-to-work initiative:

Appendix V
Comments From the Social Security
Administration and Our Evaluation

2

o    We have awarded $72.7 million to State VR agencies in
     fiscal year 1995 for the successful rehabilitation of over
     6,000 beneficiaries.  This is the highest number of
     claimants successfully rehabilitated in the program's
     history.

o    We have received input from advocates, experts, and other
     stakeholders on removing barriers to return to work in the
     SSI and SSDI programs.  We have also conducted a
     comprehensive review and analysis of the research and
     literature on the success or failure of return-to-work and
     rehabilitation efforts in the SSI and SSDI programs over the
     past 10 to 15 years.

o    We have published regulations that: (1) require the State
     VR agencies to inform us when beneficiaries referred to
     them are accepted for services and (2) permit us to refer
     beneficiaries to an alternate provider when the State VR
     agency is unable to provide services.  This is the first
     time SSA has worked with private providers of VR.

o    We have requested that States enter into performance
     partnerships with SSA to enhance the States' rehabilitation
     and employment initiatives to better focus on beneficiaries
     as VR clients.

o    We have published a brochure to inform the public about how
     SSA can help with VR services.

o    We have signed an interagency agreement with the
     Rehabilitation Services Administration for Cornell
     University to provide training on our work incentives to
     State VR professionals in all regions of the country.

o    We have let a contract for a complete, comprehensive
     evaluation of Project NetWork, a major SSA research effort
     that tested four models for delivering alternative
     employment and rehabilitation services.

o    We have improved management information to more thoroughly
     evaluate the results of our efforts.

A key element in making the current program more effective is
expanding the pool of providers who can help people with
disabilities receive the VR services they need to go to work.  As
a result of regulations published in March 1994, VR service
providers in the public and private sectors are now eligible to
participate in SSA's VR Reimbursement Program to serve SSA's
beneficiaries with disabilities who are not served by the State
VR agencies.  These providers, called alternate participants, can
be paid by SSA for the costs they incur in cases where their
services help SSA's beneficiaries obtain and retain jobs at

Appendix V
Comments From the Social Security
Administration and Our Evaluation

3

certain wage levels.  SSA has received more than 4,000 requests for further information.  We expect to release shortly a request for proposal (RFP) to the providers who responded to the initial notices.  The RFP will provide details about SSA's VR program and will invite all interested providers to submit proposals to become alternate participants.  Based on these proposals, SSA will enter into negotiated contracts with all qualified providers.

See comment 2.

With respect to the findings presented in the report, we agree that there is much to be learned from the disability management practices of private insurance programs and the disability programs of Germany and Sweden.  In fact, SSA has long had an interest in European disability programs, both short-term and long-term, and in their rehabilitation and return-to-work efforts.  We, too, are interested in determining whether provisions of these programs could be useful to our attempts to improve the rate of return to work of disability beneficiaries.

It is important to note, however, that the programs referenced in the report are fundamentally different in intent and purpose from SSA's disability programs.  SSA's disability programs are designed to be cash benefits programs for individuals with long-term disabilities, not return-to-work programs.  Moreover, the integration of health care and social insurance programs and the legislatively mandated involvement of private employers in the systems of Germany and Sweden are not present in the United States.  These would be major factors with respect to implementing the changes recommended in the report.

See comment 3.

The three strategies that the private and foreign systems have in common, namely, early intervention, assistance to achieve return-to-work goals, and benefits structured to encourage return to work, are well known and have been discussed and debated for many years.  They were mentioned prominently in the 1988 report of the Disability Advisory Council, among other discussions.  As acknowledged in GAO's report, however, there is a lack of rigorous studies presenting data on cost effectiveness of either private sector disability case management or the rehabilitation programs in Germany and Sweden.  Implementing these practices in the current DI and SSI programs may not have the same impact as for the private or foreign systems, due to the differences in the populations serviced by these programs and the different cultural and/or systemic environment in which these programs function.  These are important issues that deserve further study and review.

See comment 4.

We believe the report helps to refocus attention on these specific strategies and opens a new discussion of possible solutions.  For such discussion to be fruitful, we believe that all players in the complex network of Federal disability policy development and program execution need to be involved.

Appendix V
Comments From the Social Security
Administration and Our Evaluation

4

Representation would be needed from several Federal departments
and agencies, State disability and rehabilitation programs,
private sector providers and insurance representatives, and
employer/union groups.  Moreover, numerous  congressional
committees have a role in the development of legislation or in
budget approval for the kinds of solutions the GAO report
describes.  Such full partnership is necessary to create cost-
effective solutions that cut across jurisdictions.

Other Comments

The report states in the first paragraph on page 19 (and makes
similar statements on page 47) that "SSA's process for
determining disability does not generally focus on the
applicant's functional capacity to work," and that "The statutory
requirement for disability presumes that some medical conditions
are sufficient, in themselves, to prevent individuals from
engaging in substantial gainful employment."  However, we believe
those statements are misleading.

Functional capacity for work is the major focus of SSA's
evaluation process.  However, the Listing of Impairments serves
as a proxy for a functional evaluation, identifying impairments
that are presumed to impose functional restrictions sufficient to
preclude any gainful activity.  The statutory definition of
disability neither includes nor implies a presumption that some
impairments, in themselves, prevent substantial gainful activity.
The statute only requires that the inability to work be the
consequence of a physical or mental impairment that results from
anatomical, physiological, or psychological abnormalities that
are demonstrable by medically acceptable clinical and laboratory
diagnostic techniques.  The evaluation process that presumes
certain medical conditions are alone sufficient to preclude work
(i.e., the Listing of Impairments) is a regulatory construct.

Also, on page 68 (and elsewhere) of the report, it is
acknowledged that "SSA faces constraints in applying these
(return-to-work) strategies..."  However, the report does not
specify what those constraints are, and it does not address the
costs of overcoming those constraints as compared to the benefits
of applying the strategies.

The constraints are, in large part, statutory in nature.  The law
sets out a program that does not provide for, or even allow, many
of the strategies suggested.  Although the report implies that
statutory revision is needed (i.e., in its recommendation that
the Commissioner identify legislative changes needed to implement
such a program), it never acknowledges the legislative basis for
the current programs.

See comment 5.
Now on pp. 17 and 35.

See comment 6.
Now on p. 49.

Appendix V
Comments From the Social Security
Administration and Our Evaluation

The following are GAO's comments on the Social Security Administration's letter dated June 6, 1996.

## GAO Comments

1. We recognize that SSA has taken actions that exemplify concern for helping more DI and SSI beneficiaries gain independence by returning to work. The Commissioner stated that SSA is already placing a high priority on return to work and cited a number of actions SSA has taken to implement its return-to-work initiative. Although these actions are in the right direction, we believe the steps SSA has taken do not constitute the fundamental redirection of goals and practices necessary to move the DI and SSI programs to a much greater emphasis on return to work. Fundamental redesign is needed because the DI and SSI programs are designed, as the Commissioner acknowledges in her comments, to be cash benefits programs, not return-to-work programs.

