UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>EX REL. DAWN BARRETT, )<br> )<br>Plaintiff, )<br> )<br>v. )<br> )<br>CIGNA CORPORATION and )<br>LIFE INSURANCE COMPANY OF )<br>NORTH AMERICA, )<br> )<br>Defendants. )<br>_____) | Civil Action No. 03-12382-MLW |

**RELATOR'S RESPONSIVE MEMORANDUM REGARDING PHASED DISCOVERY**

On November 30, 2006, this Court directed the parties to respond to the question whether there are potentially dispositive issues that could be litigated prior to commencement of full discovery. In response, defendant CIGNA proposes a phased discovery process under which initial discovery and briefing would occur on two issues: (a) whether there has been a public disclosure of the allegations in the complaint and (b) whether the claims submitted for Social Security Disability Insurance (SSDI) benefits are "material" to the Social Security Administration (SSA) as part of its administrative review process. CIGNA seeks extensive discovery of the Social Security Administration (SSA) and state insurance administrative bodies. CIGNA Memorandum at 13-19.

Relator strongly agrees that dispositive legal issues should be resolved before the commencement of discovery. CIGNA has identified seven publications (six published before filing of the complaint and one published a year after the complaint was filed) that it asserts are "public disclosures" within the meaning of 31 U.S.C. § 3730(e)(4) (False Claims Act). This

1

Court can resolve the public disclosure issue raised by CIGNA at this stage without discovery. As to CIGNA's affirmative defense that the claims submitted are not materially false or fraudulent, that issue warrants more extensive discovery and resolution by this Court on a fully developed factual record. Allowing CIGNA to proceed with discovery on one affirmative defense alone while staying discovery for Relator will result in piecemeal litigation and unfair prejudice to Relator.

Assuming this Court holds that there is no statutorily relevant public disclosure, then the parties should proceed with full discovery. If this Court finds that the documents identified by CIGNA may qualify as a public disclosure, limited jurisdictional discovery may be appropriate. Such discovery would focus on whether Relator's allegations were "based upon" the public disclosure and whether Relator is the "original source." Either way this Court could then resolve the public disclosure/original source issue at the onset of the case.

## I.    CIGNA Has Not Identified A Statutorily Relevant Public Disclosure.

1.     Section 3730(e) of the federal False Claims Act deprives the Court of jurisdiction over a *qui tam* action "based upon the public disclosure of <u>allegations or transactions</u> in a criminal, civil, or administrative hearing, in a congressional, administrative, or General Accounting Office report, hearing, audit or investigation, or from the news media, unless . . . the person bringing the action is the original source of the information." 31 U.S.C. § 3730(e)(4)(A) (emphasis added). This provision was added as part of the False Claim Amendment Act of 1986. <u>See</u> Pub. L. No. 99-562, § 3, 100 Stat. 3153 (1986).

To assess whether the public disclosure bar applies, a Court must first determine whether there has been a public disclosure within the meaning of the statute. <u>United States ex rel. Rost v.</u>

Pfizer, 446 F. Supp.2d 6, 21 (D. Mass. 2006); United States ex rel. LaValley v. First Nat'l Bank of Boston, 707 F. Supp. 1351, 1366 (D. Mass. 1988). The disclosure must be in a specified public forum. In addition, the disclosure must consist of the "allegations or transactions" set forth in the complaint. Id. Mere information about some aspect of the case in the public domain does not amount to a public disclosure. See United States ex. rel. Springfield Terminal Railway v. Quinn, 14 F.3d 645, 653 (D.C. Cir. 1994) ("the Act bars suits based on publicly disclosed 'allegations or transactions,' not 'information'"); United States ex rel. Pogue v. American Healthcorp, Inc., 977 F. Supp. 1329 (M.D. Tenn. 1997) (disclosure of facially valid or innocuous transactions in Securities Exchange Commission (SEC) reports did not disclose allegations or transactions underlying *qui tam* complaint). Then, the Court must examine whether Relator's allegations are "based upon" the public disclosure. If the answers to the first two questions are yes, then the Court must consider whether the plaintiff is the "original source." Rost, 446 F. Supp. 2d at 21.

To determine  whether the "allegations or transactions" have been publicly disclosed, the Springfield Terminal case adopted a simple test called the "X + Y = Z" test. Under this test, if the material elements of the fraudulent transaction described in the complaint are disclosed, then the "allegations or transactions" have been disclosed. As the D.C. Circuit explained,

> if X + Y = Z, Z represents the allegation of fraud and X and Y represent its essential elements. In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed.

14 F.3d at 653-54. Congress sought to prohibit *qui tam* actions only when either the allegation of fraud or the critical elements of the fraudulent transaction themselves were in the public domain. Id. In Springfield Terminal, some information about the underlying fraud had been

3

disclosed in discovery but neither the allegations of fraud nor information essential to the conclusion that a fraud had occurred, had been disclosed.  Id. at 654.  Therefore, the government had no reason to suspect that a fraud had been committed or to commence an investigation.  Id.

