No. 05-1272

IN THE

# Supreme Court of the United States

ROCKWELL INTERNATIONAL CORP.
AND BOEING NORTH AMERICAN, INC.,
*Petitioners,*

V.

UNITED STATES OF AMERICA

AND

UNITED STATES *EX REL.* JAMES S. STONE
*Respondents.*

ON WRIT OF CERTIORARI TO THE
UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

**BRIEF OF SENATOR CHARLES E. GRASSLEY AS
*AMICUS CURIAE* IN SUPPORT OF RESPONDENTS**

RITA LARI, Chief Counsel
SEN. CHARLES E. GRASSLEY
UNITED STATES SENATE
COMMITTEE ON THE JUDICIARY
135 Hart Senate Office Bldg.
Washington, D.C. 20510
(202) 224-5225

November 20, 2006

JOHN E. CLARK
   *Counsel of Record*
GOODE, CASSEB, JONES,
RIKLIN, CHOATE &
WATSON P.C.
2122 North Main Ave.
San Antonio, TX 78212
(210) 733-6030

i

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................. iii

INTEREST OF *AMICUS CURIAE* ....................................... 1

SUMMARY OF ARGUMENT ............................................ 2

ARGUMENT ......................................................... 4

I.  THE PARAMOUNT PURPOSE OF THE *QUI TAM* PROVISIONS OF THE FALSE CLAIMS ACT IS TO ENLIST PRIVATE CITIZENS TO CONTRIBUTE THEIR INFORMATION AND RESOURCES TO ASSIST THE GOVERNMENT IN ITS ANTI-FRAUD LAW ENFORCEMENT EFFORTS ....................................... 4

    A.  As Originally Enacted in 1863, the False Claims Act Authorized Private Persons To Pursue Fraud Claims on Behalf of the Government Regardless of the Source of the Person's Knowledge ................................................. 5

    B.  Congress Amended the False Claims Act in 1943 To Address a Perceived Problem with Parasitic Suits by Prohibiting *Qui Tam* Actions When the Complaint Was Based Upon Information Already in the Government's Possession ................................................. 6

    C.  In 1986 Congress Sought To Correct the 1943 Version of the Law by Carefully Crafting a Limited Bar to Certain Parasitic Suits....................... 11

II. THE PUBLIC DISCLOSURE BAR PROVIDES A LIMITED FILTER TO PRECLUDE *QUI TAM* ACTIONS THAT ARE BASED UPON SPECIFIC FRAUD ALLEGATIONS ALREADY AVAILABLE TO THE GOVERNMENT IN ITS OWN PROCEEDINGS AND INVESTIGATIONS OR THROUGH THE NEWS MEDIA. .......................................... 16

A. The Public Disclosure Bar Has No Application When the Government Joins the Case ....................... 16

B. The Public Disclosure Bar Precludes Only Parasitic Suits. .......................................................... 17

C. The Original Source Exception Prevents the Public Disclosure Bar from Excluding Persons Who Brought to the Government Their Own Information That Was Independent of the Public Disclosure................................................................. 20

CONCLUSION .................................................................. 22

iii

# TABLE OF AUTHORITIES

**Page**

**Cases**

*A-1 Ambulance Service, Inc. v. California*,
    202 F.3d 1238 (9th Cir.), *cert. denied*,
    529 U.S. 1099 (2000) ................................................ 18

*United States v. Aster*,
    275 F.2d 281 (3d Cir.),
    *cert. denied*, 364 U.S. 894 (1960) ............................ 11

*United States v. Pittman*,
    151 F.2d 851 (5th Cir. 1945),
    *cert. denied*, 328 U.S. 843 (1946) ............................ 17

*United States v. Rippetoe*,
    178 F.2d 735 (4th Cir. 1949) ............................... 11-12

*United States ex rel. Jones v. Horizon Healthcare Corp.*,
    160 F.3d 326 (6th Cir. 1998) .................................... 18

*United States ex rel. Lamers v. City of Green Bay*,
    168 F.3d 1013 (7th Cir. 1999) .................................. 20

*United States ex rel. Lapin v. Int'l Bus. Machines Corp.*,
    490 F. Supp. 244 (D. Haw. 1980) ........................... 11

*United States ex rel. Longstaffe v. Litton Industries, Inc.*,
    296 F. Supp. 2d 1187 (C.D. Cal. 2003) ................... 21

*United States ex rel. Marcus v. Hess*,
    127 F.2d 233 (3d Cir. 1942) .................................. 6, 7

*United States ex rel. Marcus v. Hess*,
    317 U.S. 537 (1943) .................................................. 7

*United States ex rel. Springfield Terminal Ry. Co. v. Quinn*,
    14 F.3d 645 (D.C. Cir. 1994) ................................... 20

*United States ex rel. Wisconsin v. Dean*,
    729 F.2d 1100 (7th Cir. 1984)............................12, 20

## Statutes and Rules

Act of December 23, 1943, ch. 377, 57 Stat. 608 ..........11, 17

Act of March 2, 1863, ch. 67, 12 Stat. 696  ...........................6

False Claims Amendments Act of 1986,
    Pub. L. No. 99-562, 100 Stat. 3153 (1986),
    *codified at* 31 U.S.C. §§ 3729-3733......................1, 15

31 U.S.C. § 3730(b)(4)(A) ..................................................17

31 U.S.C. § 3730(c)(2)(A) ..................................................17

31 U.S.C. § 3730(d) ....................................................17, 21

31 U.S.C. § 3730(e)(4)......................................................17

31 U.S.C. § 3730(e)(4)(A) .................................................18

31 U.S.C. § 3730(e)(4)(B) .................................................21

Sup. Ct. Rule 37.6 ..............................................................1

