# **EXHIBIT A**

OCT05BARRETT.txt

1

1          UNITED STATES DISTRICT COURT

2           DISTRICT OF MASSACHUSETTS

3              No. 1:03-cv-12382-MLW

4

5

6   UNITED STATES OF AMERICA
    EX REL. DAWN BARRETT,
7              Plaintiff

    vs.
8

9   CIGNA CORPORATION and LIFE INSURANCE COMPANY OF NORTH
    AMERICA,
10             Defendants

11

12              *********

13

14

15       For Motion Hearing Before:
         Chief Judge Mark L. Wolf
16

         Motion to Dismiss
17

18       United States District Court
          District of Massachusetts (Boston.)
19        One Courthouse Way
         Boston, Massachusetts 02210
20       Thursday, October 5, 2006

21              ********

22

23   REPORTER: RICHARD H. ROMANOW, RPR
            Official Court Reporter
24       United States District Court
    One Courthouse Way, Room 5200, Boston, MA 02210
25              (617) 737-0370


                                    2

1              A P P E A R A N C E S

2

3   COLETTE G. MATZZIE, ESQ.
       Phillips & Cohen, LLP.
4       2000 Massachusetts Avenue, NW
       Washington, DC 20036

                   Page 1

OCT05BARRETT.txt

```
 5      (202) 833-4567
        Email: Cmatzzie@phillipsandcohen.com
 6  and
     KEVIN PARKER, ESQ.
 7      Lanier Law Firm, P.C.
        6810 FM 1960 Road W
 8      Houston, TX 77069
        (713) 659-5200
 9      Email: Jaw@lanierlawfirm.com
    and
10   PETER B. KRUPP, ESQ.
        Lurie & Krupp, LLP
11      One McKinley Square
        Boston, MA 02109
12      (617) 367-1970
        Email: Pkrupp@luriekrupp.com
13      For Plaintiff

14

     R. J. CINQUEGRANA, ESQ.
15   ANDREW D. ZIEGLER, ESQ.
        Choate Hall & Stewart, LLP
16      Two International Place
        100-150 Oliver Street
17      Boston, MA 02110
        (617) 248-5000
18      Email: Rjcinquegrana@choate.com
               aziegler@choate.com
19  and
     ROBERT DRAKE, ESQ.
20      Senior Counsel
        CIGNA Corporation
21      For Defendant

22

23

24

25
```

3

```
 1           P R O C E E D I N G S

 2           (Begins 3:00 p.m.)

 3           THE CLERK:  Civil Action 03-12382, Dawn

 4   Barrett versus CIGNA Corporation, et al.  The Court is

 5   in session.  You may be seated.

 6           THE COURT:  Good afternoon.  Would counsel

 7   please identify themselves for the Court and for the

 8   record.

 9           MS. MATZZIE:  Colette Matzzie for Dawn
```

Page 2

OCT05BARRETT.txt

2    those files that supports an interpretation that the

3    claimant would be eligible'", and you've got access to

4    the files, well, we've got access to the files, too, and

5    here are the pieces of the files which we think belie

6    your claim, and in response to that, here's what she

7    says: "CIGNA seeks to introduce documents" -- I'm

8    reading from the opposition to the motion at Page 19.

9    "CIGNA seeks to introduce documents that the plaintiff

10   has not reviewed and does not have any way of knowing

11   whether these records are accurate or complete."  And in

12   another context, "Plaintiff does not rely on undisputed

13   language in the claim files."

14            Well, I don't think she can have it both ways.  I

15   certainly anticipated that the Court would say, "Look,

16   I'm uncomfortable with this piecemeal approach to this,

17   you say it says 'X,' you say is says 'Y.'"  I just want

18   you to know, your Honor, that the reason we undertook to

19   do it that way was, first, the plaintiff defined the

20   inquiry as "What's in the totality of the file?" and,

21   second, these are private files and we took some pains

22   to make sure that they were handled appropriately.  But

23   I certainly understand that that's where the Court might

24   be going.  It seems like a reasonable place to go to me.

