# Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br>*EX REL.* DAWN BARRETT,<br><br>Plaintiff,<br><br>v.<br><br>CIGNA CORPORATION and<br>LIFE INSURANCE COMPANY<br>OF NORTH AMERICA<br><br>Defendants. | Civil Action No. 03-12382-MLW |

## RELATOR'S FIRST SET OF SUPPLEMENTAL RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Pursuant to Rule 33 of the Federal Rules of Civil Procedure and the Local Rules of this Court, Relator Dawn Barrett ("Relator") provides the following first set of supplemental answers to Defendants' First Set of Interrogatories as follows:

These responses incorporate the Definitions and General Objections set forth in Relator's Response to Defendants' First Set of Interrogatories.

### RESPONSES AND OBJECTIONS TO SPECIFIC INTERROGATORIES

### INTERROGATORY NO. 2:

Describe each of the Defendants' alleged violations of the FCA, including when and how Relator first became aware of any of these violations.

### RESPONSE TO INTERROGATORY NO. 2:

Relator objects to Interrogatory No. 2 as overly broad and unduly burdensome. Relator further objects to Interrogatory No. 2 to the extent that it seeks disclosure of privileged attorney-

client communications or attorney work product. Relator objects to Interrogatory No. 2 as a premature contention interrogatory. Relator objects to Interrogatory No. 2 as calling for a legal conclusion, not factual discovery. Subject to the these objections and Relator's general objections, Relator answers as follows: Discovery is incomplete and ongoing at this time. However, it is Relator's understanding, based on her own experiences as well as a result of communications with co-workers and agents for defendants, that defendants have misled, coerced or otherwise caused many Long Term Disability ("LTD") insureds to file for Social Security Disability Insurance benefits ("SSDI") irrespective of whether these insureds were eligible for such benefits and in many cases when a reasonable investigation would have determined that there was no good faith basis to mislead, coerce, or otherwise cause the insured to apply for a governmental benefit for which they were not eligible. The defendants therefore caused the knowing submission of numerous false applications for governmental benefits and therefore violated the federal False Claims Act. *See* 31 U.S.C. § 3729(a)(1).

It is also Relator's understanding, based on her own experiences as well as a result of communications with co-workers and agents for defendants, that defendants have misled, coerced or caused many LTD insureds to make a false statement in support of a false application for SSDI, irrespective of whether the insured actually met the definition of disability for SSDI, and in many cases when a reasonable investigation would have determined that the insured did not meet the definition. The defendants therefore caused the making of a false statement in support of a false application for governmental benefits and therefore violated the False Claims Act. *See* 31 U.S.C. § 3729(a)(2).

It is also Relator's understanding, based on her own experiences as well as a result of communications with co-workers and agents for defendants, that defendants have engaged in a

2

fraudulent scheme to mislead, coerce or cause many LTD insureds to file for Social Security Disability Insurance benefits ("SSDI") irrespective of whether these insureds were eligible for such benefits and in many cases when a reasonable investigation would have determined that there was no good faith basis to mislead, coerce, or otherwise cause the insured to apply for a governmental benefit for which they were not eligible. The defendants therefore engaged in a fraudulent scheme which caused the knowing submission of numerous false applications for governmental benefits and therefore violated the federal False Claims Act. See 31 U.S.C. § 3729(a)(1).

Defendants' knowing, repeated and sustained violations of the False Claims Act have resulted in the government having to expend resources and money in processing ineligible applications for SSDI.

The number of claims that defendants caused to be submitted that were false, the number of applications containing false statements that Defendants caused to be submitted, and the number of fraudulent claims submitted by defendants will be a matter for discovery, which is ongoing. Examples of false or fraudulent claims that defendants have caused to be filed include, but are not limited to, Claimant A through Claimant D, as set forth in ¶¶ 168 – 210 of Relator's Second Amended Complaint and Demand for Jury Trial.

Relator became aware of Defendants' practices in causing ineligible insureds to apply for SSDI, and in causing ineligible insureds to make false statements in support of SSDI applications during her employment with LINA. Relator is employed by defendant LINA. However, Relator's letterhead and ID badge are in the name of defendant CIGNA. Relator has been trained to represent herself as an employee of defendant CIGNA during communications with claimants.

