UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *ex rel.* DAWN BARRETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 03-12382-MLW |
| | ) | |
| CIGNA CORPORATION and LIFE | ) | |
| INSURANCE COMPANY OF NORTH | ) | |
| AMERICA, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**DECLARATION OF CARL S. NADLER**
**IN SUPPORT OF RELATOR'S REPLY MEMORANDUM IN SUPPORT OF HER**
**MOTION TO COMPEL**

I, CARL S. NADLER, declare as follows:

1.      I am an attorney at the law firm of Heller Ehrman LLP.  I have personal knowledge of the facts set forth in this declaration, and I would and could testify competently thereto if called upon to do so.

2.      Attached hereto as Exhibit 1 is a true and correct copy LINA 0104470-LINA 0104471 (filed under seal).

3.      Attached hereto as Exhibit 2 is a true and correct copy of a letter from Thomas S. Kimbrell to Richard C. Abati, dated April 1, 2008.

4.      Attached hereto as Exhibit 3 is a true and correct copy LINA 0105047-LINA 0105057 (filed under seal).

5.      Attached hereto as Exhibit 4 is a true and correct copy LINA 0188702-LINA 0188768, Cigna's Form 10K Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 1996.

6.      Attached hereto as Exhibit 5 is a true and correct copy LINA 0189442-LINA 0189603, Cigna's Form 10K Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 2005.

7.      Attached hereto as Exhibit 6 is a true and correct copy LINA 0051087-LINA 0051092 (filed under seal).

8.      Attached hereto as Exhibit 7 is a true and correct copy LINA 0184093-LINA 0184113 (filed under seal).

9.      Attached hereto as Exhibit 8 is a true and correct copy of a letter from Carl S. Nadler to Karen Collari Troake, dated November 20, 2007.

10.     Attached hereto as Exhibit 9 is a true and correct copy of an e-mail string with the most recent e-mail from Shari Rose to Karen Collari Troake and Richard C. Abati, dated December 20, 2007, and attaching the November 20, 2007 letter, which same letter is attached to this declaration as Exhibit 8.

11.     Attached hereto as Exhibit 10 is a true and correct copy of an e-mail string with the most recent e-mail from Richard Abati to Shari Rose, dated December 21, 2007.

12.     Attached hereto as Exhibit 11 is a true and correct copy of a letter from Carl S. Nadler to Richard C. Abati, dated February 6, 2008.

13.     Attached hereto as Exhibit 12 is a true and correct copy of a letter from Thomas S. Kimbrell to Richard C. Abati, dated February 11, 2008.

14.     Attached hereto as Exhibit 13 is a true and correct copy of a letter from Shari A. Rose to Richard C. Abati, dated February 28, 2008.

15.     Attached hereto as Exhibit 14 is a true and correct copy of an e-mail string with the most recent e-mail from Richard Abati to Shari Rose, dated March 3, 2008.

16.     Attached hereto as Exhibit 15 is a true and correct copy of a letter from Richard C. Abati to Shari A. Rose, dated March 4, 2008.

17.     Attached hereto as Exhibit 16 is a true and correct copy of an e-mail string with the most recent e-mail from Richard Abati to Shari Rose, dated April 3, 2008.

18.     Attached hereto as Exhibit 17 is a true and correct copy of an e-mail string with the most recent e-mail from Richard Abati to Shari Rose, dated April 7, 2008.

19.     Relator first served discovery on defendants CIGNA Corporation and its subsidiary Life Insurance Corporation of North America (collectively referred to as "Defendants" or "Cigna") on March 23, 2007.  From March 23, 2007 to November 20, 2007 the parties exchanged approximately two hundred separate pieces of correspondence, and Relator worked diligently to resolve the issues between the parties.

I declare under penalty of perjury according to laws of the United States of America that the foregoing is true and correct.

Executed this 20th day of May, 2008, at Washington, D.C.


/s/ Carl S. Nadler
Carl S. Nadler

3

## <u>CERTIFICATE OF SERVICE</u>

        I, Carl S. Nadler, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on May 20, 2008.

