valuation allowance during 2005 relates primarily to the completion of the IRS audit for 2000-2002. The valuation allowance at December 31, 2005 primarily relates to operating losses in the run-off reinsurance operations. The valuation allowance reflects management's assessment as to whether certain deferred tax assets will be realizable. These assessments could be revised in the near term if underlying circumstances change.

Federal operating loss carryforwards in the amount of $349 million were available at December 31, 2005. Subject to statutory limitations, the operating losses are available to offset taxable income subject to statutory limitations and begin to expire in 2020. CIGNA has no unused capital losses as of December 31, 2005.

The American Jobs Creation Act of 2004 suspends, for a two-year period commencing January 1, 2005, the tax liability of stock life insurance companies on distributions from the policyholders' surplus account. CIGNA's principal subsidiary distributed, with regulatory approval, the entire account balance of $450 million to the parent company during 2005 without incurring federal income tax.

CIGNA's federal income tax returns are routinely audited by the Internal Revenue Service (IRS). In management's opinion, adequate tax liabilities, including potential related interest charges should the IRS prevail, have been established to address potential exposures involving tax positions we have taken that may be challenged by the IRS. These liabilities could be revised in the near term if estimates of CIGNA's ultimate liability change as a result of new developments or a change in circumstances.

Deferred income tax assets and liabilities as of December 31 are shown below.

| (In millions) | 2005 | 2004 |
|---|---|---|
| **Deferred tax assets** | | |
| Employee and retiree benefit plans | $ 782 | $1,024 |
| Investments, net | 43 | 128 |
| Other insurance and contractholder liabilities | 249 | 344 |
| Deferred gain on sales of businesses | 146 | 248 |
| Policy acquisition expenses | 116 | 117 |
| Loss carryforwards | 135 | 132 |
| Bad debt expense | 47 | 42 |
| Other | 93 | 82 |
| Deferred tax assets before valuation allowance | 1,611 | 2,117 |
| Valuation allowance for deferred tax assets | (145) | (262) |
| Deferred tax assets, net of valuation allowance | 1,466 | 1,855 |
| **Deferred tax liabilities** | | |
| Depreciation and amortization | 206 | 229 |
| Unrealized appreciation on investments | 118 | 221 |
| Other | 55 | 22 |
| Total deferred tax liabilities | 379 | 472 |
| Net deferred income tax assets | $1,087 | $1,383 |

As of December 31, 2005, current income taxes receivable was $58 million and was included in premiums, accounts and notes receivable in the consolidated balance sheet. As of December 31, 2004, current income taxes payable was $301 million and was included in accounts payable, accrued expenses and other liabilities in the consolidated balance sheet.

The components of income taxes for the years ended December 31 were as follows:

| (In millions) | 2005 | 2004 | 2003 |
|---|---|---|---|
| **Current taxes** | | | |
| U.S. income | $ 73 | $815 | $ 82 |
| Foreign income | 28 | 35 | 7 |
| State income | 22 | 20 | 7 |
| | 123 | 870 | 96 |
| **Deferred taxes (benefits)** | | | |
| U.S. income | 401 | (77) | 164 |
| Foreign income | (11) | 2 | (7) |
| State income | 4 | 3 | 11 |
| | 394 | (72) | 168 |
| Total income taxes | $517 | $798 | $264 |

Total income taxes for the years ended December 31 were different from the amount computed using the nominal federal income tax rate of 35% for the following reasons:

| (In millions) | 2005 | 2004 | 2003 |
|---|---|---|---|
| Tax expense at nominal rate | $628 | $831 | $297 |
| Tax-exempt interest income | (34) | (33) | (30) |
| Dividends received deduction | (12) | (21) | (21) |
| Resolution of Federal Tax Matters | (84) | (31) | — |
| State income tax (net of federal income tax benefit) | 18 | 11 | 12 |
| Change in valuation allowance | 15 | 51 | 5 |
| Other | (14) | (10) | 6 |
| Total income taxes | $517 | $798 | $264 |

LINA 0189585

## Note 17 – Employee Incentive Plans

The People Resources Committee of the Board of Directors awards stock options, restricted stock and deferred stock to certain employees. To a very limited extent, the Committee has issued common stock instead of cash compensation and dividend equivalent rights as part of restricted and deferred stock units. Stock appreciation rights issued with stock options are authorized but have not been issued for several years. Beginning in May 2004, CIGNA began issuing shares from Treasury stock for option exercises, awards of restricted stock and payment of deferred stock units.

*Compensation cost and related tax benefits* for these awards were as follows:

| (In millions) | 2005 | 2004 | 2003 |
|---|---|---|---|
| Compensation cost | $35 | $68 | $69 |
| Tax benefits | $12 | $23 | $24 |

CIGNA had the following number of shares of common stock available for award at December 31: 11.5 million in 2005, 11.7 million in 2004 and 11.3 million in 2003.

*Stock options.* CIGNA awards options to purchase CIGNA common stock at the market price of the stock on the grant date. Options vest over periods ranging from one to five years and expire no later than 10 years after the grant date.

Until June 30, 2004, senior executives were permitted to use shares of CIGNA common or restricted stock in lieu of cash to exercise outstanding options, and CIGNA issued replacement options equal to the number of shares used. Like ordinary options, replacement options were exercisable at the market price of CIGNA common stock on their grant date. Replacement options vested six months after the grant date and expired on the expiration date of the original option.

The table below shows the status of, and changes in, common stock options during the last three years:

| (Options in thousands) | 2005 | | 2004 | | 2003 | |
|---|---|---|---|---|---|---|
| | Options | Weighted Average Exercise Price | Options | Weighted Average Exercise Price | Options | Weighted Average Exercise Price |
| Outstanding—January 1 | 13,692 | $77.66 | 15,782 | $79.51 | 14,354 | $88.71 |
| Granted | 834 | $90.14 | 3,174 | $55.86 | 3,439 | $42.03 |
| Exercised | (4,821) | $70.17 | (1,564) | $50.23 | (136) | $47.53 |
| Expired or canceled | (833) | $82.02 | (3,700) | $78.43 | (1,875) | $83.52 |
| Outstanding—December 31 | 8,872 | $82.49 | 13,692 | $77.66 | 15,782 | $79.51 |
| Options exercisable at year-end | 6,514 | $89.40 | 10,417 | $84.17 | 10,401 | $86.68 |

Compensation expense of $30 million related to unvested stock options at December 31, 2005 will be recognized over the next 2 years (weighted average period).

