# EXHIBIT K

# Growth in Disability Benefits

## Explanations and Policy Implications

Kalman Rupp and David C. Stapleton
*Editors*

1998

HD
7105.25
.U6
G76
1998

W.E. Upjohn Institute for Employment Research
Kalamazoo, Michigan

Library of Congress Cataloging-in-Publication Data

Growth in disability benefits : explanations and policy implications /
  [edited by] Kalman Rupp and David C. Stapleton.
    p. cm.
    Papers based on the conference in Washington, D.C. entitled :
  The Social Security Administration's Disability Programs :
  Explanations of Recent Growth and Implications for Disability Policy
  on July 20–21, 1995.
    Includes bibliographical references and index.
    ISBN 0–88099–188–7 (cloth : alk. paper). — ISBN 0–88099–187–9
  (pbk. : alk. paper).
    1.Insurance, Disability—United States—Congresses.
  2. Handicapped—Employment—United States—Congresses.   I. Rupp,
  Kalman.   II. Stapleton, David C.
  HD7105.25.U6G76   1998
  368.38'2—dc21                                                  98–24695
                                                                     CIP

Copyright © 1998
W. E. Upjohn Institute for Employment Research
300 S. Westnedge Avenue
Kalamazoo, Michigan 49007–4686

The facts presented in this study and the observations and viewpoints expressed are
the sole responsibility of the authors. They do not necessarily represent positions of
the W. E. Upjohn Institute for Employment Research.



Cover design by J. R. Underhill
Index prepared by Leoni Z. McVey.
Printed in the United States of America.

# The View from SSA's Concord, New Hampshire, District Office

Celeste Hemingson
*Social Security Administration*

The Concord, New Hampshire, field office certainly experienced the same expansion that is being reported elsewhere, but in our case, the growth continued into 1995. Although the increases tapered off in 1993, we had a 17 percent increase in disability claims receipts in 1994, and so far the intake in 1995 is as least as high as in 1994. The same thing has been happening throughout New Hampshire. The 1994 phenomenon is puzzling to me. Although I could partially explain it by some changes in state welfare department policies that I will describe later, those changes would normally account for an increase in SSI claims. The biggest growth we experienced in fiscal year 1994 was actually in Title II claims.

I present only one other piece of quantifiable information in this chapter, and that is a description of a disability outreach project that I did. I think this example provides a useful illustration of outreach projects, and I'm particularly proud of this one because it was very cost effective.

In 1991, I made a deal with the director of the State Department of Special Education to deliver fliers I had printed up to the parents of severely disabled children. The flier described basic entitlement requirements and included a tear-off coupon parents could mail in if they thought their child might qualify. We gave New Hampshire's Department of Special Education 8,000 flyers, which they distributed to teachers. We received thirty-eight replies, fourteen of which resulted in allowances.

The other types of outreach activities we do in district offices are not quantifiable. They are generally aimed at advocacy groups and others with whom disabled people come into contact and they're designed to enable the disabled to access our programs more easily. Several of the

308   Hemingson

studies in this volume indicate that SSI and social security disability are difficult programs to access and that this might be why some potential beneficiaries would rather stay on General Assistance than apply for our benefits. If that's true, then perhaps our work with these groups may have broken down that barrier and paid off in additional claims.

We train workers in homeless shelters on who to refer to us; we set up telephone links for filing claims; we train veterans' service organizations such as the VFW on who to refer to us and what types of evidence we need. That's the type of outreach we do.

Outreach is always a form of publicity, but publicity, even if it's unwanted, will increase the application rate. I will describe the role of publicity in disability claims growth.

In 1968, my job was to place information about social security on nationwide radio and television networks. It was a tough sell. Public affairs directors believed that carrying information about elderly or disabled people would undermine the young image stations were eager to project. My biggest—in fact my only—success on that job was to place on a network radio feed a series of vignettes about sports figures who had obtained disability benefits. I used to think that if I could only make our program seem controversial, I could get some air time. Luckily my bosses didn't go for the idea.

