# EXHIBIT L

# (1 of 2)

Dawn Barrett
6/26/2008

Page 1

Volume 1, Pages 1 - 237

Exhibits: 1 - 18

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA ex rel.

DAWN BARRETT,

        Plaintiff

vs.               Docket No. 03-12382-MLW

CIGNA CORPORATON and LIFE INSURANCE

COMPANY OF NORTH AMERICA,

        Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - -

VIDEOTAPED DEPOSITION OF DAWN BARRETT

Thursday, June 26, 2008 , 9:06 a.m.

Choate, Hall & Stewart

Two International Place

Boston, Massachusetts

- - - -Reporter: Kathleen L. Good, CSR, RPR- - - -

K. L. GOOD & ASSOCIATES

Post Office Box 367

Swampscott, Massachusetts 01907

Tel. 781-367-0815  Fax 781-598-0815

HIGHLY CONFIDENTIAL

Dawn Barrett
6/26/2008

---

Page 2

APPEARANCES:

    Heller Ehrman LLP
    Carl S. Nadler, Attorney
    Thomas S. Kimbrell, Attorney
    1717 Rhode Island Avenue, NW
    Washington, DC 20036-3001
    202-912-2000  fax: 212-912-2020
    carl.nadler@hellerehrman.com
    tom.kimbrell@hellerehrman.com
- and -
    Phillips & Cohen LLP
    Colette G. Matzzie, Attorney
    200 Massachusetts Avenue, NW
    Washington, DC  20036
    415-836-9000 Fax: 415-836-9001
    cmatzzie@phillipsandcohen.com
    Attorneys for Relator

HIGHLY CONFIDENTIAL

---

Page 4

    - and -
        Kathleen K. Tice, Attorney
        Cigna
        Two Liberty Place
        1601 Chestnut Street
        Philadelphia, Pennsylvania 19192
        T215-761-8691  fax: 215-761-5512
        kathleen.tice@cigna.com
        Attorneys for the Defendants
Also Present:  Matt Lowe, Intern USDOJ
           Andrew Hoffman, Videographer

HIGHLY CONFIDENTIAL

---

Page 3

APPEARANCES, cont.:
    United States Attorney's Office
    U. S. Department of Justice
    Jennifer A. Serafyn, AUSA
    John Moakley Federal Courthouse
    1 Courthouse Way
    Boston, Massachusetts  02210
    617-748-3188 Fax: 617-748-3969
    jennifer.serafyn@usdoj.gov
    Attorneys for the United States of
    America

    Choate, Hall & Stewart
    Mitchell H. Kaplan, Attorney
    Richard C. Abati, Attorney
    Christopher R. Blazejewski, Attorney
    Emily Hodge, Attorney
    Heather Castillo, Attorney
    R. Victoria Lindo, Attorney
    Two International Place
    Boston, Massachusetts 02110
    617-248-5000 Fax: 617-248-4000
    mkaplan@choate.com
HIGHLY CONFIDENTIAL

---

Page 5

1        P R O C E E D I N G S
2    THE VIDEOGRAPHER:  We are now recording
3  and on the record.  My name is Andy Hoffman.
4  I'm a legal video specialist for National Video,
5  Incorporated.  Our business address is 58
6  Batterymarch Street, Suite 243, Boston,
7  Massachusetts 02110.
8    We're here in association of K. L. Good
9  & Associates.
10    Today is June 26, 2008, and the time is
11  9:06.  This is the deposition of Dawn Barrett in
12  the matter of United States of America, ex rel.,
13  Dawn Barrett, versus Cigna Corporation, et al.,
14  in the United States District Court, District of
15  Massachusetts, Case No. 03-12382-MLW.
16    This deposition is being taken at Two
17  International Place, Boston, Massachusetts.  The
18  court reporter is Kathy Good of K. L. Good &
19  Associates.
20    Counsel will please state their
21  appearance and the court reporter will
22  administer the oath.
23    MR. NADLER:  Good morning.  My name is
24  Carl Nadler of Heller Ehrman and I'm here on

2 (Pages 2 to 5)

Dawn Barrett
6/26/2008

Page 6

1  behalf of the relator.
2        MS. MATZZIE:  Colette G. Matzzie from
3  Phillips & Cohen on behalf of relator.
4        MR. KIMBRELL:  Tom Kimbrell from Heller
5  Ehrmann on behalf of the relator, Dawn Barrett.
6        MS. SERAFYN:  Jennifer Serafyn from the
7  United States Attorney's Office representing the
8  United States.  And with me is Matt Lowe, who is
9  a summer intern in our office.
10       MR. BLAZEJEWSKI:  Chris Blazejewski for
11  the defendants.
12       MR. ABATI:  Rich Abati for the
13  defendants.
14       MS. TICE:  Kathleen Tice from Cigna.
15       MR. KAPLAN:  Mitch Kaplan representing
16  the defendants.
17
18       DAWN BARRETT, having been satisfactorily
19  identified and duly sworn by the Notary Public,
20  was examined and testified as follows:
21
22
23
24

Page 7

1           DIRECT EXAMINATION
2       BY MR. KAPLAN:
3  Q.  Ms. Barrett, would you state your name and
4      address for the record, please.
5  A.  Dawn Barrett, 804 Steiner Street, Pittsburgh,
6      Pennsylvania 15227.
7  Q.  Ms. Barrett, my name is Mitch Kaplan and we're
8      here for your deposition today, and I'm going to
9      be asking you a series of questions.  I'll do
10     the best I can to make them clear and
11     understandable, but history teaches me that they
12     won't all be clear and understandable.  So if at
13     any time, you find a question confusing or you
14     don't -- can't answer it in the form that I've
15     presented it, please tell me and I'll do my best
16     to restate it.
17         There's a lot of people in this room and
18     could get a little stuffy.  At any time you feel
19     you need a break, please let us know and we'll
20     take a break.
21         Now, you've been sworn this morning and
22     do you understand that you have the same
23     obligation to give complete and truthful answers
24     here today as you would if you were testifying

Page 8

1      in court?
2  A.  Yes, I do.
3  Q.  Can you think of any reason why you would be
4      unable to give complete and truthful answers
5      today?
6  A.  No, I don't.
7  Q.  Are you married?
8  A.  No, I'm not.
9  Q.  Do you have any children?
10  A.  Yes, I do.
11  Q.  What ages are they?
12  A.  18, 17 and 7.
13  Q.  Boys or girls?
14  A.  One and two.
15        MR. KAPLAN:  Let's mark as Exhibit 1, a
16     document which includes your résumé and
17     application for employment at Cigna.  I have
18     woefully inadequate number of these documents to
19     pass around.
20        (Marked, Exhibit No. 1, Résumé and
21     Application.)
22  Q.  Ms. Barrett, I ask you to take a look at Exhibit
23     No. 1 and can you tell me if you recognize it.
24     I'm most interested in the second page.

Page 9

1        MR. NADLER:  You should feel free to
2     familiarize yourself with the document.
3  A.  I do recognize this.
4  Q.  What is it?
5  A.  This is my résumé and my application for my
6      employment at Cigna.
7  Q.  Let's take a look, if you would, at the second
8      page, which is the résumé.
9          Is this résumé complete and accurate for
10     listing your education and employment for the
11     period that's referred to in the résumé?
12        MR. NADLER:  As of August 1, 2000?
13        MR. KAPLAN:  That's correct.
14  A.  Yes.
15  Q.  Now, at the time that you applied for your
16     position at Cigna, is it then the case that you
17     were working at the Sheraton Hotel Station
18     Square?
19  A.  That is correct.
20  Q.  And that was your only job?
21  A.  Right.
22  Q.  What was the nature of that job?  What services
23     did you perform?
24  A.  I was a banquet server and I would do weddings

3 (Pages 6 to 9)

