# EXHIBIT L

# (2 of 2)

Page 150

1  confidential information in here and that I'm
2  assuming, Rich, that the confidentiality
3  stipulation has specific procedures for
4  maintaining the confidentiality of depositions
5  that include reference to confidential or highly
6  confidential information.
7      MR. ABATI: To be so designated.
8      MR. NADLER: As so designated. As a
9  minimum, let's mark it as attorneys eyes only to
10 maintain confidentiality. I'm sorry. I didn't
11 mean to interrupt.
12 Q. Is there anything you can do to be more specific
13    with respect to when you -- at some point, did
14    you go and look for the files of claimants who
15    would then be referred specifically to in the
16    amended complaint?
17     MR. NADLER: I object to that question
18 as compound, and not just as to form. I think
19 there are two thoughts in that. I think you'll
20 do better --
21     MR. KAPLAN: I'll restate the question.
22 That's all right.
23 Q. Did there come a time when you searched for
24    files relating to claimants that had certain

Page 151

1     characteristics in connection with this lawsuit?
2  A. Yes.
3  Q. The four claimants identified in the second
4     amended complaint, did you search for those
5     files in connection with this lawsuit?
6  A. Yes.
7  Q. What caused you to go look for these files?
8      MR. NADLER: I would caution you not to
9  reveal communications with attorneys, either
10 Phillips & Cohen or with counsel for the
11 government in answering this question.
12 A. It was requested of me to obtain these
13    documents.
14 Q. Counsel requested you to do that?
15 A. Yes. U. S. Government.
16 Q. Pardon?
17 A. The government did.
18 Q. The government requested you to do that?
19     MR. NADLER: I want to be very clear I'm
20 cautioning you not to reveal communications with
21 your counsel or with counsel of the government
22 in answering this question, but you can go ahead
23 and answer it to the extent you can without
24 revealing those communications.

Page 152

1  Q. Without telling me what was said, who was the
2     person that directed you to look for these claim
3     files?
4      MR. NADLER: Hang on one second. Let me
5  just consult.
6      (Pause.)
7      MR. NADLER: I'm happy to answer the
8  question. Can we just agree that there's no
9  subject matter waiver in her answering that
10 question?
11     MR. KAPLAN: You know, I'm just going to
12 take these questions one at a time. If you want
13 to assert the privilege with respect to the
14 identity of the lawyer who instructed her to
15 look for this, you can assert that privilege and
16 then we will let the Court decide.
17     MR. NADLER: I'm not instructing her.
18 I'm asking if you'll agree there's no subject
19 matter waiver.
20     MR. KAPLAN: I'm not going to agree with
21 respect to anything beyond what the rules of
22 evidence provide under these circumstances. I
23 don't see any reason to do that in response to a
24 question.

Page 153

1     We have identified that she looked for
2  the files of four claimants, the four claimants
3  that appear in the complaint, and somebody
4  directed her to do that.
5     If you want to instruct her not to
6  answer the question as to who that is, you go
7  ahead and do it.
8      MR. NADLER: Give me one second.
9      (Pause.)
10     MR. NADLER: I'll let her answer it.
11 Q. Who instructed you to look for these?
12 A. Counsel for the government.
13 Q. What was the name of the person?
14 A. Jeremy. I don't remember Jeremy's last name.
15 Q. Jeremy and we don't know the last name is the
16    person who told you to look for these files?
17 A. (Witness nods head.)
18 Q. And you understood Jeremy to be an attorney for
19    the United States government, the Department of
20    Justice?
21 A. Yes.
22 Q. Do you have any memory as to when Jeremy told
23    you to look for these files?
24 A. I believe it was after the fall of 2003 to 2004

Dawn Barrett
6/26/2008

Page 154

1  time frame.
2  Q. Between 2003 and 2004?
3  A. Yes.
4  Q. At the time that you looked for these files,
5     what was your job at Cigna?
6  A. I would have been a DCA, disability claim
7     administrator.
8  Q. So you began looking for these files after you
9     completed your assignment as a vendor
10    coordinator?
11 A. Yes.
12 Q. Were these files that you identified, were they
13    files that you would have otherwise been looking
14    at in the course of your job as a DCA?
15       MR. NADLER: Object to the question as
16    vague, but you can answer.
17 A. These files were accessible to anybody in the
18    office.
19       Specifically, did I work on these files?
20 Q. Yes.
21 A. No.
22 Q. When you were looking for the files, what were
23    you looking for? What were the characteristics,
24    what were you looking to find in the file in

Page 155

1  order to select it?
2  A. The referral to Social Security disability and
3     the time frame that they were closed.
4  Q. So you were looking for files that, in which
5     there had been a referral to SSDI or to a
6     vendor?
7  A. To SSDI.
8  Q. Did it make a difference to you when you were
9     looking for these particular type of files
10    whether there had been a referral to a vendor or
11    not?
12 A. That did not matter.
13 Q. You were just looking to make sure that -- when
14    you say referred to SSDI, were you looking for
15    files where there had actually been a SSDI
16    application filed?
17 A. Yes.
18 Q. Then you said, I'm not sure I caught it, and you
19    were also looking for files that had some time
20    frame. I'm sorry. I don't recall exactly what
21    you said.
22 A. If they were denied long-term disability
23    benefits. They were in conjunction with one
24    another.

