# EXHIBIT O

# (1 OF 8)

Case 1:03-cv-12382-MLW   Document 142-22   Filed 08/22/2008   Page 1 of 15

Glenn Sklar
7/22/2008

Page 1

Volume 1, Pages 1 - 115

Exhibits: 1 - 18

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA ex rel.

DAWN BARRETT,

        Plaintiff

vs.                              Docket No. 03-12382-MLW

CIGNA CORPORATON and LIFE

INSURANCE COMPANY OF NORTH

AMERICA,

        Defendants

30(b)(6) DEPOSITION OF SOCIAL SECURITY

ADMINISTRATION

By its designee GLENN SKLAR

Tuesday, July 22, 2008, 9:47 a.m.

Choate, Hall & Stewart

Two International Place

Boston, Massachusetts

----Reporter:  Kathleen L. Good, CSR, RPR----

K. L. GOOD & ASSOCIATES

Post Office Box 367

Swampscott, Massachusetts 01907

Tel. 781-367-0815   Fax 781-598-0815

K. L. GOOD & ASSOCIATES

### Page 2

APPEARANCES:
   Heller Ehrman LLP
   Carl S. Nadler, Attorney
   1717 Rhode Island Ave. NW
   Washington, DC 20036-3001
   202-912-2000  fax: 212-912-2020
   carl.nadler@hellerehrman.com
- and -
   Phillips & Cohen LLP
   Colette G. Matzzie, Attorney
   200 Massachusetts Avenue, NW
   Washington, DC 20036
   415-836-9000  Fax: 415-836-9001
   cmatzzie@phillipsandcohen.com
   Attorneys for Relator

   United States Attorney's Office
   Jeffrey Cohen, AUSA
   John Moakley Federal Courthouse
   1 Courthouse Way
   Boston, Massachusetts 02210
   617-748-3626

- and -

### Page 3

   Social Security Administration
   Office of General Counsel
   Eskunder Boyd, Attorney
   625 JFK Federal Building
   Boston, Massachusetts 02203
- and -
   U. S. Department of Justice - Civil
   Division
   Michal Tingle, Assistant Director
   Commercial Litigation Branch
   Fraud Section
   601 D Street, NW
   Washington, DC 20004
   Attorneys for the United States of
   America and the Deponent

   Choate, Hall & Stewart
   Mitchell H. Kaplan, Attorney
   Richard C. Abati, Attorney
   Heather Castillo, Attorney
   Two International Place
   Boston, Massachusetts 02110
   617-248-5000  Fax: 617-248-4000
   mkaplan@choate.com

### Page 4

- and -

   Kathleen K. Tice, Attorney

   Cigna

   Two Liberty Place

   1601 Chestnut Street

   Philadelphia, Pennsylvania 19192

   T215-761-8691   fax: 215-761-5512

   kathleen.tice@cigna.com

   Attorneys for the Defendants

### Page 5

```
 1           PROCEEDINGS
 2       GLENN SKLAR, having been satisfactorily
 3   identified and duly sworn by the Notary Public,
 4   was examined and testified as follows:
 5           DIRECT EXAMINATION
 6   BY MR. KAPLAN:
 7   Q. Mr. Sklar, would you state your name and address
 8      for the record, please.
 9   A. My name is Glenn Sklar, S-k-l-a-r. My address
10      is 6204 Bright Plume, Columbia, Maryland 21044.
11   Q. Mr. Sklar, I'll be asking you a series of
12      questions today in connection with the case that
13      has us all here and I'll do my best to make them
14      clear and understandable, but history teaches me
15      I won't always be successful. So that if I ask
16      a question that seems to you one difficult to
17      answer, ambiguous or unclear, please just tell
18      me and I will try again.
19           If at any time you want to take a break,
20      please just let us know and we will do that.
21           MR. KAPLAN: I'd like to mark as the
22      first exhibit, the subpoena which has behind it
23      the notice of deposition with respect to the
24      deposition that has us all here today.
```

Page 6

1  (Marked, Exhibit No. 1, Subpoena and
2  Notice of Deposition.)
3  MR. KAPLAN: I think I should note for
4  the record that Mr. Cohen, on behalf of Social
5  Security Administration, and I have agreed that
6  topics 1 through 4 and 6 on the topics listed in
7  the notice of deposition have been eliminated.
8  Mr. Sklar, by whom are you presently
9  employed?
10 A. The Social Security Administration in Baltimore,
11 Maryland.
12 Q. What is your position with the Social Security
13 Administration?
14 A. My current position, I'm the Associate
15 Commissioner for the Office of Disability
16 Programs.
17 Q. As Associate Commissioner for the Office of
18 Disability Programs, what are the services that
19 you provide to SSA?
20 A. Our office is responsible for setting the
21 national disability policy for the Social
22 Security Disability Program, responsible for
23 setting the policies for the field offices, the
24 disability determination services, the hearing

Page 7

1  offices, the appeals counsel as well as perhaps
2  even interfacing on some of the cases that go to
3  federal court. But essentially we weave the
4  policy together for the entire disability
5  process.
6  Q. When did you first come to work at SSA?
7  A. 1991.
8  Q. That probably makes this question more -- it
9  should be broken down in smaller pieces.
10 Can you tell us just briefly each of the
11 positions that you held at SSA from 1991
12 forward?
13 A. Sure.
14 1991, I worked in the Office of the
15 General Counsel as a staff attorney.
16 In 1995, I left that office to help
17 start the new office of the Inspector General at
18 the Social Security Administration. I served as
19 an attorney in that office and ultimately moved
20 to the position of Deputy Counsel to the
21 Inspector General.
22 In 2001, I moved on to the Social
23 Security Administration's Senior Executive
24 Service Training Program, and in that program,

