# EXHIBIT O

# (2 OF 8)

Glenn Sklar
7/22/2008

Page 54

1   Q. Is it fair to say that to your knowledge, no one
2      within SSA has ever suggested that the states
3      are violating federal law when they engage in
4      the practice that Mr. Massanari has referred to
5      in his chapter of the book?
6            MR. NADLER: Object to the question as
7      leading and compound.
8   A. I'm certainly not aware -- again, I've never
9      been in any substantive discussions on the topic
10     at all. I certainly have not been in
11     discussions about that conduct potentially being
12     fraudulent.
13  Q. The other chapter in the book that we've marked
14     as Exhibit 8, that I have included, is entitled
15     "The View from SSA's Concord, New Hampshire,
16     District Office."
17            You'll find that at page 307.
18  A. Yes.
19  Q. Do you know who Celeste Hemingson is?
20  A. I do not.
21  Q. Concord, New Hampshire, is that the site of a
22     district office of the Social Security
23     Administration?
24  A. I suspect there's a field office in Concord.

Page 55

1   Q. Let me ask you to take a look at the paragraph
2      that begins on the bottom of page 308 and
3      carries over to page 309.
4            Does this paragraph make reference to
5      the points you just made in your prior testimony
6      about states using SSDI applications in order to
7      determine whether an applicant is eligible for
8      Medicaid?
9   A. Again, sort of the linkage of SSI Medicaid, and
10     SSDI Medicare, so it would be SSI Medicaid.
11  Q. Let me ask you to go back for a moment to what
12     we marked as Exhibit 7, which was the hearing
13     before the House, the lengthy document.
14            Let me direct your attention to what is
15     the fifth page in and it's under the heading,
16     "Statement of Martin Gerry, Deputy Commissioner,
17     Disability and Income Security Programs."
18            Then Mr. Gerry starts to testify and I'm
19     going to ask you about a comment he makes in the
20     second page of his testimony.
21            First, is Mr. Gerry still with the
22     department?
23  A. No, he's not.
24  Q. But he was, I take it, previously the Deputy

Page 56

1      Commissioner of Social Security Administration?
2   A. Yes. In fact, he was previously my boss.
3   Q. Mr. Gerry writes on the next page, I'm looking
4      at the fourth paragraph from the bottom, he
5      writes:
6            "I can tell you from my own personal
7      experience that some states have actually gotten
8      into the habit of sending people to our offices
9      for eligibility determinations as part of
10     another eligibility process. That tends to, of
11     course, artificially increase or decrease the
12     rate of allowances by running people through our
13     process just in case they might be eligible for
14     benefits."
15            Have you had the same personal
16     experience as Mr. Gerry in having seen or
17     experienced the issue that he makes reference to
18     in his testimony?
19            MR. NADLER: Object to the question as
20     vague and leading.
21  A. Again, I've certainly heard accounts from many,
22     many employees in our field offices that they
23     receive a lot of claims that they feel have no
24     merit whatsoever from either state or local

Page 57

1      governments and they just show up and they have
2      to process them.
3            Sometimes those who are advancing their
4      applications have no interest in cooperating.
5      They will often abandon their claims. We can't
6      find them. And then the state gets upset
7      because it impacts on their processing time.
8            It's just not a happy situation
9      generally.
10  Q. And once again, however, to your knowledge, no
11     one within the Social Security Administration
12     has ever given consideration as to whether the
13     states are violating federal law when they do
14     that which Mr. Gerry makes reference to in his
15     testimony?
16            MR. NADLER: Object to the question as
17     vague and leading.
18            MR. COHEN: Did you ask if he's heard of
19     conversations in which that happened?
20            MR. KAPLAN: Yes. If I didn't -- let me
21     restate the question.
22  Q. What I'm asking is whether you are aware of any
23     discussions or seen any documents suggesting any
24     consideration within the Social Security

15  (Pages 54 to 57)

Glenn Sklar
7/22/2008

Page 58

1  Administration as to whether when the states
2  engage in the practice that Mr. Gerry describes
3  in his testimony, they are violating federal
4  law.
5      MR. NADLER: Object to the question as
6  vague.
7  A. No, I have not heard or been a party to any such
8  discussions.
9  Q. To your knowledge, has SSA ever undertaken a
10  program to stop the states from engaging in the
11  practice that Mr. Gerry describes and that the
12  Concord field office person also described in
13  her chapter of Exhibit 8?
14      MR. NADLER: Object to the question as
15  compound.
16  A. It's sort of a bigger than life problem. We
17  sort of view our role as solving problems that
18  are solvable, and that's just one of those
19  gigantic massive structural issues that requires
20  a substantial expenditure of capital to solve.
21  And you really need to pick and choose your
22  spots as to what things you're going to try to
23  fix and what you're not going to try to fix.
24  And that's just a gigantic issue that is kind of

Page 59

1  bigger than life for just the Social Security
2  Administration.
3      And it has very complicated
4  state-related issues that go with it.
5      So it's my sense that we never really
6  wanted to spend the capital to go down that road
7  because it's an extraordinarily complicated
8  problem with probably a very elusive solution.
9      So as far as I know, there's never been
10  any concerted effort to tackle that. Instead,
11  we focused on trying to reform the disability
12  programs, really things that were more in our
13  control.
14      MR. KAPLAN: Let's mark as Exhibit 9, 9
15  will be Federal Register for July 27, 2005, and
16  also we'll mark as Exhibit 10, the Federal
17  Register for March 31, 2006.
18      (Marked, Exhibit No. 9, Federal
19  Register, 7/27/05.)
20      (Marked, Exhibit No. 10, Federal
21  Register, 3/31/06.)
22  Q. On July 27, 2005, do you know, Mr. Sklar,
23  whether Social Security Administration proposed
24  changes to its rules relating to the SSDI

Page 60

1  application and appeal process?
2  A. Yes. That's correct.
3  Q. I'm happily not interested in all the proposed
4  changes but rather in one that I think we would
5  find referenced on Page 43602 of Exhibit 9. In
6  particular, the heading is "Administrative Law
7  Judge Hearing Process." Then on the very bottom
8  of second column, it is written:
9      "We propose to require that you submit
10  all evidence available to you when you request
11  your hearing. This rule will require you to
12  submit all available evidence that supports the
13  allegations that form the basis of your claim as
14  well as all available evidence that might
15  undermine or appear contrary to your
16  allegations."
17      Did you have any involvement in the
18  decision to propose the changes as reflected in
19  the portion of the record that I just read?
20  A. Some, yes.
21  Q. How would this proposed change have altered
22  processes as they existed at the time?
23      MR. NADLER: Object to the question as
24  calling for a legal conclusion.

Page 61

1  A. It really would have clarified an issue that's
2  been murky for sometime, and the issue is
3  whether you need to provide not just evidence
4  that supports your claim, but evidence that
5  might derail your claim.
6      And how that rule played out,
7  particularly in regard to claimant reps, has
8  been murky under the organic Social Security
9  statute for quite sometime and it was an attempt
10  to clarify that provision.
11  Q. If we look at what we marked as Exhibit 10,
12  which is the Federal Register for March 31,
13  2006, and there I'm going to direct your
14  attention to page 16437 in the upper right-hand
15  corner.
16      I'm looking in the middle paragraph.
17      Actually, let me strike that question
18  for just a moment.
19      If we go back to the proposed change,
20  was that a change that would address issues only
21  at the time that an applicant was requesting a
22  hearing before an administrative law judge or
23  was that change one that would affect the entire
24  application process?

