# EXHIBIT O

# (3 OF 8)

DEPARTMENT OF HEALTH & HUMAN SERVICES

E5-9-08-02-019(A)

Refer to:

Social Security

AC06 ; CR04

Office of Hearings and Appeals
PO Box 3200
Arlington VA 22203

SEP 2 2 1989

MEMORANDUM TO:    Headquarters Executive Staff
                  Appeals Council Members
                  Regional Chief Administrative
                    Law Judges
                  Hearing Office Chief
                    Administrative Law Judges
                  Administrative Law Judges

FROM          :   Associate Commissioner

SUBJECT       :   Payment of Fees for Representational
                  Services by a Third Party -- INFORMATION

It has come to my attention that certain issues involving
representation of claimants by individuals whose fees may be
paid by a third party require clarification.

This type of situation typically involves a recipient of
long-term disability (LTD) benefits paid by a private insurer
which encourages or requires the recipient to file for Social
Security disability insurance benefits (DIB).  Under the
terms of most LTD policies, the amount of the LTD monthly
benefit is offset by the amount of DIB payable.  Accordingly,
the insurance company has a strong incentive to ensure that
its beneficiaries qualify for DIB and some companies have
contracted with representatives and will pay the
representative's fee directly or indirectly.

This practice has raised questions about whether the third
party (i.e., the insurance company) is the true party in
interest, and whether there has been an assignment or
subrogation of Social Security benefits in contravention of
the law.

After careful consideration of this matter, I have concluded
that there is no reason to assume that the claimant is not
the true party in interest.  Even though the insurance
company benefits when the claimant establishes eligibility to
DIB, the claimant also accrues valuable rights and
entitlements.  In addition to cash benefits, a DIB recipient
has his or her earnings record "frozen," thereby protecting



Sklar
EXHIBIT NO. 4
7/22/08
K.L. GOOD

SSA000234

page 2

future potential benefit amounts. He or she also establishes potential entitlement to Medicare and potential eligibility for auxiliary beneficiaries. Depending upon the terms of the specific LTD policy, a claimant may also be able to retain cost of living increases without a corresponding offset against LTD benefits, and derive tax advantages from receiving DIB rather than LTD benefits. Thus, a claimant has a strong interest in establishing entitlement to DIB regardless of whether he or she receives additional cash benefits.

The mere fact that the insurance company also benefits when a claimant establishes entitlement to DIB does not constitute an assignment or subrogation of Social Security benefits. The claimant retains full use of the DIB, but the LTD benefits are reduced in accordance with the terms of a private contract. There is no statutory basis or authority to question the private business dealings of individual claimants in this regard. We must presume that the claimant entered into the contract with the insurance company with full knowledge of its terms and conditions.

The law and implementing regulations do not prohibit payment of fees for representational services by third parties. In fact, the regulations anticipate this situation by requiring representatives to file fee petitions even if the fee is charged to or received from a third party. 20 C.F.R. 404.1720(b)(3). I share the concern that there is a potential for a conflict of interest on the part of the representative. Nonetheless, in the absence of persuasive evidence to the contrary, we must assume that the representative is in fact acting on behalf of the claimant.

As you know, I have strong feelings regarding the ethical obligations of attorneys, and the duties of other persons who appear as claimants' representatives. I am interested in learning of instances when a claimant's representative does not act in the best interests of the claimant, or engages in other questionable acts. Therefore, please feel free to communicate your observations to me.

Eileen Bradley

SSA000235



DEPARTMENT OF HEALTH & HUMAN SERVICES                Social Security Administration

Refer to:                                            Office of Hearings and Appeals
                                                     PO Box 3209
                                                     Arlington VA 22203

OCT 1 8 1999

MEMORANDUM TO:    Headquarters Executive Staff
                  Appeals Council Members
                  Chief Administrative Law Judge
                  Regional Chief Administrative
                    Law Judges
                  Hearing Office Chief
                    Administrative Law Judges
                  Administrative Law Judges

FROM:         :   Associate Commissioner

SUBJECT       :   Filing Fee Petitions--ACTION

As you know, an increasing number of companies provide
representational services for individuals pursuing claims
before the Social Security Administration. Quite often, the
responsibility for paying fees for such services is assumed
by private sector insurance companies which are paying long
term disability (LTD) benefits to the claimants. Typically,
a LTD policy holder is required by terms of the contract to
file for social security benefits. If the claim is allowed,
the monthly LTD benefit amount is offset by the amount of the
social security benefits payable.

