# EXHIBIT O

# (4 OF 8)

304    Massanari

and represents applicants in an effort to get them on the federal rolls. The contractor is also paid a fee for each welfare recipient who is ultimately placed on SSI or DI rolls. The Maryland program, and a similar program in Pennsylvania, have been highly successful from our perspective in SSA, as well as from theirs. They have been successful because the states' and the contractors' employees are well trained, and they have a very solid understanding of our program. They are also plugged into SSA's service delivery network, which enhances the processing of these referrals and subsequent shift to our rolls.

Our claims workloads, as you would expect, have surged following the introduction of state welfare reform initiatives. Those initiatives have, of course, all been aimed at reducing state expenditures. Both the Commonwealth of Virginia and the District of Columbia tightened up their General Assistance (GA) programs back in 1991, driving a large number of applicants into our offices. Since that time, the District has removed over 40 percent of their eligibles from their GA rolls. Pennsylvania, in 1994, introduced major changes in its GA program affecting a significant number of chronically and transitionally needy persons. That action has had an enormous impact on new SSI applications in the State of Pennsylvania.

The state of Maryland eliminated its GA cash benefit program for disabled persons this month. Effective July 1995, they dropped 22,000 disabled persons from their cash benefit rolls. That cash benefit will now be replaced by a much more modest provision for special services. Needless to say, we expect the action by Maryland to have a sizable effect on new SSI applications in that state. As several state workers have said in Maryland, SSI is now "the only game in town," and so we are expecting large numbers of applicants to come into our offices in the coming months.

We think it is likely that Virginia also may eliminate its General Assistance program, except for emergency assistance, during their next legislative session. They nearly did so this year. Considering our experience with the reduction of state GA programs and what has happened to claims intake in our offices, I can't help but believe that the welfare reform proposals that are currently being debated in the Congress will have an enormous impact on social security offices. If limits of any kind are imposed upon Aid to Families with Dependent Children (AFDC) benefits, I think we can expect many former recipients to

begin filing for SSI. I agree with the conclusions reached by the authors of Chapters 2 and 8 with respect to the welfare reform initiatives. I think, too, that their conclusions with respect to block granting, AFDC, or Medicaid are also right on target.

Finally, just a brief comment on our SSI outreach activities in the Philadelphia region. Our local field offices, like field offices across the country, conducted very aggressive outreach programs back in the late 1980s and early 1990s. We worked in close cooperation with private agencies, community organizations, and service providers to increase program understanding, to train their employees, and to target potential eligibles. Despite a high level of commitment and an equally high level of activity, neither these internally managed initiatives nor the work of outreach grantees has, in my judgment, had an appreciable affect on application growth. While we would see sudden spurts of claims following major outreach events or outreach activities, our impression is that most of those new applicants would have eventually filed for SSI at some future stage anyway. So, at most, my suspicion is that our outreach efforts got people to file somewhat earlier than they would have otherwise. Frankly, I am inclined to believe, as are many of my staff, that the expanded involvement of advocates, the legal aid community, and even private attorneys has done more to influence program growth than our own agency-sponsored initiatives.

# The View from SSA's Concord, New Hampshire, District Office

Celeste Hemingson
*Social Security Administration*

The Concord, New Hampshire, field office certainly experienced the same expansion that is being reported elsewhere, but in our case, the growth continued into 1995. Although the increases tapered off in 1993, we had a 17 percent increase in disability claims receipts in 1994, and so far the intake in 1995 is as least as high as in 1994. The same thing has been happening throughout New Hampshire. The 1994 phenomenon is puzzling to me. Although I could partially explain it by some changes in state welfare department policies that I will describe later, those changes would normally account for an increase in SSI claims. The biggest growth we experienced in fiscal year 1994 was actually in Title II claims.

I present only one other piece of quantifiable information in this chapter, and that is a description of a disability outreach project that I did. I think this example provides a useful illustration of outreach projects, and I'm particularly proud of this one because it was very cost effective.

In 1991, I made a deal with the director of the State Department of Special Education to deliver fliers I had printed up to the parents of severely disabled children. The flier described basic entitlement requirements and included a tear-off coupon parents could mail in if they thought their child might qualify. We gave New Hampshire's Department of Special Education 8,000 flyers, which they distributed to teachers. We received thirty-eight replies, fourteen of which resulted in allowances.

The other types of outreach activities we do in district offices are not quantifiable. They are generally aimed at advocacy groups and others with whom disabled people come into contact and they're designed to enable the disabled to access our programs more easily. Several of the

307

308    Hemingson

studies in this volume indicate that SSI and social security disability
are difficult programs to access and that this might be why some poten-
tial beneficiaries would rather stay on General Assistance than apply
for our benefits. If that's true, then perhaps our work with these groups
may have broken down that barrier and paid off in additional claims.

