# EXHIBIT Q

# (1 of 2)

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,                    :

EX REL PATRICK J. LOUGHREN,                  :

      Plaintiffs,                         :

v.                                           : CIVIL ACTION NO.

UNUMPROVIDENT CORPORATION, and ,             : 03-11699-PBS

GENEX SERVICES, INC.,                        :

      Defendants.                         :

- - - - - - - - - - - - - - -x

HIGHLY CONFIDENTIAL

UNDER PROTECTIVE ORDER


Realtime/Videotaped Deposition of DAVID BARNES

Washington, D.C.

Tuesday, February 12, 2008

8:30 A.M.


Reported by:  Cassandra E. Ellis, RPR

EXHIBIT
1

21

1          MR. KAYATTA:  Let me -- let me withdraw

2    that, that's -- let me try to clarify the question.

3          THE WITNESS:  Okay.

4    BY MR. KAYATTA:

5          Q    If a person wants to file a claim for

6    Social Security Disability Insurance how does a person

7    going about -- go about doing it?

8          A    They can do it a couple of different ways,

9    they can contact Social Security via their 800 number,

10   and generally what will happen is they'll be sent

11   information about filing a claim.  They may either

12   take a claim over the telephone with the person or

13   schedule an interview in person, some of the filing

14   can be done over the internet, it really depends on

15   the individual's preferences.

16         Q    So one option is for a person is to

17   actually call the number and do the claim over the

18   phone?

19         A    Yes.  I have to -- I have to say, I'm not

20   completely familiar with that entire process, though.

21   I -- I did, at one point, work in a field office and

22   at that time, but that was quite awhile ago, and at

Barnes, David - Vol. I     HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER     February 12, 2008
Washington, DC

23

1    claims representative?

2         A    I believe it does.

3         Q    And so when the applicant would walk in

4    they would eventually sit down with the claims

5    representative and go about filing a claim?

6         A    Right.

7         Q    And walk me through how that that process

8    would work when you were -- when you were there?

9         A    The interviewer, the claims representative,

10   would basically ask the questions that were on the

11   application forms of the individual, and fill out the

12   forms for them, and record their answers in the answer

13   spaces on the sheet, review the material with them at

14   the end of the interview, and obtain their signature

15   on all of the documents, at that time.

16        They -- we occasionally did some portions

17   of the interviews over the phone, I think, at that

18   time.  But it was basically an in-person procedure.

19        Q    Would the interviewer review medical

20   records or the like if the applicant brought them with

21   him or her?

22        A    They would take in medical information.

Barnes, David - Vol. I    HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER    February 12, 2008
Washington, DC

26

1    over the phone, because the person who answers the 800

2    number is not a person who would take a claim.

3         Q    I see.

4         A    But generally, yes, to your question.

5         Q    So the first call that comes in on the

6    1-800 number the general practice is to schedule

7    either a follow-up phone interview or an in-person

8    interview?

9         A    Right or I believe send them to the

10   internet application process.

11        Q    Are there any written rules or procedures

12   or policies that guide the field office personnel in

13   conducting the initial interviews that they conduct

14   with people who call up --

15        A    Yes.

16        Q    -- seeking benefits?

17        A    There are, yes.

18        Q    And where are those set forth?

19        A    They're set forth in the program operation

20   manual system, the POMS.

21        Q    And did you have any role in drafting any

22   of those procedures that guide the field office

Barnes, David - Vol. I    HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER    February 12, 2008
Washington, DC

38

1    Q    Okay?

2    **A    That it was problematic.**

3    Q    All right.  Let me see if I can break it

4    down some.

5    **A    Sure.**

6    Q    Let me start with this, is it -- is it --

7    is it fair to say, based on your experience, that it's

8    the policy of the SSA that any American who wants to

9    get a determination of whether they're entitled to

10   SSDI is entitled to ask SSA to make that

11   determination?

12   **A    That's my understanding of the policy, but**

13   **that was never a policy area that I was responsible**

14   **for formulating or monitoring, but my understanding is**

15   **that's their policy.**

16   Q    And so, based on what you knew, did you

17   agree with Anne when she said, among other things, in

18   addition, anyone can file for SSA disability?

