# EXHIBIT Q

# (2 of 2)

141

1    beginning of the benefits, which coincides with the

2    month of filing.

3            And in that instance it wouldn't have --

4    the person wouldn't have received any less total

5    benefit payments, it, you know, at the point at which

6    their case was approved.

7        Q    They just would have received them sooner

8    in the first instance?

9        A    Correct, but I -- I have to add that you're

10   really taxing my memory.

11       Q    Okay.

12       A    In an area that I don't have any particular

13   expertise any longer.

14       Q    Okay, I'll go onto another area.  When

15   you've seen a file, a doctor's report saying, for

16   example, the claimant is going to have four months of

17   chemotherapy, and then I expect he'll be able to go

18   back to work four months after the chemo stops, what

19   do you consider to be the expected recovery date in

20   that hypothetical?

21           MR. NADLER:  Object to the question, as

22   vague, but you may answer.

142

1    **A    Okay, the doctor says the person's going to**

2    **start chemotherapy and -- and what's the duration of**

3    **the chemotherapy?**

4    Q    Four months.

5    **A    Four months?  And the doctor also says the**

6    **person will be able to return to work at the cessation**

7    **of the chemotherapy?**

8    Q    He says, I expect the person will need

9    another four months after that --

10    **A    Oh.**

11    Q    -- to recover from the chemo, but should be

12    able to go back to work.

13    **A    Well, that would make the expected duration**

14    **eight months.**

15    Q    Now, do you view that expected duration as,

16    in effect, a doctor's prediction of when the doctor

17    thinks the person will be going back to work?

18    **A    I take as the doctor's prediction,**

19    **prognosis being the term that they use, in terms of**

20    **when the individual -- when he or she expects that**

21    **individual will be capable of going back to work,**

22    **whether they actually return to work or not.**

Barnes, David - Vol. I    HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER    February 12, 2008
Washington, DC

143

1        Q    Okay.

2        **A    I don't think plays into it.**

3        Q    Fair point, so it's a doctor's prediction

4    of when a person should be capable of going back to

5    work?

6        **A    Right.    Right.**

7        Q    Do you understand that that prediction, in

8    my example, the four months plus four months?

9        **A    Right.**

10       Q    That that prediction is basically the mid

11   point of a bell curve of potential recovery times?

12            MR. NADLER:    Object to the question, as

13   calling for speculation, but you may answer.

14       **A    No, I don't know that that's a middle of a**

15   **bell curve, no.**

16       Q    Okay.  Do you, using that same

17   hypothetical, do you understand that a doctor in that

18   situation is indicating that there's a hundred percent

19   probability that that person is going to be able to go

20   back to work within eight months?

21       **A    No, I wouldn't understand it that way.**

22       Q    You understand that, in fact, there's a

144

1    chance the person might be able to go back sooner?

2         A    Correct.

3         Q    And you understand that there's a chance

4    the person might take longer to recover from the

5    chemo?

6         A    Correct.

7         Q    In reviewing any of the claim files that

8    you reviewed in this case, when you relied upon an

9    indication in the file from a medical professional as

10    to an expected recovery date, did you attempt to

11    determine what the reasonable range or the breadth of

12    the reasonable range of possible recovery outcomes was

13    for that individual or did you simply use the date

14    that the doctor gave?

15         A    I hesitate to say that I used the exact

16    date on every circ- -- in every circumstance, because

17    I can foresee a circumstance where there would be

18    other information in the file that would cause me to

19    make a judgment leaning in one direction or the other,

20    but generally I would say that your -- your -- your

21    statement is correct.

22         Q    You would use the date the doctor gave

145

1    rather than a range of dates?

2        A    Yeah, right, correct.

3        Q    Can you recall any instance where you

4    attempted to determine for a particular type of

5    medical treatment what the actual range of probable

6    recoveries was?

7        A    No.

8        Q    In addressing Barnes one why did you base

9    your inquiry upon the information that was in the

10   claim file at the time of LTD approval?

11       A    Because my understanding was that that was

12   the evaluation point at which Heller Ehrman was

13   interested in -- interested in me having -- doing the

14   evaluation.

15       Q    And in question two, did you ask yourself

16   the same question that you asked in Barnes one, except

17   you considered information in the claim file after the

18   date in question one?

