# EXHIBIT R

# (1 OF 3)

Nibali, Kenneth D.                                    March 5, 2008

                                                              1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA        :

EX REL. PATRICK J. LOUGHREN,    :

      Plaintiffs,             : Civil Action No.

  v.                              : 03-11699-PBS

UNUMPROVIDENT CORPORATION and   :

GENEX SERVICES, INC.,           :

      Defendants.             :

- - - - - - - - - - - - - - X

                Washington, D.C.

                Wednesday, March 5, 2008

     Videotape Deposition of KENNETH D. NIBALI, a witness herein, called for examination by counsel for Defendants in the above-entitled matter, pursuant to notice, the witness being duly sworn by SUSAN L. CIMINELLI, a Notary Public in and for the District of Columbia, taken at the offices of HellerEhrman LLP, 1717 Rhode Island Avenue, N.W., Washington, D.C., at 9:53 a.m., and the proceedings being taken down by Stenotype by SUSAN L. CIMINELLI, CRR, RPR.

EXHIBIT 2

Case 1:03-cv-12382-MLW   Document 142-33   Filed 08/22/2008   Page 3 of 15
Case 1:03-cv-11699-PBS   Document 289-3   Filed 04/21/2008   Page 2 of 44

Nibali, Kenneth D.                                    March 5, 2008

4 (Pages 10 to 13)

Page 10

1  Security Administration -- and by the way, if I
2  abbreviate it SSA today, will you understand that
3  that means Social Security Administration?
4      A.  Yes. Certainly.
5      Q.  Just to shorten it.
6      A.  Yes, I will.
7      Q.  In your experience with the SSA, did you
8  ever work in an SSA field office?
9      A.  Actually, I had a four-month assignment in
10 the Indianapolis field office back in '83-'84, I
11 believe it was. And I was the acting district
12 manager.
13     Q.  Since you said that this CV only briefly
14 summarizes your experience with the SSA, could you
15 just walk me through, as best you can, the chronology
16 of your experience at the agency from when you
17 started?
18         MR. RENNERT: Objection. Vague. You can
19 answer it if you can. Are you seeking like a job
20 history, Mark, or --
21         BY MR. PORADA:
22     Q.  Yes. In other words, the different roles

Page 11

1  he held at the agency from when he started to when he
2  finished?
3         MR. RENNERT: The different jobs.
4         MR. PORADA: The different titles and
5  positions and where they were.
6         MR. RENNERT: Go ahead, Ken.
7         THE WITNESS: I'll do the best I can. I
8  may not hit everything, but I'll explain as I go. I
9  started with the Social Security Administration in
10 1971. I came in as what was called a management
11 intern from outside. In that program, you had two
12 years to try a variety of positions.
13         And at the end of that period of time, you
14 were then hired into a permanent position. I do not
15 recall all of the assignments I had in those initial
16 two years. But what I was initially hired into on a
17 permanent basis was actually the equal opportunity
18 and civil rights staff in the Social Security
19 Administration, internal staff that dealt with equal
20 employment opportunities. And I worked there for
21 seven or eight years or so.
22         Then I became involved in what was called

Page 12

1  the office of work force analysis. And I was there
2  for, I'm just guessing, eight or nine, 10 years. And
3  that was involved with studying all aspects of SSA's
4  operations in terms of the use of manpower. And it
5  afforded me an opportunity to see a lot of the -- of
6  the different operating components of SSA, certainly
7  included looking at field offices as one of the big
8  operating components. And it was, in fact, during
9  that time that I then took that four-month assignment
10 out as the acting district manager in Indianapolis.
11        After that period with office of work
12 force analysis, I was brought into what is called the
13 senior executive service development program. It was
14 one kind of a joint program between the Health and
15 Human Services that we were still under at the time
16 and SSA. And I was in that program for a period of
17 two years, at which time I became familiar with the
18 disability program, because I -- one of the
19 assignments was I worked on the staff that was
20 re-engineering or redesigning the disability process.
21        And from there, this is actually how I met
22 Susan Daniels, who was then the head of the office of

Page 13

1  disability. And she asked me to come over and be her
2  deputy. And so I'm forgetting the exact years. It's
3  probably in here somewhere, and became the deputy
4  after some interim period of time, because of some
5  personnel situations where someone else was filling
6  the job temporarily. But eventually, I became the
7  deputy.
8         And in '98, I became the head of the
9  office of disability when Susan Daniels moved up to
10 her job, and I retired from that position in 2002.
11        BY MR. PORADA:
12     Q.  Now, when you were the acting district
13 manager in Indianapolis back in '83 and '84, were
14 you -- was one of your tasks to supervise the front
15 line claims representatives who are intaking Social
16 Security claims?
17     A.  As district manager, you're responsible
18 for all the employees in the office. There were
19 intermediate layers of management, as you can
20 imagine. But in overseeing everybody, I became
21 pretty familiar with the work, again, on as much of a
22 basis as you can do in four months, of the work of

Case 1:03-cv-12382-MLW   Document 142-33   Filed 08/22/2008   Page 4 of 15
Case 1:03-cv-11699-PBS   Document 289-3   Filed 04/21/2008   Page 3 of 44

Nibali, Kenneth D.                                           March 5, 2008

7 (Pages 22 to 25)

**22**

1  Q. And excuse me. Did the policies and
2  procedures for which you were responsible also apply
3  to the state DDSs?
4  A. Very much so.
5  Q. Did they also apply to the ALJs within the
6  Social Security Administration?
7       MR. RENNERT: Objection. Calls for a
8  legal conclusion. You can answer.
9       THE WITNESS: Okay. Yes. The regulations
10 and policies for the basic process of adjudicating
11 disability claims apply equally to the Administrative
12 Law Judges as it did to the DDSs. There, again, were
13 additional -- excuse me, rules and guidance issued
14 for the particular processes involved in the ALJ part
15 of the process that I was not responsible for.
16      BY MR. PORADA:
17 Q. Was the POMS manual, in your experience at
18 SSA, one of the primary sources that SSA employees
19 were expected to use when processing SSDI claims?
20 A. Yes. That would be -- that would be their
21 general reference.
22 Q. Were the SSA employees expected to follow

