# EXHIBIT R

# (2 OF 3)

Case 1:03-cv-12382-MLW   Document 142-34   Filed 08/22/2008   Page 2 of 15
Case 1:03-cv-11693-PBS   Document 289-3   Filed 04/21/2008   Page 15 of 44

Nibali, Kenneth D.                                    March 5, 2008

22 (Pages 82 to 85)

**82**

1  be approved and denied in another state. That's
2  possible? Is that correct?
3      MR. RENNERT: Objection. Vague. As to
4  what claim you're referring to. You can answer.
5      THE WITNESS: Based on all of my
6  experience, the quality assurance that we run on
7  cases on a national perspective all across the
8  country, I believe any variance in allowing or
9  denying an exactly similar case, and that in and of
10 itself is a difficult thing to even come up with, to
11 be able to say that one case is exactly the same as
12 another, that that would be a very minor number of
13 cases, where something like that might occur.
14     But that's the nature of the way the
15 program is set up by Congress. The decision was made
16 that states would in fact make the decisions, the
17 initial decisions following our guidelines, but they
18 are still state employees paid by us 100 percent,
19 follow our guidelines, but there are employees in
20 different states around the country, and it's
21 possible that some variation occurs.
22     BY MR. PORADA:

**83**

1      Q. Now, I take it, is there an appeals
2  process for someone who is denied initially for SSDI?
3      A. Yes. There is.
4      Q. Okay. And would the first step of that be
5  to request reconsideration of the denial?
6      A. Yes. It would be.
7      Q. And is that determination of
8  reconsideration also made by the state DDS,
9  typically, versus by the Social Security
10 Administration itself?
11     A. The second determination of disability?
12     Q. The reconsideration?
13     A. Under the reconsideration.
14     Q. The reconsideration of determination?
15     A. Of disability -- yes, is made by the DDS
16 but it's made by a different examiner and different
17 medical doctor.
18     Q. And is it correct that if someone is
19 unsatisfied with their reconsideration decision, they
20 can appeal that and seek a hearing before an SSA
21 Administrative Law Judge?
22     A. Yes. They can as long as they meet the

**84**

1  time requirements.
2      Q. Now, in your experience at the SSA, did
3  you gain any knowledge or understanding of whether --
4  or a percentage of claims that are appealed to an ALJ
5  that get awarded benefits that were initially denied
6  benefits?
7      MR. RENNERT: I'm sorry. Could I have
8  that question back? I'm sorry.
9      THE REPORTER: "Question: Now, in your
10 experience at the SSA, did you gain any knowledge or
11 understanding of whether -- or a percentage of claims
12 that appeal to an ALJ that get awarded benefits that
13 were initially denied benefits?"
14     MR. RENNERT: Objection. Vague. You can
15 answer.
16     BY MR. PORADA:
17     Q. My question was, if you didn't understand
18 it, was, were you aware in your years at SSA of any
19 statistics or data that discussed percentages of
20 claims appealed to ALJs that were awarded benefits
21 that had initially been denied benefits?
22     A. Yes, I am.

**85**

1      Q. Okay. And what is your recollection of
2  those statistics or data?
3      A. Again, during the times that I was there,
4  for cases that had not been allowed, at either
5  initial or recon step, the cases appealed on to OHA
6  level generally had an allowance rate which would
7  vary other time, but in the 60 to 70 percent range.
8      Q. So does that data mean that in the claims
9  that were initially denied, denied on reconsideration
10 and then appealed to the ALJ level, 60 to 70 percent
11 of those claims were awarded benefits by the ALJ?
12     MR. RENNERT: Objection. Vague. You mean
13 if they were appealed to the hearing officer. Is
14 that what you're saying?
15     BY MR. PORADA:
16     Q. I believe that's what I said, yes.
17     A. And I believe that's exactly what I just
18 answered.
19     Q. I just want to make sure I'm understanding
20 the data that you're reporting?
21     A. Yeah, other people who appealed on after a
22 reconsideration denial to the OHA level, during my

**Page 86**

1  years, somewhere in the range of 60 to 70 percent
2  were allowed at the ALJ level.
3      Q.  And when you say at the OHA level, is that
4  the office of hearings and appeals?
5      A.  That's what it was called when I was
6  there. It's called something else now.
7      Q.  Is that the office or division of the SSA
8  that houses the ALJs?
9      A.  Yes, it is.
10     Q.  Now, do you know from your years at SSA
11 whether you ever saw any data that tracked whether
12 allowance rates at the ALJ level varied from state to
13 state?
14     A.  Yes.
15     Q.  And what do you remember about that data
16 or those studies that you saw?
17         MR. RENNERT: Objection. Vague. Go ahead
18 and answer.
19         THE WITNESS: Again, there would be
20 variations.
21         BY MR. PORADA:
22     Q.  From one state to the next?

**Page 87**

1      A.  Yes.
2      Q.  Do you recall the range or scope of those
3  variations, during the years that you worked at SSA?
4      A.  Actually, I don't. I did not deal with
5  those numbers all that much.
6      Q.  Now, does it mean that if the 60 to 70
7  percent of the claims that are appealed to the ALJ
8  level and are awarded benefits to the ALJ level, is
9  it your understanding that that means in those 60 to
10 70 percent of cases, the initial denial decision was
11 incorrect?
12         MR. RENNERT: Objection. Calls for
13 speculation.
14         THE WITNESS: I'd like to answer it.
15         MR. RENNERT: You can answer it. Answer
16 it if you can.
17         THE WITNESS: I would say absolutely not,
18 does not in any way shape or form mean that the
19 initial decision was wrong.
20         BY MR. PORADA:
21     Q.  Okay. And why is that?
22     A.  Because an amount of time passes in

**Page 88**

1  between when an individual has filed for initial
2  decision and receives that decision. Then goes on to
3  the reconsideration step, another period of time
4  passes. And then clearly an even longer period of
5  time passes before once they filed with an ALJ and
6  before they get that decision.
7         That passage of time can mean a number of
8  things. It can mean worsening of condition that did
9  not exist at those initial decision levels. It can
10 mean more medical information that clarifies whether
11 the situation is changed or whether it be -- just
12 better clarifies in the first place. So it can be a
13 very different case by the time it gets to the ALJ
14 from what was initially out there.
15     Q.  And is that because in some claims, a
16 person -- person's condition can worsen over time?
17        MR. RENNERT: Objection. Asked and
18 answered.
19        THE WITNESS: I think I answered that.
20        BY MR. PORADA:
21     Q.  Is that correct?
22     A.  Yes. It's correct.

