# EXHIBIT R

# (3 OF 3)

Case 1:03-cv-12382-MLW    Document 142-35    Filed 08/22/2008    Page 2 of 17
Case 1:03-cv-11699-PBS    Document 289-3    Filed 04/21/2008    Page 29 of 44

Nibali, Kenneth D.                                          March 5, 2008

42 (Pages 162 to 165)

162

1    MR. RENNERT: Same objections. You can
2  answer.
3    THE WITNESS: No, I'm not.
4    BY MR. PORADA:
5    Q. Now, when you were employed at SSA, were
6  you ever involved in proposing any new regulations or
7  rules that would require that type of screening?
8    A. No. I was not.
9    Q. Were you aware of anyone else who was
10  proposing adoption of rules requiring that type of
11  screening while you were employed at SSA?
12    A. No. I was not.
13    Q. Since you left the SSA, and you became
14  involved in this case, have you communicated with
15  anyone that you know who still works at the SSA about
16  the types of issues you looked at in this case?
17    A. I've had opportunity to talk with several
18  individuals. I do not discuss any specifics of the
19  lawsuit, other than to say I'm an expert witness on a
20  case dealing with an insurance company. And I have,
21  yes, I have asked some of these individuals because
22  they still are in the disability process, I just say,

163

1  do you see claims from individuals coming in to file
2  claims from disability companies -- private
3  disability insurance companies. And they have given
4  me some reactions.
5    Q. What types of reactions have you gotten?
6    A. Generally, very consistent with the prior
7  anecdotal information I spoke of during my years
8  there, and that is, generally, it's one of
9  frustration is the easiest way I can characterize it.
10  That they see a number of individuals who come in
11  who, again, according to them, will literally say, I
12  have to be here because the insurance company told me
13  I have to be here. And a number of cases they would
14  even say, I don't believe I'm disabled, but I've got
15  to do this.
16    And that's, you have to understand, very
17  frustrating to a work processing part of the agency
18  that's at best you can describe it as being
19  overburdened. And you can understand that their
20  frustration if that's how they view individuals who
21  are being told they have to come in when certainly in
22  their estimation, they don't come anywhere close to

164

1  meeting our definition. And even by the words of the
2  individuals themselves in cases, say the same thing.
3  So I give you that as background context for where I,
4  both before and still currently, draw those kinds of
5  conclusions.
6    Q. And when you say in their estimation, they
7  don't come anywhere near meeting the definition,
8  whose estimation are we talking about?
9    A. A number of these individuals are
10  disability claims examiners, okay? I was actually
11  with a group last week down here, very near here. It
12  was a totally unrelated issue, but we were having
13  dinner and they asked me what I was doing. And I
14  said I'm involved in this, what do you think. And
15  they took off with a number of stories, and these
16  were mostly people who were still actively involved
17  in adjudicating disability claims, and they were from
18  literally all over the country.
19    Q. Were these state DDS employees?
20    A. Yes, they were.
21    Q. Have you talked to anyone at the SSA since
22  you left about whether the agency should adopt

165

1  regulations that would require the type of screening
2  you just described?
3    A. No. I haven't.
4    Q. So you haven't recommended to anyone at
5  the SSA that they should look into adopting those
6  kinds of regulations?
7    MR. RENNERT: Objection. Asked and
8  answered. Go ahead.
9    THE WITNESS: No. I have not.
10    BY MR. PORADA:
11    Q. Now, do you have any knowledge of whether
12  Unum in particular actually employs any type of
13  screening process before sending people over to file
14  for SSDI?
15    A. I did not have knowledge of that, but upon
16  initial discussions with Heller Ehrman here, and
17  looking at the, what is it called, Loughren's
18  complaint.
19    MR. RENNERT: Complaint.
20    THE WITNESS: Thank you, that it
21  certainly -- that's the allegation is that Unum is
22  pretty much referring people to SSA with no

Case 1:03-cv-12382-MLW   Document 142-35   Filed 08/22/2008   Page 3 of 17
Case 1:03-cv-11693-PBS   Document 239-3   Filed 04/21/2008   Page 90 of 44

Nibali, Kenneth D.                                              March 5, 2008

45 (Pages 174 to 177)

---

**174**

1  obviously age. There were -- there were fields for
2  education. And I distinguish elements from field
3  because sometimes there were not elements entered
4  into a field, but there were clearly fields there.
5        There were indications of whether an
6  estimated date of return to work or estimated
7  recovery date, if I remember the terms correct, there
8  were those kinds of elements. And you know, there
9  are a lot of records, and we are just kind of looking
10 at it to see what kind of sense we can make out of
11 it.
12       Q. Now, do you know whether in evaluating an
13 SSDI claim, is the SSA bound by a determination that
14 a private insurer makes on a separate LTD claim for
15 the same applicant?
16       A. No. They are not.
17       Q. So does that mean that the SSA
18 independently makes its own evaluation of an SSDI
19 claim, apart from whatever the private insurer
20 decided on an LTD claim?
21       A. Yes. They would.
22       Q. And do you know whether the standards that

**175**

1  the SSA uses to evaluate an SSDI claim are the same
2  standards that a private insurer would use to
3  evaluate an LTD claim?
4        **A. Do I know if the standards SSA uses to**
5        **evaluate an SSA application for stability are the**
6        **same standards that a private insurer would use to**
7        **decide a case in -- for private insurance disability.**
8        Q. That's correct.
9        MR. RENNERT: Okay, let me just, before
10 you answer that, objection, vague. Go ahead.
11       THE WITNESS: No. They would not. I
12 mean, to my understanding, I don't know what the
13 standards are that -- other than general terms --
14 what the standards are that a private insurance
15 company would use vis-a-vis SSA's.
16       In answering that in terms of the
17 specifics where I can sit and tell you the exact
18 sequential evaluation process, et cetera, that SSA
19 goes through, I don't know the exact process that an
20 insurance company goes through.
21       I know, for example, that initially at
22 least in most cases, people are allowed in private

**176**

1  insurance when they are first disabled on what's
2  called an interoccupation standard. And that they
3  stay on that standard through roughly 24 months or
4  something is my understanding. And then if they are
5  going to go on any kind of extended benefit, then
6  they are usually converted over to a standard of any
7  occupation, which again without knowing the specifics
8  is a lot closer to me to the SSA way of making
9  decisions than it is just simply the fact that they
10 cannot do their current occupation.
11       Q. And what's the basis for your
12 understanding that you just described of how private
13 LTD insurance policies define disability?
14       **A. Basically, discussions with Heller Ehrman**
15 **staff.**
16       Q. So is it correct that you haven't
17 personally reviewed any Unum LTD policies to look at
18 what the definition of disability is or how it's
19 defined?
20       A. No. I haven't.
21       Q. Have you looked at any other private LTD
22 private insurance policies from other insurance

**177**

1  companies to see how they define disability.
2        A. No. I have not.
3        Q. You mentioned that your understanding is
4  that there is often some period of time, maybe 24
5  months after which the definition in a private policy
6  may change from own occupation to any occupation. Do
7  you have any knowledge of whether that 24-month
8  period that you described is always in the policies
9  or could it be a different period of time?
10       **A. I do not have specific knowledge about**
11 **what it is.**
12       Q. Could you take a look again at Exhibit 1,
13 your declaration, it's attached there.
14       A. Declaration, right. Yes.
15       Q. Paragraph 30, please. You're describing
16 some interactions between private disability insurers
17 and the SSA. And you say in that, in that first
18 sentence, the insurers have not opened their
19 operations to the SSA, nor is SSA necessarily
20 interested in their doing so. Why is it that the SSA
21 is not necessarily interested in private insurers
22 opening up their operations to the SSA?

