# EXHIBIT S

# Growth in Disability Benefits

## Explanations and Policy Implications

Kalman Rupp and David C. Stapleton
*Editors*

1998

HD
7105.25
.U6
G76
1998

W.E. Upjohn Institute for Employment Research
Kalamazoo, Michigan



Library of Congress Cataloging-in-Publication Data

Growth in disability benefits : explanations and policy implications /
  [edited by] Kalman Rupp and David C. Stapleton.
    p. cm.
    Papers based on the conference in Washington, D.C. entitled :
The Social Security Administration's Disability Programs :
Explanations of Recent Growth and Implications for Disability Policy
on July 20–21, 1995.
    Includes bibliographical references and index.
    ISBN 0–88099–188–7 (cloth : alk. paper). — ISBN 0–88099–187–9
(pbk. : alk. paper)
    1.Insurance, Disability—United States—Congresses.
2. Handicapped—Employment—United States—Congresses.   I. Rupp,
Kalman.   II. Stapleton, David C.
HD7105.25.U6G76   1998
368.38'2—dc21
                                                              98–24695
                                                                  CIP


Copyright © 1998
W. E. Upjohn Institute for Employment Research
300 S. Westnedge Avenue
Kalamazoo, Michigan 49007–4686



The facts presented in this study and the observations and viewpoints expressed are
the sole responsibility of the authors. They do not necessarily represent positions of
the W. E. Upjohn Institute for Employment Research.



Cover design by J. R. Underhill
Index prepared by Leoni Z. McVey.
Printed in the United States of America.

# The View from SSA's Philadelphia Regional Office

Larry Massanari
*Social Security Administration*

Although this chapter is entitled, "The View From the Trenches," I would challenge the premise that the authors of this chapter are really the ones working in the trenches. Whatever the case, each of us is a practitioner and is responsible for managing a portion of the disability process.

The commentaries we provide are a departure from the formal research papers that make up Chapters 2 through 8. The discussions here are more intuitive and more anecdotal, and perhaps more subjective and speculative than analytical; and I think it is safe to say that they are based less on hard objective data than on our impressions, observations, and opinions. We very much appreciate and are very much impressed by the work that is presented in the earlier chapters. The analyses have certainly added to our understanding of the causal relationships between those factors that most of us had assumed were generating the dramatic increase in our claims. By and large, the findings reflect our own experience, particularly those findings that relate to application growth.

While the results are very useful in the aggregate, we do need to be cautious in applying generalized conclusions to specific sections of the country, and even in assuming that state-level findings are applicable to every area of a particular state. We have seen widely diverse patterns of application growth, and our experience suggests that the reasons for growth vary greatly, not only among states but among counties as well.

My comments are based on observations and experience in the five-state Philadelphia region. Application growth in the mid Atlantic states for the past seven years has generally been consistent with national patterns. The overall rate of growth in this region was a few percentage points ahead of the national average in five of those seven years. We

301

have seen very little, if any, increase in Social Security Disability Insurance (DI)-only receipts. At the other extreme, Supplemental Security Income (SSI)-only cases have increased by a full 102 percent and concurrent claims by 73 percent over that seven-year period.

As you would expect, application growth has been uneven across our five states, ranging from a 34 percent increase in West Virginia to a 64 percent increase in Maryland. The most significant growth has been in Maryland and Virginia. Since 1988, concurrent and SSI-only claims in both of those states have increased by well over 100 percent. Our experience in the Philadelphia region so far in fiscal 1995 would suggest that the rapid growth in initial claims is not yet over. During the first eight months of this fiscal year, our claims receipts were running 13 percent higher than during the same period one year ago. That's five times greater than the national average and more than double the growth in any of the other nine regions. The sharp rise in initial determinations this year is largely the result of a 22 percent increase in the Commonwealth of Pennsylvania. That increase is being driven by significant cuts in the Commonwealth's general assistance program.

In describing the demographics of recent disability applicants, frontline employees tell me that applicants today are more likely to be younger, even younger than the baby boom cohort. They are more likely to be women, and they are more likely to allege a mental or stress-related impairment than at any time in the past. Particularly in the large metropolitan areas in the region, applications for AIDS, HIV infection and Drug Addiction and Alcoholism (DA&A)-related impairments are increasing. Employees are beginning to see the second and third generation of adults from the same household filing for SSI benefits. As a growing number of applicants come to accept SSI as a legitimate and permanent source of income—as a legitimate and permanent way of life—we fear that we may be creating a cycle of dependency that families are going to find more and more difficult to escape.