Without a fundamental redirection of the programs, SSA's primary focus will continue to be on determining whether individuals are unable to work and then, after declaring them unable to work, considering whether to refer them to a vocational rehabilitation provider to help them return to work. This approach does not permit earlier points of intervention that disability managers in the private sector and in the social insurance programs in Germany and Sweden believe are critical in maximizing return-to-work success.

2. Our report acknowledges the fundamental differences between SSA's disability programs and the disability programs we analyzed in the U.S. private sector and in Germany and Sweden. Our report also acknowledges that implementing the return-to-work strategies of these other systems will require new legislation, and therefore, we recommend that the Commissioner identify legislative changes needed to implement a comprehensive return-to-work program.

3. Our report acknowledges that implementing practices from other systems may not have the same impact in SSA's programs because of differences in the populations served and other fundamental factors. Because even small gains in return-to-work success can result in large reductions in program costs, however, we believe the application of the return-to-work strategies in our report warrants strong consideration.

4. We agree with SSA that, to ensure the success of a newly designed return-to-work program incorporating the strategies presented in our

report, all relevant parties need to be involved in policy development and program execution. However, we believe that SSA, as the primary manager of these multibillion-dollar programs and as the entity with fiduciary responsibility for the trust funds, must take the lead in forging the partnerships and cooperation that will be necessary in redesigning the programs to place greater priority on return to work.

5. Since SSA stated in its comments that the Listing of Impairments serves as a proxy for a functional evaluation, we disagree with SSA's assertion that our report is misleading in its discussion of SSA's process for determining disability and its general lack of focus on the applicant's functional capacity to work. Our report points out that most beneficiaries are awarded benefits on the basis of whether they have an impairment that meets or equals a medical condition found in SSA's Listing of Impairments. In such cases, the determination process does not directly assess the individual's capacity to work but instead focuses on establishing whether the individual has a specific medical condition. SSA argued that the listings consider the functional consequences of listed impairments and it is presumed that if a person's impairment meets or equals a listed impairment, his or her condition imposes functional restrictions sufficient to preclude any gainful activity. We believe these arguments demonstrate our point—that using the listings to determine eligibility does not provide a direct assessment of an individual's actual capacity to work but instead results in a presumption that a person cannot work based on the existence of certain medical conditions. Also, we note that SSA has reported previously that "some, but not all, of the Listings consider functional consequences of an impairment . . ." and that "functional considerations vary significantly among the Listings." See HHS, Plan for a New Disability Claim Process, SSA Pub. No. 01-0005 (Washington, D.C.: HHS, SSA, Sept. 1994), p. 11. Our report was revised to clarify language describing SSA's process for determining disability and the Listing of Impairments (see pp. 17 and 35).

6. We believe the report acknowledges the existence of several constraints that SSA faces in placing greater emphasis on return to work. On page 13, we note that the population SSA serves may include many individuals who are more severely impaired, have less work history, or fewer current job skills than clients the private sector serves. On page 15, we acknowledge the legislative basis for the DI and SSI programs, and accordingly, we recommend that the Commissioner should identify legislative changes needed to implement changes to the disability programs. As SSA comments note, we acknowledge the lack of rigorous studies that present conclusive

**Appendix V**
**Comments From the Social Security**
**Administration and Our Evaluation**

data on the cost-effectiveness of disability management. (See pp. 26 and 27.) For this reason, our recommendation that the Commissioner develop a return-to-work strategy did not specify exactly which practices were to be included or how they were to be implemented. Rather, we recommended that such a plan integrate, as appropriate, the strategies discussed in our report. We believe the development of such a plan will require SSA to assess the costs and benefits of a variety of return-to-work practices, and from this assessment, SSA will be able to determine which practices are cost-effective and should be included.

SSA also made a number of technical comments, which we incorporated where appropriate.

Appendix VI

# Major Contributors to This Report

Cynthia A. Bascetta, Assistant Director, (202) 512-7207
Ira B. Spears, Evaluator-in-Charge
Carol Dawn Petersen, Senior Economist
Michele Grgich, Senior Evaluator
Kenneth F. Daniell, Evaluator

# Bibliography

Akabas, Sheila H., Lauren B. Gates, and Donald E. Galvin. Disability Management: A Complete System to Reduce Costs, Increase Productivity, Meet Employee Needs, and Ensure Legal Compliance. New York: American Management Association, 1992.

Berkowitz, Monroe. Improving the Return to Work of Social Security Disability Beneficiaries. Washington, D.C.: National Academy of Social Insurance, Dec. 9, 1994.

Blackorby, Jose, and Mary Wagner. Postschool Outcomes for Youth With Disabilities Receiving SSI and SSDI: Findings From the National Longitudinal Transition Study. Menlo Park, Calif.: SRI International, Oct. 17, 1994.

Bureau of National Affairs, Inc. The Americans With Disabilities Act; A Practical and Legal Guide to Impact, Enforcement, and Compliance. Washington, D.C.: Bureau of National Affairs, Inc., 1990.

Chirikos, Thomas N. "The Economics of Employment," The Americans With Disabilities Act: From Policy to Practice, ed. Jane West. New York: Milbank Memorial Fund, 1991.

Collignon, Fredrick C. "The Role of Reasonable Accommodation in Employing Disabled Persons in Private Industry," Disability and the Labor Market, Economic Problems, Policies, and Programs, eds. Monroe Berkowitz and M. Anne Hill. Ithaca, N.Y.: ILR Press, Cornell University, 1986.

Covaleski, John M. "Rehabilitating Margins in Workers' Compensation." Best's Review, Vol. 95, No. 5 (1994), p. 54.

Cox, Brian. "Companies Debate Best Way to Handle Rehab Services." National Underwriter (Life & Health/Financial Services), No. 29 (1994), p. 14.

_____. "Scale Quantifies Efficacy of Rehab for Claimants." National Underwriter (Property & Casualty/Risk & Benefits), No. 35 (1994), p. 21.

Davidson, Craig J. "Vocational Rehabilitation Services in Workers' Compensation Programs: Evaluating Research Model Effectiveness." Benefits Quarterly, Vol. 10, No. 4 (1994), pp. 49-57.

Dean, David H., and Robert C. Dolan. "Assessing the Role of Vocational Rehabilitation in Disability Policy." Journal of Policy Analysis and Management, Vol. 10, No. 4 (1991), pp. 568-87.

Fletcher, Meg. "Broader Disability Programs Bring Multitude of Benefits." Business Insurance, Oct. 1994, pp. 3, 10, 12.

_____. "Network Helps Employers Help Workers." Business Insurance, Oct. 1994, p. 12.

Foster, Tracie. "The Evolution of Managed Disability." Employee Benefit Plan Review, Jan. 1994, pp. 30-33.

Galvin, Donald E., David Dean, and Kathleen A. Kirchner. "Applying State-of-the-Art Disability Management to Social Security Beneficiaries." Washington, D.C.: Final report by Washington Business Group on Health, Sept. 30, 1991.

George, John. "Liberty Mutual Moves Into Outpatient Rehab Facilities." Philadelphia Business Journal, Vol. 13, No. 46, Sec. 1 (1995), p. 5.

Harrington, Karen, and Jodi Starkman-Mendelsohn. "Accident Benefits: Shortening the Long of It." Canadian Underwriter, Vol. 61, No. 10 (1994), p. 62.