Numerous courts have followed the D.C. Circuit's approach and have held that there is no public disclosure unless the material elements of the fraud have been publicly revealed.  See, e.g., United States ex rel. Foundation Aiding the Elderly v. Horizon West, Inc., 265 F.3d 1011, 1015-17 (9th Cir. 2001) (qui tam action not barred where fraud allegations not publicly disclosed); United States ex rel. Mistick PBT v. Housing Authority of City of Pittsburgh, 186 F.3d 376, 388 (3d Cir. 1999) ("qui tam action is 'based upon' a qualifying disclosure if the disclosure sets out . . . all of the essential elements of the qui tam action's claims"); United States ex rel. Rabushka v. Crane Co., 40 F.3d 1509 (8th Cir. 1994) (no public disclosure where suggestion that company understated pension liability was publicly disclosed, but not that it "was scheming to dump the pension liability on the government"); United States ex rel. Downy v. Corning, Inc, 118 F. Supp.2d 1160, 1165-167 (D.N.M. 2000) (allegations in qui tam complaint were not publicly disclosed because the public information did not reveal the fraud allegations or transactions).[1]

---

[1] By comparison, cases that have found a "public disclosure" have identified publication of the precise "allegations or transactions" set forth in the complaint in the public domain.  See United States ex rel. Settlemire v. District of Columbia, 198 F.3d 913, 919 (D.C. Cir. 1999) (qui tam allegation that police department funds were used for purposes other than those intended was disclosed in Congressional hearings); United States ex rel. Findley v. FPC-Boron Employees' Club, 105 F.3d 675, 687 (D.C. Cir. 1997) (Comptroller General Opinion and Senate Report "specifically identify the nature of the fraud - illegal retention of monies owed to the government and unauthorized administrative approval of the practice - as well as the federal employee actors engaged in the allegedly fraudulent activity"); United States ex rel. McKenzie v. Bellsouth Telecommunications, Inc., 123 F.3d 935, 941 (6th Cir. 1997) (same allegations made in two earlier filed lawsuits and reported by local newspapers); A-1 Ambulance Service, Inc. v. California, 202 F.3d 1328, 1245 (9th Cir. 2000) ("all material transactions giving rise to . . .

4

In sum, there is no public disclosure under the FCA unless the information disclosed in the public forum reveals the essential elements of the fraud – the very allegations or transactions made in the *qui tam* complaint. Innocuous information about the defendant or similar defendants in the public domain does not constitute a public disclosure as the government has no reason to commence an investigation based on such limited information alone. Such disclosures must provide sufficient indication of fraud so that the Government and the general public reasonably can be expected to have been alerted to the need for the Government to investigate specific conduct or transactions. Barring *qui tam* suits based on any public disclosure that fails to meet this minimum standard of disclosure defeats rather than serves the overriding interest of the United States in effectively combating fraud. See Brief of Senator Charles E. Grassley as Amicus Curiae in Support of Respondents, Rockwell International Corp. v. United States ex rel. Stone, No. 05-1272 (United States Supreme Court), filed November 20, 2006, at 17 (attached as Exhibit A).

2.      CIGNA identifies seven documents that it claims constitute "public information" that precludes Relator's action: a July 1996 General Accounting Office report entitled SSA Disability: Return-To-Work Strategies From Other Systems May Improve Federal Programs (CIGNA's Ex. B); a July 1, 2002 article in ManagedHealthCare.Info entitled CIGNA Announces Enhancements To Speed Payment of Social Security Benefits (CIGNA's Ex. C); a July 2001

---

allegedly unlawful cost-shifting were publicly disclosed" in local agency proceeding); Federal Recovery Services, Inc. v. United States, 72 F.3d 447, 450-51 (5th Cir. 1996) (two prior state court actions alleged that defendant "submitted fraudulent claims for reimbursement for ambulance services provided to individuals who were not medically eligible"); United States ex rel. Alexander v. Dyncorp, Inc., 924 F. Supp. 292, 300-302 (D.D.C. 1992) (*qui tam* allegation that defendant mischarged labor on contract barred because newspaper detailed allegations prior to filing).

paper written by D. Gregory Rogers included in the Annual Convention of Reference Materials

of the Association of Trial Lawyers entitled <u>The Effect of Social Security Awards on Long Term</u>

<u>Disability Claims</u> (CIGNA's Ex. D); Statement by Paul Verkuil in June 2002 at Hearing Before

The Subcommittee on Social Security on the Committee on Ways and Means (CIGNA's Ex. E);

published decisions in <u>Estades Negroni v. Associations Corp. Of North America</u>, 208 F. Supp.

2d 144 (D.P.R. 2002) and <u>Ladd v. ITT Corp.</u>, 148 F.3d 753 (7th Cir. 1998) (CIGNA's Ex. G);

and a June 2004 Letter from Subcommittee on Social Security of the United States House of

Representatives Comm on Ways and Means (CIGNA's Ex. H).