## Congressional Materials

Cong. Globe, 37th Cong., 3d Sess. 952 (1863)......................5

Cong. Globe, 37th Cong., 3d Sess. 955 (1863)......................5

88 Cong. Rec. 9138 (1942) ..................................................7

89 Cong. Rec. 2801 (1943) ..................................................7

89 Cong. Rec. 7438 (1943) ..................................................9

v

89 Cong. Rec. 7439 (1943) ......................................................9

89 Cong. Rec. 7578-79 (1943) ...............................................9

89 Cong. Rec. 7601-02 (1943) ...............................................9

89 Cong. Rec. 7608 (1943) ....................................................10

89 Cong. Rec. 7614 (1943) ....................................................10

89 Cong. Rec. 7614-15 (1943) ................................................9

89 Cong. Rec. 7806 (1943) ....................................................10

89 Cong. Rec. 10844 (1943) ..................................................11

89 Cong. Rec. 10847 (1943) ..................................................11

131 Cong. Rec. 22322 (1985) ................................................13

132 Cong. Rec. 20530-42 (1986) ..........................................14

132 Cong. Rec. 20531 (1986) ................................................15

132 Cong. Rec. 20535 (1986) .........................................13, 23

132 Cong. Rec. 20536 (1986) ................................................14

132 Cong. Rec. 28533 (1986) ................................................15

132 Cong. Rec. 28580 (1986) ................................................13

145 Cong. Rec. 16025, 16031 (1999) .............................18, 21

False Claims Act Implementation:  Hearing Bef.
        the Subcomm. on Admin. Law and
        Government Relations of the House Comm.
        on the Judiciary, 101st Cong., 2d Sess. (1990) .........19

False Claims Amendments Act of 1986,
    S. Rep. No. 345, 99th Cong., 2d Sess.,
    *reprinted in* 1986 U.S.C.C.A.N. 5266 .......... 12, 13, 14

H.R. 1203, 78th Cong., 1st Sess. (1943) ................................ 7

H.R. Rep. No. 263, 78th Cong., 1st Sess. (1943) .................. 7

H.R. Rep. No. 933, 78th Cong., 1st Sess. (1943) ................ 11

S. 1562, *reprinted in* False Claims Reform Act:
    Hearing Bef. the Subcomm. on Admin. Prac.
    and Proc. of the Sen. Comm. on the Judiciary,
    99th Cong., 1st Sess. (Sept. 17, 1986) .... 13, 14, 15, 16

S. 2754, 77th Cong., 2d Sess. (1942) ...................................... 7

S. Rep. No. 1708, 77th Cong., 2d Sess. (1942) ................. 6, 7

S. Rep. No. 291, 78th Cong., 1st Sess. (1943) ................... 8, 9

**Other Materials**

GAO Report to Congress, Fraud in Government Programs:
    How Extensive is it?  How Can it be Controlled?
    (1981) ................................................................. 12-13

## INTEREST OF AMICUS CURIAE[*]

*Amicus Curiae* Senator Charles Grassley was the principal sponsor in the Senate of the False Claims Amendments Act of 1986, Pub. L. No. 99-562, 100 Stat. 3153, *codified as amended* at 31 U.S.C. §§ 3729-3733. That Act substantially revised the original False Claims Act, which was first enacted in 1863 to draw on the information and resources of private citizens in combating fraud against the Government. Since the enactment of the 1986 amendments, *qui tam* relators have assisted in returning well over $15 billion to the United States Treasury.[1] As a principal sponsor of this important legislation, Senator Grassley has a strong interest in presenting his purpose in crafting the 1986 amendments to the Act generally and specifically the public disclosure bar and its original source exception at issue in this case.

---

[*] In accordance with Rule 37.6, *amicus curiae* certifies that counsel for a party did not author this brief in whole or in part and that the only monetary payment for preparation or submission of this brief was by the law offices of John Clark for its printing. Counsel for *amicus* represents that counsel for all parties have consented to the filing of this brief. Petitioners have filed a letter with the Clerk granting blanket consent to any party filing an *amicus* brief in support of either petitioners or respondents, and letters reflecting respondents' consent to the filing of this brief have been filed with the Clerk.

[1] *See* www.usdoj.gov/opa/pr/2005/November/05_civ_595. html (reporting recoveries though fiscal year 2005); http://www.taf.org/statistics.htm (reporting additional recoveries).

2

## SUMMARY OF ARGUMENT

The *qui tam* provisions of the False Claims Act have always had as their central purpose enlisting the information and resources of private citizens to assist the Government in its efforts to combat fraud. That purpose is as essential to the Government today to confront fraud in Government programs from reconstruction in Iraq to aid for victims of Hurricane Katrina, as it was when the Act was first adopted in 1863 to redress profiteering during the Civil War. As a result of the 1986 Amendments, the Government has recovered billions of dollars taken from it by fraud, which the Government might never have learned about or pursued without the assistance of private citizens.

As originally enacted, the False Claims Act authorized a private person, or *qui tam* relator, to pursue a fraud claim on behalf of the United States Government, without regard to the source of the person's information. The Act did not authorize the Government to intervene in the relator's case, and a successful relator was entitled to fifty percent of the total recovery.

In 1943, at the request of the Attorney General, Congress amended the *qui tam* provisions of the False Claims Act to bar *qui tam* suits that were based upon information about fraud already in the Government's possession. The Attorney General had expressed concern that relators were abusing the Act by copying criminal indictments and filing them as complaints to claim a reward, without contributing any information of their own. Although some members of Congress questioned the extent of the problem, Congress was persuaded to bar such parasitic suits. The 1943 amendment required a relator to provide all information in the relator's possession to the Government before filing suit and allowed a relator to pursue a case only if the Government elected not to do so. If the Government declined to pursue the case, the *qui tam* suit could not be pursued if the Government possessed information about the fraud at the time the case was filed.