25            THE COURT:  All right.  In fact -- and we're

                                                          15

1    not there yet, because I want to hear your argument, but

2    I'll tell you something that came into sharper focus for

3    me, it occurred to me about an hour ago.  If I deny the

4    motion to dismiss, one of the things I would ask you to

5    consider -- and if you disagree, I would decide, is

6    whether I should bifurcate discovery and limit it, in

                        Page 12

OCT05BARRETT.txt

7   the first phase, to these four claims and do that in the
8   interests of the administration of justice, and frankly
9   the parties and the lawyers, but also the privacy
10  interests of the claimants?  I mean, I assume that the
11  plaintiffs, if they survive the motion to dismiss, and I
12  still have some -- this complaint's much better, but I
13  still have some questions.  And you can't -- but if you
14  survive the motion to dismiss and it's essentially on --
15  to talk shorthand, a scheme theory that's somewhat like
16  Clausen or Incorporated Township that I talked to you
17  about last time, but not some specific alleged false
18  statement, you know, you might be looking through
19  thousands of files, which would be burdensome for the
20  defendants, but they're a big company, but maybe in a
21  proper case that burden alone doesn't justify a narrower
22  discovery, but it would involve the privacy interests of
23  the claimants who even the plaintiff alleges are
24  innocent intermediaries here.  And, you know, you've got
25  these four cases and the plaintiff thinks they're good

16

1   as examples.
2         On one of them, the defendant says, you know,
3   you've alleged that we caused this person -- or
4   Advantage 2000 caused this person to file.  Actually,
5   when you look in the file, you can see that claimant --
6   and I don't remember which claimant?
7              MR. CINQUEGRANA:  It's B, your Honor.
8              THE COURT:  B, had filed before we told
9   Claimant B that we required filing.  You know, if there
10  was discovery, then I could consider the pages that are
11  here in the context of what the plaintiff says she

Page 13

OCT05BARRETT.txt

64

1    these allegations were authentic, CIGNA has said now
2    that this individual is eligible to apply for Social
3    Security benefits in their view.  In our view, it's
4    not.  We have a joint issue.  That this individual was
5    not eligible, that the claim, when submitted, was
6    false.  And I think your Honor just -- maybe on a moment
7    of levity, you asked us last time if a member of the Red
8    Sox had a CIGNA policy and they became disabled from
9    performing their work as an outfielder for the Red Sox.
10             THE COURT:  Well, this is such a painful
11   example, but go ahead.
12             (Laughter.)
13             MS. MATZZIE:  Somebody in the name of a
14   particular -- well, Trot Nixon.
15             THE COURT:  Yeah, he did get badly injured in
16   July.
17             MS. MATZZIE:  That must be why you told me
18   that.
19             THE COURT:  Well, he gets injured every year.
20   What's the question?
21             MS. MATZZIE:  He has a policy.  He's going to
22   be ineligible to perform his work as a baseball player,
23   which was the insured work, for at least 9 months.
24   CIGNA -- he can do lots of other things in the national
25   economy.  CIGNA's policy is to cause that individual to

65

1    file a claim for Social Security disability.  That's a
2    false claim.  It sets in process an administrative
3    process for review, which causes the United States
4    damage, and that, in essence, is our theory of this

Page 54

OCT05BARRETT.txt

5   case.

6           THE COURT:  Okay.  I'm going to take a break

7   for about 10 or 15 minutes.  I may have an answer for

8   you.  The Court is in recess.

9           (Short recess, 5:10 p.m.)

10          (Resumed, 5:35 p.m.)

11          THE COURT:  Okay.  We're conducting night

12  court now.

13      But I would like to resolve this now that I'm

14  focused on it.  The briefing and the arguments have been

15  helpful.  For the reasons I'll describe, the motion to

16  dismiss the second amended complaint is hereby denied.

17      I think there's a particularly close question with

18  regard to Count 2, which requires certain false

19  statements.  I believe Judge Saris, in similar

20  circumstances, inferred false statements, um, not

21  specified in Franklin.  I don't anticipate that this is

22  going to affect the parameters of discovery or have

23  practical implications, but I do want to say that I

24  think Count 2 is a particularly competitive question.