In May 2002, Relator became a vendor coordinator for defendants. Laurie Swanson was Relator's manager during her time as a vendor coordinator. Relator was told that the purpose of her job as a vendor coordinator was to obtain SSDI for insureds so that Cigna could take the offset. The primary responsibilities of Relator's position as a vendor coordinator involved following-up with insureds and third-party Social Security vendors regarding SSDI. As a vendor coordinator, Relator referred several hundred, and possibly thousands, of claimants to third-party Social Security vendors. After working as a vendor coordinator, Relator held the position of a disability claim administrator for LTD. Relator's responsibility as a disability claim administrator involved following-up with claimants regarding SSDI.

As a vendor coordinator, Relator would refer the files of claimants who had signed an authorization for SSDI assistance to one of the third-party Social Security vendors. Relator would follow-up with the third-party Social Security vendors regarding the status of the claimants' SSDI application process. Relator would also have direct contact with some claimants regarding the SSDI application process. One of Relator's tasks as a vendor coordinator was to send letters to claimants explaining SSDI. Relator would also follow-up with additional letters and telephone calls regarding authorization to refer them to third-party vendors. For some claimants, Relator would also need to follow-up directly with the claimant regarding the status of the claimant's SSDI application.

Relator was instructed and trained that if a claimant questioned why he or she had to apply for SSDI, she should inform the claimant that the terms of the policy required the claimant to apply for SSDI. Relator had conversations with claimants who questioned why they had to apply for SSDI as they did not intend to be on disability forever or were planning to return to

work. Relator was instructed and trained to tell claimants that they had to apply for SSDI because it was part of their policy and that their benefits would be reduced if they did not apply.

Relator is familiar with defendants' policies and practices regarding SSDI through her employment with defendants. Defendants have Social Security Referral Guidelines which state that with few exceptions "all claims that contain the appropriate Disclosure Authorization should be referred [Social Security third-party] vendor[s] or SSAT." *See* BAR000184 (listing the following exceptions: "simple pregnancy diagnoses[;] part-time returns to work earning at least $800 per month[;] firm return to work dates within 9 months of incurral[;] if there are outstanding eligibility issues or PCL investigation[; and] the claimant wants to work on their own or work with a representative/vendor outside of our approved network"). Moreover, it is also Relator's understanding, based on her own experiences as well as a result of communications with co-workers and agents for defendants, that claims managers, vendor coordinators, and associated personnel were instructed, trained, and incentivized to refer as many claimants to third-party Social Security vendors as possible, without adequate investigation of eligibility.

It is also Relator's understanding, based on her own experiences as well as a result of communications with co-workers and agents for defendants, that claims managers, vendor coordinators, and associated personnel were instructed to inform claimants through telephone conversations and letters that their benefits would be reduced if they did not apply for SSDI. By way of example, a document titled Social Security Referral, Coding and Estimation Procedures, dated March 24, 2000 (revised May 1, 2003) provides the following instructions for "CIGNA Vendor Managed (claims currently with the vendor)": "21 days from the date of the referral to vendor – follow-up with vendor for status and if claimant is cooperating. If the claimant is not

work. Relator was instructed and trained to tell claimants that they had to apply for SSDI because it was part of their policy and that their benefits would be reduced if they did not apply.

Relator is familiar with defendants' policies and practices regarding SSDI through her employment with defendants. Defendants have Social Security Referral Guidelines which state that with few exceptions "all claims that contain the appropriate Disclosure Authorization should be referred [Social Security third-party] vendor[s] or SSAT." *See* BAR000184 (listing the following exceptions: "simple pregnancy diagnoses[;] part-time returns to work earning at least $800 per month[;] firm return to work dates within 9 months of incurral[;] if there are outstanding eligibility issues or PCL investigation[; and] the claimant wants to work on their own or work with a representative/vendor outside of our approved network"). Moreover, it is also Relator's understanding, based on her own experiences as well as a result of communications with co-workers and agents for defendants, that claims managers, vendor coordinators, and associated personnel were instructed, trained, and incentivized to refer as many claimants to third-party Social Security vendors as possible, without adequate investigation of eligibility.