                                /s/ Carl S. Nadler                 
                                Carl S. Nadler

FILED UNDER SEAL
Exhibit 1

Exhibit 2

# HellerEhrman LLP

April 1, 2008

Thomas S. Kimbrell
Tom.Kimbrell@hellerehrman.com
Direct +1.202.912.2604
Main +1 (202) 912-2000
Fax +1 (202) 912-2020

*By E-Mail*

Richard C. Abati
Choate, Hall & Stewart
Two International Place
Boston, MA 02110
United States of America

**Re:** *United States of America, ex rel. Barrett v. Cigna Corporation et al.*

Dear Rich:

I write in response to your letter of March 25, 2008, in which you refuse to produce corrected claims file data and the missing information for claims underwritten by Connecticut General unless Relator returns the data previously produced by defendants for all LTD claims received by defendants after April 14, 2006. Your letter comes twenty-six days after Defendants produced incomplete electronic data containing the post-April 2006 information. Your letter is contrary to your prior statement, made shortly after the original electronic claims data was produced, that defendants were not requesting the return of the post-April 2006 data. Your letter is also contrary to your statements and emails, over the last several weeks, that you were endeavoring to answer Relator's questions concerning the electronic claims file data. And your letter is contrary to defendants' longstanding agreement to produce usable electronic claims information.

Relator's request for the electronic data has now been outstanding for more than eight months. Since that time, defendants have repeatedly backtracked on their commitment to produce the electronic data, raising new issues or conditions again and again in a transparent effort to delay Relator's prosecution of this action. Defendants' refusal to produce corrected data – including, astoundingly, any data at all for claims underwritten by Connecticut General – is but the latest example of defendants' attempt to delay Relator's prosecution of this action in disregard of their discovery obligations.

Your statement that you have already provided what Relator requested, or that I have "mischaracterized" defendants' production, is incorrect and unfounded. A "report" containing the fields indicated, which is what Relator requested, would provide information about the relationship between the fields produced by Defendants in a single file. As described in my March 18, 2008 letter to you, the relationships between the twenty-six

HellerEhrman₁.₁.ₚ

separate files that defendants have actually produced is not defined.[1] And, as you concede in your March 25, 2008 letter, Defendants have not produced a unique claimant identifier, which is necessary to identify which portions of the voluminous data produced relate to a particular LTD claimant. I can assure you that we have talented and technically competent people who have reviewed the electronic data produced by defendants, and that is not possible to "infer the correct relationships" without additional information in defendants' possession. Furthermore, your suggestion that the relationships between the tables can be "inferred" is belied by the fact that during our March 14, 2008 telephone call with our respective practice support teams, your practice support personnel were as perplexed by the relationships between many of the tables as we were. Lastly, your insistence that the relational information requested by Relator is not maintained by defendants, while simultaneously offering to produce a corrected set of claims file data that includes such information, is nonsensical.

There is no basis for Defendants to request the return of the data that post-dates April 14, 2006. This data is responsive to Relator's outstanding document requests, is not privileged, and any objection to its production has been waived. However, as a professional courtesy, Relator is willing to return the post-April 2006 electronic claims file data once she receives updated, usable, and accurate data in the Microsoft Access format that resolves her concerns about the missing relational information, the missing LTD claims underwritten by Connecticut General, and the other issues raised by my March 18, 2008 letter to you.[2] Once Relator receives this updated information, she will endeavor to return the data previously produced by Defendants within 48 hours.[3] Relator will expressly reserve her right to compel

---

[1] It is in this sense that the data produced by Defendants is unusable--as you well know.

[2] In addition to refusing to define the relationships between the twenty six tables produced by defendants, you have not responded to my questions regarding (1) which of the tables produced by Defendants (if any) contains the entire population of LTD claims or LTD applicants, (2) what timestamp, secondary keys, or other information indicating the order of data creation is contained or missing in Defendants' electronic data production, (3) the relationship between the Sro Data Run Claim and Sro Data Run Offset tables, (4) why certain tables, such as the "D CLAIM" table, seem to contain many fewer unique Claim IDs than the other tables, (5) for which tables, the field "Benefit Effective DT" may indicate the order of data creation, and (6) verification of the meaning of the INCURRED_DT and BENEFIT_TERMINATION_DT.

[3] Because Relator has already incurred substantial costs analyzing defendants' incomplete data, she is unwilling to pay any costs in connection with defendants' re-production.

HellerEhrman LLP

production of the post-April 2006 data, including her right to argue that any objection to the production of that data has been waived.