The table below summarizes information for stock options exercised during the last three years:

| (In millions) | 2005 | 2004 | 2003 |
|---|---|---|---|
| Intrinsic value of options exercised | $148 | $25 | $ 1 |
| Cash received for options exercised | $312 | $64 | $ 6 |
| Excess tax benefits realized from options exercised | $ 18 | $— | $— |

The following table summarizes information for outstanding common stock options at December 31, 2005:

| (In millions, except options in thousands) | Options Outstanding | | Options Exercisable | |
|---|---|---|---|---|
| Number | | 8,872 | | 6,514 |
| Total intrinsic value | $ | 263 | $ | 149 |
| Weighted average exercise price | $ | 82.49 | $ | 89.40 |
| Weighted average remaining contractual life (years) | | 5.9 years | | 5.1 years |

The weighted average fair value of options granted under employee incentive plans was $34.17 for 2005, $19.80 for

2004 and $12.62 for 2003, using the Black-Scholes option-pricing model and the following assumptions:

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| Dividend yield | 0.1% | 0.2% | 1.9% |
| Expected volatility | 35.0% | 47.6% | 44.3% |
| Risk-free interest rate | 3.9% | 2.2% | 1.9% |
| Expected option life | 5.25 years | 3.3 years | 3.5 years |

The expected volatility reflects CIGNA's past daily stock price volatility. CIGNA does not consider volatility implied in the market prices of traded options to be a good indicator of future volatility because remaining maturities of traded options are less than one year. CIGNA developed the expected option life of 2005 grants by considering certain factors, including assumptions used by other companies with comparable stock option plan features and CIGNA's cancellation of a replacement option feature in June 2004. CIGNA developed the expected option life of 2004 and 2003 grants considering CIGNA's experience.

*Restricted stock.* CIGNA makes restricted stock grants with vesting periods ranging from three to six years. Recipients are entitled to receive dividends and to vote during the vesting period, but forfeit their awards if their employment terminates before the vesting date.

LINA 0189586

The table below shows the status of, and changes in, restricted stock grants during the last three years:

| (Grants in thousands) | 2005 | | 2004 | | 2003 | |
|---|---|---|---|---|---|---|
| | Grants | Weighted Average Fair Value at Grant Date | Grants | Weighted Average Fair Value at Grant Date | Grants | Weighted Average Fair Value at Grant Date |
| Outstanding—January 1 | 1,286 | $58.31 | 1,508 | $59.69 | 946 | $90.04 |
| Granted | 337 | $92.79 | 428 | $57.14 | 1,140 | $44.24 |
| Vested | (152) | $86.18 | (154) | $88.06 | (190) | $74.93 |
| Forfeited | (218) | $56.51 | (496) | $52.42 | (388) | $80.71 |
| Outstanding —December 31 | 1,253 | $63.02 | 1,286 | $58.31 | 1,508 | $59.69 |

The grant date fair value of restricted stock vested was: $13 million in 2005 and $14 million in both 2004 and 2003.

At the end of 2005, approximately 2,000 employees held 1.3 million restricted shares with $31 million of related compensation expense to be recognized over the next 4 years (weighted average period).

*Deferred Stock.* CIGNA made deferred stock unit grants with 100% vesting in three to six years, dependent on CIGNA's consolidated earnings per share during this vesting period. Upon meeting the stated performance objectives in 2005, the Board of Directors determined that the vesting period for the deferred stock units would be three years. On vesting, stock issuance is deferred until January of the year following an employee's termination from CIGNA. These awards are generally forfeited if employment terminates before the vesting date. In 2003, 176,000 stock units with a weighted average fair value per unit of $44.22 were awarded. Through 2005, 9,000 units have vested and 14,000 units have been forfeited. As of December 31, 2005, 153,000 unvested units were outstanding with a weighted average fair value per unit of $44.22. Approximately $2 million of compensation cost will be recognized in 2006.

78

LINA 0189587

## Note 18 – Leases and Rentals

Rental expenses for operating leases, principally for office space, amounted to $148 million in 2005, $153 million in 2004 and $155 million in 2003.

As of December 31, 2005, future net minimum rental payments under non-cancelable operating leases were approximately $447 million, payable as follows (in millions): $85 in 2006, $86 in 2007, $58 in 2008, $45 in 2009, $38 in 2010, and $135 thereafter.

## Note 19 – Segment Information

CIGNA's operating segments generally reflect groups of related products, but the International segment is generally based on geography. In accordance with accounting principles generally accepted in the United States of America, operating segments that do not require separate disclosure may be combined. CIGNA measures the financial results of its segments using "segment earnings (loss)," which is defined as income (loss) from continuing operations excluding after-tax realized investment gains and losses.

In 2004, CIGNA completed the sale of its retirement benefits business and also realigned management responsibility for operations that provide case management and related services to workers' compensation insurers and employers who self-fund workers' compensation and disability benefits. To appropriately reflect the impact of these actions, CIGNA changed its segment reporting, and prior periods were reclassified to conform to this presentation:

- the sold retirement benefits business is reported in the Run-off Retirement segment;

- the corporate life insurance business (previously reported in the Retirement segment) was retained and is reported in Other Operations; and

- results from the disability and workers' compensation case management activities (previously reported in the Health Care segment) are included in the Disability and Life segment.

Also in 2004, corporate overhead previously allocated to the sold retirement benefits business was reported in Corporate.

CIGNA presents segment information as follows:

*Health Care* CIGNA's Health Care operations offer insured and self-funded medical, dental, behavioral health, prescription drug and other products and services that integrate to support the delivery of consumerism and health advocacy solutions. These operations also provide disability and life insurance products which were historically sold in connection with certain experience-rated medical products and continue to be managed by CIGNA's health care business.

These products and services are provided by subsidiaries of CIGNA Corporation.

*Disability and Life* includes group:

- disability insurance;

- disability and workers' compensation case management;

- life insurance; and

- accident and specialty association insurance.

*International* includes life, accident and health coverage's in selected markets outside the United States, primarily in Asia and Europe. In addition, CIGNA provides group benefits products to expatriate employees of multinational companies.

*Run-off Retirement* includes:

- gain recognition related to the sale of the retirement benefits business;

- results of modified coinsurance arrangements;

- expenses associated with the run-off of this business; and

- results of the retirement benefits business prior to the April 2004 sale.

*Run-off Reinsurance* consists of the run-off reinsurance business, which includes accident, domestic health, international life and health, and specialty life reinsurance businesses. CIGNA has stopped underwriting new reinsurance business.

CIGNA also reports results in two other categories.

*Other Operations* consist of:

- deferred gains recognized from the 1998 sale of the individual life insurance and annuity business;

- corporate life insurance (including policies on which loans are outstanding);

- settlement annuity business; and

- certain investment management services (a significant portion of which were sold in 2004).

*Corporate* reflects amounts not allocated to segments, such as interest expense on corporate debt, net investment income on unallocated corporate investments, intersegment eliminations, compensation cost for stock options and certain corporate overhead expenses.

CIGNA determines segment earnings (loss) consistent with the accounting policies for the consolidated financial statements, except that amounts included in Corporate are not allocated to segments. CIGNA allocates other corporate general, administrative and systems expenses on systematic bases. Income taxes are generally computed as if each segment were filing a separate income tax return.