They didn't have to. Ever since the controversy hit the press about our payment of benefits to drug addicts and alcoholics, we've been getting calls from people identifying themselves as drug addicts or alcoholics, asking for benefits.

Word of mouth is also an important factor that encourages applications for disability benefits. We have found that increasing the supply of awards increases the demand for awards. Many of those who apply for benefits say they're doing so because a relative or a neighbor was allowed, and they're sure they're just as disabled as he is. Many tell us they understand they'll have to apply three times before they're allowed.

I would like to turn to some changes in state and local welfare practice that have impacted us in New Hampshire. Here the changes have not been an instance of cost-shifting. I think for us cost-shifting is yet to come. In our case what happened is an indication of how Medicaid is a driver of SSI claims. Under a New Hampshire state law which went in to effect on December 1, 1993, the state was required to use the

Social Security Administration's definition of disability in determining Medicaid and Aid to the Permanently and Totally Disabled (a state program) entitlement. (New Hampshire is a 209B state, which means it makes its own determination about Medicaid entitlement). In the interest of efficiency, the state decided to use our actual disability decision instead of making a separate decision on their own. As a result, we quickly heard from applicants who told us they had to apply with us before the state would take their Medicaid application. Others said they were required to file with us within twenty days of filing for Medicaid. Although the state had always required Medicaid applicants to file for social security or SSI, there was now more follow-through in making those applications happen.

Another change we've noticed is more applicants being referred from their town welfare directors. (General Assistance in New Hampshire is paid for from town budgets and is administered by individuals elected to a post often titled "overseer of the poor.") We also see more towns requiring interim assistance agreements from applicants. We believe these increases are because town budgets are becoming increasingly stressed by the downturn in the economy.

We do notice that unemployment influences "demand for awards." We continue to see more people filing because they can't find work. Many tell us they *can* work but just can't get work. We also get more disability claims from 62-year-old workers who are also filing for retirement benefits. Our assumption is that the economy as much as disability is causing these workers to retire early.

These facts are surprising, because the unemployment rate in the Concord area is only 2.8 percent. However, this brings up a point we should all consider: most of the new jobs in New Hampshire are in retail sales and services, not jobs that pay enough to present a meaningful alternative to disability benefits. Many of the available jobs are the type that Richard Frank described (see the discussion following Chapter 2), which are limited in hours just enough so that the employer will not have to provide benefits. These are not jobs that are a meaningful alternative to disability benefits.

Another cause of disability applications is not directly related to current unemployment. It's what I categorize as economic deprivation. People contact us because they no longer have other resources to fall back on. Two signs of this are the increased inquiries we get from those



310   Hemingson

with short-term disabilities and those who are still working, but who have been advised by their doctors to stop working. These are workers who have no savings and no benefits to cover the period of time during which no social security or Supplementary Security Income (SSI) is available.

There have also been some changes in the world of work that cause people to apply for Social Security Disability Insurance (DI). This is the other side of the coin. More employers are requiring a disability claim before a company's private insurance policy will pay.

Recent trends to hire those with developmental disabilities have resulted in more and more SSI and disabled child beneficiaries becoming insured on their own. Gina Livermore and her colleagues found that growth in the Mental Retardation category was greater than for any other category in DI-only and DI-concurrent applications (Chapter 8). An advocate told me last week that she counsels disabled teens in school-to-work programs to apply for SSI in order to lock in Medicaid entitlement through the 1619 program. Once again, Medicaid drives SSI claims.

In summary, and this is particularly directed to those who don't work for social security, an article of faith for social security employees is that our programs provide a safety net. One of the things we say when we talk about retirement benefits is that you can depend on social security even when you can't depend on anything else. Our protection is portable, it's inflation-proof, and it's not vulnerable to stock market downturns. These facts also apply to the disability program, but in addition there are some other relevant facts: we're there when other income maintenance programs drop out of the picture. States, towns, and employers are relying on social security to pick up the slack when they can't do it. We are increasingly becoming the program of last resort.