HIGHLY CONFIDENTIAL

Dawn Barrett
6/26/2008

| Page 10 |
|---|
| 1   and served food to the people that came in for |
| 2   certain functions. |
| 3   Q. For a time, did you work at that job at the same |
| 4   time that you worked for Kirkpatrick & Lockhart? |
| 5   A. For the entire time I worked basically at |
| 6   Kirkpatrick & Lockhart, I also worked at the |
| 7   Sheraton, and I stayed at the Sheraton up until |
| 8   my employment with Cigna as well. |
| 9   Q. What was the nature of your job at Kirkpatrick |
| 10   & Lockhart? |
| 11   A. I was a file clerk. |
| 12   Q. What did you do as a file clerk? |
| 13   A. I filed many files and did filing for -- inside |
| 14   the legal files. |
| 15   Q. What was the job that you applied for at Cigna? |
| 16   A. Support associate. |
| 17   Q. How did you find out about the availability of |
| 18   that job? |
| 19   A. There was an advertisement in a local paper. |
| 20   Q. Had you worked for Cigna previously? |
| 21   A. No, I had not. |
| 22   Q. Had you worked for a life insurance or a health |
| 23   insurance company previously? |
| 24   A. No. |

| Page 11 |
|---|
| 1   Q. Had you had any background in long-term |
| 2   disability or short-term disability insurance |
| 3   before you went to work at Cigna? |
| 4   A. No. |
| 5   Q. Had you had any familiarity with Social Security |
| 6   disability insurance before you went to work at |
| 7   Cigna? |
| 8   A. No. |
| 9   Q. Why did you apply for a job at Cigna? |
| 10   A. It was a position in which I felt comfortable |
| 11   with the way the ad read. I thought it was |
| 12   something that I could do. |
| 13   Q. And I take it that Cigna gave you a job? |
| 14   A. Yes, they did. |
| 15   Q. And what was the title of the position, the |
| 16   first position you had at Cigna? |
| 17   A. Support associate. |
| 18   Q. Do you recall when you started working as a |
| 19   support associate at Cigna? |
| 20   A. My first day was September 11, 2000. |
| 21   Q. Do you happen to remember how long you had the |
| 22   position of support associate? |
| 23   A. In the beginning of 2002. |
| 24   Q. The beginning of 2002? |

| Page 12 |
|---|
| 1   A. (Witness nods head.) |
| 2   Q. What was -- what position did you get in the |
| 3   beginning of 2002? |
| 4   A. I was a vendor coordinator. |
| 5   Q. Would you describe the work that you did as a |
| 6   support associate at Cigna? |
| 7   A. That was basic file work as well. I would |
| 8   retrieve files, insert file documents into the |
| 9   files. |
| 10   Q. Retrieve files, retrieve documents from what |
| 11   kind of files? |
| 12   A. I would place documents into the files, |
| 13   long-term and short-term disability claims. |
| 14   Q. Did you report to one person or to several |
| 15   people? |
| 16   A. That varied at the time. |
| 17   Q. In general, who did you report to while working |
| 18   as a support associate? |
| 19   A. For the most of my position there, it was Judith |
| 20   Manning. |
| 21   Q. Who gave you the documents that you were to |
| 22   file? |
| 23   A. Other short-term and long-term disability claim |
| 24   managers. |

| Page 13 |
|---|
| 1   Q. And they would give you loose documents and it |
| 2   was your job to insert those into the |
| 3   appropriate files? |
| 4   A. Correct. |
| 5   Q. In doing this work, did you have any need to |
| 6   speak to anybody outside of Cigna? In other |
| 7   words, were your communications all with fellow |
| 8   employees at Cigna or from time to time did you |
| 9   have to converse with people outside of Cigna? |
| 10   MR. NADLER: I take it your question is |
| 11   did she in the course of her employment converse |
| 12   with people outside Cigna as opposed to in |
| 13   general? |
| 14   Q. In the course of your work as a support |
| 15   associate, did you have to talk to anybody other |
| 16   than your co-workers at Cigna? |
| 17   A. During my business day? |
| 18   Q. Yes. |
| 19   A. No. |
| 20   Q. And you didn't -- I take it that you didn't have |
| 21   to prepare any correspondence or prepare any |
| 22   documents while you were a support associate? |
| 23   A. No. |
| 24   Q. And your next position was vendor coordinator? |

4 (Pages 10 to 13)

HIGHLY CONFIDENTIAL

Dawn Barrett
6/26/2008

| Page 14 | Page 16 |
|---|---|
| 1  A. Correct. | 1  A. It could have been either way. |
| 2  Q. Was that a promotion? | 2  Q. Were you assigned to work for all claim managers |
| 3  A. Yes. | 3     generally or did you have certain ones that you |
| 4  Q. Increased salary come with that? | 4     were responsible for? |
| 5  A. Yes. | 5  A. When I first started, I was the only vendor |
| 6  Q. Do you remember what day you started -- do you | 6     coordinator so I had the whole office. |
| 7     remember what month you started as vendor | 7  Q. At some time, were there additional vendor |
| 8     coordinator? | 8     coordinators? |
| 9  A. It was in spring, around May of 2002. | 9  A. There were two more. |
| 10 Q. If I told you that your personnel records | 10 Q. Who were the other vendor coordinators? |
| 11    reflect a date of June 17 as your first day as a | 11 A. Diana Salgado Salinas and Jennifer Blackmon. |
| 12    vendor coordinator, would that be consistent | 12 Q. She's going to ask you how to spell her name. |
| 13    with your memory? | 13     MR. NADLER: Don't underestimate her, |
| 14     MR. NADLER: Object to the question as | 14     she may not have to. |
| 15    vague, but you can answer. | 15     THE COURT REPORTER: I'll get it later. |
| 16 A. Inconsistent? No. | 16 Q. Now, in doing your work as a vendor coordinator, |
| 17 Q. What were your duties and responsibilities -- | 17     did you ever have occasion to speak directly |
| 18    strike that. | 18     with claimants? |
| 19     Do you recall how long you were a vendor | 19 A. Yes. |
| 20    coordinator? | 20 Q. Did that happen frequently? |
| 21 A. From 2002 through some point in 2003. | 21 A. In the period? I spoke with claimants. |
| 22 Q. What was your job? What did you do as a vendor | 22 Q. Well, did it happen, for example, on average |
| 23    coordinator? | 23     once a month? |
| 24 A. As a vendor coordinator, I was responsible for | 24 A. I can't remember how often. |

| Page 15 | Page 17 |
|---|---|
| 1     obtaining information from the claim managers in | 1  Q. Well, was it frequently the case that you could |
| 2     order to refer them to the outside vendors for | 2     go a week without having to speak with a |
| 3     Social Security assistance. | 3     claimant? |
| 4  Q. When you say "them," by that do you mean the | 4  A. No, I don't believe so. |
| 5     claimants? | 5  Q. Best of your memory, was it ever the case that |
| 6  A. Yes. | 6     you could go a week without speaking to a |
| 7  Q. How did you -- is that the total of the -- is | 7     claimant? |
| 8     that a complete description of the work that you | 8     MR. NADLER: Object to the question as |
| 9     performed during the period that you were a | 9     asked and answered, but you can answer it again. |
| 10    vendor coordinator? | 10 A. Can you repeat how you're saying -- was there |
| 11 A. That was the basic position. | 11     ever -- |
| 12 Q. Were you involved at all in determining who | 12 Q. I'm just trying to ask some questions in order |
| 13    should be referred to these vendors, which | 13     for me to get a sense of how frequently during |
| 14    claimants should be referred to vendors? | 14     the period that you were a vendor coordinator, |
| 15 A. No. | 15     you had occasion to speak with claimants. |
| 16 Q. The case managers on the long-term claim files | 16     Did you speak with a claimant on every |
| 17    determined whether or not a particular claimant | 17     occasion that you referred the claimant to a |
| 18    should be referred to a vendor? | 18     vendor? |
| 19 A. Yes. | 19 A. No. |
| 20 Q. And then they contacted you so that you could | 20 Q. Did you speak to a claimant for every ten files |
| 21    make the referral. Is that the way it worked? | 21     that you referred to a vendor? Did you speak to |
| 22 A. Yes. | 22     a claimant once or more than once? |
| 23 Q. Was that contact orally or was it sent to you in | 23 A. I don't think I can answer that. |
| 24    some form of writing? | 24 Q. Did you work an eight hour day? |

HIGHLY CONFIDENTIAL

Dawn Barrett
6/26/2008

Page 18

1  A. Eight hours.
2  Q. What hours did you work?
3  A. At that time, it was 8:30 to 5:00.
4  Q. In general, how much of that time, 8:30 to 5:00
5    when you were at work did you spend speaking to
6    claimants, on average?
7        MR. NADLER: Object to the question as
8  vague. You mean on average during her entire
9  employment or over the entire time she had that
10  job?
11        MR. KAPLAN: I think after you objected,
12  you've now preserved your right if my question
13  isn't any good. Then at the time of trial, I
14  won't be able to use it.
15        Generally we're very careful in this
16  federal district not to have speaking
17  objections.
18  Q. During the period that you were a vendor claim
19    working from 8:30 -- vendor coordinator working
20    from 8:30 to 5:00, how much of your day did you
21    spend speaking to claimants, on average?
22  A. Throughout the course of my day, I spoke to many
23    people. Whether it be the claim managers or
24    claimants, I would not be able to answer.

Page 19

1  Q. What was the nature of the conversation that you
2    had with the claimants? Was it -- was there one
3    subject that you generally spoke to them about?
4    Were there many subjects?
5  A. It would have been about Social Security.
6    That's all I knew.
7  Q. Did you speak with them generally about Social
8    Security or about the referral to the vendor?
9  A. More to the referral to the vendor.
10  Q. How did you go about making the referral to the
11    vendor? In other words, did you make a
12    telephone call? Did you send an e-mail? Was
13    there a process set up when a claim manager
14    said: This claimant should be referred to a
15    vendor? Typically what did you do?
16  A. It was via e-mail that the referral form was
17    sent to the vendor.
18  Q. Did you -- was it your job also to contact the
19    claimant?
20  A. They were notified by a letter.
21  Q. Did you send a letter?
22  A. A lot of the introductory letters, I did.
23  Q. Was that a form letter or a letter that you
24    composed for each claimant?