Page 156

1  Q. So you were looking for any file where there had
2     been both a SSDI application filed and Cigna had
3     denied long-term disability benefits?
4  A. Correct.
5  Q. Were there any other particular characteristics
6     that you were looking for or just any file that
7     had those two elements in it?
8  A. Basically those two elements.
9  Q. How many files did you look through to find --
10    well, did you copy pages from files that you
11    selected through this process?
12 A. Yes, I did.
13 Q. You copied pages from the files of the four
14    claimants that are identified in the second
15    amended complaint; is that correct?
16 A. That is correct.
17 Q. Did you copy pages from any other files as well?
18 A. No.
19 Q. Do you have a memory of how many files you
20    looked through to find the -- to select the
21    files from which you would copy pages?
22 A. Not many.
23 Q. A hundred?
24 A. I wouldn't think that many.

Page 157

1  Q. The four files that you selected to copy pages
2     from, did you do that all -- was that done all
3     in the same day or the same trip to the file
4     cabinet?
5  A. Yes.
6  Q. Did you make this selection without regard to
7     who the case manager might have been on the
8     particular files?
9  A. That is correct.
10       MR. KAPLAN: Okay. Let's mark as
11    Exhibit 11, I think probably the best way to
12    identify them, these are documents having the
13    Bates Nos. BAR 994 through 1004.
14       (Marked, Exhibit No. 11, Documents,
15    Bates Nos. BAR 994-1004.)
16 Q. Ms. Barrett, I can tell by the BAR prefix on the
17    identification numbers these were documents
18    produced to us from your attorneys. My question
19    to you is:
20       Do these documents come from the Cigna
21    claim file for the claimants referred to as
22    Claimant A in the second amended complaint?
23 A. Sorry.
24       MR. NADLER: That's all right. Take

40 (Pages 154 to 157)

HIGHLY CONFIDENTIAL

Page 190

1  have more time to reflect on it, if it's
2  appropriate to reduce that designation to
3  confidential, we will do so.
4      MR. KIMBRELL: Highly confidential.
5      MR. NADLER: Highly confidential.
6      MR. KAPLAN: Highly confidential,
7  attorneys eyes only under the terms of the
8  stipulation?
9      Let's go off the record.
10     THE VIDEOGRAPHER: The time is 2:53.
11 We're off the record.
12     (Discussion off the record.)
13     THE VIDEOGRAPHER: The time is 2:53. We
14 are back on the record.
15     MR. KAPLAN: Why don't we simply note
16 that unless the parties agree otherwise later,
17 that the transcript and the exhibits will be
18 considered highly confidential under the terms
19 of the confidentiality stipulation.
20     MR. NADLER: Agreed.
21 Q. Ms. Barrett, are you familiar with a gentleman
22    named Patrick Loughren?
23 A. Who?
24 Q. Loughren?

Page 191

1  A. Loughren.
2  Q. How did you first come to meet Mr. Loughren?
3  A. Patrick represented my brother and I in
4     litigations, mainly my brother, for an
5     automobile accident that he was involved in.
6  Q. When was that accident, or perhaps better said,
7     when did Mr. Loughren first begin to represent
8     you and your brother in connection with that
9     accident?
10 A. My brother's accident was March 15, 2002.
11    Within the first two weeks probably after that.
12 Q. Did those -- did Mr. Loughren's representation
13    of you and your brother in all matters that were
14    connected to that accident, has that come to a
15    conclusion at some point?
16 A. As far as the accident is concerned, yes.
17 Q. Mr. Loughren brought on your behalf or as a next
18    friend to your brother, personal injury action
19    because of your brother's accident?
20 A. He was my brother's attorney. My brother never
21    met Patrick.
22 Q. But that matter was resolved and that case was
23    closed?
24 A. The automobile accident, yes.

Page 192

1  Q. Has Mr. Loughren represented you in any other
2     matters in addition to matters relating to the
3     automobile accident?
4  A. Yes.
5  Q. What matters were those?
6  A. He represented me in guardian proceedings.
7  Q. With respect to your brother?
8  A. With respect to my brother.
9  Q. In addition to the guardianship proceedings, any
10    other matters on which Mr. Loughren represented
11    you?
12 A. I contacted Patrick on different occasions for
13    other legal matters that have arisen with child
14    custody and child support.
15        Any legal questions, I would call
16    Patrick for reference.
17 Q. Any other matters in addition to the personal
18    injury proceeding, the guardian proceeding and
19    child custody and child support matters, any
20    other matters in which Mr. Loughren represented
21    you?
22 A. This claim, case.
23 Q. The Cigna claim?
24 A. Yes.