Page 8

1  it was a 24-month program, I rotated into
2  various positions across the agency and also
3  outside the agency, including places such as
4  Homeland Security.
5  Thereafter, I came back and was
6  appointed to a senior executive service position
7  as the Associate Commissioner in the Office of
8  Disability Programs, which is my current
9  position.
10 Q. What was your education after high school?
11 A. I'm a graduate of Tufts University in Boston, of
12 course.
13 Q. Welcome back to Boston.
14 A. Thank you.
15 And a graduate of Washington College of
16 Law in Washington, D. C., at the American
17 University.
18 Q. When did you receive your JD?
19 A. I believe it was 1991.
20 Q. So is it fair to say that since you graduated
21 from law school, all of your employment has been
22 with the Social Security Administration?
23 A. Yes.
24 Q. Well, you, having as much of a significant legal

Page 9

1  background, you understand that you're here
2  pursuant to a so-called Rule 30(b)(6)
3  deposition?
4  A. I do.
5  Q. And that you have been designated to testify on
6  behalf of the Social Security Administration
7  with respect to the topics that were laid out in
8  the subpoena that we've marked as Exhibit 1?
9  A. Yes.
10 Q. What did you do to prepare to provide this
11 testimony today?
12 A. I reviewed the relevant statutory and regulatory
13 matters that I thought might come up and any
14 materials that were provided to me by the U. S.
15 Attorney's Office.
16 Q. Did you meet with any personnel other than
17 counsel?
18 A. No.
19 Q. Do you have an understanding of the claim that
20 is asserted in the case that brings us all here
21 this morning?
22 A. In general, a general understanding.
23 Q. What is that?
24 A. That there's been a Qui Tam Whistleblower claim

Glenn Sklar
7/22/2008

Page 10

1  brought by a relator regarding certain alleged
2  practices of private disability insurers,
3  vis-a-vis encouraging and/or requiring
4  applicants, or I would say, their insured to
5  apply for Social Security disability benefits.
6  Q. What do you understand to be the unlawful
7     conduct on the part of Cigna that is alleged in
8     that qui tam action?
9        MR. NADLER: I object to the question as
10    outside the scope of the notice and as calling
11    for speculation, but you may answer.
12       MR. COHEN: What is the point of this,
13    Mitch?
14       MR. KAPLAN: I believe that an
15    understanding of the allegations that are
16    asserted in the case as to which the relator
17    contends unlawful activity has occurred is
18    directly relevant to the questions about the
19    programs that are laid out, and I guess I would
20    add that I've taken a lot of 30(b)(6)
21    depositions in my time and I've never heard
22    anybody object to the notion that I'm not
23    permitted to ask some questions of the witness
24    as to whether they understand the nature of the

Page 11

1     claim that's involved in the case.
2        MR. COHEN: Why don't you ask him if
3     he's read the complaint first and see if -- I'm
4     not trying to be difficult here. I just want to
5     make sure that you're not asking him for his
6     legal opinion about what the case is.
7        MR. KAPLAN: No, I'm not. Let me ask:
8  Q. Have you read the complaint?
9  A. Only if it was included in the package of
10    materials that was provided to me by the U. S.
11    Attorney's Office. That's all that I've looked
12    at.
13 Q. Well, when did you review the materials that you
14    reviewed in preparation for this deposition?
15 A. Probably the last 60 days or less.
16 Q. Do you recall whether the package of materials
17    that was provided to you included the qui tam
18    complaint against Cigna?
19 A. I don't recall actually seeing the complaint.
20       MR. KAPLAN: You folks can take whatever
21    position you want to take. My question is:
22 Q. What is your understanding of the conduct that
23    the relator alleges violates the law?
24       MR. NADLER: Same objection. Outside

Page 12

1  the scope and calling for speculation, but you
2  may answer.
3        MR. COHEN: Objection. Calls for legal
4  conclusion.
5        You can answer.
6  A. Well, for starters, I can tell you the Social
7     Security Administration has not taken an
8     official position in this matter and really do
9     not have any opinion as to which is the better
10    set of arguments and whether the allegations
11    have merit or not.
12       Based on the materials I've reviewed,
13    I'm just generally aware that there's an
14    allegation by relators that Cigna and/or Unum
15    have improperly directed certain individuals to
16    apply for Social Security disability insurance
17    benefits, notwithstanding the fact that they
18    performed no screening of those individuals and
19    that they may have compelled these individuals
20    to apply for Social Security disability
21    benefits.
22       Again, for the record, I want to be
23    abundantly clear, the Social Security
24    Administration has not formed any opinion as to

Page 13

1     whether this conduct is appropriate or
2     inappropriate at this time.
3  Q. When did you first become aware that Cigna -- I
4     take it you'll understand what I'm talking about
5     if I refer to the Cigna qui tam case?
6        When did you become aware there was this
7     qui tam case pending against Cigna?
8        MR. COHEN: Just for clarification, are
9     you asking him as --
10       MR. KAPLAN: Both ways.
11       MR. COHEN: This question --
12       MR. KAPLAN: This question is directed
13    to Mr. Sklar individually.
14 Q. When did you become aware of that? And I have a
15    follow-up question.
16 A. On a personal basis, my first introduction to
17    this matter came when I opened up the New York
18    Times, I think it was a Monday morning, and I
19    saw it printed above the fold on the right side
20    of page 16 the New York Times.
21       That was my first introduction to this
22    case.
23 Q. Do you know when SSA, as an agency, first became
24    aware of the existence of this case?