Glenn Sklar
7/22/2008

Page 62

1  A. I probably need to go back and re-read the
2     proposed rule but it's my understanding that
3     that certainly would have been a policy that
4     would have carried throughout the entire life of
5     the claim from very beginning to very end.
6  Q. Okay. So now, let's look at the Federal
7     Register for March 31, 2006, and the middle
8     column on page 16437.
9  A. If I could go back and take a quick look and
10    read that provision one more time.
11 Q. Take your time. We were looking at Page 43602.
12    (Pause.)
13 A. Actually, having read, re-read the proposed
14    rule, it appears that that provision falls under
15    administrative law judge hearing section, and
16    one could certainly make the argument because it
17    fell under that section, it only applied to ALJ
18    hearings.
19       It's been quite sometime since I worked
20    with this reg so forgive me.
21 Q. That's fine.
22       In any event, if we now go to March 31,
23    2006, Federal Register, that provision that I
24    directed you to or that segment that I directed

Page 63

1     you to says:
2       "Finally we agreed to remove language
3     requiring claimants to submit evidence adverse
4     to their claims because the comments revealed
5     that the requirement was too confusing. We
6     clarified, however, that when claimants submit
7     evidence, such as medical report, the evidence
8     must not be redacted."
9       And then actually, let me direct your
10    attention also to page 16444 where you see the
11    actual amended reg.
12 A. Is that 1512(c)?
13 Q. Yes.
14 A. Got it.
15 Q. Is it fair to say that the proposal to include
16    adverse evidence did not actually become a part
17    of the regulations that govern the SSDI
18    application process?
19 A. Yes.
20       MR. NADLER: Objection to the question
21    as calling for legal conclusion and misstating
22    his testimony, but you can answer.
23 Q. And was it then the case that other than with
24    respect to that comment on not redacting medical

Page 64

1     evidence, that the regulations in this regard
2     remain the same as they were before the proposed
3     amendment?
4  A. That is correct. Essentially, this reg, large
5     portions of this regulation were essentially
6     held in abeyance and not implemented, to be
7     revisited at a future date.
8       So that's correct. The prior status quo
9     and plus the redaction piece is what's currently
10    in play.
11 Q. As these regs are presently enforced, would a
12    SSDI claimant who was also seeking disability
13    benefits from a third party, such as a private
14    disability insurer, who is denied benefits by
15    that third party have to inform the SSA of that
16    denial?
17       MR. NADLER: Object to the question as
18    calling for a legal conclusion.
19       MR. KAPLAN: If you want it read back, I
20    actually chose those words carefully. Would you
21    read back.
22       (Question read.)
23 A. It's really a fact-bound decision in that
24    certainly on the one hand, it's clear this rule

Page 65

1     was repealed, or at least the proposed rule was
2     pulled back and that there is no affirmative
3     requirement under Social Security statute or
4     organic enabling statute to provide what could,
5     in theory, be adverse evidence.
6       You'd also have to kind of navigate
7     between the shoals between the civil money
8     penalty provisions and, again, it's very a
9     fact-bound determination that I can't really --
10    I'm not even authorized to make.
11       I mean, only the AIG can navigate
12    through the civil money penalty piece, but
13    clearly you're not required to supply adverse
14    evidence under the Social Security statute in
15    1512(c), the section that we just looked at.
16 Q. And the civil money penalty statute, you don't
17    have off the top of your head a citation?
18 A. I do, actually. Section 1129 of the Social
19    Security Act, and the implementing regulations
20    are at 20 CFR part 498.
21 Q. That's impressive.
22 A. Thank you.
23       (Marked, Exhibit No. 11, Agenda, 2/19.)
24

17 (Pages 62 to 65)

Page 66

```
1         (Marked, Exhibit No. 12, Presentation,
2    2/19/02.)
3         (Marked, Exhibit No. 13, E-Mail,
4    5/17/02.)
5         (Marked, Exhibit No. 14,
6    Document/Procedures Meeting Proposal, 5/20/02.)
7         (Marked, Exhibit No. 15, E-Mail,
8    1/7/05.)
9         (Marked, Exhibit No. 16, Letter,
10   11/1/05.)
11        MR. KAPLAN:  Exhibit 11 is an agenda
12   dated February 19 of a SSA/DI carrier meeting.
13        Then Exhibit 12 is a series of slides or
14   PowerPoints.  Cover page is Private Disability
15   Insurance, and it's dated February 19, 2002.
16        Exhibit No. 13 is an e-mail dated May
17   17, 2002.
18        Exhibit 14 is a series of materials for
19   a meeting Social Security Administration,
20   Baltimore, Maryland, May 20, 2002.
21        Exhibit 15 is an agenda and related
22   materials from a meeting SSA/DI carrier meeting
23   October 2, 2002.
24        Exhibit 16 is an e-mail, string of
```

Page 67

```
1    e-mails dated January 7, 2005.
2         And Exhibit 17 is a letter from --
3         MR. NADLER:  I think you skipped one.
4         MR. COHEN:  Why don't we do them as you
5    go through them.
6         (Discussion off the record.)
7    Q.  Mr. Sklar, do you know if beginning in 2002, a
8    group of representatives of private disability
9    insurers began meeting periodically with SSA
10   representatives to discuss SSA adopting a
11   standard authorization form that would permit
12   private disability insurers to obtain
13   information regarding the status of a SSDI
14   application filed by their insureds and
15   information that SSA could provide to these
16   insurers electronically?
17        MR. NADLER:  Objection.  Leading and
18   compound.
19   A.  Yes.  That sounds correct.
20   Q.  Did these meetings continue for a period of
21   years at least through 2005?
22        MR. NADLER:  Objection.  Leading.
23   A.  That also sounds correct.
24   Q.  Do you know if this group of insurance company
```

Page 68

```
1    representatives identified themselves as
2    DISSATAG?
3         MR. NADLER:  Objection.  Leading.
4    A.  I don't know what they called themselves but I
5    am aware that there have been ongoing, just a
6    regular dialogue between SSA and the private
7    disability insurers on a variety of issues.
8    Q.  Were you a participant in any of those meetings?
9    A.  Some.  Not as early as 2002, but starting in
10   2004, I certainly have been regularly invited to
11   meetings of a group called AHIP, American Health
12   Insurance Providers, and they would typically
13   bring together a whole group of these carriers
14   and we would meet with them on occasion.
15   Naturally, we would actually make visits to some
16   of the particular insurers.  For example, I've
17   been down to Unum in Chattanooga.  I've been to
18   Aetna's headquarters in Hartford.  I've also
19   been to MetLIfe's facility, I believe it's in
20   Atlanta.
21        So, yes, I'm generally familiar with
22   these.
23   Q.  And the purpose of those site visits, if you
24   will, was what?
```