There is nothing inherently illegal or improper when a third
party pays the cost of a claimant's representational services
although we realize that there is a potential for abuse in
such cases. In the absence of evidence to the contrary,
however, we presume that the representative is in fact acting
in the best interests of the claimant.

Nonetheless, one aspect of this practice does cause us
concern. We are aware that some representatives retained by
insurance companies are not filing fee petitions. Usually,
the representative will waive receipt of a fee and his or her
employer will merely collect the retainer from the insurance
carrier. In our view, this represents the indirect
collection of an unauthorized fee in contravention of the
regulations.



SSA000240

Page 2

To monitor compliance with the regulatory requirements, please ensure that there is a validly executed form appointing an individual as the claimant's representative before you recognize the person. If the representative waives collection of fees for his or her services, determine whether the representative or the representative's employer will receive a fee from a third party. If fees are to be paid by a third party, formally notify the representative that it is still necessary to file a fee petition. Also provide Special Counsel Staff with documentation of the incident, including a statement indicating whether the representative did in fact file a fee petition.

In this regard, it has come to our attention that Integrated Benefits, Inc., contracts with insurance carriers to provide services as claimants' representatives. Although we do not have actual evidence that the the company collects unauthorized fees, we have reason to suspect that this may be the case. We have put the company on notice of the regulatory requirements and would appreciate being kept informed of your experience with employees of the firm.

I am attaching for your information a copy of the notice sent to Integrated Benefits, Inc. Please review all recent cases in which agents or employees of Integrated Benefits are the representatives of record and forward to the Special Counsel documentation or a listing by name and account number of those cases where the representative waived collection of a fee and did not file a fee petition. Please consider this a continuing requirement and provide your first report within two weeks of the date of this memorandum.

Eileen Bradley

Attachment

SSA000241

# Growth in Disability Benefits

## Explanations and Policy Implications

Kalman Rupp and David C. Stapleton

*Editors*

1998

HD
7105.25
.U6
G76
1998

W.E. Upjohn Institute for Employment Research
Kalamazoo, Michigan



Sklar

EXHIBIT NO. 8
7/22/05
K.L. GOOD



Library of Congress Cataloging-in-Publication Data

Growth in disability benefits : explanations and policy implications /
[edited by] Kalman Rupp and David C. Stapleton.
    p. cm.
    Papers based on the conference in Washington, D.C. entitled :
The Social Security Administration's Disability Programs :
Explanations of Recent Growth and Implications for Disability Policy
on July 20–21, 1995.
    Includes bibliographical references and index.
    ISBN 0–88099–188–7 (cloth : alk. paper). — ISBN 0–88099–187–9
(pbk. : alk. paper)
    1.Insurance, Disability—United States—Congresses.
2. Handicapped—Employment—United States—Congresses.  I. Rupp,
Kalman.  II. Stapleton, David C.
HD7105.25.U6G76   1998
368.38'2—dc21
                                      98–24695
                                        CIP

Copyright © 1998
W. E. Upjohn Institute for Employment Research
300 S. Westnedge Avenue
Kalamazoo, Michigan 49007–4686

The facts presented in this study and the observations and viewpoints expressed are
the sole responsibility of the authors. They do not necessarily represent positions of
the W. E. Upjohn Institute for Employment Research.

Cover design by J. R. Underhill
Index prepared by Leoni Z. McVey.
Printed in the United States of America.

# The View from SSA's
# Philadelphia Regional Office

Larry Massanari
*Social Security Administration*

Although this chapter is entitled, "The View From the Trenches," I would challenge the premise that the authors of this chapter are really the ones working in the trenches. Whatever the case, each of us is a practitioner and is responsible for managing a portion of the disability process.

The commentaries we provide are a departure from the formal research papers that make up Chapters 2 through 8. The discussions here are more intuitive and more anecdotal, and perhaps more subjective and speculative than analytical; and I think it is safe to say that they are based less on hard objective data than on our impressions, observations, and opinions. We very much appreciate and are very much impressed by the work that is presented in the earlier chapters. The analyses have certainly added to our understanding of the causal relationships between those factors that most of us had assumed were generating the dramatic increase in our claims. By and large, the findings reflect our own experience, particularly those findings that relate to application growth.