We train workers in homeless shelters on who to refer to us; we set
up telephone links for filing claims; we train veterans' service organi-
zations such as the VFW on who to refer to us and what types of evi-
dence we need. That's the type of outreach we do.

Outreach is always a form of publicity, but publicity, even if it's
unwanted, will increase the application rate. I will describe the role of
publicity in disability claims growth.

In 1968, my job was to place information about social security on
nationwide radio and television networks. It was a tough sell. Public
affairs directors believed that carrying information about elderly or dis-
abled people would undermine the young image stations were eager to
project. My biggest—in fact my only—success on that job was to place
on a network radio feed a series of vignettes about sports figures who
had obtained disability benefits. I used to think that if I could only
make our program seem controversial, I could get some air time. Luck-
ily my bosses didn't go for the idea.

They didn't have to. Ever since the controversy hit the press about
our payment of benefits to drug addicts and alcoholics, we've been get-
ting calls from people identifying themselves as drug addicts or alco-
holics, asking for benefits.

Word of mouth is also an important factor that encourages applica-
tions for disability benefits. We have found that increasing the supply
of awards increases the demand for awards. Many of those who apply
for benefits say they're doing so because a relative or a neighbor was
allowed, and they're sure they're just as disabled as he is. Many tell us
they understand they'll have to apply three times before they're
allowed.

I would like to turn to some changes in state and local welfare prac-
tice that have impacted us in New Hampshire. Here the changes have
not been an instance of cost-shifting. I think for us cost-shifting is yet
to come. In our case what happened is an indication of how Medicaid
is a driver of SSI claims. Under a New Hampshire state law which
went in to effect on December 1, 1993, the state was required to use the

Social Security Administration's definition of disability in determining Medicaid and Aid to the Permanently and Totally Disabled (a state program) entitlement. (New Hampshire is a 209B state, which means it makes its own determination about Medicaid entitlement). In the interest of efficiency, the state decided to use our actual disability decision instead of making a separate decision on their own. As a result, we quickly heard from applicants who told us they had to apply with us before the state would take their Medicaid application. Others said they were required to file with us within twenty days of filing for Medicaid. Although the state had always required Medicaid applicants to file for social security or SSI, there was now more follow-through in making those applications happen.

Another change we've noticed is more applicants being referred from their town welfare directors. (General Assistance in New Hampshire is paid for from town budgets and is administered by individuals elected to a post often titled "overseer of the poor.") We also see more towns requiring interim assistance agreements from applicants. We believe these increases are because town budgets are becoming increasingly stressed by the downturn in the economy.

We do notice that unemployment influences "demand for awards." We continue to see more people filing because they can't find work. Many tell us they *can* work but just can't get work. We also get more disability claims from 62-year-old workers who are also filing for retirement benefits. Our assumption is that the economy as much as disability is causing these workers to retire early.

These facts are surprising, because the unemployment rate in the Concord area is only 2.8 percent. However, this brings up a point we should all consider: most of the new jobs in New Hampshire are in retail sales and services, not jobs that pay enough to present a meaningful alternative to disability benefits. Many of the available jobs are the type that Richard Frank described (see the discussion following Chapter 2), which are limited in hours just enough so that the employer will not have to provide benefits. These are not jobs that are a meaningful alternative to disability benefits.

Another cause of disability applications is not directly related to current unemployment. It's what I categorize as economic deprivation. People contact us because they no longer have other resources to fall back on. Two signs of this are the increased inquiries we get from those

310    Hemingson

with short-term disabilities and those who are still working, but who have been advised by their doctors to stop working. These are workers who have no savings and no benefits to cover the period of time during which no social security or Supplementary Security Income (SSI) is available.

There have also been some changes in the world of work that cause people to apply for Social Security Disability Insurance (DI). This is the other side of the coin. More employers are requiring a disability claim before a company's private insurance policy will pay.

Recent trends to hire those with developmental disabilities have resulted in more and more SSI and disabled child beneficiaries becoming insured on their own. Gina Livermore and her colleagues found that growth in the Mental Retardation category was greater than for any other category in DI-only and DI-concurrent applications (Chapter 8). An advocate told me last week that she counsels disabled teens in school-to-work programs to apply for SSI in order to lock in Medicaid entitlement through the 1619 program. Once again, Medicaid drives SSI claims.

In summary, and this is particularly directed to those who don't work for social security, an article of faith for social security employees is that our programs provide a safety net. One of the things we say when we talk about retirement benefits is that you can depend on social security even when you can't depend on anything else. Our protection is portable, it's inflation-proof, and it's not vulnerable to stock market downturns. These facts also apply to the disability program, but in addition there are some other relevant facts: we're there when other income maintenance programs drop out of the picture. States, towns, and employers are relying on social security to pick up the slack when they can't do it. We are increasingly becoming the program of last resort.