19   **A    Yes, that's my understanding, mm-hmm.**

20   Q    Was it your understanding that the work --

21   that some employers had disability programs that

22   required any participant who wanted the benefit under

Barnes, David - Vol. I · HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER    February 12, 2008
Washington, DC

39

1    that program to, in fact, go to SSA and ask SSA to

2    determine whether or not they were entitled to SSDI

3    benefits?

4         MR. NADLER:  Object to the question, it's

5    calling for speculation, but you may answer.

6         A    Yeah, I'm not sure that I know.  You --

7    part of your question was that any individual filing

8    for the insurance benefit needed, I don't necessarily

9    understand that that aspect of that, it's any person,

10   but I understand that there are disability programs in

11   which some individuals who are applying for disability

12   insurance are required, as a condition of their

13   receipt of those benefits or filing for those

14   benefits, that they also apply for SSDI.

15        Q    What such programs are you familiar with?

16        A    The long-term disability, certain long-term

17   disability programs.  I don't know, I don't have any

18   great familiarity with different companies or the

19   provisions of any -- of any individual policies, but

20   it was -- in -- in my work in Social Security I had

21   occasion to see circumstances where an individual

22   applied for disability, and their explanation of their

40

1    reason for filing was because my insurance provider

2    made me file, and that -- that -- that's common

3    knowledge among individuals who work in the disability

4    program that that circumstance occurs.

5        Q    Are there -- are you aware of any federal

6    employee benefit programs where, as a condition to

7    obtaining a benefit in the federal program, an

8    applicant is required to go get a determination from

9    SSA as to whether they're entitled to SSDI benefits?

10        MR. NADLER:  Object to the question as

11    vague but you may answer.

12        A    Yeah, I do not know, one way or the other.

13        Q    Are you familiar with any state worker's

14    compensation programs where, as a condition to

15    obtaining worker's compensation benefits, an applicant

16    must first apply to the Social Security Administration

17    for SSDI benefits?

18        A    No, I'm -- I'm -- I'm not aware, no.

19        Q    Anne, in the next to last paragraph said,

20    that -- referred to -- some employer's disability

21    programs require a denial from SSA before they could

22    file for the employer's disability program, was that

43

1      A    Yeah, I do not know what she was referring

2    to.

3      Q    Okay.  When you worked as a -- did you work

4    as a claims representative, is that one --

5      A    Yes, some time ago.

6      Q    I assume that was one of the first

7    positions that you held?

8      A    Yes.

9      Q    When you worked as a claims representative

10   if someone came in and, in the course of their

11   interview with you, you determined that you thought

12   they had essentially no chance to succeed in their

13   request for benefits --

14     A    Right.

15     Q    -- how did you handle that?

16     A    I would -- I would have told them that

17   their -- their circumstance doesn't look promising,

18   but that I'm not the individual who makes that

19   decision, and I'm -- wasn't qualified to give them a

20   definitive answer on the question, and I would tell

21   them that they have a right to file, if they want to,

22   but that the circumstance don't necessarily look

Barnes, David - Vol. I    HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER    February 12, 2008
Washington, DC

44

1    promising.

2         Q    Okay.  And would you explain to them if

3    they asked why the circumstances don't look promising?

4         A    Yeah, I would try to explain in terms of

5    the -- the basic concept of the Social Security

6    Disability program in terms of a severe disability

7    that prevents any substantial gains activity and that

8    sort of sense.  I wouldn't address specific medical

9    issues or standards, also.

10        Q    If you -- did you ever have situations, for

11   example, where someone would come in and in the

12   interview you would find out they were actually, at

13   that time, although ill, engaged in a substantially

14   gainful employment activity?

15        A    Yes.

16        Q    And how would you handle that situation?

17        A    Very similarly, in that I would -- I would

18   tell them that if they are working, and their work

19   appeared to be both substantial and gainful, that that

20   was the first evaluation that -- that would be done if

21   they did -- if they filed a claim.

22             And that based on the information that they

Barnes, David - Vol. I    HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER    February 12, 2008
Washington, DC

45

1    had given me it appeared that their work was

2    substantial, gainful activity, and their case would

3    probably be denied.