19       A    That's correct.

20       Q    Now, to answer Barnes one and Barnes two,

21   how many files did you personally look at?

22            MR. NADLER:    How many claims files?

146

1    BY MR. KAYATTA:

2        Q    Claim files?

3        A    I don't know the exact number, off the top

4    of my head.  I could find it, if you wanted to wait,

5    but it was somewhere in the neighborhood of -- it was

6    more than 855, but it was somewhere in the 900 to a

7    thousand range.

8        Q    When was it that you started doing Barnes

9    one and Barnes two?

10       A    Would you like the exact date?

11       Q    If you have it there, yeah.

12       A    It may take me a moment to find it.

13       Q    Okay.

14       A    But I'll try.

15       Q    Are you looking at Exhibit 5?

16       A    No.

17       Q    Okay.

18       A    But if you think that's going to help me

19   I'll look for it.  Yeah, no, I don't think that this

20   is going to answer the question for me.

21            I think, in order to tell you the date, I

22   would have to look through my more detailed records,

Barnes, David - Vol. I    HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER    February 12, 2008
Washington, DC

158

1     A    I really don't remember.  But I think my

2     memory is there were some problems and some or all of

3     it was not recorded.

4     Q    During that training conference did you and

5     Mr. Young describe to the reviewers generally what

6     they would be called upon to do and how they were to

7     do it?

8     A    Yes.

9     Q    Did you instruct all the reviewers at the

10    beginning of the process, in substance, that one of

11    the most striking differences they would observe as

12    they started going through the cases with each claim

13    file was that there would be a lot less in volume and

14    quality than they were used to seeing in Social

15    Security cases?

16    A    I think that generally that -- I made a

17    point similar to that, whether I used those exact

18    words, I'm not sure, but --

19    Q    Did you explain to them that the Unum case

20    files, those cases, were not developed for the purpose

21    -- purposes of determining Social Security Disability

22    Insurance entitlement?

159

1      **A     I don't recall whether I said that,**

2   **specifically.  I don't know.**

3          Q     Let me ask you this, prior to this training

4   session you had looked at a number of files, yourself,

5   had you not?

6          **A     Yes.**

7          Q     Unum files?

8          **A     Yes.**

9          Q     And you had had conversations with counsel

10   to develop the project, how you were going to do it,

11   the criteria, the questions and the like; is that

12   correct?

13          **A     That's correct.**

14          Q     Based on the work you had done as of

15   October 17th, when you held your -- and I'm going to

16   ask you to assume that's when you held your training

17   conference -- had you formed the view that Unum's

18   files were not developed for the purposes of

19   determining Social Security Disability Insurance

20   entitlement?

21          **A     Yes, I think that's a fair --**

22          Q     Did you form a view that based on what you

179

1       Q    Now, you -- you know, based on looking at

2    the files, don't you, that the files, in fact, often

3    do not contain the complete medical picture or

4    vocational picture for each of these persons; is that

5    correct?

6       A    For -- for some of these cases, I can't say

7    how many, the file does not contain -- contain the

8    complete medical and vocational picture on the person,

9    yeah.

10      Q    And for those persons would you recommend

11   they not apply, knowing that you might not have seen

12   the full picture?

13           MR. NADLER:  Object to the question, as

14   asked and answered, but you can answer again.

15      A    Well, I actually I interpret that as a

16   different question.  The -- you're -- you're adding

17   another circumstance that I wasn't considering before,

18   my understanding was you wanted me to consider the

19   evidence in the file was all I was going to get, and

20   it was all that there was, okay?

21           If -- if there was -- if I were aware that

22   there were -- that there was additional information

183

1    as an expert consultant?

2         A    Okay.

3         Q    You had made the point at the beginning of

4    the questions, which I agreed that the answer depended

5    some on which capacity you were acting in?

6         A    Okay.

7         Q    And you had cited -- you had cited as an

8    alternative capacity the capacity that you used to

9    have as a person processing or intaking claims at the

10   Social Security Administration office?

11        A    Correct.

12        Q    Am I correct that if you were in that

13   capacity, in the capacity of a person intaking claims,

14   as people initially came in the door, that for these

15   855 you might try to dissuade them from filing, but if

16   they wanted to file you would complete the application

17   for them, have it signed, and put it through for

18   processing?