**23**

1  what was in the POMS manual when they were processing
2  SSDI claims?
3  A. Yes. The basic answer to that is yes.
4  There were variations that could occur, and that did
5  occur, but basically, if you're looking for what the
6  expectations were about how the process should work,
7  it should be following the POMS.
8  Q. Did you have any role in drafting any of
9  the sections in the POMS manual?
10 A. My staff did. Yes.
11 Q. So that was under your supervision?
12 A. Yes.
13 Q. Do you recall, as you sit here today, what
14 part of the POMS manual you or your staff were
15 involved in preparing?
16 A. No. I could not -- I could not answer
17 that question with any specificity at all. As I say,
18 they were the way of turning into the day-to-day
19 operating manual, the POMS, the policies and
20 procedures that my folks figured out for the
21 disability aspects of doing disability claims.
22      But quite truthfully, since I was not

**24**

1  involved with a lot of the front line people, like
2  the field office folks, et cetera, that followed
3  those for intake reasons, I generally was not very
4  familiar with exactly where it went, and what section
5  is a reference, et cetera.
6  Q. Now, I take it based on your experience at
7  SSA, you are familiar with the process one could use
8  to apply for SSDI benefits?
9  A. The process that one would follow?
10 Q. To apply for SSDI.
11 A. Yes.
12 Q. And can you just tell me -- can you give
13 me sort of a summary of how the process works, how
14 someone who wants to apply for SSDI can go about
15 doing so?
16      MR. RENNERT: Objection. Vague. Vague as
17 to time. The question itself is ambiguous, as to
18 giving a summary. But if you can answer it, go
19 ahead.
20      THE WITNESS: I will give you a general
21 description, based on when I was there. I will
22 acknowledge right now that a number of things have

**25**

1  changed about that process, but I don't believe it
2  will affect my basic answer here.
3       The general way someone would apply for
4  disability is either to walk into a field office,
5  hopefully, call first on the national 800 number.
6  And now they can, in fact, apply online for
7  disability.
8       And so through one of those, one of those
9  routes, they generally end up, even if they started
10 in one of the other routes in telephone or online,
11 they end up in a field office with a claims rep who
12 will help them complete the application and the forms
13 associated with it, making sure the form is filled
14 out completely, and -- and then have the person sign
15 the form. And I'll stop there, because I could go on
16 forever.
17      BY MR. PORADA:
18 Q. Let's focus in on the instances where
19 someone comes into a field office to apply for SSDI.
20 You mentioned that the SSA employees will typically
21 fill out the application form, is that -- that's sort
22 of the general practice, that the SSA employees will

Case 1:03-cv-12382-MLW   Document 142-33   Filed 08/22/2008   Page 5 of 15
Case 1:03-cv-11699-PBS   Document 289-3   Filed 04/21/2008   Page 4 of 44

Nibali, Kenneth D.                                          March 5, 2008

8 (Pages 26 to 29)

**Page 26**

speak with the individual and record the information on the application forms?

A. I need you to be specific about what time frame we are talking about here, because the process has evolved.

Q. Okay,

A. With, with technology, et cetera. Would you be talking --

Q. Well, let's focus first on the years when you were working back in the field office in Indianapolis.

MR. RENNERT: What years, 1983-'84?

THE WITNESS: Yes.

MR. RENNERT: Can you go that far back, Ken?

THE WITNESS: I don't need to go back quite that far. I will talk about the process before some of the more modernized techniques came into play. People would be, you know, given an application to fill out and a work history report to fill out. And they would do it to the best that they could.

**Page 27**

The agency, in a lot of ways, relies on what is called self help. We need individuals to fill -- you know, do as much of the work as possible in advance to have those forms on their way. And then when they would show up in the office, the claims rep could go through that with them, help them finish the form, answer any questions, and then go from there, having the form signed.

Partly while I was there, and certainly now, there is much more of an online process involved where individuals are actually given more background packages, the starter kits they are called now, to basically think about and gather the kind of information that they need.

And then when they come in the office, generally on the basis of an appointment, they come in and claims rep will enter that information online, on a screen, and while the person is there. And then the person gets to review that, and attest that that is, in fact, what they intended to submit. And that they intend to file a claim.

BY MR. PORADA:

**Page 28**

Q. So I take it, there is some sort of interview process that occurs between the SSA claims rep and the individual applicants when they come into the field office to file a claim, is that correct?

A. There is certainly back and forth, yes, between the claimant and the claims rep to help illicit whatever information that's needed that hasn't otherwise been provided.

Q. Now, does the process work similarly if someone calls the 800 number you mentioned, and talks to someone on the phone about an SSDI claim?

MR. RENNERT: Objection. Vague.

BY MR. PORADA:

Q. How is that information recorded on the forms?

MR. RENNERT: Objection. Vague. Objection, compound.

THE WITNESS: You're asking how the process would basically work if someone starts off calling the 800 number.

BY MR. PORADA:

Q. That's right.

**Page 29**

A. The application process? My understanding, and let me -- if I can preface something I've already said. This is -- this whole area in the field office is not my area of expertise, okay? I did not have responsibility over them. I have some familiarity with it as I spoke of before, but I'm doing my best to answer your question of my understanding of what happens. And my understanding of what happens with the 800 number is when an individual calls in, the basic purpose of that call is for them to get basic background information, to give -- send the person a starter kit, where they can figure out what to start gathering. And then to set up an appointment for them to go into the field office to, in fact, conduct an interview.

Q. And so under that scenario, the individuals would still go into the field office to complete the filing of their SSDI claim?