**Page 89**

1      Q.  And I take it, then, that when a claim
2  gets to the ALJ level, at that point in the process,
3  the Social Security Administration considers the
4  totality of medical evidence from the onset of the
5  claim up until that point in evaluating the claim, is
6  that right?
7         MR. RENNERT: Objection. Calls for a
8  legal conclusion. Calls for speculation.
9         THE WITNESS: ALJ decision is a de novo
10 decision by law. They will take whatever information
11 they can get from prior folders, et cetera, but they
12 are to make an entirely new decision.
13        BY MR. PORADA:
14     Q.  And that decision isn't limited to the
15 evidence that was available at the onset of the
16 claim, is that correct?
17     A.  No. Evidence can be supplied, in my days,
18 up to the time of the decision, new evidence.
19     Q.  And in your opinion, based on your
20 experience of SSA, do you have any opinion or
21 knowledge about whether the change in medical records
22 over time or the change in individual's condition

Case 1:03-cv-12382-MLW   Document 142-34   Filed 08/22/2008   Page 4 of 15
Case 1:03-cv-11693-PBS   Document 289-3   Filed 04/21/2008   Page 97 of 445

Nibali, Kenneth D.                                    March 5, 2008

25 (Pages 94 to 97)

**94**

1  THE WITNESS: My answer before was, those
2  kind of things were generally outside the purview of
3  my responsibilities, since they didn't involve
4  disability issues themselves. And I'm just not aware
5  of what referrals might have been made on the issue
6  of substantial gainful activity.
7  BY MR. PORADA:
8  Q.  So is it correct, then, that in your role
9  as Associate Commissioner overseeing the disability
10 program, it was not part of your responsibility or
11 duty to have any involvement in deciding which types
12 of claims should be referred to OIG and which ones
13 should not?
14 MR. RENNERT: Objection. Mischaracterizes
15 his prior testimony.
16 THE WITNESS: Yeah, that's not what I
17 said. There -- I was involved in a number of issues
18 that had to do with the substantive disability
19 determination, and that included some of the kinds of
20 things I've already referenced.
21 And I'm going on memory here, but as I was
22 -- the last few years I was with Social Security, we

**95**

1  actually started a joint effort with the Office of
2  Inspector General, the DDSs and the field offices.
3  We started a joint effort and set up units that could
4  be out in the field and specifically able to move in
5  very quickly and take up issues of fraud in the
6  disability program.
7  I do not recall what the units were
8  involved in, but I use this just to respond to your
9  question that myself and my office and staff were
10 very involved in efforts to handle fraud as involves
11 the substantive disability issues.
12 BY MR. PORADA:
13 Q.  All right. But can you me whether these
14 units that were formed in the field to quickly move
15 in on instances of suspected fraud, whether those
16 focused on anything other than the third party fraud
17 situation or the false medical record information
18 situations that you described earlier? Were there
19 other types of fraud situations?
20 A.  I simply don't remember. I believe that
21 they were able to handle any fraud situation that
22 came up, but I don't remember the details at this

**96**

1  point in time.
2  Q.  Now, is it fair to say that your
3  understanding at least was that all claim that were
4  denied SSDI because the SSA concluded somebody was
5  able to work, there was no rule stating that all such
6  claims should be referred to the OIG for fraud
7  investigation, is that correct?
8  MR. RENNERT: Objection. Vague. Calls
9  for speculation. You can answer.
10 THE WITNESS: Are you asking that anyone
11 who was denied their disability application could be
12 subject to referral to the fraud for that reason
13 alone?
14 BY MR. PORADA:
15 Q.  Yes. I'm asking whether there are any
16 such rules that allow that or call for that
17 procedure?
18 A.  Not at all. No.
19 Q.  Were there any rules or procedures that
20 you are aware of that suggested a claim should be
21 referred to OIG because someone reported they were
22 unable to work, but the agency found they could work?

**97**

1  A.  I believe I've answered that, but -- and
2  my answer is still the same that that channel of any
3  referrals was probably outside of my purview.
4  Q.  So the answer is you're not aware of any
5  rules that called for such referrals in those
6  situations?
7  MR. RENNERT: Objection. Mischaracterizes
8  the prior testimony. Asked and answered.
9  THE WITNESS: I was answering whether I
10 was aware of any referrals. And I'm not -- I'm also
11 not clear on what the POMS might -- might talk about
12 on this.
13 BY MR. PORADA:
14 Q.  So the answer is you're not aware of any
15 such rules and procedures that call for referrals in
16 that situation, is that right?
17 MR. RENNERT: Objection. Same objections.
18 THE WITNESS: By my not being aware does
19 not mean that they may not exist.
20 BY MR. PORADA:
21 Q.  Right. But you're not aware of them. If
22 they do exist, you don't know of any such rules?

Case 1:03-cv-12382-MLW    Document 142-34    Filed 08/22/2008    Page 5 of 15
Case 1:03-cv-11699-PBS    Document 289-3    Filed 04/21/2008    Page 18 of 44

Nibali, Kenneth D.                                           March 5, 2008

26 (Pages 98 to 101)

**Page 98**

1    MR. RENNERT: You mean as he sits here
2    today?
3        BY MR. PORADA:
4    Q. As you sit here today, based on all your
5    years working for the SSA?
6    A. I don't recall dealing with any rules like
7    that. No.
8    Q. Are you aware, as you sit here today,
9    based on your years at SSA, of any rules or
10   procedures that suggested that SSDI claims that were
11   filed in which the claims representatives thought the
12   claim was weak at the outset should be referred to
13   OIG for investigations?
14       MR. RENNERT: Objection. Vague as to what
15   --
16       THE WITNESS: What does weak mean?
17       BY MR. PORADA:
18   Q. What do you think weak means? How would
19   you define weak?
20   A. You asked the question. You have to tell
21   me what weak means.
22   Q. Let's define weak as a claim when the

**Page 99**

1    claims representative, when it comes in, looks at the
2    claim, looks at the information that's provided and
3    thinks to himself or herself, I don't think this
4    claim is probably going to be awarded disability
5    benefits?
6        MR. RENNERT: Objection. Calls for
7    speculation. You can answer.
8        BY MR. PORADA:
9    Q. The question was whether you're aware of
10   any rules or procedures that call for the referral of
11   that type of claim to OIG for fraud investigations?
12   A. If it involved issues of work, if it
13   possibly involved issues of apparent fraud in
14   whatever they were seeing in the claim, I believe
15   there are rules that call for referral, whether it is
16   OIG or some administrative process to take a look at
17   those, and I think I've answered that.
18   Q. I just want to make sure I understand what
19   you mean when you say where it appeared that they
20   were instances of fraud involved, the fraud you're
21   talking about, you're still talking about the third
22   party fraud type claims or fabricating medical