Case 1:03-cv-12382-MLW    Document 142-35    Filed 08/22/2008    Page 4 of 17
Case 1:03-cv-11699-PBS    Document 289-3    Filed 04/21/2008    Page 31 of 44

Nibali, Kenneth D.                                          March 5, 2008

46 (Pages 178 to 181)

**178**

1     MR. RENNERT: Objection. Misstates what
2  the document says. That's not a sentence. It's a
3  clause in a sentence. Go ahead.
4     THE WITNESS: What I'm referring to is I
5  spoke to the earlier part of that sentence earlier
6  when I said, even though I had a specific instance of
7  speaking to insurance companies, and I'm sure other
8  individuals in SSA have spoken to them, my
9  interaction was that the insurance company for
10 business-related reasons has proprietary concerns
11 about how much information they share about -- about
12 their practices and procedures.
13    I know they -- my sense certainly is that
14 they are careful about that in relation to other
15 insurance companies. So that's what the first part
16 of that is referring to.
17    And the second part is referring to that
18 is not something that SSA is particularly interested
19 in is a proprietary nature of, you know, exactly how
20 much money they pay or what basis they decide to pay
21 it on. Talking about the -- the internal decision
22 making of an insurance company about their opinion of

**179**

1  benefits in their program.
2     We were interested in obviously the
3  processes they went through. But when it gets down
4  to some of the proprietary specifics, that's what I'm
5  referring to. And it's simply not something that we
6  would either necessarily expect to have shared with
7  us, or necessarily be interested in.
8     BY MR. PORADA:
9     Q. You've testified before that in your
10 opinion, you think it would be -- that you think it
11 would be useful for the SSA to have information from
12 private insurers about the screening processes that
13 they might use before sending people over for SDI.
14 Is that something that you would expect private
15 insurers to share with the SSA, or would that be the
16 type of proprietary information that you just talked
17 about that you don't think private insurers would
18 share with the SSA?
19    A. I believe what I testified to is that I
20 think SSA would be interested in knowing more about
21 exactly what these practices are in the insurance
22 industry, if in fact they are resulting in -- I would

**180**

1  use the term once again -- any number of unnecessary
2  claims being referred to SSA.
3     I did not specifically say that SSA would
4  expect insurance companies to share that with us or
5  whatever, but I certainly think it's information SSA
6  would be interested in knowing, if in fact has an
7  impact on unnecessary claims coming into the process.
8     Q. Now, before you discussed the fact that
9  the type of people that come in to apply for SSDI can
10 vary greatly in terms of their educational background
11 and their understanding of how Social Security works,
12 is that right?
13    A. Yes. They can.
14    Q. Is it fair to say that a number of
15 individuals who come into SSA to apply for SSDI don't
16 really know when they come in what form of benefits
17 they might be eligible for?
18    MR. RENNERT: Objection. Calls for
19 speculation. Go ahead.
20    THE WITNESS: SSA's practice is to view
21 people who come in to file benefits, that they are --
22 the claims reps from open to, if there is any

**181**

1  information that might lead them in a direction that
2  this person might qualify for other benefits that are
3  provided through Social Security, the person would be
4  encouraged to apply for those benefits at the same
5  time. Generally, that involves a disability program.
6  They might come in for Title 2 and be determined that
7  they also want to file for Title 16 because of low
8  income or whatever.
9     BY MR. PORADA:
10    Q. So was it the policy of the SSA, when you
11 were employed there, for -- when someone comes in to
12 apply for SSDI that the claims rep is supposed to
13 explore with them the possibility of whether they
14 might be entitled to some other form of benefits as
15 well, or in addition?
16    A. They are to be open to any information
17 that comes in front of them that would trigger the
18 possibility of doing that. I want to clarify that
19 they're not going to sit there and go through every
20 possible program we have to make sure whether
21 somebody does or doesn't qualify for those things.
22 It's -- it's, I believe, pretty self-evident as you

Case 1:03-cv-12382-MLW    Document 142-35    Filed 08/22/2008    Page 5 of 17
Case 1:03-cv-11699-PBS    Document 289-3    Filed 04/21/2008    Page 32 of 44

Nibali, Kenneth D.                                        March 5, 2008

47 (Pages 182 to 185)

182

1  go and interview with somebody, if there is potential
2  in those other areas to do so.
3      Q.  And in those situations where that arises,
4  would the individual be encouraged to apply for those
5  other type of benefits that they might be eligible
6  for as well?
7      A.  Yes. They would be.
8      Q.  Might that also include someone who comes
9  in to apply for SSDI, and let's suppose the person is
10 62 years old, would one of the other options that
11 might be explored be the possibility of early
12 retirement benefits?
13         MR. RENNERT: Objection. Calls for
14 speculation. Hypothetical. Go ahead.
15         THE WITNESS: One of the things they would
16 look at is the age of the individual, and if they
17 haven't already applied, started an application for
18 benefits or early benefits, yes, that's one possible
19 thing that could happen.
20         BY MR. PORADA:
21     Q.  So is it possible that someone who comes
22 in the door to the SSA field office to apply for SSDI

183

1  might be encouraged to apply not only for SSDI, but
2  some other form of benefits that they might be
3  eligible for, like early retirement or perhaps SSI
4  that you described?
5      A.  I think I just answered that.
6      Q.  Well, I just -- what I want to understand
7  is whether these other alternatives that are explored
8  with the person, are these typically explored in lieu
9  of filing for SSDI or in addition to filing for SSDI?
10         MR. RENNERT: Okay. Objection. Calls for
11 speculation. If you know, go ahead.
12         THE WITNESS: Yeah, it would not be in
13 lieu of. If someone comes in to file for a certain
14 program, again, unless they meet one of the
15 circumstances we talked about earlier, where the
16 application might be terminated, that application
17 would go ahead and be continued.
18         It is clearly not -- I mean, the argument
19 is that anybody that comes into an SSA office for any
20 reason or makes contact with SSA on the telephone or
21 gets on our website, we take every opportunity to try
22 to make them aware that if they are approaching a

184

1  certain age, for example, that you're using, they
2  should be thinking about whether they want to take
3  normal retirement or early retirement. So it is in
4  no way tied to the fact that someone needs to come in
5  to file disability claim that they would get that
6  kind of feedback or interaction with the agency. It
7  could happen in that context, but it could also
8  happen in many other contexts.
9      Q.  Now, in the SSDI context, does the SSA
10 have any rules that you're aware of or policies that
11 encourage individuals to apply for disability as soon
12 as they think they might be disabled?
13     A.  Yes. There are -- there are reasons why
14 it's beneficial to file for disability as soon as you
15 believe you're disabled.
16     Q.  And what are those advantages and reasons
17 to file as soon as you think you might be disabled?
18     A.  Sticking with the SSDI program, when you
19 file, there is -- well, obviously, the obvious answer
20 is to get benefits as soon as you can, okay? If
21 you're going to, in fact, end up with money, then the
22 sooner you apply, then the sooner you have those,

185

1  those benefits coming in, assuming that the
2  five-month waiting period has passed.
3         There is also the 24-month waiting period,
4  but at some point, you're also -- once you're from
5  your date of onset of disability, you're eligible for
6  Medicare. And I guess the processing answer to the
7  question is, if you're not allowed at the first stage
8  of the process and you have to go into
9  reconsideration, or you have to go into appeals,
10 obviously that time frame begins to extend and
11 therefore the earlier you start, there is a benefit
12 to that.
13     Q.  Is there also a benefit to applying sooner
14 rather than later in that if you are awarded SSDI
15 benefits, they can only reach back in time a certain
16 period of time retroactively?
17     A.  Well, that's a 12 month, yes, that
18 12-month period of time.
19     Q.  That's the 12-month period you're
20 referring to?
21     A.  Yes.
22     Q.  So does that 12-month rule mean that