As in other parts of the country, the business cycle has clearly influenced receipt patterns in this region. The impact of the 1990–1991 recession was very apparent, particularly in highly industrialized areas of the region. However, we are beginning to wonder if longer-term structural changes in the economy have not had an equally significant impact on certain parts of this region. We also wonder whether the widening gap between low- and high-income families has had and will

continue to have a significant effect on program growth. The general economic decline in some parts of this region as well as industrial restructuring have resulted in the elimination of many jobs that in the past have been held by unskilled workers. In our region, job loss has been concentrated in heavy manufacturing, in mining, and in the construction industry. Increased automation and technology have reduced the demand for unskilled and semiskilled labor. Consequently, large numbers of people have simply removed themselves from the labor market because they don't have the education or the skills to compete.

Last week, a 65-year old coal miner filed a retirement application in our office in Clarksburg, West Virginia. He had made well over $50,000 per year, he had lived a good life, and he was now ready to retire. But according to the claims representative who took his application, the man was probably functionally illiterate. He had a very difficult time understanding the most simple explanation or instruction. Similar situations are arising throughout the region. Today, with industries such as coal mining and glass manufacturing beginning to close, it is doubtful whether that same person entering the labor market today could earn more than minimum wage. These individuals might well end up poor, underemployed, perhaps being paid cash "under the table," and filing for SSI on the basis of a developmental disability. In many parts of the region, this is becoming a common applicant profile. These are people who, out of frustration, are dropping out of the labor market and are no longer seeking a job. Sadly, they have no alternative but to turn to us for financial support. These individuals, of course, are not reflected in any of our unemployment statistics.

In the Philadelphia region, cost-shifting actions by state and local governments have been, and I think will continue to be, a major contributor to increased claims receipts. All of our states require, or certainly strongly encourage, applicants to their assistance programs to also file with us. Many local welfare offices continue to refer people to social security (SSA) who are obviously not disabled. Yet, these offices still insist that SSA provide a formal denial.

Two of our states, Pennsylvania and Maryland, operate well-organized and highly effective referral programs. They are aimed at shifting disabled persons from state-funded programs to SSI. For instance, Maryland began contracting with a private company back in the late 1980s to carry out its referral function. The contractor screens, refers,

and represents applicants in an effort to get them on the federal rolls. The contractor is also paid a fee for each welfare recipient who is ultimately placed on SSI or DI rolls. The Maryland program, and a similar program in Pennsylvania, have been highly successful from our perspective in SSA, as well as from theirs. They have been successful because the states' and the contractors' employees are well trained, and they have a very solid understanding of our program. They are also plugged into SSA's service delivery network, which enhances the processing of these referrals and subsequent shift to our rolls.

Our claims workloads, as you would expect, have surged following the introduction of state welfare reform initiatives. Those initiatives have, of course, all been aimed at reducing state expenditures. Both the Commonwealth of Virginia and the District of Columbia tightened up their General Assistance (GA) programs back in 1991, driving a large number of applicants into our offices. Since that time, the District has removed over 40 percent of their eligibles from their GA rolls. Pennsylvania, in 1994, introduced major changes in its GA program affecting a significant number of chronically and transitionally needy persons. That action has had an enormous impact on new SSI applications in the State of Pennsylvania.

The state of Maryland eliminated its GA cash benefit program for disabled persons this month. Effective July 1995, they dropped 22,000 disabled persons from their cash benefit rolls. That cash benefit will now be replaced by a much more modest provision for special services. Needless to say, we expect the action by Maryland to have a sizable effect on new SSI applications in that state. As several state workers have said in Maryland, SSI is now "the only game in town," and so we are expecting large numbers of applicants to come into our offices in the coming months.

We think it is likely that Virginia also may eliminate its General Assistance program, except for emergency assistance, during their next legislative session. They nearly did so this year. Considering our experience with the reduction of state GA programs and what has happened to claims intake in our offices, I can't help but believe that the welfare reform proposals that are currently being debated in the Congress will have an enormous impact on social security offices. If limits of any kind are imposed upon Aid to Families with Dependent Children (AFDC) benefits, I think we can expect many former recipients to

begin filing for SSI. I agree with the conclusions reached by the authors of Chapters 2 and 8 with respect to the welfare reform initiatives. I think, too, that their conclusions with respect to block granting, AFDC, or Medicaid are also right on target.

Finally, just a brief comment on our SSI outreach activities in the Philadelphia region. Our local field offices, like field offices across the country, conducted very aggressive outreach programs back in the late 1980s and early 1990s. We worked in close cooperation with private agencies, community organizations, and service providers to increase program understanding, to train their employees, and to target potential eligibles. Despite a high level of commitment and an equally high level of activity, neither these internally managed initiatives nor the work of outreach grantees has, in my judgment, had an appreciable affect on application growth. While we would see sudden spurts of claims following major outreach events or outreach activities, our impression is that most of those new applicants would have eventually filed for SSI at some future stage anyway. So, at most, my suspicion is that our outreach efforts got people to file somewhat earlier than they would have otherwise. Frankly, I am inclined to believe, as are many of my staff, that the expanded involvement of advocates, the legal aid community, and even private attorneys has done more to influence program growth than our own agency-sponsored initiatives.