Hearne, Paul G. "Employment Strategies for People with Disabilities: A Prescription for Change," The Americans with Disabilities Act: From Policy to Practice, ed. Jane West. New York: Milbank Memorial Fund, 1991.

Hennessey, John C., and L. Scott Muller. "Work Efforts of Disabled-Worker Beneficiaries: Preliminary Findings From the New Beneficiary Followup Survey." Social Security Bulletin, Vol. 57, No. 3 (1994), pp. 42-43.

Hester, Edward J. "Development of a Rehabilitation Strategy for Fortis Benefits Insurance Company's Group Long-Term Disability Claimants." Synopsis of report. Kansas City, Mo.: Fortis Benefits Insurance Company, Mar. 1994.

Himmelstein, Jay, and Kathleen Rest. Workers' Compensation and Health Care Reform: Is There a Need for Federal Action? (Issue Brief, No. 650) Washington, D.C.: The George Washington University, National Health Policy Forum, 1994.

Hunt, H. Allan, Rochelle V. Habeck, Patricia Owens, and others. "Disability and Work: Lessons From the Private Sector." Paper prepared for the Disability, Work, and Cash Benefits Conference, sponsored by the National Academy of Social Insurance and the National Institute on Disability and Rehabilitation Research, Santa Monica, Calif.: Dec. 8-10, 1994.

Johnson, William G., John F. Burton, Jr., Lisa Thornquist, and others. "Why Does Workers' Compensation Pay More for Health Care?" Benefits Quarterly, Vol. 9, No. 4 (1993), pp. 22-31.

Juliff, Ronald J., and Phillip L. Polakoff. "An Integrated Approach to Disability Management." Risk Management, Vol. 41, No. 4 (1994), pp. 91-97.

Keppel, Allison. "Managing Disability in the Workplace; An Expansive Approach." LIMRA's MarketFacts, July/August 1992, pp. 22-26.

Koco, Linda. "Mrs. Smith Went Back to Work, Thanks to Rehab/Managed Care Scores Points in Group Disability Insurance." National Underwriter (Life & Health/Financial Services), No. 22 (1994), pp. 11, 14.

Kuhn, Leslie. "Recovery and Return." Small Business Reports, Aug. 1994, pp. 15-19.

Lee, Barbara A., and Karen A. Newman. "Employer Responses to Disability: Preliminary Evidence and a Research Agenda." Employee Responsibilities and Rights Journal, Vol. 8, No. 3 (1995), pp. 209-29.

Leonard, Jonathan S. "Labor Supply Incentives and Disincentives for Disabled Persons," Disability and the Labor Market, Economic Problems, Policies, and Programs, eds. Monroe Berkowitz and M. Anne Hill. Ithaca, N.Y.: ILR Press, Cornell University, 1986.

Masengarb, Linda. "Formulating an In-House Disability Management Program." Employment Relations Today, Autumn 1994, pp. 307-17.

Meyer, Bruce D., W. Kip Viscusi, and David L. Durbin. "Workers' Compensation and Injury Duration: Evidence From a Natural

Experiment." NBER Working Papers Series, Working Paper No. 3494. Cambridge, Mass.: National Bureau of Economic Research, Oct. 1990.

Mulcahy, Colleen. "Disability Rehab Programs Really Pay Off: Study." National Underwriter (Life & Health/Financial Services), Apr. 25, 1994, p. 2.

National Academy of Social Insurance. Rethinking Disability Policy: The Role of Income, Health Care, Rehabilitation and Related Services in Fostering Independence. Preliminary Status Report of the Disability Policy Panel. Washington, D.C.: National Academy of Social Insurance, Mar. 1994.

Polakoff, Phillip L. and John S. Tortarolo. "The Future of Disability Management Is . . . . Integration." Washington Business Group on Health, 1994 National Disability Management Conference. Washington, D.C.: WBGH, 1994, tab 9.

Rathburn, Alice, and Jeff Seeman. "Identifying and Measuring Key Characteristics of Disability Rehabilitation Candidates." Employment Relations Today, Autumn 1994, pp. 319-28.

Rupp, Kalman, Stephen H. Bell, and Leo A. McManus. "Design of the Project NetWork Return-to-Work Experiment for People With Disabilities." Report for Social Security Bulletin, Mar. 28, 1994.

Schlossman, Sy. "Statement of Sy Schlossman, Interim President, the American Rehabilitation Association, Before the Committee on Finance, United States Senate, for the Record of the Hearing on Social Security Disability Programs, March 22, 1995." Summary of Testimony. Washington, D.C.: American Rehabilitation Association, 1995.

Smith, S.L. "Owens-Corning: Insulating Against High Disability Costs." Occupational Hazards, July 1994, pp. 33-36.

Stoll, Michael L. "Complete Cost Containment." Business Insurance, Vol. 28, No. 48, (1994), p. 15.

"Temporary Alternate Duty Programs Succeed at Returning Disabled Employees to Work." Employee Benefit Plan Review, Vol. 49, No. 7 (1995), pp. 16-17.

Tweed, Vera. "Simple Answers to a Complex Problem." Business & Health, Vol. 12, No. 10 (1994), pp. 57-60.

Weaver, Carolyn L., ed. Disability and Work: Incentives, Rights, and Opportunities. Washington, D.C.: The AEI Press, 1991.

_____. "Privatizing Vocational Rehabilitation, Options for Increasing Individual Choice and Enhancing Competition." Journal of Disability Policy Studies, Vol. 5, No. 1 (1994), pp. 53-76.

Wojcik, Joanne. "Return-to-Work Plan's Allure: Works Better and Costs Less." Business Insurance, Oct. 17, 1994, pp. 3-4, 6.

UNUM. Disability Management: Costs and Solutions. Portland, Me.: UNUM Corporation, July 1994.

U.S. Department of Health and Human Services, Social Security Administration. Annual Statistical Supplement to the Social Security Bulletin, 1994, 1995.

_____. "Developing a World-Class Employment Strategy for People With Disabilities." Briefing for Commissioner Chater and Principal Deputy Commissioner Thompson. Aug. 5, 1994.

_____. 1992-1994 Interim Report of Demonstration Activities Under Public Law 96-265, Section 505 (a) (as Amended) and Related Activities. Washington, D.C.: Nov. 1994.

_____. Disability Process Redesign: Next Steps in Implementation. SSA Pub. No. 01-006, Nov. 1994.

_____. Final Report and Recommendations From the SSA/RSA Joint Task Force on Vocational Rehabilitation Referrals. SSA/VR Administrative Letter No. 94-5. Joint Vocational Rehabilitation Referral Task Force. Apr. 1994.

_____. Plan for a New Disability Claim Process. SSA Pub. No. 01-0005, Sept. 1994.

_____. Results of 1994 Two-Day Field Office Survey of Disability Applicants. Agency correspondence S5H, Mar. 22, 1994.

Bibliography

_____. "Rethinking Disability Policy: The Role of Income, Health Care, Rehabilitation, and Related Services in Fostering Independence." Social Security Bulletin, Vol. 57, No. 2 (1994), pp. 56-62.