　　　None of these documents constitute a public disclosure of the allegations or transactions

in this action.  None of these documents in any way reveal the essential material allegations of

the fraud set forth by Relator in the Second Amended Complaint.  The Second Amended

Complaint alleges that CIGNA requires <u>all</u> of its Long Term Disability claimants to submit

claims for SSDI benefits  in reckless disregard of their eligibility for such benefits all the while

knowing that thousands of those claimants are not eligible for SSDI and concealing its

knowledge of ineligibility from SSA.  Second Amended Complaint ¶¶ 5-9, 67-77, 123-132, 138-

147.  The core allegation of the fraud – that CIGNA knowingly causes ineligible claimant to

submit claims for SSDI and does not evaluate the merits of the claim before causing wholesale

submission – is not in the public record.[2]

　　　First, **Exhibit D** and **Exhibit H** are clearly not public disclosures.  **Exhibit D** does not

_____

[2] The 2004 Congressional letter discusses the allegations about CIGNA.  But public disclosure of
the fraud a year after the filing of the complaint is common and clearly does not bar jurisdiction
over an action.

even fall into any of the specified statutory fora.  Congress did not intend <u>any</u> information in the public domain to preclude bringing a *qui tam* action.  Congress directed specified fora to serve the purpose of ensuring that the allegations had been made sufficiently public to justify dismissal of the *qui tam* case.  The list of specified fora that qualify as a public disclosure is exhaustive. <u>See</u> <u>Rost</u>, 446 F. Supp. 2d at *18 (citing <u>United States ex rel. LeBlanc v. Raytheon Co.,</u> 913 F.2d 17, 20 (1st Cir. 1990) (interpreting the plain language of the public disclosure bar to hold that "it does not deny jurisdiction over actions based on disclosures other than those specified") <u>United States ex rel. O'Keefe v. Sverdup Corp.</u>, 131 F. Supp. 2d 87, 91 (D. Mass. 2001)).[3]

In any event, **Exhibit D** does not disclose the essential allegations of the fraud.  **Exhibit D** does not identify or describe CIGNA's fraudulent scheme.  Instead, the ATLA paper addresses the wholly separate question of when a favorable decision by SSA awarding an insured SSDI benefits may be used by an insured to estop a private insurer from denying benefits.  Nothing in **Exhibit D** reveals – or even suggests – that insurers are causing ineligible insureds to claim SSDI benefits.  Instead, **Exhibit D** works from the opposite assumption that meritorious claims are referred for SSDI benefits and then wrongfully denied LTD benefits by the insured.  No one reading this article would be able to identify the fraud alleged in the complaint.

**Exhibit H** is also clearly not a public disclosure because this 2004 letter from the House Ways and Means Subcommittee was issued a year after the case was filed.  The letter was the result of efforts by relator's counsel to alert Congress to CIGNA's (and other disability insurer's) fraudulent scheme in hopes that the conduct would be stopped.  For that reason, **Exhibit H**

---

[3]  <u>United States ex rel. Fine v. Advanced Sciences, Inc.</u>, 99 F.3d 1000, 1006 (10th Cir. 1996) does not stand for the proposition that unpublished articles compiled for a private conference are "public disclosures" as CIGNA suggests.  CIGNA Memorandum at 5 n.6.

closely tracks the allegations in the previously-filed action.  Post-filing publication of the

allegations of the complaint has never been thought to bar previously-filed actions, however.  To

hold to the contrary would be absurd.  News media reports of pending investigation are, of

course, very common.  Congress never intended to require dismissal of meritorious actions

where the news media or the government commence an investigation _after_ the filing of the case

(particularly where, as here, the Congressional letter was prompted by efforts of Relator's

counsel to alert the Committee to wrongdoing by the disability insurers).  The public disclosure

bar was narrowly drafted to foreclose actions brought by Relators who draft a complaint "based

on" public disclosures of the fraud – not to cut off actions where Congress later champions

combating the fraud identified by Relator in her complaint. .

3.    Although the remaining documents identified by CIGNA mention some factual

details about CIGNA's SSDI offset, the material elements of the fraud – that CIGNA causes

claims to be submitted without regard to their eligibility and conceals information about the

claimant's residual work capacity and medical condition from SSA -- alleged in the complaint

have not been publicly disclosed by any of the documents identified by CIGNA.  Relator reviews

each of the Exhibits in turn:

**Exhibit B:**    This 1996 GAO Report concerns strategies SSA might use to encourage

persons receiving SSDI benefits to return to work when able.  Nothing in Exhibit B reveals the

essential allegations of the fraud in this case.  Page 22 of the Report references the well-known

fact that most insurers have "offset" provisions requiring that private benefits be reduced "dollar

for dollar" by SSDI benefits received.   The GAO Report does not suggest or imply, however,

that CIGNA, or any other insurer, obtains such reductions in private benefits by forcing

submission of meritless claims.  Disclosure of the "offset" alone does not reveal the fraud.  The "offset" could be appropriately used if CIGNA had a policy and practice of screening its insureds for SSDI eligibility before requiring them to submit SSDI claims.