3

Courts applied the literal language of the 1943 amendment to bar any *qui tam* suit where the Government was already aware of the fraud, even if the only source of the Government's knowledge was the information the relator provided before filing suit, as the law required. As a result, *qui tam* relators whose lawsuits were not in any sense parasitic were barred from pursuing a civil action on the Government's behalf, and the *qui tam* provisions of the statute largely fell into disuse.

In 1986, Congress sought to revitalize the False Claims Act and make it a more effective means of combating fraud. The 1986 Congress agreed with the policy choice of the 1943 Congress that parasitic actions should be barred. To ensure that only parasitic suits were barred, however, Congress discarded the Government knowledge bar and replaced it with the public disclosure bar. The public disclosure bar was intended to exclude only suits actually based upon revelations about specific instances of fraud that were publicly disclosed in certain Government proceedings or the news media. In order to limit such exclusion only to truly parasitic *qui tam* actions, Congress added the "original source" exception to the bar. The exception allows a relator to proceed with a case based upon publicly disclosed allegations of fraud, if the relator brought his own information underlying his allegations, independent of the public disclosure, to the Government before filing his suit.

Courts have since interpreted the public disclosure bar and its original source exception to bar a wide range of suits that are not parasitic in any sense, in conflict with both the language of the law and congressional intent. In the process, courts have created an increasingly complex and burdensome set of requirements that unnecessarily deter private citizens from assisting the Government. Unless a suit is truly parasitic of disclosures made public in certain Government proceedings or the news media, the suit serves Congress's purposes in authorizing *qui tam* actions. The Act seeks to encourage persons with information about fraud to provide

4

that information to the Government and to bring their resources to bear on the problem. The Act provides other ways to address concerns about the level of the relator's contribution to the ultimate resolution of the case. The public disclosure bar and its original source exception were never intended to be used to deprive the Government of the assistance of relators whose actions are not parasitic.

**ARGUMENT**

**I.    THE PARAMOUNT PURPOSE OF THE *QUI TAM* PROVISIONS OF THE FALSE CLAIMS ACT IS TO ENLIST PRIVATE CITIZENS TO CONTRIBUTE THEIR INFORMATION AND RESOURCES TO ASSIST THE GOVERNMENT IN ITS ANTI-FRAUD LAW ENFORCEMENT EFFORTS.**

Since the inception of the False Claims Act, the central purpose of the *qui tam* provisions has been to enlist private citizens in combating fraud against the Government in several important ways.  First, the provisions hold out the promise of a reward to the private citizens who file suits on the Government's behalf to encourage them to disclose their information about fraud to the Government, notwithstanding the considerable personal risks that can entail. Second, and equally important, by providing the relator an ongoing role in the case, the Act enhances the ability of the Government to pursue cases it might otherwise need to abandon for lack of resources. Finally, authorizing private citizens to pursue cases on the Government's behalf provides a measure of public oversight when the Government fails to act.

Within this framework, the public disclosure bar serves the limited purpose of preventing parasitic suits based on fraud that has already been publicly exposed in a manner that is likely to alert the Government to the misconduct alleged and to spur it to appropriate action. The sole purpose of the original source exception to the public disclosure bar is to

further limit the reach of the public disclosure bar. The exception preserves cases involving publicized fraud allegations that were brought by persons who gave their own information underlying their complaint's allegations to the Government before filing suit. As courts have noted, in enacting the 1986 Amendments to the False Claims Act, Congress sought to balance the Government's interests in enlisting the information and resources of private citizens with the need to discourage opportunistic suits by persons who did not contribute their own information. However, Congress did not afford those interests equal weight. The Act Congress adopted weighs heavily in favor of pursuing fraud against the Government, while providing narrow filters to exclude only truly parasitic actions.

### A. As Originally Enacted in 1863, the False Claims Act Authorized Private Persons To Pursue Fraud Claims on Behalf of the Government Regardless of the Source of the Person's Knowledge.

Congress first adopted the False Claims Act in 1863 during the Civil War.[2] The measure had been introduced in Congress at the "urgent solicitation of the officers who [were] connected with the administration of the War Department and Treasury Department" in response to complaints about "the frauds and corruptions practiced in obtaining pay from the Government during the [Civil] War."[3] Congress sought to enact "a more speedy and vigorous remedy" that would seek the assistance of private citizens in prosecuting fraud. As the sponsor explained, "The bill offers, in short, a reward to the informer who comes into court and betrays his coconspirator, if he be such; but it is not confined to that class."[4]

The 1863 Act authorized private individuals, or "*qui tam* relators*,*" to bring a suit on behalf of the United States to

---

[2]  Act of March 2, 1863, ch. 67, 12 Stat. 696.

[3]  Cong. Globe, 37th Cong., 3d Sess. 952 (1863).

[4]  Cong. Globe, 37th Cong., 3d Sess. 955 (1863).

redress fraud against the Government. The Act provided for double damages and a $2,000 civil penalty per false claim. A private individual who successfully pursued a claim was entitled to half of the Government's recovery. The Act did not authorize the Government to intervene in the private individual's case, nor did the Act preclude *qui tam* actions based upon the source of the relator's information.[5] The Government thus sought both to encourage private citizens to report their information about fraud and to use their own resources in pursuing claims on the Government's behalf.