25      I've applied the familiar standards in reaching my

66

1   decision.  The motion to dismiss by defendant, CIGNA, is

2   made pursuant to Rules 9(b) and 12(b)(6).  Rule 9(b)

3   requires that in all averments of fraud, the

4   circumstances constituting fraud shall be stated with

5   particularity.  The First Circuit has interpreted the

6   rule to require specification of time, place and content

7   of the allegedly false or fraudulent representation or,

8   in this case, claim, but not the circumstance or

9   evidence from which fraudulent intent could be

OCT05BARRETT.txt
10    conferred.  That general proposition is in McGinty, 633
11    F. 2nd 226 at 228.  It's elaborated in the Karvelas case
12    in a meaningful way for the purposes of this case.
13              Essentially in Karvelas, 360 F. 3rd 220 at 232 to
14    233, the First Circuit indicated that a relator must
15    state specifically the time, place and content of an
16    alleged false claim.
17              With regard to Rule 12(b)(6), I, of course, must
18    accept all well-pleaded facts in the complaint as true
19    and draw all reasonable inferences in favor of the
20    plaintiff.  A complaint should not be dismissed for
21    failure to state a claim unless it appears beyond doubt
22    that the plaintiff can include no set of facts in
23    support of her claim, which would entitle her to
24    relief.  The Court must neither weigh the evidence nor
25    rule on the merits because the issue is not whether the

67

1    plaintiff will ultimately prevail, but whether she is
2    entitle to offer evidence in support of her claim.
3              As discussed earlier, while the second amended
4    complaint does refer to CIGNA's claimant files, I'm not
5    considering the excerpts from the relevant files or the
6    files of the four claimants identified in the complaint
7    because they are only excerpts, and to consider them
8    would convert this into a motion for summary judgment,
9    and that wouldn't be equitable because the plaintiff has
10    not yet had an opportunity for discovery.
11              A threshold issue that was briefed previously, but
12    not focused on in the briefing with regard to the second
13    amended complaint, has become important.  The defendants
14    again allege that the disability report that CIGNA

Page 56

OCT05BARRETT.txt

15  allegedly required the claimants to file with the Social

16  Security Administration is not a claim for the purpose

17  of the False Claims Act.  For present purposes, I find

18  that was not true.

19      Over time a judicially-crafted definition of

20  "claim" has emerged.  In United States vs. Niefert-

21  White, 390 U.S. 228 at 961 to 62, the Supreme Court

22  noted that "A claim has the purpose and effect of

23  inducing the government immediately to part with its

24  money."  However, the Court also noted that "The False

25  Claims Act was a remedial statute that reaches beyond

68

1  claims which might be legally enforced to all fraudulent

2  attempts to cause the government to pay out sums of

3  money."

4      In 1986, following that 1968 decision by the

5  Supreme Court, Congress amended the False Claims Act to

6  include Section 3729(c), which partially defines

7  "claim."  It states that "A claim includes any request

8  or demand for money, whether under contract or

9  otherwise, for money or property which is made to a

10  contractor grantee or other recipient if the United

11  States government provides any portion of the money for

12  property which is requested or demanded or if the

13  government will reimburse such contractor."

14      The courts now define a claim as "A statement made

15  with the purpose and effect of inducing the government

16  immediately to part with its money," which the First

17  Circuit said in Rivera, 55 F. 3rd 703 at 709, quoting

18  Niefert-White.  "Specifically, the courts examined the

19  circumstances in which a purported claim is made to

Page 57

OCT05BARRETT.txt

20    determine whether, within the payment scheme, the

21    statement has the practical purpose and effect and poses

22    the attendant risk of inducing wrongful payment," as the

23    First Circuit said in Rivera at Page 710.

24          There is some dispute about what role the

25    disability report plays in the Social Security payment

                                                             69

1    system. This is a fact-intensive inquiry. Since this

2    is a motion to dismiss, I feel that unless the law is

3    clear, I must accept the facts alleged in the complaint

4    as true and draw reasonable inferences in favor of the

5    plaintiff.

6          For present purposes, I find that the disability

7    report form is a request for government benefits. But

8    first, the form appears to be a request for money. It's

9    a way any applicant brings his disability to the

10    government's attention so he can receive payment. It is

11    the only document an applicant has to fill out in order

12    to receive Social Security benefits as alleged.