It is also Relator's understanding, based on her own experiences as well as a result of communications with co-workers and agents for defendants, that claims managers, vendor coordinators, and associated personnel were instructed to inform claimants through telephone conversations and letters that their benefits would be reduced if they did not apply for SSDI. By way of example, a document titled Social Security Referral, Coding and Estimation Procedures, dated March 24, 2000 (revised May 1, 2003) provides the following instructions for "CIGNA Vendor Managed (claims currently with the vendor)": "21 days from the date of the referral to vendor – follow-up with vendor for status and if claimant is cooperating. If the claimant is not

cooperating with the vendor, apply estimate at the later of 6 months from incurral or 60 days from the date of first contact if RA and SS App not received." *See* BAR000188. Additionally, if a claimant did not apply, vendor coordinators, claim managers, and associated personnel were instructed to actually reduce the claimant's LTD benefit payment by the estimate and inform the claimant that their LTD benefit would be reduced until the claimant provided defendants with proof of an application for SSDI.

Defendants encouraged its employees, such as claims managers, to make as many referrals to third-party Social Security vendors as possible. It is also Relator's understanding, based on her own experiences as well as a result of communications with co-workers and agents for defendants, that defendants have had a practice of rewarding LTD case managers based on high rate of referrals. By way of example, in an e-mail dated August 29, 2003, Sam Mariskanish stated: "I also wanted to let you know that starting on Tuesday, we will be counting the number of referrals each Case Manager has made along with looking at each Case Manager's estimation rates and tracking this for four weeks. At the end of the four weeks, which will be September 25th, I will be honoring the top two performers of each category with prizes which are as follows: First Place: $50 American Express Gift Certificate[;] Second Place: Two Free Movie Passes." BAR000218; *see also* BAR000236. Defendants would also offer other prizes, such as pizza parties, for teams with the highest rate of referrals. In Relator's experience, there would be a large spike in the number of referrals made when awards or incentives for referrals were offered.

Prior to May 2002, defendants used a number of third-party Social Security vendors, including 1) Advantage 2000 Consultants, Inc.; 2) Allsup, Inc.; 3) Social Security Law Group; 4) Integrated Benefits, Inc.; 5) David Brown; and 6) Jerry Zivek. It is Relator's understanding,

based on her own experiences as well as a result of communications with co-workers and agents for defendants, that around May 2002, defendants started to primarily use only two third-party Social Security vendors: Advantage 2000 Consultants, Inc., and Allsup, Inc.

It is also Relator's understanding, based on her own experiences as well as a result of communications with co-workers and agents for defendants, that these third-party Social Security vendors would also contact claimants directly regarding filing applications for SSDI through telephone calls and letters. The third-party Social Security vendors acted as defendants' agents in assisting claimants in applying for SSDI and appealing denials of SSDI applications. Defendants encouraged claimants to use the services of third-party SSDI vendors by telling the claimants that such services were offered free of charge to them.

As used in this interrogatory response, "communications with co-workers and agents for defendants" refers to communications that Dawn Barrett has had with at least the following individuals: Laurie Swanson, Jennifer Blackman, Dianna Salgado-Salinas, Sam Mariskanish, Stephen Ostrega, Gary Fritsch, Ruth Fetcher, Doug Miller, Wendy Schimmel, Shawn Ashley, Scott Donelli, Nicole Rose, Kim DiPaolo, Brad Lehn, Troy McKay, Jerry Zivek, David Brown, Missy Thomas, Terry Binder, Tia Mink, and Justin Wing. Relator also had conversations with other LTD claim managers, senior claim managers and team leaders, but does not recall the identity of any additional specific individuals at this time. Relator also had conversations with other employees from Integrated Benefits, Inc., Social Security Law Group, Allsup, Inc., and Advantage 2000 Consultants, Inc., but does not recall the specific names of these individuals at this time.

**INTERROGATORY NO. 4:**

Identify every person with whom you have communicated and/or interviewed or questioned in connection with the allegations of the Complaint, and describe such communications. Your answer should include, but not be limited to, the following: (a) any

Advantage 2000 Consultants, Inc., but does not recall the specific names of these individuals at this time.