Please do not hesitate to contact me if you have any questions or concerns. In light of the current schedule, I would appreciate your response to this letter no later than Wednesday, April 3rd.

Very truly yours,

Thomas S. Kimbrell

FILED UNDER SEAL
Exhibit 3

Exhibit 4

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

(Mark One)

[X]  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 1996

OR

[ ]  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from            to

Commission file number 1-8323

# CIGNA Corporation
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **06-1059331** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **One Liberty Place, Philadelphia, Pennsylvania** | **19192-1550** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code (215) 761-1000

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, Par Value $1; Preferred Stock Purchase Rights | New York Stock Exchange, Inc. Pacific Stock Exchange, Inc. Philadelphia Stock Exchange, Inc. |

**Securities registered pursuant to Section 12(g) of the Act:**
None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes X   No __.

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

The aggregate market value of the voting stock held by non-affiliates of the registrant as of February 28, 1997, was approximately $11.2 billion.

As of February 28, 1997, 74,020,202 shares of the registrant's Common Stock were outstanding.

Parts I and II of this Form 10-K incorporate by reference information from the registrant's annual report to shareholders for the year ended December 31, 1996. Part III of this Form 10-K incorporates by reference information from the registrant's proxy statement dated March 19, 1997.

# TABLE OF CONTENTS

| | Page |
|---|---|
| **Part I** | |
| Item 1. Business | 1 |
|     A. Description of Business | 1 |
|     B. Financial Information about Industry Segments | 2 |
|     C. Employee Life and Health Benefits | 2 |
|     D. Employee Retirement and Savings Benefits | 8 |
|     E. Individual Financial Services | 11 |
|     F. Property and Casualty | 15 |
|     G. Investments and Investment Income | 28 |
|     H. Regulation | 32 |
|     I. Ratings | 34 |
|     J. Miscellaneous | 36 |
| Item 2. Properties | 36 |
| Item 3. Legal Proceedings | 36 |
| Item 4. Submission of Matters to a Vote of Security Holders | 37 |
| Executive Officers of the Registrant | 37 |
| **Part II** | |
| Item 5. Market for Registrant's Common Equity and Related Stockholder Matters | 38 |
| Item 6. Selected Financial Data | 38 |
| Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations | 38 |
| Item 8. Financial Statements and Supplementary Data | 38 |
| Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 38 |
| **Part III** | |
| Item 10. Directors and Executive Officers of the Registrant | 38 |
|     A. Directors of the Registrant | 38 |
|     B. Executive Officers of the Registrant | 38 |
| Item 11. Executive Compensation | 38 |
| Item 12. Security Ownership of Certain Beneficial Owners and Management | 38 |
| Item 13. Certain Relationships and Related Transactions | 39 |
| **Part IV** | |
| Item 14. Exhibits, Financial Statement Schedules, and Reports on Form 8-K | 39 |
| Signatures | 40 |
| Index to Financial Statement Schedules | FS-1 |
| Index to Exhibits | E-1 |

LINA 0188703

# PART I

## Item 1.  *Business*

### A.  *Description of Business*

With shareholders' equity of $7.2 billion and assets of $98.9 billion as of December 31, 1996 and revenues of $19 billion for the year then ended, CIGNA Corporation and its subsidiaries constitute one of the largest investor-owned insurance organizations in the United States and one of the principal United States companies in the financial services industry. Unless the context otherwise indicates, the terms "CIGNA" and the "Company," when used herein, refer to one or more of CIGNA Corporation and its consolidated subsidiaries. Although CIGNA Corporation is not an insurance company, its subsidiaries are major providers of group life and health insurance, managed care products and services, retirement products and services, individual financial services, and property and casualty insurance. CIGNA is one of the largest international insurance organizations based in the United States, measured by international revenues, and one of the largest investor-owned health maintenance organizations in the United States, based on the number of members. CIGNA's major insurance subsidiaries, Connecticut General Life Insurance Company ("CG Life") and Insurance Company of North America ("ICNA"), are among the oldest insurance companies in the United States, with ICNA tracing its origins to 1792 and CG Life to 1865. CIGNA Corporation was incorporated in the State of Delaware in 1981.