LINA 0189588

Summarized segment financial information for the years ended and as of December 31 was as follows:

| (In millions) | 2005 | 2004 | 2003 |
|---|---|---|---|
| **Health Care** | | | |
| Premiums and fees and other revenues | $11,268 | $11,895 | $13,213 |
| Net investment income | 275 | 283 | 283 |
| Segment revenues | $11,543 | $12,178 | $13,496 |
| Income taxes | $ 361 | $ 425 | $ 222 |
| Segment earnings | $ 688 | $ 763 | $ 429 |
| **Disability and Life** | | | |
| Premiums and fees and other revenues | $ 2,263 | $ 2,125 | $ 2,004 |
| Net investment income | 264 | 253 | 250 |
| Segment revenues | $ 2,527 | $ 2,378 | $ 2,254 |
| Income taxes | $ 92 | $ 71 | $ 56 |
| Segment earnings | $ 227 | $ 182 | $ 155 |
| **International** | | | |
| Premiums and fees and other revenues | $ 1,239 | $ 1,031 | $ 866 |
| Net investment income | 71 | 58 | 49 |
| Segment revenues | $ 1,310 | $ 1,089 | $ 915 |
| Income taxes | $ 46 | $ 42 | $ 30 |
| Equity in loss of investees | $ (1) | $ (1) | $ (4) |
| Segment earnings | $ 109 | $ 76 | $ 55 |
| **Run-off Retirement** | | | |
| Premiums and fees and other revenues | $ 350 | $ 777 | $ 145 |
| Net investment income | 144 | 467 | 1,413 |
| Segment revenues | $ 494 | $ 1,244 | $ 1,558 |
| Income taxes | $ 105 | $ 134 | $ 98 |
| Segment earnings | $ 209 | $ 282 | $ 222 |
| **Run-off Reinsurance** | | | |
| Premiums and fees and other revenues | $ 44 | $ (82) | $ (467) |
| Net investment income | 99 | 92 | 82 |
| Segment revenues | $ 143 | $ 10 | $ (385) |
| Income taxes (benefits) | $ (12) | $ 7 | $ (181) |
| Segment loss | $ (64) | $ (115) | $ (359) |

| (In millions) | 2005 | 2004 | 2003 |
|---|---|---|---|
| **Other Operations** | | | |
| Premiums and fees and other revenues | $ 216 | $ 297 | $ 375 |
| Net investment income | 465 | 475 | 517 |
| Segment revenues | $ 681 | $ 772 | $ 892 |
| Income taxes | $ 39 | $ 71 | $ 61 |
| Segment earnings | $ 130 | $ 142 | $ 111 |
| **Corporate** | | | |
| Other revenues and eliminations | $ (48) | $ (33) | $ (73) |
| Net investment income | 41 | 15 | — |
| Segment revenues | $ (7) | $ (18) | $ (73) |
| Income tax benefits | $ (118) | $ (114) | $ (75) |
| Segment loss | $ (12) | $ (114) | $ (127) |
| **Realized Investment Gains** | | | |
| Realized investment gains (losses) | $ (7) | $ 523 | $ 151 |
| Income taxes | 4 | 162 | 53 |
| Realized investment gains (losses), net of taxes (benefits) | $ (11) | $ 361 | $ 98 |
| **Total** | | | |
| Premiums and fees and other revenues | $15,332 | $16,010 | $16,063 |
| Net investment income | 1,359 | 1,643 | 2,594 |
| Realized investment gains (losses) | (7) | 523 | 151 |
| Total revenues | $16,684 | $18,176 | $18,808 |
| Income taxes | $ 517 | $ 798 | $ 264 |
| Segment earnings | $ 1,287 | $ 1,216 | $ 486 |
| Realized investment gains (losses), net of taxes (benefits) | (11) | 361 | 98 |
| Income from continuing operations | $ 1,276 | $ 1,577 | $ 584 |

Premiums and fees and other revenues by product type were as follows for the years ended December 31:

| (In millions) | 2005 | 2004 | 2003 |
|---|---|---|---|
| Medical | $10,344 | $10,853 | $12,075 |
| Disability | 709 | 653 | 574 |
| Life, Accident and Health | 2,432 | 2,311 | 2,303 |
| Other | 1,847 | 2,193 | 1,111 |
| Total | $15,332 | $16,010 | $16,063 |

LINA 0189589

## Note 20 – Contingencies

### A. Financial Guarantees Primarily Associated with the Retirement Benefits Business

CIGNA, through its subsidiaries, is contingently liable for various financial guarantees provided in the ordinary course of business.

Separate account assets, primarily associated with the sold retirement benefits business, are contractholder funds maintained in accounts with specific investment objectives. CIGNA records separate account liabilities equal to separate account assets. In certain cases, CIGNA guarantees a minimum level of benefits for retirement and insurance contracts written in separate accounts. CIGNA establishes an additional liability if management believes that CIGNA will be required to make a payment under these guarantees. Except as noted below, these guarantees are fully reinsured by an affiliate of the buyer of the retirement benefits business:

- CIGNA guarantees that separate account assets will be sufficient to pay certain retiree or life benefits. The sponsoring employers are primarily responsible for ensuring that assets are sufficient to pay these benefits and are required to maintain assets that exceed a certain percentage of benefit obligations. This percentage varies depending on the asset class within a sponsoring employer's portfolio (for example, a bond fund would require a lower percentage than a riskier equity fund) and thus will vary as the composition of the portfolio changes. If employers do not maintain the required levels of separate account assets, CIGNA or an affiliate of the buyer has the right to redirect the management of the related assets to provide for benefit payments. As of December 31, 2005, employers maintained assets that exceeded the benefit obligations. Benefit obligations under these arrangements were $2.1 billion as of December 31, 2005. As of December 31, 2005 approximately 80% of these guarantees are reinsured by an affiliate of the buyer of the retirement benefits business. There were no additional liabilities required for these guarantees as of December 31, 2005.

- CIGNA guarantees that separate account assets, primarily fixed income investments, will be sufficient to pay retiree benefits for participants under a certain group annuity contract. These guarantees are fully reinsured by an affiliate of the buyer of the retirement benefits business. These guaranteed benefit obligations were $30 million as of December 31, 2005. CIGNA had no additional liabilities for these guarantees as of December 31, 2005.