Page 20

1  A. It was a form letter that Cigna composed.
2  Q. If the process -- in some percentage of the
3    time, did this referral process -- was it
4    completed without your having to speak to either
5    the vendor or the claimants?
6  A. Yes.
7  Q. And I take it on some occasions you would have
8    to speak to the claimant?
9  A. Yes. Verbal?
10  Q. Yes.
11  A. Yes.
12  Q. What circumstances would give rise to the need
13    to speak to the claimant?
14  A. If, for instance, we didn't have a correct
15    address, we got return mail, I would contact
16    them to correct the address. If they had
17    questions regarding the referral and why they
18    were being referred.
19  Q. They called you or the case manager?
20  A. They would call me. My name was on the
21    correspondence.
22  Q. Other than correcting an address or questions as
23    to why they were being referred, is there any
24    other kind of conversations that you would have

Page 21

1    with the claimant?
2  A. Not that I can recall.
3  Q. What about with the vendor. Did you have
4    occasion while you were the vendor coordinator
5    to speak with the vendors?
6  A. Yes.
7  Q. In most instances, could the referral be made
8    without your having an actual conversation with
9    the vendor?
10  A. Yes.
11  Q. In some instances, you would have a conversation
12    with the vendor then, I take it?
13  A. In some, yes.
14  Q. Do you have a feel for what percentage? Let me
15    ask the question a better way.
16        On the majority of referrals, did that
17    happen without the need for a discussion with
18    the vendor?
19  A. Most referrals were done via e-mail.
20  Q. What about with the claimants. In the majority
21    of the instances in which you made those
22    referrals, did you not have a conversation with
23    the claimant?
24  A. Verbal communication?

6 (Pages 18 to 21)

HIGHLY CONFIDENTIAL

Dawn Barrett
6/26/2008

| Page 22 |
| --- |

1  Q. Yes.
2  A. Most of the times, I did not.
3  Q. Did your responsibilities, your duties as vendor
4     coordinator, did they remain the same for the
5     entire period you were a vendor coordinator or
6     did they change over time?
7  A. They were the same.
8  Q. Other than the fact that two other vendor
9     coordinators were hired during the period that
10    you were a vendor coordinator, can you think of
11    any other change in the job that occurred over
12    that period?
13 A. No.
14       MR. KAPLAN: Let's mark as Exhibit 2, a
15    document entitled Social Security Assistance
16    Team.
17       (Marked, Exhibit No. 2, Document
18    entitled Social Security Assistance Team.)
19       (Discussion off the record.)
20 Q. Why don't you take a moment and take a look at
21    what we've marked as Exhibit No. 2.
22       (Pause.)
23 Q. Have you seen this document previously?
24 A. I don't recall this document.

| Page 23 |
| --- |

1  Q. When you became a vendor coordinator, was that a
2     new position that had just been created?
3  A. Yes, it was.
4  Q. Were you -- did someone train you in how you
5     would perform your job as a vendor coordinator?
6  A. I did have training.
7  Q. What was the nature of that training, as best
8     you can recall? Obviously, it was a long time
9     ago.
10 A. I've been in many training sessions.
11       Most of it, my training consisted of
12    mail merge documents and learning how to do
13    that.
14 Q. So -- and that was a word processing, data
15    processing kind of deal?
16 A. Right. I also had training in coding in the SRO
17    system.
18 Q. What is the SRO system?
19 A. That's the database that Cigna uses. It has the
20    check -- that's where they issue their checks
21    from.
22 Q. Other than training in coding and training in
23    the creation of the documents, do you recall
24    having any other training?

| Page 24 |
| --- |

1  A. The actual referral process and discussing with
2     the vendors.
3  Q. Did you have training in what to say to
4     claimants if they called you up after they got
5     the referral letter?
6  A. I'm sure that I have but I can't recall the
7     specifics.
8  Q. So it would be your best memory that at the time
9     you got started as a vendor coordinator,
10    somebody trained you in that, but you don't
11    recall any longer what it was?
12 A. Correct.
13 Q. Do you recall who it was?
14 A. Training?
15 Q. Yes.
16 A. In training, no. On the floor training, I would
17    have -- it would have been Laurie Swanson.
18 Q. Who is Laurie Swanson, please?
19 A. My manager.
20 Q. What was her title?
21 A. I don't know what her title was at the time.
22    She's had several.
23 Q. If you look at what we've marked as Exhibit 2,
24    on the bottom, it makes reference to a vendor

| Page 25 |
| --- |

1     coordinator and -- well, the top it says,
2     "Listing of primary responsibilities of each
3     position of the team."
4        Why don't you take a moment and just
5     read to yourself the bullet points under vendor
6     coordinator.
7        (Pause.)
8  Q. My question to you, Ms. Barrett, is:
9        Are these bullet points, in your mind, a
10    fair description of the work you did as a vendor
11    coordinator?
12 A. After reviewing this, yes.
13 Q. Can you think of anything that you did as a
14    vendor coordinator that's not listed here?
15 A. No.
16 Q. "Follow-up and oversight in processing Social
17    Security claims."
18       In your own words, what does that mean
19    to you? What is the nature of that part of your
20    job?
21 A. That would be where I would get in touch with
22    one of the vendors to see where the claimant is
23    in status.
24       MR. KAPLAN: Let's mark as Exhibit

7 (Pages 22 to 25)

HIGHLY CONFIDENTIAL

Dawn Barrett
6/26/2008

## Page 38

1    In particular, under the heading "Social
2 Security technical consultant," and the last
3 bullet point there says:
4    "Managed non-represented SSDI
5 claimants."
6    Does looking at that refresh your
7 recollection at all as to whether there was a
8 group within Cigna whose job it was to deal with
9 claimants who had chose not to be represented by
10 vendors?
11    MR. NADLER: Object to the question as
12 vague, both as to time frame and as to the
13 responsibilities of this group, but you may
14 answer.
15 A. There was one technical consultant in the whole
16 office.
17 Q. What was the job of that technical consultant?
18 A. It would be outlined on this form.
19 Q. Once you had referred the claimant to the vendor
20 or had this conversation and the claimant said
21 they didn't want a vendor, did you have any
22 continuing role in dealing with that claimant?
23 A. Without vendor representation?
24 Q. Yes.

## Page 39

1 A. Not that I remember.
2 Q. Did you have any continuing role dealing with
3 that claimant if the claimant did have vendor
4 representation?
5 A. Yes.
6 Q. What was that?
7 A. Follow-up for the procedure, follow-up for their
8 status.
9 Q. Did you do that by speaking to the vendor or by
10 speaking to the claimant?
11 A. Sometimes both.
12 Q. How -- what was the nature of your conversations
13 with the claimant if they had accepted the
14 vendor referral?
15 A. Prior to A2K, there was numerous vendors. We
16 would have to make follow-ups if we could not
17 get in touch with certain vendors. That's why
18 the vendors were in the meeting.
19 Q. Once A2K began, that was no longer the case?
20 A. There were still outstanding claimants. They
21 were still in the process.
22 Q. With other vendors?
23 A. With other vendors.
24 Q. As to those, you would follow-up to see where

## Page 40

1 they were in the process?
2 A. Occasionally.
3 Q. With respect to A2K, A2K took care of that?
4 A. They would notify by e-mail.
5 Q. How long were you a vendor coordinator before
6 the relationship with A2K began?
7    That was poorly stated.
8    Did there come a time when all of your
9 referrals were to A2K?
10 A. Not just A2K, no. There was another group.
11 Q. What was the other group?
12 A. ALLSUP.
13 Q. Do you recall when it was that all claims were
14 referred to A2K or ALLSUP?
15 A. There was one specific group that we still
16 referred to SSLG, so I cannot say. But most of
17 the claims were referred -- the referrals to the
18 other vendors stopped in 2002.
19 Q. When you were a vendor coordinator, did you play
20 any role in determining whether the claimant was
21 eligible for long-term disability insurance
22 under their Cigna policy?
23    MR. NADLER: Object to the question as
24 vague, but you may answer.