Page 193

1  Q. When did Mr. Loughren begin to represent you
2     with respect to the Cigna claim?
3  A. August 2003.
4  Q. Did Mr. Loughren give you a retention -- was
5     there any writing that reflected that
6     Mr. Loughren was now your attorney with respect
7     to Cigna matters?
8         MR. NADLER: Ms. Barrett, answer that
9     question yes or no.
10 A. Yes.
11 Q. Is that retention letter dated in August of
12    2003?
13 A. I don't know the date.
14        MR. KAPLAN: I'm going to request a copy
15    of that retention letter, if you have it, if
16    your client has it in her possession.
17        MR. NADLER: I mean, let's talk off-line
18    and I'm happy to pursue that with you.
19 Q. Are you paying Mr. Loughren for his services in
20    representing you in connection with the Cigna
21    matter?
22        MR. NADLER: Object to the question as
23    vague, but you can answer.
24 A. Is money coming out of my pocket right now?

Dawn Barrett
6/26/2008

Page 194

1  Q. Yes.
2  A. No money has come out of my pocket right now.
3  Q. Does Mr. Loughren submit invoices to you
4     reflecting time spent and fees due with respect
5     to the Cigna matter?
6         MR. NADLER: Hang on. I just want to
7     consult about this. I just want to consult
8     because I think we're close to the privilege
9     line.
10        (Pause.)
11        MR. NADLER: Can I have the question
12    back.
13        (Question read.)
14        MR. NADLER: I'll allow you to answer
15    the question yes or no.
16 A. No.
17 Q. Does Mr. Loughren have a contingency fee
18    agreement where he will be paid only if there's
19    a successful result in this case?
20        MR. NADLER: I'll instruct you not to
21    answer that question.
22 Q. To your knowledge, is Mr. Loughren licensed to
23    practice law in the Commonwealth of
24    Massachusetts?

Page 195

1  A. I don't know where he's licensed to practice
2     law.
3  Q. At some time, did Mr. Loughren tell you that he
4     had a plan to sue Unum?
5         MR. NADLER: I would ask you not to
6     reveal any communication you had with
7     Mr. Loughren that reflected legal advice or
8     legal discussions in connection with any matter
9     in which he represents you.
10        To the extent you can answer that
11    question without doing so, you can answer.
12        MR. KAPLAN: Why don't you take a moment
13    and instruct your client generally, because I'm
14    going to need to make a record. I think this is
15    very important for the purposes of this case
16    that it be accurate and it's not going to be
17    much of a record if you do a long speech between
18    each question.
19        I understand the issues you're
20    confronting and I want you certainly to be in a
21    position to advise your client, but it's pretty
22    hard to conduct an examination if each question
23    is followed by such a long explanation as to
24    what she shouldn't do that Ms. Barrett no longer

Page 196

1     remembers the question.
2         So if you want to take a break and you
3     can talk about the attorney/client -- I'm going
4     to ask her a series of questions concerning her
5     discussions with Mr. Loughren.
6         MR. NADLER: I actually think it's
7     important for my instructions to be on the
8     record and so I'll try to keep them short and I
9     certainly don't want to interfere with your
10    examination.
11        I think we both have to make a record
12    here and I think I just need -- I want my
13    instructions to be on the record.
14        MR. KAPLAN: Well, I'll start again.
15 Q. Did Mr. Loughren tell you that he was planning
16    to bring a lawsuit in his own name against Unum?
17        MR. NADLER: Same instruction.
18 A. I cannot answer that question.
19 Q. Did he tell you that before or after August, if
20    he told you -- strike that.
21        Did you have conversations with
22    Mr. Loughren concerning whether he was going to
23    bring a lawsuit against Unum prior to August
24    2003?

Page 197

1         MR. NADLER: Same instruction.
2  A. I cannot answer that question.
3  Q. Earlier today, you testified that you had a
4     conversation with Laurie Swanson about the
5     propriety of Cigna's practices with respect to
6     SSDI.
7         Was that conversation before or after
8     August 2003?
9  A. Prior to August 2003.
10 Q. Earlier today you had no idea when it occurred.
11    I asked you the same question. What's caused
12    you to remember that between now and then?
13 A. No. If I remember correctly, I said it was
14    during the period of time I was a vendor
15    coordinator.
16 Q. Correct.
17 A. And I was not a vendor coordinator in August of
18    2003.
19 Q. What was your position in August 2003?
20 A. Disability claim administrator.
21 Q. Did you mention to any of your friends that
22    Mr. Loughren had told you that he was going to
23    bring a lawsuit against Unum?
24 A. No.