4 (Pages 10 to 13)

Page 14

1  A. Subsequently, I became aware of additional
2     information about this case. It's my
3     understanding that in 2003, the Social Security
4     Administration was alerted about this matter,
5     perhaps it was unsealed, and at that point, the
6     Social Security Administration and its counsel
7     had an opportunity to read additional
8     information about this case.
9         I would add that since 2003, a lot of
10    additional information has come forward in that
11    the 2003 information seemed to be somewhat
12    limited, and additional information has been
13    unearthed since then.
14        Of course in 2008, there's a lot more
15    information available about this matter than
16    there was in 2003.
17 Q. Within the context of SSDI disability benefits
18    and long-term disability industry, do you have
19    an understanding of the meaning of the term
20    "coordination of benefits"?
21 A. Limited, but some.
22 Q. What's your understanding of what that term
23    means?
24 A. Typically, on the governmental side, we want to

Page 15

1     make sure that the state and federal benefits
2     were somehow integrated. For example, we want
3     to make sure that there are appropriate workers'
4     comp offsets in relation to Social Security
5     disability offsets.
6         In terms of public/private, I suspect
7     that the private disability insurers have
8     contractual provisions requiring their insured
9     to apply for Social Security disability
10    insurance benefits. Thereafter, they want to
11    make sure that those individuals actually apply,
12    and if they do receive benefits, they certainly
13    want to learn about what those benefit amounts
14    were and, thereafter, offset those benefit
15    amounts.
16 Q. What is -- always difficult in a 30(b)(6)
17    witness -- but what is SSA's understanding as to
18    how the long-term disability insurers enforce
19    coordination of benefits, enforce those
20    provisions?
21        How does that work? How do they require
22    claimants to apply?
23        MR. NADLER: Objection to the question
24    as vague, but you may answer.

Page 16

1  A. Our understanding is quite limited, I might add,
2     in that we have general knowledge about the
3     practice. Certainly I personally have met with
4     numerous private disability insurers, numerous
5     companies, and talked to them generally about
6     the practice of offsetting, but the specifics as
7     to how the contract provisions are written, as
8     to how they do offsets, they've been somewhat
9     walled off from us in that they're proprietary
10    information.
11        Typically when we try to find out
12    more -- and we really don't have a reason to try
13    to find out more -- we'll get pushed back so we
14    usually don't go there.
15        There's sort of a natural understanding
16    between the public and private sector that we
17    have a job to do, they have a job to do and that
18    there's some general high-level exchange of
19    information, but typically we do not drill down
20    into -- it would be even inappropriate for me to
21    ask to see, say, Cigna's contractual provisions.
22    I'd never do that.
23 Q. Do you have any understanding, or others at SSA,
24    to your knowledge, have an understanding that

Page 17

1     forms of contracts have to be filed with
2     insurance commissioners across the country?
3         MR. NADLER: Object to form. Objection
4     to the question as leading.
5         MR. KAPLAN: The SSA is the real party
6     in interest suing us and you're objecting to me
7     asking leading questions? Okay. That's fine.
8         MR. NADLER: The answer is yes, I am.
9  A. It's fairly well understood by SSA that
10    individual insurance companies are responsible
11    to comply with state insurance bureaus or
12    agencies, I assume, in all 50 states. That's
13    just something that's obvious.
14 Q. Do you know of any disability insurers that do
15    not coordinate benefits, that is, private
16    insurance benefits, with SSDI?
17 A. My assumption is it's really general industry
18    practice to do an offset, and if you do not do
19    an offset, you probably would be at a
20    competitive disadvantage since others were doing
21    offsets.
22        Again, I'm aware of generally it is a
23    practice, but the specifics as to how it's done
24    and who, what, when, where, why, how this

Page 18

1  happens, I have no idea.
2  Q. In addition to private disability insurers, do
3     you know if there are any federal programs that
4     coordinate benefits and use offsets?
5         MR. NADLER: Objection. Leading.
6  A. Social Security has a very close relationship
7     with, really, all 50 states where we do lots of
8     coordination of benefits.
9         For example, Social Security is a
10    gateway program -- Social Security disability
11    insurance benefits are a gateway to Medicare
12    benefits. So we work very closely with the
13    states in that regard.
14        Supplemental security income, SSI, is a
15    gateway program to Medicaid benefits so the
16    states have a huge interest in our
17    determinations.
18        So we work very closely -- we have
19    extensive data exchanges with all the states,
20    all 50 states, extensive data exchanges with the
21    IRS in terms of confirming earnings, and a very
22    close relationship with the states generally.
23        Relationship with the private disability
24    insurers is a little bit different in that,

Page 19

1  obviously, we're a governmental entity, we're
2  not a for-profit entity, and to the extent that
3  we do have dialogue with the private disability
4  insurers, it's typically to share best practices
5  and to learn things. But it's a bit of an arms
6  length type relationship. It's not the type of
7  relationship where they know exactly what we're
8  doing, where we know exactly what they're doing.
9  And that's probably how it should be.
10 Q. Are you familiar with the Federal Employer's
11    Retirement System Disability Benefits Program?
12 A. Limited understanding, but, yes, I am somewhat
13    familiar with it.
14 Q. Do you know if that program coordinates benefits
15    available to federal employees who become
16    disabled with SSDI?
17        MR. NADLER: Objection. Leading.
18 A. It's my understanding that there are regulations
19    out there in 5 CFR that I believe require in
20    certain instances individuals to apply for
21    Social Security disability insurance benefits.
22 Q. Are you familiar with the definition of
23    disability within the Federal Employer's
24    Retirement System Disability Program?

Page 20

1  A. I am not.
2  Q. So you don't know whether that definition is the
3     same as SSA's definition of disability. Is that
4     a fair statement?
5  A. I really have no idea what their statutory
6     definition is.
7         MR. KAPLAN: Let's mark as Exhibit 2,
8     provision from Title 5 of the U. S. Code,
9     dealing with disability under the Federal
10    Employer's Retirement System, Section 8451,
11    5USC8451.
12        And let's Mark as Exhibit 3, the
13    corresponding section of the Code of Federal
14    Regulations, which is 5844.201.
15        (Marked, Exhibit No. 2, Provision from
16    Title 5 of the U. S. Code, ,Federal Employer's
17    Retirement System, Section 8451.)
18        (Marked, Exhibit No. 3, Code of Federal
19    Regulations, 5844.201.)
20 Q. I'm not sure now whether this is fair to do this
21    while we all sit here or not. Let me suggest to
22    you that in Section 8451 of Title 5, Section B,
23    there is the definition of disability under this
24    particular program.