Page 69

```
1    A.  Typically these visits were always -- let me
2    back up.  These visits were always organized by
3    AHIP, and AHIP always wanted to know what was
4    going on with Social Security and, of course,
5    Social Security was always looking for the most
6    efficient way to process claims.  So there was
7    some, certainly, some convergence of interests.
8         So we would often sit down and put our
9    issues on the table, they'd put their issues on
10   the table, and see where there was commonality.
11        Occasionally it would be extremely
12   beneficial to Social Security Administration.
13        For example, I believe it was MetLife
14   who had a predictor model for screening out
15   cases where they were obviously going to pay
16   that case, and it was a computerized model.  We
17   saw it, we thought it was cool, we then
18   contracted with IBM to build our own model and
19   we've subsequently rolled that out nation-wide
20   to all of our facilities and it's been wildly
21   successful.
22        So there's certainly benefit to the
23   Social Security Administration to know what's
24   going on on the private carrier side.
```

18 (Pages 66 to 69)

Glenn Sklar
7/22/2008

Page 70

1  Q. So I hope what I've marked as Exhibit 11, which
2     should be in front of you, is the agenda of a
3     meeting February 19. And I suggest if we also
4     look at Exhibit No. 12, it appears to have been
5     a February 19, 2002, meeting.
6        Do you recall whether you were present
7     at the meeting that's reflected by this agenda
8     and then the meeting materials that are Exhibit
9     12?
10 A. I don't believe I was at this specific meeting
11    but it certainly seems like it happened and
12    these materials were shared with the Social
13    Security Administration.
14 Q. We can tell from the document production number
15    that these materials were produced in this
16    litigation by the Social Security
17    Administration.
18       Do you know who was the individual who
19    had these materials in his or her files?
20 A. I do not.
21       MR. KAPLAN: Jeff, at some time, I'll
22    give you a formal letter. I would be interested
23    in knowing whether or not these were in a
24    general file or whether these came from a

Page 71

1     particular individual.
2  Q. Do you know whether you discussed with anyone
3     what occurred at this particular February 19
4     meeting?
5  A. At some point, more recently since July 2004,
6     forward, the issue of common authorization form
7     was once again discussed with the Social
8     Security Administration between AHIP, the
9     carriers and SSA, and there was huge interest in
10    coming up with a common authorization form,
11    particularly on the private carrier side, so I
12    believe on some of those discussions, I'm sure
13    they referenced there had been earlier
14    discussions on a common authorization form.
15       That's the extent of how I learned about
16    this.
17 Q. And the common authorization form would replace
18    what?
19 A. Well, right now when an individual who's
20    applying for Social Security disability
21    insurance benefits identifies one of the
22    carriers as a source of medical evidence, at
23    that point, we'll go back to the carrier with
24    our standard authorization form called SSA 827,

Page 72

1     and request that they supply medical evidence on
2     behalf of the claimant.
3        And we hope that they do, we like when
4     they do, but they don't always do it. Just like
5     a lot of other people we ask for medical
6     evidence like doctors and hospitals, sometimes
7     they do it and sometimes they don't. So we ask
8     nicely.
9  Q. And was there also an issue with respect to the
10    insurers wanting to access information with
11    respect to an application at SSDI of one of
12    their insureds and wanting a form that would
13    allow them to receive this information from
14    SSDI?
15       MR. NADLER: Object to the question as
16    vague.
17 A. I understand your question.
18       The carriers always want to know what's
19    going on with these claims, and if we don't tell
20    them, they just keep calling us. They'll call
21    us monthly, weekly. And it's just a lot of work
22    for us to keep answering status of this person
23    who went from Point A to Point B, B to C, and
24    now it's going to payment. So there was

Page 73

1     potentially a synergy or common interest in
2     finding a more efficient way of keeping them in
3     the loop as to what's going on so they'd stop
4     calling us continuously.
5        So there were discussions about possibly
6     automating that process. And you can imagine
7     the complexity, given the sensitivity of the
8     information and all the authorizations, and all
9     these lawyers sitting around the table, we can
10    all imagine how complicated that process was to
11    try to figure out a way to do this.
12       But there were many, many discussions on
13    this point, partly because it was particularly
14    important to the carriers.
15 Q. At the time that these meetings began in 2002,
16    it was known to SSA that the insurance companies
17    were asking SSA to provide them with status
18    updates with respect to their insureds who were
19    also in the SSDI application process?
20       MR. NADLER: Object to the question as
21    leading.
22 A. Yes.
23 Q. Let me ask you to look at 1049. This is the
24    document control numbers.

19 (Pages 70 to 73)

Glenn Sklar
7/22/2008

Page 74

1  A. Exhibit 12?
2  Q. Yes. It also has a page 13.
3  A. I see it. Okay. I'm fine.
4  Q. I have to ask, you don't know whose handwriting
5     this is?
6  A. No, I don't know. I can assure you it's not
7     mine.
8  Q. No doubt.
9        It talks about authorization forms
10    differences among SSA field offices regarding
11    types of form used, length of time that forms
12    are considered valid.
13       Do you understand the point being raised
14    on that page with regard to that issue?
15 A. I do.
16 Q. What is that?
17 A. That there's tremendous complexity in terms of
18    mobilizing this information. I believe the
19    carriers were struggling somewhat with what can
20    they release to SSA? How long is the SSA 827
21    authorization form valid for? Can they use it?
22    What pieces of information can they send over?
23       So there was probably dialogue on what's
24    okay to send over and what's not.

Page 75

1        But, again, I was not privy to those
2     discussions.
3  Q. Is it fair to say there had been for some time
4     even before 2002, discussions with the private
5     insurance carriers about these issues that
6     you've just referenced and the flow of
7     information back and forth between SSA and the
8     private insurers regarding common insureds?
9        MR. NADLER: Object to the question as
10    vague, leading and compound.
11 A. I don't know.
12 Q. But certainly they began at least in 2002?
13 A. Certainly, yes.
14 Q. Let me ask you to look at 1043.
15       Did you look at this particular page in
16    connection with your preparation for the
17    deposition today?
18 A. I believe I did.
19 Q. I think earlier you testified that there was
20    little exchange of information regarding policy
21    provisions and that sort of thing between SSDI
22    and the private insurance carriers.
23       Do you know, have you talked to anyone
24    about the nature of the conversations that

Page 76

1     occurred on February 19, 2002, in reference to
2     this slide that lays out LTD and SSDI side by
3     side?
4  A. No.
5  Q. Was it SSA's general understanding, if you look
6     at definition of disability down in the bottom
7     blocks, did SSA have a general understanding of
8     the definition of disability used by the private
9     carriers before 2002, before this meeting, do
10    you know?
11 A. I don't know.
12 Q. They might have; they might not have?
13 A. That's correct.
14 Q. If you look at what is page 10 of Exhibit 12,
15    actually pages 10 and 11 as well, it gives
16    examples of benefit coordination.
17       Do you know whether before this exhibit
18    12 was presented at this meeting in February of
19    2002, whether SSA was generally aware of how
20    these benefit coordinations worked?
21 A. I really don't know but, again, as I testified
22    to previously, it seems rather obvious that if
23    the private insurers are asking folks to apply
24    for SSDI then they're going to offset that

Page 77

1     money, so I think it's just self-evident that
2     something like this would happen. Without any
3     formal knowledge or slide, it just seems
4     obvious.
5  Q. In preparation for this deposition, however, you
6     didn't go and talk to folks at SSA who had
7     perhaps been there for a long time to get a
8     sense for how much they knew about the
9     coordination of benefits arrangements back in
10    2002 or 2001 or that period?
11 A. No.
12 Q. Let me ask you to take a look at what we've
13    marked as Exhibit 13, which I hope is an e-mail,
14    first one dated May 17, 2002.
15 A. Yes.
16 Q. As is always the case, the top of the e-mail
17    string is from a Dana Bauer to a bunch of other
18    folks, I assume within SSA.
19       Do you know Dana Bauer?
20 A. I do not.
21 Q. I take it you don't know whether she's still
22    there.
23 A. Right.
24 Q. Joan Peddicord, do you know Joan Peddicord?