While the results are very useful in the aggregate, we do need to be cautious in applying generalized conclusions to specific sections of the country, and even in assuming that state-level findings are applicable to every area of a particular state. We have seen widely diverse patterns of application growth, and our experience suggests that the reasons for growth vary greatly, not only among states but among counties as well.

My comments are based on observations and experience in the five-state Philadelphia region. Application growth in the mid Atlantic states for the past seven years has generally been consistent with national patterns. The overall rate of growth in this region was a few percentage points ahead of the national average in five of those seven years. We

301

302    Massanari

have seen very little, if any, increase in Social Security Disability Insurance (DI)-only receipts. At the other extreme, Supplemental Security Income (SSI)-only cases have increased by a full 102 percent and concurrent claims by 73 percent over that seven-year period.

As you would expect, application growth has been uneven across our five states, ranging from a 34 percent increase in West Virginia to a 64 percent increase in Maryland. The most significant growth has been in Maryland and Virginia. Since 1988, concurrent and SSI-only claims in both of those states have increased by well over 100 percent. Our experience in the Philadelphia region so far in fiscal 1995 would suggest that the rapid growth in initial claims is not yet over. During the first eight months of this fiscal year, our claims receipts were running 13 percent higher than during the same period one year ago. That's five times greater than the national average and more than double the growth in any of the other nine regions. The sharp rise in initial determinations this year is largely the result of a 22 percent increase in the Commonwealth of Pennsylvania. That increase is being driven by significant cuts in the Commonwealth's general assistance program.

In describing the demographics of recent disability applicants, front-line employees tell me that applicants today are more likely to be younger, even younger than the baby boom cohort. They are more likely to be women, and they are more likely to allege a mental or stress-related impairment than at any time in the past. Particularly in the large metropolitan areas in the region, applications for AIDS, HIV infection and Drug Addiction and Alcoholism (DA&A)-related impairments are increasing. Employees are beginning to see the second and third generation of adults from the same household filing for SSI benefits. As a growing number of applicants come to accept SSI as a legitimate and permanent source of income—as a legitimate and permanent way of life—we fear that we may be creating a cycle of dependency that families are going to find more and more difficult to escape.

As in other parts of the country, the business cycle has clearly influenced receipt patterns in this region. The impact of the 1990–1991 recession was very apparent, particularly in highly industrialized areas of the region. However, we are beginning to wonder if longer-term structural changes in the economy have not had an equally significant impact on certain parts of this region. We also wonder whether the widening gap between low- and high-income families has had and will

continue to have a significant effect on program growth. The general economic decline in some parts of this region as well as industrial restructuring have resulted in the elimination of many jobs that in the past have been held by unskilled workers. In our region, job loss has been concentrated in heavy manufacturing, in mining, and in the construction industry. Increased automation and technology have reduced the demand for unskilled and semiskilled labor. Consequently, large numbers of people have simply removed themselves from the labor market because they don't have the education or the skills to compete.

Last week, a 65-year old coal miner filed a retirement application in our office in Clarksburg, West Virginia. He had made well over $50,000 per year, he had lived a good life, and he was now ready to retire. But according to the claims representative who took his application, the man was probably functionally illiterate. He had a very difficult time understanding the most simple explanation or instruction. Similar situations are arising throughout the region. Today, with industries such as coal mining and glass manufacturing beginning to close, it is doubtful whether that same person entering the labor market today could earn more than minimum wage. These individuals might well end up poor, underemployed, perhaps being paid cash "under the table," and filing for SSI on the basis of a developmental disability. In many parts of the region, this is becoming a common applicant profile. These are people who, out of frustration, are dropping out of the labor market and are no longer seeking a job. Sadly, they have no alternative but to turn to us for financial support. These individuals, of course, are not reflected in any of our unemployment statistics.

In the Philadelphia region, cost-shifting actions by state and local governments have been, and I think will continue to be, a major contributor to increased claims receipts. All of our states require, or certainly strongly encourage, applicants to their assistance programs to also file with us. Many local welfare offices continue to refer people to social security (SSA) who are obviously not disabled. Yet, these offices still insist that SSA provide a formal denial.

Two of our states, Pennsylvania and Maryland, operate well-organized and highly effective referral programs. They are aimed at shifting disabled persons from state-funded programs to SSI. For instance, Maryland began contracting with a private company back in the late 1980s to carry out its referral function. The contractor screens, refers,