4         Q    Okay.  If the person said they still wanted

5    to go forward and take a shot at it would you then

6    complete the application for them and have them sign

7    it?

8         A    Yes.

9         Q    And on the application form was there one

10   question that would ask for the date the person became

11   disabled?

12        A    Actually, I think there were more than one

13   place where that's asked for, right.

14        Q    And how -- did you have an option, on

15   those, to put in not applicable as one of the choices?

16        A    No.  No.  You needed to put in a date.

17        Q    And in the situation I just gave to you

18   what would you put in for the date for a person?

19             MR. NADLER:  In the situation, I'm sorry,

20   where the person was actually still working?

21             MR. KAYATTA:  Yes.

22             MR. NADLER:  I just want to be clear on

Barnes, David - Vol. I    HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER    February 12, 2008
Washington, DC

46

1    that.

2              MR. KAYATTA:    Thank you.

3              THE WITNESS:    Thank you.

4        A    I would have put in -- I would have asked

5    them to give a date where they felt was the point at

6    which they became unable to work.    And at that point I

7    would probably, again, point out the discrepancy

8    between a claim of being unable to work and the fact

9    that they were working.    So --

10       Q    Were you aware that after you stopped

11   working as a claims representative the Social Security

12   Administration added an option to the form to indicate

13   NA in response to the date the person became disabled?

14       A    I don't recall there ever being an NA

15   added.

16       Q    Okay.

17       A    I would be surprised.

18             MR. NADLER:    Bill, it's 9:30, and I just

19   realized, we're going to need to take a break in this

20   morning session, so at your convenience.

21             MR. KAYATTA:    Why don't we take a break

22   right now, then?

64

1    publication?

2        **A    Yes.**

3        Q    I'm going to ask you about a few of the

4    sort of helpful comments that are in this publication,

5    just to make sure that I'm understanding them

6    correctly.

7            If you could turn to page three of the

8    summary?

9        **A    Okay.**

10       Q    And the -- the paragraph beginning at the

11   top of page three, the sentence that says that the

12   SSA's definition of disability is, quote, complex and

13   it has medical, functional, and vocational components;

14   is that a fair statement?

15           MR. NADLER:  Object to the question as

16   vague.  Are you asking whether he agrees with it or --

17           MR. KAYATTA:  Sure.

18   BY MR. KAYATTA:

19       Q    Do you agree with that?

20       **A    That the definition of disability is**

21   **complex and has medical and -- yes, I agree with that.**

22       Q    Now, in the -- when a person applies for

66

1    individual's current work activity or work activity

2    during the time they claim to have been unable to work

3    would be evaluated.  And if that resulted in a denial

4    the field office would issue that, that denial, as

5    well.

6              There may be others.  Those are the ones

7    that come -- come to mind.

8        Q    As part of the application process would an

9    applicant be asked to detail the applicant's work

10   history?

11       A    Yes.

12       Q    And if, based on that information, it

13   appeared that the person, at the time of application,

14   was engaged in substantially gainful activity, did the

15   field office then have the ability to deny that

16   application?

17       A    Yes, the -- the information that's gathered

18   about the individual's work history, alone, would not

19   be sufficient to make that judgment.  The field office

20   would solicit additional information from the person

21   in order to reach that a conclusion.

22             The information about work history is

Barnes, David - Vol. I    HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER    February 12, 2008
Washington, DC

74

1    video record.  The time is now 10:23 A.M.

2    BY MR. KAYATTA:

3        Q    Mr. Barnes, during the period of time that

4    you worked at the Social Security Administration was

5    it generally understood that the rates at which claims

6    for SSDI benefits were denied varied materially from

7    region to region and from field office to field

8    office?

9            MR. NADLER:  Object to the question as

10   vague, to use the phrase, generally understood, but

11   you may answer.

12       A    Yeah, I don't know about whether it was

13   generally understood or not, and it depends on by whom

14   you're talking about, but there certainly was

15   discussion within the agency about the extent to which

16   there was variation in rates of allowance or denial at

17   -- regionally.