19        A    No, I don't think so.  When I worked in

20   that capacity it was the policy of the Social Security

21   Administration, as I understood it, that people who

22   worked in my capacity then, and interviewed people,

Barnes, David - Vol. I     HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER     February 12, 2008
Washington, DC

184

1    would try to avoid dissuading people from filing if

2    they had an interest in filing.

3            And I would have done the best I could to

4    present the circumstance to them, as information, but

5    I would not have tried to dissuade them from filing.

6       Q    Okay.  So if -- if one of these people on

7    this 855 came up to you in that capacity, and

8    described to you the information that you now know to

9    be the case from reviewing their file, you wouldn't

10   dissuade them --

11      A    Right.

12      Q    -- from applying, you might point out to

13   them the ramifications of that information, but if

14   they wanted to apply you would complete the

15   application for them and have them sign it and turn it

16   in?

17      A    Yeah, that's approximately right.  The --

18   the -- the -- no, that's fine.

19      Q    And when you say, no, that's fine, you mean

20   your answer's fine?

21      A    My answer is complete.

22      Q    Thank you.

Barnes, David - Vol. I    HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER    February 12, 2008
Washington, DC

211

1    individual circumstance, because I think it depends on

2    a bunch of things.

3        Q    Fair enough.

4        A    But there's certainly a chance that that

5    would be the case.

6        Q    On average?

7        A    Mm-hmm.

8        Q    Recognizing that there are variances from

9    average?

10       A    Yeah.

11       Q    On average the sooner one files for one's

12   claims for benefits the sooner one is likely to get

13   money if it's ultimately determined you're eligible?

14       A    I would say that's a fair generalization,

15   yeah.

16           MR. KAYATTA:  Fifteen.

17           THE WITNESS:  Thank you.

18   BY MR. KAYATTA:

19       Q    Do you have before you Exhibit 15?

20       A    I do.

21       Q    And is that a series of e-mails exchanged

22   between you and Tammy Clifton?

Barnes, David - Vol. I    HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER    February 12, 2008
Washington, DC

212

1      **A    Yes, it is.**

2          Q    On some level do you agree with Ms. Clifton

3      that ultimately deciding how to answer initial one and

4      initial two, in phase two, at some level called upon

5      her to act based upon a gut feeling?

6              MR. NADLER:  I object to the question, as

7      compound and as mischaracterizing the e-mail exchange,

8      but you may answer.

9      BY MR. KAYATTA:

10         Q    Let me ask you this, let me withdraw that

11     question, in picking the people who you picked to do

12     phase two did you try to pick people who you thought

13     had had good judgment?

14         **A    Yes.**

15         Q    And was one of the reasons is that the

16     nature of disability is such that, generally speaking,

17     the decisions that you needed to make, at some level,

18     would call upon the exercise of judgment?

19             MR. NADLER:  Object to the question, as

20     vague, but you may answer.

21         **A    The -- the -- the evaluation of the cases**

22     **can rely on judgment.  There are ranges of judgment**

Henderson Legal Services, Inc.

202-220-4158                        calendar@hendersonlegalservices.com

Barnes, David - Vol. I    HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER    February 12, 2008
Washington, DC

213

1    involved, from very little to a lot, and it depends on

2    the individual case circumstances, but exercising good

3    judgment and sound evaluation skills and reasoning are

4    key components of being able to arrive at a proper

5    decision in these cases, and that's why I picked these

6    people.

7         Q    You just answered my question, which is,

8    how did you pick those particular people.

9              MR. KAYATTA:   Exhibit 16?

10             THE WITNESS:   Thank you.

11   BY MR. KAYATTA:

12        Q    This Exhibit 16, an exchange of e-mails

13   between you and an examiner by the name of Dessieux?

14        A    Yes, Sheila Dessieux.

15        Q    Sheila Dessieux, and that's

16   D-e-s-s-i-e-u-x?

17        A    Yes.

18        Q    And she was one of your reviewers?

19        A    Yes.

20        Q    And she had worked -- what was her job

21   prior with the SSA?