A. Could they?

Q. Would they still have to do so?

A. Claims can be taken over the telephone, okay? And a lot of people want to come in face to

Case 1:03-cv-12382-MLW   Document 142-33   Filed 08/22/2008   Page 6 of 15
Case 1:03-cv-11699-PBS   Document 289-3   Filed 04/21/2008   Page 9 of 44

Nibali, Kenneth D.                                          March 5, 2008

9 (Pages 30 to 33)

**Page 30**

1 face, and that's afforded them if they want to do so.
2 And that's where the appointment is set up. If the
3 person desires, is okay with filing a claim by phone,
4 they can do that.
5     But you know, some different procedures
6 are involved, then, in terms of having to get the
7 person to attest that what the claims rep filled out
8 on that screen with them not there, and I think
9 eventually they have to sign a paper copy of the
10 form, but I'm really getting outside my area of
11 expertise.
12    Q. Do you know whether at the time
13 individuals apply for SSDI, they are expected to turn
14 over to the SSA, medical evidence of any kind that
15 supports their claim?
16    MR. RENNERT: Objection, vague as to time
17 frame. You can answer.
18    THE WITNESS: Individuals are advised of
19 the basic kind of information that SSA needs to
20 process their claim, including their medical history.
21 At a minimum, they are expected to supply names of
22 doctors, clinics, places where they have received

**Page 31**

1 care. And if, in fact, they have copies of the
2 medical information, that's a benefit, and it can be
3 applied -- it can be supplied at that time.
4    BY MR. PORADA:
5    Q. Now, do you know whether, as part of the
6 application process for SSDI, if a claimant brings in
7 medical records, is the claims representative
8 expected to review those records before accepting or
9 processing the claim?
10    A. No. That is not their job.
11    Q. And do you know whether the claims
12 representatives are expected to perform any sort of
13 vocational analysis for the claimant in terms of
14 determining what their work capacity is, or what they
15 could do before processing or accepting the claim?
16    A. Again, the answer to that would be
17 generally no. What is the claims rep's
18 responsibility in either of those areas is they are
19 to observe and record as much as they can about the
20 individual as they appear before them, what they told
21 them, and any information that might be relevant to
22 the subsequent adjudication of the claim, the medical

**Page 32**

1 disability part of the claim in the DDS.
2    Q. So is it fair to say, then, that the
3 claims representatives aren't expected to make any
4 sort of assessment of whether a person is or is not
5 disabled at the time they accept the SSDI claim?
6    MR. RENNERT: Objection. Mischaracterizes
7 his prior testimony. You can answer.
8    THE WITNESS: Say that one more time?
9    BY MR. PORADA:
10    Q. Sure. I'm wondering whether it's fair to
11 say that the SSA claims representatives aren't
12 expected to make any informal assessment of whether
13 an applicant is likely to be found disabled at the
14 time that they accept and begin processing that SSDI
15 application?
16    MR. RENNERT: Same objection.
17    THE WITNESS: There are provisions where a
18 claims rep, given -- given certain kinds of cases
19 that are called Kerry cases, or presumptive
20 disability cases, where people, they have lists that
21 people obviously meet our definition, they can in
22 fact raise the issue that this case would be,

**Page 33**

1 therefore, put into the special channel to get the
2 case processed faster.
3    So I would not say that they make no
4 assessments at all in terms of, you know, an
5 individual's capabilities. Because then they are
6 expected to observe and record, and they are expected
7 to look for those -- for those kinds of situations.
8 They are also expected to clearly look at the first
9 step of eligibility, which is, is the person working?
10    The first stage of being disabled is that
11 you are not engaged in substantial gainful activity,
12 and that is something that the claims rep inquires
13 about, and has some records on. And can, in fact,
14 notify a person that they are not going to be
15 eligible if they are, in fact, still working.
16    Q. Now, in that scenario you just described,
17 where someone comes in and appears to still be
18 engaged in substantial gainful activity, you
19 mentioned that the claims rep might inform the person
20 that they are not likely to be found disabled because
21 they are working. Is the --
22    A. Let me correct --

Case 1:03-cv-12382-MLW   Document 142-33   Filed 08/22/2008   Page 7 of 15
Case 1:03-cv-11699-PBS   Document 269-3   Filed 04/21/2008   Page 8 of 44

Nibali, Kenneth D.                                              March 5, 2008

10 (Pages 34 to 37)

**Page 34**

1     MR. RENNERT: Hang on, hang on a second.
2  Wait for a question, okay?
3     BY MR. PORADA:
4     Q. Is the procedure that the claims rep is
5  supposed to follow, to still nevertheless process the
6  claim if the person wants to go ahead and apply
7  anyhow?
8     MR. RENNERT: Objection. Mischaracterizes
9  prior testimony. You can answer.
10    THE WITNESS: I just want to clarify that
11 the claims rep are not informing them that they're
12 not likely to be found disabled, but that they are
13 not likely to be eligible. There is distinction.
14 There are nondisability factors to eligibility. And
15 one of those factors is that you are, in fact, not
16 working.
17    And if the person has either said that
18 they are working or the claims rep has information to
19 lead one to believe that that's happening, they are
20 advised of that. And they are advised of that and
21 SSA will never not take a claim and proceed with it.
22 But in that circumstance, if it is clear that the

**Page 35**

1  person is working, the claims rep attempts to
2  terminate the application at that point in time. If
3  the person insists, they will take it.
4     Q. So the situation where someone is engaged
5  in substantial gainful activity when they come in to
6  apply for SSDI, that's an example of a nondisability
7  determination that the claims rep could make, is
8  that -- is that what you said?
9     MR. RENNERT: Objection. Mischaracterizes
10 prior testimony. Go ahead.
11    THE WITNESS: I'm not sure I understand
12 your question.
13    BY MR. PORADA:
14    Q. I guess I'm just trying to, just trying to
15 understand, you seem to be making this distinction
16 between the claims representatives making
17 nondisability determinations at the time a claim
18 comes in versus making -- determining whether someone
19 is or is not disabled, or making a disability
20 determination. Is that a distinction you were trying
21 to make?
22    A. Yes. It's a distinction that exists.