**Page 100**

1    evidence type claims?
2        MR. RENNERT: Objection. Vague question.
3        THE WITNESS: Well, I'm at least referring
4    to those, those things, yes. There may be other
5    examples, but those are ones you've already asked me
6    about.
7        BY MR. PORADA:
8    Q. And can you think of any other examples?
9    A. No. Generally not, because again the same
10   answer -- it is not an area that I dealt with
11   routinely.
12       MR. RENNERT: Mark, we are kind of getting
13   toward the lunch break, do you want to go a few more
14   minutes?
15       MR. PORADA: We can take a break now.
16       MR. RENNERT: Lunch break?
17       THE VIDEOGRAPHER: This concludes tape two
18   in the deposition of Kenneth Nibali. Off the record
19   at 11:59.
20       (Whereupon, at 11:59 a.m., the deposition
21   in the above-entitled matter was recessed, to
22   reconvene at 1:00 p.m., this same day.)

**Page 101**

1            AFTERNOON SESSION
2               (1:05 p.m.)
3    Whereupon,
4          KENNETH B. NIBALI,
5    the witness on the stand at the time of recess,
6    having been previously duly sworn, was further
7    examined and testified as follows:
8    EXAMINATION BY COUNSEL FOR DEFENDANTS (RESUMED)
9        THE VIDEOGRAPHER: Here begins tape three
10   in the deposition of Kenneth Nibali. On the record
11   at 1:05.
12       BY MR. PORADA:
13   Q. Welcome back. I've placed in front of you
14   what was already marked as Exhibit 1, in particular,
15   your declaration that's attached to that exhibit.
16   Could you just look at the -- what's marked as page 7
17   of that -- excuse me, that declaration, and just
18   confirm that that's your signature for me?
19   A. That is it.
20   Q. Okay. And this was dated May 31st, 2007,
21   the declaration?
22   A. Okay.

Case 1:03-cv-12382-MLW    Document 142-34    Filed 08/22/2008    Page 6 of 15
Case 1:03-cv-11699-PBS    Document 289-3    Filed 04/21/2008    Page 19 of 44

Nibali, Kenneth D.                                    March 5, 2008

27 (Pages 102 to 105)

102

1  Q. Was it?
2  A. Yes, it is.
3  Q. Okay.
4  A. Yes, it is.
5  Q. If you could turn to paragraph 27 of that
6  declaration, please, I'd like to read the first
7  sentence of that paragraph. It says, "one example of
8  unnecessary claims could be a disability insurance
9  company forcing or coercing applicants to apply for
10 SSDI benefits when a disability insurance company
11 does so without consideration of whether there is a
12 reasonable possibility the applicant may be eligible
13 under the statute for such benefits, or where their
14 own information suggests that there is no reasonable
15 basis to expect the claimant might be eligible under
16 the statute." Did I read it correctly?
17 A. I believe you did. Yes.
18 Q. Now, are you aware of any SSA rules that
19 address whether an insurance company is required to
20 determine whether there is a reasonable possibility
21 the applicant may be eligible under the statute for
22 such benefits before asking someone to apply for

103

1  SSDI?
2  A. I'm not aware that there is any specific
3  rule as you just stated. No.
4  Q. Are you aware more generally of any rule
5  that would require the insurance company to determine
6  whether there is a reasonable possibility that the
7  applicant may be eligible under the statute for such
8  benefits before asking someone to apply?
9     MR. RENNERT: Objection. Calls for a
10 legal conclusion. You can answer.
11    THE WITNESS: You asked if there is any
12 general requirements?
13    BY MR. PORADA:
14 Q. Well, you said specifically you don't
15 recall one, but I just wanted to confirm. More
16 generally, are you aware of any rule that would apply
17 to any such a situation?
18    MR. RENNERT: Objection. Vague. Do you
19 mean SSA rule?
20    BY MR. PORADA:
21 Q. Any rule that would govern SSA's
22 procedures for SSDI claims?

104

1     MR. RENNERT: Objection. Same objection.
2  Calls for a legal conclusion. Vague.
3     THE WITNESS: I'm not aware of any rule
4  that would require -- that would require a disability
5  insurance company to do that.
6     BY MR. PORADA:
7  Q. Are you aware of any SSA rules that
8  address whether an insurance company is allowed to
9  ask someone to apply for SSDI if the information in
10 the insurance company's files suggests that there is
11 no reasonable basis to expect a claim that may be
12 eligible under the statute?
13    MR. RENNERT: Objection. Vague. Calls
14 for a legal conclusion. You may answer.
15    THE WITNESS: The question was, am I aware
16 of any rule that would require --
17    MR. RENNERT: Do you want the question
18 read back, please?
19    THE WITNESS: Yes, please.
20    MR. RENNERT: Could you please read the
21 question back?
22    THE REPORTER: "Question: Are you aware

105

1  of any SSA rules that address whether an insurance
2  company is allowed to ask someone to apply for SSDI
3  if the information in the insurance company's files
4  suggests that there is no reasonable basis to expect
5  a claim that may be eligible under the statute?"
6     THE WITNESS: No. I'm not aware of a rule
7  that specifically requires that.
8     BY MR. PORADA:
9  Q. Are you aware of any SSA rules or
10 guidelines that would explain how to determine
11 whether someone has a reasonable possibility of being
12 found eligible under the statute for benefits?
13    MR. RENNERT: Objection. Vague. Calls
14 for a legal conclusion. You can answer.
15    THE WITNESS: I'm aware of data that are
16 produced and published by the agency that could form
17 a basis for drawing such a reasonable conclusion that
18 someone would not have a basis for being allowed
19 under the program.
20    BY MR. PORADA:
21 Q. And what data are you referring to?
22 A. The SSA is able to produce lots of data

### 106

and does so on a fairly routine basis, particularly through what at least used to be called the office of research evaluation and statistics. In fact, one of their documents is in the background material that you provided. And it is an example of the kind of thing where the agency can show by different impairment codes different impairments and different age categories. In particular, what the allowance rate were in fact for those groups of individuals as they went through the disability claims process.