Case 1:03-cv-12382-MLW   Document 142-35   Filed 08/22/2008   Page 6 of 17
Case 1:03-cv-11699-PBS   Document 289-3   Filed 04/21/2008   Page 33 of 44

Nibali, Kenneth D.                                    March 5, 2008

57 (Pages 222 to 225)

**222**

1  imply that they are additional cost to SSA.
2       BY MR. PORADA:
3       Q.  You also reference in your report in the
4  next paragraph, the impacts on other applicants for
5  SSDI and you note that insurance companies asking
6  some of their insureds to apply for SSDI could delay
7  the -- delay the resolution of other individuals'
8  SSDI applications, is that -- is that a fair summary
9  of what you've described here?
10      A.  Yes.
11      Q.  Now, is it fair to say that the delays
12 experienced by other SSDI applicants don't result in
13 any additional financial costs for the SSA?
14      A.  **To the extent that those delays are**
15 **already factored into the average number that I**
16 **talked about before, then these statements do not add**
17 **anything on top of that.  But as these impacts are**
18 **already reflected in those average costs that I spoke**
19 **of.**
20      Q.  So there is no additional costs to the SSA
21 on top of those average costs that we've already gone
22 through based on a backlog or a delay in processing

**223**

1  other individuals' SSDI claims, is that correct?
2       A.  Yes.  That's correct.
3       Q.  I'd like to turn to the work you did
4  starting in August of 2007 when you were asked to
5  identify impairment groupings that would be of
6  interest for Heller Ehrman to take a look at.  Now, I
7  take it that attached to the very back of your report
8  there is an Exhibit E which is entitled identified
9  categories of claim files.  If you want to take a
10 look at that?
11      MR. RENNERT:  Exhibit E?
12      BY MR. PORADA:
13      Q.  Do you see that?
14      A.  **Yes, I see it.  I just want to check it**
15 **real quick.  Yes.**
16      Q.  Is this -- is this the end result of the
17 work that you were asked to do in August of 2007 to
18 identify impairment groupings of interest to look at?
19      A.  Yes.  It is.
20      Q.  Now, there is no explanation given in your
21 report for how you got to Exhibit E, where it came
22 from, is that, is that correct?  There is nothing in

**224**

1  your report that explains how you developed or
2  identified these categories of claim files?
3       A.  Not in my report.  No.  There is not.
4       Q.  So in looking at your report, there's no
5  way for us to determine where these claim, these
6  categories of claim files in Exhibit E, where they
7  came from or how they were developed, is that right?
8       A.  That's correct.
9       Q.  Now, on page 1 of your report, you say --
10 you were asked to identify these groupings to
11 determine which types of claims warranted scrutiny
12 under SSDI guidelines.  What -- what did you mean by
13 SSDI guidelines?  What were you talking about there?
14      A.  **I want to make sure I'm reading the same**
15 **sentence you are.**
16      Q.  Certainly.  Looking at the sentence that
17 begins in August 2007, and at the very end of that
18 sentence, you say that you were asked to identify
19 groupings that warrant scrutiny under SSDI
20 guidelines.
21      A.  **You're skipping some language there.  The**
22 **first part of the sentence refers to, I was asked to**

**225**

1  **identify some impairment groupings that would be of**
2  **interest in determining whether cases falling within**
3  **those groupings would meet the Social Security**
4  **Disability Insurance guidelines.  Then the second**
5  **part says, as well as to identify groupings based on**
6  **electronic indicators from Unum's own data that**
7  **warranted scrutiny under SSDI guidelines.**
8       Q.  And my question is, what did you mean by
9  SSDI guidelines?  What guidelines were you talking
10 about?
11      A.  **Under the processing of a disability**
12 **application.**
13      Q.  So you're talking about the definition of
14 disability under the Social Security Act?  Is that
15 the SSDI guideline that you're using?
16      A.  **The process for determining, for making a**
17 **determination of whether someone is disabled under**
18 **the guidelines.  Yes.**
19      Q.  Now, were you given any recommendation or
20 suggestion as to how to go about identifying those
21 groupings of impairments?
22      A.  **This is the part that I worked with Alan**

Case 1:03-cv-12382-MLW   Document 142-35   Filed 08/22/2008   Page 7 of 17
Case 1:03-cv-11699-PBS   Document 289-3   Filed 04/21/2008   Page 34 of 44

Nibali, Kenneth D.                                      March 5, 2008

58 (Pages 226 to 229)

226

1   Shafer on, Alan Shafer worked with me on. And it was
2   evident to us that what was being asked for is if you
3   are -- what we've been talking about are cases that
4   would be considered unnecessary to be filed in SSA,
5   meaning they had no basis for believing that there
6   would be a finding of disability under our
7   guidelines.
8       And so in being asked to pick out of the
9   sample of cases that Unum had provided, what would be
10  some of the subsets of those cases that you would
11  find a good number of that grouping falling under
12  that definition that I just gave of unnecessary
13  cases.
14      And so what we want on was our past
15  knowledge. Alan Shafer was my division director and
16  then personal assistant for years and dealt very much
17  with data, produced lots of the data on what happened
18  in the disability program, did breakouts on
19  impairment groupings and what the allowance rates
20  were for those, for those groupings, broke them out
21  by age categories, et cetera. He is very, very
22  familiar with the data. He is very familiar with the

227

1   ICD-9 codes, is that an okay term to use, ICD-9?
2   Okay, ICD-9 codes.
3       And I myself have a fair amount of
4   familiarity with it from the years of experience with
5   the programs. But between us, we kind of discussed
6   what was in the Unum database in terms of indicators
7   of those impairment codes. And based on our
8   knowledge of what categories of claims would pretty
9   routinely show very low allowance rates for
10  impairment codes and age groupings, we selected what
11  you see on tab E. And kind of included the numbers
12  of cases that were in the files from Unum.
13      Actually, that's not -- is that -- no.
14  That's not on this one. We knew roughly what numbers
15  of cases were in these categories, so I will say that
16  that decision making was also afforded by the fact
17  that SSA I -- mentioned this earlier -- routinely
18  publishes a fair amount of data on the same subject.
19      And in fact, we had access to a just
20  recently published report from Research Evaluation
21  Statistics that talked very specifically about this
22  topic, ICD-9 codes, impairment codes, certain age

228

1   groupings that we further refined here that were very
2   parallel to some of the categories that we pulled out
3   here.
4       So this was -- this was an attempt to
5   break out those groupings that would fall under the
6   categories that I just described, and that's the end
7   result of the first part of attachment E.
8       Q.  So is it your opinion that before
9   referring a claim to Social Security for an SSDI
10  filing, that a private insurer should consider the
11  historical allowance rate for people of the same age
12  group and impairment code?
13      A.  I was not asked to reach any conclusions
14  about what insurers should or should not do in this
15  case. What I would say is insurers certainly would
16  have the opportunity, based on their own experience
17  and if SSA chose to share additional information with
18  them, it would make the case that much stronger, that
19  pretty clearly some very useful guidelines could be
20  established based on age groupings and categories,
21  wherein absent -- and this is important distinction
22  -- absent extenuating circumstances, that if they

229

1   existed, for example, there was something else about
2   this case other than just the impairment and the age
3   that were coded in this thing, in this listing, that
4   may very well throw somebody into the category that
5   they were a valid candidate for being looked at by
6   SSA.
7       But absent some extenuating circumstances
8   like that, those kind of guidelines based on
9   groupings, et cetera, would be a very good indicator
10  that there would be very little evidence that someone
11  in that kind of grouping would be allowed by SSA.
12      And I will add that we did not intend in
13  any way for this list of groupings here to be a list
14  that if SSA chose to help out or expect agents of
15  disability insurance companies to look at these kinds
16  of things, this would not be the bottom line list or
17  the end list. This was a starting point based on
18  what we knew was in the Unum database, and some of
19  the kinds of groupings that we felt would be a good
20  set of cases if Heller Ehrman decided to go that way,
21  to look at a subset of those cases out of the Unum
22  database, to see what conclusions could be drawn