**Bibliography**

**Bibliography**

Bibliography

# Related GAO Products

SSA Disability: Program Redesign Necessary to Encourage Return to Work (GAO/HEHS-96-62, Apr. 24, 1996).

PASS Program: SSA Work Incentive for Disabled Beneficiaries Poorly Managed (GAO/HEHS-96-51, Feb. 28, 1996).

SSA's Rehabilitation Programs (GAO/HEHS-95-253R, Sept. 7, 1995).

Social Security Disability: Management Action and Program Redesign Needed to Address Long-Standing Problems (GAO/T-HEHS-95-233, Aug. 3, 1995).

OHA Backlogs (GAO/HEHS-95-228R, July 28, 1995).

Supplemental Security Income: Growth and Changes in Recipient Population Call for Reexamining Program (GAO/HEHS-95-137, July 7, 1995).

Disability Insurance: Broader Management Focus Needed to Better Control Caseload (GAO/T-HEHS-95-164, May 23, 1995).

Supplemental Security Income: Recipient Population Has Changed as Caseloads Have Burgeoned (GAO/T-HEHS-95-120, Mar. 27, 1995).

Social Security: Federal Disability Programs Face Major Issues (GAO/T-HEHS-95-97, Mar. 2, 1995).

Supplemental Security Income: Recent Growth in the Rolls Raises Fundamental Program Concerns (GAO/T-HEHS-95-67, Jan. 27, 1995).

Social Security: Continuing Disability Review Process Improved, But More Targeted Reviews Needed (GAO/T-HEHS-94-121, Mar. 10, 1994).

Social Security: Disability Rolls Keep Growing, While Explanations Remain Elusive (GAO/HEHS-94-34, Feb. 8, 1994).

Vocational Rehabilitation: Evidence for Federal Program's Effectiveness Is Mixed (GAO/PEMD-93-19, Aug. 27, 1993).

Vocational Rehabilitation Program: Client Characteristics, Services Received, and Employment Outcomes (GAO/T-PEMD-92-3, Nov. 12, 1991).

## Ordering Information

The first copy of each GAO report and testimony is free. Additional copies are $2 each. Orders should be sent to the following address, accompanied by a check or money order made out to the Superintendent of Documents, when necessary. VISA and MasterCard credit cards are accepted, also. Orders for 100 or more copies to be mailed to a single address are discounted 25 percent.

Orders by mail:

U.S. General Accounting Office
P.O. Box 6015
Gaithersburg, MD 20884-6015

or visit:

Room 1100
700 4th St. NW (corner of 4th and G Sts. NW)
U.S. General Accounting Office
Washington, DC

Orders may also be placed by calling (202) 512-6000
or by using fax number (301) 258-4066, or TDD (301) 413-0006.

Each day, GAO issues a list of newly available reports and testimony.  To receive facsimile copies of the daily list or any list from the past 30 days, please call (202) 512-6000 using a touchtone phone.  A recorded menu will provide information on how to obtain these lists.

For information on how to access GAO reports on the INTERNET, send an e-mail message with "info" in the body to:

info@www.gao.gov

or visit GAO's World Wide Web Home Page at:

http://www.gao.gov

PRINTED ON RECYCLED PAPER

**United States**
**General Accounting Office**
**Washington, D.C. 20548-0001**

Bulk Rate
Postage & Fees Paid
GAO
Permit No. G100

**Official Business**
**Penalty for Private Use $300**

**Address Correction Requested**

**EXHIBIT C**

Copyright 2002 ManagedHealthcare.Info via NewsRx.com and NewsRx.net
ManagedHealthcare.Info

July 1, 2002

**SECTION:** EDITOR'S CHOICE; Pg. 3

**LENGTH:** 523 words

**HEADLINE:** DISABILITY: Cigna announces enhancements to speed payment of Social Security benefits

**BODY:**

U.S. Social Security Administration data indicate that some 5.3 million ill or injured Americans currently receive **$4.3 billion in Social Security disability benefits. That's an average monthly benefit of $814 - money that individuals with disabilities depend on to help maintain their financial health. Yet the application process for disability-related Social Security benefits can be daunting, and lack of understanding about how the process works often contributes to lengthy delays in benefits payments.**

To further assist employees with disabilities, Cigna Group Insurance has forged an alliance with Allsup, Inc., and Advantage 2000 Consultants, two companies that specialize in obtaining Social Security benefits payments for ill or injured employees who cannot return to work.

The new vendor alliance will help Cigna Group Insurance provide an even higher level of support in simplifying and expediting the Social Security filing process for customers. While the ill or injured employee is kept up-to-date on the status of the Social Security application, the vendors handle all of the details and paperwork. This helps accelerate the payment of benefits and allows the employee to focus on improving his or her health.

"Without our assistance, it might take customers weeks to fill out and send in the required Social Security forms. If they have questions, the whole process can stall while they try to sort out the paperwork," said Scott Storrer, senior vice president, Cigna Group Insurance. "Today, we involve dedicated specialists at the outset so we can intervene as early as possible for the benefit of the customer. Our case managers can focus on what they do best - paying benefits promptly to those who can't work, and helping those who can work get back on the job as safely and quickly as possible."

Within seven days of receipt of a long-term disability claim, case managers determine whether the disability has the potential to qualify for Social Security assistance. Ill and injured workers are notified at that point that Cigna will assist them in processing their Social Security benefits so they don't have to worry about filling out applications or calling government agencies. To be eligible for Social Security benefits, an applicant must be judged unable to work for 12 months or more because of a disability.

Typically, when someone is considered to have a long-term disability, disability insurance covers the full benefit until the payments are offset by Social Security. By using a more focused, proactive approach to get specialized assistance for customers early in the process, Social Security benefits are awarded more quickly.

"This is even stronger support we can now provide to help ease the financial hardship associated with long-term disability," Storrer said. "The Social Security benefits we help our customers secure are a crucial part of their financial well-being."

This article was prepared by ManagedHealthcare.Info editors from staff and other reports.

http://www.NewsRx.net

**LOAD-DATE:** June 28, 2002

**EXHIBIT D**

Westlaw.

Ann.2001 ATLA-CLE 1117                                                                                   Page 1
1 Ann.2001 ATLA-CLE 1117 (2001)

Association of Trial Lawyers of America

**July, 2001**
**ATLA Annual Convention Reference Materials**
**Volume 1**
**Social Security Disability Law Section**

THE EFFECT OF SOCIAL SECURITY AWARDS ON LONG-TERM DISABILITY CLAIMS

Table of Contents,   List of Authors

D. Gregory Rogers [FNa]

I. Introduction

---

This paper addresses the effects of Social Security awards on long-term disability (LTD) claims.  No practitioner with long-term disability cases can avoid Social Security issues.  This is primarily because the great majority of long-term disability insurance policies and/or ERISA plans contain an offset for the amount awarded by the Social Security Administration.  The insurance company and/or employer (who ever actually *pays* the benefits) will insist upon your client obtaining Social Security benefits so that it may reduce its payments by that amount.  The language of the policy usually states that the long-term disability benefits will be offset by that amount the claimant and his or her family members "receives or is entitled to receive" from the Social Security Administration.  The LTD benefit providers sometimes even go so far as to provide representation from their in-house attorneys for the claimant in his or her Social Security case. [FN1]

The Social Security award will often reduce the LTD benefit almost completely, leaving nothing but the minimum payment, sometimes as low as $100 per month. Unfortunately, the courts have upheld the legality of reducing LTD benefits by the amount paid to the claimant by the Social Security Administration for disability benefits. [FN2] These cases hold that while some states may have laws that prevent offsets, those laws are preempted by ERISA and further that ERISA provides for these type offsets in the statute itself. [FN3]  It is only in the most egregious situations that the courts may refuse to enforce the offset. [FN4] Despite these financial drawbacks, if the remaining amount after reduction is large enough to make an ERISA claim worthwhile, there are benefits to a favorable decision by the Social Security Administration.  The Social Security award is one of the best and most convincing pieces of evidence in any ERISA claim.