**Exhibit C:**    **Exhibit C** is a short article from "ManagedHealthCare Info," presumably a trade press publication.  The article does not reveal the fraud but, instead, arguably conceals it from public review.  The article, which reads like a press release, announces CIGNA's partnership with Allsup, Inc. and Advantage 2000 to assist with submission of claims for SSDI benefits.  The ManagedHealthCare Info article does not reveal that CIGNA requires all of its LTD claimants with return-to-work dates of at least nine months to file SSDI claims regardless of their eligibility.  Instead, the article plainly states that "[w]ithin seven days of receipt of a long-term disability claim, case managers determine whether the disability has the potential to qualify for Social Security assistance."  That statement suggests that, if anything, CIGNA performs a meaningful review of the claimant's eligibility.  The next sentence states that an applicant must be judged unable to work for 12 months or more to be eligible for SSDI.  Although duration of disability is not the only relevant factor for SSDI disability, that statement also suggests, if anything that CIGNA attempts to adhere to the SSDI eligibility requirements.  That statement contradicts, rather than discloses, the allegations of Relator's complaint.  **Exhibit C** cannot possibly be a public disclosure.

**Exhibit E:**    **Exhibit E** is a Statement from Professor Paul Verkuil submitted to a House Subcommittee of the House Ways and Means Committee to report on a recent study for the Social Security Advisory Board reviewing proposals for changes in the judicial review structure related to disability determinations by SSA.  Professor Verkuil's Statement  mentions

absolutely nothing of even remote relevance about private disability insurance except to note that private insurers increasingly require that "claimants pursue their offsetting SSA benefits." That private insurers require that claimants pursue SSDI offsets does not, however, suggest that private insurers are causing ineligible insureds to claim SSA benefits. The SSDI "offset" can be quite legitimate as long as the disability insurer weeds out ineligible applicants rather than pressuring all of its insureds to file SSDI claims once they are receiving LTD benefits of a set duration. As discussed at length in the Complaint, LTD benefits typically insure inability to perform work in one's "own occupation" as distinguished from SSDI's definition of disability as unable to perform work in "any occupation." Accordingly, a disclosure that private insurers have offset provisions that may require more severely disabled insureds from seeking SSDI benefits as an offset, in and of itself, cannot reveal the fraud. The public would likely still assume that the private insurer is only causing claimants who likely are eligible under the more stringent standard for SSDI to claim benefits.

**Exhibit F:**    The longer version of Professor Paul Verkuil's report referenced in **Exhibit E**, is equally unavailing. Nothing in **Exhibit F** reveals the fraud. **Exhibit F** merely mentions in passing that increasing numbers of disability insurers are exercising their contractual rights to require "offsets" before paying disability benefits. For the reasons given for **Exhibit E**, that innocent observation also does not reveal that claimants are submitting ineligible and fraudulent claims.

**Exhibit G**:    The two published federal cases cited by Unum – Estades Negroni v. The Associates Corp. Of North America, 208 F. Supp. 2d 144 (D. Puerto Rico 2002) and Ladd v. ITT Corporation, 148 F.3d 753 (7th Cir. 1998) – also clearly do not disclose the essential allegations

of the fraud. <u>Estades Negroni</u> is a case brought under the Age Discrimination in Employment Act and the Americans with Disabilities Act. Although the facts are complicated, it appears that the plaintiff, who suffered from depression, claimed LTD benefits under a Prudential policy and claimed SSDI benefits. Although the plaintiff received SSDI benefits, she was denied LTD benefits. Eventually her LTD benefits were approved by another carrier but then terminated when she failed to produce proof of application for SSDI. All in all, the facts in <u>Estades Negroni</u> do not reveal the alleged fraud but suggest a common dispute over entitlement for private disability benefits.

<u>Ladd</u> is no more helpful for CIGNA. <u>Ladd</u> concerns the question of when a decision by SSA to grant SSDI benefits may collaterally estop a private insurer from denying benefits. 148 F.3d at 756. Nothing in <u>Ladd</u> suggests that private insurers force ineligible claimants to submit SSDI claims. If anything, <u>Ladd</u> stands for the opposite proposition and assumes that private insurers often wrongfully deny insureds private benefits even after the insured appropriately is awarded SSDI benefits.

Accordingly, none of the Exhibits cited by CIGNA reveal the fraudulent conduct alleged in the Complaint in this action. Pieces of information about a defendant or an industry, even when public disclosed, rarely add up to an allegation of fraud. <u>See</u> False Claims Act Implementation: Hearing Before the Subcommittee on the Judiciary, 101st Cong., 2d Sess. 6 (1990) ("The publication of general, non-specific information does not necessarily lead to the discovery of specific individual fraud which is the target of the *qui tam* action.") (Statement of Senator Grassley). Under the test articulated by the D.C. Circuit in <u>Springfield Terminal</u>, there must be "enough information . . . in the public domain to expose the fraudulent transaction."

This analysis should not be reduced to a simple formula.  Congress wanted to encourage those

with insider knowledge as well as those who through their independent efforts assist the

Government in ferreting out fraud.  See United States ex rel. Lamers v. City of Green Bay, 168

F.3d 1013, 1018 (7th Cir. 1999).   Relator's action revealed CIGNA's fraud publicly for the first

time.