### B. Congress Amended the False Claims Act in 1943 To Address a Perceived Problem with Parasitic Suits by Prohibiting *Qui Tam* Actions When the Complaint Was Based Upon Information Already in the Government's Possession.

Nearly 80 years later, in the midst of another war, Attorney General Francis Biddle wrote to Congress to seek a change to the False Claims Act based on his concern that lawyers were filing *qui tam* complaints that were copied straight from criminal indictments.[6] These types of suits, the Attorney General urged, did not serve the original purposes of the *qui tam* provisions. Relators who copied the Government's own work contributed little or no information to the Government and interfered with the Government's criminal cases.[7] The example the Department cited was a case from the Third Circuit, *United States ex rel. Marcus v. Hess*, 127 F.2d 233, where the appellate court had reversed a trial court award in favor of a relator.[8] The Attorney General pressed Congress to repeal the authorization for *qui tam* actions.

---

[5]  Act of March 2, 1863, 12 Stat. 696.

[6]  S. Rep. No. 1708, 77th Cong., 2d Sess. (1942) (reprinting letter).

[7]  *Id.*

[8]  *United States ex rel. Marcus v. Hess*, 127 F.2d 233, 235 (3d Cir. 1942) (observing that because informer statutes have

Although the Senate quickly responded to the Attorney General's entreaty by adopting a measure to repeal the *qui tam* provisions in their entirety, the House did not act before the close of the 77th Congress.[9] At the commencement of the 78th Congress, the House took up H.R. No. 1203, which was identical to the earlier Senate bill proposing repeal of the *qui tam* provisions.[10]  The House Committee on the Judiciary reported the measure without substantive amendment,[11] and the House passed H.R. 1203 on April 1, 1943.[12]

When the Senate took up the proposed repeal this time, acquiescence in the Attorney General's request was not immediately forthcoming. The Committee on the Judiciary did not recommend approval of the repeal, but instead reported the measure with amendments. The proposed amendments would have maintained the *qui tam* provisions, but would have provided a bar to parasitic suits. The proposed bar would have provided that no court "shall have power or jurisdiction" over a *qui tam* action unless:

---

been regarded with disfavor, they must be construed with utmost strictness, and concluding that the relator had not established that a claim had been submitted to the United States).

[9]  S. 2754, 77th Cong., 2d Sess. (1942), passed, Nov. 27, 1942, 88 Cong. Rec. 9138 (1942).  The Senate Report recommending passage consisted solely of the Attorney General's letter.  *See* S. Rep. No. 1708, *supra* note 6.

[10]  H.R. 1203, 78th Cong., 1st Sess. (1943).

[11]  H.R. Rep. No. 263, 78th Cong., 1st Sess. 2 (1943).  Like the earlier Senate Report, the House Report consisted solely of a letter from the Attorney General requesting the repeal, this time citing the Supreme Court's then very recent decision in *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943), which reversed the Third Circuit and allowed the relator to recover.

[12]  89 Cong. Rec. 2801 (1943).

8

- the case was "based upon information, evidence, and sources original with such person and not in the possession of or obtained by the United States in the course of any investigation or proceeding instituted or conducted by it;"

- prior to commencement of the action the person "made full disclosure in writing to the Attorney General of the grounds thereof, and has requested the Attorney General to cause such suit to be brought;" and

- the Attorney General has "declined in writing to comply with such request, or has allowed six months to elapse after receipt of such disclosure and request without causing a suit to be brought."[13]

The report explained that the Committee had amended the House proposal "to protect and compensate genuine informers who comply with the provisions respecting notice to the Attorney General."[14]  At the same time, the proposal sought to address the concerns of the Department of Justice that:

> many persons who have filed suits and may file suits under this section, have no information or facts of their own, but prepare and file complaints which obviously are based on information and alleged facts obtained bodily from indictments returned in United States courts, from newspaper stories, and congressional investigations.  In some of the cases filed the indictment was

---

[13]  S. Rep. No. 291, 78th Cong., 1st Sess. 1-2 (1943).

[14]  *Id.* at 1.

> copied in the complaint filed, the only
> difference being the caption and the prayer
> of the complaint.[15]

The report included the minority views of Senator William Langer of North Dakota, who took issue with the Department of Justice's claim that there was a crisis caused by parasitic *qui tam* suits. Senator Langer observed that it appeared from the records of the cited lawsuits that the Government had been letting defendants plead to small criminal fines and leaving the civil damages and penalties untouched.[16] Noting that the opportunities for contractor fraud were greater than ever before, Senator Langer championed the *qui tam* actions as a way for citizens to act as a check on the Government, so that Government officials could not let favored individuals off lightly.[17]

When the measure proceeded to the Senate floor, this debate continued. On the one hand, Senator Van Nuys urged that the measure as amended by the committee would "stop racketeers, who are springing up like mushrooms all over the United States, from taking advantage of this antiquated statute."[18] On the other hand, Senator Langer questioned whether a problem with parasitic suits even existed. Pointing out that the committee had not contacted any of the parties or lawyers in these cases, he read into the record telegrams explaining the nature and extent of the fraud alleged in the cases, and efforts of relators to pursue fraud.[19] In his view, the current effort was an attempt "not merely to amend the act but to emasculate it to such an extent as to amount to its practical repeal."[20] Senator Langer was not alone in

---

[15]  *Id*. at 2-3.

[16]  S. Rep. No. 291, Pt. 2, 78th Cong., 1st Sess. 1 (1943).

[17]  *Id.* at 4.

[18]  89 Cong. Rec. 7439 (1943) (statement of Sen. Van Nuys).

[19]  89 Cong. Rec. 7578-79, 7601-02 (1943) (remarks of Sen. Langer).