13          Second, the form or forms, because somewhat

14    different forms have been used at different times,

15    according to the complaint, in some respects

16    characterize themselves as claims. For example, the

17    form that's Exhibit P to the defendants' opposition

18    states: "The information that you give on this form

19    will be used by the office that makes the disability

20    decision on your disability claim. This information on

21    this form is needed by Social Security to make a

22    decision on the claimant's claim," it says. "While

23    giving us the information on this form is voluntary," it

24    adds, "failure to provide all or part of the information

                            Page 58

OCT05BARRETT.txt
25    could prevent an accurate or timely decision on the

70

1    named plaintiff's claim."  That was in the disability
2    report that I was focusing on last time, which I think
3    is the same as Exhibit P.
4         While the use of the word "claim" is not
5    dispositive, it tends to indicate that the government
6    treated the form as part of a claim and that potential
7    applicants would have understood the form to be a
8    request for money.  The allegations in the second
9    amended complaint indicate that a disability report
10   poses the attendant risk of inducing wrongful payment.
11        The defendants point out that the filing of the
12   report triggers a process that requires a number of
13   steps before a person, the claimant, can be determined
14   to be eligible to pay.  And while the Supreme Court and
15   the First Circuit have said that a claim is something --
16   a request that causes the government or asks the
17   government to pay money immediately, in Rivera, six
18   months was regarded as sufficiently immediate to qualify
19   as a claim.
20        So for present purposes, I find that the plaintiff
21   has alleged a claim for the purposes of the False Claims
22   Act, although it's possible that the factual evolution
23   of this case could result in a different decision on
24   that point.
25        Count 1 adequately alleges causation.  As I said

71

1    in ruling on the first amended complaint in March, I
2    believe that the kind of causation contemplated by the
3    False Claims Act was comparable to the causation
                              Page 59

OCT05BARRETT.txt

4  criminalized in 18 United States Code Section 2(b).
5  That concept is discussed by the Eleventh Circuit in the
6  United States vs. Tobin Bueles, 706 F. 2nd 1092.
7  Essentially while aiding and abetting requires a
8  principal to commit every element of the crime and an
9  aider and abetter to -- for the required state of mind,
10  do something to assist, causation involves an innocent
11  intermediary, somebody who doesn't have the required
12  criminal state of mind, typically. But if somebody with
13  the required state of mind here, with intent to defraud
14  the government, causes an intermediary to do something
15  that would cause the defendant, in this case, CIGNA, to
16  be held liable as a principal, this concept of causation
17  also establishes liability.
18       As Judge Saris discussed in what the parties
19  called Franklin II, 203 Westlaw 204, 8255, at Page 4,
20  causation has two elements, causation in fact and
21  proximate cause. But whether the defendants' actions
22  were a substantial factor in a claimant's filing their
23  Social Security benefits is a factual question. It's
24  alleged that -- in the second amended complaint, that
25  the defendant caused the filing. The defendant, in

72

1  documents on which I don't feel I can properly rely now,
2  says that at least one of the claimants filed his Social
3  Security Act claim before getting any advice or
4  instructions from CIGNA's agent. But given the standard
5  that applies on a motion to dismiss, causation is
6  adequately alleged.
7       I note that in one of the cases on which the
8  defendant primarily relies in contending that the motion

Page 60

OCT05BARRETT.txt

9   to dismiss should be dismissed because of a problem with
10  causation, the Court was acting on a motion for summary
11  judgment.  That's the Kinney case, 2001 Westlaw 964011.
12          I also find that the plaintiff has adequately
13  alleged that the claims at issue are fraudulent.  The
14  plaintiff asked me to infer that the claimants cited in
15  the four examples filed the disability reports and
16  represented themselves to be disabled within the meaning
17  of the Social Security Act by providing some unknown
18  answer to the question "when did you become unable to
19  work?"  The plaintiffs -- the plaintiff contends that
20  any response to that question, for any of the four
21  exemplars, would be objectively false.
22          If that were the end of the inquiry, I'd have to
23  wrestle whether that is a fair inference and that they
24  made such statements, although they allegedly, or at
25  least by inference, completed the forms.  But I don't