**INTERROGATORY NO. 6:**

In relation to Paragraphs 4, 133-138 and 211 of the Complaint, state the basis for your contention that the Defendants "knowingly cause to be submitted to the [SSA] false or fraudulent claims for [SSDI] benefits" or "should have known that many of the claims that they caused to be filed with the SSA were and are false or non-meritorious."

**RESPONSE TO INTERROGATORY NO. 6:**

Relator objects to Interrogatory No. 6 as a premature contention interrogatory. Subject to this objection and Relator's general objections, Relator answers as follows: Discovery on defendants' policies and practices is incomplete and ongoing at this time. Nonetheless, documents in Defendants' own files, as well as Relator's understanding, based on her own experiences as an employee of the Defendants, in addition to numerous communications with co-workers and agents for defendants, is that defendants engage in the practice of misleading, coercing, or causing LTD claimants to submit applications for SSDI, and have done so for quite some time. *See, e.g.* BAR000186-BAR000198. Some of the methods that Defendants have used to cause claimants to submit applications to SSDI are discussed more fully below in response to Interrogatory No. 22, and that answer is incorporated herein by reference. Relator also believes that defendants either failed to make an adequate investigation regarding SSDI eligibility or caused claimants to make application for SSDI in situations where defendants had information sufficient to demonstrate that many of these claimants had no reasonable basis to believe that they qualified for SSDI. It is Relator's understanding, based on her own experiences as well as a result of communications with co-workers and agents for defendants, that documentation in each LTD claimant's long term disability file includes, among other things, medical records, a

diagnosis of the claimant's impairment, the claimant's vocational history and often a projected return to work date for the claimant.

It is also Relator's understanding and belief that, based on defendants' historical experience with many tens of thousands of LTD insureds, defendants are aware that large numbers of these insureds cannot meet the eligibility requirements for SSDI as a result of the expected duration of their disability, their inability to meet SSDI's any occupation requirement or other reasons. Notwithstanding this knowledge – and particular knowledge about an insured's medical and vocational situation in particular files – defendants have caused or coerced large numbers of insureds to apply for SSDI unless they fall within the limited exceptions set forth in defendants' Social Security Referral, Coding and Estimation Procedure ("all claims that contain the appropriate Disclosure Authorization should be referred to the vendor except in the following circumstances … simple pregnancy diagnoses[;] part-time returns to work earning at least $800 per month[;] firm return to work dates within 9 months of incurral[;] if there are outstanding eligibility issues or PCL investigation[; and] the claimant wants to work on their own or work with a representative/vendor outside of our approved network"). BAR000187. Defendants know, or were reckless if they did not know, that these exceptions to its Social Security referral requirement are far narrower than the SSDI eligibility requirements, and that referral of all insureds that do not fall within these exceptions, can be expected to result in large numbers of insureds seeking SSDI benefits for which they are not eligible. Moreover, it is Relator's understanding, based on her own experiences as well as a result of communications with co-workers and agents for defendants, that defendants did not conduct an adequate inquiry prior to causing individuals to apply for SSDI, into whether they could reasonably qualify for SSDI benefit. Documentation in each LTD claimant's file includes medical records, a diagnosis of the

claimant's impairment, the claimant's vocational history and often a projected return to work date for the claimant, but insureds are subject to Cigna's Social Security referral practices unless they fall within one of the limited exceptions described above. *See* BAR000184-BAR000198.

In addition, it is also Relator's understanding, based on her own experiences as well as a result of communications with co-workers and agents for defendants, that defendants used third-party Social Security vendors (such as Advantage 2000 Consultants, Inc., and Allsup, Inc.) in order to cause insureds to submit claims that were ineligible. Defendants have Social Security Referral Guidelines which state that with few exceptions "all claims that contain the appropriate Disclosure Authorization should be referred [Social Security third-party] vendor[s] or SSAT." *See* BAR000184 (listing the following exceptions: "simple pregnancy diagnoses[;] part-time returns to work earning at least $800 per month[;] firm return to work dates within 9 months of incurral[;] if there are outstanding eligibility issues or PCL investigation[; and] the claimant wants to work on their own or work with a representative/vendor outside of our approved network"). Moreover, it is Relator's understanding, based on her own experiences as well as a result of communications with co-workers and agents for defendants, that claims managers, vendor coordinators, and associated personnel were instructed, trained, and incentivized to refer as many claimants to third-party Social Security vendors as possible, without adequate investigation of eligibility. See also Response to Interrogatory No. 2, incorporated herein by reference.