CIGNA's revenues are derived principally from premiums and fees and investment income. CIGNA conducts its business through the following operating divisions, the financial results of which are reported in the following segments:

Employee Life and Health Benefits Segment (beginning on page 2)

    CIGNA HealthCare

    CIGNA Group Insurance: Life, Accident, Disability

Employee Retirement and Savings Benefits Segment (beginning on page 8)

    CIGNA Retirement & Investment Services

Individual Financial Services Segment (beginning on page 11)

    CIGNA Individual Insurance

    CIGNA Reinsurance

Property and Casualty Segment (beginning on page 15)

    CIGNA Property & Casualty

    CIGNA International

Investment results produced by CIGNA Investment Management on behalf of CIGNA's insurance operations are reported in each segment's results or in Other Operations. The other businesses of CIGNA Investment Management are described on page 32, and financial results for these businesses are reported in Other Operations.

### *Recent Transaction*

On February 27, 1997, CIGNA agreed to conduct a cash tender offer, through CHC Acquisition Corp., an indirect, wholly owned subsidiary of CIGNA, for all of the outstanding shares of Healthsource, Inc. ("Healthsource"). The tender offer was commenced on March 6, 1997, at a price of $21.75 per share. Consummation of the tender offer is subject to, among other things, at least a majority of the shares of Healthsource common stock being tendered and not withdrawn prior to the expiration of the tender offer and the receipt of all applicable regulatory approvals.

LINA 0188704

Healthsource operates health maintenance organizations in 15 states serving approximately 1.1 million members. Healthsource also provides medical and dental indemnity products, primarily self-insured products, which cover approximately 2 million and 2.5 million lives, respectively. In addition, Healthsource offers point of service plans, preferred provider organization plans, utilization review services, managed workers compensation services, pharmacy benefit management services and other managed care consulting and administrative services.

As soon as practicable after the consummation of the tender offer, CIGNA intends to combine Healthsource's operations with its health care operations. The combining of CIGNA's health care operations with those of Healthsource would, among other things, involve consolidating certain operations and reorganizing other businesses and operations.

### B. Financial Information about Industry Segments

All financial information in the tables that follow is presented in conformity with generally accepted accounting principles ("GAAP"), unless otherwise indicated. Certain reclassifications have been made to 1995 and 1994 financial information to conform with the 1996 presentation. Industry rankings and percentages set forth below are for the year ended December 31, 1995, unless otherwise indicated. Unless otherwise noted, statements set forth in this document concerning CIGNA's rank or position in an industry or particular line of business have been developed internally, based on publicly available information.

Revenues, income (loss) before income taxes, and identifiable assets attributable to each of CIGNA's business segments and Other Operations are set forth in Note 17 and those attributable solely to foreign operations are set forth in Note 18 to CIGNA's 1996 Financial Statements included in its 1996 Annual Report to Shareholders ("Annual Report").

### C. Employee Life and Health Benefits

#### Principal Products and Markets

CIGNA's Employee Life and Health Benefits operations offer a wide range of traditional indemnity products and services and are a leading provider of managed care and cost containment products and services.

The following table sets forth the principal products of this segment and their related net earned premiums and fees.

| | Year ended December 31, | | |
|---|---|---|---|
| | 1996 | 1995 | 1994 |
| | | (in millions) | |
| Indemnity: | | | |
| Medical | $1,942 | $1,973 | $1,854 |
| Life | 1,798 | 1,754 | 1,813 |
| Long-term Disability | 426 | 388 | 422 |
| Dental | 397 | 384 | 374 |
| Accidental Death and Dismemberment | 227 | 249 | 253 |
| Short-term Disability | 70 | 86 | 93 |
| Other | 15 | 20 | 17 |
| Total | 4,875 | 4,854 | 4,826 |
| Prepaid Medical and Dental Care | 3,466 | 3,281 | 3,018 |
| Total Premiums and Fees | $8,341 | $8,135 | $7,844 |

Amounts in table do not include "premium equivalents," which are described below.

CIGNA's Employee Life and Health Benefits customers range in size from some of the largest United States corporations to small enterprises, and include employers, multiple employer groups, unions, professional and other associations, government-sponsored Medicare and Medicaid programs, and other groups. Products are marketed in all 50 states, the District of Columbia and Puerto Rico. The segment's products are

LINA 0188705

generally offered through traditional insurance and alternative funding arrangements, and through arrangements that combine features of both.