### B. Other Financial Guarantees

CIGNA had indemnification obligations to lenders of up to $336 million as of December 31, 2005 related to borrowings by certain real estate joint ventures which CIGNA either records as an investment or consolidates. These borrowings, which are nonrecourse to CIGNA, are secured by the joint ventures' real estate properties with fair values in excess of the loan amounts and mature at various dates from 2006 to 2017. CIGNA's indemnification obligations would require payment to lenders for any actual damages resulting from certain acts such as unauthorized ownership transfers, misappropriation of rental payments by others or environmental damages. Based on initial and ongoing reviews of property management and operations, CIGNA does not expect that payments will be required under these indemnification obligations. Any payments that might be required could be recovered through a refinancing or sale of the assets. In some cases, CIGNA also has recourse to partners for their proportionate share of amounts paid. There were no liabilities required for these indemnification obligations as of December 31, 2005.

To enhance investment returns, CIGNA guaranteed principal payments for groups of primarily investment grade corporate debt issuers by entering into Dow Jones indexed credit default swaps with notional amounts of $290 million as of December 31, 2005. Under these contracts, CIGNA receives periodic fees to provide future payment if an issuer of an underlying corporate bond defaults on scheduled payments or files for bankruptcy through 2010. If a default or bankruptcy occurs, CIGNA will make payment for par value of the underlying corporate bond and may subsequently sell or hold that bond as an invested asset. CIGNA has recorded liabilities of less than $1 million for the fair value of these indexed credit default swaps as of December 31, 2005.

As of December 31, 2005 CIGNA guaranteed that it would compensate the lessor for a shortfall of up to $49 million in the market value of leased equipment at the end of the lease. Guarantees of $21 million expire in 2006 and $28 million expire in 2012. CIGNA had additional liabilities for these guarantees of $2 million as of December 31, 2005.

CIGNA guaranteed construction loans of $23 million as of December 31, 2005 related to real estate joint venture investments. The loans are secured by joint venture real estate property with fair values in excess of the loan amounts and mature by 2008, including extension options. CIGNA would be required to repay the construction loans if permanent financing could not be obtained. There were no liabilities required for these guarantees as of December 31, 2005.

CIGNA had indemnification obligations as of December 31, 2005, in connection with acquisition and disposition transactions. These indemnification obligations are triggered by the breach of representations or covenants provided by CIGNA, such as representations for the presentation of financial statements, the filing of tax returns, compliance with law or the identification of outstanding litigation. These obligations are typically subject to various time limitations, defined by the contract or by operation of law, such as statutes of limitation. In some cases, the maximum potential amount due is subject to contractual limitations based on a percentage of the transaction purchase price, while in other cases limitations are not specified or applicable. CIGNA does not believe that it is possible to determine the maximum

LINA 0189590

potential amount due under these guarantees, since not all amounts due under these indemnification obligations are subject to limitation. As of December 31, 2005, aggregate liabilities for these obligations were less than $5 million.

CIGNA does not expect that these guarantees will have a material adverse effect on CIGNA's consolidated results of operations, liquidity or financial condition.

## C. Guaranteed Minimum Income Benefit Contracts

CIGNA's reinsurance operations, which were discontinued in 2000 and are now an inactive business in run-off mode, reinsured variable annuity contracts that provide annuitants with certain guarantees related to minimum income benefits. When annuitants elect to receive these minimum income benefits, CIGNA may be required to make payments based on changes in underlying mutual fund values and interest rates.

CIGNA estimates the fair value of the assets and liabilities associated with these contracts using assumptions as to market returns and volatility of the underlying equity and bond mutual fund investments, interest rates, mortality, lapse, credit risk and annuity election rates.

Interest rates include both (a) the liability discount rate assumption and (b) the projected interest rates used to calculate the reinsured income benefit at the time of annuitization. Lapse refers to the full surrender of an annuity prior to annuitization of the policy. Credit risk refers to the ability of reinsurers to pay (see below). Annuity election rates refer to the proportion of annuitants who elect to receive their income benefit as an annuity.

CIGNA regularly evaluates the assumptions used in establishing these assets and liabilities and changes its estimates if actual experience or other evidence suggests that earlier assumptions should be revised. If actual experience differs from the assumptions and other considerations used in estimating these assets and liabilities, the resulting change could have a material adverse effect on CIGNA's consolidated results of operations, and in certain situations, could have a material adverse effect on CIGNA's financial condition.

During 2005, CIGNA completed its normal review of assumptions and recorded an after-tax charge of $9 million ($14 million pre-tax). This charge primarily reflects updates to the lapse assumption. See page 9 for the effects of hypothetical changes in assumptions for guaranteed minimum benefit contracts.

The following provides information about the assumptions used in calculating the assets and liabilities for guaranteed minimum income benefits:

- These liabilities represent estimates of the present value of net amounts expected to be paid, less the present value of net future premiums expected to be received. Included in net amounts expected to be paid is the excess of the expected value of the income benefits over the values of

the annuitant's accounts at the time of annuitization. The assets associated with these contracts represent receivables in connection with reinsurance that CIGNA has purchased from third parties (see below).

- The market return assumption is 8-12% varying by equity fund type; 6-9% varying by bond fund type; and 5-6% for money market funds.

- The volatility assumption is 14-24%, varying by equity fund type; 6-7%, varying by bond fund type; and 2-3% for money market funds.

- The discount rate is 5.75%.

- The projected interest rate used to calculate the reinsured income benefits at the time of annuitization varies by economic scenario, reflects interest rates as of the valuation date, and has a long-term mean rate of 5-6% and a standard deviation of 12-13%.

- The mortality assumption is 70% of the 1994 Group Annuity Mortality table, with 1% annual improvement beginning January 1, 2000.

- The lapse rate assumption is 3-12%, depending on policy duration.

- The annuity election rate assumption is that no more than 5% of the policies eligible to annuitize their variable annuity contracts will do so each year.

CIGNA is required to disclose the maximum potential undiscounted future payments for guarantees related to minimum income benefits using hypothetical adverse assumptions, defined as follows:

- No annuitants surrendered their accounts; and

- All annuitants lived to elect their benefit; and

- All annuitants elected to receive their benefit on the first available date (beginning in 2006 through 2014); and

- All underlying mutual fund investment values remained a the December 31, 2005 value of $3.3 billion, with no future returns.

The maximum potential undiscounted payments that CIGN/ would make under those assumptions would aggregate to $1. billion before reinsurance recoveries. CIGNA believes the likelihood of such payment is remote and CIGNA expects the amount of actual payments to be significantly less than this hypothetical undiscounted aggregate amount. CIGNA has purchased reinsurance from third parties which covers 55% c the exposures on these contracts.

As of December 31, 2005, CIGNA had liabilities of $88 millio related to these contracts and net amounts recoverable from reinsurers of $48 million. CIGNA had an additional liability o $49 million associated with the cost of reinsurance as of December 31, 2005. As of December 31, 2004, CIGNA had liabilities of $71 million related to these contracts and

LINA 0189591

amounts recoverable from reinsurers of $39 million. CIGNA also had an additional liability of $41 million associated with the cost of reinsurance as of December 31, 2004.

See Note 10(G) to the Financial Statements for further information.