## Page 41

1 A. No.
2    MR. KAPLAN: Let's mark as Exhibit
3 No. 5, a document entitled "Advantages of
4 Receiving Social Security Disability Benefits."
5    (Marked, Exhibit No. 5, Document
6 entitled Advantages of Receiving Social Security
7 Disability Benefits.)
8 Q. Ms. Barrett, have you seen this document
9 previously?
10 A. Yes.
11 Q. Is this a document that you sent out along with
12 your referral letter?
13 A. Yes.
14 Q. Did anybody provide you with information so that
15 you -- did you have any training so that you
16 could provide more information than was listed
17 here if you were questioned about that by a
18 claimant?
19    MR. NADLER: Objection to the question
20 as vague, but you can answer.
21 A. I don't remember.
22 Q. Do you recall whether during any of your
23 conversations with claimants while you were a
24 vendor coordinator, they asked you about these

11 (Pages 38 to 41)

HIGHLY CONFIDENTIAL

Dawn Barrett
6/26/2008

Page 42

1     advantages?
2 A. I can't remember.
3 Q. Other than what you've testified to, can you
4     remember any other thing that you did for Cigna
5     in your capacity as a vendor coordinator, any
6     other service that you performed?
7 A. Not to my knowledge.
8 Q. Did you move on to another position within Cigna
9     after being vendor coordinator?
10 A. Yes.
11 Q. What was your next position?
12 A. Disability claim administrator for long-term
13     disability.
14 Q. What was the role of the disability claim
15     administrator?
16 A. I would follow-up for all -- it was at the end
17     of the claim. It was before -- I would
18     follow-up for everything to be in place before a
19     claim was SAM'd.
20        MR. KAPLAN: Actually, let's mark as
21     Exhibit 6, this interoffice memo dated May 20,
22     2003.
23        (Marked, Exhibit No. 6, Interoffice
24     Memo, 5/20/03.)

Page 43

1        MR. KAPLAN: Take a moment to look at
2     that.
3        (Pause.)
4 Q. As you're looking through it, my first question
5     will be whether or not you recall receiving this
6     memo.
7        (Pause.)
8 A. I'm sure I did. It was addressed to all
9     employees.
10 Q. But you don't have any memory as you sit here
11     today as having received it?
12 A. No.
13        MR. NADLER: Ms. Barrett, just be sure
14     you give verbal answers because the reporter
15     will appreciate that.
16 Q. If you look sort of towards the middle -- and
17     Laurie Swanson was your manager during this
18     period?
19 A. Correct.
20 Q. If you look towards the middle, she writes:
21     "The vendor coordinators who are
22     currently located in Pittsburgh have accepted
23     positions as claim administrators and will be
24     part of the pre-SAM team in Pittsburgh."

Page 44

1        What does pre-SAM refer to?
2 A. It's before the claim is SAM'd.
3 Q. Good point. I could have guessed that one.
4     Okay. SAM stands for something?
5 A. Yes.
6 Q. What is that?
7 A. Stable and mature.
8 Q. As a member of this pre-SAM team, what did you
9     do?
10 A. We would -- it was the end of the claim for a
11     long-term disability claim. It's for claimants
12     who were on long-term disability intended to be
13     there for the duration of the claim's life,
14     whether it be their age or the benefit, you
15     know, to the benefit term date, and we would
16     follow-up for all offsets, make sure that there
17     is current medical, make sure the claimant was
18     still disabled.
19        We would do one follow through swoop to
20     make sure everything was set before it went to
21     the SAM team.
22 Q. So let's take an example. I mean, you're coming
23     to work in the morning and you pick up a claim
24     to deal with as a member of a pre-SAM team.

Page 45

1        Is there a typical claim that you would
2     be addressing?
3 A. Just so you know, the team was three people.
4     There wasn't a big team. Again, we handled a
5     lot of claims for the office.
6 Q. Was there a typical process that you went
7     through as a disability claim administrator with
8     respect to a claim?
9 A. There was a process.
10 Q. Okay. Can you tell me what it was?
11        You came in, pick up the claim, and then
12     you did what?
13 A. We had a checklist of -- if I remember
14     correctly -- and everything had to be in order
15     to make sure that that claim could be ready to
16     be sent to the SAM team.
17 Q. So this involved reviewing all of the
18     documentation within that claim to make sure
19     that it was appropriate and complete before you
20     moved it on to somebody else?
21 A. Correct.
22 Q. And you would review that file against the
23     checklist to make sure that everything was
24     there?

12 (Pages 42 to 45)

HIGHLY CONFIDENTIAL

Dawn Barrett
6/26/2008

Page 46

1    A.  Yes.
2    Q.  I take it from time to time, you would find
3        something that wasn't where it was meant to be?
4    A.  This is correct.
5    Q.  Can you give me an example of the kinds -- you
6        know, if you went through a file and you
7        couldn't pass it on because something was
8        missing, what, in general, were the kinds of
9        things that would be missing?
10       MR. NADLER:  Object to the question as
11       vague and compound, but you may answer.
12   A.  Offsets were the key number of things that we
13       had to look for, to make sure all offsets were
14       in place.
15   Q.  And that could be Social Security disability?
16   A.  That is an offset.
17   Q.  Or it could be workers' comp or other kinds of,
18       other sources of income that the disabled person
19       might be receiving?
20   A.  Yes.
21   Q.  Did you ever have to call the claimant in
22       connection with your work as a disability claims
23       administrator?
24   A.  Yes.

Page 47

1    Q.  What -- to do what?  What were the nature of
2        your interactions with claimants as a disability
3        claims administrator?
4        MR. NADLER:  Object to the question as
5        compound, but you may answer.
6    A.  The question -- I would contact them to verify
7        the information we have is true.
8    Q.  As a disability claims administrator, did you
9        ever have occasion to refer somebody to a
10       vendor?
11   A.  Yes.
12   Q.  Did -- were there ever occasions where you had
13       to tell somebody to go apply for Social Security
14       benefits?
15   A.  Yes.
16   Q.  And these were all people who had -- whose
17       claims were mature, they were out of work and
18       had been out of work for sometime?
19       MR. NADLER:  Object to the question as
20       vague and compound, but you may answer.
21   A.  They have been on long-term disability.  For the
22       length of time, I don't know.
23   Q.  Do you have any particular memory of any -- do
24       you have a memory of any conversation that you

Page 48

1        had with somebody in your capacity as a
2        disability claims administrator in which you
3        told them they needed to apply for Social
4        Security disability benefits --
5        MR. NADLER:  Object to the question as
6        asked and answered.
7    Q.  -- and they suggested --
8        MR. KAPLAN:  Are you going to frequently
9    object while I'm still asking the question or
10   are you generally going to wait until I've
11   completed the question before you make your
12   objection?
13       MR. NADLER:  I think I've done it once
14   and I think I did it because you paused
15   unnaturally long before you finished your
16   answer.  I'm sorry.
17       I don't think it's helpful for you to be
18   so testy about my objections.  I apologize for
19   interrupting you.  I did it because I thought
20   you were done.  I won't do it again.  I didn't
21   do it intentionally.  I won't do it again.  I
22   apologize.
23       Why don't you ask your question again
24   and let's great on with it.

Page 49

1        MR. KAPLAN:  If I have posed a question
2    that you think is objectionable as to form, and
3    you say "objection," you've reserved your rights
4    under the record.  Your description as to why
5    it's objectionable and so on are totally
6    unnecessary and don't advance the ball.
7        MR. NADLER:  I think my objections are
8    fine and I'm really not interested in your
9    advice on how to make them.
10       So why don't you ask your next question
11   and let's get on with it.
12   Q.  Ms. Barrett, do you recall during the period
13       that you were a disability claims administrator,
14       asking an individual to apply for Social
15       Security disability benefits, and that
16       individual saying, no, I won't?
17   A.  Specific person?
18   Q.  Yes.
19   A.  Specifically, no.
20   Q.  Do you recall referring any of these individuals
21       during the period that you were a disability
22       claims administrator to a vendor or suggesting
23       to that person that they be referred to a vendor
24       and the individual saying, I don't want to be

13  (Pages 46 to 49)

Dawn Barrett
6/26/2008

Page 50

1    referred to a vendor?  Do you recall if that
2    happened?
3    A.  Specifically, no.
4    Q.  For what period were you a disability claims
5    administrator?
6    A.  From this letter, sometime in May of 2003 until
7    the beginning of 2005.
8    Q.  Was your job as a disability claim administrator
9    essentially the same for the entire time or did
10    it evolve?
11    A.  That remained the same.
12    Q.  What was your next position at Cigna?
13    A.  Short-term disability claim manager.
14    Q.  Was that a promotion?
15    A.  It should have been but I don't recall that it
16    was an actual promotion.
17    Q.  Was that a position that you applied for or one
18    that someone came and said your new job is the
19    following?
20    A.  I've applied for all my positions.
21    Q.  So that was a job that you at least thought that
22    you would prefer to do over and above being a
23    disability claim administrator?
24    A.  It was strongly suggested to apply for the

Page 51

1    position.
2    Q.  Do you recall whether it came with a higher
3    salary?
4    A.  It was supposed to.  It didn't at first and then
5    it became higher.
6    Q.  Is that your current position today?
7    A.  Yes.
8    Q.  What were the duties you performed as a group
9    claims -- tell me again what the title was.
10    A.  Short-term disability claim manager.
11    Q.  As a short-term disability claim manager, what
12    was your job?
13    A.  Doing initial investigations on short-term
14    disability claims.
15    Q.  So in this job -- and were you involved then in
16    making decisions as to whether to approve the
17    claim for short-term disability for a particular
18    claimant?
19    A.  Yes.
20    Q.  In that job, did you deal, I take it -- strike
21    that.
22        As a short-term disability claim
23    manager, did you have any involvement with
24    long-term disability claims?