50 (Pages 194 to 197)

HIGHLY CONFIDENTIAL

Dawn Barrett
6/26/2008

### Page 198

1  Q. Did you talk to Elaine Belenis about your plans
2     to bring a lawsuit against Cigna?
3  A. No.
4  Q. When did Ms. Belenis, Elaine Belenis, when did
5     you and Ms. Belenis cease being friends?
6        MR. NADLER: Object to the question as
7     lacking foundation, but you can answer.
8        MR. KAPLAN: Well, let me lay a
9     foundation then.
10 Q. For some period of time, was Elaine Belenis one
11    of your closest friends?
12 A. Yes, she was.
13 Q. Did there come a time when you weren't friends
14    any longer?
15 A. Yes, there was.
16 Q. And you no longer speak to her?
17 A. I do still speak to her, not in the closeness
18    that we were previously.
19 Q. When did you cease to be a close friend of
20    Ms. Belenis?
21 A. Approximately 2004, 2000 -- sometime in 2004.
22 Q. Did you ever have any conversations with
23    Ms. Belenis about the Cigna lawsuit?
24 A. Not to my knowledge.

### Page 199

1  Q. Did you ever tell Ms. Belenis how much money you
2     thought you might get if the Cigna lawsuit was
3     successful?
4  A. I have no idea how much money I could get.
5  Q. Did you ever talk to Ms. Belenis about
6     Mr. Loughren, generally?
7  A. In representation with my brother's case, yes,
8     that's when her and I were still really close.
9  Q. Did you ever speak to Ms. Belenis about his work
10    with you with respect to Cigna?
11 A. No, not to my knowledge.
12 Q. As best you recall, what was the first date on
13    which you had any conversation with Mr. Loughren
14    about the propriety of Cigna's SSDI processes?
15       MR. NADLER: I'll instruct her not to
16    answer.
17       MR. KAPLAN: The date, the date of the
18    communication is privileged? Okay.
19       MR. NADLER: I mean, you've coupled it
20    to substance.
21 Q. When was the first date that you recall speaking
22    to Mr. Loughren about Cigna's SSDI processes?
23       MR. NADLER: Give me one second.
24       (Pause.)

### Page 200

1        MR. NADLER: All right. I'm allow you
2     to answer that.
3  A. I think I did answer that previously. In August
4     2003.
5  Q. Did Mr. Loughren suggest to you initially or did
6     you suggest to Mr. Loughren that there was the
7     opportunity for you to bring a lawsuit against
8     Cigna?
9        MR. NADLER: Same instruction. I'd ask
10    you not to answer that to the extent it would
11    reveal communications with counsel.
12 Q. So are you going to answer the question?
13 A. No, I will not.
14 Q. At the time that you spoke with Mr. Loughren in
15    August of 2003, how long had it been since you'd
16    ceased to be a vendor coordinator?
17 A. A couple of months.
18 Q. Was there some particular event that caused you
19    to speak to Mr. Loughren about Cigna and
20    bringing a lawsuit against Cigna?
21       MR. NADLER: I would simply caution you
22    not to answer that question if doing so would
23    cause you to reveal communications with counsel.
24 A. I cannot answer that question.

### Page 201

1  Q. So you can't tell me whether there was an event
2     that caused you to talk to Mr. Loughren about
3     Cigna's SSDI processes without invading the
4     attorney/client privilege; is that true?
5        MR. NADLER: Same instruction.
6  A. That's true.
7  Q. That's true.
8        When you first spoke to Mr. Loughren
9     about Cigna and its SSDI processes, when you
10    were first speaking to him, did you have any
11    documents to show him?
12       MR. NADLER: Same instruction.
13 A. I cannot answer.
14 Q. Can't answer because you don't remember or
15    because you're declining to answer that question
16    on the grounds of attorney/client privilege?
17 A. Attorney/client privilege.
18 Q. So you can remember but you're just not going to
19    answer?
20 A. Correct.
21 Q. How long before you first spoke to Mr. Loughren,
22    how much time had passed between the last
23    conversation you had with anybody internal to
24    Cigna about your concerns about the propriety of

08/01/00  10:08 FAX                                                                  ☒001

                                                          804 Steiner Street
                                                        Pittsburgh, PA. 15227

                                                        August 1, 2000

I am transmitting 2 pages including this transmittal sheet.

Attention:        Human Resources

From:             Dawn Barrett

Phone No.        881-1369

Comments:       I am interested in being considered for the File Clerk Position that was advertised in the Post Gazette – Job code HR/FC. My resume is attached. I hope to hear from you soon.