Page 21

1         MR. NADLER: Of Exhibit 2?
2         MR. KAPLAN: Right.
3  Q. My question to you, sir, would be whether that
4     definition is the same as the definition of
5     disability under the Social Security
6     Administration regulations?
7         MR. NADLER: I object to the question as
8     calling for legal conclusion and as outside the
9     scope of the notice, but you may answer.
10        MR. COHEN: Same objection.
11 A. It's really quite a different definition of
12    disability.
13 Q. If you look at what we've marked as Exhibit 3,
14    which are the regulations, and in particular,
15    Section B-1 of 1 of the regulations, it
16    describes the actions that somebody applying for
17    disability under the federal system must take
18    before it can receive any payment under the
19    federal -- before it can receive any federal
20    payment.
21        That's a completely fouled up question.
22        Let me ask you to take a look at Section
23    B-1 of the Code of Federal Regulations that we
24    marked as Exhibit 3.

**Page 22**

1   I guess my question to you, sir, is:
2   Do you know whether anyone has ever
3   suggested that the federal program that is
4   governed by what we now marked as Exhibits 2 and
5   3 is somehow inappropriate and causes too many
6   individuals to apply for Social Security
7   disability benefits?
8       MR. NADLER: Object to that question as
9   calling for speculation.
10      MR. KAPLAN: After you're done saying
11  objection, here in this district, you have
12  preserved your record and you're not entitled to
13  give a speech about why you have an objection,
14  which might inadvertently color the response.
15      You've said objection. If your
16  objection is upheld at the time of trial, this
17  testimony won't come in.
18      But there's no need to give a speech as
19  to why you're objecting and we generally don't
20  do that in Massachusetts.
21      MR. NADLER: Are you done?
22      MR. KAPLAN: I'm done.
23      MR. NADLER: I object to the question as
24  calling for speculation and that it's compound.

**Page 23**

1       MR. COHEN: Objection. Vague.
2       You can answer if you understand.
3   A.  If you could repeat the question.
4   Q.  I'm just asking whether to your knowledge,
5       anyone associated with the Social Security
6       Administration has ever asked that the program
7       as it is laid out in Exhibits 2 and 3 be changed
8       because of the number of individuals that are
9       required to apply for SSDI benefits who might
10      not be eligible because they do not meet the SSA
11      definition of disability?
12  A.  Just to be clear, I've never worked with a FERS
13      case in my 16 or 17 years with the agency. I
14      suspect that they come up fairly rarely and that
15      would drive my answer to no.
16  Q.  But it is then fair to say that to your
17      knowledge, in general, you never heard that
18      issue discussed within the Social Security
19      Administration in the 17 years that you've
20      worked there?
21      MR. NADLER: Object to the question as
22      vague, but you can answer.
23  A.  That's correct. I've never heard this issue
24      raised in the time I've spent with the agency.

**Page 24**

1   Q.  Do you know whether there are state disability
2       programs for state employees that offset
3       benefits?
4       MR. NADLER: Object to the question as
5       leading.
6   A.  Again, I have no personal knowledge other than I
7       believe Oregon was referenced in the subpoena.
8   Q.  You don't know whether there exists many others
9       states as well that require someone to apply for
10      SSDI benefits as a precondition to receiving
11      disability benefits under that state disability
12      program for state employees?
13  A.  No, I do not. To the extent that we coordinate
14      benefits with the individual states on workers'
15      comp matters, there's a whole statutory scheme
16      that SSA follows for workers comp offset.
17      There's a statute, there's implementing
18      regulations, and we call it the POMS, that's our
19      operational manual policy on that. But it's
20      really a little bit different. That's really
21      about making sure that somebody is not receiving
22      or double dipping, receiving both Social
23      Security and workers' comp benefits, say, the
24      public policy argument is they shouldn't be

**Page 25**

1   receiving so much money that no one ends up
2   working. Really a totally different idea.
3   Q.  Again, in the 17 years that you've been working
4       at SSA, have you ever heard about or
5       participated in any discussion where the
6       propriety of state disability programs for their
7       state employees, those states requiring
8       employees to apply for SSDI as a precondition to
9       receiving benefits under that state program,
10      you've never engaged in or heard about
11      discussions about the propriety of that
12      practice?
13  A.  As previously stated, I never heard of this
14      issue until I saw it in the subpoena
15      approximately 60 days ago.
16  Q.  How long, to your knowledge -- I guess now I'm
17      asking you in your 30(b)(6) capacity -- how long
18      has SSA been aware of the practice of
19      coordination of benefits by private long-term
20      disability insurers?
21  A.  SSA has had general knowledge of the practice
22      for many years. In fact, I believe the first
23      documentation that I'm familiar with comes from
24      the late '80s that we had general knowledge that

Page 26

1 this practice was going on and that knowledge
2 went to the highest levels of the agency.
3      That said, we certainly have an
4 arms-length relationship with the private
5 insurers. We don't have their contracts. We
6 don't know who they send over. We typically
7 don't ask. We didn't have a reason to know
8 until this litigation started. It's just not
9 something that was really on our radar screen.
10      MR. KAPLAN: Let's mark as Exhibits 4
11 and 5, two memoranda from Associate Commissioner
12 Eileen Bradley, one dated September 22, 1989,
13 and the other dated October 18, 1989.
14      (Marked, Exhibit No. 4, Memo, 9/22/89.)
15      (Marked, Exhibit No. 5, Memo, 10/18/89.)
16 Q. As you review Exhibits 4 and 5, my question will
17 be whether these are the memoranda you were just
18 referring to in your prior answer.
19 A. Yes.
20 Q. Were you familiar with these memoranda prior to
21 your getting ready for this deposition?
22 A. No, I was not familiar with these particular
23 memoranda. However, I was familiar with the
24 general practice of private disability insurers

Page 27

1 encouraging or requiring their policyholders to
2 apply for Social Security disability insurance
3 benefits generally.
4 Q. In Exhibit 4, first let me ask, do you know
5 Eileen Bradley?
6 A. No, I do not.
7 Q. She is no longer with Social Security
8 Administration?
9 A. Yes. She's retired, long retired.
10 Q. Her position, Associate Commissioner, is that
11 the same position that you currently fill?
12 A. Not exactly. It's a comparable level but it's
13 really -- this is governing the hearings and
14 appeals process, adjudication process, rather
15 than the policy office.
16 Q. Where she writes, now looking at Exhibit No. 4,
17 the third paragraph, and she writes:
18      "This practice has raised questions
19 about whether the third party, i.e., the
20 insurance company, is the true party in interest
21 and whether there has been an assignment or
22 subrogation of Social Security benefits in
23 contravention of the law."
24      Do you understand the issue she's