20 (Pages 74 to 77)

Glenn Sklar
7/22/2008

Page 78

1   A. I'm vaguely familiar with who she is. I believe
2      she probably still works for Jonathan Cantor in
3      the General Counsel's Privacy and Disclosure
4      branch.
5   Q. This Exhibit 17, if you look at the bottom, it
6      forwards an e-mail from a Martha Nolan at
7      MetLife.
8         Ms. Nolan wrote to a Ramona Frentz --
9   A. I'm sorry. I believe you said Exhibit 17.
10  Q. I'm sorry.
11        MR. NADLER: I have 13.
12  Q. It is 13. Sorry.
13        In any event, if you look at the bottom
14     of the page, it appears that at least according
15     to this e-mail, Martha Nolan, assistant
16     vice-president of MetLife, is sending by e-mail
17     a number of documents ahead of a meeting planned
18     for May 20.
19        First, do you know who Ramona Frentz is?
20  A. I do. She previously was a colleague of mine in
21     the policy group and has since retired.
22  Q. Then if you look at what we've marked as Exhibit
23     14, also you can tell from the Bates numbers
24     that these are documents produced from the files

Page 79

1      of Social Security Administration, it appears to
2      line up with the e-mail that we marked as
3      Exhibit 13 as the materials that are being
4      transmitted.
5   A. I would agree.
6   Q. So I guess my first question is:
7         One, do you know whether you attended
8      this May 20, 2002, meeting?
9   A. I'm fairly certain I did not attend this
10     particular meeting.
11  Q. Did you meet with anybody in preparation for
12     this deposition who attended the May 20, 2002,
13     meeting?
14  A. No.
15  Q. If we turn back to Exhibit 13, the e-mail,
16     Ms. Nolan writes to Ms. Frentz:
17        "We have finally completed the work on
18     the various documents that we were asked to put
19     together after our February meeting."
20        Is it safe to say that you don't have
21     any particular information apart from what you
22     read here on Exhibit 13 with respect to what
23     documents SSA asked the insurance
24     representatives to put together for their next

Page 80

1      meeting?
2   A. That's correct.
3   Q. Let me ask you to turn to, I think the Bates
4      number is the easiest way to identify it, within
5      Exhibit 14, page 994.
6         I hope you're looking at a page that has
7      the heading, "High Level Information Flow of LTD
8      Claim."
9   A. Yes.
10  Q. Do you know if, in fact, this was particular
11     information that SSA had asked the insurance
12     companies to come up with for their next
13     meeting?
14        MR. NADLER: Objection. Leading.
15  A. I don't know.
16  Q. Do you know if the information set out on 994
17     was, in fact, discussed at the May 20 meeting
18     which included representatives of the insurance
19     industry and representatives of Social Security
20     Administration?
21  A. I don't know, but it certainly would be
22     something relevant and interesting, and I don't
23     see why it wouldn't have been presented.
24        I would think part of the process was

Page 81

1      education in both directions, and that we would
2      try to educate the private disability carriers
3      on what we do and they often would try to
4      generally educate us on what they do, again,
5      within limits.
6   Q. Does it appear to you that this page that we're
7      looking at, High Level Information Flow, was an
8      attempt by the insurance industry to educate the
9      SSA folks on how they handled the interface
10     between LTD claims and their insureds applying
11     for SSDI?
12        MR. NADLER: Object to the question as
13     leading and calling for speculation.
14  A. Yes.
15  Q. Do you have any reason to believe that the
16     members of the insurance industry who were
17     participating in these meetings weren't candid
18     and forthcoming when providing information about
19     how their program interfaced with SSDI?
20        MR. NADLER: Objection as calling for
21     speculation.
22  A. Again, since I wasn't at these meetings I have
23     no idea what was discussed.
24  Q. If you look at the last couple of pages of what

21  (Pages 78 to 81)

Glenn Sklar
7/22/2008

Page 82

1   we've now marked as Exhibit 14, there are
2   additional examples of how coordination between
3   SSDI benefits and long-term disability benefits
4   works.
5       Do you know if the SSA representatives
6   asked for additional information so that they
7   could better understand how this coordination of
8   benefits was working?
9       MR. NADLER: Object to the question as
10  leading and calling for speculation.
11  A. Again, as I wasn't present at this meeting, I
12  have no idea what the contents of discussions
13  were about.
14  Q. Is it fair to say that you didn't seek out
15  anybody who still works with the Social Security
16  Administration and did attend these meetings in
17  order to prepare for today's deposition?
18  A. That's correct.
19      MR. KAPLAN: I take it that I did not
20  mark as an exhibit, a document which was the
21  agenda for October 2, 2002, meeting.
22      MR. NADLER: I think you recited it, but
23  I never got a copy of it.
24      (Discussion off the record.)

Page 83

1       MR. KAPLAN: No. 17 is the Agenda,
2   October 2, 2002, meeting of Social Security
3   Administration.
4       (Marked, Exhibit No. 17, Agenda, SSA/DI
5   Carrier Meeting, 10/2/02.)
6   Q. Mr. Sklar, you have before you Exhibit 17.
7.  A. Yes.
8   Q. And again, a document produced from the files of
9   Social Security Administration and makes
10  reference to a meeting with the carriers on
11  October 2, 2002.
12      Were you present at this meeting?
13  A. I don't believe so.
14  Q. Do you know whether you've spoken to anybody who
15  was present at this meeting?
16  A. Again, I don't believe so.
17  Q. The second page, which bears Bates No. 965, in
18  the lower right-hand corner, is entitled
19  "Summary of SSA and DISSATAG's May meeting and
20  Work Projects."
21      In the middle of that page, it is
22  written:
23      "In preparation for the May 20 meeting,
24  DISSATAG created the following documents," and

Page 84

1   it lists them.
2       And then it says:
3       "All of these documents were reviewed
4   and discussed at the May 20 meeting."
5       You don't have any reason to believe
6   that's not an accurate statement, do you, sir?
7       MR. NADLER: Object to the question as
8   calling for speculation.
9   A. I do not.
10  Q. And then it goes on to say:
11      "As a result of the meeting, both SSA
12  and DISSATAG agreed to address areas of concern
13  for purposes of further discussions and
14  agreement at the next meeting," and then it
15  lists a bunch of areas.
16      Do you know whether there was any
17  consideration of whether an area of concern was
18  the fact that private disability insurers
19  were sending all of their applicants for
20  disability insurance to SSDI for a determination
21  of eligibility?
22      Do you know if that was ever considered
23  an area of concern by this group?
24      MR. NADLER: Object to the question as