18       Q    And were you aware that there were some

19   substantially different rates of denial regionally?

20           MR. NADLER:  Object to the question as

21   vague, but you may answer.

22       A    There were different rates of denial,

Barnes, David - Vol. I     HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER     February 12, 2008
Washington, DC

75

1    **whether they were substantial or not depends on, you**

2    **know --**

3         Q    This -- part of the proj- -- National

4    Academy's projects that you worked on was one of the

5    goals to determine whether or not it would be possible

6    to develop a so-called objective gold standard for

7    determining what constitutes disability for SSA

8    purposes?

9         A    **I'm not sure that that was a specific goal**

10   **of the project.  But the -- the -- the topic came up**

11   **in discussions.**

12        Q    Was one of the impetuses to this project

13   the fact that a lack of a gold standard, and by that I

14   mean a way to identify true positives and negatives,

15   independent of the SSA process, itself, hampered the

16   ability of SSA to assess its decision making process?

17              MR. NADLER:  Can I have that back?

18              (Last question read back by the reporter.)

19        A    **Again, I don't know whether that was one of**

20   **the impetuses of the project, but it was certainly a**

21   **factor that was discussed in -- in -- in the**

22   **deliberations that the committee undertook.**

76

1      Q    And was the committee able, at the end of

2    the day, to come up with such a gold standard to be

3    used?

4      A    No.

5      Q    And why is that?

6      A    I think that you would have -- you would

7    have to read the entire report to figure out what

8    their rationale was -- the -- I believe that they

9    considered that it was difficult to objectively

10   measure disability, and that was the primary reason

11   why they were -- they were hard-pressed to come up

12   with some sort of a gold standard.

13     Q    And did you agree that it was difficult to

14   objectively measure disability?

15     A    Yes.

16     Q    And is that, in part, because of the

17   complexity of the interaction of medical and

18   vocational considerations?

19     A    That's part of it.

20     Q    And for whatever -- what other reasons is

21   it difficult to come up with an objective measure?

22     A    Measurement of functional ability is not

Barnes, David - Vol. I    HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER    February 12, 2008
Washington, DC

77

1    precise, and many factors go into the assessment of

2    what the -- the effect of an individual's disability

3    on their ability to function are, and you have varying

4    perceptions of symptomology by individual people, and

5    that's another factor.

6        Q    Is part of the difficulty is that two

7    persons with apparently the same condition can react

8    very differently to that condition?

9        A    Yes, mm-hmm.

10       Q    And two persons who seem to have identical

11   symptomatology could experience that symptomatology

12   very differently as far as how it impacts their

13   ability to work?

14           MR. NADLER:  Object to the question as

15   calling for speculation but you may answer.

16       A    Well, symptomatology is what the person

17   experiences, so I'm not sure I necessarily agree with

18   the statement that there's a difference between, you

19   know, they're the same thing, that's what

20   symptomatology.

21       Q    Let me ask this:  Based on your experience

22   is it true that two people who have essentially

Barnes, David - Vol. I    HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER    February 12, 2008
Washington, DC

99

1    sufficient is a lower standard than substantial.

2        Q    I was asking you why -- if someone -- if

3    the initial reviewer said yes, in response to question

4    20, you did not proceed forward with it in the second

5    stage, and you indicated that if they answered yes to

6    20 that means they had already determined that there

7    was a sufficient basis to determine that the person

8    met the disability criteria?

9        A    Right.

10       Q    And so why would that fact keep you from

11   putting it through the second review?

12       A    The -- we were trying to identify cases to

13   narrow down the number of cases, to identify a final

14   subset of cases, for which it was fairly clear that

15   the person did not meet the SSDI disability standard.

16       Q    That was your ultimate inquiry?

17       A    Right, when we got to the -- the final

18   stage of the process, which I assume we'll speak about

19   in a few minutes.