22        A    If you give me a moment I'll look it up.

Barnes, David - Vol. I    HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER    February 12, 2008
Washington, DC

214

1    She was a disability examiner in the Missouri DDS.

2        Q    Okay.  And based on her experience and her

3    review of the particular claim file that is referred

4    to in Exhibit 16 she indicated that she thought, in

5    response to question 20, that there was a sufficient

6    basis for an award of SSDI benefits to this particular

7    claimant?

8        A    I believe that's correct, yes.  Yes.

9        Q    And then you reviewed her answers on this,

10   well, this is one of the ones that went to you in

11   December?

12       A    I think it was in November, this -- this

13   wasn't the -- the second and third review.

14       Q    Okay.

15       A    This was a first review case.

16       Q    All right.  How did you come to be

17   reviewing her work on November 27th?

18       A    I can't say how I specifically came to this

19   individual case.  I don't recall why I ended up

20   reviewing this case.  But both Anne Graham and I were

21   reviewing selected cases from the individual

22   reviewers, at that time, for quality review purposes,

Barnes, David - Vol. I    HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER    February 12, 2008
Washington, DC

215

1    and that -- that is probably the reason I -- I -- I

2    ended up with this case.  But I really don't know for

3    sure.

4        Q    Doesn't it appear that, in fact, on

5    November 27th, you were looking over a bunch of cases

6    for which the reviewers answered yes to question 20?

7             MR. NADLER:  Can I have that back?  I'm

8    sorry.

9             (Last question read back by the reporter.)

10       A    Yes, it appears that way.

11       Q    And those are cases which, under normal

12   practices, the case would not have gone onto a phase

13   two or phase three review; is that correct?

14       A    That's correct, yeah.

15       Q    And did you convince Sheila to change her

16   answer to question 20?

17       A    Give me a moment to read the rest of it, I

18   still haven't finished it, and I'll -- I pointed out

19   to her that based on my review of the record I wasn't

20   sure that the yes answer was the correct answer.  I

21   asked her to look at it again.

22             And she reviewed the information, once

Barnes, David - Vol. I    HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER    February 12, 2008
Washington, DC

216

1    again, and concluded that, in fact, the yes was not

2    the correct answer, that no was the correct answer,

3    and she changed the response.

4        Q    Well, Mr. Barnes, that's not, in fact, what

5    happened?

6        A    Is it not?  Okay.  Excuse me.

7            MR. NADLER:  Well, I object to the question

8    as argumentative.

9    BY MR. KAYATTA:

10       Q    Let me ask you this:  Isn't what happened

11   is that you wrote her, having reviewed the file, and

12   asked her to take another look at the case, suggesting

13   that perhaps the yes answer was incorrect?

14       A    Yes, I think that's what I said, wasn't it?

15       Q    Yes.  And didn't she write back and explain

16   why she gave a yes answer, and conclude, if you don't

17   agree, that she would revise the form?

18       A    Oh, you're correct.  I'm sorry, I misread

19   it, yes.

20       Q    So even --

21       A    Right.  Right.

22       Q    -- having read your e-mail to her that

Barnes, David - Vol. I    HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER    February 12, 2008
Washington, DC

217

1    began this exchange it's fair to say that she was not

2    convinced that her answer was wrong?

3        A    Yeah, I think that's a fair assessment,

4    yes.

5        Q    And then the last e-mail was you telling

6    her that denial is the right answer?

7        A    Right.

8             MR. NADLER:   Second to last answer.

9        A    Second to last.

10       Q    Second to last?

11       A    Yes, that's correct.

12       Q    And she therefore agreed to change the

13   answer --

14       A    Right.

15       Q    -- to a no?

16       A    Correct.   Correct.

17       Q    Now, in your database is there any

18   reflection of the fact that you were able to have her

19   change her answer, on question 20, from a yes to a no?

20       A    No, I don't think so.

21       Q    So if this exchange had not happened to

22   occur in an e-mail, but had occurred over the phone --

Barnes, David - Vol. I     HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER     February 12, 2008
Washington, DC

229

1    of Stage Four, off the top of my head, no.

2         Q    Do you know what the prognosis is for a

3    person with Stage Four Lymphoma?

4         A    Not off the top of my head.  I would have

5    to research that.

6         Q    Then how would you research that?

7         A    I would probably consult an online resource

8    of medical information that defines the categories.