**Page 36**

1  Right.
2     Q. Okay. And is that distinction that claims
3  representatives are not expected to make disability
4  assessments or determinations at a time -- at the
5  time that the claim comes in?
6     A. I answered that before in a way that said
7  they are expected to make certain observations and
8  decisions about whether a case for medical reasons
9  might fall into a category of terminal or presumptive
10 disability.
11    Q. Okay. So if I understand it, then, there
12 is a process for essentially screening in claims
13 where someone comes in with a disability that appears
14 to be terminal, for instance, where they appear to be
15 presumptively disabled, is that correct?
16    A. It puts the -- it puts those claims in a
17 different track, if you will. The field office is
18 not making a decision. It still is going to go to
19 the DDS, but it's in a different track and a faster
20 track, so --
21    Q. And that's the procedure followed for
22 claims where it appears to the claims representative

**Page 37**

1  that the person is likely to be disabled because they
2  have some sort of a terminal condition?
3     A. There are very specific situations that
4  are set out in the POMS, in the procedures, that say
5  that people have certain conditions, then they should
6  be put into these faster tracks, yes.
7     Q. Is there any similar procedure for putting
8  into a special track sort of the opposite type of
9  claim, where someone comes in and it appears to the
10 claims representative initially that the person,
11 whatever their condition is, is not likely to be
12 disabling?
13    A. No. There is not.
14    Q. So does --
15    A. Just to finish, except for -- just to make
16 sure it's clear, except for the issue of substantial
17 gainful activity.
18    Q. So if someone comes in and reports that
19 they are engaged in substantial gainful activity, the
20 claims representative can use that information to
21 inform the claimant that because of that, they are
22 likely to not be eligible for SSDI, is that right?

**38**

1  A. Yes. A factor of entitlement to
2  disability claims is you cannot be working.
3  Q. Other than that --
4  A. Now, again, I don't mean to interrupt you,
5  but I want to finish my statement here. There are
6  corollary things going on with return to work issues,
7  et cetera, that I'm no expert in. And I will not
8  attempt to describe them to you. But it is possible
9  that someone can be working and receive disability
10 benefits, but -- but claims reps would know those
11 exceptions, and know those circumstances. But the
12 general rule is if someone is coming in, certainly on
13 an initial claim, and filing, and is already working,
14 the claims rep will make that call.
15 Q. Now, is that the only situation you're
16 aware of where the SSA claims reps have a procedure
17 for essentially screening out claims that appear to
18 them to be claims where someone is not going to be
19 eligible for SSDI?
20 A. Well, the other factor that is their
21 responsibility is they have to be -- they have to
22 have coverage under Social Security for SSDI

**39**

1  benefits. And that would be the second thing that
2  the claims rep would be looking for, is they may not
3  be working. They come in to file their application.
4  But in checking the records, if this person, you
5  know, simply does not have the coverage required,
6  generally that means they have worked under Social
7  Security, paying FICA taxes for a certain period of
8  time which gets adjusted based on age and everything
9  else for disability, then they would be able to
10 inform the person of that issue as well.
11 Q. Okay. So other than the situation where
12 someone is reporting substantial gainful activity, or
13 the situation where someone doesn't have enough
14 quarters of coverage, so they are not eligible for
15 SSDI, are you aware of any other situations where the
16 claims representatives have a process or procedure
17 for essentially screening out other claims that they
18 determine aren't likely to be eligible for SSDI?
19 A. No. I do not.
20    MR. RENNERT: Are you okay with that? Go
21 ahead.
22    THE WITNESS: Break time comes when I

**40**

1  finish.
2     MR. RENNERT: When you finish that.
3     THE WITNESS: I apologize for coughing in
4  the microphone.
5     BY MR. PORADA:
6  Q. So I take it, then, that the process of
7  reviewing the medical evidence occurs at some point
8  after the SSDI claim is accepted by the claims rep,
9  is that correct?
10    MR. RENNERT: Objection. Excuse me.
11 Objection. Vague. Reviewing medical evidence where?
12 It's vague.
13    BY MR. PORADA:
14 Q. The process of the SSA or the DDS
15 reviewing a claimant's medical records to determine
16 whether they are disabled or not, that's a process
17 that occurs after the application is initially
18 accepted. Is that correct?
19 A. Generally, except for the exceptions that
20 I have already noted on the special case.
21 Q. Is that -- is that one of the functions of
22 the state DDS, to gather an applicant's medical

**41**

1  records from the physicians or providers that they
2  have identified?
3  A. If they have not already been provided.
4  Yes.
5  Q. So is it correct, then, that the DDS
6  doesn't limit its medical evaluation to whatever
7  records were provided by the applicant at the time of
8  the application, is that right?
9  A. Not necessarily.
10 Q. In other words, the DDS will go out and
11 gather more records if the individual identifies
12 additional treating medical providers?
13 A. Yes. They will.
14 Q. So there is no rule, I take it, then,
15 under the SSA's procedures that requires an applicant
16 for SSDI to actually provide all of the -- all of his
17 or her medical records that would support the claim
18 for SSDI at the time that they apply?
19    MR. RENNERT: Objection. Calls for a
20 legal conclusion. You can answer.
21    THE WITNESS: If my understanding of the
22 question is correct, the requirement is that an

Case 1:03-cv-12382-MLW   Document 142-33   Filed 08/22/2008   Page 9 of 15
Case 1:03-cv-11699-PBS   Document 289-3   Filed 04/21/2008   Page 8 of 44

Nibali, Kenneth D.                                    March 5, 2008

12 (Pages 42 to 45)

**42**

1  individual inform SSA of all the medical sources that
2  they have seen, that's part of the application, and
3  it's expected and required to do that, to actually
4  supply the medical records. Again, we encourage it.
5  And if they haven't, we want them, but they are not
6  required to submit the actual medical records if they
7  don't have them.
8       BY MR. PORADA:
9    Q. Now, based on your years of experience at
10 the SSA, would you say that the SSA's policy is that
11 any American who wants to get a determination of
12 whether he or she is disabled for purposes of SSDI is
13 entitled to submit an application and have the SSA
14 make that determination?
15   A. SSA -- I will say SSA has very much of
16 what I call an open door policy. Our mantra is
17 service to the public, and if individuals have reason
18 to believe that they may be disabled, and we don't
19 require them obviously to know that up front, but if
20 they have reason to believe they may be disabled, and
21 they want to file a disability application, absent
22 some of the circumstances I've already mentioned that

**43**

1  the claims rep might look at, they will certainly
2  take that application. That's the service to the
3  public angle of what SSA does.
4       What I will add to that is, we also care
5  deeply about protecting the trust funds. That's the
6  second mantra of the Social Security Administration.
7  So there are certainly some circumstances where we
8  would not proceed, and I would generally put those
9  under the area of fraud.
10      People do try to cheat their government
11 and cheat the taxpayers. And there are provisions of
12 fraud and similar fault in our regulations. I'm not
13 an expert in them, but I have familiarity with them
14 because the disability program is one of the programs
15 in which individuals are as likely, more likely than
16 some of the other programs to attempt fraud on the
17 government.
18      And if we have reason to believe up front,
19 I will give you an example that's fairly fresh in my
20 mind from when I left, it's called third party fraud,
21 where the agency became aware that individuals,
22 non-English speaking individuals were coming in to