So, and the fact is that those reports show that even for age groups that are not particularly low, that for certain impairments, the allowance rates are very low, in the 2, 3 percent range. And if in fact the agency so chose to do so, to run data at rates for individuals that in our disability process system would fall under categories of lower age ranges, it could produce data that would be even more specific to the types of impairments that would have -- that would show very low allowance rates for those particular individuals.

Q. Other than the data that you've just

### 107

referred to, are you aware of any rules or regulations that the Social Security Administration has adopted that define what a reasonable possibility is for success of an SSDI claim?

MR. RENNERT: Objection. Calls for a legal conclusion. Vague. You can answer.

THE WITNESS: What I reference is a -- I'll call it, for lack of a better word, a parallel kind of process where the Social Security Administration is required to review individuals on a periodic basis. It's called continuing disability reviews, and those have to be done every certain number of years to help ascertain whether people continue to be disabled.

The agency as a reflection of part of the resource constraint that it's pretty much constantly under, developed procedures during the time I was there to use data, the type of which I was just referring to, to in fact do a screening of individuals that were coming due for continuing disability reviews.

And based on the screening of those data,

### 108

saying that there was very, very low likelihood that these individuals would have recovered based on the data that we're able to run, those people were in fact subject to a different kind of continuing disability review instead of being expected to come in and have the complete medical go around again. So I use that as an example where the agency in fact has used data that helps establish by impairment groups, age, length of time on the rolls and other factors that were built into that, that they drew some conclusions that, by my way of thinking, would put it directly to disability determinations.

BY MR. PORADA:

Q. Other than that internal data that you've just referenced, are you aware of any rules that are binding on outside parties other than internal guidance at the SSA that require someone who is applying for SSDI to show in advance that they have a reasonable possibility of getting SSDI?

MR. RENNERT: Objection. Vague. Calls for a legal conclusion. You can answer.

THE WITNESS: I thought I answered that

### 109

question already. Did I not?

BY MR. PORADA:

Q. Could you answer it again, please, then?

MR. RENNERT: Well, do you have anything to add to your answer, Ken.

THE WITNESS: I do not.

MR. RENNERT: The witness has asked --

MR. PORADA: That was actually a different question.

MR. RENNERT: Okay. Let's have the question again.

THE WITNESS: Yes.

BY MR. PORADA:

Q. The question was other than the internal data that you've just referenced, are you aware of any rules the SSA has promulgated that say before someone can apply for SSDI they have to show that they have a reasonable possibility of success on their claim?

MR. RENNERT: Objection. Vague. Calls for a legal conclusion.

BY MR. PORADA:

Case 1:03-cv-12382-MLW    Document 142-34    Filed 08/22/2008    Page 8 of 15
Case 1:03-cv-11699-PBS    Document 289-3    Filed 04/21/2008    Page 21 of 44

Nibali, Kenneth D.                                    March 5, 2008

29 (Pages 110 to 113)

**Page 110**

1  Q.  I'm asking for his understanding if he is
2  aware of any such rules?
3      MR. RENNERT: I understand. Same
4  objections. You can answer.
5      THE WITNESS: Yes. I'm not aware of any
6  such rule.
7      BY MR. PORADA:
8  Q.  Now, you've referenced data that you've
9  seen that shows by age groups and certain impairment
10 codes that certain types of people have low -- low
11 approval rates, is that correct?
12 A.  That's correct.
13 Q.  Has the SSA ever adopted any rules
14 requiring that for someone to apply for SSDI they
15 have to show that they have an impairment or that
16 they are within an age group that has a certain level
17 or percentage chance of success before they applied?
18     MR. RENNERT: Objection. Vague as to time
19 frame. Vague as to -- ambiguous as to the question.
20 Go ahead.
21     THE WITNESS: During my time, no, I'm not
22 aware of any requirement for individuals to have to

**Page 111**

1  show anything like that.
2      BY MR. PORADA:
3  Q.  So if an individual come to the SSA field
4  office and based on their age and their impairment
5  code, let's assume that the SSA's data shows that
6  they have a 10 percent chance of getting SSDI, do you
7  follow that so far?
8  A.  I follow your question. Yes.
9  Q.  Okay.
10 A.  Or statement so far anyway.
11 Q.  All right. Does the SSA have any
12 procedures or practices for screening those claims
13 out or telling those claimants that they should not
14 apply for SSDI?
15     MR. RENNERT: Objection. Vague. Calls
16 for speculation. You can answer.
17     THE WITNESS: In my experience, no.
18     BY MR. PORADA:
19 Q.  If that person in that same scenario comes
20 to SSA and wants to file a claim, will the SSA still
21 accept a claim?
22     MR. RENNERT: Objection. Vague and

**Page 112**

1  ambiguous. You can answer.
2      THE WITNESS: Absent any of the reasons I
3  spoke about earlier that we might not adjudicate the
4  claim, we would accept the claim, yes.
5      BY MR. PORADA:
6  Q.  Are you aware of the SSA ever establishing
7  any procedures or standards that would define a claim
8  as a fraudulent claim based on the percentage chance
9  of success that the claim has based on the person's
10 age or impairment code?
11     MR. RENNERT: Objection. Vague. Calls
12 for a legal conclusion. You can answer.
13     THE WITNESS: In my experience, no.
14     BY MR. PORADA:
15 Q.  Can you turn, please, to page 3 of your
16 report, Exhibit 1.
17 A.  All right.
18 Q.  In the first main paragraph on that page,
19 you say that "SSA must determine whether to allow an
20 application for SSDI based on a more extensive
21 evaluation of whether the person meets the statutory
22 definition of disability that makes them eligible to

**Page 113**

1  receive benefits under the SSDI program." Do you see
2  that, that phrase?
3  A.  Yes, I do.
4  Q.  What is the extensive evaluation that you
5  are referring to there?
6  A.  That part of the sentence is referencing
7  back to the beginning part of the sentence where I
8  was making the point that unlike -- I'll just read it
9  -- unlike some other benefit programs, for example,
10 Social Security retirement system in which age and
11 work history are the prime determining factors, and
12 then continue on with what you read, SSA must
13 determine whether to allow an application for SSDI
14 based on more extensive evaluation of -- and then I
15 list some things that go beyond that.
16 Q.  All right. So I think my question was,
17 what is the extensive evaluation? What's involved in
18 the extensive evaluation that you're referencing
19 there?
20     MR. RENNERT: Objection. Vague. You can
21 answer. Asked and answered. Go ahead.
22     THE WITNESS: Okay. Are you asking me

Case 1:03-cv-12882-MLW Document 142-34 Filed 08/22/2008 Page 9 of 15
Case 1:03-cv-12888-PBS Document 289-3 Filed 04/21/2008 Page 22 of 44