Case 1:03-cv-12382-MLW   Document 142-35   Filed 08/22/2008   Page 8 of 17
Case 1:03-cv-11699-PBS   Document 289-3   Filed 04/21/2008   Page 35 of 44

Nibali, Kenneth D.                                      March 5, 2008

59 (Pages 230 to 233)

**230**

1  about the, you know, having any basis for those cases
2  going in front of SSA.
3      Q.   All right. I want to make sure I
4  understood something that you said in that lengthy
5  answer. Are you not offering any opinion then that
6  private insurers such as Unum should reference are
7  the type of data that you referenced that would show
8  by age grouping or impairment code the percentage
9  allowance rate for similar people with the same
10  impairments, the same age grouping?
11          MR. RENNERT: Excuse me. Objection. That
12  mischaracterizes his testimony. Go ahead. You can
13  answer.
14          THE WITNESS: I'm sorry. Say that one
15  more time?
16          BY MR. PORADA:
17      Q.   I'm wondering whether you are actually
18  offering the opinion that Unum or other private
19  insurers should reference the data that you looked
20  at, that breaks out by age grouping and impairment
21  code, the percentage allowance rates historically in
22  deciding whether to ask somebody in the same age

**231**

1  grouping or with the same impairment code whether to
2  apply for SSDI?
3      A.   No. I'm not.
4      Q.   And you were not aware of the SSA having
5  adopted any similar listing of impairment codes or
6  groupings as you did in Exhibit E that are to be used
7  as a reference tool in deciding whether someone
8  should apply for SSDI or not?
9      A.   No. I'm not.
10      Q.   Do you know whether the SSA has ever
11  contemplated adopting any regulations or procedures
12  that would establish a listing such as you have that
13  breaks down certain impairment codes that should be
14  assessed before deciding whether someone should apply
15  for SSDI or not?
16      A.   During my time frame in the discussions I
17  was involved with, there was no discussion of that.
18      Q.   And since your time frame, are you aware
19  of anyone at the SSA proposing to adopt those types
20  of rules or listings?
21      A.   I don't have a very good basis for saying
22  one way or the other on that.

**232**

1      Q.   Well, my question was just whether you're
2  aware of anyone at the SSA who is proposing that?
3      A.   I'm not aware. No.
4      Q.   Now, in going about generating a listing
5  of impairment groupings that would be of interest,
6  did you factor in the SSA's policy that you described
7  earlier as an open door policy of encouraging people
8  to file for SSDI if they feel they might be disabled?
9          MR. RENNERT: Objection. Vague.
10          THE WITNESS: Again, we were asked to
11  develop this list in relation to identifying subsets
12  of cases, Unum cases, that could potentially be
13  looked at in order to see what kind of evidence -- if
14  the evidence in the file would support the conclusion
15  that these -- basically, there was just no evidence
16  to think that SSA would allow these cases. That's
17  what this list was developed for.
18          BY MR. PORADA:
19      Q.   Now, you said earlier that the list you
20  developed at Exhibit E, you were not intending that
21  this would be a list actually adopted by the SSA, and
22  I'd like to know why that is?

**233**

1      A.   Because it's probably a little bit crude
2  in terms of how sophisticated with all the data that
3  SSA has at its disposal, if they chose to provide
4  this kind of feedback and assistance to disability
5  insurance companies, then with the expectation that
6  they would take that information into account in
7  making their referrals to SSA, that they would, they
8  would come up with a more sophisticated list than we
9  did here.
10      Q.   Now, how did you go about determining what
11  you would include in this list?
12          MR. RENNERT: Objection. Asked and
13  answered.
14          THE WITNESS: Answered already. Yes.
15          BY MR. PORADA:
16      Q.   Well, how did you go about determining
17  which specific ICD-9 codes, for instance, or which
18  age groupings of ICD-9 codes to include in this list?
19      A.   I answered that, but I will repeat. We
20  did it based on our experience and knowledge, and
21  particularly Alan's long-term experience with working
22  with these kinds of numbers and facts day-to-day over

Case 1:03-cv-12382-MLW   Document 142-35   Filed 08/22/2008   Page 9 of 17
Case 1:03-cv-11699-PBS   Document 289-3   Filed 04/21/2008   Page 36 of 44

Nibali, Kenneth D.                                March 5, 2008

60 (Pages 234 to 237)

**234**

1  his tenure at SSA. We had a very good feel for what
2  categories, and I can go down them if you want, but
3  some of them are pretty obvious that they are the
4  kinds of categories that we know historically,
5  particularly for the age levels that are assigned to
6  some of them, would have very low allowance rate.
7      And therefore, it would represent the kind
8  of cases, again absent extenuating circumstances,
9  that would have really no evidence to support a
10 finding of disability in SSA. So it's based on our
11 experience, and again I reference -- buttressed by
12 that recent report from Research Evaluation
13 Statistics that listed many of the similar kinds of
14 categories and the same low allowance rates.
15     Q. So was it your intent to create a list of
16 ICD-9 codes that had historically in the data you
17 referenced, the lowest allowance rates?
18     A. That had low allowance rates, coupled with
19 the age categories that are shown.
20     Q. But how did you go about determining which
21 of the ones that have low allowance rates you would
22 include in this list and which you would not include

**235**

1  that have similarly low allowance rates?
2      MR. RENNERT: Objection. Asked and
3  answered. Go ahead.
4      THE WITNESS: Based on the list that we
5  had in front of us, the ICD-9 codes and all, and if
6  there were any significant number of cases and also a
7  combination of a number of cases with those ICD-9
8  codes that was in the Unum file, we ended up with
9  this list that there would be a reasonable number of
10 cases to create a sub sample, and that we knew from
11 our experience and data that those had low allowance
12 rates.
13     It is not intended to be a definitive list
14 that these are all the low allowance rates, or that
15 necessarily these are even the lowest allowance
16 rates. But within the parameters of what we were
17 asked to do, that's the list we came up with.
18     BY MR. PORADA:
19     Q. So then if I understand that, you compared
20 a list of data you had of ICD-9 codes that have
21 historically low allowance rates and you compared
22 that to data that you received from Heller Ehrman

**236**

1  regarding Unum's claims and you looked to see which
2  claims had ICD-9 codes that you could match up with
3  the ICD-9 codes in the data that you were looking at
4  that had lower allowance rates, is that correct?
5      A. That existed in a reasonable number of
6  cases that you could do a sample of.
7      Q. Now, you mentioned earlier that there
8  could be special circumstances, such that someone who
9  has an ICD-9 code included in this list that you have
10 as Exhibit E could nevertheless be found disabled for
11 SSDI, is that right?
12     A. Yes.
13     Q. So not all claims that are filed by
14 individuals with ICD-9 codes on the list you've
15 attached in Exhibit E are denied for SSDI, is that
16 right?
17     A. That's correct.
18     Q. And you, I take it, did not undertake the
19 task of reviewing Unum's claim files that had these
20 ICD-9 codes to determine whether, in your opinion,
21 those claims might have these special circumstances
22 or might actually be the ones that get allowed for