II.  Pretrial Benefits to a Favorable Decision

---

*Reduces trial preparation time and expense*

There are significant pretrial benefits to a favorable decision by the Social Security Administration.  Depending on the stage at which Social Security benefits are awarded, Social Security awards can cut down on the amount of time necessary for trial preparation.  If the benefits were awarded after an administrative hearing, the administrative law judge will often have performed the task of summarizing your client's medical records and drafting the choicest

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

phrases. This can reduce trial time preparation greatly.

Social Security awards can also cut down on the costs associated with a case. If the doctor to whom Social Security sent your client was favorable, his or her opinion can amount to a free IME. However, the experienced practitioner should carefully check the Social Security's doctor's credentials.      Unfortunately, these opinions can be unconvincing evidence in that the Social Security Administration often sends claimants to general practitioners as opposed to specialists in the field of the claimant's disability.   Further, Social Security will often send a claimant to a psychiatrist or a psychologist depending on the claimant's disorder. As a general rule, unless your client's illness is truly a mental illness, it is best not to rely on a consultative psychiatric evaluation. ERISA plans and/or policies often have limitations on the amount of years which the policy and/or plan will pay for claims based upon mental illness. Often the plan will pay for only as little as one year of benefits when the claimant suffers from a mental rather than a physical illness. Because of this financial incentive, the LTD benefit provider will often latch onto any report that states that the claimant has mental problems even if these problems are caused by an underlying physical disease. The LTD provider then grants benefits solely for mental illness and attempts to take advantage of the standard limitation. While the LTD provider's actions may not ultimately survive under a trial judge's scrutiny, it is best in ERISA cases not to provide the other side with any sort of argument at all.

*A closed administrative file may be reopened*

Because the Social Security award is powerful evidence it should always be part of the administrative record. Always forward Social Security awards to the LTD carrier along with the rest of your claimant's medical evidence. However, even if Social Security benefits are awarded after the ERISA administrative review process is closed, it should still be forwarded to the plan administrator. This evidence will often convince the plan or claim administrator to reopen the file and reconsider your client's case.    This is a particularly helpful tactic when your clients have handled the administrative process themselves and failed to adequately stack the record with supportive evidence. This is a chance to send in the Social Security award and all the accompanying exhibits and have these be considered part of the record. If the adjuster reconsiders and pays benefits you have just won a case with very little effort. If the adjuster fails to reconsider you have at least contributed to the record and expanded the amount of evidence, which may be utilized at trial even if the level of review is arbitrary and capricious. [FN5]  While the Eleventh Circuit has not directly addressed the issue, several circuits have held that even after the administrative review has concluded, claimants may submit new evidence to the administrator. [FN6]  Thus, practitioners should always submit the Social Security award and the medical evidence supporting it to the claims administrator prior to trial then allow the administrator to have 45 days to respond before bringing suit. [FN7]

III. Benefits of Favorable Decisions at Trial

---

*Social Security regulations and case law are persuasive*

The Eleventh Circuit, in *Paramore v. Delta Air Lines, Inc.*, [FN8] *held that SSA's holdings are "not dispositive" on the issue of whether to award benefits in an ERISA case. Defendants cite this case routinely to try to reduce the evidentiary value of the Social Security decision at trial. However, a careful reading of* Paramore *will reveal that the Eleventh Circuit specifically noted that the Social Security Administration's decision "was not available to the Administrative Committee during the relevant time frame." [FN9] Thus, as stated above, a trial attorney should always submit the decision at the administrative level and make sure that the decision is available to the administrator. If it is made available, the award is powerful evidence in that it represents an objective independent determination that the client was, and is, totally disabled. In order for a defendant corporation and/or insurance company to prevail it must discredit or distinguish this evidence. This is extremely difficult for defendants. Most defense attorneys have never practiced Social Security law and lack the experience to combat the regulations successfully or to argue that the Social Security Administration made a mistake. Additionally, often the definition of disability in the ERISA Plan will be so similar to that of Social Security Administration that the award amounts to almost a conclusive prior determination.*

Even if the definition in the long-term disability plan varies from SSA's definition of disability under which your client was found disabled, Social Security guidelines are still helpful in ERISA cases. Because ERISA law itself is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Ann.2001 ATLA-CLE 1117                                                                                                Page 3
**1 Ann.2001 ATLA-CLE 1117** (2001)

still somewhat underdeveloped, courts routinely borrow principles from Social Security law in ERISA cases. [FN10] The courts "believe that it is instructive to review how different courts had interpreted cases raising similar issues." [FN11] For example, courts in ERISA cases have adopted the rule from Social Security cases that "a reasonable interpretation of a claimant's entitlement to payments based on a claim of 'total disability' must consider the claimant's ability to pursue gainful employment in light of *all the circumstances*" and have rejected overly restrictive requirements for total disability. [FN12]

Therefore, when the Social Security Administration grants an award to a claimant with an ERISA case pending, the reasoning behind that grant can be used to persuade the court to grant LTD benefits as well. For example, if your client met a Social Security "listing," the plan administrator will have an extremely difficult time in defeating this evidence. The Listing of Impairments describes, for each of the major body systems, impairments that are considered severe enough to prevent an adult from doing any gainful activity. [FN13] It is extremely persuasive to argue to the court in an ERISA case that your claimant has such a severe problem that he or she was found to be *per se* impaired by the Social Security Administration.

Further, the Social Security award can be used to convince the court in an ERISA case to adopt the treating physician's rule. Under this rule the Social Security Administration accords greater weight to the opinions of the treating physicians than the opinions of the non-treating examiners. The factors that the Social Security Administration considers in deciding what weight to accord a treating physician's evidence are (1) the frequency of examination; (2) the length, nature, and extent of the treatment relationship; and (3) the opinion's consistency with the record as a whole. [FN14] This rule is particularly helpful in defeating the opinions of both the long-term disability carrier's "reviewing" doctor and its one-time independent medical examiner.

The court in an ERISA case can also be persuaded to adopt the Social Security Administration's practice of giving more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist. [FN15] This is particularly helpful when the claim administrator's reviewing doctor and/or IME are not a specialist in the disability suffered by the claimant.