4.        Finally, even if it is true, as Relator does not concede, that the SSA was aware of

CIGNA's practice of referring insureds for SSDI claim submission regardless of eligibility, such

awareness on the part of government officials does not amount to a public disclosure as CIGNA

suggests.  Courts have rejected the argument that disclosure even of the actual fraud by a

defendant to a competent government official constitutes a public disclosure.  See Rost, 446 F.

Supp. 2d at 26; see also United States ex rel. Brennan v. The Devereux Found., 2003 U.S. Dist.

LEXIS 2783 (E.D. Pa. 2003) (defendants' notification of public officials did not constitute a

public disclosure).[4]

Judge Tauro's recent opinion in Rost is particularly instructive on this point.  In Rost, the

defendant also argued that government knowledge of its conduct through its own disclosure

barred jurisdiction over a *qui tam* suit.  Here, Relator does not concede that the SSA knew the

scope of CIGNA's alleged fraud.  But even if it did, for the reasons set forth in Rost, government

knowledge does not equate to public disclosure.  Such a reading would be contrary to both the

---

[4] But see United States ex rel . Mathews v. Bank of Farmington, 166 F.3d 853 (7th Cir. 1999);
United States ex rel. Cosens v. Yale-New Haven Hosp., 233 F. Supp. 2d 319, 327 (D. Conn.
2002) (adopting Mathews approach without discussion).

plain language of the terms "public" and "disclosure" and the history of the 1986 amendments to the federal False Claims Act.

As explained in <u>Rost</u>, a "public disclosure" is something that is exposed, made known to or at least made accessible to the general public. <u>Rost</u> specifically rejects the idea that the "general public" is synonymous with the government. 446 F. Supp. 2d at 27-28. Information in the possession of the government that is not disclosed to the public is not a "public disclosure" under the FCA. To hold otherwise, reasoned the Court in <u>Rost</u>, would be to revive the pre-1986 version of the FCA specifically repudiated by Congress. <u>Id.</u> at 29. Even if CIGNA disclosed information to the government about its fraud, that information was never disclosed to the public.

Accordingly, here, there has been no <u>public</u> disclosure of the allegations or transactions set forth in the Complaint. For these reasons, this case is even easier the <u>Pogue</u> where the district court held that information related to the allegations in the complaint disclosed in SEC reports did not trigger the jurisdictional bar. <u>See</u> 977 F. Supp. 1329. In <u>Pogue</u>, Relator alleged that defendant dialysis centers entered into a series of incentive based contracts with physicians for referral of patients resulting in a scheme to defraud Medicare and Medicaid through illegal admissions and referrals. <u>Id.</u> at 1332-33. Defendant argued that the contracts at issue had been disclosed in SEC filings. Nonetheless, the Court found that the essential elements of the fraudulent transactions – illegal referrals and submission of claims to Medicare and Medicaid -- had not been publicly revealed. <u>Id.</u> at 1338-39. Accordingly, the court in <u>Pogue</u> denied defendants' motion to dismiss under the public disclosure bar. <u>Id.</u> at 1340. In this case, the pre-filing documents identified by CIGNA do not reveal any of the material elements of the fraud

and the post-filing 2004 Congressional letter cannot qualify as a public disclosure for a previously-filed complaint.

## II.     Allegations in the Complaint Are Not "Based Upon" Public Information.

Even if the Court had concerns that one of the documents publicly disclosed the material allegations of the complaint, here, there is no basis for concluding that Ms. Barrett's information was "based upon" publicly disclosed information.   As CIGNA acknowledges, there is a split in the circuits over the meaning of "based upon."   Under the majority view, courts have held that an action is "based upon" a  public disclosure "when the supporting allegations are similar to or the same as those that have been publicly disclosed . . . regardless of where the relator obtained his information."  See, e.g., United States ex rel. Doe v. John Doe Corp., 960 F.2d 318, 324 (2d Cir. 1992); see also Rost, 446 F. Supp. 2d at * 19 & n.73 (citing cases).

Recognizing that the majority view is in conflict with the plain statutory language, the minority view holds that "based upon" means "derived from" and that an action is barred only where the relator has actually derived from the public disclosure the allegations upon which the qui tam complaint is based.   See United States ex rel. Mathews v. Bank of Farmington, 166 F.3d 853, 863 (7th Cir.1999); United States ex rel. Siller v. Becton Dickinson & Co., 21 F.3d 1339, 1348 (4th Cir. 1994).   The First Circuit has not opined on which version of "based upon" it adopts.  Four district courts in this district have faced the issue and have split three to one in favor of the minority rule including this Court's 1988 decision in LaValley   See Rost, 446 F. Supp. 2d at * 19 & n. 77 (citing cases including LaValley, 707 F. Supp. at 1366-67 (holding that plaintiff's knowledge was not based upon the public disclosures because plaintiff's knowledge was independent of those disclosures)).