[20]  89 Cong. Rec. 7438 (1943) (statement of Sen. Langer).

protesting the amendment. Other Senators pointed out that the proposed amendment created a catch-22 for potential relators because the person would have to give the information to the Attorney General before filing suit, but once the Government had the information, the person would be barred from bringing a suit.[21] Although efforts to recommit the measure were rejected,[22] the Senate did agree to delete the requirement that the relator's information be "original with such person." As one Senator explained, "taken literally," this language could be understood to prohibit a person from bringing or conducting a suit "unless all the information originated with himself."[23] There were no objections to the change, which would not have altered the expressed purpose of the amendment's sponsors, which was to preclude parasitic suits based on information about fraud that was already in the Government's possession.

The measure was sent to conference to reconcile the Senate and House proposals.[24] The amendment that emerged provided that if the United States proceeded with a case, the case would be prosecuted solely by the United States and the relator would have no role. If the United States failed to join the case after 60 days, the person could continue on his or her own. The Government had no ability to join the case at a later date. Critically, however, if the Government did not join the case, no court would have "jurisdiction" to proceed with a relator's case "whenever it shall be made to appear that such suit was based upon evidence or information in the

---

[21]  89 Cong. Rec. 7614 (1943) (statements of Sens. Clark and Wheeler).
[22]  89 Cong. Rec. 7608, 7614-15 (1943).
[23]  89 Cong. Rec. 7614 (1943) (statement of Sen. Wheeler).
[24]  89 Cong. Rec. 7806 (1943).

possession of the United States, or any agency, officer or employee thereof, at the time such suit was brought."[25]

As one congressman pointed out, this proposal placed "limitations upon the prosecution of true informer actions which defeat the very purpose and in practical effect nullify true informer suits."[26] He explained that, if a person with information about fraud was about to file an informer suit but was subpoenaed to testify before Congress, that person could not bring a suit because the Government would already have the information before the suit was brought.[27] "This is the vice of this [conference] report, or of this bill. Instead of encouraging the disclosure of frauds perpetrated against the Government, it places a premium upon secrecy, because what potential informer would dare disclose the information he had when he had not filed a suit if by disclosing it he is forever precluded from the prosecution of the action?"[28]

## C. In 1986 Congress Sought To Correct the 1943 Version of the Law By Carefully Crafting a Limited Bar to Certain Parasitic Suits.

While it was never clear how significant a problem parasitic suits were, predictions that the 1943 amendments would put an end to informer actions proved prescient. Following the 1943 amendment, courts construed the literal terms of the Act to preclude a *qui tam* action if the Government had information about the fraud in its possession, even if the relator had provided that information. *See United States ex rel. Lapin v. Int'l Bus. Machines Corp.*, 490 F. Supp. 244 (D. Haw. 1980); *United States v. Aster*, 275 F.2d 281 (3d Cir.), *cert. denied,* 364 U.S. 894 (1960); *United*

---

[25] H.R. Rep. No. 933, 78th Cong., 1st Sess. (1943), *reprinted in* 89 Cong. Rec. 10844 (1943); Act of December 23, 1943, ch. 377, 57 Stat. 608.

[26] 89 Cong. Rec. 10847 (1943) (statement of Rep. Miller).

[27] *Id.*

[28] *Id.*

12

*States v. Rippetoe*, 178 F.2d 735, 738 (4th Cir. 1949). Thus the provision was interpreted to effectively bar all suits the Government did not take over, including suits that were in no sense parasitic.

In a case that epitomized the way in which the exception undermined the Act itself, in 1984 the Seventh Circuit held in *United States ex rel. Wisconsin v. Dean*, 729 F.2d 1100 (7th Cir. 1984), that the Government knowledge bar precluded the relator from bringing a *qui tam* action. In *Wisconsin v. Dean,* the only reason the Government was already aware of the fraud allegations contained in the relator's complaint was because the relator, the state of Wisconsin, had provided the information to the federal Government as required under another federal law. Precluding Wisconsin from pursuing the case did not protect the Government from a parasitic suit, but rather deprived the Government of a significant partner in pursuing a well-documented case of fraud. The United States had in fact wanted Wisconsin to proceed as the relator because Wisconsin was in the best position to prosecute the case.[29] Following the decision, the National Association of Attorneys General adopted a resolution to urge Congress to "rectify the unfortunate result of the *Wisconsin v. Dean* decision."[30]

At about the same time, members of Congress had begun to study the problem of fraud against the Government. The General Accounting Office had reported in 1981 that the known cases of fraud against the Government totaled between $100 million and $200 million, but that that number was likely very low because most fraud goes undetected.[31] The

---

[29] *United States ex rel. Wisconsin v. Dean*, 123 F.2d at 1103, n.2.

[30] False Claims Amendments Act of 1986, S. Rep. No. 345, 99th Cong., 2d Sess. 13, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5278.

[31] *See* S. Rep. No. 345, *supra* note 30*, at 2, *reprinted in* 1986 U.S.C.C.A.N. at 5267 (citing GAO Report to Congress, Fraud

Department of Justice informed Congress that fraud was draining between one and ten percent of the federal budget.[32] In an effort to stem this tide, Congress decided to revisit the Government's "primary weapon against fraud."[33] Examining the existing law, and finding a number of flaws, Congress set out to breathe new life into the law to "establish a solid partnership between public law enforcers and private taxpayers."[34]

Senate bill 1562, introduced on August 1, 1985,[35] would have amended the False Claims Act to, among other things, replace the 1943 "Government knowledge bar" which had undermined the *qui tam* provisions.[36] The proposed amendment would have replaced the Government knowledge bar with a more limited "public disclosure" bar. Under S. 1562 as introduced, a *qui tam* action could not proceed if it was based on specific evidence or information that the Government had disclosed as a basis of allegations in a prior administrative, civil, or criminal proceeding, or specific information disclosed during the course of a congressional

---

in Government Programs: How Extensive is it? How Can it be Controlled? (1981)).