                                                        73

1   feel it's necessary to rely on that because I do find
2   that the relator has stated specifically the time, place
3   and content of an alleged and viable fraudulent claim.
4   The allegations are sufficient to do that.
5   Specifically, the details alleged in the second amended
6   complaint provides the information required by
7   Karvelas.  All four of the relators' specific
8   allegations present similar facts.  Claimant A is
9   illustrative.
10          The second amended complaint identifies Claimant A
11  by his LTD, Long-Term Disability claim number.  It
12  alleges that Claimant A filed for SSDI benefits on March
13  30, 2004 and did so only because CIGNA referred him to
                        Page 61

OCT05BARRETT.txt

14    the Advantage 2000 Social Security Assistance Program.
15    In addition to having the filing pushed upon him through
16    the Advantage 2000 program, Claimant A, it is alleged,
17    was coerced into the application by CIGNA's imposition
18    of a reimbursement agreement signed a few months earlier
19    in December 31, 2003.  The agreement acknowledged
20    CIGNA's right to immediately reduce the benefits by the
21    amount it estimates Claimant A would receive from SSDI.
22         In December 2004, several months prior to the
23    Advantage 2000 referral in the March 2000 -- it must be
24    December 2003.  In December 2003, several months prior
25    to the Advantage 2000 referral in the March 2004 filing,

1    CIGNA had received medical information of Claimant A's
2    treating physician establishing Claimant A's
3    ineligibility for SSDI benefits, it's alleged in
4    Paragraphs 170 and 177.  At the time of the claimant's
5    SSDI application, CIGNA already knew, by virtue of the
6    medical records provided, that Claimant A would not
7    qualify for SSDI benefits.  Moreover, CIGNA was not
8    alone in this knowledge as it conspired with Advantage
9    2000, in part, to achieve its fraudulent scheme, it's
10    alleged in the second amended complaint, Paragraphs 820
11    and 22.  These specific allegations established the
12    time, place and content of the false claims, as required
13    by Rule 9(b).
14         Through Claimant A, the second amended complaint
15    alleges the time and place of a specific false claim
16    from the March 20, 2004 application for SSDI benefits.
17    Moreover, it alleges who, CIGNA, in concert with LTD
18    and, with particular importance, Advantage 2000; how,
Page 62

OCT05BARRETT.txt

19    through inducement and coercion; and what, Claimant A's
20    false assertion of eligibility for SSDI benefits.
21    Finally, the allegations give particular details about
22    defendant's knowledge even though a simple averment
23    would have sufficed.  It alleges CIGNA knew the claim
24    was false because it held Claimant A's medical records.
25          These allegations, I find, properly allege a

75

1    fraudulent claim under the False Claims Act as opposed
2    to a claim containing a false statement.  The courts
3    have not limited False Claims Act claims to claims
4    containing express or implied falsehoods.  The courts
5    also recognize that any claim filed as part of a
6    fraudulent scheme to cause the government to pay amounts
7    of money it does not owe come under the Act.

8          For example, it has been found that any claim for
9    payment submitted as part of a bid-rigging scheme
10   violates the False Claims Act.  Even though the claims
11   themselves contain no false statement, the bid-rigging
12   scheme is a fraudulent scheme, which is sufficient to
13   bring the claim under the FCA, as the court in the
14   Eastern District of New York found, in United States vs.
15   Incorporated Village of Island Park, 888 F. Supp. 419 at
16   439.  By analogy, if the defendants here knew that an
17   applicant was ineligible for Social Security disability
18   benefits, yet caused him to file an application for
19   benefits, it appears that this would be a fraudulent
20   scheme.  As the Eleventh Circuit said in Clausen vs. Lab
21   Corp. of America, 290 F. 3rd 1301 at 1311, liability
22   exists when a claimant knowingly asks the government to
23   pay amounts it does not owe.  That theory of liability
                          Page 63

OCT05BARRETT.txt

24    is adequately alleged in the second amended complaint.