As used in this interrogatory response, "communications with co-workers and agents for defendants" refers to communications that Dawn Barrett has had with at least the following individuals: Sam Mariskanish, Laurie Swanson, Jennifer Blackman, Dianna Salgado-Salinas, Stephen Ostrega, Missy Thomas, Terry Binder, Tia Mink, and Justin Wing. Relator also had

conversations with other employees from Integrated Benefits, Inc., Social Security Law Group, Allsup, Inc., and Advantage 2000 Consultants, Inc., but does not recall the specific names of these individuals at this time. Relator also had other conversations, but does not recall the specific names of those individuals with whom she conversed at this time.

**INTERROGATORY NO. 7:**

In relation to Paragraph 12 of the Complaint, state the basis for your contention that "[f]or each false claim submitted to SSA, CIGNA [sic] can reduce its reserves on that claim during the pendency of that claim with SSA, allowing it to improve its financial statements and to write more disability insurance policies."

**RESPONSE TO INTERROGATORY NO. 7:**

Relator objects to Interrogatory No. 7 as a premature contention interrogatory. Subject to this objection and Relator's general objections, Relator answers as follows: Discovery on defendants' policies and practices is incomplete and ongoing at this time. Defendants' own documents evidence that defendants have reduced their reserves based on claims having pending SSDI applications. A document titled Coding and Reserving Impact, and dated November 13, 1998 (revised September 22, 2000), states: "Claims less than 24 months that are coded as Social Security application in progress or in the appeal have a 20 to 30% reduction in the reserve amount based on the probability of being approved for Social Security. When Social Security is approved, the new net benefit amount will be used in calculating the reserve and the reduction no longer applies. Because of the tremendous impact that Social Security offset coding has on reserves, it is crucial that our coding is accurate and updated regularly." *See* BAR000479-BAR000483. In addition, Relator understands, based on her own experiences as well as communications with co-workers, that one of the purposes for which Defendants estimated SSDI benefits was for the purposes of setting reserves.

**INTERROGATORY NO. 38:**

Identify every employee of the federal government who contends that the Defendants caused any Claimant to submit a false claim to the SSA.

**RESPONSE TO INTERROGATORY NO. 38:**

Relator objects to Interrogatory No. 38 on the grounds that it seeks information protected by the joint prosecution privilege, joint defense privilege and common interest privilege. Relator objects to Interrogatory No. 38 as overly broad and unduly burdensome, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Relator further objects to Interrogatory No. 38 to the extent it seeks information which is beyond the scope of allowable discovery under the federal rules. Furthermore, the opinions of employees of the federal government are irrelevant as to whether defendants caused the submission of false claims.

Dated: January 18, 2008

_____
Carl S. Nadler

Mary Louise Cohen
Colette G. Matzzie
PHILLIPS AND COHEN LLP
2000 Massachusetts Ave., NW
Washington, DC 20036
Tel: (202) 833-4567
Fax: (202) 833-1815

Carl S. Nadler
Stuart M. Rennert
HELLER EHRMAN LLP
1717 Rhode Island Avenue, NW
Washington, DC 20036
Tel: (202) 912-2000
Fax: (202) 912-2020

Peter B. Krupp, B.B.O. #548112
LURIE & KRUPP, LLP
One McKinley Square
Boston, MA 02109
Tel: (617) 367-1970
Fax: (617) 367-1971

*Counsel for Dawn Barrett*

CERTIFICATION OF SERVICE

I hereby certify that this document was sent by electronic mail, and by Federal Express mail, postage prepaid on the following addressees on January 18, 2008:

    Richard C. Abati
    CHOATE, HALL & STEWART
    Two International Place
    Boston, Massachusetts 02110

*Shari A. Rose*
Shari A. Rose

## VERIFICATION

I, Dawn M. Barrett, hereby certify, pursuant to 28 U.S.C. § 1746 and under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct to the best of my personal knowledge, information and belief.

Date: 1/18/08

Dawn M. Barrett