Under traditional insurance funding arrangements, CIGNA charges a premium and bears the risk for costs incurred. Traditional insurance arrangements may include products offered on a retrospectively experience-rated basis. These are arrangements in which the premium may be increased within limits or decreased based on actual incurred costs of the policyholder over a certain period of time with either additional premium paid to CIGNA or premium returned to the policyholder. Further, traditional insurance arrangements include products offered on a guaranteed-cost basis for which there is no retrospective adjustment for actual incurred claims. Experience-rated business and guaranteed-cost business constituted 92% and 8%, respectively, of CIGNA's traditional insurance business in 1996.

Alternative funding arrangements consist primarily of administrative services only ("ASO") plans and "minimum premium" programs. Under ASO plans, CIGNA provides claims processing, health cost containment services (through its provider networks) or utilization management programs, or a combination of these services, in exchange for an administrative services fee. The plan sponsor is responsible for self-funding all claims, but may purchase stop-loss insurance from CIGNA or other insurers for claims in excess of some predetermined amount in total or for specific types of claims or both. Minimum premium programs combine traditional insurance protection with self-funding. The policyholder self-funds claims up to a predetermined aggregate, maximum amount and CIGNA bears the risk for claims in excess of that amount. Alternative funding programs constituted approximately 55% of business volume (premiums and fees plus premium equivalents) in 1996 and 1995. Premium equivalents generally represent paid claims under ASO and minimum premium plans and are additional premiums that would have been earned premium if they had been written as traditional insurance. Alternative funding programs and their effect on CIGNA's results are more fully described on page 10 of the Management's Discussion and Analysis ("MD&A") section of CIGNA's Annual Report.

*Health Care Products and Services*

Based on premiums, including premium equivalents, health care products are the segment's principal product line. CIGNA provides a wide array of health care products including, indemnity products, medical cost and utilization management products and services and comprehensive managed care products, such as:

- health maintenance organizations ("HMOs");
- preferred provider organizations ("PPOs");
- Medicare programs;
- managed dental programs;
- managed mental health and substance abuse products and services; and
- managed pharmacy programs.

This broad spectrum of products allows CIGNA to satisfy a customer's health benefit needs.

*Indemnity Products.* At one end of the product spectrum, CIGNA offers medical and dental indemnity products. These indemnity products place no restrictions on provider choice. However, because there are no prior arrangements with physicians or hospitals to control unit costs and limited management over the utilization of services, the costs of such products are higher than managed care products. Indemnity products are offered through traditional insurance and alternative funding arrangements.

*Managed Care Products.* On the other end of the product spectrum, CIGNA offers managed care products, including medical, dental and mental health products. Managed care products promote effective, efficient use of health care services by coordinating utilization of care and controlling unit costs through provider contracts. Managed care products are offered on a guaranteed-cost basis (such as commercial HMOs), on an experience-rated basis and through alternative funding programs.

LINA 0188706

*Health Maintenance Organizations.* HMOs are generally the most cost-efficient form of managed care. CIGNA's HMOs include individual practice association ("IPA") models, staff models and mixed models. The relationship between the HMO and the health care providers distinguishes the models. Under an IPA model, the HMO contracts with independent physicians and hospitals to provide services. Some physicians and hospitals receive a monthly fixed fee (capitation) for each HMO member, regardless of the medical services provided to each member, while most others are paid on a contracted fee for service basis. IPAs may cover wide geographic areas with low fixed costs, but must rely on cost-effective contracts with providers and the appropriate utilization management to influence medical costs. In a staff model, physicians and other providers are employees of the HMO, and receive their compensation from the HMO. The HMO either owns or contracts with the medical facilities where the services are performed. Staff models offer a greater opportunity for direct influence over medical costs, quality and service, but require more capital investment. Staff models generally offer lower costs to the consumer, whereas IPAs may offer broader provider choice. Mixed model HMOs offer participants a choice of staff and IPA providers.

The table below shows the number of IPA, staff and mixed model HMOs as of December 31:

|  | 1996 | 1995 | 1994 |
|---|---|---|---|
| IPA Models | 37 | 37 | 37 |
| Staff Models | 3 | 4 | 4 |
| Mixed Models | 5 | 5 | 5 |

As of December 31, 1996, CIGNA's HMO networks included approximately 150,000 physicians and 2,000 hospitals.