### D. Regulatory and Industry Developments

*Employee benefits regulation.* The business of administering and insuring employee benefit programs, particularly health care programs, is heavily regulated by federal and state laws and administrative agencies, such as state departments of insurance and the federal Departments of Labor and Justice, as well as the courts. Regulation and judicial decisions have resulted in changes to industry and CIGNA's business practices and will continue to do so in the future. In addition, CIGNA's subsidiaries are routinely involved with various claims, lawsuits and regulatory audits and investigations that could result in financial liability, changes in business practices, or both. Health care regulation in its various forms could have an adverse effect on CIGNA's health care operations if it inhibits CIGNA's ability to respond to market demands or results in increased medical or administrative costs without improving the quality of care or services.

Other possible regulatory changes that could have an adverse effect on CIGNA's employee benefits businesses include:

- additional mandated benefits or services that increase costs;

- legislation that would grant plan participants broader rights to sue their health plans;

- changes in ERISA regulations resulting in increased application of varying state laws to benefit plan administration, thus increasing administrative burdens and costs;

- additional restrictions on the use of prescription drug formularies;

- additional privacy legislation and regulations that interfere with the proper use of medical information for research, coordination of medical care and disease and disability management;

- additional variations among state laws mandating the time periods and administrative processes for payment of health care provider claims;

- legislation that would exempt independent physicians from antitrust laws; and

- changes in federal laws, such as amendments to income tax laws, which would affect the taxation of employer provided benefits, and pension legislation, which could increase pension cost.

The employee benefits industry remains under scrutiny by various state and federal government agencies and could be subject to government efforts to bring criminal actions in circumstances that could previously have given rise only to civil or administrative proceedings.

*Tax benefits for corporate life insurance.* Federal legislation in 1996 eliminated on a prospective basis the tax deductibility of policy loan interest for most leveraged corporate life insurance products, and an IRS initiative in 2001 encouraged policyholders to settle tax disputes regarding these products. As a result, some customers have surrendered their policies and management expects earnings associated with these products to continue to decline.

*Insurance-related assessments.* Many states maintain funds to pay for the operating expenses of insurance regulatory agencies and pay the obligations of insolvent insurance companies. Regulators finance these funds by imposing assessments against insurance companies operating in the state. In some states, insurance companies can recover a portion of these assessments through reduced premium taxes.

CIGNA's insurance and HMO subsidiaries have recorded $20 million in liabilities and $10 million in assets for insolvency fund and other insurance-related assessments.

*Concentration of risk.* CIGNA's products in its International segment include coverages for employees and individuals who may be exposed to acts of terrorism, the events of a war zone or natural disasters. These risks could result in a concentration of loss if a single adverse event affected many covered individuals and, in certain situations, could lead to losses that could be material to earnings for the International segment and to CIGNA's consolidated results.

South Korea represents the single largest geographic market for CIGNA's international businesses. In 2005, South Korea generated 27% of International's revenues and 41% of its segment earnings. International's business in South Korea would be vulnerable to adverse consumer credit conditions in that country. In addition, geopolitical and economic events in South Korea could have a significant impact on the International segment.

### E. Litigation and Other Legal Matters

In 2004, a Florida federal court handling multi-district health care litigation against CIGNA and several health care industry competitors approved a settlement agreement between the physician class and CIGNA. A dispute with a representative of certain physicians over administration of the settlement with the physician class is likely to be resolved in mid 2006. In April 2005, the court approved a settlement between CIGNA and the remaining plaintiffs, a class of non-physician health care professionals.

In 2003, CIGNA recorded an after-tax charge of $37 million ($57 million pre-tax) to increase the reserve for this health care litigation. CIGNA had previously recognized an after-tax charge of $50 million ($77 million pre-tax) in 2002 for expected costs associated with the multi-district litigation. The reserve reflects insurance recoveries.

LINA 0189592

Various regulators, including the New York and Connecticut Attorneys General and the Florida Insurance Department, have been investigating insurance broker compensation. Some regulators have brought suit against certain insurance brokers, including Universal Life Resources (ULR), alleging, among other things, that these brokers sought rigged bids from, and steered business to, insurers with whom they had contingent compensation arrangements. CIGNA and some of its subsidiaries are included in one such lawsuit seeking injunctive relief against these types of contingent compensation arrangements. CIGNA is also providing information about ULR in connection with an investigation by the U.S. Attorney's Office for the Southern District of California. In addition, CIGNA is providing information about another broker in connection with an investigation by the U.S. Department of Labor. CIGNA is cooperating with the inquiries and investigations by regulators and the U.S. Attorney's Office. Separately, several purported class action lawsuits have been filed against brokers and insurance companies, including CIGNA and certain of its subsidiaries, asserting that contingent commissions are unlawful. These suits are now in a multi-district litigation proceeding in federal court in New Jersey. CIGNA disagrees with the assertions against it in the lawsuits.

In 2004, the New York Attorney General commenced a lawsuit against Express Scripts, Inc. and two CIGNA insurance companies. Under an agreement with the CIGNA companies, Express Scripts is responsible for administering the prescription drug benefit program under New York State's principal employee health plan, the Empire Plan. The CIGNA companies insured the prescription drug benefit program and held the contract with the New York State Department of Civil Service. The complaint primarily focuses on administration of the prescription drug benefit program.

A purported class action lawsuit and a shareholder derivative lawsuit against CIGNA and certain of its senior officers and directors allege securities law violations and breach of fiduciary duty. These suits originated in 2002.

Plaintiffs representing CIGNA Pension Plan participants who earned certain Plan benefits prior to 1998 filed a class action lawsuit against CIGNA and the CIGNA Pension Plan. The plaintiffs allege, among other things, that the Plan violated ERISA by impermissibly conditioning certain post-1997 benefit accruals on the amount of pre-1998 benefit accruals, that these conditions are not adequately disclosed to Plan participants, and that the Plan's cash balance formula discriminates against older employees.

See "Uncover and other run-off reinsurance" on page 64 for a description of legal matters arising out of the run-off reinsurance operations.

CIGNA is routinely involved in numerous claims, lawsuits, regulatory audits, investigations and other legal matters arising, for the most part, in the ordinary course of the business of administering and insuring employee benefit programs. An increasing number of claims are being made for substantial non-economic, extra-contractual or punitive damages. The outcome of litigation and other legal matters is always uncertain, and outcomes that are not justified by the evidence can occur. CIGNA believes that it has valid defenses to the legal matters pending against it and is defending itself vigorously. Nevertheless, it is possible that resolution of one or more of the legal matters currently pending or threatened could result in losses material to CIGNA's consolidated results of operations, liquidity or financial condition.

LINA 0189593

## Management's Annual Report on Internal Control over Financial Reporting

Management of CIGNA Corporation ("the company") is responsible for establishing and maintaining adequate internal control over financial reporting. The company's internal control system was designed to provide reasonable assurance to the company's management and board of directors regarding the preparation and fair presentation of published financial statements. The company's internal control over financial reporting includes those policies and procedures that:

(i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets and liabilities of the company;

(ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and

(iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements.