Page 52

1    A.  As a short-term disability claim manager, I do
2    have contact with long-term disability claim
3    managers.
4    Q.  What is the nature of that contact?
5    A.  When short-term disability gets to the maximum
6    point, there's a referral process to the
7    long-term disability side.
8    Q.  You move the file to the long-term claim manager
9    at that point?
10    A.  Right.
11    Q.  Do you play any role in referring the claimant
12    to a vendor for Social Security disability
13    benefits?
14    A.  It's not part of the process.
15    Q.  Well, as a short-term -- as short-term
16    disability claim manager, is it your job to
17    discuss with the claimants the Social Security
18    disability application process?
19    A.  When the short-term disability claim is getting
20    ready to transition to the long-term disability
21    side, we, if they have questions, we answer them
22    regarding long-term disability.
23    Q.  Is part of your job determining whether that
24    particular person is appropriate for referral to

Page 53

1    a vendor, Social Security vendor?
2    A.  No.
3    Q.  Once the short-term disability period is over,
4    do you have any continuing involvement with the
5    claimant?
6    A.  Once short-term disability ends to the maximum
7    period of short-term disability?
8    Q.  Yes.
9    A.  I have had occasion where the short-term
10    disability claimant has called me after that.
11    Q.  On how many occasions has that happened, do you
12    know?
13    A.  I don't know.
14    Q.  More than ten?
15    A.  It happens.
16    Q.  Do you have a general sense of what they want to
17    talk to you about when they call you?
18        MR. NADLER:  Object to the question as
19    compound.
20    Q.  Or the nature -- strike that question.
21        What are the nature of the conversations
22    that you've -- you have with the short-term
23    disability claimant who is now passed on past
24    the short-term disability period?

14 (Pages 50 to 53)

Dawn Barrett
6/26/2008

| Page 102 |
| --- |

1  A. In different meetings we have had, regional
2     claim meetings throughout, they would discuss
3     the reserves.
4  Q. Who?  Who told you that?  Who in particular said
5     that?
6  A. Regional claim managers.
7  Q. Do you remember the name of the regional claim
8     manager that said that?
9  A. Different regional claim managers have done each
10    of the meetings over the course of the years.
11 Q. Do you have a memory of any regional claim
12    manager that told you that the reserve can be
13    offset by the amount of the estimated SSDI
14    income?
15 A. The RCM, regional claim managers at the time,
16    when they were addressing these issues, they
17    were Paul Haberstock, there was -- I don't think
18    Theresa was at the time yet -- Linda Wiesbrod
19    may have been.  There are different regional
20    claim managers.  Like I said, Glenn Komaromy was
21    one at the time, I believe.
22 Q. Did they show you any documents, show you any
23    document that shows reserves being offset by the
24    amount of estimated SSDI income?

| Page 103 |
| --- |

1  A. Yes, there were documents.
2  Q. And that's what they showed?
3  A. Yes.
4  Q. Can you picture one -- can you describe for me a
5     document that I could go look for now that would
6     say that?
7  A. They put it on overhead projectors.  They were
8     there.
9  Q. What happens when a claim -- what happens to
10    reserves when a claim is denied?
11 A. I don't know.
12 Q. What happens to reserves when a SSDI application
13    is denied?
14 A. The reserves, so long as they're in the appeal
15    process, they would stay the same.
16 Q. How do you know that?
17 A. By the information that has been previously
18    conveyed.  That's the way -- the coding is what
19    maintains the reserves.
20 Q. Correct.  The coding drives the reserves?
21 A. Right.
22 Q. What I'm asking you is -- well, strike that.  So
23    it is your belief that when a claim is denied,
24    the reserve stays the same?

| Page 104 |
| --- |

1  A. When it's denied and closed?
2  Q. Let's do it in steps.
3        Does the initial denial of a SSDI claim
4     affect the reserve?
5  A. I believe so.
6  Q. In what way?
7  A. I don't know.
8  Q. But you do know what happens when an initial
9     claim is filed.  You know how that affects the
10    reserves?
11 A. Right.
12 Q. But you don't know what happens to the reserves
13    when the claim is denied?
14 A. I don't know how bad it affects -- it affects
15    the reserves.
16 Q. In what way?  Is it better or worse for the
17    reserves?
18 A. It depends on where it is in the process of the
19    SSDI.
20 Q. When, in the last sentence, you say, "In other
21    words, the mere fact that the SSDI application
22    has been filed, was used by Cigna to reduce its
23    reserves and thereby improve its financial
24    statement," in making that allegation, are you

| Page 105 |
| --- |

1     relying solely on what was said to you by these
2     regional claim managers?
3  A. Not what was said, what was produced in
4     documents.
5  Q. Describe for me these documents.
6  A. They were documents they used, they were on
7     overhead projectors, but they would --
8     occasionally they would be handed out too.
9  Q. Now, let's turn to Paragraph 104.  There you
10    allege:
11       "Because there exists a high attrition
12    rate of senior claims examiners at Social
13    Security as well as a lack of SSA resources to
14    fully investigate the large volume of SSDI
15    claims, Cigna knows that a setting exists where
16    non-meritorious claims for SSDI that Cigna
17    causes or has caused to be filed will inevitably
18    and improperly be approved."
19       How do you know that?
20 A. I don't know.
21 Q. Then if you look at Paragraph 105, you allege:
22       "Every SSDI claim approved erroneously
23    for a Cigna insured directly benefits Cigna."
24       Are you aware of any long-term, any

27 (Pages 102 to 105)

HIGHLY CONFIDENTIAL

Dawn Barrett
6/26/2008

| Page 106 |
|---|
| 1    recipient of long-term disability benefits from |
| 2    Cigna who was improperly awarded SSDI benefits? |
| 3    A. Specifically, no. |
| 4    Q. Has anybody ever told you that that happened? |
| 5    A. I can't recall. |
| 6    Q. So somebody might have told you that happened; |
| 7      you just don't remember one way or the other? |
| 8    A. Yes. |
| 9    Q. Who might it have been? |
| 10   A. Probably a claim manager. |
| 11   Q. Remember the name of the claim manager? |
| 12   A. No. |
| 13   Q. Let's turn to Paragraph 106. |
| 14       "Even after Cigna has denied the |
| 15   insured's claim, Cigna will continue to |
| 16   follow-up with Social Security and make inquiry |
| 17   as to whether Social Security ended up awarding |
| 18   SSDI benefits to the insured. In the event that |
| 19   such an award has been made, Cigna will then |
| 20   contact the insured whose LTD claim they have |
| 21   denied (because the person was not even disabled |
| 22   from performing his or her own occupation) and |
| 23   will demand payment of the lump sum retroactive |
| 24   SSDI award." |

| Page 108 |
|---|
| 1    A. Yes. |
| 2    Q. And that at some point, that person who had |
| 3      received long-term disability benefits from |
| 4      Cigna, was awarded Social Security disability |
| 5      benefits? Is that what happened? |
| 6    A. At some point, yes. |
| 7    Q. And then it was determined, based on the |
| 8      contract language, that the payments that Cigna |
| 9      had made to that claimant were more than they |
| 10     were entitled under the policy? |
| 11   A. Yes. |
| 12   Q. And then they sought to recover those payments? |
| 13   A. Yes. |
| 14   Q. What's wrong with that? Do you allege that to |
| 15     be fraudulent in some way? |
| 16       MR. NADLER: By "that," you mean the |
| 17   allegations in Paragraph 106? |
| 18       MR. KAPLAN: Correct. |
| 19   Q. Is it your contention that the allegations in |
| 20   Paragraph 106 refer, in part, to a fraudulent |
| 21   scheme? |
| 22       MR. NADLER: You mean the entire |
| 23   Paragraph 106? |
| 24       MR. KAPLAN: I'm asking the questions. |

| Page 107 |
|---|
| 1        Did I read it correctly? |
| 2    A. You read it word for word. |
| 3    Q. Are you aware of any instance where Cigna denied |
| 4      a long-term disability claim but then demanded |
| 5      to receive part of that claimant's awarded |
| 6      Social Security disability insurance benefits? |
| 7    A. Yes, I am. |
| 8    Q. When did that happen? |
| 9    A. I processed some of the overpayments when I was |
| 10     a vendor coordinator. |
| 11   Q. Well, that meant that Cigna was paying that |
| 12     claimant, correct? |
| 13   A. They had paid them at one point. |
| 14   Q. So then they were seeking to recover sums that |
| 15     they had paid them? |
| 16   A. Right. |
| 17   Q. So that they then didn't deny that claim, did |
| 18     they? |
| 19       MR. NADLER: Objection. |
| 20   A. They did. |
| 21       MR. NADLER: Go ahead. |
| 22   Q. Is this referring to an instance in which |
| 23     long-term disability benefits were initially |
| 24     awarded and paid for some period of time? |

| Page 109 |
|---|
| 1    Q. My question to you is: |
| 2        Do the allegations in Paragraph 106 |
| 3    refer, in part, to a fraudulent scheme? |
| 4    A. It's not addressed in the complaint. |
| 5    Q. But it's your understanding that Paragraph 106 |
| 6      is intended to refer only to those instances in |
| 7      which a long-term disability claimant was |
| 8      awarded benefits for some period of time, |
| 9      correct? |
| 10       It's not -- well, is the allegation in |
| 11   Paragraph 106 intended to refer in any way to |
| 12   instances in which a claimant was never awarded |
| 13   long-term disability benefits by Cigna? |
| 14       MR. NADLER: Object. The question is |
| 15   vague, but you can answer. |
| 16   A. If they were never awarded Social Security |
| 17     disability benefits by Cigna? |
| 18   Q. Yes. |
| 19   A. They would not have the right to recoup the |
| 20     overpayment paid by Social Security disability. |
| 21     There was nothing paid. |
| 22   Q. Right. Are you aware of Cigna ever trying to |
| 23     recover money from somebody who had applied for |
| 24     long-term disability benefits and been denied, |