Dawn Marie Barrett
804 Steiner Street
Pittsburgh, PA 15227
Residence (412) 881-1369

**EXPERIENCE:**

| | |
|---|---|
| 3/96 - Present | Sheraton Hotel Station Square - 7 Station Square Drive - Pittsburgh, PA<br>Banquet Server - Set up banquet facility for various functions, such as weddings, reunions, etc. Serve dinners from appetizers to desserts and final cleanup. |
| 9/95 - 2/00 | Kirkpatrick & Lockhart LLP - 1500 Oliver Building - Pittsburgh, PA 15222<br>Senior Records Clerk - Assist in processing information by sorting and classifying material for integration into the central filing system. Enter data into the department's database. Retrieve and reference information for users. Accumulate statistical data. Perform special data gathering projects. Maintain logs and indexes to provide status of information. Responsible for off-site storage billing invoices. Assist in training personnel and perform other office duties as required. |
| 12/94 - 9/95 | J&K Sportspot - 426 Lebanon Road - West Mifflin, PA 15122<br>Barmaid - Duties include waiting on customers promptly, cooking, handling stock and balancing cash register. |
| 9/91 - 11/94 | Half-Time Lounge - 1413 Cathell Road - Pittsburgh, PA 15236<br>Barmaid - Duties include waiting on customers promptly, cooking, handling $800 cash drawer and balancing cash register. |
| 1/92 - 7/92 | Kaufmann's - 5th Avenue - Pittsburgh, PA 15222<br>Customer Service Representative - Duties included answering phone calls, pulling up account information by data entry, writing up complaints, filing information and organizing the mail. |
| 9/91 - 1/92 | Equifax - 381 Mansfield Avenue - Greentree, PA<br>Telephone reporter - Duties included calling customers to verify their auto insurance information. |
| 8/88 - 5/90 | Centimark Corporation - 3000 Industrial Boulevard - Bethel Park, PA<br>Telemarketer - Duties included setting up inspections and quotes for sales representatives. Received a special achievement award for high sales from leads. |
| 10/86 - 7/88 | Ames Department Store - 5055 Library Road, Bethel Park, PA 15102<br>Customer Service - Duties included cashier, supervising cashiers, handling exchanges and refunds, responsible for a $500 cash drawer, checking and receiving merchandise and directing incoming calls. Scheduled breaks for cashiers. |

**SKILLS:** Data entry on CRT, computer knowledge of Microsoft Exchange (E-mail), Windows and Access filing softwares; receptionist, switchboard, hostess, operating copiers and facsimile machines, handling phone calls, shipping and receiving, doing inventory, and filing.

**PERSONAL:** Member American Legion Ladies Auxiliary - Was Active in D.E.C.A. (Distributed Education Clubs of America) for 2 years.

**INTERESTS:** Teaching and working with children, photography, word puzzles, walking, throwing darts and bowling.

**EDUCATION:** Bethel Park High School - Class of 1988
309 Church Road
Bethel Park, PA 15102

**REFERENCES:** Available upon request.

### ACKNOWLEDGEMENT RECEIPT

### CIGNA GROUP INSURANCE
### ATTENDANCE POLICY

I hereby acknowledge that I have received a copy of the new CIGNA Group Insurance Attendance Policy, the Absence Policy, effective January 1, 2003.

I understand that the Attendance Policy is subject to change at any time at the discretion of division management. I also understand that the policy is not a contract of employment.

_Dawn M. Barrett_
Employee Name (Print)

_[signature]_
Employee Signature

_10/16/02_
Date

9/25/02

**EMPLOYMENT APPLICATION**

Name _Dawn Barrett_    Date _8/16/00_

*Consider A Company In The Business of Caring.*



CIGNA

EMPLOYMENT APPLICATION

PLEASE PRINT

**NAME** (First) Dawn (Middle) Marie (Last) Barrett
**(Area Code) TELEPHONE NO.** (412) 881-1369
**E-MAIL**

**ADDRESS** 804 Steiner St **CITY** Pittsburgh **STATE** PA **ZIP CODE** 15227

If you are not a U.S. Citizen, do you have a legal right to remain and work in the U.S.A.? ☒ YES ☐ NO
☐ VISA Type
☐ VISA Number
Have you previously applied to a CIGNA* company? When? Where? Which company? no

Have you ever been employed by a CIGNA* company? If yes, list company, department and positions, dates of employment, location and reason for leaving.
☐ YES ☒ NO

How were you referred to CIGNA*? (Please check)
☐ Direct Application
☐ Campus Recruiting
☐ Employment Agency
☐ Job Fair
☒ Newspaper
☐ Television
☐ Employee Referral _____ (NAME)
☐ Community Organization _____ (NAME)
☐ Magazine
☐ Radio
☐ Internet

**SALARY DESIRED** $22,000 ☒ per year
**POSITION OR TYPE OF WORK DESIRED** File Clerk
**WHEN ARE YOU AVAILABLE TO START WORKING?** A.S.A.P.