Page 28

1 concerned about in writing in this memorandum?
2      MR. NADLER: Objection to the question
3 as calling for speculation, but you may answer.
4 A. Vaguely. It's not an issue that I really have
5 any responsibility over or any great interest in
6 resolving at this point in time.
7      It seems that her subsequent memo may
8 have actually resolved the issue in play and
9 that was -- as I read the two memos together, it
10 seemed like it brought closure to the issue.
11 Q. That's Exhibit No. 5?
12 A. That's correct.
13 Q. How does Exhibit No. 5 bring closure to the
14 issue that seems to be raised in Exhibit No. 4?
15 A. Well, as I read the second paragraph where she
16 fairly explicitly writes, "There's nothing
17 inherently illegal or improper," it would appear
18 to have resolved the issue at that point in
19 time.
20 Q. During the time that you were with the Social
21 Security Administration, have you been a
22 participant in, or are you aware of any
23 discussions as to whether the practice as laid
24 out in these memorandums of encouraging or

Page 29

1 requiring a LTD insured to also apply for SSDI
2 is somehow improper or in violation of some law?
3      MR. NADLER: Object to the question as
4 calling for speculation, outside the scope of
5 the notice, but you can answer.
6 A. I've been in no discussions regarding the
7 propriety of this practice. However, I have
8 certainly been on notice that this practice
9 generally happens, but have never been in a
10 substantive discussion with anybody about the
11 propriety of that practice partly because the
12 issue was never flagged.
13 Q. Again, with reference to what we've now marked
14 as Exhibit 5, is it also generally known, and
15 had been known within Social Security
16 Administration, for a long time that private LTD
17 insurers use the assistance of applicant
18 representatives to assist their insureds in
19 filing applications and proceeding through the
20 process of hopefully obtaining SSDI benefits?
21      MR. NADLER: Objection. Leading.
22 A. As stated in my prior answer, it was generally
23 known that private insurers, private disability
24 insurers, had contractual provisions asking

Page 30

their insured to apply for Social Security disability benefits in certain instances.
During those discussions, or during discussions that we've had with the industry generally, it's abundantly clear that these provisions exist and that they send some of their clientele to third-party representational organizations such as ALLSUP or Genex.
But again, we never got behind what the relationship was. There was no reason to look at the propriety of the relationship, what the contractual provisions said, what any incentive clause is, any of that. That was never a point of discussion with any of us. And we had no reason to get involved with that.

Q. Did SSA have a general understanding for some number of years that if an applicant for private disability benefits refused to apply for SSDI benefits, that the private insurer would reduce the amount of its payment by some estimated amount that would be received if the person applied successfully?

MR. NADLER: Objection. Leading.

A. I would say that part is probably less well

Page 31

known. Personally, I can't say I have a great awareness of that point and I've been dealing with the private disability insurers very closely, weekly, for the last several years.
Although I can't foreclose the possibility that in other discussions that point came out, it certainly, I suspect, wasn't a secret of any sort, but, again, it's not the type of thing that we'd really care about or have an interest in pursuing unless there was a reason to get involved with it.
And the predicates to get involved just never seemed to be there up until this litigation was filed.

MR. KAPLAN: Let's mark as Exhibit 6, a document entitled, "SSA Disability, Return-to-Work Strategies From Other Systems May Improve Federal Programs," dated July 1996.

(Marked, Exhibit No. 6, Document entitled, "SSA Disability, Return-to-Work Strategies From Other Systems May Improve Federal Programs," dated July 1996.)

MR. KAPLAN: Then we'll mark a document entitled, "Hearing Before the Subcommittee on

Page 32

Social Security, the Committee on Ways and Means, House of Representatives," dated June 11 and 20, 2002, as Exhibit 7.

(Marked, Exhibit No. 7, Document entitled, "Hearing Before the Subcommittee on Social Security, the Committee on Ways and Means, House of Representatives," dated June 11 and 20, 2002.)

Q. I'm not going to ask you to read either of documents.

A. Thank you.

Q. With respect to what we've marked as Exhibit 6, the GAO report of July 1996, first, have you seen this document previously?

A. Possibly excerpts of this document, yes.

Q. In connection with your preparing for this deposition or generally with your work at the SSA?

A. Again, if it was included in the package of materials that the U. S. Attorney's Office provided me, I'm sure I read this.

Q. But this isn't a document that you had occasion, at least to your recollection, a document you had occasion to look at generally as part of

Page 33

your work at SSA?

A. No.

Q. Would you turn to page 5 under the heading, "Principal Findings."
There at the bottom of the very first paragraph, the GAO reports:
"Studies show that only one in two newly-disabled workers who remain out on disability five months or more will ever return to work."
Are you generally familiar with that statistic?

MR. NADLER: I'm lost.

MR. KAPLAN: Page 5 of what we marked as Exhibit No. 6.

A. I'm generally familiar with the fact that it's extremely difficult to get folks off the disability rolls once they get on, and that the return-to-work rate is exceedingly low and it's an exceedingly thorny problem for the Social Security Administration.

Q. Is it fair to say that you have no reason to either doubt GAO's conclusion or consider that things have improved since 1996?