Page 85

1   calling for speculation and leading, but you may
2   answer.
3       MR. COHEN: I object to it as vague.
4   A. I do not.
5   Q. Is it fair to say that you have not sought out
6   anyone at Social Security Administration who
7   participated in these meetings to see if there
8   was any discussion of this issue during the
9   course of the February, May or October 2002
10  meetings that took place between representatives
11  of the insurance industry and representatives of
12  Social Security Administration?
13  A. That's correct.
14  Q. Let me ask you to turn to page 969 and, in
15  particular, I hope you're looking at a document
16  that says "Attachment A."
17  A. That's correct.
18  Q. And under Point 4, Attachment A reads:
19      "The LTD contract requires that the
20  claimant apply for benefits. The contract also
21  specifies the level that the claimant must take
22  his application through."
23      Have you had any conversations with
24  anybody at SSA with respect to their

22 (Pages 82 to 85)

Glenn Sklar
7/22/2008

Page 86

1　understanding that the standard LTD contract
2　requires that the claimant apply for benefits?
3　A. Again, as I stated in my prior testimony, I'm
4　generally aware these claims were coming but
5　never really dug into the details of them.
6　Q. Do you know whether during all of these, the
7　meetings that we've just made reference to, the
8　February, the May and the October meetings of
9　2002, that, in fact, there were discussions
10　during the course of those meetings about which
11　claimants and whether all LTD claimants were, in
12　fact, being forwarded over to SSDI to determine
13　whether they were also eligible for SSDI
14　benefits?
15　　　MR. NADLER: Object to question as
16　compound and calling for speculation.
17　A. Again, as I wasn't at this particular meeting, I
18　really don't know.
19　Q. Let's turn to the January 5 e-mail.
20　　　MR. COHEN: Exhibit 15.
21　　　MR. KAPLAN: January 7 e-mail, Exhibit
22　15. Thank you.
23　Q. I think you testified earlier that at some point
24　in time, you became involved in this string of

Page 87

1　meetings that was addressing the authorization
2　form and the electronic exchange of information.
3　　　Do you know whether it was before or
4　after January 7, 2005?
5　A. I'm not sure of the particular date, but I am
6　very familiar with Winthrop Cashdollar. He is
7　sort of their AHIP disability carrier point
8　person and I have regular and routine contact
9　with Winthrop and probably -- actually talked to
10　him yesterday, as a matter of fact.
11　Q. By January 7, 2005, do you know how many times
12　this, whether you want to call it the AHIP group
13　or DISSATAG group, do you know how many times
14　they had met?
15　A. I don't know the specific number, but there were
16　fairly routine meetings between the agency and
17　AHIP and the carriers, roughly maybe a couple of
18　times a year.
19　　　Again, that's just a guess on my part
20　but they happened on a fairly regular basis
21　because there were always issues to be
22　discussed.
23　Q. If you look at the beginning of this e-mail
24　chain, the first e-mail is from a Joan

Page 88

1　Peddicord, and I think you identified her as
2　someone who works within the General Counsel's
3　Office?
4　A. Correct.
5　Q. Then it's to a number of other individuals. Any
6　of those folk also in the General Counsel's
7　Office, to your knowledge?
8　A. The to line, Randy Gaines?
9　Q. Yes.
10　A. Actually, I know them all pretty much so I can
11　go through them.
12　　　Randy Gaines is retired.
13　Q. Was he in General Counsel's Office?
14　A. He was.
15　　　Jonathan Cantor is also in Counsel's
16　office.
17　　　Linda Thibodeaux may or may not still be
18　working in Counsel's Office.
19　　　Pete Malinauskas is an office systems
20　person. He's automation guy.
21　　　And Wiseman, I don't know.
22　Q. By January 2005, the Cigna qui tam case and the
23　Unum qui tam had already been filed, correct?
24　A. Correct.

Page 89

1　Q. While you might not have had knowledge, it's
2　your understanding that General Counsel's Office
3　was aware of the filing of those actions?
4　A. Correct.
5　Q. Do you know whether in the course of any of
6　these meetings between representatives of the
7　long-term disability industry and
8　representatives of SSA, including from General
9　Counsel's Office, anyone made any mention of the
10　qui tam case?
11　A. I can just tell you that I was in many, many
12　meeting with carriers and the topic never came
13　up. And that's why I was so shocked when I read
14　about it in the New York Times. I was really
15　surprised.
16　Q. Is it fair to say that at none of these meetings
17　did anybody from Social Security Administration
18　suggest to any of the disability carriers that
19　they should change the manner in which they
20　encourage or require their insureds to also
21　apply for SSDI insurance?
22　　　MR. NADLER: Object to the question as
23　leading and calling for speculation.
24　　　MR. COHEN: Objection. Vague.

23 (Pages 86 to 89)

Glenn Sklar
7/22/2008

Page 90

1   A. Again, I can only speak to the meetings that I
2      attended. I can't recollect the topic ever
3      coming up on the proprietary of who is being
4      sent over and who is not. And again, I wasn't a
5      party to the meetings prior to July 2004.
6      That's for sure.
7   Q. Is it also then fair to say that prior to 2008
8      when you read the New York Times article, you
9      weren't even aware of the existence of these
10     lawsuits?
11  A. That's correct.
12  Q. And at least as you observed during the course
13     of these meetings, therefore, the fact that
14     these qui tam cases had come up didn't slow down
15     the process that you were working on with AHIP
16     and the insurance carriers toward a uniform
17     authorization form and the electronic transfer
18     of data?
19  A. Actually, I was kind of surprised that the whole
20     issue was so closely held by both the carriers
21     and, I guess, by SSA. It really was never a
22     point of dialogue.
23        Subsequently, I've learned that the SSA
24     position was just, you know, we don't have a

Page 91

1      position, and we're going to let the litigation
2      play out to figure out who is right and who is
3      not.
4   Q. So is it fair to say that as far as you know,
5      either at these AHIP/DISSATAG meetings or any
6      other meeting that you're aware of, no one from
7      Social Security Administration ever told any
8      long-term disability carrier that they should
9      stop doing -- they should stop their practice as
10     it related to SSDI?
11        MR. NADLER: Object to the question as
12     leading, as speculative and as vague.
13        MR. COHEN: Objection. Vague.
14  Q. Do you understand the question?
15  A. If you could repeat the question, that would be
16     helpful.
17  Q. Sure.
18        During the course of these -- I want to
19     come up with a common phrase so I don't have to
20     keep describing this. So I'll refer to them as
21     the AHIP meetings. And so that we are all on
22     the same record, by that, I mean the continuum
23     of meetings that started in 2002 and went
24     through now to 2005 as reflected in Exhibit 15,