20            If we became aware, at some point in the

21   process, that -- that there was an indication that --

22   whether from the fact that SSDI or Social Security had

Barnes, David - Vol. I    HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER    February 12, 2008
Washington, DC

107

```
1    are the questions.

2         Q   One of the things you were trying to do was

3    to differentiate claims where you thought the person

4    was ineligible, but it was a close call, from claims

5    where you thought the person was ineligible, but it

6    wasn't close call; is that correct?

7         A   Yeah, I think that's a fair -- yeah.

8         Q   All right.  In attempting to make that

9    differentiation, among the claims that you thought

10   were ineligible, was there any preexisting standard or

11   formulation or policy or rules, that you were able to

12   look to, to come up with the formulation that you

13   used?

14        A   No, I don't think so.

15        Q   After you came up with the standard that

16   you came up with did you review it with anyone not

17   working on this case?

18        A   No.

19        Q   Did you attempt to perform any study to

20   assess the reliability of the standard that you came

21   up with?

22            MR. NADLER:  Object to the question as
```

118

1    **Barnes one and Barnes two.**

2        Q    Okay.  If you applied the standard that

3    you've described here today, in answering Barnes one

4    and Barnes two, in a reliable manner, then should

5    anyone listed on Exhibit D to your expert report,

6    marked as Barnes number one, have a strong argument

7    for being eligible for SSDI benefits?

8            MR. NADLER:  And I -- can I -- can I have

9    that back?

10           THE WITNESS:  I'm not --

11           (Last question read back by the reporter.)

12           MR. NADLER:  And I object to the question

13   as vague, but you may answer.

14       **A    If we're talking about based on the same**

15   **record that I reviewed the answer to the question is**

16   **no.  None of them should have a strong argument.  But**

17   **that doesn't mean that, based on some additional**

18   **information that was not available in the case, in the**

19   **file that I reviewed, one -- one or more of them might**

20   **have a strong argument -- argument for a case.  I**

21   **wouldn't know that.**

22       Q    Did the files that you reviewed contain

Barnes, David - Vol. I    HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER    February 12, 2008
Washington, DC

119

1    within them the type and volume of information that

2    you would customarily see in a Social Security

3    Disability Insurance claim file?

4            MR. NADLER:  Object to the question as

5    vague and compound in that it asks about every file,

6    but you may answer.

7        **A    Yeah, they con- -- contain a lot of -- the**

8    **answer to the question is yes.  They contain the same**

9    **type of information in terms of the type, in terms of**

10   **volume, they probably contained -- well, it really**

11   **varied from case to case in terms of whether the**

12   **volume was the same as, less than, or greater than you**

13   **would see in a Social Security case, that was your**

14   **question, right, the -- the type and the volume?**

15       Q    Yes.

16       **A    Okay.**

17       Q    How would it be that there would be

18   additional information concerning one of these claims,

19   that you did not see, that would provide the person

20   with a strong argument in favor of getting SSDI

21   benefits?

22           MR. NADLER:  Object to the question as

120

1    vague, and calling for speculation, but you may

2    answer.

3        A    How could --

4        Q    Let me strike that.  In answering my

5    question you -- I asked whether if you applied your

6    test in reliable manner, than any of these people on

7    Exhibit D to Exhibit 1 should have a strong argument

8    for SSDI, and if I understand your answer you said,

9    no, none of them should, with the possible exception

10   that if there was additional information concerning

11   their claim that was not in the file you reviewed,

12   then perhaps they might have a strong argument; have I

13   got that correct?

14       A    Yeah, I think that's a fair representation

15   of what I said.

16       Q    Okay.  And my next question is, do you

17   think it reasonably possible that some of these people

18   may well have had additional information, relevant to

19   their SSDI claim, that was not in the files that you

20   reviewed?

21           MR. NADLER:  Object to the question as

22   vague, but you may answer.

Barnes, David - Vol. I    HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER    February 12, 2008
Washington, DC

121

1        **A    I think it's reasonably possible they**

2    **would, I don't know, but it's reasonably possible.**

3        Q    Okay.  When you were assessing, when you

4    were answering Barnes one and Barnes two with respect

5    to a particular claims file, did you, as part of your

6    assessment, assume, for purposes of this exercise that

7    you were asked to do, that there was no additional

8    information and you should simply base your decision

9    solely on what was in the claims file?

10        MR. NADLER:  Object to the question as

11    compound, but you may answer.