9         Q    Did you do that when you were reviewing Mr.

10   Parker's claim, as part of your stage three, or as

11   part of your phase three review?

12        A    I don't think so, no, because I don't

13   recall.  I don't recall that circumstance, no.

14        Q    Do you regard the award of SSDI benefits to

15   one of these claimants by the Social Security

16   Administration as inconsistent with your listing that

17   person on Exhibit D to your expert report?

18        MR. NADLER:  Object to the question as

19   asked and answered, but you may answer again.

20        A    No, I don't consider it inconsistent.

21        (Barnes Exhibit 019 was marked for

22   identification.)

Barnes, David - Vol. II    HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER    February 13, 2008
Washington, DC

277

1    generally is not enough to learn how to do that job.

2          And the experience was some time ago, as I

3    said, approximately seven years, a little over seven

4    years from the time that I was asking her about it.

5      Q    How long does the Social Security

6    Administration train people before it allows them to

7    have the responsibility for determining whether or not

8    a person meets the eligibility requirements for SSDI?

9      A    The -- the training and the time periods

10   involved are left up to the individual states to do.

11   I don't believe, but -- and I -- I phrase it

12   cautiously because I'm not an expert in that aspect of

13   the -- of -- of the personnel issue -- but I don't

14   believe that Social Security dictates to the states a

15   specific amount of training.

16          My perception and memory, from having

17   worked in the program, is that they generally undergo

18   a few months of initial training, a short period of

19   time, maybe two to three months, whatever, and then

20   they work in a -- in a progressively more responsible

21   way, with a mentor or a, you know, a review system in

22   place.

Barnes, David - Vol. II    HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER    February 13, 2008
Washington, DC

278

1          My understanding, from working with

2    disability examiners and the people who train them,

3    and whatever, is it would probably take in the

4    neighborhood of three years before a person becomes

5    really competent at doing that job.

6          Q    At doing the job of deciding who gets SSDI

7    benefits?

8          A    Yeah.  Yeah.

9          MR. NADLER:  Bill, if you disagree, we have

10   no objection to Unum contacting Ms. McElrath and

11   offering her employment.

12   BY MR. KAYATTA:

13         Q    I'm -- I'm -- I'm a bit puzzled by the

14   length of time you point to, and perhaps it's because

15   you've been clear at explaining how the process works,

16   but what is it about deciding whether someone meets

17   the SSDI benefits that would normally take someone

18   three years to learn to do proficiently?

19         A    The -- the work that they do in the state

20   agencies, the disability determination services,

21   involve not just, you know, the -- the evaluation

22   part, but the development part, too.  They develop

Barnes, David - Vol. II    HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER    February 13, 2008
Washington, DC

279

1    evidence, they -- they -- excuse me, I am just kind of

2    stammering, I am trying to -- to -- to come up with a

3    coherent explanation.  The -- the program is complex

4    it --

5        Q    The SSDI program?

6        A    The SSDI program is complex, the rules are

7    extensive, as I'm sure you're aware, and a lot of the

8    -- the knowledge is -- is something that you gain over

9    a period of time, from working in the program, and it

10    takes some time.

11        I'm sorry I don't have a much better

12    explanation than that.

13        Q    Okay.  You referred to one of the things

14    they learned to do when they work as a person who's

15    deciding SSDI claims for SSA is to develop evidence?

16        A    Mm-hmm, correct.

17        Q    What do you mean by that?

18        A    When they received the file, initially, as

19    you'll remember from discussions yesterday, the intake

20    process occurs at the Social Security field office,

21    they take basic information from the individual, they

22    sometimes take medical evidence in, but that's the

Barnes, David - Vol. II    HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER    February 13, 2008
Washington, DC

280

1    exception as opposed to the rule, and then the case is

2    sent to the state agency to do the evaluation.

3            And the first step of that process is

4    usually to request evidence, medical evidence,

5    primarily, from the individual's medical sources,

6    similar to the -- the process that Unum uses when they

7    do a long-term disability case.  They request, you

8    know, a report from the person's primary physician, I

9    think.

10           So that's the first stage of the process.

11   And the -- the assessment that the examiner does is to

12   look at what's given to them in the intake process and

13   figure out what they need to ask for, what they --

14   what might be superfluous, you know, where to focus

15   their attention, stuff like that.