**44**

1  file disability claims. They were often represented
2  by the same person who was being -- was interpreting
3  for them. And it became evident that this person was
4  giving almost identical information, medical and
5  otherwise, for everybody that they were bringing in.
6       And in those kinds of circumstances, our
7  procedures call for those being turned over to
8  probably the Office of Inspector General, one of the
9  offices within SSA that can then take over fraud
10 investigation on those. So we would not, say
11 obviously -- it may not be obvious -- but we would
12 certainly not proceed with processing cases where we
13 have reason to believe something like that is going
14 on.
15   Q. What other types of situations are you
16 aware of where the SSA won't proceed to process an
17 SSDI claim based on some suspicion of fraud?
18   A. If there is suspicion of medical
19 information that's provided by someone that someone
20 believes is false, is attempting a fraud, that can
21 happen as well.
22   Q. Now, when you say there is a suspicion

**45**

1  that medical information is false, what do you mean
2  by that?
3    A. That a doctor or even someone signing for
4  a doctor has submitted evidence supposedly supporting
5  some aspect of the claim, that in fact through other
6  information, SSA would have reason to strongly
7  suspect or know is false information.
8    Q. Are you talking about essentially where
9  medical records have been fabricated or created that
10 don't actually exist, something like that?
11   A. That could be one example. Right.
12   Q. What other type of example would you have?
13   A. Where a doctor gives purely false
14 testimony about what the condition of an individual
15 is.
16   Q. So essentially, where a doctor is lying
17 about a condition that someone has, saying they have
18 a condition when they don't, or that it's something
19 about it --
20   A. The signs and symptoms of it are much
21 worse than anything that they have actual records to
22 support.

Case 1:03-cv-12382-MLW   Document 143-33   Filed 08/22/2008   Page 10 of 15
Case 1:03-cv-11693-PBS   Document 289-3   Filed 04/21/2008   Page 9 of 44

Nibali, Kenneth D.                                        March 5, 2008

13 (Pages 46 to 49)

**Page 46**

1  Q. Are those the only types of situations
2  you're aware of where the SSA won't proceed to
3  process an SSDI claim, the ones you just described?
4  A. I think that's the major area that I'm
5  familiar with, with the disability. That doesn't
6  mean that there aren't others.
7  Q. But you're not aware of any others?
8  A. I'm not familiar with any others. No.
9  Q. Now, the scenario that you described a
10 minutes ago, where someone comes to apply for SSDI
11 and reports that they are still engaged in
12 substantial gainful activity, I take it that's not
13 one of the situations where the SSA will decline to
14 process the claim if the person still wants to go
15 ahead with it?
16 A. If the person insists, they will proceed
17 with the claim.
18 Q. So that wouldn't be a situation that the
19 SSA would consider to be a fraudulent situation,
20 where it would refuse to process the claim?
21     MR. RENNERT: Objection. Calls for a
22 legal conclusion. You can answer that if you can

**Page 47**

1  answer.
2     THE WITNESS: Yes. It would have to
3  depend on the specific case. I can't answer that as
4  a generality.
5     BY MR. PORADA:
6  Q. Are you aware of any situations when you
7  were employed at the SSA where anyone who applied for
8  SSDI and reported that they were engaged in
9  substantial gainful activity was referred to the
10 Office of Inspector General for fraud investigation?
11 A. I generally would not be in a position to
12 know that. Those kinds of things, you know, if they
13 didn't involve issues of processing disability, the
14 aspects of processing a disability claim, I generally
15 would not be in the loop to know that.
16 Q. And if we today used the term SGA as a
17 short hand for substantial gainful activity, would
18 that be acceptable to you?
19 A. That's fine.
20 Q. Okay. That shortens things a bit. So I
21 just want to make sure I understand. If someone
22 comes in and reports that they are still engaged in

**Page 48**

1  SGA, the claims representative might inform the
2  person that they are unlikely to be eligible for
3  SSDI, but if the person still wants to proceed and
4  file the claim, the claims representative will accept
5  it and begin processing it, is that correct?
6     MR. RENNERT: Objection. Asked and
7  answered. Mischaracterizes the prior testimony. If
8  you have anything to add to the prior answer, please
9  go ahead.
10    THE WITNESS: Well, I don't really think
11 -- I thought I answered that.
12    BY MR. PORADA:
13 Q. I just want to make sure I'm understanding
14 correctly. Is that a correct understanding?
15    MR. RENNERT: Can we please have the
16 question back?
17    THE REPORTER: "Question: So I just want
18 to make sure I understand. If someone comes in and
19 reports that they are still engaged in SGA, the
20 claims representative might inform the person that
21 they are unlikely to be eligible for SSDI, but if the
22 person still wants to proceed and file the claim, the

**Page 49**

1  claims representative will accept it and begin
2  processing it, is that correct?"
3     THE WITNESS: That -- that basic approach
4  is what the POMS calls for, and that's my
5  understanding of how they handle it. It does not
6  mean there could not be extenuating circumstances
7  under which, you know, the claims rep would raise an
8  issue if they thought fraud or something was
9  involved. But generally, I think that's a correct
10 statement.
11    BY MR. PORADA:
12 Q. Now, does the SSA have any policy or
13 procedures for dissuading individuals from applying
14 for SSDI, or discouraging them not to apply?
15 A. No. I'm not -- not that come to mind.
16 Again, our open door policy, I will -- I'm going to
17 put my answer in a somewhat larger context here. We
18 deal with individuals of all kinds of backgrounds,
19 education, basic intelligence, poverty levels. And
20 it's the policy of the agency to be as open as
21 possible to encouraging people, if they feel that
22 there is a basis for disability, to come in and file.