Nibali, Kenneth D.                                           March 5, 2008

30 (Pages 114 to 117)

**114**

1  what's involved in basically doing a disability
2  evaluation?
3       BY MR. PORADA:
4       Q. Yes. What is involved in the extensive
5  evaluation that you've referenced in that sentence?
6       A. What's involved is obviously initially the
7  intake of the claim and the work in the field office
8  that goes along with that. Then the referral over to
9  the DDS, and there you have the process by which the
10 DDS has to establish the folder, collect the medical
11 information, probably follow up with the claimant in
12 a number of cases to get any additional information
13 that's needed, make sure all the forms are complete,
14 follow up with those.
15      And then start the disability
16 determination process. And as can often happen,
17 additional information is needed and so there may be
18 follow up with the person, the treating source, the
19 physician, or if it's not able to get from that
20 source, then they have to set up a consultative
21 examination.
22      And there is often work involved in

**115**

1  following up to make sure that is done and that the
2  correct report is gotten. Then once that information
3  is received, the totality of the -- it involves a
4  fair amount of, obviously, labor, time and contact
5  with both the claimant and outside sources.
6       And I will stop there, but there are also
7  obviously -- if the evaluation gets to what's called
8  steps 4 and 5 of the process, and just to reiterate,
9  step 1 is, are you engaging in substantial gainful
10 activity, step 2 is do you have a severe impairment,
11 which is basically a threshold issue, step 3 is do
12 you meet or equal a medical listing, of a peer that
13 you've already spoken on beyond that.
14      BY MR. PORADA:
15      Q. Does a typical disability particularly
16 involve assessment of the claimant's vocational
17 skills or background?
18      A. If the evaluation gets to what's called
19 steps four and five of the process, just to reiterate
20 step one is, are you engaging in substantial gainful
21 activity. Step two is, do you have a severe
22 impairment which is basically a threshold issue.

**116**

1  Step three is, do you meet equal a medical listing
2  and that is a, that's the stage of the process where
3  a number of allowances occur and that's an end part
4  of the process, if you will. If you are found to
5  meet or equal medical listing, you are disabled. But
6  if you are not, it's not an out stage because then
7  you go on to step four and five, which before you get
8  to that step you do what is called a residual
9  functional capacity test, and you have to get
10 information about -- from the person's physician and
11 all the other information in the file as to what that
12 individual is capable of doing, despite their
13 impairment.
14      And then that, what's called residual
15 functional capacity statement is used in steps four
16 and five which is given that residual functional
17 capacity, can the person do his past relevant work.
18 And if he can't do that, can he do other work that's
19 found in the national economy.
20      Q. Based on your experience at SSA during
21 your years there, do you have any understanding or
22 sense of how long it takes to perform the initial

**117**

1  disability analysis by a DDS?
2       A. Yes, I do on average, yes.
3       Q. And what is your understanding of that
4  average?
5       A. At the time I was there, it was running
6  roughly 90 days, and data I've looked at recently
7  it's still roughly in that time frame.
8       Q. And just so I understand that average of
9  .90 days, does that include all claims, as an average
10 for all claims whether they get through all five
11 steps of that sequential process you described or
12 fall out somewhere.
13      A. That's the correct, that is correct, yes.
14      Q. In your experience at the SSA, do you know
15 whether the agency automatically awards SSDI benefits
16 in every claim where someone reports that they are
17 unable to work as of a certain date?
18      A. Does SSA automatically award benefits
19 based on someone saying they are no longer able to
20 work?
21      Q. Correct.
22      A. No. They do not.

Case 1:03-cv-12382-MLW   Document 142-34   Filed 08/22/2008   Page 10 of 15
Case 1:03-cv-11699-PBS   Document 289-3   Filed 04/21/2008   Page 23 of 44

Nibali, Kenneth D.                                          March 5, 2008

31 (Pages 118 to 121)

118

1  Q. And why is that?
2  A. It's certainly one factor in making a
3  decision of disability.
4  Q. The other factors would include the --
5  A. I want to go back and make sure --
6  Q. Process you just described?
7  A. Make sure I heard that question correctly.
8  You said they were unable to work.
9  Q. That's correct.
10 A. Okay.
11 Q. And your answer, just so I understand, was
12 that the SSA does not automatically award SSDI
13 whenever someone says they are unable to work?
14 A. That's correct. They do not.
15 Q. You were talking a moment ago about the
16 five step sequential process for SSDI and you
17 described step one that you said focuses on whether
18 someone is engaged in substantial gainful activity.
19 Could you just tell me what SGA is, your
20 understanding of how that's defined?
21 A. It's actually defined in the statute and
22 is updated in our regulations. And it's -- it's a

119

1  level of income per quarter, I believe, that either
2  month or quarter, I forget now, that if an individual
3  is earning at least that much, then they are
4  considered to be engaging in substantial gainful
5  activity.
6  Q. So is it correct, then, that the fact that
7  someone is working by itself doesn't preclude them
8  from getting SSDI, is that correct?
9  A. Yes. It's possible to work at a minimal
10 level and still receive a disability benefit.
11 Q. When you say a minimal level, is that
12 determined by the amount of money that's earned or by
13 the amount of hours that are worked or how is that
14 determined?
15     MR. RENNERT: Sorry. Objection.
16 Compound. You can answer.
17     THE WITNESS: It's determined by SGA,
18 first and foremost, but there are a number of caveats
19 to that, depending upon the situations of individuals
20 if they earn certain amount of money over that, but
21 that goes to enabling them to earn the money in the
22 first place, such as, you know, wheelchairs or

120

1  assistive devices of some sort, there are
2  modifications taken into account for that.
3      BY MR. PORADA:
4  Q. So if a person is working at a level below
5  the SGA level, they could still be eligible for SSDI,
6  is that right?
7  A. That's correct.
8  Q. Is it also possible that someone could be
9  working when they file for SSDI, but they might be
10 eligible for prior closed period of disability
11 benefits?
12 A. That is correct.
13 Q. Does the SSA also have a trial work
14 program that allows someone to attempt to work and in
15 some cases still be eligible for SSDI benefits?
16     MR. RENNERT: Objection. Vague as to
17 time.
18     THE WITNESS: Within my experience, yes.
19     BY MR. PORADA:
20 Q. So under that scenario, someone, under the
21 ticket to work or trial work program, might be
22 eligible to receive SSDI benefits even though they

121

1  are working, is that how that program works?
2  A. This is very much outside my area of
3  expertise. In fact, this part of the program was --
4  used to be under the office that I ran, but was set
5  up as a separate office. So I really have just very
6  general knowledge of it, but certainly my
7  understanding is that's what a trial work period is
8  about.
9  Q. You mentioned step three of the process
10 focuses on whether an individual has a condition that
11 meets one of the listings on the SSA listing of
12 impairments. Is that what step three focuses on?
13 A. I'm sorry. Would you repeat that? I was
14 engaged.
15 Q. Sure. I believe you mentioned earlier
16 that step three of the sequential process focuses on
17 whether the applicant has a condition that is on the
18 SSA's listing of impairments?
19 A. That meets or equals the listing. Yes.
20 Q. Did you say earlier this morning that you
21 were involved in somehow updating the listings or
22 preparing the listing of impairments?