**237**

1  SSDI, as opposed to denied, is that right?
2      A. I did not, but it was developed for the
3  purpose of some other group of people doing that.
4      Q. But you were not involved in reviewing the
5  claim files?
6      A. I was not.
7      Q. Now, as part of the process that you used
8  in developing this claim files of interest, did you
9  focus at all on the -- whether the timing of when
10 Unum asked someone to file for SSDI was a factor that
11 should be included or considered in reviewing the
12 claim files to assess whether they were unnecessary,
13 as you put it?
14     A. Could you explain what you mean by timing?
15     Q. Sure. Did you -- as part of the work you
16 did, did you look at the data and consider or
17 recommend that someone else consider the timing of
18 when in the claims process, Unum asked somebody to
19 apply for SSDI, whether that was a factor that should
20 be examined or looked at in evaluating these claims?
21     A. It was not a factor in the first 14, if I
22 remember the number correctly, but it was a factor in

Case 1:03-cv-12382-MLW   Document 142-35   Filed 08/22/2008   Page 10 of 17
Case 1:03-cv-11699-PBS   Document 289-3   Filed 04/21/2008   Page 37 of 44

Nibali, Kenneth D.                                     March 5, 2008

61 (Pages 238 to 241)

**238**

1  the last five or six.
2    Q. And in what way do you think that the
3  timing of when Unum asked someone to apply for SSDI
4  was something that you thought should be examined in
5  looking at these claim files?
6    A. From our prior work at looking at the
7  files and having some idea of the kind of factors
8  that Unum would being tracking, we noticed the items
9  from 15 through 21, I believe, that again in language
10 of the report raised items of interest that we
11 thought to be worth looking at a sample of cases.
12 And they had to do with -- pick an easy one to talk
13 about. 18, the difference between a disability date
14 and first estimated resolution date was nine months
15 or less.
16         Again, our understanding whether it was
17 correct or not, because this was not the easiest
18 stuff to figure out exactly what Unum always used
19 these codes for. But if there was -- if there was a
20 statement that early on, they had said we expect that
21 this case would be resolved within nine months from
22 the date of disability, given the 12-month continuous

**239**

1  duration requirement, that would raise questions in
2  our mind as to why a case like that would be
3  forwarded to SSA.
4         19 is just the -- is the last estimated
5  recovery date was nine months or less. That would be
6  an even more recent call and 20 would be, for
7  example, the projected return to work date of nine
8  months or less. So you can see, I believe, the
9  theory that we were after here.
10   Q. So would you agree, then, that the fact
11 that someone has asked to apply for SSDI early on in
12 the claims process in and of itself doesn't mean that
13 their claim is going to be an unnecessary claim as
14 you called it?
15        MR. RENNERT: Objection. Mischaracterizes
16 his prior testimony. You can answer.
17        THE WITNESS: It's not all what I said,
18 but to answer your question, no, just because
19 somebody files for it does not mean that.
20        BY MR. PORADA:
21   Q. And that's because, for instance, someone
22 might have a severe disability that would entitle

**240**

1  them to disability benefits even if they filed early
2  on in the process?
3    A. Absolutely.
4    Q. Can you mark this, please.
5         (Nibali Exhibit No. 5 was
6         marked for identification.)
7      BY MR. PORADA:
8    Q. I'm showing you what's been marked as
9  Exhibit 5. If you could take a look at that, please.
10   A. I'm looking at the top message.
11   Q. Well, yes. Does that first page --
12   A. Is that a string?
13   Q. Well, it seems to be a string of emails.
14 If you could take a look at that, with an attachment.
15 Does that appear to be a string of emails on August
16 8th, and then one on August 9th, 2007 between you and
17 Alan Shafer, and then actually it looks like the
18 final one maybe from your wife -- or from Ellen, who
19 I'm assuming is your wife?
20   A. That's a good assumption.
21   Q. So is that correct, this is a string of
22 emails between you and Alan Shafer?

**241**

1        MR. RENNERT: Take --
2        THE WITNESS: Let me look at it.
3        BY MR. PORADA:
4    Q. Oh, certainly. I thought you had.
5    A. Getting a lot of inside information. Yes,
6  that is a series of communications we had.
7    Q. Okay. And in the email at the top of the
8  first page, August 8th, 2007 at 4:38 p.m. from Alan
9  Shafer, he references that he is attaching two
10 documents. One which he says is an expansion of the
11 ICD code Word document, and then he has attached a
12 second document regarding some questions -- or
13 regarding his review of the Unum systems manual. If
14 you turn to the page that's Bates stamped KDN370,
15 that's one of the attachments, it's entitled initial
16 data analysis.
17   A. I have it.
18   Q. Is it your understanding, is this a
19 document that Mr. Shafer prepared and then emailed to
20 you to take a look at it?
21   A. I need to look at it. Yes. It's my
22 recollection that's one of our work in progress

Case 1:03-cv-12382-MLW   Document 142-35   Filed 08/22/2008   Page 11 of 17
Case 1:03-cv-11699-PBS   Document 289-3   Filed 04/21/2008   Page 38 of 44

Nibali, Kenneth D.                                    March 5, 2008

62 (Pages 242 to 245)

**242**

1  documents being passed back and forth.
2  Q. Do you recall whether this --
3  A. Are you asking me just to look at that 70
4  and 71.
5  Q. Yes, please.
6  A. Okay.
7  Q. Is it your recollection that this initial
8  data analysis listing was prepared by Mr. Shafer?
9  A. This list, yes, and attached to the email
10 was prepared by him, but we had already had
11 discussions over the phone back and forth about what
12 kinds of things we were looking for.
13 Q. So before you got this, this email with
14 this attachment, you and Mr. Shafer had already had
15 communications where you had talked about the
16 different ICD categories that you might want to
17 include in a listing, is that right?
18 A. Yes, in very general terms.
19 Q. So before you got this document, had you
20 and Mr. Shafer specifically discussed the 28
21 different ICD categories that were going to be
22 included in this initial list?

**243**

1  A. We had discussed categories in general.
2  We did not discuss every one of these 28 categories.
3  Q. So is it fair to say that when you got
4  this email from Mr. Shafer, this was the first time
5  you had seen these specific 28 categories of ICD
6  codes?
7  A. I would have to go back and look at the
8  string of emails being passed around, but if this is
9  the first time it shows up in what was provided to
10 you, I provided you all the communications we had.
11 And so assuming that's -- the answer to that is yes,
12 then my answer to you is yes.
13 Q. Now, do you know, is there any rationale
14 behind the ordering of these groupings, number one to
15 28?
16     MR. RENNERT: Objection. Vague. Go ahead
17 and answer.
18     THE WITNESS: Well, I believe they are
19 just following an ICD-9, or as I recall, and I'm
20 looking at them now, I think that's true.
21     BY MR. PORADA:
22 Q. Okay. So these weren't ranked 1 to 28 in

**244**

1  terms of the allowance rates?
2  A. No. They were not intended to be ranked.
3  Q. Now, in the first paragraph of the text at
4  the top of that page, the document references that
5  the, that the -- the second sentence there, "from
6  these groupings, we should exclude any claim that has
7  a mental impairment ICD code 290 through 319, as a
8  secondary diagnosis"?
9  A. Yes.
10 Q. Why was it -- or do you know why claims of
11 mental illness as a secondary diagnosis were going to
12 be excluded from these categories?
13 A. Yes. They would fall under the language
14 I've been using about extenuating circumstances,
15 meaning that there was, besides the primary
16 impairment that someone claimed, if they are also
17 claiming mental impairment, mental conditions are
18 extra difficult to adjudicate. And we were not
19 interested in suggesting that people with mental
20 problems should be considered as not having any basis
21 for being allowed on disability.
22 Q. So your suggestion was to include any

**245**

1  claim that has any mental impairment code regardless
2  of what the type of mental impairment might be?
3      MR. RENNERT: Wait. Objection.
4  Mischaracterizes the testimony. Go ahead.
5      THE WITNESS: I said to exclude those
6  cases, not to include them.
7      BY MR. PORADA:
8  Q. No, I'm sorry. If I said include, I
9  didn't mean to.
10 A. Okay.
11 Q. Your intent was to exclude?
12 A. Yes.
13 Q. Any claim with any type of mental
14 impairment with those ICD codes, is that correct?
15 A. Yes.
16 Q. So as part of your analysis, you were not
17 recommending that someone should examine the severity
18 of the mental impairment that was reported or even
19 the type of mental impairment beyond these ICD-9
20 codes 290 through 319?
21 A. That's correct. We were not suggesting
22 that.