*Judicial estoppel is a winning argument*

As discussed above, LTD carriers often force your client to obtain Social Security benefits. Often, LTD carriers will steer the claimant to their own in-house attorneys. GENEX, a corporation which provides Social Security attorneys to long-term disability claimants, is a wholly owned subsidiary of UNUM, the largest disability insurance provider in the country. If you have certain facts in your case, you may be able to argue that a LTD carrier's conduct in denying benefits is arbitrary and capricious. The facts are these: after the LTD carrier pays benefits under the "own occupation" provision, the plan administrator then assists the claimant in his or her Social Security disability claim by providing representation in the Social Security case; the provider then demands and receives the "overpayment" amount from the claimant once Social Security benefits are obtained; the LTD provider then rejects the disabled person claim for benefits for the "any occupation" period. These facts are quite commonplace. While this conduct is egregious in the extreme, it may actually help your case. One of the potentially most powerful arguments at trial is that the LTD administrator is judicially estopped from denying long-term disability benefits when that same administrator helped the client to obtain Social Security benefits. In *Ladd v. ITT Corp.*, [FN16] decided under the strict "arbitrary and capricious" standard, the Seventh Circuit noted that the "grant of social security benefits . . . has an additional significance." It brings the case within the "penumbra of the doctrine of judicial estoppel-- that if a party wins a suit on one ground, it can't turn around and in further litigation with the same opponent repudiate the ground in order to win a further victory." [FN17] The court explained that the doctrine was technically not applicable, because MetLife and ITT, the defendants in that suit, were not parties to the proceeding before the Social Security Administration. Yet they "prevailed" in a practical sense because the grant of Social Security benefits to Ladd reduced the amount of her LTD claim against the employee welfare plan. Judge Posner, writing for the Seventh Circuit, stated as follows:

> If we reflect on the purpose of the doctrine, which is to reduce fraud in the legal process by forcing a modicum of consistency on a repeating litigant, *McNamara v. City of Chicago, supra*, 138 F.3d at 1225; *Johnson v. Oregon*, 141 F.3d 1361, 1369 (9th Cir. 1998), we see that its spirit is applicable here. To lighten the cost to the employee welfare plan of Ladd's disability, the defendants encouraged and supported her effort to demonstrate total disability to the Social Security Administration going so far as

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Ann.2001 ATLA-CLE 1117                                                                    Page 4
1 Ann.2001 ATLA-CLE 1117 (2001)

to provide her with legal representation. To further lighten that cost, it then turned around and denied that Ladd was totally disabled . . . In effect, having won once the defendants repudiated the basis of their first victory in order to win a second victory. This sequence casts additional doubt on the adequacy of their evaluation of Ladd's claim. [FN18]

No other circuit has addressed this argument, but Judge Posner's reasoning is sound. Insurance carriers in particular should not be in the business of providing attorneys for social security cases when their underlying profit-making role conflicts with the best interests of the claimants.

IV. Conclusion

—————————————————————————————————————————

Social Security awards are helpful in many ways. The award can reduce trial preparation time and expenses. The award may reopen a closed administrative file and give the claimant a second chance to argue entitlement to benefits. The award is convincing evidence and may persuade the trial court to adopt the Social Security Administration's reasoning. Finally, if the facts permit, the plan participant can argue that the long-term disability carrier is judicially estopped from denying eligibility for benefits if the plan or claim administrator helped the claimant obtain a favorable Social Security award.

FNa. Rogers & Hofrichter, P.C., 135 Brandywine Boulevard, Suite C, Fayetteville, Georgia 30214, (770) 460-1118, rogan411@aol.com

FN1. When Social Security disability benefits are paid retroactively, LTD carriers force the claimant to turn over all or most of the past due disability benefits. Often these companies will even reduce that amount sent to provide for the family of the disabled as well. Fortunately very few LTD plans will offset their award by the cost of living adjustments. Most plans only reduce the benefit by the initial Social Security award amount. Some, but not all, LTD benefit providers will pay for the claimant's attorneys' fees and will not force your client to repay that amount withheld by Social Security for attorney representation.

FN2. See, e.g., Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 510 (1981); Nachman Corp. v. Pension Benefit Guar. Corp., 446 U.S. 359, 361 (1980); Reska v. Pension Plan of Bethlehem Steel Corp., 848 F.2d 372 (1st Cir.1988); Holliday v. Xerox Corp., 732 F.2d 548, 551 (6th Cir.), cert. denied, 469 U.S. 917 (1984); Horace v. Auto Specialties Mfg. Co., 663 F. Supp. 54 (W.D. Mich. 1987); Vintilla v. U.S. Steel Corp. Plan for Employee Pension Benefits, 606 F. Supp. 640 (W.D. Pa. 1985), aff'd mem ., 782 F.2d 1033 (3d Cir. 1986), cert. denied, 475 U.S. 1141 (1986); Twohey v. Lincoln Nat'l Life Ins. Co., 2000 WL 1006529 (N.D. Cal.).

FN3. See Holliday, 732 F.2d at 551 (ERISA "itself establishes that it is permissible for a . . . plan to provide for the offset of social security benefits.").

FN4. See Godfrey v. Bellsouth Telecommunications, Inc., 89 F.3d 755 (11th Cir. 1996).

FN5. See Lee v. Blue Cross & Blue Shield of Ala., 10 F.3d 1547, 1550 (11th Cir. 1994) (the application of the heightened arbitrary and capricious standard requires the court to look only to the facts known to the administrator at the time the decision was made).

FN6. See Vega v. Nat. Life Ins. Serv. Inc., 188 F.3d 287 (5th Cir. 1999) (if the claimant submits additional information to the administrator before filing suit and requests the administrator to reconsider his decision, that additional information should be treated as part of the administrative record); Williams v. Int'l Paper Co., 227 F.3d 706, 710-15 (6th Cir. 2000) (administrator could not refuse to consider new reports from doctors which were submitted to the plan administer prior to trial and that ignoring said medical evidence was arbitrary and capricious).

FN7. I chose 45 days because the regulation allows administrators 45 days to review information in a normal appeals process. See 29 C.F.R. § 2560.503-1.

FN8. 129 F.3d 1446 (11th Cir. 1997).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Ann.2001 ATLA-CLE 1117                                                      Page 5
1 **Ann.2001 ATLA-CLE 1117** (2001)


FN9. Id. at 1452.

FN10. See Helms v. Monsanto Co. Inc., 728 F.2d 1416, 1420, 1421 (11th Cir. 1984); Halpin v. W.W. Grainger, Inc., 962 F.2d 685, 695 n.11 (7th Cir. 1992); Torix v. Ball Corp., 862 F.2d 1428, 1431 & n.6 (10th Cir. 1988).

FN11. Torix, 862 F.2d at 431.

FN12. Id. (emphasis added).

FN13. 20 C.F.R. § 416.925.

FN14. 20 C.F.R. § 404.927.

FN15. 20 C.F.R. § 404.927.

FN16. 148 F.3d 753, 756 (7th Cir. 1998).

FN17. Id.

FN18. Id.