If this Court reaches the question whether Relator's allegations are "based upon" a public disclosure it should use the test used by this Court eighteen years ago in LaValley and articulated most recently by Judge Tauro in the Rost decision. Under that interpretation, "based upon" means "derived from" or "taken, received, obtained ... from a specific source." See Rost, 446 F. Supp. 2d at 35 (quoting dictionary definitions for "based upon"). To adopt such an interpretation would be to reject CIGNA's argument that it is enough to bar Relator's action if her allegations are "similar to" public disclosures. Memorandum at 10-11. As the Court held in Rost, even information that is identical to information in the public domain is not necessarily "based upon" that information unless it is "derived from" that information. Accordingly, the minority's view is more consistent with the plain statutory text. The "derived from" test also better serves the policies behind the FCA and eliminates only those *qui tam* actions that are truly parasitic. Id. In this case, as in Rost, even if there were public disclosures of CIGNA's fraud, which Relator wholeheartedly contests, Relator's complaint is not "based upon" any such disclosures. Relator's complaint derives from her own direct and independent knowledge of CIGNA's practices as a claims handler. See Second Amended Complaint ¶¶ 15-17.

**III.     No Discovery Is Needed on Public Disclosure**.

Resolution of the public disclosure issue does not require any discovery.[5]  Public disclosures are just that – disclosures made in the public domain. The "government knowledge" CIGNA seeks to discover is simply not relevant to the jurisdictional question before the Court.

---

[5]  The only conceivable fact-based question would be whether Relator's allegations were "based upon" public disclosures. But that question would only be presented if the Court found that the documents identified by CIGNA disclose the essential allegations of the fraud which Relator contends they do not.

Under the current public disclosure bar, only suits actually based upon revelations of specific instances of fraud that are publicly disclosed in certain Government proceedings or the news media are barred.  The public disclosure bar enacted in 1986 supplanted a previous, more restrictive provision that barred a *qui tam* action "based on evidence the Government had when the suit was brought."  31 U.S.C. § 3720(b)(4) (1982) (superseded).  The previous provision had created the anomalous situation of barring otherwise legitimate relator cases when valuable information was shared with the government.  See United States ex rel. O'Keefe v. Sverdup Corp., 131 F. Supp.2d 87, 91 (D. Mass. 2001) (Saris, J.) (reviewing legislative history of 1986 amendments to FCA).  In amending the FCA to add the current public disclosure bar in 1986, Congress's goal was to provide "adequate incentives" for whistleblowers with "valuable information" while discouraging "opportunistic plaintiffs who have no significant information to contribute of their own."  Id.

In substituting the current public disclosure bar for the government knowledge bar in 1986, Congress sought to strengthen the False Claims Act to make it a more effective tool for combating fraud.  To allow government knowledge about defendant's practices to inform the "public disclosure"inquiry one way or the other would subvert Congressional intent.  Accordingly, CIGNA does not require any discovery before the threshold legal issue of public disclosure can be decided.  The case law strongly supports the proposition that there is no need for discovery to find something that is in the public domain.[6]

**IV.    There Is No Justification for Limiting Discovery to CIGNA's Defenses.**

CIGNA's additional argument to limit initial discovery to one of its affirmative defenses

---

[6]  Only if this Court finds that there has been a public disclosure within the meaning of the statute, does the Court need to consider whether Ms. Barrett is the original source.

that claims for SSDI benefits are not "claims" and are not "material" to the Social Security

Administration's claims disposition process, is completely without foundation.  Relator does not

oppose CIGNA conducting discovery of SSA or seeking to coordinate such discovery with

Unum.[7]  But CIGNA's argument that it can establish that the claim forms are not material to

SSA as a matter of law and summarily dispose of this case is absurd on its face.  Under

CIGNA's theory no matter how egregious CIGNA's conduct in knowingly causing the

submission of false or fraudulent claims and concealing material information from SSA, CIGNA

cannot be held liable under the FCA.  Allowing CIGNA to limit discovery to its single

affirmative defense that any fraud committed by CIGNA could not harm SSA is not likely to

lead to a speedy resolution of this case and, instead, will likely lead to piecemeal litigation and

unfairly prejudice Relator's rights.

1.    **Claims for SSDI Benefits are "Claims"**

The issue of whether the SSDI form is a "claim" is easily resolved as a matter of law and

does not require any discovery.  Under the FCA, a "claim" includes any "request or demand" for

money or property.  See 31 U.S.C. § 3729©.  Applications for government benefits are "claims"

under the FCA.  See United States v. Neifert-White, 390 U.S. 228, 230 (1968); see also United

States ex rel. Kneepkins v. Gambro Heathcare, Inc., 115 F Supp. 2d 35, 42 (D. Mass. 2000)

("submitting a claim for program benefits under the false pretense of entitlement is fraudulent").

---

[7] CIGNA suggests that discovery of the SSA can occur in a timely manner.  However, Relator is
not aware that the United States has agreed to produce a representative of SSA for deposition or
to comply with discovery requests in the Unum case or at all.  Relator agrees that the case law
supports the proposition that the Court has the authority to compel attendance of government
witnesses under Federal Rule of Civil Procedure 45.  See Yousui v. Samantar, 451 F.3d 248
(D.C. Cir. 2006).   However, as a practical matter, discovery of the United States usually
involves petitioning the agency under the agency's Tuohy regulations.   See 20 C.F.R. § 403.140
et seq.