[32] S. Rep. No. 345, *supra* note 30, at 3, *reprinted in* 1986 U.S.C.C.A.N. at 5268.

[33] 132 Cong. Rec. 20535 (1986) (statement of Sen. Grassley).

[34] 132 Cong. Rec. 28580 (1986) ("Primary in the original 'Lincoln Law' as well as this legislation is the concept of private citizen assistance in guarding taxpayer dollars. The expanded *qui tam* provisions of this bill will serve to establish a solid partnership between public law enforcers and private taxpayers in the fight against fraud.") (statement of Sen. Grassley).

[35] 131 Cong. Rec. 22322 (1985).

[36] *Id.* (observing that change was necessary in part because "the teeth of President Lincoln's law were removed during World War II, and the provision has been little used since") (statement of Sen. Grassley).

investigation or disseminated in the news media, unless the Government failed to act within a certain time.[37] If the Government intervened in the *qui tam* action, the bar would not have applied.[38] Unlike the 1943 bar, this proposal would not have prohibited the filing of a *qui tam* action simply because it was based on information somewhere in the vast Government bureaucracy.

The Senate Judiciary Committee reported a substitute measure, which the Senate adopted, along with some modifications.[39]  Among other changes, the Senate proposal addressed the Department of Justice's concern that the *qui tam* provisions would give rise to a greater number of actions filed against public officials for political purposes. Accordingly, the Senate proposal provided that *qui tam* actions could not be brought against public officials if the Government already had the information about the fraud in its possession.  This provision essentially retained the Government knowledge bar for suits against public officials.[40] In addition, the Senate proposal limited the reward for persons who brought an action based on information of fraud of which they did not have independent knowledge.[41]

---

[37]  S. 1562, *reprinted in* False Claims Reform Act:  Hearing Bef. the Subcomm. on Admin. Prac. and Proc. of the Sen. Comm. on the Judiciary, 99th Cong., 1st Sess. (Sept. 17, 1986).

[38]  *Id.*

[39]  132 Cong. Rec. 20530-42 (1986).

[40]  S. Rep. No. 345, *supra* note 30, at 29, *reprinted in* 1986 U.S.C.C.A.N. at 5294 ("This provision actually reflects current law in that any *qui tam* suit based on information already known to the Government is currently without jurisdiction.  While S. 1562 repeals that jurisdictional bar for most suits, the Committee, at the request of the Justice Department, retained the bar for those suits which might be politically motivated.").

[41] 132 Cong. Rec. 20536 (1986) (statement of Sen. Grassley).

The Senate proposal also altered the public disclosure bar to provide that no court would have jurisdiction over a *qui tam* action that was "based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, a congressional, administrative, or Government Accounting Office report, hearing, audit or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information."[42] The proposal defined "original source" as an individual who has "direct and independent knowledge of the information on which the allegations are based and has voluntarily informed the Government or the news media prior to an action filed by the Government."[43] The exception would have allowed a *qui tam* action based on publicly disclosed allegations or transactions to be maintained by relators who, like the relator in the *Dean* case, brought information, independent of the public disclosure, to the Government.

The Senate subsequently adopted a revision to the definition of original source to require that the person "voluntarily provided the information to the Government before filing an action under this section which is based on the information," rather than before the Government filed an action.[44] This final version, which Congress adopted, barred a *qui tam* action based upon allegations or transactions publicly disclosed in certain Government proceedings or the news media, unless the person bringing the suit was an original source of the information on which the allegations in his own complaint were based, as Congress had defined that term.[45]

---

[42] S. 1562, as amended, *reprinted in* 132 Cong. Rec. 20531 (1986).

[43] *Id.*

[44] 132 Cong. Rec. 28533 (1986).

[45] Pub. L. No. 99-562, 100 Stat. 3153 (1986).

## II.    THE PUBLIC DISCLOSURE BAR PROVIDES A LIMITED FILTER TO PRECLUDE *QUI TAM* ACTIONS THAT ARE BASED UPON SPECIFIC FRAUD ALLEGATIONS ALREADY AVAILABLE TO THE GOVERNMENT IN ITS OWN PROCEEDINGS AND INVESTIGATIONS OR THROUGH THE NEWS MEDIA.

As the history of the public disclosure bar demonstrates, Congress intended this provision to serve a narrow purpose, and the original source exception was intended to make the bar more narrow still.  If a *qui tam* suit is not parasitic, nothing in the Act, its legislative history, or the policies underlying it suggest that Congress had any interest in precluding it. The complex requirements that have been grafted onto this simple concept create a landscape of hidden pitfalls that can disqualify relators whose suits are clearly not parasitic, based on so-called "public disclosures" of which neither the relators nor the Government were, or could even reasonably be expected to be, aware.  Such harsh and unjust results serve only to discourage relators with meritorious cases from taking the risk of coming forward, which is precisely the opposite of the statute's purpose.

### A. The Public Disclosure Bar Has no Application When the Government Joins the Case.

Because the public disclosure bar is intended to protect the Government's interest, the bar has never had any application to a *qui tam* action that the Government joins and decides to pursue on its merits. From its inception, the 1986 public disclosure bar was intended to arise only when the Government did not proceed with the case.[46] The final version of the public disclosure bar enacted into law expressly provides that the bar does not apply if the Attorney

---

[46]    *See supra* at 13-14, discussing S. 1562, 99th Cong., 2d Sess. (1986).