25          As I've said, if knowledge is adequately alleged,

76

1     it need not be alleged with particularity.  However, in

2     this case, the second amended complaint alleges that

3     when the defendants cause claimants to file their false

4     claims, the defendants had actual knowledge or at least

5     were deliberately indifferent, which I infer to mean in

6     reckless disregard of the fact that the claimants did

7     not qualify for Social Security disability benefits.

8     The plaintiff adds that CIGNA accumulates extensive

9     medical and vocational information and therefore knew

10    the claimants were ineligible for SSDI, but nonetheless

11    caused claimants to file their inevitably futile false

12    claims.

13          Some time has been spent today with regard to

14    whether the disability reports that are at the heart of

15    this case are material?  I assume, like my colleague,

16    Judge Woodlock, that materiality is an element of a

17    False Claims Act claim.  However, as Judge Woodlock

18    wrote in President and fellows of Harvard College, 323

19    F. Supp. 2nd 151 at 182, "Whether a false statement is

20    material depends on whether it has a natural tendency to

21    influence agency action or is capable of influencing

22    agency action."  This is consistent with the definition

23    of "materiality" in a comparable context used by the

24    Supreme Court in Neder, 527 U.S. at 16.

25          As Judge Woodlock explained, the question of

77

1     materiality is a mixed question of fact and law.  Under

Page 64

OCT05BARRETT.txt

2    the natural tendency test, the plaintiff has adequately

3    alleged that claimants' false assertion of eligibility

4    for SSDI benefits was material to the government's

5    decision to pay.  The government will not pay SSDI

6    benefits to any person that does not apply, as explained

7    in 20 CFR Section 416.305.  Therefore, the assertion of

8    eligibility or any assertion of eligibility is not an

9    inconsequential fact, it's essential to the government's

10   decision to pay SSDI benefits.

11        The defendants argue that the five-tier system of

12   review by the government and the courts for SSDI claims

13   precludes the government from relying on any false

14   statements.  However, as the Fifth Circuit explained in

15   Southland Management Corporation, 288 F. 3rd at 681,

16   "Fortuities in the government's subsequent decision-

17   making process have no effect on the objective truth or

18   falsity of the claimants' asserted entitlement and

19   should, thus, have no effect on the plaintiff's

20   potential liability under the Act."  The gravamen in a

21   False Claims Act case flows from defendants' conduct,

22   not the resulting consequences, as discussed in

23   Southland and also in Rivera, 55 F. 3rd 710, where the

24   First Circuit explains that the False Claims Act focuses

25   on the claim, not on the government's subsequent

78

1    action.  Which as I said earlier, is not so remote in

2    time or so remote from them filing the application as to

3    render the application not part of a claim.

4        I thought I would say it's probably -- I'm not

5    granting the motion to dismiss Count 2, but I guess I'm

6    reserving judgment on it, because I've -- well, I'm not

Page 65

OCT05BARRETT.txt
7    granting it.  But I do have some difficulty with it.  I
8    could, arguably, reasonably infer that every one of
9    those applications has some statement that somebody
10   became unable to work or the plaintiff became unable to
11   work on a particular day, but I really need to wrestle
12   with the implications of the varying meanings of "work,"
13   which is really not possible to resolve, I think, on
14   this motion to dismiss.  There is a definition in the
15   introduction to the form, a Social Security Act
16   definition, but then there's a series of questions as to
17   -- that would be consistent with a different
18   understanding or ruling.
19        Count 3 alleges a conspiracy.  In Paragraph 8(a),
20   the second amended complaint alleges that CIGNA
21   conspired with its agents, among others.  In Paragraphs
22   110 and 111, Advantage 2000 is alleged to be an agent.
23   So I view, at the moment, that Advantage essentially is
24   an undicted co-conspirator.  And while only one of
25   the -- if this were a criminal case, you'd say that only

79

1    one of the defendants, the potential defendants has been
2    named, it's permissible to allege a conspiracy between a
3    named defendant and some unindicted co-conspirator and
4    Advantage could be an agent, but one can conspire with
5    an agent even if one can't conspire with himself or
6    itself, in my present understanding.
7        I will save the veil-piercing argument, that CIGNA
8    suggests, for a motion for summary judgment.  As counsel
9    for CIGNA commendably acknowledged, CIGNA has waived its
10   right to contest personal jurisdiction at this point
11   because it didn't raise that issue in the first

Page 66

OCT05BARRETT.txt
12  responsive pleading, the first motion to dismiss, as is
13  required by Rule 12(h)(1).