To maintain and enhance the quality of health care delivered in its HMOs, CIGNA has initiated the development of standard performance measurements for affiliated physicians, hospitals and other providers. CIGNA is also in the process of seeking accreditation of all of its HMOs by external accrediting agencies as validation of its quality programs. To date, 89% of CIGNA's HMOs have been accredited. The remainder are expected to be accredited in 1997.

CIGNA has also contracted with the federal Health Care Financing Administration ("HCFA") to provide HMO coverage for Medicare beneficiaries. These contracts provide for a fixed per member per month premium from HCFA based upon a formula that calculates the projected cost of services for each Medicare member. These amounts are updated annually, and reflect differences in expected costs by location, age and other factors, which are predictive of medical costs. As required by HCFA, CIGNA uses only providers who are part of its existing HMO networks to provide services to enrolled Medicare members. In addition, CIGNA has one contract with the state of Arizona to provide HMO coverage to Medicaid-eligible individuals.

*Other Managed Care Products.* CIGNA offers managed care dental products through networks of independent providers in most states. CIGNA also provides managed mental health and substance abuse coverage and services to HMOs, insurers and employers through a national network of mental health specialists, some of whom are employees of CIGNA. Further, CIGNA offers managed pharmacy benefit programs to HMO and indemnity customers.

In addition to the indemnity and managed care products, CIGNA also offers products that combine features of both types of products. These products are PPOs and point-of-service plans.

*Preferred Provider Organizations.* CIGNA has arrangements with doctors, hospitals and other independent providers to form PPOs. CIGNA has both medical and dental PPO networks. Under a typical PPO plan, a participant may choose any health care provider, and CIGNA reimburses PPO participants at a higher percentage for the costs of care obtained from contracted providers, who generally charge on a discounted rate basis, than it does for care obtained from non-contracted providers. As of December 31, 1996, 1995 and 1994, CIGNA had 86, 80 and 74 medical PPO networks. CIGNA has one national dental PPO network with approximately 20,000 participating dentists.

4

LINA 0188707

When a medical PPO has a gatekeeper, a contracted primary care physician ("Gatekeeper PPO"), the higher reimbursement level is available only if participants first consult their contracted primary care physician before consulting a contracted specialist. As of December 31, 1996, 1995 and 1994, CIGNA had 34, 29 and 25 Gatekeeper PPO networks.

*Point-of-Service Product.* Point-of-service products permit participants to use CIGNA's network providers where services are received generally for a small, fixed payment (co-pay) or go directly, without a referral, to non-network providers, subject to certain deductibles and coinsurance that are generally less favorable than those offered under traditional indemnity arrangements. Participants in point-of-service plans are considered HMO members for purposes of the table below.

As of December 31, 1996, CIGNA's HMOs and PPOs (including Gatekeeper PPOs) served all or part of 43 states, the District of Columbia and Puerto Rico. CIGNA's managed care and indemnity products covered the following lives for the periods presented. Covered lives includes participants under traditional and alternative funding programs.

| | As of December 31, | | |
|---|---|---|---|
| | 1996 | 1995 | 1994 |
| | Approx. No. of Covered Lives | Approx. No. of Covered Lives | Approx. No. of Covered Lives |
| | (amounts in thousands) | | |
| **Medical Covered Lives** | | | |
| **HMOs:** | | | |
| Guaranteed Cost: | | | |
| Commercial | 1,148 | 1,137 | 1,046 |
| Medicare | 69 | 56 | 44 |
| Medicaid | 52 | 150 | 149 |
| Experience-rated and alternative-funding (including Gatekeeper PPOs) | 3,046 | 2,587 | 2,262 |
| Total HMOs | 4,315 | 3,930 | 3,501 |
| Indemnity: | | | |
| Medical | 3,392 | 3,719 | 4,550 |
| Medical PPO (excluding Gatekeeper PPOs) | 1,178 | 981 | 908 |
| Total Indemnity | 4,570 | 4,700 | 5,458 |
| Total Medical Covered Lives | 8,885 | 8,630 | 8,959 |
| **Dental Covered Lives** | | | |
| Dental Managed Care | 2,548 | 2,290 | 1,993 |
| Dental Indemnity | 7,901 | 8,032 | 8,173 |
| Total Dental Covered Lives | 10,449 | 10,322 | 10,166 |

LINA 0188708