Management assessed the effectiveness of the company's internal control over financial reporting as of December 31, 2005. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in *Internal Control—Integrated Framework*. Based on Management's assessment, we determined that the company's internal control over financial reporting is effective as of December 31, 2005 based upon those criteria set forth by COSO.

Management's assessment of the effectiveness of the company's internal control over financial reporting, as of December 31, 2005 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which appears herein.

LINA 0189594

**Report of Independent Registered Public Accounting Firm**



**To the Board of Directors
and Shareholders of CIGNA Corporation**

We have completed integrated audits of CIGNA Corporation's 2005 and 2004 consolidated financial statements and of its internal control over financial reporting as of December 31, 2005 and an audit of its 2003 consolidated financial statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Our opinions, based on our audits, are presented below.

**Consolidated financial statements**

In our opinion, the accompanying consolidated balance sheets and the related consolidated statement of income, comprehensive income and changes in shareholders' equity and cash flows presents fairly, in all material respects, the financial position of CIGNA Corporation and its subsidiaries ("the Company") at December 31, 2005 and December 31, 2004, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2005 in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit of financial statements includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

**Internal control over financial reporting**

Also, in our opinion, management's assessment, included in the accompanying *Management's Report on Internal Control Over Financial Reporting*, that the Company maintained effective internal control over financial reporting as of December 31, 2005 based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), is fairly stated, in all material respects, based on those criteria. Furthermore, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2005, based on criteria established in *Internal Control – Integrated Framework* issued by the COSO. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express opinions on management's assessment and on the effectiveness of the Company's internal control over financial reporting based on our audit. We conducted our audit of internal control over financial reporting in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. An audit of internal control over financial reporting includes obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we consider necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

*PricewaterhouseCoopers L L P*

Philadelphia, Pennsylvania
February 22, 2006

86

LINA 0189595

**Quarterly Financial Data** *(unaudited)*

The following unaudited quarterly financial data is presented on a consolidated basis for each of the years ended December 31, 2005 and 2004.

Quarterly financial results necessarily rely heavily on estimates. This and certain other factors, such as the seasonal nature of portions of the insurance business, suggest the need to exercise caution in drawing specific conclusions from quarterly consolidated results.

| *(In millions, except per share amounts)* | Three Months Ended | | | |
|---|---|---|---|---|
| | March 31 | June 30 | Sept. 30 | Dec. 31 |
| **Consolidated Results** | | | | |
| **2005** | | | | |
| Total revenues | $4,345 | $ 4,107 | $ 4,022 | $ 4,210 |
| Income from continuing operations before income taxes | 665 | 437 | 383 | 308 |
| Net income | 436[1] | 720[2] | 259[3] | 210[4] |
| Net income per share: | | | | |
| Basic | 3.34 | 5.58 | 2.04 | 1.71 |
| Diluted | 3.28 | 5.48 | 2.00 | 1.67 |
| **2004** | | | | |
| Total revenues | $4,722 | $ 4,633 | $ 4,479 | $ 4,342 |
| Income from continuing operations before income taxes | 312 | 759 | 495 | 809 |
| Income before cumulative effect of accounting change | 207 | 504 | 308 | 558 |
| Net income | 68[5] | 504 | 308[6] | 558[7] |
| Earnings per share from income before cumulative effect of accounting change: | | | | |
| Basic | 1.48 | 3.63 | 2.28 | 4.22 |
| Diluted | 1.47 | 3.59 | 2.26 | 4.16 |
| **Stock and Dividend Data** | | | | |
| **2005** | | | | |
| Price range of common stock — high | $92.74 | $109.45 | $118.24 | $119.82 |
| — low | $78.11 | $ 85.64 | $102.82 | $105.10 |
| Dividends declared per common share | $ .025 | $ .025 | $ .025 | $ .025 |
| **2004** | | | | |
| Price range of common stock — high | $63.96 | $ 70.54 | $ 70.40 | $ 82.80 |
| — low | $52.90 | $ 58.82 | $ 58.93 | $ 58.15 |
| Dividends declared per common share | $ .33 | $ .025 | $ .025 | $ .025 |

[1] *The first quarter of 2005 includes an after-tax gain of $169 million related to the accelerated recognition of a portion of the deferred gain on the sale of the retirement benefits business, an after-tax cost reduction charge of $33 million related to CIGNA's first quarter 2005 program and an after-tax charge of $8 million for amounts associated with a modified coinsurance arrangement.*

[2] *The second quarter of 2005 includes an after-tax gain of $29 million related to the accelerated recognition of a portion of the deferred gain on the sale of the retirement benefits business and an after-tax benefit of $430 million related to an IRS settlement. See Note 16 for additional information.*

[3] *The third quarter of 2005 includes an after-tax gain of $2 million related to the accelerated recognition of a portion of the deferred gain on the sale of the retirement benefits business and an after-tax benefit of $7 million related to an IRS settlement.*

[4] *The fourth quarter of 2005 reflects an after-tax gain of $4 million related to the accelerated recognition of a portion of the deferred gain on the sale of the retirement benefits business.*

[5] *The first quarter of 2004 includes an after-tax restructuring charge of $49 million related to CIGNA's operational effectiveness review and an after-tax charge of $11 million related to the accounting for SOP 03-1. See Note 2 to the Financial Statements for additional information.*

[6] *The third quarter of 2004 includes an after-tax gain of $79 million related to the accelerated recognition of a portion of the deferred gain on the sale of the retirement benefits business and an after-tax charge of $9 million related to derivative accounting associated with the modified coinsurance arrangements resulting from the sale of the retirement benefits business.*

[7] *The fourth quarter of 2004 includes an after-tax gain of $141 million related to the accelerated recognition of a portion of the deferred gain on the sale of the retirement benefits business, an after-tax charge of $16 million for amounts associated with a modified coinsurance arrangement, an after-tax benefit of $28 million for a federal tax refund and an after-tax gain of $12 million on the sale of a significant portion of CIGNA's investment advisory businesses.*