28 (Pages 106 to 109)

HIGHLY CONFIDENTIAL

Dawn Barrett
6/26/2008

---

Page 110

1    but nonetheless been awarded Social Security
2    disability benefits?
3  A. I do not know that.
4  Q. You've never seen a policy that would permit
5    that, correct?
6  A. If they're denied LTD benefits, they're denied
7    LTD benefits.
8  Q. So far as you know, the only time that Cigna
9    seeks to recoup money from somebody who has been
10   awarded Social Security disability benefits is
11   if they have previously paid long-term
12   disability benefits and then determined under
13   the contract that those were overpayments
14   because of the SSDI award.
15      Is that a fair statement?
16  A. Yes.
17  Q. Now, this complaint was filed in November of
18   2003, and by that, I mean what we've marked as
19   7.
20      Now, at the time you filed this
21   complaint, were you aware of any particular
22   claimant who Cigna had referred to a vendor
23   where it was clear from Cigna's files that the
24   claimant could not possibly qualify for SSDI

---

Page 111

1    benefits?
2  A. At the time this complaint was filed?
3  Q. Right.
4  A. I'm --
5      MR. KAPLAN: Why don't you read the
6    question back. I know it's a long question,
7    unfortunately.
8      (Question read.)
9  A. A specific claimant at that time?
10  Q. Yes.
11  A. No.
12  Q. Did anybody tell you that that had happened,
13   that a long-term disability claimant who, based
14   on Cigna's files, couldn't possibly be entitled
15   to Social Security disability insurance
16   benefits, had been referred to a vendor?
17  A. Has anyone told me that?
18  Q. Yes. At the time this complaint was filed, had
19   anybody told you that that had happened?
20  A. I knew that that had happened.
21  Q. Let me ask the first question.
22      Had anybody told you that that had
23   happened?
24  A. Nobody had to tell me this. I knew it happened.

---

Page 112

1  Q. Let's leave aside whether anybody had to tell
2    you it happened. My question is:
3      Did anybody tell you that that had
4    happened?
5      MR. NADLER: Object to the question as
6    vague, but you can answer.
7  A. I don't know one specific person, no.
8  Q. And you don't -- you do not have in mind any
9    particular claimant who fits that description.
10     Is that a fair statement?
11     MR. NADLER: Object to the question as
12   vague, but you can answer.
13  A. There have been many claimants that have been
14   referred that did not fit that. I've --
15  Q. Can you identify in any way, by any means
16   whatsoever, a claimant who Cigna referred to a
17   vendor where it was clear from Cigna's files
18   that the claimant could not possibly qualify for
19   SSDI benefits?
20  A. I think I provided that information in my
21   complaint.
22  Q. That was provided in 2006. I am talking about
23   at the time you filed this complaint in 2003.
24      Did you then have in mind any claimant

---

Page 113

1    who fit that description?
2      MR. NADLER: Object to the question as
3    vague, but you can answer.
4  A. There were claimants that fit the description,
5    yes.
6  Q. I take it you don't remember the name of any one
7    of those claimants?
8  A. No, I do not.
9  Q. Do you remember any other descriptive
10   characteristic of that claimant so that we can
11   go back and find the file?
12  A. No.
13  Q. And you don't remember anybody telling you that
14   that was happening?
15  A. Specifically telling me, no.
16  Q. You just know it?
17  A. I know it.
18  Q. Because you were a vendor coordinator?
19  A. And an employee at Cigna.
20  Q. Now, with respect to those claimants that you
21   know, but cannot identify by any characteristic,
22   were referred to vendors but could not possibly
23   qualify for SSDI benefits, did the vendor then
24   go ahead and assist them in filing a SSDI

---

29 (Pages 110 to 113)

HIGHLY CONFIDENTIAL

Dawn Barrett
6/26/2008

Page 114

1    application?
2    A. Yes.
3    Q. How do you know that?
4    A. That was part of their contract. We would get
5       notification that those had taken place.
6    Q. Their contract permitted them to reject some
7       claimants when they concluded that they could
8       not -- they weren't appropriate for filing a
9       SSDI application, did it not?
10   A. I don't know exact words of the contract.
11   Q. So as you sit here today, you don't know whether
12      the vendor was entitled to reject referred
13      claims?
14   A. I do not know that.
15   Q. Do you have any memory of whether vendors ever
16      rejected referred claims?
17   A. I do not recall them doing that.
18          MR. KAPLAN: Let's mark as Exhibit 8,
19      Second Amended Complaint and Demand For Jury
20      Trial in this action.
21          (Marked, Exhibit No. 9, Second Amended
22      Complaint and Demand For Jury Trial.)
23          MR. KAPLAN: It's 9, excuse me.
24   Q. Have you seen -- let me represent to you that

Page 115

1    this is the Second Amended Complaint and Demand
2    For Jury Trial that was filed in federal court
3    here in Boston in this action.
4          Have you seen this second amended
5    complaint previously?
6    A. Yes, I have.
7    Q. And did you read it?
8    A. Yes, I have.
9    Q. Did you read it before it was filed?
10   A. Yes, I have.
11   Q. Did you satisfy yourself that it was true and
12      accurate in all respects?
13   A. Yes, I have.
14   Q. Let me ask you to look at Paragraph 5, in
15      particular, the first sentence of Paragraph 5.
16      There you allege:
17          "As a matter of uniform corporate
18      policy, Cigna requires all of the long-term
19      disability claimants on its disability policies
20      and those written by its subsidiaries to apply
21      for SSDI as a condition of receiving the full
22      LTD benefits which the claimants are entitled to
23      receive."
24          Is that a true statement?

Page 116

1    A. Yes.
2    Q. If a claimant has a firm return-to-work date
3       within nine months of the beginning of their
4       disability, does that claimant have to file in
5       order to receive their full disability benefits?
6    A. It's -- with a firm return-to-work date, it has
7       to be a complete firm return-to-work date in
8       order for them not to have to file.
9    Q. But if they have a firm return-to-work date
10      within nine months of the beginning of their
11      disability, they don't have to file to receive
12      their full benefits; isn't that correct?
13   A. As part of the process of the documents, it says
14      they're not referring those claims. But they
15      are still required to file.
16   Q. Are you aware of any long-term disability
17      claimants with firm return-to-work dates within
18      nine months who did not file for SSDI benefits?
19          Are you aware of those claims?
20   A. There are claimants that have not wanted to file
21      for Social Security disability benefits because
22      they said they wanted to return to work, and if
23      they did not file, their benefits were reduced.
24   Q. Identify one for -- well, strike that.

Page 117

1          I'm talking now about a claimant who has
2    a firm return-to-work date within nine months.
3    Is that -- and has long-term disability benefits
4    awarded.
5          Are those benefits reduced for that
6    claimant if the claimant doesn't file a SSDI
7    application?
8    A. Yes.
9    Q. Can you identify a single claim in which that
10      has occurred?
11   A. As far as I know, they -- Cigna claim managers
12      do not constitute any firm return-to-work date.
13      They look at it all as a what-if. There is no
14      firm return-to-work dates.
15   Q. Who told you that?
16   A. That's the process.
17   Q. Did anybody tell you that? Has any human being
18      said that to you?
19   A. Yes.
20   Q. Who?
21   A. Specifically, I don't know.
22   Q. Paragraph 6, you allege:
23          "Cigna knows, based on its extensive
24      experience in reviewing LTD claims and in light

30  (Pages 114 to 117)

Dawn Barrett
6/26/2008

Page 118

1    of the comprehensive medical and vocational
2    record that it acquires for each insured, that
3    most LTD claimants cannot possibly be eligible
4    for SSDI benefits under well-established law."
5        Is that a true statement?
6  A. Yes, I believe so.
7  Q. What do you base that on?
8  A. There are nurses and doctors and vocational
9    rehab personnel.
10 Q. Well --
11       MR. NADLER:  Wait.  Let her finish.
12 Q. Did you finish your answer?
13 A. Did you hear my answer?
14 Q. I did, but your attorney was sticking his hand
15    up as you were still speaking.
16       MR. KAPLAN:  Would you read back the
17    question and answer, Kathy, and see whether or
18    not that's the full and complete answer.
19       (Question and answer read.)
20 Q. Is there anything else you want to add to that?
21 A. I was going to say, in the office that reviewed
22    files.
23 Q. Do you have Exhibit 8?  Do you recall earlier
24    today we looked at Exhibit 8?