**WORK SCHEDULE DESIRED** (Check more than one box if appropriate)
☒ Full-Time ☐ Temporary ☐ Co-op
☐ Part-Time ☐ Summer Only Hours _____

**WOULD YOU BE WILLING TO RELOCATE?**
☐ Yes If yes, where?
☒ No

FOR PROPER EVALUATION, IT IS ESSENTIAL THAT ALL OF THE FOLLOWING QUESTIONS BE ANSWERED ON THIS APPLICATION.

EDUCATIONAL BACKGROUND

| | Name | City | State | Major Course of Study | Circle Last Year Successfully Completed | Diploma or Degree Awarded | Scholastic Average |
|---|---|---|---|---|---|---|---|
| High School or Preparatory | Bethel Park Senior High | Bethel Park | PA | Business marketing | 1 2 3 ④ | Diploma | 3.0 |
| College | | | | | 1 2 3 4 | | |
| College | | | | | 1 2 3 4 | | |
| Additional Education | | | | | | | |
| | | | | | | | |
| | | | | | | | |

ADDITIONAL SKILLS AND ACTIVITIES

**TYPING SPEED** not sure WPM
**DATA ENTRY** not sure WPM
**COMPUTER EXPERIENCE:** List hardware and software Microsoft Word & Exchange, Access, Q&A

**LIST EXTRACURRICULAR ACTIVITIES OR HONORS** Bowling, Darts, Word Searches, MVP in DARTS

Please list additional skills, technical or professional knowledge that you feel would enhance this application for employment.
quick learner
good problem solver

List any licenses (with expiration dates), certificates, publications or professional achievements that would support this application for employment.

*CIGNA refers to CIGNA Corporation and its subsidiaries. Most employees are employed by subsidiaries.

# EMPLOYMENT HISTORY

**IMPORTANT** List every employment, including part-time, whether or not it seems relevant to the position for which you are applying. If a recent graduate, please indicate summer employment. Please ask if you need additional paper.

## PRESENT OR LAST EMPLOYER

- **NAME OF EMPLOYER:** Sheraton Hotel
- **AREA CODE / TELEPHONE NO.:** (412) 261-2000
- **ADDRESS:** 7 Station Sq Dr
- **CITY:** Pittsburgh
- **STATE:** PA
- **ZIP CODE:**
- **DATES OF EMPLOYMENT:** FROM MO. 3 YR. 96 TO present MO. YR.
- **TITLE OF POSITION:** Banquet Server
- **NAME AND TITLE OF SUPERVISOR:** Hortense Peoples - Banq. Mgr
- **DESCRIPTION OF DUTIES, RESPONSIBILITIES AND SIGNIFICANT ACCOMPLISHMENTS:** Please see resume
- **SALARY STARTING:** avg. $12/hr
- **SALARY ENDING:** avg. $12/hr
- **NO. OF HOURS WORKED WEEKLY:** varied
- **REASON FOR LEAVING:** looking for steady full-time employment

## NEXT PREVIOUS EMPLOYER

- **NAME OF EMPLOYER:** Kirkpatrick + Lockhart
- **AREA CODE / TELEPHONE NO.:** (412) 355-6500
- **ADDRESS:** 1500 Oliver Bldg
- **CITY:** Pittsburgh
- **STATE:** PA
- **ZIP CODE:**
- **DATES OF EMPLOYMENT:** FROM MO. 9 YR. 95 TO MO. 2 YR. 00
- **TITLE OF POSITION:** Senior Records Clerk
- **NAME AND TITLE OF SUPERVISOR:** Joanne Foley - Director of Office Services
- **DESCRIPTION OF DUTIES, RESPONSIBILITIES AND SIGNIFICANT ACCOMPLISHMENTS:** Please see Resume
- **SALARY STARTING:** $16,500/yr
- **SALARY ENDING:** $22,500/yr
- **NO. OF HOURS WORKED WEEKLY:** 37½
- **REASON FOR LEAVING:** Change in management

## NEXT PREVIOUS EMPLOYER

- **NAME OF EMPLOYER:** J+K Sportspot
- **AREA CODE / TELEPHONE NO.:** Out of Business
- **ADDRESS:** 426 Lebanon Rd
- **CITY:** W. Mifflin
- **STATE:** PA
- **ZIP CODE:** 15122
- **DATES OF EMPLOYMENT:** FROM MO. 12 YR. 94 TO MO. 9 YR. 95
- **TITLE OF POSITION:** Bartender
- **NAME AND TITLE OF SUPERVISOR:** Jeff Kalfas - Owner
- **DESCRIPTION OF DUTIES, RESPONSIBILITIES AND SIGNIFICANT ACCOMPLISHMENTS:** Wait on customers, ring cash register, cook
- **SALARY STARTING:** $5.00/hr + tips
- **SALARY ENDING:** $5.50/hr + tips
- **NO. OF HOURS WORKED WEEKLY:** 40+
- **REASON FOR LEAVING:** Full-time "9-5" hours with benefits

## ADDITIONAL DETAILS

Please explain any lapses in employment or provide additional information which would be helpful to us and relevant to this application.