Case 1:03-cv-12382-MLW    Document 142-22    Filed 08/22/2008    Page 11 of 15

Glenn Sklar
7/22/2008

Page 34

1    MR. NADLER: Object to the question as
2    compound and calling for hearsay, but you may
3    answer.
4  A. There has been very little progress made in the
5    return-to-work area over the last couple of
6    decades, exceedingly difficult to motivate
7    individuals to leave the disability rolls once
8    they're on. The ticket-to-work program was one
9    way the agency sought to remedy the problem, and
10   there have been several attempts to launch that
11   program, most recent of which is happening right
12   now.
13 Q. Let me ask you to turn to page 22.
14    I direct your attention to the paragraph
15   just ahead of the section that talks about
16   disability programs in Germany and Sweden.
17    Why don't I ask you to read that brief
18   paragraph into the record, if you will, sir.
19 A. You'd like for me to read it into the record?
20 Q. Yes.
21    MR. COHEN: Into the record?
22    MR. KAPLAN: Yes.
23 A. "Almost all private long-term disability
24   insurance benefits are coordinated with DI

Page 35

1    benefits; that is, private benefits are reduced
2    dollar for dollar by the amount of DI benefits.
3    The rationale for reducing private benefits is
4    to provide an incentive to return to work by
5    paying only the targeted partial replacement of
6    earnings. Also, reducing private benefits
7    dollar for dollar against DI benefits can lower
8    disability insurance premiums. As a result, it
9    is common practice for private plans to require
10   claimants to apply for DI benefits."
11 Q. Let me ask you, what we've marked as Exhibit 7,
12   which is that very lengthy subcommittee -- here
13   I should have marked the page for you because
14   these pages aren't numbered.
15    What I would like to direct your
16   attention to and I don't how to do this, it
17   looks to be 20 pages from the end, but I'm
18   looking for a section which begins on the
19   bottom, this is the easiest way, talks about the
20   statement of Paul Verkuil, professor of law,
21   Benjamin Cardozo School of Law.
22    I apologize for not having marked it
23   before.
24    MR. NADLER: I need a second to find it.

Page 36

1    (Pause.)
2    MR. KAPLAN: Do you have it? Mr. Sklar
3    has it.
4    MR. NADLER: He's better at navigating
5    these documents than I am.
6  Q. Are you familiar with the Social Security
7    advisory board?
8  A. I am.
9  Q. What is it?
10 A. Social Security advisory board is an advisory
11   body to the Social Security Administration.
12   They have members that have term appointments
13   and they typically make recommendations to the
14   Social Security Administration on ways to
15   improve the administration of the Social
16   Security Administration. The Social Security
17   Administration is in no way required to adopt
18   recommendations of the advisory board. That's
19   why they're called an advisory board.
20    And typically, they will adopt ideas
21   that we think are sensible and not adopt ideas
22   that we disagree with.
23 Q. Let me ask you to turn to the next page, the
24   third full paragraph begins:

Page 37

1    "While these and other alternatives."
2  A. Right.
3  Q. By the way, are you familiar with Professor --
4    do you know Professor Verkuil?
5  A. I do not, although I have met Jeffrey Lubbers.
6  Q. In any event, in that paragraph, Professor
7    Verkuil notes:
8    "The number of disability claims is
9    expected to rise in the future for several
10   reasons. One, is the impending retirement of
11   baby boomers" -- like me, I will add -- "two,
12   the downturn of the economy in the last two
13   years; and three, the resumption of CDRs by the
14   SSA; and four, the increasing tendency of
15   private insurance companies to require as a
16   condition of payment that claimants pursue their
17   offsetting SSA benefits."
18    First question:
19    What is a CDR?
20 A. CDR is a continuing disability review. They're
21   done in increments of three years, five years
22   and seven years.
23    Essentially, the reviews conducted by
24   the Social Security Administration to ensure

10 (Pages 34 to 37)

K. L. GOOD & ASSOCIATES

Page 38

1  that somebody who gets on the disability rolls
2  continues to be disabled.
3  Q. Now, both the GAO and what we've marked as
4  Exhibit No. 6 and Professor Verkuil here in
5  Exhibit No. 7 reflect on the tendency of private
6  insurance companies to require as a condition of
7  payment the claimants pursue their offsetting
8  SSA benefits.
9         Is that consistent with SSA's
10 understanding of what the private insurance
11 providers are doing?
12        MR. NADLER: Object to the question as
13 vague and compound, but you may answer.
14 A. Just to be clear, and hopefully to be consistent
15 with my prior answer on this point, SSA's
16 general awareness is that there are contractual
17 provisions requiring insureds to apply for
18 benefits.
19        It seems obvious that if they apply, the
20 whole point is to offset those benefits. And
21 that's as much as we essentially know, that the
22 industry does this as a general matter.
23 Multiple companies do this.
24        And to a certain extent, we've worked

Page 39

1  with various private disability insurers to
2  figure out ways to streamline the processing of
3  these types of applications, realizing that
4  they're going to show up so why have them file
5  the paper when we're a fully electronic agency.
6         One of Social Security's main
7  initiatives is a fully electronic process.
8  We've sunk hundreds of millions of dollars in a
9  fully electronic process. It works. It's a
10 beautiful thing, and we work closely with the
11 private disability insurers to make sure that
12 when they file claims, they file claims
13 electronically, especially if they have
14 electronic information. There's very little
15 sense in having them convert it to paper only to
16 re-scan it back into an electronic document.
17        We spend a fair amount of time working
18 with the company. So the fact, though, it's
19 obvious to us that there are contractual
20 provisions that require people to apply for
21 benefits. It's obvious to us that they must be
22 doing something with that, offsetting those
23 benefits.
24        And that's generally as much as we know

Page 40

1  and we don't go behind that firewall to ask who,
2  what, when, where, how.
3         But we are aware of it. And realizing
4  these claims are going to show up on our door
5  step, it behooves us to figure out the most
6  efficient way to move the information to the
7  Social Security Administration if these claims
8  are coming our way.
9  Q. In the various discussions with private insurers
10 and so on that you've just made reference to, to
11 your knowledge, has anyone at SSA ever told any
12 of these representatives of private insurers
13 that they oughtn't to be including contract
14 provisions requiring folks to apply for SSDI
15 benefits as a precondition to receiving
16 long-term disability benefits?
17        MR. NADLER: Object to the question as
18 vague, but you may answer.
19 A. As I mentioned before, there's been scarce
20 little discussion, if any at all, on the
21 propriety of the practice. Really had no reason
22 to get behind it. Weren't privy to the
23 contractual terms.
24        We just knew generally this was