Page 92

1      and at least as to at some point the insurers
2      called themselves DISSATAG, but I'll refer to
3      them as the AHIP meetings.
4         So is it the case that you were in
5      attendance beginning at least in the 2004 time
6      period forward at some of the AHIP meetings?
7   A. I think that's probably correct.
8         Again, I need to go back and check on my
9      calendar to give you exact dates and times, but
10     I believe that's correct.
11        From 2004, forward, I most likely would
12     have been at at least some of these meetings,
13     certainly not all.
14        And there really are two definite sets
15     of meetings, just to be clear. I was much more
16     involved on the policy side. There's also the
17     separate discussion on the systems automation
18     deal where AHIP was fairly aggressively pursuing
19     a way to access status information in an
20     automated fashion.
21        I was not involved in any of those
22     meetings or discussions and have never been and
23     know very little about it.
24        On the other hand, on the policy

Page 93

1      discussions in terms of best practices and
2      things like that, I typically would have been
3      involved in those discussions.
4   Q. When you say the policy meetings, what in
5      particular were the policy issues that were
6      being addressed in the AHIP meetings that you
7      attended? Generally. I'm not --
8   A. Sure. Generally, the authorization form was
9      always a hot topic. How can we come up with a
10     common authorization form?
11        Certainly SSA was pushing that all
12     evidence should be submitted electronically,
13     perhaps through an Internet portal.
14        We certainly had an interest in having
15     them fill out certain forms on the Internet
16     or -- just searching, I'm searching my memory
17     bank for what exactly came up.
18        Really talked a lot about how they
19     submit claims information generally to SSA in
20     terms of format, not substance.
21  Q. When you say "they," you mean the private
22     disability insurance carriers submit claim
23     information for their insureds who are now
24     applying for SSDI benefits?

24 (Pages 90 to 93)

Glenn Sklar
7/22/2008

Page 94

1  A. Correct. It was really discussion about the
2    automation piece and probably less a discussion
3    about the content.
4  Q. And certainly during no meeting that you
5    attended did anybody from the SSA side say, in
6    words or substance, we're aware of these qui tam
7    cases and you should stop sending over all of
8    your LTD applicants without doing some
9    screening? You never heard such a conversation?
10       MR. NADLER: Object to the question as
11   leading.
12 A. The topic never came up.
13 Q. To your knowledge, based on conversations with
14   your colleagues at SSA, that topic never came up
15   in any of the meetings that you didn't attend?
16       MR. NADLER: Object to the question as
17   leading and calling for speculation.
18 A. Again, I have no way of gauging what was talked
19   about at meetings I wasn't at, but I certainly
20   did not hear downstream chatter about we had
21   this discussion about this topic came up.
22       So, again, it was news to me when I saw
23   that this case had been filed in 2008.
24 Q. Let's look at the exhibit which is the September

Page 95

1    1, 2005, letter from Commissioner Barnhart.
2       MR. COHEN: 16.
3  Q. Have you seen Exhibit 16 previously?
4  A. Yes.
5  Q. Were you aware that this letter was being sent
6    to AHIP on or about November 1, 2005?
7  A. Sure seems to reflect that.
8  Q. Did you play any role in discussions leading up
9    to the Commissioner's decision to send this
10   letter to AHIP?
11 A. I do not believe so. Again, it goes to the fact
12   that the functions were somewhat bifurcated.
13   There's a group working on this automation, on
14   this project whereby the insurers would know
15   where their case is at a particular time, and
16   that automation piece, and I was working on a
17   different automation piece essentially trying to
18   mobilize electronic information from the private
19   disability insurers just like we were trying to
20   do that with Kaiser, we were trying to do that
21   with Mayo Clinic and Hopkins and University of
22   Maryland.
23       So they were just sort of another party
24   that we would go through that exercise with

Page 96

1    because we were really trying to up the
2    percentage of electronic information coming into
3    the agency. That was a priority goal for us.
4  Q. Let me direct your attention to the middle
5    paragraph where Commissioner Barnhart writes:
6       "Our objective regarding the form and
7    content of the authorization form was to ensure
8    that SSDI applicants and beneficiaries fully
9    understand the authority requested, its
10   implications and their rights."
11       Did you have any discussions with others
12   at SSA with respect to issues concerning the
13   applicants' and beneficiaries' understanding of
14   the authority that was being requested by the
15   insurance carriers?
16 A. There were a whole series of discussions, I'm
17   sure, about the authorization form. And how I
18   know this is I bumped up against them when I
19   started looking at this issue in 2007 and 2008,
20   so I know there's a whole dialogue.
21       I think the General Counsel's Office was
22   involved in some of these discussions in making
23   sure that they could come up with this common
24   authorization form.

Page 97

1       So I know there were lots of discussions
2    and it was about the authorization. That was
3    the issue.
4  Q. To your knowledge, through the date that
5    Commissioner Barnhart issued her letter on
6    November 1, 2005, had SSA, to your knowledge,
7    had SSA done anything or said anything that
8    would indicate to any private insurance carrier
9    that the way in which they were referring their
10   insureds to apply for SSDI benefits was
11   violative of the law?
12       MR. NADLER: Object to the question as
13   leading and calling for speculation, but you may
14   answer.
15       MR. COHEN: Objection. Vague.
16 A. Again, I'm not aware of any conversations of
17   that sort prior to November 2005.
18       Retrospectively in 2008, I learned that
19   the thought was to just let the litigation play
20   out and see where the chips fall and who is
21   right and who is wrong will become clear.
22       Certainly weren't going to regulate the
23   practice if it was okay. So we certainly
24   weren't going to go out and propose rules on

25 (Pages 94 to 97)

Page 98

1  something like this until the answer became
2  clearer. And that would drive the policies.
3      So in many ways, we were largely waiting
4  to see what happened and continue in that status
5  right now. We're monitoring the litigation
6  very, very closely.
7  Q. The regulations that govern the application
8  process, those are promulgated by the Social
9  Security Administration?
10 A. That's correct. Evidence proves we have
11 extremely broad delegated authority in setting
12 the policies and procedures on how we run our
13 process.
14 Q. And yet it's the SSA's position that it has no
15 position on whether the regulations that it has
16 promulgated around the SSDI process have been
17 violated by any conduct of the private long-term
18 disability carriers?
19     MR. COHEN: Objection. Mischaracterizes
20 his testimony.
21 A. That's really not what I said.
22     Basically, SSA has complete and total
23 control over how we set the process up, assuming
24 we can publish a reg through notice and comments

Page 99

1  and make it stick.
2      And this particular case, there's a
3  balance that we're watching as to how our regs
4  are balanced against the obligation of a
5  claimant to be forthright and truthful when they
6  file a claim. And it's a balance that I
7  mentioned previously. And we're very curious as
8  to how that balance will be struck between SSA's
9  organic statute and the civil money penalty
10 statute.
11     They were statutes that were passed at
12 different times. This is, to my knowledge, the
13 first time that, arguably, there's a case that
14 puts those two statutes in conflict. And, quite
15 frankly, it's not clear to us what the answer is
16 going to be.
17 Q. Is the Social Security Administration still
18 planning on implementing a means for providing
19 electronic transfer of information both to the
20 private long-term disability carriers and from
21 the long-term disability carriers to SSA?
22     MR. NADLER: Object to the question as
23 outside the scope of the notice, but you can
24 answer.