12        **A    Yes.**

13        Q    Did you, for any of the people who are

14    listed on Exhibit D, review their application for SSDI

15    benefits?

16        **A    I believe that some of the individuals**

17    **listed in Exhibit D -- D -- had filed for SSDI.  And**

18    **the files that I reviewed contained some information**

19    **that was from their SSDI claim record.**

20        **But I have no way of knowing whether the --**

21    **all of the information that was in their Social**

22    **Security claim record was included in these files.**

Barnes, David - Vol. I      HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER      February 12, 2008
Washington, DC

122

1      Q    Okay.  Did you make any record from which

2    you could determine how many of the claims listed on

3    Exhibit D to your report had claim files where there

4    was a copy of the application for SSDI benefits in the

5    file?

6      **A    Yes, that was one of the items that -- that**

7    **was collected in the initial review of the cases was**

8    **whether there's a copy of the SSDI application in the**

9    **file.**

10     Q    Did you, in the course of your work, either

11   yourself or others working for you, make any record of

12   whether the claim file that you were reviewing

13   appeared to contain a complete copy of whatever had

14   been submitted to the SSA in connection with the

15   person's pursuit for SSDI benefits?

16     **A    No.**

17     Q    So is it fair to say that you cannot tell

18   us that there is any claim listed on Exhibit D for

19   which you and/or your team have reviewed a complete

20   copy of what the claimant submitted to the Social

21   Security Association in connection with the person's

22   request for SSDI benefits?

123

1          MR. NADLER:  Can I have that back, please?

2          (Last question read back by the reporter.)

3          MR. NADLER:  Object to the question as

4     calling for speculation, but you may answer.

5          MR. KAYATTA:  Let me re-ask that question.

6     BY MR. KAYATTA:

7          Q    Are there any claims listed on 855 for

8     which you're able to tell us that you and/or your team

9     of reviewers have reviewed a complete copy of what

10    that claimant submitted to the SSA in connection with

11    that claimant's request for SSDI benefits?

12          MR. NADLER:  Same objection, but you may

13    answer.

14          A    No.

15          Q    In the course of your team's review of the

16    files that it reviewed in this case did there ever

17    come to your attention any indication where a claimant

18    or Unum or Genex had said something false to the SSA?

19          MR. NADLER:  Object to the question as

20    calling for a legal conclusion, but you may answer.

21          A    False to the Social Security

22    Administration?

Barnes, David - Vol. I    HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER    February 12, 2008
Washington, DC

124

1      Q    Yes.

2      A    Not that I recall.

3      Q    If we could look back at Exhibit 5, page

4    2487?

5      A    Okay.

6      Q    Where -- where, on the case review notes,

7    would it be reflected whether there is actually a copy

8    of the Social Security Disability Insurance

9    application in the file?

10     A    That would be question 11.

11     Q    And so, for example, on page 2487, which is

12   a review, you did -- you or your team did recently --

13   question 11 is unanswered?

14     A    Right.

15     Q    And what does that mean when it's

16   unanswered?

17     A    It's a follow on to question 10.  Question

18   10 asks whether an SSDI claim was ever filed.  And

19   only if the answer to question ten is yes does the

20   reviewer go onto answer question 11 and indicate

21   whether there's a copy of the application in the file.

22     Q    Okay.  Could you turn to page 2492 of

Barnes, David - Vol. I    HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER    February 12, 2008
Washington, DC

125

1    Exhibit 5?  And question 10, the answer is no; is that

2    correct?

3         **A    That's correct.**

4         Q    And so that means that an SS -- a claim for

5    SSDI was not filed, as best one could tell, reviewing

6    that file?

7         **A    That's correct.**

8         Q    And then what does the next entry

9    underneath that 221 refer to?

10        **A    It refers to a page number of the file**

11   **where the reviewer extracted that no answer from.**

12        Q    If question 10 had been answered yes on a

13   case review note then we should be able to look in

14   question 11 and see whether the app, itself, was in

15   the file and, if so, what page it is at in the file?