16       Q    Are those people in the state offices who

17   gather that evidence charged with actually making the

18   decision, granted, denied?

19       A    It really varies a great deal from state to

20   state.  The general process is that that individual,

21   working with others in the office, make the decision.

22   Oftentimes it involves a medical or psychological

Barnes, David - Vol. II    HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER    February 13, 2008
Washington, DC

281

1    consultant working with them on the case.  Oftentimes

2    they do it independently, it -- it really depends.

3         Social Security has also been operating a

4    number of pilot programs over the past decade to

5    explore various options in terms of how to use

6    different personnel in -- in the functions of -- of

7    processing and adjudicating a case.

8         So there's a lot of variation in that,

9    that's the point, but sometimes they do it

10   independently, sometimes they do it as a member of a

11   team.

12        (Barnes Exhibit 025 was marked for

13   identification.)

14   BY MR. KAYATTA:

15       Q   Mr. Barnes, could you now please look at

16   the new exhibit the court reporter has given you,

17   which I believe is marked Barnes deposition Exhibit

18   25?

19       A   Okay.

20       Q   And could you tell us what that is, please?

21       A   It's an e-mail exchange between myself and

22   Diane Bailey, who was one of the initial case

Barnes, David - Vol. II    HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER    February 13, 2008
Washington, DC

300

1        Q    How -- how could you predict how an ALJ

2    would review -- would rule on Ms. Jones' claim without

3    speaking with her?

4        A    I didn't attempt to predict what an ALJ

5    would rule on the claim.

6        Q    Okay.  So in -- in answering Barnes one and

7    Barnes two did you understand your inquiry as not to

8    involve attempting to make a prediction as to how an

9    ALJ would or would not ultimately rule on those

10   claimant's claims?

11             MR. NADLER:  Could I have that back,

12   please?

13             (Last question read back by the reporter.)

14             MR. NADLER:  Bill, do you mean to limit

15   your question to if the evidence was that --

16             MR. KAYATTA:  I mean it as asked.

17             MR. NADLER:  I object to the question, as

18   vague, but you may answer.

19        A    You're correct, that's how I understood my

20   inquiry.

21             MR. KAYATTA:  Mark that as the next

22   exhibit.

Barnes, David - Vol. II    HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER    February 13, 2008
Washington, DC

322

1    Q    Is there any indication in your notes that
2    you were even aware that his wife had reported that he
3    was unable to get out of the bed to use the bathroom?

4    A    No, there's no indication in my notes.

5         MR. KAYATTA:  I think we're going to need
6    to change the tape, so we'll take a break.

7         THE VIDEOGRAPHER:  This concludes videotape
8    number two.  We're going off the video record at 11:29
9    A.M.

10        (Recess.)

11        (Barnes Exhibits 032 and 033 were marked
12   for identification.)

13        THE VIDEOGRAPHER:  Here begins videotape
14   number three in the deposition of David Barnes.  We
15   are going back on the video record at 11:44 A.M.

16   BY MR. KAYATTA:

17        Q    Mr. Barnes, if an applicant for Social
18   Security Disability Insurance benefits establishes
19   that the applicant has a disabling condition, that
20   keeps him from doing his own job, to get SSDI benefits
21   does he have any burden of producing any evidence that
22   shows that he can't engage in other jobs?

Barnes, David - Vol. II    HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER        February 13, 2008

## Washington, DC

323

1          A   Generally, I'm a policy expert as opposed

2     to a law expert, but generally, once an individual has

3     established that they are precluded from their past

4     work the burden of proof shifts to the -- to the

5     Social Security Administration to establish that there

6     are other jobs that an individual can do.

7          The extent to which my generally adjective

8     applies means I don't know all the detailed

9     ramifications of -- of -- of that policy, but that's

10    what I understand the basic policy.

11         Q   Did -- before answering Barnes one and

12    Barnes two did you, at that time, go back and try to

13    understand who had the burden and exactly what that

14    burden meant as far as establishing an ability to

15    engage in substantial, gainful activity?

16         A   No, I did not.

17         Q   Did you take that burden into consideration

18    in answering Barnes one and Barnes two?

19         A   No, I did not.

20         Q   Let me show you a document marked as

21    Exhibit 32.  Do you know who that typewritten note is

22    from?