Case 1:03-cv-12382-MLW    Document 142-33    Filed 08/22/2008    Page 11 of 15
Case 1:03-cv-11893-PBS    Document 265-3    Filed 04/21/2008    Page 10 of 14

Nibali, Kenneth D.                                      March 5, 2008

14 (Pages 50 to 53)

**50**

1    We don't expect them to know up front
2    themselves whether they meet our definition or not.
3    But if they believe that they might, we encourage
4    them to come in. And the broader context is as we
5    spoke of at the beginning of this conversation, we
6    take disability claims not only from fairly well
7    educated people with good jobs, but we take them from
8    SSI applicants, et cetera, and oftentimes those
9    groups can overlap, they can be dually eligible,
10   concurrently eligible, is the right term. And so the
11   agency does bend over backwards. As individuals seek
12   benefits from us, we are not in the practice of
13   discouraging them.
14       Q.  So the SSA's procedures or rules don't
15   require an individual to know in advance that they
16   are definitely eligible for SSDI before they apply,
17   is that right?
18           MR. RENNERT: Objection. Calls for a
19   legal conclusion. Mischaracterizes the prior
20   testimony. You can answer.
21           THE WITNESS: SSA does not require an
22   individual who files for disability to know if they

**51**

1    are disabled or not, if that was your question.
2        BY MR. PORADA:
3        Q.  Now, I believe you said a moment ago that
4    the policy also is to allow anyone who thinks they
5    have a basis for seeking SSDI to apply, is that -- is
6    that something you said, is that what you said?
7            MR. RENNERT: Objection. Mischaracterizes
8    prior testimony.
9            THE WITNESS: That's out of context for
10   me. I'm really not quite sure what we are referring
11   back to here. I've already said that anybody who --
12           MR. RENNERT: Ken, Ken, wait for a
13   question.
14           THE WITNESS: I'm sorry. Thank you.
15       BY MR. PORADA:
16       Q.  Does the SSA expect individuals to have
17   reviewed the Social Security Act or the Social
18   Security regulations for SSDI in an attempt to
19   determine what the standards are before they apply
20   for SSDI?
21           MR. RENNERT: Objection. Calls for a
22   legal conclusion. You can answer.

**52**

1            THE WITNESS: SSA would not expect someone
2    to review our laws, regulations, et cetera. What is
3    clear is that when an individual files for
4    disability, the definition of disability is made
5    known to them. It's on the application. And they
6    are asked when they -- you know, when they became
7    unable to work, based on that definition of
8    disability.
9            So it's not -- it's not a purely unknown
10   factor by any stretch of the imagination, that
11   individuals don't have some idea what they are
12   applying for. But we do not expect them to go read
13   our regulations.
14       BY MR. PORADA:
15       Q.  And so is it fair to say that the way that
16   many applicants learn of the disability standard for
17   SSDI is through the application form that they are
18   asked to fill out when they -- when they approach
19   Social Security to apply?
20           MR. RENNERT: Objection. Vague.
21           THE WITNESS: Yeah, I can't -- I can't
22   answer that. Some people would. Some people would

**53**

1    clearly know before they got there.
2            MR. RENNERT: Mark, we've been going for
3    about an hour. When you reach a convenient time, can
4    we take a break, please?
5            MR. PORADA: Sure. We can take a short
6    break now.
7            MR. RENNERT: Thanks.
8            THE VIDEOGRAPHER: This concludes tape one
9    in the deposition of Kenneth Nibali. Off the record
10   at 10:49.
11           (Recess.)
12               (Nibali Exhibit No. 2 was
13               marked for identification.)
14           THE VIDEOGRAPHER: Here begins tape two in
15   the deposition of Kenneth Nibali. On the record at
16   11:03.
17       BY MR. PORADA:
18       Q.  Right before we took our break, you
19   started speaking about the application for disability
20   insurance benefits. So I've shown you Exhibit 2,
21   which is a form SSA-16-F6. Is that the application
22   form that someone would use to apply for SSDI

Case 1:03-cv-12382-MLW   Document 142-33   Filed 08/22/2008   Page 12 of 15
Case 1:03-cv-14809-PBS   Document 269-3    Filed 04/21/2008   Page 91 of 44

Nibali, Kenneth D.                                           March 5, 2008

16 (Pages 58 to 61)

**58**

1  this a form that's filled out by the SSA claims
2  representatives during that initial interview process
3  that you described earlier?
4       A.  I need you to specify time here.
5       Q.  In terms of your experience when you were
6  working at SSA, was this a form that was filled out
7  during the initial interview process by the SSA
8  claims representatives?
9            MR. RENNERT: Objection. Vague as to
10  time.
11           BY MR. PORADA:
12       Q.  Does that help you understand the time
13  period that we are talking about?
14       A.  I believe I can answer that, based on my
15  experience with the process back when I was working
16  with the Social Security Administration. This was a
17  form that needed to be completed to make an
18  application for disability benefits. It could be
19  completed in part or total by the applicant
20  themselves, or if need be, it could be completed with
21  the assistance of the claims rep -- claims rep.
22       Q.  Now, is this a form -- is your

**59**

1  understanding -- is it your understanding, excuse me,
2  that this is a form that could be completed by the
3  applicant before coming to the Social Security
4  Administration? Is that your understanding, or is
5  this a form that would be completed when they came to
6  the office, the field office to fill out their
7  application and submit it?
8            MR. RENNERT: Objection. Compound.
9  Objection. Both questions have been asked and
10  answered. Go ahead.
11           THE WITNESS: My answer is that that -- my
12  answer is that claimants can fill this form out. I'm
13  not clear on what you mean by before they came to the
14  Social Security Administration. People can stop in
15  and get the form, fill it out there. They can go
16  home and fill it out and come back again, but there
17  would have been some contact with SSA before they got
18  this form.
19           BY MR. PORADA:
20       Q.  So in those contacts with the SSA in the
21  interview process that you described earlier, would
22  it be typical for a claims representative to go

**60**

1  through the information and the questions on this
2  form with the applicant?
3       A.  Yes. It would. We ask that question
4  because the important point here is that -- you
5  referenced the POMS earlier, as being what is
6  generally followed by the claims representatives in
7  the field office. And that POMS makes it very clear
8  that every effort is to be made to complete this form
9  and answer all questions.
10           And if the individual themselves has not
11  answered this question, or has answered it
12  incorrectly once the discussion occurs with the
13  claims rep about -- have to make sure that they
14  understand what that question means, the claims rep
15  will make every effort to fill that question in and
16  explain to the individual what -- if there is any
17  misunderstanding about what question five means.
18       Q.  So would it be typical for the claims
19  representative and an applicant to talk about the
20  date that should be filled in in response to question
21  five, to make sure that the applicant understands
22  what the question means?