Case 1:03-cv-12382-MLW   Document 142-34   Filed 08/22/2008   Page 11 of 15
Case 1:03-cv-11699-PBS   Document 289-3   Filed 04/21/2008   Page 24 of 44

Nibali, Kenneth D.                                          March 5, 2008

32 (Pages 122 to 125)

**122**

1   A.  Yes. Some of the divisions within my
2   office had the responsibility for updating those
3   listings.
4   Q.  Is it correct that if someone has a
5   condition that -- they have an illness that meets or
6   equals a condition that's on the list of impairments
7   that they are automatically eligible for SSDI?
8       MR. RENNERT: Objection. Calls for a
9   legal conclusion. You can go ahead.
10      THE WITNESS: I'm not sure what you mean
11  by the word automatically, but step three of the
12  process if you are found to, by your medical
13  conclusions, to meet or equal that listing if you
14  have those particular signs and symptoms and lab
15  findings and everything that's involved, you would be
16  found disabled, yes.
17      BY MR. PORADA:
18  Q.  So is it correct, then, that if someone
19  has a condition or meets a listing of step three that
20  the SSA never gets to step four, where it determines
21  whether someone, the person is able to keep doing
22  their past work?

**123**

1   A.  That's true, basically. Yes.
2   Q.  And is it also true that if someone has a
3   condition that meet or equals a listing of step
4   three, the SSA will never get to step five where it
5   will determine whether the person is able to do some
6   other type of work?
7   A.  Yes. That's true also.
8   Q.  So is it possible, then, that a person who
9   has a condition that meets or equals a listing of
10  step three might still be able to do either his own
11  work or some other work?
12      MR. RENNERT: Objection. Calls for
13  speculation.
14      THE WITNESS: That could be true.
15      BY MR. PORADA:
16  Q.  Now, with step five of the process that
17  focuses on the applicant's ability to perform other
18  work, do you have any understanding of whether -- who
19  has the burden of establishing whether the applicant
20  can do some other type of work?
21  A.  It's been established in law that the
22  burden of proof shifts to the Social Security

**124**

1   Administration in step five.
2   Q.  So do you understand that to mean that
3   it's up to the SSA to establish in step five that the
4   person can do some other type of work?
5       MR. RENNERT: Objection. Asked and
6   answered. Go ahead.
7       THE WITNESS: Actually, I'd say no.
8   That's not what I'm saying. The fact is that any
9   claimant who comes in is responsible for putting the
10  information in front of us as to their impairments,
11  the limitations of those impairments on their ability
12  to function, their work history, all the other things
13  that we've talked about.
14      That information provided and was also
15  obviously SSA helps gather that information, helps
16  get additional information, if it's called for in the
17  evaluation by -- through consultative examinations.
18  So in fact, the agency is carrying not what I call a
19  legal burden, but they are carrying the burden of
20  developing that case along with the claimant to make
21  sure that as much information possible is developed.
22      So in order to -- to show that you can be

**125**

1   allowed under step three, or to show that you could
2   be allowed under step four, the information in front
3   of the agency basically developed through the
4   claimant is what comes to bear on that.
5       Step five is a common sense acknowledgment
6   of the fact that what we are saying now is that given
7   all those things established up to that point, the
8   person's residual functional capacity and all the
9   other information in the file, what step five calls
10  for is are there other jobs in the economy that that
11  individual is capable of performing.
12      And therefore, it's common sense that any
13  individual claimant is not going to come in and know
14  all the jobs in the economy and whether they can
15  perform them or not. And so the agency has developed
16  a series of administrative procedures by which we
17  take administrative notice of the existence of jobs
18  in the economy based on factors that involve the
19  residual functional capacity of a person, their age,
20  their education and their work experience. And
21  through that, what is called grid system, we can
22  reach a conclusion whether, in fact, other jobs exist

Case 1:03-cv-12382-MLW    Document 142-34    Filed 08/22/2008    Page 12 of 15
Case 1:03-cv-11699-PBS    Document 289-3    Filed 04/21/2008    Page 25 of 44

Nibali, Kenneth D.                                              March 5, 2008

33 (Pages 126 to 129)

**126**

1  in the economy.
2       BY MR. PORADA:
3       Q.  Does the SSA sometimes undertake to
4  perform a vocational analysis with a vocational
5  expert at step five to assist in determining what the
6  other jobs are that the applicant might be able to
7  perform?
8       A.  Vocational experts typically come into
9  play where the exactly, fitting our grid as it is
10 called -- is it all right to use that term?  Are you
11 familiar with what I'm meaning when I say grid?
12      Q.  Why don't you just define what you mean by
13 grid?
14      A.  Okay.  It's a subsection of SSA
15 regulations that I think it's part P.  I can get the
16 exact reference if you need it.  But it's a section
17 of the regulations that lays out literally a grid,
18 based on each of the three or four levels of residual
19 functional capacity, meaning you are capable of doing
20 either sedentary, light, medium or heavy work.  And
21 within each other's grids, it runs down different age
22 categories, education, experience levels and says

**127**

1  given meeting those factors, you are either disabled
2  or not disabled.
3       However, vocational experts specifically
4  come into play is where a person's situation does not
5  exactly meet the grid situation.  They might be
6  between sedentary and light work, and therefore a
7  vocational expert would have to talk about how many
8  jobs in between those numbers would, in fact, exist
9  for this individual, and therefore would they meet
10 our standard of being sufficient numbers in the
11 national economy that they are capable of going out
12 and getting those jobs?
13      Q.  And would it be the SSA or the applicant
14 that would undertake to perform that vocational
15 analysis?
16      A.  Vocational what?
17      Q.  The vocational analysis that you
18 described?
19      A.  The vocational analysis would basically be
20 done certainly in the initial steps of the process
21 would be done by SSA.  Oftentimes in the appeals part
22 of the process, people would bring in their own