Case 1:03-cv-12382-MLW    Document 142-35    Filed 08/22/2008    Page 12 of 17
Case 1:03-cv-11699-PBS    Document 289-3    Filed 04/21/2008    Page 89 of 44

Nibali, Kenneth D.                                          March 5, 2008

63 (Pages 246 to 249)

246

1  Q. And do you know if historically at the SSA
2  mental impairments have a relatively high allowance
3  rate compared to other physical impairments?
4      MR. RENNERT: Objection. Vague as to
5  time. You can answer.
6      THE WITNESS: I really do not, I really do
7  not recall. I know mental impairments were the
8  fastest growing group of applications that we had,
9  but as to whether the allowance rate was different
10 than the average, I simply don't recall.
11     BY MR. PORADA:
12  Q. Now, why did you recommend that the ICD
13 code groupings be broken out or distributed by age
14 groupings?
15  A. I will refer back to my earlier
16 description of the grid system. These are, you know,
17 these issues are coming into play in steps four and
18 five, where you have developed information on persons
19 residual functional capacity -- residual functional
20 capacity. And then information, if you recall, by
21 age, education, work experience.
22      And looking at the grid analysis, when you

247

1  are under a certain age, generally 50, 45, even 40,
2  you were getting into a territory where there is --
3  there is virtually no likelihood that you will be
4  allowed based on almost any combination of factors,
5  assuming you have at least a residual functional
6  capacity for light work. And in many cases, even for
7  sedentary work.
8      And if you get up to medium and heavy,
9  it's zeros almost all the way across the board in
10 terms of that you would be disallowed with that
11 combination of factors. So by looking at the subset
12 of cases that fall under that 40 or 45 age range, we
13 are trying to isolate out the kind of cases that
14 again very clearly fall into that category that would
15 really be no basis for allowance under our system,
16 absent extenuating circumstances.
17  Q. Right. So given the specific facts of any
18 particular claim, someone who is under the age 45 or
19 age 40 grouping might still be entitled to SSDI, is
20 that right?
21  A. I'm sorry. Say that again?
22  Q. Yes. Given the specifics of a particular

248

1  claim, it's possible that someone even in the under
2  age 40 or 45 groupings could still be found eligible
3  for SSDI?
4  A. It is possible. Yes.
5  Q. And that would be determined by the SSA in
6  the course of evaluating an individual claim that
7  comes in the door, the SSA would look at the claim
8  and determine based on the evidence that's in the
9  file whether the person is disabled or not?
10     MR. RENNERT: Objection. Compound. You
11 can answer.
12     THE WITNESS: Yes. That would be
13 determined by the DDS, basically, on the initial
14 cases. Obviously, our implication here is that
15 someone like Unum would be in a position to know if
16 there were extenuating circumstances beyond the
17 straightforward categorizations here.
18     BY MR. PORADA:
19  Q. Is it fair to say that it's your opinion
20 that a private insurer such as Unum should do more or
21 do some form of additional screening that the
22 individual applicant who comes in off the street

249

1  would not be expected to do?
2  A. Yes. That is my opinion.
3  Q. And just so I'm clear, that opinion that
4  you've reached, you're not aware of any SSA
5  procedures that draw that distinction between
6  expectations of individuals coming in on their own to
7  apply and those who are sent or referred by a private
8  insurer, for instance?
9  A. I've answered that before. I will answer
10 it again. No. I'm not aware.
11  Q. Now, are you aware of any SSA procedures
12 that would have the initial claims representative or
13 the DDS screen claims based on age, in other words,
14 this under 40 that you're talking about, screen out
15 claims based on under 40 for a different type of
16 evaluation or review than those who are over age 40
17 would get?
18  A. No. The DDSs are required to follow the
19 sequential evaluation process which I've spoken of.
20  Q. And that would be in all claims regardless
21 of age of applicant?
22  A. Yes. There are some special rules in our

Case 1:03-cv-12382-MLW    Document 142-35    Filed 08/22/2008    Page 13 of 17
Case 1:03-cv-11699-PBS    Document 289-3    Filed 04/21/2008    Page 40 of 44

Nibali, Kenneth D.                                         March 5, 2008

64 (Pages 250 to 253)

**Page 250**

1  grid system, where people can be allowed without too
2  much additional work. But it still, you know, you
3  have to get to that step where they have not been
4  allowed through the medical listings or disallowed
5  because of SGA or not having a severe impairment.
6      But assuming you're at that step, there
7  are certain rules that basically allow individuals,
8  it does not disallow them, but allows individuals.
9  Just one example, I don't remember exactly, but if
10 you're of advanced age, you have less than a high
11 school education, and you've done nothing but heavy
12 manual labor all your life, that's what's called a
13 special rule, and that pretty much puts you in
14 directly.
15     Q.  So that -- excuse me.
16     A.  But absent that, you're following the
17 sequential evaluation process.
18     Q.  So that rule that you just described
19 essentially -- would that essentially fast track or
20 screen in claims of people with advanced age and
21 limited background skills to process their claim more
22 quickly to an award? Is that the intent of that

**Page 251**

1  rule?
2      A.  It would not be recognized probably at the
3  field office level, but it would be recognized once
4  it was in the DDS process.
5      Q.  So that's an example of a -- of a
6  screening tool to help more quickly identify claims
7  that are more likely to be awarded SSDI, is that
8  correct?
9      A.  Are eligible for award. Right. Yes. If
10 those factors are met, and the other factors
11 involved, they would be found disabled.
12     Q.  But you're not aware of any SSA policies
13 and procedures that would do the opposite of that,
14 that would fast track or more quickly screen out
15 claims of people based on age if they are younger,
16 for instance, to more quickly reach a denial?
17     A.  No. I'm not.
18     Q.  Will you mark this, please.
19         (Nibali Exhibit No. 6 was
20          marked for identification.)
21     MR. RENNERT: What are we up to?
22     BY MR. PORADA:

**Page 252**

1      Q.  If you could take a look at Exhibit 6,
2  please. And let me know if this appears to be a
3  string of emails from Alan Shafer to David Young and
4  Carl Nadler of Heller Ehrman, and further down the
5  string, there are emails from you to Alan Shafer and
6  Alan Shafer to you.
7      A.  Okay.
8      Q.  Now, this top email from Alan Shafer to
9  David Young is dated August 10th, 2007. That was
10 after the Exhibit 5 we looked -- we just looked at in
11 which --
12     MR. RENNERT: Exhibit 5?
13     BY MR. PORADA:
14     Q.  In which Alan Shafer had emailed to you on
15 August 8th, the draft list of the, of the data
16 analysis. So was it your understanding that
17 Mr. Shafer was going to forward along the data
18 analysis that you and he had been discussing to the
19 folks at Heller Ehrman to give them your initial
20 thoughts on how they might identify categories of
21 claims to look at?
22     A.  Yes. I would have to check, check the

**Page 253**

1  record, but I'm pretty sure this is when I was on
2  vacation. We actually had some telephone discussions
3  between Al and I and Heller Ehrman. And then I had
4  subsequent conversation with Alan and based on both
5  of those, I asked him to go ahead and forward this
6  information on. I'm doing that from recollection,
7  but I'm pretty sure that's what --
8      Q.  Now, if you could turn, please, to the
9  page that's marked KDN 376. That's the initial data
10 analysis again. And if you could also open up the
11 Exhibit 5, page KDN 370. In the version sent to
12 Heller Ehrman on page 376, in that first paragraph,
13 the top of the page, Mr. Shafer seems to have deleted
14 a clause that was in the first sentence of the
15 version that you and he had been looking at two days
16 before at page 370. He seems to have removed the
17 phrase that says "and to begin evaluating whether
18 cohorts of cases should have been referred to SSA."
19 Do you see that language on page 370? Up in the
20 first --
21     A.  Second sentence. Second line.
22     Q.  Yes. Second line of the first paragraph.