Copyright © 2001 Association of Trial Lawyers of America

**Ann.2001 ATLA-CLE 1117**
END OF DOCUMENT

**EXHIBIT E**

# SECOND IN A SERIES ON SOCIAL SECURITY DISABILITY PROGRAMS' CHALLENGES AND OPPORTUNITIES

## HEARING

BEFORE THE

SUBCOMMITTEE ON SOCIAL SECURITY

OF THE

COMMITTEE ON WAYS AND MEANS

HOUSE OF REPRESENTATIVES

ONE HUNDRED SEVENTH CONGRESS

SECOND SESSION

———————

JUNE 11 AND 20, 2002

———————

**SERIAL 107-86**

———————

Printed for the use of the Committee on Ways and Means

**COMMITTEE ON WAYS AND MEANS**
BILL THOMAS, California, *Chairman*

| | |
|---|---|
| PHILIP M. CRANE, Illinois | CHARLES B. RANGEL, New York |
| E. CLAY SHAW, Jr., Florida | FORTNEY PETE STARK, California |
| NANCY L. JOHNSON, Connecticut | ROBERT T. MATSUI, California |
| AMO HOUGHTON, New York | WILLIAM J. COYNE, Pennsylvania |
| WALLY HERGER, California | SANDER M. LEVIN, Michigan |
| JIM MCCRERY, Louisiana | BENJAMIN L. CARDIN, Maryland |
| DAVE CAMP, Michigan | JIM MCDERMOTT, Washington |
| JIM RAMSTAD, Minnesota | GERALD D. KLECZKA, Wisconsin |
| JIM NUSSLE, Iowa | JOHN LEWIS, Georgia |
| SAM JOHNSON, Texas | RICHARD E. NEAL, Massachusetts |
| JENNIFER DUNN, Washington | MICHAEL R. MCNULTY, New York |
| MAC COLLINS, Georgia | WILLIAM J. JEFFERSON, Louisiana |
| ROB PORTMAN, Ohio | JOHN S. TANNER, Tennessee |
| PHIL ENGLISH, Pennsylvania | XAVIER BECERRA, California |
| WES WATKINS, Oklahoma | KAREN L. THURMAN, Florida |
| J. D. HAYWORTH, Arizona | LLOYD DOGGETT, Texas |
| JERRY WELLER, Illinois | EARL POMEROY, North Dakota |
| KENNY C. HULSHOF, Missouri | |
| SCOTT MCINNIS, Colorado | |
| RON LEWIS, Kentucky | |
| MARK FOLEY, Florida | |
| KEVIN BRADY, Texas | |
| PAUL RYAN, Wisconsin | |

Allison Giles, *Chief of Staff*
Janice Mays, *Minority Chief Counsel*

————————————

## SUBCOMMITTEE ON SOCIAL SECURITY
E. CLAY SHAW, JR., Florida, *Chairman*

| | |
|---|---|
| SAM JOHNSON, Texas | ROBERT T. MATSUI, California |
| MAC COLLINS, Georgia | LLOYD DOGGETT, Texas |
| J.D. HAYWORTH, Arizona | BENJAMIN L. CARDIN, Maryland |
| KENNY C. HULSHOF, Missouri | EARL POMEROY, North Dakota |
| RON LEWIS, Kentucky | XAVIER BECERRA, California |
| KEVIN BRADY, Texas | |
| PAUL RYAN, Wisconsin | |

Pursuant to clause 2(e)(4) of Rule XI of the Rules of the House, public hearing records of the Committee on Ways and Means are also published in electronic form. **The printed hearing record remains the official version.** Because electronic submissions are used to prepare both printed and electronic versions of the hearing record, the process of converting between various electronic formats may introduce unintentional errors or omissions. Such occurrences are inherent in the current publication process and should diminish as the process is further refined.

————————————

# C O N T E N T S

————————

Advisories announcing the hearing

## WITNESSES

Social Security Administration, Martin Gerry, Deputy Commissioner, Disability and Income Security Programs

U.S. General Accounting Office, Robert E. Robertson, Director, Education Workforce, and Income Security Issues

Social Security Advisory Board, Hon. Hal Daub, Chairman

————————————

American Bar Association, Commission on Legal Problems for the Elderly, John H. Pickering

American Federation of Government Employees, Social Security General Committee, AFL-CIO, and National Council of SSA Field Operations Locals, Witold Skwierczynski

Association of Administrative Law Judges, and Social Security Administration, Office of Hearings and Appeals, Milwaukee, Wisconsin, Hon. Ronald G. Bernoski

Consortium for Citizens with Disabilities, Social Security Task Force, Marty Ford

Federal Bar Association, Social Security Section, and Social Security Administration, Office of Hearings and Appeals, Atlanta, GA, Hon. Kathleen McGraw

National Association of Disability Examiners, Jeffrey H. Price

National Council of Disability Determinations Directors, Linda Dorn

National Council of Social Security Associations, Inc., and Social Security Administration District Office, Hackensack, New Jersey, Anthony T. Pezza

National Organization of Social Security Claimants' Representatives, Nancy G. Shor

National Treasury Employees Union, Chapter 224, and Social Security Administration, Office of Hearings and Appeals, Cleveland Heights, OH, James A. Hill

Stapleton, David C., Cornell Center for Policy Research

Verkuil, Paul, Benjamin N. Cardozo School of Law, Yeshiva University, accompanied by Jeffrey Lubbers, Washington College of Law, American University

## SUBMISSIONS FOR THE RECORD

Federal Managers Association, Alexandria, VA, statement

Public Employees Federation, New York, NY, Larry Jacks, statement

Robinson, Philip A., Framingham, MA, statement

---

## SECOND IN A SERIES ON SOCIAL SECURITY DISABILITY PROGRAMS' CHALLENGES AND OPPORTUNITIES

---

Tuesday, June 11, 2002

House of Representatives,
Committee on Ways and Means,
Subcommittee on Social Security,
*Washington, DC.*

The Subcommittee met, pursuant to notice, at 3:33 p.m., in room 1100 Longworth House Office Building, Hon. Mac Collins presiding.

---

[The advisory, revised advisory, and revised advisory #2, announcing the hearing follow:]

Mr. COLLINS. The Subcommittee will come to order. Chairman Shaw is at the airport and is on his way into the Capitol now. So, he should be coming in most any time. We will enter his statement into the record, unless he just wants to go through it once he arrives.

[The opening statement of Chairman Shaw follows:]

Mr. COLLINS. We will call on Mr. Matsui and see if he has any words of wisdom for us.

Mr. MATSUI. I only have words of wisdom to thank you for holding this hearing.

Mr. COLLINS. I like that. Short and sweet.

Our first witness will be Mr. Martin Gerry, Deputy Commissioner for Disability and Income Security Programs. Welcome, Mr. Gerry, and we are glad you are here, appreciate your taking the time to come, and if you would like, your whole statement will be entered into the record, and if you would like to summarize your statement, we are ready.

## STATEMENT OF MARTIN GERRY, DEPUTY COMMISSIONER, DISABILITY AND INCOME SECURITY PROGRAMS, SOCIAL SECURITY ADMINISTRATION

Mr. GERRY. Thank you very much, Mr. Chairman.

Mr. Chairman and Members of the Subcommittee, thank you very much for inviting me to testify today

opportunity to testify. We look forward to working with the Subcommittee and with SSA on these issues in the future. Thank you very much.

[The prepared statement of Mr. Pickering follows:]

Chairman SHAW. Thank you.