The key inquiry is whether the "claim" has the "practical purpose and effect, and poses the attendant risk, of inducing wrongful payment."  United States v. Rivera, 55 F.3d 703, 710 (1st Cir. 1995).  Even unsuccessful attempts to defraud the United States can trigger FCA liability. Id. at 709.

Here, the form submitted to SSA is the claimant's only way of initiating resolution of his or her claim for SSDI benefits.  SSA regulations designate the SSDI form submitted to SSA as a "claim" and provide that no benefits may be awarded unless that claim is filed and signed.  See 20 C.F.R. § 404.610 (describing SSDI form as "claim for benefits").   The most recent version of the Form explains "What We Mean By Disability" and states that  "For purposes of this claim, we want you to understand that 'disability' means that you are unable to work as defined by the Social Security Act.  You will be considered disabled if you are unable to do any kind of work for which you are suited and if your disability is expected to last (or has lasted) for at least a year or to result in death. So when we ask, 'when did you become unavailable to work,' we are asking when you became disabled as defined by the Social Security Act."  (Emphasis added)

The Form also makes clear that it will be used to evaluate the claim for federal benefits. Page 1 of the instructions state "[t]he information that you give us on this form will be used by the office that makes the disability decision of your disability claim."  Page 2 of the instructions state "[t]he information on this form is needed by Social Security to make a decision on the named claimant's claim.  While giving us the information on this form is voluntary, failure to provide all or part of the requested information could prevent an accurate or timely decision on the named claimant's claim."  (Emphasis added).  Upon submission of Form SSA-3368-BK, SSA initiates an administrative process for disposing of the claimant's claim.  There is no other

18

claim form for SSDI benefits.  The next official communication between SSA and the claimant

(other than requests for additional information) would be a letter from SSA either awarding

benefits or explaining the procedures for filing an appeal.

Taken to its logical extreme, CIGNA's argument that the SSA Form is not a "claim,"

Memorandum at 15-17, would mean that the United States could not pursue civil damages and

penalties under the FCA even against a claimant who admittedly lies about factual information.

As cited in Relator's Opposition to Dismiss the First Amended Complaint, the United States has

used the False Claims Act to pursue actions against  individuals who knowingly misrepresent

eligibility for SSDI.   Knowing misrepresentations of one's eligibility for benefits or factual

misrepresentations in the SSDI Application Form may be prosecuted as a false "claim."

That the SSA investigates the claim for eligibility before money is actually paid out also

is if no moment to the "claim" analysis.  Liability attaches when a request or demand for

payment occurs even if the government's liability to pay the claim does not ripen until

subsequent conditions occur.  Rivera, 55 F.3d at 710.  Otherwise, no claims for governmental

benefits would be subject to the FCA.   Most claims for government programs, including claims

for reimbursement from Medicare, are subject to investigation by the federal program officers.[8]

---

[8]For these reasons, courts have recognized a great variety of submissions to be "claims" within
the meaning of the FCA. See, e.g., United States v. TDC Management, 288 F.3d 421 (D.C. Cir.
2002) (progress and expenditure reports submitted to support payment under program to
encourage minority participation in large transportation construction projects are "claims"); Ab-
Tech Const., Inc., v. United States, 31 Fed. Cl. 429, aff'd, 57 F.3d 1084 (Fed. Cir. 1995) (claims
made under project intended for minority businesses); United States v. Cooperative Grain &
Supply Co., 476 F.2d 47 (8th Cir. 1973) (false representation in claim to obtain price supports for
purchased grain); Sell v. United States, 336 F.2d 467, 474 (10th Cir. 1964) (fraudulent claim for
federal assistance under the Emergency Feed Program); United States ex rel. King v. F.E.
Moran, Inc., 2002 WL 2003219 (N.D. Ill. 2002) (claims made under project intended for
minority businesses).

**2.      False or Fraudulent Claims for SSDI Benefits are Material.**

The First Circuit has assumed without deciding that some showing of "materiality" must be made to support a FCA claim.  See United States v. Data Translations, Inc., 984 F.2d 1256, 1267 (1st Cir. 1992).  Most courts have held that the materiality inquiry is whether the information presented "has a natural tendency to influence agency action or is capable of influencing agency action."  United States ex rel. President and Fellows of Harvard College, 323 F. Supp. 2d 151, 181-182 (D. Mass. 2004) (citing numerous cases).   Also courts have emphasized that the question of what constitutes a claim – and whether that claim was material – turns on what the defendant did and "not on how the government chooses to process the claim . . . because the gravamen of these cases is that the focus in on the conduct of the defendant."  Id at 183 (citing United States v. Krisek, 111 F.3d 934, 939 (D.C. Cir. 1997)).