General brings the case, as occurs when the Attorney General elects to join and proceed with a *qui tam* action.[47]

Nothing in the text of the False Claims Act or its legislative history suggests that the public disclosure bar was ever intended to aid defendants in dismissing a *qui tam* relator from a case that the Government had joined and was pursuing on its merits. Under those circumstances, dismissing a relator at the defendant's request would serve only to deprive the Government of resources to assist it in pursuing the case, contrary to the purposes of the Act. To the extent the Government has concerns about the relator's participation or contribution to the case, the statute provides other ways for the Government to address those concerns.[48]

## B. The Public Disclosure Bar Precludes Only Parasitic Suits.

The public disclosure bar was intended only to bar certain parasitic suits that did not contribute to the Government's knowledge about, and ability to pursue, claims against a

---

[47] *See* 31 U.S.C. § 3730(e)(4); *see also* 31 U.S.C. § 3730(b)(4)(A) (providing that when the Government elects to proceed "the action shall be conducted by the Government"). Similarly, the 1943 Government knowledge bar came into play only if the Government declined the case. *See* Act of December 23, 1943, ch. 377, 57 Stat. 608. *See also United States v. Pittman*, 151 F.2d 851 (5th Cir. 1945) (holding that the 1943 bar did not apply when the Government pursued the case), *cert. denied,* 328 U.S. 843 (1946).

[48] *See, e.g.*, 31 U.S.C. § 3730(d) (providing courts discretion in making awards based upon the contribution of the relator); 31 U.S.C. § 3730(c)(2)(A) (authorizing the Government to dismiss action); 31 U.S.C. § 3730(d) (authorizing reduced relator's reward where *qui tam* complaint is based primarily on publicly disclosed information).

particular defendant.[49]  For this reason, Congress limited the bar to situations in which a relator's complaint is based upon allegations or transactions that have been disclosed in a limited set of Government proceedings or the news media, where public disclosure of fraud allegations or transactions would mean that the federal Government and the general public were aware of the allegations.[50]  There is no reason to assume that disclosures of fraud allegations in local government proceedings,[51] private lawsuits,[52] or other types of proceedings not listed in the statute make the federal Government aware of the fraud allegations and put it in a position to pursue them.  Congress did not list those types of proceedings in the public disclosure bar because they were not relevant to the purpose of the section.  Applying the public disclosure bar to these types of disclosures would expand the public disclosure bar even beyond the broad "Government knowledge bar" that Congress sought to replace.

Similarly, the primary fraud-fighting objective of the Act must be considered when determining whether a relevant "public disclosure" of "allegations or transactions" involving False Claims Act violations exists.  To remain consistent with that purpose, the benchmark for determining whether one or more public "disclosure(s)" warrant invocation of the statutory bar must be whether such disclosures provide sufficient indication of fraud so that the Government and the general public reasonably can be expected to have been

---

[49]   145 Cong. Rec. 16025, 16031 (1999) (reprinting letter from Rep. Berman and Sen. Grassley to Attorney General Reno).

[50]   *See* 31 U.S.C. § 3730(e)(4)(A).

[51]   *See, e.g., A-1 Ambulance Service, Inc. v. California*, 202 F.3d 1238, 1244 (9th Cir.), *cert. denied*, 529 U.S. 1099 (2000).

[52]   *See, e.g.*, *United States ex rel. Jones v. Horizon Healthcare Corp.,* 160 F.3d 326 (6th Cir. 1998).

alerted to the need for the Government to investigate specific conduct or transactions. Barring *qui tam* suits based on any public disclosure that fails to meet this minimum standard of disclosure defeats rather than serves the overriding interest of the United States in effectively combating fraud.

Thus, for example, mere awareness on the part of the Government that a particular type of fraud occurs, without information that a specific defendant engaged in that conduct, does not put the Government in a position to pursue a case. The Government is well aware that practices such as overbilling, or failure to test, do occur in certain industries. It is unrealistic to conclude, however, that awareness that a general practice occurs means the Government is aware of fraud by a particular defendant and is in a position to pursue it.[53]

When a public disclosure occurs in one of the fora enumerated in the Act, specific allegations of fraud committed by identifiable wrongdoers obviously provide the level of notice necessary to alert the Government and spur it to action. Determining whether exposure of bits and pieces of information about "transactions" suffices to trigger the Act's public disclosure bar must begin with consideration of the extent to which the "disclosure(s)" at issue actually can be expected to have provided the kind of alert needed to effectively combat fraud. As the D.C. Circuit correctly noted, pieces of information about a defendant and some of its actions, even when publicly disclosed, rarely add up to an allegation of fraud. There must be "enough information . . .

---

[53] False Claims Act Implementation: Hearing Bef. the Subcomm. on Admin. Law and Government Relations of the House Comm. on the Judiciary, 101st Cong., 2d Sess. 6 (1990) ("The publication of general, non-specific information does not necessarily lead to the discovery of specific, individual fraud which is the target of the *qui tam* action.") (statement of Sen. Grassley).

in the public domain to expose the fraudulent transaction."[54] This analysis, however, cannot always be reduced to a simple, formulaic inquiry. Even if all the critical elements of the fraud or the fraudulent transaction appear somewhere in the public domain, if the information needed to piece together a discernible picture of actionable fraud must be gathered from several places, it may be unrealistic to assume that the Government is aware or likely to become aware of the apparent fraud. The issue remains whether clear enough indications or allegations of fraud were disclosed in one of the ways Congress specified in the Act so that the Government can proceed with the case if it wants, or be held accountable if it does not. A relator who collects and analyzes dispersed public information and brings an otherwise unrecognized fraudulent transaction to light is not a parasite. Congress intended to encourage such persons to bring the fruits of their labor to the Government's attention.[55]

### C. The Original Source Exception Prevents the Public Disclosure Bar from Excluding Persons Who Brought to the Government Their Own Information That Was Independent of the Public Disclosure.