14       It's now 6:05 p.m., but I want to establish a
15  schedule for you to confer.  I need to see you
16  relatively soon to create a schedule for the case,
17  because I am concerned about the scope of discovery and
18  whether it should be limited or whether discovery should
19  be bifurcated in any way?  And not just damages and
20  liability, but basically what's the -- what kind of
21  discovery is necessary to reasonably develop a record of
22  whether there's a viable claim here.  I'm concerned both
23  about the burden of discovery on the plaintiff and the
24  defendant, the cost, and I'm also concerned, as I said
25  about three hours ago, about the invasion of privacy of

80

1  claimants' files, which will probably be very difficult
2  to redact.

3       So I'm going to order that you confer and we'll
4  provide you a standard scheduling conference order.  And
5  I have some scheduling difficulties, because I'm away on
6  judicial business both at the end of October and then
7  for the second week in November.

8       I'm going to order that you confer and respond to
9  the scheduling order, ideally jointly, but it's
10  foreseeable you may have disputes, by November 8th, and
11  I'm going to see you at 4:00 on November 15th to
12  establish a schedule for the rest of the case.

13       As part of that discussion, you also are obliged
14  to discuss the possibility of settling the case.  And
15  I've looked at this from a very -- as I must, of
16  applying a standard that's very favorable to the

OCT05BARRETT.txt

17    plaintiff.  And plaintiff's counsel clearly has
18    considerable experience in these cases, but there are a
19    number of legal questions that -- as well as factual
20    questions, that are going to have to be resolved.  So I
21    strongly encourage you not to make perfunctory efforts
22    to settle this case, but the most serious efforts that
23    you can, because this is going to be costly and complex
24    litigation, if it goes on.
25            At a minimum, it's got to be bad for CIGNA's

81

1    business because it's going to drag its insureds into
2    litigation, which can't be good for business, and it
3    also has the prospect of being expensive and time
4    consuming for Miss Barrett and her counsel.  The
5    government looked at this and decided not to devote any
6    of its limited resources to it.  I think I can imagine
7    why now that you've educated me so much about this
8    case.  So I think you've each got incentives to see if
9    you can resolve this.  And if it can ever be resolved by
10    agreement, it would be great if you could do it within
11    the next month.
12            (Laughter.)
13            THE COURT:  All right.  Anything further in
14    this matter for today?
15            MR. CINQUEGRANA:  Your Honor, would you
16    consider holding that scheduling conference either
17    earlier that day or the next day?
18            THE COURT:  Yes.  Well, I can't do it the next
19    day.  I can do it -- how about the -- how early do you
20    need it?
21            MR. CINQUEGRANA:  I'm supposed to do something

OCT05BARRETT.txt

22    from 2:00 on that afternoon.

23              THE COURT:  Okay.  I'm scheduled to be on

24    trial that week.  Well, actually, I could do it at --

25    um, what about the afternoon of November 17th?

                                                          82

1               MR. CINQUEGRANA:  Thank you, your Honor.  That

2     would work.

3               MS. MATZZIE:  It seems fine for me.

4               THE COURT:  I'll give you two more days to

5     hammer out the details of your agreement.

6               MR. CINQUEGRANA:  What time of day that day,

7     your Honor?

8               THE COURT:  3:00.  Okay?

9           All right.  You've certainly challenged me, so

10    I'll look forward to that continuing, if necessary.

11          The Court is in recess.

12              (Ends, 6:15 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                          83

OCT05BARRETT.txt

1              C E R T I F I C A T E
2
3
4
5          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,
6      do hereby certify that the foregoing record is a true
7      and accurate transcription of my stenographic notes,
8      before Chief Judge Mark L. Wolf, on Thursday, October 5,
9      2006, to the best of my skill and ability.
10
11
12
13
14
15     _____
16     RICHARD H. ROMANOW
17
18
19
20
21
22
23
24
25