LINA 0189596

## Supplementary Financial Information

| (In millions) | 2005 | 2004 | 2003 |
|---|---|---|---|
| For the years ended December 31, | | | |
| **Revenues from Continuing Operations** | | | |
| **Health Care** | | | |
| Premiums and fees: | $ 2,646 | $ 3,191 | $ 4,060 |
| Commercial HMO | 2,836 | 2,937 | 3,216 |
| Experience-rated medical | 899 | 888 | 944 |
| Dental | 286 | 286 | 450 |
| Medicare and Medicaid | 1,389 | 1,177 | 895 |
| Other Medical | 399 | 496 | 638 |
| Life and other non-medical | 1,722 | 1,893 | 2,081 |
| Fees | | | |
| Total premiums and fees | 10,177 | 10,868 | 12,284 |
| Net investment income | 275 | 283 | 283 |
| Other revenues | 1,091 | 1,027 | 929 |
| Realized investment gains | 1 | 22 | 68 |
| Total | 11,544 | 12,200 | 13,564 |
| **Disability and Life** | | | |
| Premiums and fees | 2,065 | 1,923 | 1,807 |
| Net investment income | 264 | 253 | 250 |
| Other revenues | 198 | 202 | 197 |
| Realized investment gains (losses) | (3) | 28 | 59 |
| Total | 2,524 | 2,406 | 2,313 |
| **International** | | | |
| Premiums and fees | 1,243 | 1,026 | 855 |
| Net investment income | 71 | 58 | 49 |
| Other revenues | (4) | 5 | 15 |
| Realized investment gains | — | 2 | 1 |
| Total | 1,310 | 1,091 | 920 |
| **Run-off Retirement** | | | |
| Premiums and fees | 2 | 215 | 272 |
| Net investment income | 144 | 467 | 1,412 |
| Other revenues | 348 | 562 | (128) |
| Realized investment gains | 7 | 448 | 44 |
| Total | 501 | 1,692 | 1,600 |
| **Run-off Reinsurance** | | | |
| Premiums and fees | 92 | 80 | 86 |
| Net investment income | 99 | 92 | 87 |
| Other revenues | (48) | (162) | (557) |
| Realized investment gains (losses) | (3) | 1 | 26 |
| Total | 140 | 11 | (361) |
| **Other Operations** | | | |
| Premiums and fees | 116 | 124 | 151 |
| Net investment income | 465 | 475 | 573 |
| Other revenues | 100 | 173 | 25 |
| Realized investment gains (losses) | (9) | 22 | (6) |
| Total | 672 | 794 | 837 |
| **Corporate** | | | |
| Net investment income | 41 | 15 | 17 |
| Other revenues and eliminations | (48) | (33) | (6) |
| Total | (7) | (18) | (6) |
| **Total Consolidated Revenues from Continuing Operations** | | | |
| Premiums and fees | 13,695 | 14,236 | 15,415 |
| Net investment income | 1,359 | 1,643 | 2,522 |
| Other revenues | 1,637 | 1,774 | 622 |
| Realized investment gains (losses) | (7) | 523 | 192 |
| Total | $16,684 | $18,176 | $18,851 |

LINA 0189597

*(In millions)*

| For the years ended December 31, | 2005 | 2004 | 2003 |
|---|---|---|---|
| **Segment Earnings (Loss)**[1] | | | |
| Health Care | $ **688** | $ 763 | $ 429 |
| Disability and Life | **227** | 182 | 155 |
| International | **109** | 76 | 55 |
| Run-off Retirement | **209** | 282 | 222 |
| Run-off Reinsurance | **(64)** | (115) | (359) |
| Other Operations | **130** | 142 | 111 |
| Corporate | **(12)** | (114) | (127) |
| Total | $ **1,287** | $ 1,216 | $ 486 |
| **Income (Loss) from Continuing Operations** | | | |
| Health Care | $ **689** | $ 778 | $ 473 |
| Disability and Life | **223** | 202 | 194 |
| International | **109** | 77 | 60 |
| Run-off Retirement | **214** | 578 | 254 |
| Run-off Reinsurance | **(66)** | (110) | (346) |
| Other Operations | **119** | 166 | 76 |
| Corporate | **(12)** | (114) | (127) |
| Total | $ **1,276** | $ 1,577 | $ 584 |
| **Segment Statistics** | | | |
| **Health Care** | | | |
| Estimated covered lives *(in thousands):* | | | |
| Guaranteed cost: | | | |
| Commercial HMO | **813** | 900 | 1,332 |
| Medicare and Medicaid | **32** | 33 | 42 |
| Other | **214** | 56 | 74 |
| Total guaranteed cost | **1,059** | 989 | 1,448 |
| Experience-rated | **1,129** | 1,257 | 1,420 |
| Service | **6,902** | 7,455 | 8,667 |
| Total medical membership | **9,090** | 9,701 | 11,535 |
| Dental[2] | **10,516** | 10,747 | 12,149 |
| Behavioral care[2] | **15,642** | 14,334 | 14,189 |
| Pharmacy[2] | **7,345** | 7,429 | 8,993 |

[1] Segment earnings (loss) is defined as income (loss) from continuing operations excluding after-tax realized investment gains and losses.

[2] Reflects members enrolled in CIGNA's dental, behavioral care or managed pharmacy programs, which provide access to services through a nationwide network. These members may also be medical members, or they may have stand-alone dental, behavioral care or pharmacy coverage.

LINA 0189598

**Corporate and
Board of Directors Information**

## BOARD OF DIRECTORS

H. EDWARD HANWAY
*Chairman, President
and Chief Executive Officer
CIGNA Corporation*

ROBERT H. CAMPBELL
*Retired Chairman and
Chief Executive Officer
Sunoco, Inc., a domestic refiner
and marketer of petroleum products*

ISAIAH HARRIS, JR.
*President, Bell South Advertising
and Publishing Group, a provider
of communications services*

JANE E. HENNEY, M.D.
*Senior Vice President and Provost,
Health Affairs
University of Cincinnati Academic
Health Center, an educational institution*

PETER N. LARSON
*Retired Chairman of the Board
and Chief Executive Officer
Brunswick Corporation, a producer
of recreational consumer products*

ROMAN MARTINEZ IV
*Private Investor*

LOUIS W. SULLIVAN, M.D.
*President Emeritus
Morehouse School of Medicine,
an educational institution*

HAROLD A. WAGNER
*Non-Executive Chairman
Agere Systems Inc., a provider of
communication components*

CAROL COX WAIT
*President
Boggs, Atkinson, Inc.,
a real estate company*

DONNA F. ZARCONE
*President and Chief Operating Officer
Harley-Davidson Financial Services,
a provider of wholesale and retail
financing, insurance and credit card
programs to Harley-Davidson dealers
and riders*

WILLIAM D. ZOLLARS
*Chairman, President and
Chief Executive Officer
YRC Worldwide Inc. (formerly Yellow
Roadway Corporation), a holding
company whose subsidiaries provide
regional, national and international
transportation and related services*

## STANDING BOARD COMMITTEES

### Executive Committee

H. EDWARD HANWAY, *Chairman*
ROBERT H. CAMPBELL
PETER N. LARSON
HAROLD A. WAGNER
CAROL COX WAIT

### Audit Committee

ROBERT H. CAMPBELL, *Chairman*
JANE E. HENNEY, M.D.
PETER N. LARSON
ROMAN MARTINEZ IV
CAROL COX WAIT
DONNA F. ZARCONE

### Corporate Governance Committee

CAROL COX WAIT, *Chairman*
ROBERT H. CAMPBELL
ISAIAH HARRIS, JR.
JANE E. HENNEY, M.D.
LOUIS W. SULLIVAN, M.D.