Page 119

1  A. Yes.
2  Q. As of November 4, 2003, what percentage of
3    claimants were having their SSDI benefits
4    awarded?
5        MR. NADLER:  Object to the question as
6    calling for hearsay and having a lack of
7    foundation, but you can answer.
8  A. According to this document?
9  Q. Uh-huh.
10 A. The award rate climbed to 83 percent.
11 Q. Do you have any reason to believe that the
12    information on this document is inaccurate?
13       MR. NADLER:  Object to the question as
14    lacking foundation, but you can answer.
15 A. I have no idea where they got -- how they
16    compiled these, their percentages.
17 Q. In Paragraph 6, you say:
18       "Most LTD claimants cannot possibly be
19    eligible for SSDI benefits."
20       What was the basis for that statement?
21       MR. NADLER:  Object to the question as
22    asked and answered, but you may answer again.
23 A. Based on the medical and vocational personnel
24    that are there at Cigna.

Page 120

1  Q. So those medical and vocational personnel tell
2    you that most of their claimants could not
3    possibly be awarded SSDI benefits?
4  A. No.
5  Q. What does the fact that there are medical and
6    vocational people at Cigna, how does that
7    substantiate the fact that most LTD claimants
8    cannot possibly be eligible for SSDI benefits?
9    How does that establish that in your mind?
10       MR. NADLER:  Object to the question as
11    compound, but you may answer.
12 A. The medical and vocational personnel should know
13    if they are qualified applicants or not.
14 Q. Right.  A medical and vocational -- the medical
15    and vocational experts should know if a
16    particular applicant is eligible for SSDI
17    benefits as well?
18 A. They should know, yes.
19 Q. How do you conclude that as a result of that
20    fact, most LTD claimants cannot possibly be
21    eligible for SSDI benefits?  How do you know
22    that?
23 A. Because they are referred prior to enough
24    screening.

Page 121

1  Q. But isn't it the case that 83 percent of the LTD
2    claimants are awarded benefits?
3        MR. NADLER:  Object to the question as
4    lacking foundation and calling for hearsay, but
5    you can answer.
6  A. Again, I don't know where the percentage came
7    from.
8  Q. How do you know where the "most" percentage
9    comes from?
10       MR. NADLER:  Object to the question as
11    argumentative and vague, but you can answer.
12 A. I don't have a percentage in my complaint.
13 Q. Most.  In your mind, is that more than 50
14    percent?
15 A. I don't have any --
16 Q. It's your complaint.  Do you understand where
17    you use the word "most" in Paragraph 6, that
18    you're saying that more than 50 percent of LTD
19    claimants cannot possibly be eligible for SSDI
20    benefits under well-established law?  Are you
21    using the word "most" to mean more than 50
22    percent?
23       MR. NADLER:  Object to the question as
24    compound.

31 (Pages 118 to 121)

HIGHLY CONFIDENTIAL

Dawn Barrett
6/26/2008

Page 122

1   A. I can't answer that question.
2   Q. Have you seen any data with respect to the
3      number of LTD claimants who are rejected for
4      benefits that support the allegation in
5      Paragraph 6? Are you aware of any data that
6      supports your claim?
7   A. Specific data, no.
8   Q. When you read this complaint before it was
9      filed, were you at all concerned by the
10     allegations in Paragraph 6 and that you had no
11     data to support what you were alleging?
12  A. No.
13         MR. NADLER: Mitch, it's noon. What are
14     your plans for lunch? We can keep going for a
15     while.
16         MR. KAPLAN: Why don't we go for another
17     half hour.
18         MR. NADLER: If we're going to do that,
19     let's take a break for a little while.
20         MR. KAPLAN: Why don't we take a
21     five-minute break and then do a half hour,
22     45-minute lunch.
23         THE VIDEOGRAPHER: The time is 11:59.
24     We're off the record.

Page 123

1          (Recess.)
2          THE VIDEOGRAPHER: The time is 12:13.
3      We are back on the record.
4   Q. Ms. Barrett, you still have in front of you
5      Exhibit 9, the second amended complaint?
6   A. Yes.
7   Q. Can I ask you to turn to Paragraph 14?
8          There in Paragraph 14, you allege:
9          "Cigna causes thousands of such false
10     and fraudulent claims to be submitted to SSA
11     each year."
12         How did you calculate the thousands?
13  A. Just by the number of claims that have been
14     filed.
15  Q. What number was that that you used to get to the
16     thousands of false and fraudulent claims?
17  A. I don't know.
18  Q. Well, in Paragraph 98 of your first complaint,
19     you allege that by September 2000 -- why don't
20     you get that.
21  A. 98?
22  Q. Yes. Paragraph 98 on page 24.
23         There you allege that "By September
24     2003, more than 2,000 claims had been referred

Page 124

1      from Cigna to Advantage 2000."
2          Do you see that?
3   A. Yes.
4   Q. I think you testified previously, Advantage 2000
5      got most of the claimants; is that correct?
6   A. Yes.
7   Q. And then if you look at what we've looked at
8      previously, Exhibit 8, the offset reporter, do
9      you recall that that showed a success rate of
10     approximately 84 percent?
11         MR. NADLER: Object to the question as
12     calling for hearsay and lack of foundation, but
13     you can answer.
14  A. The Offset Observer does indicate 83 percent.
15  Q. Right. So is that information, in your mind,
16     consistent with Cigna causing thousands of false
17     and fraudulent claims to be submitted to SSA
18     each year?
19         MR. NADLER: Objection to the question.
20     What do you mean by that question?
21         MR. KAPLAN: I asked a question. Are
22     you directing her not to answer?
23         MR. NADLER: I object to the question as
24     vague and object to the phrase "that

Page 125

1      information."
2   Q. Is the information contained in the offset
3      reporter and your allegation in Paragraph 98
4      consistent with your claim, your assertion that
5      Cigna causes thousands of such false and
6      fraudulent claims to be submitted to SSA each
7      year?
8   A. Yes.
9   Q. What data were you looking at to come up with
10     this thousands of false and fraudulent claims?
11  A. I don't recall the data.
12  Q. What is your best understanding of the number of
13     claims that are referred to the vendors, what
14     percentage of those claims actually result in
15     awards? Do you know that?
16  A. I do not.
17  Q. If you don't know that, how could you assert
18     that thousands of false and fraudulent claims
19     were submitted to SSA each year?
20         MR. NADLER: Object to the question as
21     argumentative, but you may answer.
22  A. Based on a number of LTD claimants, claims that
23     are filed each year.
24  Q. How many is that?

32 (Pages 122 to 125)

HIGHLY CONFIDENTIAL

Dawn Barrett
6/26/2008

Page 126

1   A. Thousands.
2   Q. How many -- what percentage of them are false?
3   A. I could not answer that question.
4   Q. Then why did you make this allegation in
5      Paragraph 14 if you can't answer that question?
6          MR. NADLER: Object to the question as
7      argumentative, but you can answer.
8   A. I don't know why it's stated.
9   Q. When you read this complaint before it was
10     filed, did this first sentence in Paragraph 14,
11     did that cause you any concern?
12  A. No.
13  Q. Wasn't that important to you?
14         MR. NADLER: Object to the question as
15     argumentative.
16         You can answer.
17  A. I just know there's thousands of claimants in
18     the system.
19  Q. But you don't know what percentage of those
20     claimants in the system ultimately are awarded
21     SSDI after review by the Social Security
22     Administration?
23  A. Not at this time, no.
24  Q. Did you know it at the time this complaint was

Page 127

1      filed?
2   A. At that time, maybe not. Maybe. I don't
3      remember.
4   Q. Would you turn to Paragraph 69.
5   A. I'm sorry. 69?
6   Q. 69 on page 15.
7          There, you allege that "Since 1997, even
8      if a claim does not meet the Social Security
9      Assistance referral guidelines set forth in
10     paragraphs" -- they're unspecified -- "Cigna
11     still instruct its LTD case managers to direct
12     LTD claimants to file for SSDI benefits.
13     Claimants are told if they do not file for
14     SSDI benefits, their Cigna benefits will be
15     offset by the amount Cigna determines they would
16     have received had they applied for those
17     benefits."
18         What do you base that allegation on?
19  A. The information that was supplied to me during
20     my training.
21         MR. KAPLAN: Let's mark as Exhibit 10,
22     this document entitled "Social Security Referral
23     Coding and Submission Procedures."
24