## MILITARTY EXPERIENCE

| U.S. MILITARY BRANCH | ACTIVE DUTY ENTRY DATE | DISCHARGE DATE | TRAINING SPECIALTY |
|---|---|---|---|
| | | | |

In order to be considered for employment at CIGNA*, you will required to:

- provide proof of U.S. citizenship or the authorization to work in the United States in accordance with the Immigration Reform and Control Act of 1986, temporary visas, 1-20, work authorization (I-765), or "green cards;"
- successfully pass an employment health examination, if required; and
- successfully pass tests for the presence of illegal drugs and alcohol;
- successfully pass a background check.

The types of checks may include, but are not limited to, criminal, verification of residence, credit, motor vehicle and state insurance records. Should CIGNA* decide to offer you a position, you would be required to sign an Authorization for Release form. Your actual employment would depend on satisfactory reports from these checks.

Your signature on this application grants CIGNA* permission to contact your schools, professional organizations or former employer(s), and releases them from any liability resulting from providing the information requested.

I grant permission to CIGNA* and to contact my present employer. Please check one: ☐ Yes ☐ No

CIGNA* reserves the right to test any employee for the illegal presence of drugs or alcohol.

Should you become an employee of CIGNA* and receive any overpayment of salary of benefits (including short-term disability), CIGNA* may recover overpayments by taking deductions from future paychecks or any unused vacation days.

I UNDERSTAND THAT NOTHING IN THIS APPLICATION AND NOTHING AT ANY TIME COMMUNICATED TO ME ABOUT MY RIGHTS AS AN EMPLOYEE, REGARDLESS OF SOURCE, LIMIT IN ANY WAY MY RIGHT TO RESIGN FROM MY EMPLOYMENT WITH A CIGNA* COMPANY AT ANY TIME FOR ANY REASON OR MY EMPLOYER'S RIGHT TO WITHDRAW AN OFFER OF EMPLOYMENT, OR TO TERMINATE MY EMPLOYMENT AT ANY TIME FOR ANY REASON.

I AGREE THAT IN RETURN FOR BEING CONSIDERED FOR EMPLOYMENT AND/OR RECEIVING AN OFFER OF EMPLOYMENT, I WILL RESOLVE ANY DISPUTE ABOUT MY CANDIDACY FOR EMPLOYMENT, EMPLOYMENT OR CESSATION OF EMPLOYMENT EXCLUSIVELY THROUGH THE INTERNAL AND EXTERNAL EMPLOYMENT DISPUTE RESOLUTION PROCESS OF MY EMPLOYER, WHICH INCLUDES FINAL AND BINDING ARBITRATION WITH A NEUTRAL ARBITRATOR. I UNDERSTAND THAT MY EMPLOYER ALSO AGREES TO FOLLOW THE DISPUTE RESOLUTION PROCESSES AND THAT COPIES OF THE POLICIES AND PROCEDURES DESCRIBING THE DISPUTE RESOLUTION PROCESSES ARE AVAILABLE TO ME.

I agree to fulfill all of the requirements listed above and understand that any misrepresentation or omission of facts on the Employment Application is sufficient cause for my disqualification from employment or my dismissal.

I certify that all of the information provided in this employment application is correct.

Date: 8/16/00           Signature of Applicant: _[signature]_

All phases of employment with CIGNA* are based strictly upon qualifications of the individual as related to the work requirements of the position. This policy is applied without regard to race, gender, color, religion, national origin, age, disability, veteran status, marital status or sexual orientation.

*CIGNA refers to CIGNA Corporation and its subsidiaries. Most employees are employed by subsidiaries.

HH-604734b Rev. 1/99



**CIGNA Group Insurance**
Life • Accident • Disability

September 6, 2000

Dawn Barrett
804 Steiner St.
Pittsburgh, PA  15227

Gateway View Plaza
1600 West Carson Street
Suite 300
Pittsburgh, PA  15219
Toll Free 800.238.2125

Dear Dawn,

We are pleased to confirm our offer and your acceptance of employment with Life Insurance Company of North America (LINA). We look forward to you beginning your employment on September 11, 2000, as a File Clerk in CIGNA Group Insurance, a Division of LINA. As discussed, your salary will be paid bi-weekly and will be at an annual rate of $22,100.

Our offer of employment will be contingent upon satisfactory findings from the background checks we will perform on you and successfully testing negative on a drug test. If your confirmed test is positive for the presence of drugs, your employment offer will be immediately rescinded. You will not be eligible to apply for employment with any CIGNA company for twelve (12) months.