Page 41

1  happening as early as the late '80s and really
2  had no reason to look behind it.
3         There were certainly no pending
4  allegations of impropriety on the table until
5  such time this lawsuit was filed.
6  Q. Fair to say before this lawsuit was filed, to
7  your knowledge, no one at the SSA ever thought
8  that there was anything improper about the
9  practice?
10        MR. NADLER: Object to the question as
11 leading and calling for speculation.
12 A. Again, I'm not aware of any substantive
13 discussions on the propriety or impropriety. It
14 was just something that happened.
15        Social Security Administration is a very
16 large place. We process 2.5 million initial
17 disability claims each year. These claims,
18 while a significant number, and they're probably
19 tens of thousands of claims, possibly more, our
20 eyes are always on moving large volumes of work
21 efficiently. And I don't think we really
22 stopped to really have substantive discussions
23 about the propriety, impropriety. We just
24 process the work and we really had no reason to

Page 42

1   get in the middle of the whole issue.
2   Q. Is it fair to say that prior to the time this
3      case was filed, SSA never really even thought
4      about whether there was any screening of
5      long-term disability applicants, I mean, any
6      steps taken by the private insurance carriers to
7      screen out some number of these claimants and
8      not have them apply?
9         There's a confusing question.
10  A. If you could please repeat the question.
11  Q. To your knowledge, was there ever any discussion
12     at SSA prior to the filing of this lawsuit, in
13     which consideration was given as to which
14     claimants for long-term disability insurance
15     were being sent over by or encouraged or
16     required to apply by the long-term disability
17     industry, whether it was all claimants or some
18     subset of their claimants, that that was never
19     discussed or considered by the SSA before this
20     lawsuit was filed?
21        MR. NADLER: Object to the question as
22     vague and compound.
23  A. Social Security really doesn't collect
24     information on these claims per se and we really

Page 43

1   had no reason to. We typically don't ask why
2   somebody is showing up at our door. We have,
3   quote, unquote, an open-door policy, all comers
4   are welcome.
5      We don't track whether it's an
6   individual claim or whether it's somebody who
7   showed up because of the private disability
8   insurers. We really don't ask why they're there
9   and we have no reason to.
10     From a policy point of view, many
11  instances we've even encouraged, for example,
12  homeless people to come forward and file claims
13  because they're often very difficult to contact.
14  We really don't get behind the why people are
15  showing up at our door and who is encouraging
16  them to apply for benefits. That's just not
17  something we typically ask or do.
18  Q. You just made reference to open-door policy.
19     Can you expound on, in the context that you just
20     used it, what is meant by the term "open-door
21     policy"?
22        MR. NADLER: Object to the question as
23     outside the notice, but you may answer.
24  A. Typically every American who is paying FICA has

Page 44

1   the right to file a claim for Social Security
2   disability insurance benefits. That said,
3   again, we certainly hope that they're truthful
4   as they provide information to the Social
5   Security Administration and give us a straight
6   story. But every American has a right to file
7   that claim. And even if somebody wanted to file
8   a claim that we knew was going to be denied and
9   they were very persistent about it and they
10  said, I want to be denied, deny me, we're going
11  to process that claim and deny them.
12     We would not typically foreclose
13  somebody from filing a claim. We may try to
14  talk them out of filing a claim if we know it's
15  ridiculous and if we know that there's no
16  possibility the claim will be allowed, but
17  ultimately, they will be permitted to file that
18  claim if they're persistent.
19  Q. Is it fair to say that all that is required of
20     them is that they meet the requirement of having
21     paid into the system for the requisite quarters
22     and that the information that they put on their
23     application is truthful?
24        MR. COHEN: Objection. Calls for a

Page 45

1   legal conclusion.
2   A. If you could just pars that. You had multiple
3      pieces in that question.
4   Q. Fair enough.
5         As I understand your testimony, anybody
6      who has paid into the FICA system for a
7      requisite period of time is entitled to receive
8      from the Social Security Administration a
9      determination as to whether or not they are
10     eligible for SSDI benefits?
11        MR. NADLER: Objection. Leading.
12  A. It's nonsensical that that would be the policy
13     on its face, but there is a public policy
14     interest in encouraging people to apply for
15     benefits, and many folks are somewhat
16     intimidated by governmental entities and we want
17     to be as welcoming as possible.
18        So we try to encourage people to apply
19     when they think they have a reason to apply. We
20     just ask that as they move their claim forward,
21     that they're forthcoming and truthful with the
22     Social Security Administration.
23  Q. And that is the case even if it is apparent to a
24     person, an SSA employee in a field office that

Page 46

1   this person isn't sick or injured enough to meet
2   the definition of eligibility as it's set out in
3   the regulations?
4         MR. NADLER: Objection. Leading.
5   A. Just to be clear, I have not personally
6   processed claims in a field office. So please
7   realize the limitations of my testimony. I can
8   only speak from a high-level policy perspective.
9         But in that instance where somebody
10  wanted to file a claim and they either didn't
11  have the requisite quarters of coverage to be
12  insureds under FICA or they were making $50,000
13  a year and were clearly over the substantial
14  gainful activity limit, we would typically try
15  to talk them out of filing that claim. It's
16  absurd, nonsensical, ridiculous, but
17  occasionally there are people who absolutely
18  want their determination, want their day in
19  court, so to speak, and we'll take that claim
20  and probably deny it the next day.
21  Q. To your knowledge, the Social Security
22  Administration has never sought to pursue
23  somebody who did what you just said as having
24  engaged in filing a false claim?