Page 100

1  A. To the best of knowledge, that project is pretty
2  much dead. SSA did come up with a prototype and
3  there was a cost attached to that prototype,
4  and, again, this is hearsay on my part, I've
5  heard it from others who told me that apparently
6  the insurers didn't want to pay that much money
7  for it. So the project isn't going anywhere.
8      But I have no firsthand knowledge of
9  that. I'm just repeating what I was told.
10     That said, we have continued to have
11 dialogue about electronic submissions of claims
12 and, in particular, obviously, disabled
13 individuals, we have a huge interest, common
14 interest to making sure those claims get paid
15 rapidly, so we're currently exploring ways of
16 moving those cases as expeditiously as possible.
17 Q. Is it fair to say that the existence of these
18 qui tam actions hasn't impacted SSA's desire to
19 continue on with the process that had begun
20 working towards a possible electronic transfer
21 of information between the carriers and Social
22 Security Administration?
23     MR. NADLER: Object to the question as
24 outside the scope of the notice.

Page 101

1  A. If you just clarify, are you referencing the
2  Ignagni letter and the project explained
3  therein, including the project where they could
4  check the status of their claims at any point in
5  time?
6  Q. Yes.
7  A. Okay. Now I understand your question.
8      It just seems like all the parties to
9  the project walked away, including AHIP. It
10 just seems like there's not a lot of interest in
11 pursuing that part of the project anymore and I
12 don't know why. They invested a lot of time and
13 resources in the project and came up with a
14 prototype and there was a cost attached and it
15 just hasn't moved.
16     MR. KAPLAN: Let's mark as Exhibit 18,
17 June 17, 2004, letter to the Honorable JoAnne B.
18 Barnhart, from Congressmen Shaw and Matsui.
19     (Marked, Exhibit No. 18, Letter,
20 6/17/04.)
21 Q. Have you seen Exhibit 18 previously?
22 A. I'm not sure. I don't know if it was in the
23 package of materials that I received. It could
24 have been in the first wave that I looked at

26 (Pages 98 to 101)

Glenn Sklar
7/22/2008

Page 102

1    about 60 days ago.  I'm really not sure.
2    Q.  Do you know if there ever was any follow-up at
3        SSA to this letter?
4    A.  Let me just take a second and just read it
5        carefully.
6    Q.  Sure.
7            (Pause.)
8    A.  I'm sure I've seen this letter before.  I just
9        don't recall when.  I suspect it was probably in
10       getting ready for this deposition.
11   Q.  If you look at the second page, the Congressmen
12       write to the Commissioner:
13           "The subcommittee asks that you work
14       with the Inspector General and any other
15       relevant law enforcement authorities to
16       investigate and address this practice that harms
17       the administration of Social Security disability
18       programs."
19           Do you know if that ever happened?
20   A.  To the best of my knowledge, I've never heard
21       about any type of investigation, although the
22       party in interest to talk with would be the
23       Inspector General's Office who -- it's not clear
24       they would have told us what's going on either,

Page 103

1    but I'm not aware of any such investigation.
2    Q.  Is it a fair summary of the SSA's current
3        position that it has no opinion one way or the
4        other as to whether any of the allegations in
5        the Cigna qui tam complaint are violative of the
6        law?
7            MR. NADLER:  I object to that question
8        as calling for a legal conclusion, as calling
9        for speculation about what those allegations
10       are, and it's leading, but you may answer.
11           MR. COHEN:  Objection.
12           We had a conversation at the beginning
13       about he had never seen, he hadn't read the qui
14       tam.  You're asking for a general description --
15           MR. KAPLAN:  It's a good point.  That's
16       not a fair question.
17   Q.  Does the SSA have an opinion as to whether under
18       statutory or regulatory law, a private
19       disability insurer has an obligation to screen a
20       claimant for long-term disability insurance to
21       determine the likelihood that that claimant
22       would also be eligible for SSDI before requiring
23       such claimant to apply for SSDI benefits?
24           MR. NADLER:  Object to the question as

Page 104

1    calling for a legal conclusion and as calling
2    for speculation.
3    A.  I'm not aware that the Social Security
4        Administration has ever promulgated guidance on
5        this topic, for example, Social Security ruling
6        or a POMS or a regulation to that effect.
7            So I'm not aware of any guidance one way
8        or the other.
9    Q.  To your knowledge, if a long-term disability
10       insurer was interested in determining whether
11       such conduct was violative of the law, is there
12       any place, is there any regulation, bulletin,
13       document, writing of any kind within the SSA
14       that it could look to to determine a course of
15       conduct that would be consistent with SSA's view
16       of the law?
17   A.  I lost the first part of the question.  I'm
18       sorry.
19           MR. KAPLAN:  I don't know that I could
20       do better so could you read it back, Kathy.
21           (Question read.)
22           MR. NADLER:  I object to the question as
23       outside the scope of the notice.
24   A.  I will need a clarification on what you mean by

Page 105

1    "such conduct."
2            Just the sending of applications to SSA
3        without prescreening them?
4    Q.  That's correct.
5    A.  Again, as I previously mentioned, this is really
6        going to be a fairly fact-specific situation.
7        It's going to be a case-by-case scenario and I
8        just don't see how any particular guidance can
9        address the myriad of potential factual
10       situations that might come up.  I think each
11       case is its own case.
12   Q.  Each individual claimant?
13   A.  Right.  I don't know how generically -- I'm
14       trying to think in my own mind how we could put
15       out guidance on screening of claims.  It's not
16       somewhere where we've previously gone, and I'm
17       literally thinking out loud right now whether
18       it's somewhere we should go in the future or
19       not, but the reality is we haven't and there is
20       currently no published policy out there that
21       requires, certainly requires private disability
22       insurer to, quote, unquote, prescreen an
23       application before a claimant comes and files.
24       I'm not aware of any such thing.

27 (Pages 102 to 105)

Glenn Sklar
7/22/2008

Page 106

1  Q. Focusing on the individual claimant, having in
2     mind the open door policy as you just described,
3     is there any obligation on the part of a
4     claimant who provides completely factual
5     information with respect to who his medical
6     providers are, what jobs he's had and when was
7     the last time he worked and so on, is there any
8     obligation anywhere within the POMS or the SSA
9     handbook or any other writing that requires such
10    claimant to make a self-assessment as to whether
11    such claimant believes that he meets the
12    eligibility requirements as defined in the regs?
13        MR. NADLER: Object to the question as
14    calling for a legal conclusion.
15 A. I'm not aware of any such provision, although
16    they have to sign each application that it's
17    truthful under the penalty of perjury right
18    above their signature so that's sort of the
19    balance.
20        So we certainly wouldn't expect the
21    claimant to have the sophistication to decide
22    whether they're in or out. Many of the
23    claimants have -- some of them don't even have a
24    high school education and they really are not

Page 107

1     very good at even explaining what their medical
2     problems are.
3  Q. Is that true with respect to the claimant who --
4     earlier you testified that there were sometimes
5     claimants who arrived at field offices and the
6     field office person tried to discourage them
7     from submitting an application because it
8     appeared clear that they simply weren't
9     disabled. That person goes ahead and submits
10    that application anyhow.
11        Is there any regulation, statute or
12    anything that would suggest that by submitting
13    that application, that claimant, if the
14    information in the application is all accurate,
15    has violated the law?
16        MR. COHEN: Objection. Calls for a
17    legal conclusion. I think we covered this
18    territory as well.
19        MR. KAPLAN: Why don't we take a break.
20    I think I'm done but let's take two minutes to
21    confer with my colleagues.
22        (Recess.)
23 Q. Mr. Sklar, assume the following set of facts:
24        Young individual, say in his early