16        **A    That's correct, yeah.**

17        Q    At the beginning of this exercise, when you

18   were training your reviewers, did you instruct them

19   that they should not expect to see, in the Unum claim

20   files, the amount and type of information that they

21   would customarily be used to seeing working in a DDS

22   office and adjudicating Social Security

Barnes, David - Vol. I    HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER    February 12, 2008
Washington, DC

126

1    Administration, in adjudicating claims for SSDI

2    benefits?

3        **A    I said something similar to that, I -- I --**

4    **I don't have a recollection of the exact wording, but**

5    **I might -- I probably said something similar to that,**

6    **yes.  I certainly said something similar to that.**

7        Q    Based on the files that you reviewed would

8    you feel comfortable concluding that the claims

9    handlers at Unum, whose work you saw in the files, had

10    the expertise, experience, and skill that your team of

11    reviewers had in determining whether a particular

12    claim would or would not be eligible for SSDI

13    benefits?

14        **A    I wouldn't have any information about their**

15    **skill level.  I don't know, so --**

16        Q    Would you generally expect the persons who

17    worked in a DDS office for the Social Security

18    Administration, reviewing claims, would, on average,

19    tend to have a lot more experience and expertise in

20    deciding whether a claim for Social Security

21    Disability Insurance benefits is a strong claim or not

22    than would persons who have never worked in that

Barnes, David - Vol. I    HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER    February 12, 2008
Washington, DC

127

1    office and never appeared before the office in the

2    course of prosecuting a claim?

3              MR. NADLER:  Object to the question as

4    calling for speculation but you may answer.

5         A    Yeah, I would expect that they would have

6    more experience than someone who did not.

7         Q    And, in fact, that's one of the -- that was

8    one of the principals that guided the assembling of

9    your team, is it not?

10        A    Well, not necessarily formulated that way.

11   I wasn't making any sort of comparison to the --

12   between this body of people versus the rest of the

13   people in the world.  But the -- I wanted to get the

14   people who had experience doing this.

15        Q    In stage three, when you were answering

16   Barnes one and Barnes two, and you looked at a file,

17   did you attempt to factor into your determination the

18   possibility that there might be more evidence

19   concerning a person's medical condition and/or

20   employment skills and suitability than was contained

21   in the file that you were looking at?

22        A    I'm not sure what you mean by factor it in,

Barnes, David - Vol. I    HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER    February 12, 2008
Washington, DC

136

1    it's certainly a rare circumstance.

2         Q    So as a practical matter, when a claimant

3    gets to the stage of a hearing before an ALJ, it has

4    generally been more than 12 months since the date on

5    which that person initially claimed to be the onset of

6    their disability; is that correct?

7         A    I think, generally, that's true, yes.

8         Q    So generally speaking, at the ALJ stage,

9    the ALJ has the benefit of not needing to make the

10   decision as to expected duration since the ALJ will

11   know the actual duration since the date of onset?

12        A    In many circumstances that will be true,

13   probably most circumstances, but ALJs do have to

14   evaluate expected duration in an instance where an

15   individual has a new impairment that began in the --

16   in -- during the pendency of their case.  So it's not

17   -- it's not unheard of that an ALJ would address

18   expected duration.

19        Q    If you or I became disabled today, within

20   the meaning of the Social Security Disability

21   Insurance Act, is there any potential benefit to us of

22   getting our application in sooner rather than later?

137

1    MR. NADLER:  Object to the question as

2 calling for speculation but you may answer.

3    A    Is there a benefit?  Well, yes, I -- I

4 imagine there's a benefit in that the sooner you start

5 the sooner you'll get a -- an answer.

6    If an individual's disability onset date,

7 the beginning of their disability, was in the remote

8 past, there are limitations on how much -- how -- how

9 far back benefits may be paid.  There's a limit on

10 retroactivity of benefit payments.

11    And it's the longer one waits in that

12 circumstance the benefit amount may eventually be

13 reduced.

14    Those are a couple of advantages, I can't

15 think of any others, off the top of my head.

16    Q    When you were working as a claims

17 representative, and a person would come in and it was

18 not at all clear that they were disabled, it wasn't

19 clear what the course of their medical future was

20 going to be, would you advise them to wait or to --

21 and not file -- or file and then, if appropriate,

22 withdraw at some subsequent point?