Barnes, David - Vol. II    HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER    February 13, 2008
Washington, DC

332

1    opinion on that point or guidance?

2         A    No, I don't, no.

3         Q    Do you know if she had any basis other than

4    either talking with you or having reviewed several

5    hundred files?

6              MR. NADLER:  Object to the question, as

7    calling for speculation, but you may answer.

8         A    Yeah, I don't know whether she had any

9    other basis.

10        Q    Was that consistent with what you saw in

11   the files that you looked at?

12             MR. NADLER:  Was what consistent, that that

13   statement of when PF forms are sent?

14             MR. KAYATTA:  Yes.

15        A    No, I don't think so.

16        Q    Well, let me ask you this:  Did you ever

17   attempt to address the following question, based on

18   your review of the file, did Unum think a person would

19   get SSDI?

20             MR. NADLER:  Object to the question, as

21   vague, but you may answer.

22        A    I -- I don't believe in the reviews I ever

Barnes, David - Vol. II    HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER    February 13, 2008
Washington, DC

333

1    addressed that question in a systematic or deliberate

2    way.  I may have commented on that in an individual

3    file and in an individual service stance but it was

4    not part of the review.

5        Q    When you were done assembling all of the

6    questions that the reviewers, the second reviewers and

7    you would address in this, is it fair to say that you

8    were never asked to address the question of whether it

9    appeared, from a review of the file, that Unum thought

10   the person would get SSDI benefits, that was never a

11   question that you asked any of your reviewers to

12   answer or attempted to answer, yourself.

13           Let me ask this way:  Are there any

14   questions that you were asked to answer, other than

15   the ones that are reflected in the 24 questions the

16   initial reviewers did, and then initial one and

17   initial two and Barnes one and Barnes two?

18       A    No, I don't believe that there were other

19   questions.

20       Q    Okay.

21           (Barnes Exhibit 037 was marked for

22   identification.)

Barnes, David - Vol. II    HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER    February 13, 2008
Washington, DC

337

1    benefits, other than SSDI, provided by the federal

2    government, that the claimant might consider pursuing?

3         A    I don't know the answer to that question

4    with regard to the current time.  When I performed

5    that job, many years ago, it was the policy to provide

6    information to individuals about other benefits they

7    might qualify for.

8         Q    In -- in making a request for SSDI

9    benefits, and in pursuing that request through with

10   the government, if the SSA employees reviewing the

11   medical evidence, at least when you worked there, felt

12   that the person was not entitled to SSDI benefits, but

13   that they might be entitled to some other benefits,

14   then custom and practice was to let the claimant know

15   that; is that correct?

16        A    Yes, I -- I think that that's true, yeah.

17        Q    And can you recall the other types of

18   federal benefits that a person who felt they were

19   injured or sick might qualify for and might learn

20   about as a result of pursuing a claim for SSDI

21   benefits?

22             MR. NADLER:  This is at the time that Mr.

Barnes, David - Vol. II    HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER    February 13, 2008
Washington, DC

338

1    Barnes worked as a claims specialist?

2    BY MR. KAYATTA:

3        Q    Well, at the time that you were employed at

4    SSA?

5        A    Well, first of all, I'll say that that's

6    not my area of expertise in terms of the -- what these

7    other benefits are.  I have common knowledge of some

8    of them, in terms of Veteran's Administration

9    benefits, you know, unemployment insurance, excuse me,

10   you asked about federal benefits, specifically,

11   correct?

12       Q    Yes.

13       A    Those would be -- well, you know

14   unemployment insurance is administered by the states,

15   but federally funded.

16       Q    Medicare?

17       A    Well, Medicare is generally they do that

18   through Social Security, anyway, so that would have

19   been a routine part of the claim, but those are the

20   kinds of things Medicaid, again, another state

21   administered program.

22       Q    In fact, sometimes people file claims for

384

1    administrative law judges that would allow me to find

2    them in -- in an easy way.

3           Secondly, the cost of doing that sort of an

4    assessment, I think, would have been much higher than

5    the cost of -- of -- of doing this.