**61**

1            MR. RENNERT: Objection. Vague.
2            THE WITNESS: I don't know -- yeah. I
3  can't answer if it's typical or not. Some
4  applications are completed. The individual will know
5  that date, and will explain to the satisfaction of
6  the claims rep that they understand what that date
7  means. And in other cases, it will have to be back
8  and forth with the claims rep to make sure that it's
9  understood.
10           BY MR. PORADA:
11       Q.  So in at least some cases, then, there
12  would be a back and forth discussion between the
13  claims representative and the applicant as to
14  question five, and what date should be filled in
15  there? Is that your testimony?
16           MR. RENNERT: Sorry. Objection. Calls
17  for speculation. And vague.
18           THE WITNESS: Would you repeat that one
19  more time?
20           BY MR. PORADA:
21       Q.  Sure. I believe my question was that in
22  at least some circumstances, the claims

Case 1:03-cv-12382-MLW   Document 142-33   Filed 08/22/2008   Page 13 of 15
Case 1:03-cv-11699-PBS   Document 289-3   Filed 04/21/2008   Page 12 of 44

Nibali, Kenneth D.                                    March 5, 2008

17 (Pages 62 to 65)

**Page 62**

1  representative and the applicant would have a back
2  and forth discussion about question five, and what
3  date should be recorded in response to that question,
4  is that -- is that fair to say?
5        MR. RENNERT: Same objections.
6        THE WITNESS: What I would say is the
7  claims rep would -- would help the individual
8  understand what is asked for by that date and -- and
9  then work with the claimant to come up with the
10 proper date that should be entered there.
11       BY MR. PORADA:
12    Q. So is question five basically looking for
13 the applicant to provide a date on which he or she
14 believes he became unable to work? Is that the gist
15 of question five?
16       MR. RENNERT: Objection. Vague. Calls
17 for a legal conclusion. You can answer. And I
18 should say, and part of the question is asked and
19 answered. But you can go ahead and answer.
20       THE WITNESS: I thought we answered that
21 already. What part of that question have I not
22 answered?

**Page 63**

1        BY MR. PORADA:
2     Q. I just want to make sure I'm understanding
3  that the gist of question five, as you understand it,
4  is that that's asking an applicant to provide a date
5  on which he believes he became unable to work. Is
6  that your understanding of question five?
7     A. The alleged onset date is an absolutely
8  crucial piece of information for adjudicating a
9  disability claim, and that is what question five is
10 after.
11    Q. When you say alleged onset date, what does
12 that mean? What is the alleged onset date?
13    A. That is when the individual is saying that
14 they became unable to work because of their illness,
15 injuries or conditions.
16    Q. Now, is it necessarily the case that the
17 date that should be recorded in response to question
18 five is the same date when someone actually stopped
19 working?
20    A. It is not.
21    Q. And what situations or scenarios might you
22 have where someone would record a date that is not

**Page 64**

1  the date when they actually stopped working?
2     A. Some individuals will continue to try to
3  work after what could be found to be a legitimate
4  onset date, after all the medical information is
5  looked at, so -- that's one example.
6     Q. So that's an example where someone
7  essentially struggled to keep working, and apparently
8  they weren't really able to keep doing so. And so
9  the date that you would record in response to
10 question five is some date in the past before they
11 actually stopped working, is that right?
12    A. It would not necessarily be the date that
13 you record, but to clarify, the determination of what
14 the actual -- not the alleged -- the determination of
15 what the actual onset date is, is a determination to
16 be made by the DDS after all information is in.
17 Obviously, a very important starting point is what
18 the claimant tells us about when they believe that
19 they were unable to work because of their illness,
20 injuries or conditions.
21       What can happen is some people can put
22 down a date, based on when they actually stopped

**Page 65**

1  working, and then after the evidence is looked at, it
2  can be determined that that date was, in fact, from
3  that.
4     Q. And in some cases, that date of onset
5  might be before the date when someone actually
6  stopped working, is that possible?
7     A. That is possible. Yes. I'm losing my
8  voice here.
9     Q. So then is it fair to say that the SSA and
10 the DDS don't rely entirely on the date that's
11 provided in response to question five when
12 determining what the onset date is for someone's
13 disability claim?
14       MR. RENNERT: Object. Mischaracterizes
15 his prior testimony. You can answer.
16       THE WITNESS: The Social Security
17 Administration, the DDS uses all the information
18 gathered to help determine what the onset date is,
19 certainly including what the individual puts on the
20 form.
21       BY MR. PORADA:
22    Q. But it might include additional evidence

Case 1:03-cv-12382-MLW   Document 142-33   Filed 08/22/2008   Page 14 of 15
Case 1:03-cv-11699-PBS   Document 289-3   Filed 04/21/2008   Page 13 of 44

Nibali, Kenneth D.                                          March 5, 2008

18 (Pages 66 to 69)

**Page 66**

1  or materials that are gathered by the DDS in the
2  claims evaluation process as well, is that correct?
3      MR. RENNERT: Objection. Calls for
4  speculation. You can answer.
5      THE WITNESS: The DDS would be expected to
6  use additional information they get to make that
7  determination.
8      BY MR. PORADA:
9      Q. Are you aware of whether the POMS manual
10 permits the SSA or an applicant to record NA in
11 response to any of the questions on this form?
12     A. NA meaning?
13     Q. Not applicable.
14     A. I'm not -- excuse me, totally familiar
15 with the POMS as to what might or might not be put on
16 the form. What I do know the POM calls for is to
17 complete the application in every case where it's
18 possible, and for every question where it's possible.
19 Is it possible to leave something blank? Yes. But I
20 don't think NA would be the appropriate thing there.
21 And anyway, it's possible to leave something blank,
22 but it doesn't constitute a completed application.