**128**

1  vocational experts to testify.
2       Q.  In your experience at the SSA, did you
3  gain any understanding of whether it was common for
4  applicants' conditions to change over time?
5            MR. RENNERT:  Objection.  Vague.
6            THE WITNESS:  I can't answer what you mean
7  by common.  Certainly I've already spoken of that
8  people's conditions change over time.
9            BY MR. PORADA:
10      Q.  Some get better?
11      A.  Some get better.  Some get worse.
12      Q.  Now, in your experience --
13      A.  Actually, if I may, what people are we
14 talking about here?  People that are on the rolls
15 that are -- that have already been allowed or people
16 that are in the process?
17      Q.  Well, let's talk about that distinction.
18 Let's focus first on the people who are in the
19 process of applying.  Is it your experience that such
20 people, sometimes their conditions either get better
21 or get worse from the time they applied from let's
22 say the time they get to the ALJ level?

**129**

1       A.  Both can happen.  Obviously, if they are
2  pursuing a disability claim, the majority of time the
3  change will be that they are getting worse, or should
4  be.
5       Q.  So would you agree that it's possible then
6  that for some claimants when they initially file for
7  a disability, their medical records and their
8  condition might not support a finding of disability,
9  but over time as they get to the ALJ level, let's say
10 their condition has changed such that they may be
11 disabled under the SSDI definitions?
12      A.  The answer to that is yes.  The condition
13 can change such that they would be eligible, but I
14 would also point out that what can change is the
15 certainty necessary to say that -- if you recall the
16 definition says that they have to have this
17 medically -- medically determinable physical or
18 mental impairment that's expected to result in death
19 or has lasted or is expected to last at least 12
20 continuous months.  That is what we euphemistically
21 or generally call the duration requirement, 12
22 continuous months.

Case 1:03-cv-12382-MLW   Document 142-34   Filed 08/22/2008   Page 13 of 15
Case 1:05-cv-11695-PBS   Document 289-3   Filed 04/21/2008   Page 26 of 44

Nibali, Kenneth D.                                           March 5, 2008

34 (Pages 130 to 133)

**130**

So one of the issues earlier on in the process can be yes, they have -- they have a condition. It might in other respects meet our definition of disability, but if it looks unlikely that it's going to last for 12 months, then they can be denied at that step. And then obviously, if they appeal, the more time they are in the process, and if the same conditions continue to exist with updated medical information, then you're making a better case that it's going to last at least 12 months. And in fact, by the time you're at the ALJ level, you're pretty damn sure it's lasted 12 months because hardly anybody gets to the ALJ level before that period of time.

BY MR. PORADA:

Q. You focused on the definition of disability and part of that focuses on whether someone has a condition that's expected to last for 12 months. Is it possible for someone to file for SSDI and be approved for SSDI because it's found that they have a condition that's expected to last 12 months, and then as time goes on, in fact, they

**131**

improve and they are no longer disabled say at 11 months. But when they applied it was expected that they would be disabled for at least 12 months?

A. Can that happen?

Q. Can that happen?

A. Yes, it can and it does happen. The requirement is that they tell us if their medical condition improves. That's an absolute requirement. And just as it's a requirement for them to tell us if they go back to work. So if that happens, they are to tell us.

Now, does everybody tell us? No. And that's one of the reasons why we have continuing disability reviews, and probably what would happen in a case like that, those people would be coded in our system as medical improvement likely -- medical improvement, I'm sorry, expected. And that means that they would be followed up generally within about an 18-month period of time, so that if they in fact did not report back to us that they had improved, we would hopefully discover that within a relatively reasonable period of time.

**132**

Q. So is it correct to say, then, that the SSDI definition does not require that someone actually be disabled for 12 months if it is expected that they will be disabled for 12 months?

MR. RENNERT: Objection. Calls for a legal conclusion. You can answer.

THE WITNESS: Yes. The definition of disability requires just what it says, and let me read it to be sure I'm absolutely clear. Which can be expected to result in death or which has lasted or can be expected to last a continuous period of not less than 12 months. So the evaluation is based on we truly expect that it will last at least 12 months. If it in fact does not, we've discussed what happens then.

BY MR. PORADA:

Q. Do you know whether the SSA has any rules that require SSDI applicants to submit objective proof of their disability?

MR. RENNERT: Objection. Vague. Calls for a legal conclusion. You can answer.

THE WITNESS: Do we have any rules that

**133**

require an applicant to provide objective proof of their disability?

BY MR. PORADA:

Q. That's correct.

A. Did I state that correctly?

Q. Yes.

A. Our rules require what I think we've already talked about numerous times here. They are required to fill out an application which has a number of pieces of information on it about what treatments they have had, what jobs they've held, how their physical functioning is limited and they are clearly asked if they have any medical information in their possession that they can supply at the time of the application, they are expected to do that.

If they either don't have it or can't easily get it, then the Social Security Administration, generally through the DDSs, will get that information by going back to those sources and, and paying for them to send us the information.

Q. Do you know whether under the SSA's rules for processing and evaluating SSDI claims, the agency

Case 1:03-cv-12382-MLW   Document 142-34   Filed 08/22/2008   Page 14 of 15
Case 1:03-cv-11699-PBS   Document 289-3   Filed 04/21/2008   Page 27 of 44

Nibali, Kenneth D.                                                March 5, 2008

39 (Pages 150 to 153)

**Page 150**

1  part of the 1990s or the late part?
2      A.  It would have been from the mid to late
3  1990s, I think probably more mid 1990s.
4      Q.  Other than that one occasion in the mid
5  1990s when you may have looked at a Unum claim file,
6  you haven't looked at any other Unum claim files
7  since then, I take it?
8      A.  No. I have not.
9      Q.  Now, you mentioned that visit in the
10 1990s. Was that the only occasion that you had when
11 you were employed at the SSA to -- to interact with
12 private disability insurers whether Unum or some
13 other company?
14     MR. RENNERT: Let me just object, vague as
15 to interact, but go ahead and answer.
16     THE WITNESS: I'm going to say basically
17 yes. It doesn't mean that -- I traveled extensively
18 around the country as part of my job. We were often
19 in cities, sometimes individuals from private
20 insurance companies would be at conferences or
21 whatever. And you know, I could have had
22 conversations or possibly could have stopped in