Case 1:03-cv-12382-MLW   Document 142-35   Filed 08/22/2008   Page 14 of 17
Case 1:03-cv-11699-PBS   Document 289-3   Filed 04/21/2008   Page 41 of 44

Nibali, Kenneth D.                                          March 5, 2008

73 (Pages 286 to 289)

**286**

1  I'd have to go back and read the text. Do you want
2  me to do that?
3     Q.  Well, would you turn, please, to page KDN
4  387 of that document. If you look further down on
5  the left column, there is a paragraph that begins,
6  fourth. Do you see that paragraph?
7     A.  Yes, I do.
8     Q.  If I could just read that, it says,
9  "fourth, cost containment measures in the privately
10 insured short-term disability, long-term disability
11 and Workers' Compensation benefit systems direct
12 workers to the SSDI program in cases where claimants
13 meet the initial SSDI eligibility criteria, the
14 effect of such measures is to shift some or all of
15 the benefit payments and medical costs from private
16 disability insurance companies to the Federal
17 Government."
18        Is that -- what's just been described in
19 that paragraph, that practice, is that something that
20 the SSA was aware of when you were employed at the
21 SSA in the Associate Commissioner capacity?
22        MR. RENNERT: Objection. Vague. Calls

**287**

1  for speculation.
2        THE WITNESS: Based on when I was at SSA
3  in my experience, I would say SSA was aware of what
4  that -- of the conditions that that paragraph
5  describes.
6        BY MR. PORADA:
7     Q.  And if you look at the right-hand column,
8  the paragraph that -- the first paragraph that begins
9  there, it begins, despite.
10    A.  I see it.
11    Q.  It says, "despite these positive
12 developments, the management of long-term disability
13 claims in the private sector has consistently relied
14 on helping individuals obtain SSDI benefits." When
15 you were employed at the SSA as the Associate
16 Commissioner, was the SSA aware of that, that
17 management practice of long-term disability claims in
18 the private sector as is described there?
19        MR. RENNERT: Objection. Calls for
20 speculation. It's also been asked and answered. Go
21 ahead.
22        THE WITNESS: I'm going to read what I

**288**

1  believe you're asking me to react to, the management
2  of long-term disability claims in the private sector
3  has consistently relied on helping individuals obtain
4  SSDI benefits. I'm not even sure I understand that,
5  that statement.
6        BY MR. PORADA:
7     Q.  Are you still reviewing it?
8     A.  Yes. I'm trying to understand it, I'm
9  saying if I'm understanding what it's saying. Your
10 question about that statement is?
11    Q.  My question was whether when you were the
12 Associate Commissioner at the SSA, that the SSA was
13 aware of the -- what is described here as the
14 management of long-term disability claims, the
15 practice of helping individuals obtain SSDI benefits,
16 if that was a practice that the SSA was aware of?
17        MR. RENNERT: And I'll object as vague,
18 but also assumes facts not in evidence. Go ahead and
19 answer.
20        THE WITNESS: I can't -- I can't answer
21 that. That is a statement I was never familiar with
22 seeing when I was with the Social Security

**289**

1  Administration and disability program. And frankly,
2  I question how it's worded there in terms of helping
3  individuals so -- you know, I've answered the
4  question before that SSA was aware that private
5  disability insurance companies referred individuals
6  to SSA's disability program.
7        BY MR. PORADA:
8     Q.  We have one more comparison of your cohort
9  list. Could you take a look, please, at Exhibit 8,
10 what you were just looking at a moment ago, the
11 cohort lists you have attached at the back of that?
12    A.  Do I need 6 anymore?
13    Q.  No. You don't need 6. If we could find
14 Exhibit 1, the Exhibit E you have attached at the
15 back of that.
16    A.  Okay.
17    Q.  Now, your Exhibit E list again seems to
18 add in a number of different categories. First of
19 all, they are numbered differently, but it seems to
20 add in a number of additional categories based on,
21 for instance, the timing of when somebody was asked
22 to apply for SSDI in the claims process. Is that

Case 1:03-cv-12382-MLW   Document 142-35   Filed 08/22/2008   Page 15 of 17
Case 1:03-cv-11699-PBS   Document 289-3   Filed 04/21/2008   Page 42 of 44

Nibali, Kenneth D.                                   March 5, 2008

75 (Pages 294 to 297)

294

1  at SSA.
2  Q. Now, did you -- have you at any time
3  reviewed the expert report prepared by Mr. Barnes in
4  this case?
5  A. No. I have not.
6  Q. Now, are you aware that as part of his
7  work, Mr. Barnes prepared a list of claims for which
8  he determined that there was no basis for concluding
9  that the claimant met the requirements of SSDI at the
10 time of the -- the onset of the LTD claim?
11 A. I am not -- I don't really have any
12 knowledge about what specifically David Barnes ended
13 up being asked to do. And therefore, what -- what
14 kinds of information he may have developed as a
15 result of that request.
16    I recommended him on the basis that I said
17 before, which is that if we were identifying
18 groupings of cases where we felt that review of them
19 would show that there was really no evidence to
20 support a finding of disability in SSA, that he would
21 be a good individual to head an effort to do that.
22 But then I was no longer in the loop about any

295

1  discussions about how to go about that and who was
2  involved.
3  Q. So were you asked at any time to review
4  any of Mr. Barnes' work or the analysis he performed?
5  A. No. I was not.
6  Q. Were you involved at all in the -- the
7  preparation or completion of his expert report?
8  A. No. I was not.
9  Q. And I think you may have already answered
10 this, but you haven't reviewed any of the claim files
11 that Mr. Barnes identified as claims for which he
12 determined there was not a proper basis for seeking
13 SSDI, is that right?
14 A. Yes. I've answered that and no, I have
15 not.
16 Q. So I take it, then, is it fair to say that
17 you have no opinion on whether the claims identified
18 by Mr. Barnes as having no basis for seeking SSDI,
19 whether you -- you have no opinion on the result that
20 he reached on those claims?
21    MR. RENNERT: Objection. Vague. You mean
22 the specific claims?

296

1  BY MR. PORADA:
2  Q. Specific claims?
3  MR. RENNERT: Oh, the specific claims.
4  Okay.
5  THE WITNESS: I have no information on
6  what he found, so therefore, I would have no opinion
7  about what he found.
8  BY MR. PORADA:
9  Q. Now, you testified earlier that you worked
10 for Susan Daniels. I take it that was when you
11 worked at the Associate Commissioner of Social
12 Security?
13 A. I initially worked for Susan Daniels as
14 the Deputy Associate Commissioner of disability.
15 Thank you for promoting me, but it was just
16 disability, not Social Security. And then I worked
17 under her when she moved up to be what we call a
18 Deputy Commissioner. And then as -- when I headed
19 the office of disability, I reported to her.
20 Q. Do you have any -- do you have any opinion
21 about whether she is someone who is knowledgeable
22 about the SSDI program?