**STATEMENT OF PAUL VERKUIL, PROFESSOR OF LAW, BENJAMIN N. CARDOZO SCHOOL OF LAW, YESHIVA UNIVERSITY, NEW YORK, NEW YORK, ACCOMPANIED BY JEFFREY LUBBERS, FELLOW, WASHINGTON COLLEGE OF LAW, AMERICAN UNIVERSITY**

Mr. VERKUIL. Thank you. Mr. Chairman and Members of the Committee, I am pleased to be here this morning to discuss the findings and conclusions of a recent study for the Social Security Advisory Board that evaluates various proposals for changes in the judicial review structure relating to disability determinations.

The study was conducted for the SSAB by Jeffrey Lubbers and myself. Mr. Lubbers is here. It was submitted on March 1, 2002.

Of course, in our testimony we do not speak for the SSAB, but I believe that the Committee has copies of the study. It should be made generally available. It was submitted both to Members of Congress and also to members of the Judiciary.

In the last few decades there have been several legislative proposals to modify the current system of judicial review, including one model that would change the review structure after the ALJ stage by creating a new Article I court, a so-called Social Security court, and give it limited Article III review power to legal and constitutional issues.

There is another proposal that would maintain the current district court review structure, but centralize court of appeals review in a special Article III court, the Social Security Court of Appeals.

While these and other alternatives are not themselves new, they have become increasingly relevant in light of recent events. The number of disability claims is expected to rise in the future for several reasons. One is the impending retirement of baby boomers; two, the downturn of the economy in the last 2 years; three, the resumption of CDRs by the SSA; and four, the increasing tendency of private insurance companies to require as a condition of payment that claimants pursue their offsetting SSA benefits.

These caseload realities create pressure on the SSA to achieve more uniform, fair and efficient decision-making and will likely increase the present time-consuming nature of that review, which varies between 12 to 18 months.

In addition, during the last decade, a possible model for Article I and Article III shared review of disability cases has become a reality with the emergence of a program for the review of the U.S. Department of Veterans Affairs disability claims.

Finally, in 1994 Congress also made a significant structural change in the Social Security program by separating SSA from the U.S. Department of Health and Human Services to "ensure that policy errors resulting from inappropriate influence from outside the Agency such as those that occurred in the early

1980s do not occur in the future." I believe Mr. Pickering referred to those incidents in his testimony.

As a result, the Agency is now independent and better able to assist in a restructuring of the decision process. After the SSA signs off on a disability case, either as a result of an ALJ decision or after Appeals Council review, the losing claimant has an opportunity to appeal to the District Court. While traditionally known as a trial court, the District Court serves an appellate function in connection with disability review. In this role it is called upon not to hear matters in a trial de novo, as it usually does, but to apply the substantial evidence test to the record before it.

Over the years, substantial evidence review of disability cases by District Courts and even subsequent review by Courts of Appeals has been a heavily contested matter.

Modification in the role of a District Court was made necessary because of the size of the disability caseload, which makes the usual practice of direct review in the Court of Appeals to create administrative adjudication impractical.

For example, during the decade of 1990 to 2000, the number of new disability cases in the Federal District Courts nearly tripled from 5,000 to 15,000. In terms of impact upon the court system, during the 1-year period ending September 30, 2000, Social Security cases represented 5.86 percent of all civil District Court cases.

It seems clear that the substantial judicial resources allocated to disability determinations are not used in the most cost effective manner.

I do not wish to minimize the significant, symbolic role, as well as a corrective one that the District Courts play in our judicial system. Over the years the theoretical advantage of Article III oversight in SSA cases has become more limited in practice. District judges increasingly review disability cases not by themselves directly, but through surrogates. Article I, magistrate judges take evidence, decide on summary judgment or remand to the Agency. In fiscal year 1999 magistrates decided over 40 percent of disability cases throughout the Federal courts and, in some jurisdictions over 50 percent.

In addition to caseload concerns within the District Courts, there are genuine concerns as to uniformity of decisions around the country, not only because of widely varying reversal rates, but also in terms of the need for better development of the law. A Social Security court would be a remedy for both of these problems.

Opponents of such a court counter these arguments on a variety of fronts: the new court would be inconvenient to claimants; it would produce a windfall of appointments to the current President; or it might become captured by the SSA or those that tend to favor a higher rate of denial of claims.

I respect these concerns, but believe that the caseload and uniformity problems are acute enough to warrant serious consideration of the changes to the current system.

The current system of administrative hearings with a somewhat revised system of administrative review, followed by review in an Article I Social Security court with a right of appeal on questions of law to the regular courts of appeals, as with the current Tax Court, is, in our judgment, the best approach.

This doesn't mean that class actions and facial constitutional challenges would be heard in this Article I court. They could still be reserved to the District Courts, as well as, challenges to SSA rule making which could be heard directly in the Courts of Appeals.

Concerns about the convenient problem can be addressed by having regional offices for the SSA disability court. Concern about politicized appointments to the court would, of course, be ameliorated by the Senate confirmation process, but could be addressed more directly by requiring judges to be appointed like commissioners of independent agencies, with one political party limited to a bare majority.

Down the road one could foresee the combination of such a court with the current Court of Veterans Appeals to produce a Federal disability court with a broader experience and expertise.

Well, next steps to consider: Whatever happens with the Judicial Review Proposal, we believe that several steps can and should be taken at the SSA level. First, the use of attorneys for the government requires further consideration, as has been mentioned.

Second, consideration should be given to a long pending suggestion to closing the file after the ALJ stage.

Third, amending the good cause remand provision in the current law, section 205(g), should also be considered to reduce the ease with which District Courts simply remand cases back to the SSA. These remands fail to produce an effective feedback loop.

Finally, we believe that much can be done to better utilize and improve the performance of ALJs in the current process, separate and apart from the Article I idea. An ALJ appeals process, which has been mentioned, is something worth looking at. We have made some initial analyses of that idea and if it works it could assume the correction and quantity review functions now performed by the Appeals Council.

By the side of my statement was written "explain." In connection with the ALJ appeals process idea, I gather that note is from the staff. I will reserve further explanation for the comment period.

I would like to thank you and praise the Committee for their efforts in this hearing.

[The prepared statement of Mr. Verkuil follows:]

Chairman SHAW. Thank you, Professor. Ms. Ford, you made reference in your testimony and I believe Mr. Pickering also made reference that when someone is going through the appeals process and their condition changes, that this is sort of an unamendable process.

An example: Starting out the process, the claimant is partially blind. He is denied. During the appellate process in the days that are going by the claimant becomes totally blind. I would gather from your testimony that the process would require that claimant to start the process all over again and claim total blindness. Is that what you are saying?

Ms. FORD. Well, as I understand the process, after the ALJ hearing new evidence would be allowed only if it related to the period before the ALJ hearing. So, depending on when that total blindness occurred, it might require him to start over, if I get that correctly.

Chairman SHAW. I see. So, it would be like regular court process. Once a judgment is made, if you are appealing an ALJ process, that the record would stay intact. Is that correct?

Ms. FORD. It is closed somewhat. The period of disability before the hearing is what is being looked at.