CIGNA's argument that even if it causes its insureds to make knowing false statements or representations on SSDI claim form these are immaterial to SSA's claims process is absurd on its face.  The claimant's representation that he or she is unable to work and is disabled within the meaning of the SSA definition is a material representation that could influence a decisionmaker.  The existence of an administrative review process for the claim does not render the

_____

Cases cited by CIGNA do not involve a claim for benefits under a federal benefit program equivalent to the claim here.  Dookeran v. Mercy Hospital, 281 F.3d 105 (3d Cir. 2002) did not involve a request or demand for money from any federal grant program but merely an application to be designated by a federal agency as a "clinical center" for a national clinical trial on the effectiveness of certain chemotherapy agents.  Id. at 107-09.  Similarly, in United States ex rel. Cooper v. Gentiva Health Servs., Inc. 2003 WL 22495607 (W. D. Pa. Nov. 4, 2003), the court  found it "obvious" that a misrepresentation on an initial application to qualify for a Medicare provider identification number is not a claim for payment.  Id. at *7, n.9.  Neither Dookeran nor Gentiva Health remotely resembles a request for government benefits under the SSDI program.

representation of statutory eligibility immaterial under the law.  The false representation of eligibility is material to initiating the administrative process resulting in the harm to the government in wasted and excessive administrative expenses.  So too, CIGNA's concealment of its denial of LTD benefits contributed to the material misrepresentation that the claimants were eligible for SSDI.  CIGNA has a duty to disclose material information in its possession that may be relevant to the SSDI determination of eligibility.  42 U.S.C.§ 408(4);  42 U.S.C. § 1320a-8; see also 20 C.F.R. § 404.1740 (imposing affirmative duties on representatives of SSDI applicants and prohibiting making false or misleading statements about a material fact).   Yet, such information is knowingly concealed.  Second Amended Complaint ¶¶ 8, 67, 133-138.

The United States has taken the position that it may use the federal False Claims Act to prosecute one who submits a knowingly false claim for SSDI benefits suggesting that false claims of eligibility for SSDI benefits are material to the United States whether or not the SSA relies on the claim form in awarding benefits.  In any event, even if benefits are never awarded, the United States incurs damages by processing ineligible claims.  By causing ineligible claimants to submit meritless SSDI claims, SSA incurs expenses of $1300-$1600 per claim to process each meritless claim for benefits.

For these reasons, there is no justification for allowing defendant to proceed with discovery on a single affirmative defense while the rest of the case languishes.  To the extent the Court believes it would like to have a full factual record of the role of the claim form in SSA's review, it would likewise also be helpful for the Court also to have a factual record on the claims management process used by CIGNA and its vendors including Advantage 2000.  The interplay between CIGNA, its Social Security Disability Referral program, CIGNA's private vendors and

the Social Security Administration is essential to considering the merits of Relator's allegation that material information is concealed from SSA and that the eligibility of claimants is misrepresented. Only with the full factual record on the two claims handling processes will the Court be able to make an informed, and final, determination at summary judgment or trial about the materiality of the claim to SSA's benefits review process.

Not surprisingly, the cases cited by CIGNA at page 7 of its Memorandum do not support its assertion that materiality is a threshold issue that can be resolved summarily with only limited discovery. Unlike a jurisdictional issue, materiality turns on development of the factual record on the role of the claims form in the administrative review process. See President and Fellows of Harvard College, 323 F. Supp. at 182-184 (determining materiality after extensive review of claims submission procedures and testimony regarding what constitutes a condition of payment). CIGNA cannot establish as a matter of law at an initial discovery stage that claims form cannot be material to the SSA claims disposition process.

Accordingly, "materiality" is not an issue capable of resolution before full discovery. Limiting discovery to that issue will not expedite the case and will likely needlessly delay and extend the proceedings.

## CONCLUSION

For the foregoing reasons, CIGNA'S Proposal for Phased Discovery should be rejected.

This Court should further hold that defendant has not demonstrated a "public disclosure" within

the meaning of section 3730(e)(4) of the federal False Claims Act.  Discovery should commence

on the plan proposed by Relator.

Date:   December 18, 2006                    Respectfully submitted,

                                            / S /  Peter B. Krupp

W. Mark Lanier                              Peter B. Krupp, B.B.O. # 548112
Lawrence Wilson                             LURIE & KRUPP, LLP
Kevin P. Parker                             One McKinley Square
THE LANIER LAW FIRM, P.C.                   Boston, MA  02109
P.O. Box 691408                             Tel.: (617) 367-1970
Houston, TX  77269-1408                     Fax: (617) 367-1971
Tel.: (713) 659-5200
Fax:  (713) 659-2204                        Mary Louise Cohen
                                            Colette G. Matzzie
                                            Phillips & Cohen LLP
                                            2000 Massachusetts Avenue, NW
                                            Washington, DC 20036
                                            Tel:(202) 833-4567
                                            Fax:(202) 833-1815

## CERTIFICATE OF SERVICE

I, Peter B. Krupp, hereby certify that this document filed through the ECF system will be
sent electronically to the registered participants as identified on the Notice of Electronic Filing
and paper copies will be sent to those indicated as non registered participants on December 18,
2006.

                                            / S /  Peter B. Krupp

                                            Peter B. Krupp