The original source exception to the public disclosure bar serves a very limited function under the False Claims Act. Like the relator in *Wisconsin v. Dean*, some relators whose complaints are based on allegations or transactions of fraud that have been publicly disclosed are not parasites. A person's disclosure of information to the Government could itself result in a public disclosure, as, for example, when a criminal

---

[54] *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994).

[55] *See United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999) (observing that "to a certain degree, Congress wanted to encourage busybodies who, through independent efforts, assist the government in ferreting out fraud").

indictment was the result of the relator's information.  A leak to the press about a Government investigation based on information provided by a relator could also result in a public disclosure.  Under these circumstances, Congress did not want the relator to be barred from bringing a *qui tam* case.[56] Such relators are precisely the types of individuals the Government should reward.

Congress expressly decided not to limit the original source exception to persons whose information led to the particular public disclosure.[57] Congress adopted a specific definition of "original source" that requires only that the information upon which the relator bases the allegations in his or her complaint be provided to the Government before the relator files suit.[58] The reason Congress required no more is clear. If before filing suit, the relator provides to the Government direct information about the allegations in his complaint that is independent of the publicly disclosed allegations, that suffices to demonstrate that the person's *qui tam* action is not parasitic. Such a case does not implicate the concerns underlying the public disclosure bar, even though the complaint involves publicly disclosed allegations or transactions of fraud.  Congress also recognized that in some cases this could potentially result in a relator proceeding in a case that was based only in small part on his or her own information.  The statute addresses this concern as well, by permitting a lesser reward when the action is primarily based on publicly disclosed allegations or transactions of fraud.[59]

---

[56] 145 Cong. Rec. 16025, 16031 (1999) (reprinting letter of Rep. Berman and Sen. Grassley to Attorney General Reno).

[57] *See, e.g.*, *United States ex rel. Longstaffe v. Litton Industries, Inc.*, 296 F. Supp. 2d 1187 (C.D. Cal. 2003) (requiring relator to be the source of the disclosure).

[58] 31 U.S.C. § 3730(e)(4)(B) (requiring that information be provided to the Government "before filing an action" based on the information).

[59] 31 U.S.C. § 3730(d).

22

Because the original source requirement serves the narrow function of ensuring that persons who bring their own information to the Government before filing suit are not improperly filtered out by the public disclosure bar, as they were under the 1943 version of the law, no stringent requirements are necessary to qualify as an original source. There is no need for a person to have seen the fraud with his or her own eyes or to have received no information from other people or sources. Someone who sees a fraudulent transaction take place has direct and independent knowledge of the fraud, but that is not the only way such knowledge may be obtained. For example, a relator who learns of false claims by gathering and comparing data could have direct and independent knowledge of the fraud, regardless of his or her status as a percipient witness to the fraud and regardless of whether some of the information was filtered through other people. The purpose of the original source inquiry is simply to confirm that the person's complaint, which was based on publicly disclosed allegations or transactions of fraud, was not in fact parasitic because the person had his or her own information about the fraud that was not dependent upon the public disclosure. Congress had no interest in preventing persons with their own information about fraud from assisting the Government in its efforts to pursue that fraud.

## CONCLUSION

The False Claims Act balances the need for information with concerns about opportunistic behavior, but the 1986 amendments did not assign equal weight to those interests. The overriding purpose of the Act is to enlist the information and resources of the public to assist the Government in pursuing fraud. The 1986 Amendments have been highly effective in achieving those goals.

As Congress recognized in 1986, "[t]he Federal Government has a big job on its hands as it attempts to ensure the integrity of the nearly $1 trillion we spend each year on various programs and procurement. That job is simply too big

23

if Government officials are working alone."[60] Reading the
public disclosure bar too broadly, and the original source
exception too narrowly, undermines the central purpose of the
*qui tam* provisions of the Act.

Where the Government joins a *qui tam* case, no
jurisdictional bar based on potential public disclosure can
apply. The Act provides other tools to protect the
Government's interests in cases in which it intervenes despite
potential public disclosures. In a non-intervened case, once a
court has found that the complaint is based upon allegations
or transactions of fraud disclosed in one of the ways
enumerated in the statute (and is therefore potentially
parasitic), the only issue is whether the person brought
supporting information, about which he or she had direct
knowledge independent of the public disclosure, to the
Government before filing the case. A person who merely
copied an indictment or a government report would not have
such direct and independent knowledge. If the person did
have direct information about fraud independent of the public
disclosure, then the goal underlying the public disclosure bar,
precluding parasitic suits, is not implicated and Congress had
no interest in barring the suit.

---

[60] 132 Cong. Rec. 20535 (Aug. 11, 1986) (statement of Sen.
Grassley).

Respectfully submitted,

JOHN E. CLARK
 *Counsel of Record*
GOODE, CASSEB, JONES, RIKLIN,
CHOATE & WATSON P.C.
2122 North Main Avenue
San Antonio, TX  78212
(210) 733-6030

RITA LARI, Chief Counsel
SENATOR CHARLES E. GRASSLEY
UNITED STATES SENATE
COMMITTEE ON THE JUDICIARY
135 Hart Senate Office Bldg.
Washington, D.C. 20510
(202) 224-5225

November 20, 2006