### Finance Committee

PETER N. LARSON, *Chairman*
ROMAN MARTINEZ IV
HAROLD A. WAGNER
DONNA F. ZARCONE
WILLIAM D. ZOLLARS

### People Resources Committee

HAROLD A. WAGNER, *Chairman*
ISAIAH HARRIS, JR.
LOUIS W. SULLIVAN, M.D
WILLIAM D. ZOLLARS

## EXECUTIVE OFFICERS

H. EDWARD HANWAY
*Chairman, President
and Chief Executive Officer
CIGNA Corporation*

MICHAEL W. BELL
*Executive Vice President and
Chief Financial Officer
CIGNA Corporation*

DAVID M. CORDANI
*President, CIGNA HealthCare*

PAUL E. HARTLEY
*President, CIGNA International*

JOHN M. MURABITO
*Executive Vice President
Human Resources and Services
CIGNA Corporation*

KAREN S. ROHAN
*President, CIGNA Group Insurance and
President, CIGNA Dental & Vision Care*

90

LINA 0189599

JUDITH E. SOLTZ
*Executive Vice President*
*and General Counsel*
*CIGNA Corporation*

SCOTT A. STORRER
*Executive Vice President*
*CIGNA Service Operations and*
*Information Technology*

## Other Officers

JOHN CANNON, III
*Senior Vice President*
*Associate General Counsel*
*CIGNA Corporation*

ANNMARIE T. HAGAN
*Vice President and*
*Chief Accounting Officer*
*CIGNA Corporation*

MORDECAI SCHWARTZ
*Vice President and Treasurer*
*CIGNA Corporation*

CAROL J. WARD
*Corporate Secretary and*
*Compliance Officer*
*CIGNA Corporation*

## Chairman Emeritus

WILSON H. TAYLOR

## Annual Meeting

The 2006 annual meeting of shareholders will be held on Wednesday, April 26, at 3:30 p.m., at the Gregg Conference Center, American College, 270 S. Bryn Mawr Avenue, Bryn Mawr, Pennsylvania.

Proxies and proxy statements are being mailed to shareholders of record as of February 28, 2006. At December 31, 2005, there were 9,440 common sharcholders of record.

## Financial Information

*CIGNA's Form 10-K is available on the Internet at www.cigna.com.*

*If you would like a printed copy of the Form 10-K, please contact:*

*CIGNA Corporation*
*Shareholder Services Department*
*TL17*
*1601 Chestnut Street*
*Philadelphia, PA 19192*
*215.761.3516*

For a copy of CIGNA's quarterly earnings news releases, visit our Web site at www.cigna.com and click on "Newsroom."

The tentative release dates for CIGNA's 2006 earnings are:

| | |
|---|---|
| 1st Quarter | May 3, 2006 |
| 2nd Quarter | August 2, 2006 |
| 3rd Quarter | November 1, 2006 |
| Full Year | February 7, 2007 |

## Offices and Principal Subsidiaries

CIGNA Corporation
Two Liberty Place
1601 Chestnut Street
Philadelphia, PA 19192
215.761.1000

## Connecticut General Life Insurance Company

900 Cottage Grove Road
Hartford, CT 06152
860.226.6000

## Life Insurance Company of North America

Two Liberty Place
1601 Chestnut Street
Philadelphia, PA 19192
215.761.1000

91

LINA 0189600

**Direct Stock Purchase Plan**

Shareholders can automatically reinvest their quarterly dividends and make optional cash purchases of common shares. For information on these services, please contact:

Mellon Bank, N.A.
c/o Mellon Investor Services
P.O. Box 3338
South Hackensack, NJ 07606-1938

**Shareholder Account Access**

You can access your CIGNA shareholder account on the Internet through Mellon Investor Services' Web site at www.melloninvestor.com or through using the interactive voice response system at 800.760.8864. You will need your Investor ID and PIN for access to your account.

If for any reason you do not have your Investor ID or PIN, you may obtain one by following the online instructions.

**Direct Deposit of Dividends**

Direct deposit of dividends provides a prompt, efficient way to have your dividends electronically deposited into your checking or savings account. It avoids the possibility of lost or delayed dividend checks. The deposit is made electronically on the payment date. For more information and an enrollment authorization form, contact Mellon Investor Services at 800.760.8864 or 201.680.6535 outside the United States and Canada or access your account on Mellon's Web site at www.melloninvestor.com.

**Stock Listing**

CIGNA's common shares are listed on the New York, Pacific and Philadelphia stock exchanges. The ticker symbol is CI.

**Transfer Agent**

Mellon Investor Services
P.O. Box 3338
South Hackensack, NJ 07606-1938
Toll free at 800.760.8864 or outside the United States and Canada at 201.680.6535

*Hearing Impaired TDD:*
800.231.5469
*Web site:* www.melloninvestor.com
*Email:* At Web site, click on Help, then click on "What can I do if I still need help?"

**CIGNA Online**

To access information about CIGNA and our products and services, visit our Web site at www.cigna.com.

**Certifications**

In 2005, CIGNA submitted to the New York Stock Exchange the Annual CEO Certification required by Section 303A.12(a) of t New York Stock Exchange Listed Company Manual. CIGNA has also filed, as exhibits to its Annual Report on Form 10-K for th year ended December 31, 2005, the certifications of its Chief Executive Officer and Chief Financial Officer required by Section 302 of the Sarbanes-Oxley Act of 2002.

*As used in this Annual Report, "CIGNA" may refer to CIGNA Corporation itself, one or more of its subsidiaries, or CIGNA Corporation c its consolidated subsidiaries. CIGNA Corporation is a holding company. Products and services are provided exclusively by subsidia and not by CIGNA Corporation. Most employees are employed by subsidiaries of CIGNA Corporation.*

*"CIGNA" and "A Business of Caring" are registered service marks.*

*CIGNA Corporation and its subsidiaries constitute one of the largest investor-owned employee benefits organizations in the United Sta Its subsidiaries are major providers of employee benefits offered through the workplace, including health care products and services; gr disability, life, and accident insurance.*

92

LINA 0189601

We are a business of caring.
We provide our customers with
employee benefits, expertise and services
that improve the health, well-being and
productivity of their employees.
We will be recognized by our
customers and shareholders for
industry leadership and superior results.



LINA 0189602



visit CIGNA online at
# www.cigna.com

Two Liberty Place
Philadelphia, PA 19192-1550



CIGNA
*A Business of Caring.*

803832

LINA 0189603

FILED UNDER SEAL
Exhibit 6

FILED UNDER SEAL
Exhibit 7

Exhibit 8