Page 128

1          (Marked, Exhibit No. 10, Social Security
2      Referral Coding and Submission Procedures.)
3   Q. Have you seen this document previously?
4          MR. NADLER: Ms. Barrett, I just caution
5      you, you have the right to familiarize yourself
6      with the document.
7   Q. Let me point out to you, Ms. Barrett, by the
8      number at the bottom, the number that begins
9      BAR, that was produced to us by your lawyers.
10         That may help you or may not help you in
11     determining whether you've seen this document
12     previously.
13  A. I've seen this before.
14  Q. Is this a document that was provided to you in
15     the course of your training and for your work at
16     Cigna.
17  A. It's available to me.
18  Q. Is it something that you referred to when you
19     worked at Cigna?
20  A. Yes.
21  Q. Did you make a copy of this document and take it
22     home with you while you were working at Cigna?
23  A. Yes.
24  Q. Was that permitted for you to take home company

Page 129

1      documents?
2   A. I don't know what documents were, or if there
3      were specific documents, which were and which
4      were not.
5   Q. So did you take it home so that you could become
6      very familiar with its contents and be able to
7      use it in your job?
8   A. No.
9   Q. Why did you take it home?
10         MR. NADLER: I just caution you,
11     Ms. Barrett, not to reveal communications with
12     counsel, but you may answer if you can do so
13     without revealing communications with counsel.
14  A. I don't think I can answer.
15  Q. Is that because your lawyer told you to copy it
16     and bring it home?
17         MR. NADLER: I instruct you not to
18     answer that question.
19  Q. Let me ask you to turn to page 4 of 13 in the
20     document.
21         Do you see the heading "All other
22     claims"?
23  A. Yes.
24  Q. Why don't we read it into the record. There

33 (Pages 126 to 129)

HIGHLY CONFIDENTIAL

Dawn Barrett
6/26/2008

Page 130

1    it's written:
2        "As indicated above, there are some
3    claims that will not be sent to the vendor
4    because they do not meet the referral criteria,
5    or because they choose to pursue benefits on
6    their own. In these cases, the CM" -- that's
7    the claim manager?
8    A. Correct.
9    Q. -- "and/or SST will need to closely monitor the
10   SS process. Each exception is monitored" --
11       MR. NADLER: SSAT, actually.
12   Q. SSAT. Sorry.
13       So No. 1:
14       "Simple pregnancy or expected return to
15   work with nine months from incur date."
16       And there it says:
17       "Diary should be set for eight months
18   from incurral date to request Social Security
19   application and refer claim to the vendor if
20   full-time RTW is not expected within next 30
21   days."
22       What is your understanding of what is
23   being directed by the part that I just read?
24   What is the instruction, as you understand it?

Page 131

1    A. The diaries should be set for eight months from
2    the incurral date to request a Social Security
3    application and refer to the vendor if the
4    full-time return to work is not expected within
5    the 30 days, as it says.
6    Q. If the person had already been directed to
7    apply -- is it your understanding that this
8    person would already have been directed to apply
9    for Social Security disability benefits?
10   A. They may have been.
11   Q. Is there someplace in this document that says
12   for a person who has a return-to-work date
13   within nine months, make them apply for Social
14   Security disability benefits?
15   A. In this document?
16   Q. Yes.
17   A. I'd have to go through the whole document.
18       MR. NADLER: Do you want to do that,
19   Mr. Kaplan?
20       MR. KAPLAN: Well, she had it with her
21   at home. My question is -- actually, I don't
22   want you to do that.
23   Q. Do you know whether there's any other place in
24   this document that says that this person should

Page 132

1    be required to apply for SSDI even if they have
2    a -- even if full-time return to work is
3    expected within nine months?
4    A. I do not know that.
5    Q. Are you aware, as you sit here today, are you
6    aware of any document that directs the claim
7    manager to ensure that a SSDI claim is filed
8    even if their claim file reflects return to work
9    within nine months? Is there such a document
10   anywhere in Cigna's files that you can think of?
11   A. A document that would say it's okay to send that
12   referral or a document specifying, saying to
13   return it?
14   Q. I guess -- we can all agree that there are
15   guidelines as to when a claimant should be
16   referred to a vendor, correct?
17   A. There are guidelines.
18   Q. Right. And guidelines are set out in this
19   document, aren't they, amongst many other
20   places?
21       For example, if you look at page 2, 2 of
22   13, and does that list the Social Security
23   referral guidelines at the top of the page?
24   A. Yes, it does.

Page 133

1    Q. And those list the screens that should be
2    applied claimants that fit any one of these
3    characteristics, those aren't to be referred to
4    the vendor. Is that your understanding of how
5    the system worked?
6    A. That should be applied, correct.
7    Q. Is it your understanding that somebody told the
8    claim manager to disregard the guidelines?
9    A. I don't know.
10   Q. Well, did you, during your period working for
11   Cigna, do you have a memory of anybody ever
12   telling you that they had heard that we were
13   supposed to disregard the guidelines?
14   A. Telling me?
15   Q. Yes.
16   A. Or just doing it?
17   Q. Let's start with telling you.
18   A. No.
19   Q. Now, are you aware that any claim manager
20   simply, to your knowledge, disregarded these
21   guidelines?
22   A. Yes.
23   Q. Who did that?
24   A. Specifically, I don't know.

34  (Pages 130 to 133)

Dawn Barrett
6/26/2008

Page 134

1  Q. As you sit here today, you know that a claim
2     manager did it, but you have no recollection of
3     the name of that claim manager?
4  A. I know several claim managers have done it.
5  Q. What are their names?
6  A. I don't know.
7  Q. Then how do you know they did it?
8  A. By the referrals that I've received.
9  Q. Do you have in mind any claim, any claimant who
10    was -- you were told to refer to a SSDI vendor
11    that met one of these characteristics on the top
12    of page 2?
13 A. I cannot name one.
14 Q. Let me ask you to turn to Paragraph 76.
15       MR. NADLER: Of Exhibit 9?
16       MR. KAPLAN: Of Exhibit 9, yes. Page
17    16, Paragraph 76 of Exhibit 9.
18 Q. Paragraph 76, you allege:
19       "Cigna reduces its reserves when the
20    SSDI claim is filed even if the SSDI claim is
21    later denied."
22       What does it do to the reserves when the
23    claim is denied?
24       MR. NADLER: Objection. This is asked

Page 135

1     and answered, but you can answer again.
2  A. I'm not sure.
3  Q. What's the effect of a denial -- do you think,
4     do you have any -- well, is there -- when a
5     claim is denied and not appealed, do you code
6     that?
7  A. When a claim for Social Security?
8  Q. When a Social Security -- one of your jobs was
9     coding the events that occurred in the SSDI
10    application process. Is that fair?
11 A. Yes.
12 Q. And there were a set of guidelines that told you
13    what codes to enter as different events occurred
14    in the life of a SSDI claim, correct?
15 A. Yes.
16 Q. If a claim is denied and not appealed, was there
17    a code that you entered with respect to that
18    claim?
19 A. Until we got receipt of appeal, we did not
20    change that code.
21 Q. How would you know if no appeal was taken? Did
22    you get some documentation that told you whether
23    a claim initially denied was appealed or not
24    appealed?

Page 136

1  A. There would be documentation.
2  Q. Let's assume you got documentation that it had
3     not been appealed.
4        Did you have a code that you then
5     entered?
6  A. There would have been a coding, yes.
7  Q. Did that have an effect on reserves?
8  A. As far as I know, yes.
9  Q. What was the effect?
10 A. I don't know.
11 Q. So you know what the effect of filing the SSDI
12    claim is but you have no idea what the effect of
13    denying the SSDI claim is?
14       MR. NADLER: Objection. The question
15    has been asked and answered, but you can answer
16    again.
17 A. The reserves are set per claim.
18 Q. Then you go on to write:
19       "This reduction in reserves improves
20    Cigna's financial statements even temporarily,
21    allowing it to write more insurance policies and
22    reap more premiums."
23       What do you mean by that sentence?
24 A. The reduction in reserve does improve Cigna's

Page 137

1     financial statements.
2  Q. How does that allow it to write more insurance
3     policies and reap more premiums?
4  A. I don't know.
5  Q. Why is it alleged in the complaint if you don't
6     know?
7  A. I don't recall why we put that in there at the
8     time.
9  Q. So you were comfortable with the complaint being
10    filed that had statements that you didn't know
11    what they meant?
12       MR. NADLER: Object to the question as
13    argumentative, but you can answer.
14 A. At the time, I knew. At this time, I don't
15    know. This was four years ago.
16 Q. Let's turn to Paragraph 115 on page 25.
17       Here you assert:
18       "Cigna rewards LTD case managers based
19    on high rates of referral of claims for SSDI
20    assistance knowing that many of the claims that
21    will be submitted to SSA will be false or
22    fraudulent claims."
23       What were the rewards that Cigna
24    provided?

35 (Pages 134 to 137)