You will receive from our Pre-Employment Processing Center (PEP), a Chain of Custody Form. Within 48 hours of receipt of the form, you need to take the form and a picture ID to one of the test sites indicated. If you have any questions regarding the testing, please contact the PEP Center at 1.800.944.6169.

Employment eligibility, as required by the Immigration Reform and Control Act of 1986, requires that you provide documents to verify your identity. We have attached a list of acceptable documentation to assist you. Under current law your inability to provide appropriate documentation may result in our inability to employ you. Please call me should this requirement be a problem for you.

As an employee of LINA, you will be entitled to participate in SIGNATURE BENEFITS, the CIGNA companies benefits program. This comprehensive and state-of-the-art program allows you to personalize your benefits program to meet your needs. Core benefits, such as Vacation, Holidays, Personal Days, Pension, Short Term Disability (STD), Basic Life, Business Travel Accident, and Basic Long Term Disability (LTD) are provided at no cost to you. Other plans, such as Medical, Dental, Supplemental LTD, and the several survivor income protection plans which we offer, require you to make contributions if you enroll. Some of these contributions are made on a pre-tax basis. CIGNA* also offers dependent and health care reimbursement accounts and a 401(k) plan. In addition, CIGNA offers an Education Reimbursement Program, an Employee Assistance Program, an employee referral program called TalentScout, and a Job Opportunities Program.

Details of these and other programs will be presented to you during your orientation.

**On your first day of employment at the orientation session, please bring the following:**

- Employee Handbook Receipt and Agreement (Page 77 of *You and CIGNA* booklet)
- Appropriate identification as required by Immigration Reform and Control Act of 1986 (see attached document)
- W-4 form

Please feel free to contact me with any questions you may have. Congratulations and welcome!

Sincerely,

Nancy Smigiel
Human Resources Coordinator
412.402.3195

*Interoffice Memo*

<span style="float:right">**A** Group Insurance
Life · Accident · Disability</span>

Date: May 20, 2003
To: All CIGNA DMS Claim Associates

From: Laurie Swanson, Manager of Social Security Operations
Telephone: 800.238.2125 x 3153

Subject: Social Security Assistance Team

As you are aware, we have made significant enhancements to our Social Security process during the past year. With the introduction of early vendor intervention and more involvement by the Case Managers, we have seen improvements in all of our key Social Security results since December 2001. The following are three key SS metrics for the Network, with our December 2001 result and our April 2003 result, which demonstrate the progress we have made:

|  | December 2001 | April 2003 |
|---|---|---|
| Award Rate | 80.3% | 81.6% |
| Estimation Rate | 2.71% | 2.97% |
| Not In Process Rate | 5.1% | 4.5% |

We have continually assessed our SS process during this time to ensure appropriate staffing levels and resource allocation. With the advent of dedicated Pre-SAM resources in each office and a higher percentage of claims moving into our vendor network, the need for continued centralized support of the non-vendor claims has diminished.

The Vendor Coordinators who are currently located in Pittsburgh have accepted positions as Claim Administrators and will be part of the Pre-SAM team in Pittsburgh. They will begin their training on May 27, 2003. We want to thank Dawn Barrett and Diana Salgado Salinas for their efforts to ensure timely and accurate SS pursuit and award entry; and we wish them well in their new positions. We have decided not to fill the vacant Vendor Coordinator positions at this time. Therefore, the Case Managers will assume responsibility for all SS issues effective May 27, 2003.

**Due to these changes, all referrals to the SSAT must cease effective Wednesday, May 21, 2003.** In order to facilitate the transfer of claims from the SSAT back to the Case Managers, the SSAT will be updating all SS diaries and assigning them to the appropriate Case Managers. In addition, the SS representatives will be provided with the Case Managers' information so updates can be sent directly to the Case Managers. Any mail that comes to the SSAT will be forwarded to the appropriate Case Manager for handling.

All SS invoices will continue to be paid from the Pittsburgh office. If you receive any invoices, please forward them to the attention of Marilyn Hissong, in Pittsburgh, immediately.

The Technical Consultants will continue to be available to provide assistance whenever it is needed. In particular, we encourage Case Managers to seek out guidance for interpreting their SS queries, which many of the outside representatives provide in place of an SS Award letter. Your local Technical Consultant will also continue to be available to answer questions about SSA procedures and our internal SS process.

**HIGHLY CONFIDENTIAL**     LINA 0152956


Barrett
EXHIBIT NO. 6
6/26/08
K.L. GOOD

```
May 20, 2003
Page 2
```

Should you have any questions regarding these changes, please contact your local Technical Consultant.

**HIGHLY CONFIDENTIAL**

LINA 0152957