Page 47

1         MR. NADLER: Objection to the question
2   as vague and speculative and compound.
3   A. Yeah. I'm not sure that's what I just said,
4   actually, that that's a fair reading of my
5   testimony.
6   Q. Well, I guess what I'm saying, you just
7   described a particular claimant whose claim
8   would be denied the next day. My question to
9   you is whether to your knowledge, the Social
10  Security Administration has ever sought to
11  pursue such a person for having filed a false
12  claim.
13        I'm simply taking the individual that
14  you previously described, who would be denied
15  the next day, I'm asking whether such a person
16  has ever been prosecuted for filing a false
17  claim?
18        MR. COHEN: Objection. Vague.
19        We're talking in a hypothetical, and
20  you're asking if this hypothetical person ever
21  actually had a false claim charge against them.
22        It's a very confusing question so I'm
23  objecting to vague.
24        MR. NADLER: I also object to the

Page 48

1   question as beyond the scope of the notice.
2   Q. To your knowledge, has the Social Security
3   Administration -- let me start over.
4         To your knowledge, has the Social
5   Security Administration ever asked -- back up a
6   little bit.
7         Does the Social Security Administration
8   have within the confines of that administration
9   any group that is assigned the responsibility of
10  prosecuting individuals who have made false
11  statements on an application for SSDI?
12        MR. NADLER: Object to the question as
13  outside the scope of the notice.
14  A. Yes, it does.
15  Q. To your knowledge, has this group ever
16  prosecuted an individual who provided accurate
17  information on their form with respect to who
18  their medical care providers were and who their
19  employers were?
20        MR. NADLER: Object to the question as
21  outside the scope.
22  A. I think to really answer this question, I have
23  to kind of talk through what the relevant body
24  is who would be responsible for that and what

Page 49

1   the authorities are, if that's okay.
2   Q. Sure.
3   A. There are provisions known as the civil money
4   penalty provisions which were adopted as part of
5   the Social Security Independence and Program
6   Improvements Act of 1994, also known as the
7   Independent Agency Act in-house, and these
8   provisions act a bit like a mini false claims
9   act.
10        What these provisions are about if an
11  individual makes an affirmative false statement
12  to the Social Security Administration, the
13  Social Security Administration or its delegatee,
14  in this case, the Office of Inspector General as
15  delegated authority, can impose a penalty up to
16  $5,000 for each false statement and twice the
17  amount of the overpaid amount as an assessment.
18        So that's both for affirmative false
19  statements and this provision was amended in
20  1999 as part of the Foster Care Act to talk
21  about material omissions as well.
22        So I'm somewhat familiar with the
23  provisions on affirmative false statements. I
24  was actually in the Inspector General's Office

Glenn Sklar
7/22/2008

Page 50

1  in the late '90s when these cases were done, but
2  I'm not at all familiar with how the omissions
3  piece operates and, quite frankly, probably the
4  best body to answer questions on the civil money
5  penalty statute is the Inspector General's
6  Office, since they have the delegated authority.
7  I no longer work there.
8      MR. KAPLAN: Let's mark as Exhibit
9  No. 8, excerpts from a book entitled "Growth in
10 Disability Benefits, Explanations and Policy
11 Implications."
12     (Marked, Exhibit No. 8, Excerpts from
13 Book entitled Growth in Disability Benefits,
14 Explanations and Policy Implications.)
15 Q. Mr. Sklar, have you seen this publication
16 previously?
17 A. I believe I've seen excerpts of this
18 publication.
19 Q. In preparation for the deposition?
20 A. That's correct.
21 Q. Is it fair to say that other than in preparation
22 for this deposition, you were not familiar with
23 this volume?
24 A. That's correct.

Page 51

1  Q. Do you know who the editors are, Kalman Rupp and
2  David Stapleton?
3  A. I've heard Stapleton's name mentioned. He's
4  just somebody who's kind of sort of around the
5  disability program but I don't know him
6  personally.
7  Q. What about Upjohn Institute For Employment
8  Research. Is that a facility known to you?
9  A. Not something I'm familiar with.
10 Q. First chapter in this book that is included in
11 Exhibit 8, written by a Larry Massanari of
12 Social Security Administration.
13     Do you know Mr. Massanari?
14 A. Yes, I do.
15 Q. What is his position currently?
16 A. He has retired from the Social Security
17 Administration, but previously he was a
18 long-standing regional commissioner in the
19 Philadelphia region and briefly was the acting
20 commissioner of Social Security.
21 Q. Let me ask you to turn to page 303, and in
22 particular, I'm focused on the next to last
23 paragraph, that begins -- in fact, I'll read it
24 into the record.

Page 52

1      "In the Philadelphia region,
2  cost-shifting actions by state and local
3  governments have been, and I think will continue
4  to be, a major contributor to increased claims
5  receipts. All of our states require or
6  certainly strongly encourage applicants to their
7  assistance programs to also file with us. Many
8  local welfare offices continue to refer people
9  to Social Security who are obviously not
10 disabled, yet these offices still insist that
11 SSA provide a formal denial."
12     Other than just reading it in
13 Mr. Massanari's chapter of this book, were you
14 independently familiar with what Mr. Massanari
15 makes reference in the paragraph I just read?
16 A. Yes.
17 Q. To your knowledge, has SSA ever suggested to the
18 states that they stop this practice of referring
19 everyone who applies for assistance programs to
20 SSA for a SSDI application?
21     MR. NADLER: Object to the question as
22 compound.
23 A. I seem to recall some Congressional letters on
24 this topic from some of the Social Security

Page 53

1  oversight committees about the general practice
2  of state and local governments compelling people
3  to apply for Social Security, but, again, it
4  really hasn't been high on our radar screen in
5  terms of agency initiatives.
6      I certainly don't recall any meetings,
7  strategy discussions or the like trying to
8  restrict that from happening.
9      As I testified to previously, a lot of
10 the states rely on us, on our determinations as
11 a gateway to their programs so, I mean, their
12 Medicaid and Medicare, or Medicaid payments are
13 often tied to us so there's a nexus there.
14     It is frustrating to some of our
15 employees, that I can assure you. There is some
16 great frustration. I think the line employees
17 see it and they're very frustrated by it, that
18 the states keep, quote, unquote, dumping people
19 on SSA that they know may not be eligible.
20     To the best of my knowledge, it's very
21 informal and I've never been in formal settings
22 where we've had strategy discussions or
23 substantive discussions about doing something
24 about this.