Page 108

1     twenties, without a high school diploma, has
2     been engaged in what we will refer to as heavy
3     occupations requiring pushing and pulling,
4     lifting more than 50 pounds, suffers a very
5     severe broken leg in multiple places, and
6     through surgery, convalescence, rehabilitation,
7     fifteen months after the accident, he's able to
8     return to a relatively heavy duty job.
9        Is he eligible to benefits for the
10    twelve months he was out of work?
11        MR. COHEN: Objection. I think we're
12    outside the scope.
13        I'll let him answer.
14        MR. NADLER: I object to the question as
15    vague, but you can answer.
16 A. As I mentioned previously, I am not a disability
17    adjudicator. I don't do individual claims and
18    I've never been asked to decide who is in or
19    out. We're the policy guys who write the
20    policy.
21        That said, I guess I could give you a
22    guess as to what might happen here.
23        Let me make sure I have this correct.
24    This is an individual who's been in heavy sort

Page 109

1     of occupation who has a medically determinable
2     impairment, fracture, that puts them out for
3     fifteen months?
4  Q. Yes.
5  A. And the question is whether that individual
6     could potentially qualify for Social Security
7     disability benefits?
8  Q. Yes.
9  A. It's possible. Again, they'd certainly take a
10    whole lot more information than that to make a
11    determination. They would want to know what
12    your daily activities are, what type of
13    vocational information, what types of vocational
14    skills do you have, do you have any other
15    impairments, any co-morbidities. They'd
16    probably look him in the eye if he came in the
17    field office and make a credibility assessment.
18        So probably there's a lot more
19    information. We'd need to look at the primary
20    medical information and pull the medicals, and a
21    team of disability examiner and a medical
22    consultant would look at the case.
23        So it's pretty impossible for me to
24    hypothetically -- it's a very fact-dependent,

28 (Pages 106 to 109)

Glenn Sklar
7/22/2008

Page 110

1  fact-bound determination.
2  Q. These are difficult determinations requiring
3    multiple sources of information to answer that
4    kind of hypothetical that I put to you?
5  A. That's correct.
6        MR. KAPLAN: No further questions.
7        MR. NADLER: Just two minutes.
8        (Pause.)
9             CROSS-EXAMINATION
10 BY MR. NADLER:
11 Q. Mr. Sklar, thank you for your patience. My name
12   is Carl Nadler and I represent the relator, Dawn
13   Barrett, in this proceeding.
14        With respect to your answer to the last
15   hypothetical about the man who broke his leg, my
16   understanding, sir, is that you have not worked
17   previously in disability determinations as such;
18   is that correct?
19 A. That's correct.
20 Q. And you don't claim expertise in those
21   determinations or how they're made?
22 A. I do not.
23 Q. And did you understand that question to be
24   within the scope of the 30(b)(6) notice you'd be

Page 111

1  called upon to testify to today?
2  A. My personal opinion is that it wasn't 5, 7, 8, 9
3    or 10.
4  Q. And in preparing to testify today, did you do
5    anything to familiarize yourself with how
6    disability determinations are made?
7  A. No.
8        MR. NADLER: I have no further
9    questions, thank you.
10        (12:50 p.m., proceedings adjourned.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 112

1          CERTIFICATE OF COURT REPORTER
2        I, Kathleen L. Good, Certified Shorthand
3  Reporter and Registered Professional Reporter, do
4  certify that the deposition of GLENN SKLAR, in the
5  matter of USA vs. Cigna, on July 22, 2008, was
6  stenographically recorded by me; that the witness
7  provided satisfactory evidence of identification, as
8  prescribed by Executive Order 455 (03-13) issued by
9  the Governor of the Commonwealth of Massachusetts,
10 before being sworn by me, a Notary Public in and for
11 the Commonwealth of Massachusetts; that the
12 transcript produced by me is a true and accurate
13 record of the proceedings to the best of my ability;
14 that I am neither counsel for, related to, nor
15 employed by any of the parties to the above action;
16 and further that I am not a relative or employee of
17 any attorney or counsel employed by the parties
18 thereto, nor financially or otherwise interested in
19 the outcome of the action.
20
21 _____
22 Kathleen L. Good, CSR, RPR
23
24

Page 113

1                  INDEX
2  WITNESS:                    PAGE:
3  GLENN SKLAR
4    BY MR. KAPLAN              5
5    BY MR. NADLER            110
6             *****
7  EXHIBITS:
8  No. 1, Subpoena and Notice of Deposition      6
9  No. 2, Provision from Title 5 of the U. S.   20
10 Code, Federal Employer's Retirement
11 System, Section 8451
12 No. 3, Code of Federal Regulations,          20
13 5844.201
14 No. 4, Memo, 9/22/89              26
15 No. 5, Memo, 10/18/89             26
16 No. 6, Document entitled, "SSA Disability,   31
17 Return-to-Work Strategies From Other
18 Systems May Improve Federal Programs,"
19 dated July 1996
20 No. 7, Document entitled, "Hearing Before     32
21 the Subcommittee on Social Security, the
22 Committee on Ways and Means, House of
23 Representatives," dated June 11 and 20,
24 2002

29 (Pages 110 to 113)

Glenn Sklar
7/22/2008

Page 114

1  EXHIBITS:
2  No. 8, Excerpts from Book entitled Growth    50
3    in Disability Benefits, Explanations and
4    Policy Implications
5  No. 9, Federal Register, 7/27/05         59
6  No. 10, Federal Register, 3/31/06        59
7  No. 11, Agenda, 2/19             65
8  No. 12, Presentation, 2/19/02        66
9  No. 13, E-Mail, 5/17/02          66
10  No. 14, Document/Procedures Meeting      66
11    Proposal, 5/20/02
12  No. 15, E-Mail, 1/7/05           66
13  No. 16, Letter, 11/1/05          66
14  No. 17, Agenda, SSA/DI Carrier Meeting,    83
15    10/2/02
16  No. 18, Letter, 6/17/04          101
17          *****
18
19
20
21
22
23
24

Page 115

1          WITNESS: GLENN SKLAR
2          CASE: USA vs. Cigna
3        SIGNATURE PAGE/ERRATA SHEET
4  PAGE  LINE  CHANGE OR CORRECTION AND REASON
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22  I have read the transcript of my deposition taken July 22, 2008,
23  except for any corrections or changes noted above I hereby
24  subscribe to the transcript as an accurate record of the
25  statements made by me.
26  Signed under the pains and penalties of perjury.
27
28  _____DATE_____
29  Deponent, GLENN SKLAR
30
31  On this _____ day of _____, 200__, before me, the
32  undersigned notary public, personally appeared GLENN SKLAR, who
33  presented satisfactory evidence of identification, to wit,
34  _____, and signed this document in my
35  presence.
36
37  _____
38  Notary Public in and for_____
39  My commission expires_____
40

K. L. GOOD & ASSOCIATES