6           Thirdly, I'm not sure that administrative

7    law judges would be in the best position to perform

8    this sort of an evaluation based solely on case files

9    as opposed to narrative testimony or something like

10   that, we were facing a circumstance where we had to

11   review case files, and I thought the individuals who

12   performed that function, as a routine part of their

13   job in case adjudication, would be a better choice for

14   that, for that project.

15        Q    Than ALJs?

16        A    Than ALJs, yes.

17        Q    And that's because ALJs generally made

18   their decisions on the basis of a different type or

19   organization of evidence than did the field office

20   workers?

21        A    I think that's -- that's part of it, I

22   wouldn't say that's it, but yes.

Barnes, David - Vol. II    HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER    February 13, 2008

## Washington, DC

385

1      Q    Well, what else is there to it?

2      A    Well, I think that administrative law

3   judges, as a general rule, had an expectation that

4   they would be able to question the witness and -- and

5   they wouldn't have that opportunity in this

6   circumstance.  The -- that's about all I -- I have on

7   that, sorry.

8      Q    Did you consider assembling a team of

9   people who had experience working at private

10  disability carriers and deciding long-term disability

11  claims?

12     A    No, I didn't.

13     Q    Is there any reason you didn't consider

14  that?

15     A    I thought that because the purpose of the

16  evaluation was to try to apply Social Security's rules

17  I would seek individuals who had experience applying

18  those rules.

19     Q    And you felt the people you assembled

20  probably had more experience than a team of people who

21  had not worked for Social Security but had worked for

22  a group of private disability carriers?

Barnes, David - Vol. II    HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER    February 13, 2008
Washington, DC

386

1            MR. NADLER:  Object to the form of the

2    question in that he said he didn't consider it, but

3    you may answer.

4            MR. KAYATTA:  I think he did answer it,

5    I'll give you another chance to answer it.

6            THE WITNESS:  Sure.  I'm sorry, could you

7    then repeat the question?  I think I lost track of it.

8    BY MR. KAYATTA:

9        Q    I asked you if there was any reason you

10   didn't consider hiring a group of people who worked at

11   private disability carriers.  And you said, I quote, I

12   thought that because the purpose of the evaluation to

13   try to apply Social Security rules I would seek

14   individuals who had experience applying those rules.

15           And then I then asked whether you felt that

16   the people you assembled probably had more experience

17   in doing the task that was assigned to you than would

18   a team of people who had not worked for Social

19   Security but had, instead, worked for a group of

20   private insurance carriers?

21       A    Okay.  And the answer to that is yes.

22       Q    Thank you.

Barnes, David - Vol. II    HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER    February 13, 2008
## Washington, DC

388

1    do list for this case is blank, at least for now?

2         A    At least for the moment.

3         Q    And in the course of your -- entire course

4    of your work here have you seen any documents of any

5    type that concern any of the claimants who are on --

6    who are mentioned in your expert report, other than

7    materials that were in the actual Unum claim files,

8    and any e-mails that people in your team generated?

9         A    No.    No.    No.

10        Q    Have you ever sought to gather any

11   materials concerning any claimants, other than

12   materials that were in the claim files?

13        A    No.

14        Q    Have you reviewed Mr. Nibali's report,

15   expert report, in this case?

16        A    No, I haven't.

17        Q    During the entire period of time that you

18   were employed by the SSA did you ever hear of any

19   instance in which the SSA or some other branch of the

20   federal government charged a person with submitting a

21   false SSDI claim?

22        A    Could you repeat the beginning of the

Barnes, David - Vol. II    HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER    February 13, 2008
Washington, DC

389

1    question, again?

2         Q    I'm referring to the period of time when

3    you were employed by the Social Security

4    Administration?

5         A    Right.

6         Q    During that period of time do you -- do you

7    recall of a hearing during that period of time about

8    the government pursuing someone for filing a false

9    claim for SSDI benefits?

10        A    I do recall about hearing circumstances

11   like that, yes.

12        Q    Do you recall anything about the nature of

13   those circumstances, what the nature of the false

14   claims were?

15        A    No, I don't.

16        Q    And I think I know the answer to this, but

17   I'm not sure, so I need to ask it.

18        A    I understand.

19        Q    Which is the number of people for whom you

20   answered no to Barnes one, but yes to Barnes two, is

21   that information that we can glean from that little

22   summary chart that you made?