**Page 67**

1      Q. So is the answer to the question, then,
2  that you're not aware of a provision in POMS that
3  allows someone to record NA on one of these forms?
4      A. There may very well be a provision in POMS
5  that allows NA. I'm just saying I don't believe it
6  would apply to this question.
7      Q. Now, in the scenario you described
8  earlier, where someone comes in and reports that they
9  are still engaged in substantial gainful activity,
10 but they want to file the claim for SSDI anyhow, what
11 date would you expect to be recorded in response to
12 question five?
13     MR. RENNERT: Objection. Calls for
14 speculation.
15     THE WITNESS: I couldn't speculate what
16 would happen there. It's really outside my area of
17 expertise, because it's very much a field office
18 question of how they are instructed to handle that
19 circumstance. I have explained that it very clearly
20 is an issue that a claims rep would raise if someone
21 is working and tells them that they are not going to
22 meet a factor of entitlement, and probably terminate

**Page 68**

1  the application unless the person objects. So in a
2  number of cases, they wouldn't have to put anything
3  in there because the application would be terminated.
4      BY MR. PORADA:
5      Q. But if the person doesn't want to
6  terminate the application and wants to proceed, I
7  take it you don't know what date or what guidance the
8  claims representative should follow in determining
9  what date to put into that box?
10     A. No. I do not know that specifically.
11     Q. Are you aware of statistics on the
12 percentage of SSDI claims that get approved or denied
13 at the various levels within the Social Security
14 process?
15     MR. RENNERT: Objection. Vague as to
16 time. You can answer.
17     THE WITNESS: I'm familiar as to the
18 extent my memory is good as to what they were when I
19 was there. And I have seen some updated figures, but
20 they would be a general scenario of what the -- of
21 what the allowance rates were.
22     BY MR. PORADA:

**Page 69**

1      Q. When you were employed at SSA, did you
2  have an understanding or an awareness of whether the
3  initial approval rates for SSDI claims varied from
4  state to state?
5      A. Did I have an understanding of that?
6      Q. Yes.
7      A. Yes, I did.
8      Q. And what was your understanding?
9      A. They do vary from state to state.
10     Q. And did you have any understanding of
11 whether there was -- were these minor variations or
12 wide variations, or what kind of variations were
13 they?
14     A. I don't know what you mean by minor or
15 why, but there were variations from state to state.
16 I do not -- I do not recall statistically what they
17 were. But they were -- but there were variations,
18 right.
19     (Nibali Exhibit No. 3 was
20     marked for identification.)
21     BY MR. PORADA:
22     Q. I'm showing you what's been marked as

Case 1:03-cv-12382-MLW   Document 142-33   Filed 08/22/2008   Page 15 of 15
Case 1:03-cv-11699-PBS   Document 289-3   Filed 04/21/2008   Page 14 of 44

Nibali, Kenneth D.                                   March 5, 2008

21 (Pages 78 to 81)

**Page 78**

1  medical examinations or consultative examinations in
2  evaluating disability claims more than other states
3  did?
4      MR. RENNERT: Objection. Vague as to
5  time.
6      THE WITNESS: The Social Security
7  Administration tracks the usage of consultative
8  exams. That's what I believe your question is about.
9  And those rates can vary within states over time and
10 they can vary between states. Yes.
11     BY MR. PORADA:
12     Q. And would a variance in the rate of using
13 consultative examinations, could that have an impact
14 on the approval rate or the variance in approval
15 rates for SSDI claims from one state to another?
16     A. I do not -- I don't know definitely about
17 that. I'm trying to think if that was ever looked at
18 or studied. One of the biggest reasons for
19 differences in consultative examination rates are --
20 have a lot to do with whether the medical evidence of
21 record is gathered in cases in the first place.
22     The more -- you know, if a person comes in

**Page 79**

1  and says, I've seen these five doctors and clinics,
2  and if that medical evidence of record is available,
3  that greatly reduces the need for consultative exams.
4  In other states, there may not be -- and parts of
5  states, there may not be as many hospitals available
6  or clinics available. And therefore, the DDS needs
7  to rely more on a consultative exam to get the
8  information that they need. But I would not
9  characterize in any way that the CE rate is related
10 to the allowance rate. I do not recall that ever
11 being done.
12     Q. I'm sorry. I just want to make sure I
13 understood your answer. Are you saying that you do
14 not believe it is, or you're not aware of any studies
15 that determined whether it was related?
16     A. My first answer is I'm not aware of any
17 information that even looked at that issue. And my
18 second answer would be, based on my experience, I
19 don't particularly think that that's a relationship,
20 no.
21     Q. And why do you think it wouldn't have any
22 impact on approval rates?

**Page 80**

1      A. CE rates?
2      Q. Why do you think that the rate or number
3  of CEs that are done would not have any impact on the
4  overall approval rate for SSDI claims on initial
5  applications?
6      MR. RENNERT: Objection. Vague. Do you
7  mean as to cases in which CEs are not done? Is that
8  what you're asking him to compare, or do you mean the
9  total?
10     BY MR. PORADA:
11     Q. What I'm asking him is, as I understand
12 it, he said that he doesn't believe that whether a CE
13 is done or not has any impact on the approval rates
14 within a state?
15     A. No, that's not -- what I said was, I do
16 not believe states with high CE rates or low CE rates
17 has a relationship to their allowance rate. There
18 can be the reasons that I explained in my prior
19 answer as to why those can vary.
20     You know, whether a case is denied or
21 allowed depends on whether the medical evidence
22 supports that someone, in fact, has impairments that

**Page 81**

1  cause them to be unable to engage in substantial gain
2  or activity. And if the medical evidence of record
3  is there, to make a quality decision on that, that's
4  fine. If consultative exams are needed to do that,
5  then those are gotten, and they would lead to the
6  same quality decision. But I do not -- I don't, I
7  just -- I don't see any basis for relating in any way
8  consultative exam rates to high or low allowance
9  rates in the state.
10     Q. Now, based on your experience at SSA and
11 your awareness of the differences in initial approval
12 rates from one state DDS to another, is it possible
13 in your opinion that the same SSDI claim by the same
14 person could have a different result depending on
15 whether it's filed in one state or another?
16     MR. RENNERT: Objection. Calls for
17 speculation. You can answer.
18     THE WITNESS: Yes. It would -- it would
19 be wrong to say that you could not get a variation on
20 the, in some cases, on the same subfacts.
21     BY MR. PORADA:
22     Q. So the same claim filed in one state might