**Page 151**

1  somewhere, but I think the substantive contact was
2  what I spoke of.
3      BY MR. PORADA:
4      Q.  Were you aware when you were employed at
5  SSA of others at SSA who were engaged in meetings
6  with the private disability insurance industry?
7      A.  Yes.
8      Q.  Were these employees who were above you in
9  the chain of command or below you or some
10 combination?
11     A.  Generally, they were individuals who work
12 closer with Susan Daniels. You know who Susan
13 Daniels is. Susan Daniels' role at SSA was very much
14 directed towards return to work activities. And she
15 is very good at it. And one of the ways she did a
16 lot of information gathering was going all over the
17 country meeting with all kinds of folks, and I'm
18 quite certain that she met a number of times with
19 private insurers, because of some of the tie in
20 between the work they did and the work SSA was trying
21 to do to get people returning to work.
22     Q.  When you were -- when you were working as

**Page 152**

1  Associate Commissioner of the SSA, was the SSA aware
2  that private LTD insurance policies often contained
3  an offset provision for SSDI benefits?
4      A.  Yes. We were aware that there was an
5  offset provision.
6      Q.  And --
7      A.  Could be an offset provision.
8      Q.  And was it your understanding that the way
9  those offset provisions typically worked was that if
10 somebody was getting LTD benefits from the private
11 insurer, and they were also getting SSDI benefits,
12 the SSDI would be deducted from the private LTD
13 benefits?
14     A.  That was my general understanding. Yes.
15     Q.  Did you have any understanding of how
16 common those -- those types of offset provisions were
17 in the private LTD insurance industry?
18     MR. RENNERT: Objection. Vague. You can
19 answer.
20     THE WITNESS: Common by what standard?
21 Between companies? Within a company?
22     BY MR. PORADA:

**Page 153**

1      Q.  Within the whole private insurance
2  industry, how common those provisions were.
3      A.  No. My knowledge was -- and again, I want
4  to make sure you're clear that this was not an area
5  that I dealt with a lot, and in fact, the return to
6  work aspects of disability program, as I stated
7  earlier, were broken off and were actually handled
8  under Susan Daniels under a different department
9  and -- but anecdotally, many times, you know, I would
10 hear from individuals on the front lines, the DDSs,
11 et cetera, about cases coming in from private
12 disability insurance companies where individuals were
13 coming in because they were required by the private
14 insurance company to come in and file a disability
15 claim.
16     Q.  Are you aware of anyone at the SSA ever
17 communicating with the private LTD insurance industry
18 about those practices of asking insureds to come in
19 and apply for SSDI?
20     MR. RENNERT: Objection. Mischaracterizes
21 his prior testimony. You can answer.
22     THE WITNESS: I'm sorry. Could you

Case 1:03-cv-12382-MLW   Document 142-34   Filed 08/22/2008   Page 15 of 15
Case 1:03-cv-11699-PBS   Document 289-3   Filed 04/21/2008   Page 28 of 44

Nibali, Kenneth D.                                    March 5, 2008

41 (Pages 158 to 161)

**158**

1  legislatively and otherwise, that no, that issue to
2  my knowledge was not brought up by anyone.
3      Q.  Is it fair --
4      A.  It doesn't mean it was not. I'm just not
5  aware of it. It could have been brought up at the
6  local level. I don't know.
7      Q.  Is it fair to say that at the time you
8  were employed at SSA, the agency had higher
9  priorities of the type you just described?
10         MR. RENNERT: Objection. Mischaracterizes
11  his prior testimony.
12         THE WITNESS: I don't know that I would
13  call them higher priorities. I'm just saying we were
14  busy with a lot of things and that issue did not come
15  up.
16         MR. PORADA: Why don't we take a break.
17         THE WITNESS: Thank you.
18         THE VIDEOGRAPHER: This concludes tape
19  three in the deposition of Kenneth Nibali. Off the
20  record at 2:10.
21         (Recess.)
22         THE VIDEOGRAPHER: Here begins tape four

**159**

1  in the deposition of Kenneth Nibali. On the record
2  at 2:23.
3         BY MR. PORADA:
4      Q.  Right before the break, I believe you said
5  that you weren't aware of any discussions between the
6  SSA and private insurance industry about the types of
7  claims that were being referred over to SSA for SSDI
8  claims, but that you thought that the SSA would have
9  been interested in knowing whether private insurers
10  were employing any type of screening process, I
11  think. Is that what you said?
12      A.  I also gave the example of Bethlehem Steel
13  just to complete the answer about no discussions with
14  anyone about those practices, but I said in general,
15  yes, there had not been those discussions but, and
16  then I added what you just stated.
17      Q.  And why is it that you feel that the SSA
18  would have been interested in knowing whether there
19  were any types of screening procedures being used by
20  private insurers?
21      A.  Because I personally, and I believe SSA,
22  would be interested in drawing a distinction between

**160**

1  disability claims that are filed with the agency from
2  individuals who as I described before are often
3  through lack of education and poverty and
4  impairments, et cetera, we bend over backwards to
5  assure that they have an open door for filing claims,
6  because they, in many, many cases, have no real
7  background to understand the program and where
8  their -- you know, whether their probability of being
9  allowed comes into play.
10         I will tell you I think there's a very
11  different circumstance for private insurance
12  companies in this instance, who in my opinion have
13  much of the same information that SSA has about
14  certainly their own employees and their medical
15  conditions and their work histories. And I would
16  also say over any length of time, a private insurance
17  company that routinely refers their employees to SSA
18  has got to have an understanding about what the basic
19  requirements of SSA are, and what the definition of
20  disability over -- with us is, much more so than we
21  would ever expect any individual to have that
22  understanding.

**161**

1         And so just as I referenced in the
2  anecdotal example of Bethlehem Steel and the
3  interaction of the agency, again, as I heard it, to
4  deal with them and help them understand the impact on
5  us, I think it clearly throws a number of cases into
6  -- you referenced it before -- the unnecessary
7  category of cases that -- with any of that background
8  and knowledge that the insurance industry has, there
9  can certainly be some screening of cases before they
10  get to the SSA disability process.
11     Q.  But are you aware of any current rules or
12  procedures of the SSA that require that type of
13  screening that you're describing that you think would
14  be advantageous?
15        MR. RENNERT: Objection. Calls for a
16  legal conclusion. Asked and answered.
17        THE WITNESS: Are we agreeing it's been
18  asked and answered?
19        BY MR. PORADA:
20     Q.  No. I'm asking for your answer, if you're
21  aware of any rules that require the type of screening
22  that you just described?