297

1  MR. RENNERT: Objection. Vague. If you
2  know, you can answer.
3  THE WITNESS: I do know, and I will say I
4  have the highest respect for Susan Daniels, and she
5  is a very knowledgeable person.
6  BY MR. PORADA:
7  Q. Now --
8  A. About disability. Just make sure you knew
9  that.
10 Q. Have you, have you -- well, actually, I
11 take it you have reviewed her prior declaration that
12 she prepared in this case, is that right?
13 A. The original declaration, yes, I have.
14 Q. And have you also reviewed an expert
15 report that she prepared and we submitted to Heller
16 Ehrman in February of this year?
17 A. Yes. I did. I think I got that not a
18 long time ago, but I did review it.
19 Q. Was there anything -- focused on first her
20 declaration, was there anything in the declaration
21 that you reviewed that you disagreed with in any way?
22 MR. RENNERT: Objection. I mean, do you

Case 1:03-cv-12829-MBB    Document 242-35    Filed 08/22/2008    Page 16 of 17
Case 1:03-cv-12829-MBB    Document 289-3    Filed 04/21/2008    Page 43 of 44

Nibali, Kenneth D.                                          March 5, 2008

77 (Pages 302 to 305)

**302**

1  Q. I'm sorry, other than the fraud
2  situations, what other instances are you referring to
3  when the claim wouldn't be worked through?
4  A. That's sufficient for now, the fraud
5  example. I also have questions from generally
6  paragraph 28 on through the discussions of what the
7  requirements are for applicants or their
8  representatives to submit adverse evidence. I know
9  Miss Daniels references the Sarah Humphries document
10 which is attached.
11       I believe I stated in my declaration that
12 that is guidance that was produced by the office of
13 general counsel. I believe in here that Susan
14 Daniels even refers to that as regulation. It is
15 not, of course, it is merely an administrative
16 statement, and is subject to any interpretation as to
17 whether it's consistent with existing law and
18 regulation.
19       So that whole discussion raises issues
20 about whether the point being made is that there is,
21 you know, no obligation for people to submit evidence
22 other than evidence that helps their case. So I

**303**

1  generally refer that to a number of paragraphs, at
2  least through number 33.
3    Q. On that point, are you --
4    MR. RENNERT: Is it -- can he finish his
5  answer?
6    BY MR. PORADA:
7    Q. Well, I thought he was finished with those
8  paragraphs.
9    MR. RENNERT: Well, can he finish? You
10 asked him a question, and he said he was highlighting
11 those areas that jumped out at him. Are you finished
12 with that answer?
13   THE WITNESS: I'm not finished with that
14 answer. I will stop there. I've just highlighted
15 those two or three instances of where I do have
16 questions. I would also state that the majority of
17 this document are pretty much statements about how
18 SSA's process operates most particularly in the light
19 of how individuals filing for a disability come in
20 and are encouraged by the agency to file or helped by
21 the agency to file, et cetera.
22       And I would just again raise the issue of

**304**

1  distinction that they should be drawn between that
2  and individuals who are required to come in with no
3  screening by an insurance company that has pretty
4  extensive information about their condition. So
5  while these statements, many of these statements
6  apply directly to the case of an individual, I do not
7  read them as supporting in any way the obligations of
8  an insurance company. I'm finished.
9    BY MR. PORADA:
10   Q. But with respect to that distinction you
11 just made, you're not aware of any SSA rules that
12 draw that sail distinction that you're making between
13 the individual who comes in to apply and those who
14 come to apply because they are asked to do so by
15 their insurance company, is that right?
16   MR. RENNERT: Objection. That's been
17 asked and answered more than once.
18   BY MR. PORADA:
19   Q. And he's just restated it again?
20   A. And I will say no, I'm not aware.
21   Q. Now, focusing on the paragraphs 28 to 33
22 that you were mentioning earlier regarding the Sarah

**305**

1  Humphries document, you have reviewed the Sarah
2  Humphries document before, is that correct?
3    A. Sometime ago, yes.
4    Q. Are you aware of any SSA regulations that
5  contradict what is said in the Sarah Humphries
6  document?
7    MR. RENNERT: Okay. Take the time you
8  need to review this, to answer that question, if you
9  need to review the Sarah Humphries document.
10   THE WITNESS: My answer would be that even
11 if I rereviewed it, I would not have a basis for
12 knowing if there is any regulations inconsistent with
13 it, if that was your question.
14   BY MR. PORADA:
15   Q. Yes. It was.
16   A. Okay.
17   Q. Now, you also testified a few minutes ago
18 that you reviewed Ms. Daniels' expert report attached
19 to the beginning of that exhibit, is that correct?
20   A. This is the one that just came in, right?
21 Yes. I went through it fairly quickly.
22   Q. And do you know when it was that you

Case 1:03-cv-12382-MLW   Document 142-35   Filed 08/22/2008   Page 17 of 17
Case 1:03-cv-11699-PBS   Document 289-3   Filed 04/21/2008   Page 44 of 44

Nibali, Kenneth D.                                    March 5, 2008

81 (Pages 318 to 321)

### Page 318

    BY MR. PORADA:
    Q.  Well, you haven't answered the question. You said those are the major issues that you have. My question is, are there other issues, non-major issues that you've identified having reviewed that that you have with her conclusions in that report?
        MR. RENNERT:  As he sits here today, that's your question?
        BY MR. PORADA:
    Q.  Yes.  After having just reviewed the report.
        MR. RENNERT:  Are there any non-major issues that you've identified?
        BY MR. PORADA:
    Q.  Well, I'm just using that because that was his terminology. He has identified major issues. My question was, are there any other issues?
    A.  Based on the reading I did here, I would say no.
    Q.  And based on your prior review of it, you said you reviewed this previously as well, is that right?

### Page 319

    A.  Very quickly, yes.
    Q.  And based on that prior review?
    A.  This document I only had for a short period of time so -- this document I've only had for a short period of time.
    Q.  And based upon your review of that document prior to today, you don't have any -- you didn't identify any other issues that you have with it, other than the ones that you've already testified about?
    A.  Repeating a major consideration that many of the points that she makes in here, I am not -- I would say I do not disagree with. The conclusions or implications that she may draw from these, particularly in relation to individual claimants coming in to file claims versus individuals that have been forced to come and apply from a disability insurance company, any sort of readings from those kinds of points, I would reserve as a -- as a question I would have.
    Q.  Now, you testified a moment earlier about with a reference to instances of fraud that you've

### Page 320

talked about today, in which the SSA might not process a claim for SSDI?  Do you recall that?
    A.  I do.
    Q.  In your experience at the SSA, did the SSA ever consider a claim to be a fraudulent claim if someone came in, reported on the application form that they were unable to work as of a certain date, in fact, they were not working at the time they filed the application, but it was later determined that they did have work capacity?
        MR. RENNERT:  Objection.  That's been asked and answered.
        BY MR. PORADA:
    Q.  Could you repeat the answer, if in fact it has been asked already?
    A.  It has been.  State it one more time and I will answer.
    Q.  The question is whether in your experience at the SSA, you're aware of the SSA ever treating a claim as a fraudulent claim where someone came in and on the application for SSDI recorded a date as of when they believe they became up able to work, in

### Page 321

fact they were not working at the time they filed the SSDI application, but it was later determined that they did have work capacity?
    A.  I -- I believe my answer to that question was on that specific issue, I generally would not be in the loop of knowing if in fact any prosecution or any pursuance of fraud on that issue alone was undertaken.
    Q.  So the answer is you're not aware of any such instances?  Is that correct?
    A.  I'm not aware.
    Q.  Let's mark this, please.
        MR. RENNERT:  We've been at this for an hour and 40 minutes in this session, so how much more do you have?
        MR. PORADA:  Five minutes.
        MR. RENNERT:  Five minutes.  Are you okay with that?  Five minutes is five minutes.  But if five minutes becomes 15, we are going to stop at five and take a break.
        (Nibali Exhibit No. 11 was marked for identification.)