1.  Sign and return the enclosed Reimbursement Agreement. This Agreement will agree to reimburse Connecticut General Life Insurance Company for any [LTD] benefits overpaid....

2.  Apply for Social Security Disability benefits. In certain circumstances, our Social Security Assistance Team (SSAT) will be able to assist you with the filing process. We ask that you extend your full cooperation to the consultant, if contacted.

3.  Send a copy of your receipt of application of Social Security Disability.

Cited as Administrative Record 408-410 and quoted in part in Plaintiff's Memo. of Law in Support of Mot. for Summary Judgment, p.2 (copy attached as Exhibit G to Abati Aff.).[12]

A seventh set of public disclosures occurred in a case filed against LINA in March 2003.

Harker v. Life Ins. Co. of N. Am., Case No. 03-CIV-20587 (S.D. Fla.). Dianne Harker challenged

LINA's decision to terminate her LTD benefits after one year based on its determination that she

was no longer disabled. She alleged that LINA's decision was wrongful, particularly because she

had been awarded SSDI benefits. The parties settled and the case was dismissed on November 25,

2003. Many of Barrett's factual allegations are identical to the allegations that were publicly

disclosed in various pleadings and motions filed in Harker before Barrett filed the instant action.

For example:

- Complaint (copy attached to Abati Aff. as Exhibit H): Ms. Harker alleged that "LINA demanded . . . Harker . . . pursue an application for [SSDI]. LINA hired, at its own expense, an attorney to represent Harker in the Social Security disability matter. LINA instructed retained counsel to represent to the [SSA] that Harker was totally and permanently disabled and entitled to [SSDI] benefits." Harker Compl. ¶ 15.

- Answer (copy attached to Abati Aff. as Exhibit I): "Defendant admits that the [LTD] Policy required Plaintiff to apply for [SSDI] Benefits and further admits that it assisted Plaintiff in applying for [SSDI] Benefits." Harker Answer ¶ 15.

- LINA's policy, attached to Plaintiff's summary judgment brief (copy attached to Abati Aff. as Exhibit J): "The Insurance Company will assume the Employee . . . [is]

---

[12] Compare Compl. ¶ 67 (all LTD claimants must apply for SSDIB under threat of their LTD benefits being reduced by estimated SSDIB), ¶¶ 126-29 (LTD claimants who apply for SSDIB must sign a "Reimbursement Agreement" agreeing to pay CIGNA any SSDIB they receive), ¶ 101 (the initial letter or telephone call to claimant conveys the same information as that included in the letter to plaintiff in the Kelly case).

receiving Other Income Benefits if they may be eligible for them. These assumed benefits will be the amount the Insurance Company estimates the Employee . . . may be eligible to receive. Disability Benefits will be reduced by the amount of any assumed benefits as if they were actually received." Page 13 of Exhibit 1 to Harker Motion for Final Summary Judgment and Incorporated Memorandum of Law. However, "this assumption will not be made if the Employee gives the Insurance Company proof of the following events. 1. Application was made for these benefits 2. A Reimbursement Agreement is signed  3. Any and all appeals were made for these benefits or the Insurance Company determines further appeals will not be successful 4. Payments were denied." Id.

The pleadings in these cases expressly describe CIGNA's practice of requiring its LTD claimants also to apply for SSDI benefits in virtually identical language to that employed by Barrett in her complaint – Barrett offers no material, new allegations. Moreover, as described below, CIGNA's practices were also the practices employed by the entire LTD industry and the industry-wide practice was not only known to the United States government but described by it in reports and publications.

<b>b.    Public Disclosures of the Industry-Wide Practice</b>

Disclosures that do not name the particular *qui tam* defendant, but rather disclose a common industry-wide practice will also give rise to a jurisdictional bar if they "'set the government squarely on the trail of fraud' such that it would not [be] difficult for the government to identify [the defendant] as a potential wrongdoer." In re AWP Litig., 538 F. Supp. 2d at 383 n. 10 (*quoting* U.S. ex rel. Fine v. Sandia Corp., 70 F.3d 568, 571-72 (10th Cir. 1995); see also, U.S. ex rel. Gear v. Emergency Med. Assocs. of Ill., 436 F.2d 726, 729 (7th Cir. 2005). In the present case, Barrett herself alleges that CIGNA is "the third-largest seller of disability insurance policies in the country, with a market share of 8.7%." Compl. ¶ 19. In consequence, disclosures about industry wide SSDI application practices clearly implicate CIGNA's practices. Perhaps even more significantly, there are several disclosures of this LTD industry practice made by the federal

government itself, thereby establishing that the government did not require Barrett to put it "on the

trail of fraud." Here are several examples:

- "SSA Disability – Return-to-Work Strategies from Other Systems May Improve Federal Programs," GAO/HEHS Report 96-133, at 22 (July 11, 1996), *available at* http://www.gao.gov/archive/1996/he96133.pdf ("[R]educing private benefits dollar for dollar against DI benefits can lower disability insurance premiums. As a result, it is common for private plans to require claimants to apply for DI benefits.").

- Celeste Hemingson, "The View from SSA's Concord, New Hampshire, District Office" ("There have also been some changes in the world of work that cause people to apply for Social Security Disability Insurance (DI). This is the other side of the coin. More employers are requiring a disability claim before a company's private insurance policy will pay."), *in* GROWTH IN DISABILITY BENEFITS: EXPLANATIONS AND POLICY IMPLICATIONS 310 (Kalman Rupp & David C. Stapleton, eds. 1998) (excerpt attached to Abati Aff. as Exhibit K).

- D. Gregory Rogers, presentation at American Trial Lawyers Association program, "The Effect of Social Security Awards on Long-Term Disability Claims," *available on* Westlaw *at* 1 Ann.2001 ATLA-CLE 1117, at 1 (July 2001) ("The insurance company . . . will insist upon your client obtaining Social Security benefits so that it may reduce its payments by that amount. The language of the policy usually states that the long-term disability benefits will be offset by that amount the claimant and his or her family members 'receives or is entitled to receive' from the Social Security Administration. The LTD benefit providers sometimes even go so far as to provide representation from their in-house attorneys for the claimant in his or her Social Security case.").

- Paul Verkuil, Statement to the Social Security Subcommittee of the House Ways and Means Committee (June 2002) (stating that the number of disability claims was expected to rise, in part because of "the increasing tendency of private insurance companies to require as a condition of payment that claimants pursue their offsetting SSA benefits."), *available at* http://waysandmeans.house.gov/legacy/socsec/107cong/6-11-02/107-86final.htm.

- Paul Verkuil & Jeffrey Lubbers, "Alternative Approaches to Judicial Review of Social Security Disability Cases: A Report to the Social Security Advisory Board," Admin. L. REV., vol. 55, at 2 (2003) (same), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=418241.

Moreover, the common practice by which LTD insurers and large employers who self-

insure their LTD benefits require or direct their applicants also to apply for SSDI benefits is

disclosed not only by expert commentators, some of whom are listed above, but also by the fact

that this routine practice is plainly described in scores of decisions issued in litigations in state and

federal courts sitting in jurisdictions across the United States. Footnote 11 provides citations to

thirty-two decisions all rendered *before* Barrett's action was filed involving more than twenty-five different insurers, pension plans or employers that required SSDI applications to be filed by claimants seeking private disability benefits.[13]

---

[13] Meinze v. Holmes, 532 N.E.2d 170, 171 (Ohio App. 1987) ("[u]nder the disability policy covering the University's employees, TIAA required Meinze to apply for Social Security benefits because those payments would reduce the amounts contractually payable by TIAA"); Calloway v. Pacific Gas & Elec. Co., 800 F. Supp. 1444, 1445 (E.D. Tex. 1992) (employer's long-term disability plan "requires all LTD recipients to apply for social security disability benefits"); Wallace v. Transport Life Ins. Co., 841 P.2d 613, 614 (Okla. App. 1992) (LTD plan contained offset for SSDI received or "which would have been provided or available if an application for the same were approved" by SSA; "[t]he trial court found the Plan provisions requiring Wallace to apply for Social Security . . . to be clear, unambiguous and not in violation of public policy"); Cox v. Mid-America Dairymen, Inc., 965 F.2d 569, 573 (8th Cir. 1992) (employer's retirement plan "provides that a Plan participant must apply for Social Security disability benefits to be eligible for Plan disability benefits"); Scott v. Shalala, No. 94-50096, 1994 WL 725034, at *1 (5th Cir. Dec. 19, 1994) ("her application for SSDI was required by her insurer"); Frost v. Mihm, No. 95-CA-38, 1995 WL 737914, at *1 (Ohio App. Nov. 15, 1995) ("under Navistar's nonoccupational long-term disability program, . . . Frost was required to apply for Social Security disability benefits"); State of Vt. v. G.S. Blodgett Co., 656 A.2d 984, 988 n.1 (Vt. 1995) ("defendant's insurer required Beauchemin to apply for Social Security [disability] benefits"); Buck v. Fries & Fries, Inc., 953 F. Supp. 896, 906 (S.D. Ohio 1996) ("the Court cannot censure UNUM for having requested or required the Plaintiff to apply for Social Security benefits when it was entitled to a set-off if such benefits were awarded"); Hughes v. Reinsurance Group, 957 F. Supp. 1097, 1100 (E.D. Mo. 1996) ("Plaintiff states in her affidavit that the Personnel Department required her to apply for Social Security disability benefits as a prerequisite to receiving long-term disability benefits. Plaintiff maintains that she informed the doctors and the Social Security employees that she was not disabled from all work."); Harris v. Marathon Oil Co., 948 F. Supp. 27, 28 (W.D. Tex. 1996) ("Under the provisions of the long term disability plan Mr. Harris was required to apply for social security benefits"); Pikora v. Blue Cross & Blue Shield, 970 F. Supp. 591, 593-94 (E.D. Mich. 1997) ("In order to apply for [her employer's LTD] program, the Plaintiff was required to apply for Social Security" disability benefits); Greig v. Metro. Life Ins. Co., 980 F. Supp. 169, 171 (W.D. Va. 1997) ("MetLife may reduce a beneficiary's long-term disability benefits by the estimated amount of Social Security disability benefits for which MetLife considers the beneficiary eligible, even if Social Security has not yet approved the disability application"; plaintiff filed for SSDI "in order to avoid having MetLife reduce his long-term disability benefits"); Thornley v. Penton Publ'g, Inc., 104 F.3d 26, 31 (2d Cir. 1997) ("Under the terms of [the employer's LTD] plan, . . . a beneficiary must apply for social security payments and the benefit amount is reduced by their receipt"); Sumner v. Michelin N. Am., Inc., 966 F. Supp. 1567, 1582 (M.D. Ala. 1997) ("Sumner was told that, in order to apply for his retirement benefits as a totally disabled employee, he would first have to apply for Social Security benefits"); Matz v. Sisters of Providence, No. CIV. 98-1598, 1999 WL 1201682, at *4 (D. Or. Dec. 8, 1999) (plaintiff "applied to social security because Standard Insurance required her to apply"); Rigel v. Rigel, No. CT98-0021, 1999 WL 436824, at *1 (Ohio App. June 23, 1999) ("appellant had begun the process of filing for social security disability benefits, for which he was required to apply pursuant to the terms of his Met Life policy"); Van Meter v. Smith, 14 S.W.3d 569, 571 (Ky. App. 2000) (employer's pension plan "included a coordination of benefits clause whereby Smith was required either to apply for social security disability benefits or to have his pension benefits reduced according to the plan's estimate of what his social security benefit would be"); Myers v. Hercules, Inc., 253 F.3d 761, 763 (4th Cir. 2001) ("Myers, as required by the Plan, applied for disability benefits under the Social Security Act (Her LTD benefits would be reduced by the amount of any Social Security award.)"); Marx v. Meridian Bancorp., No. CIV. A. 99-CV-4484, 2001 WL 706280, at *5 (E.D. Pa. June 20, 2001) ("Plaintiff highlights the provisions of the plan that require a claimant to apply for Social Security Disability Income ('SSDI') in order to retain LTD"); Rocca v. Standard Ins. Co., No. 01-2069, 2001 WL 1667807, at *1 (E.D. Pa. Dec. 20, 2001) ("Standard sent [plaintiff] a letter reminding him of his obligation to pursue Social Security Disability benefits"); Hackett v. Xerox Corp. Long-Term Disability Income Plan, 177 F. Supp. 2d 803, 806 (N.D. Ill. 2001) ("Xerox advised Hackett that as a condition to his continuing to receive long-term disability benefits he was required to apply for social security disability benefits") rev'd on other grounds, 315 F.3d 771 (7th Cir. 2003) ; Thompson v. E.I. DuPont de Nemours & Co., 140 F. Supp. 2d 764, 777 (E.D. Mich. 2001) ("Plaintiff

Finally, it is equally well disclosed that the practice "of requiring a [SSDI] disability claim" before policy benefits will be paid also extends to government entities that provide long term disability benefits to their public employees. Most notably, a review of the applicable federal statutes and regulations "discloses" that under the Federal Employees Retirement System ("FERS") Act (5 U.S.C. § 8451), federal employees who apply for FERS disability benefits are required to apply for SSDI benefits which, if awarded, are offset against FERS statutory benefits. 5 C.F.R. § 844.201(b)(1). See Trevan v. Office of Personnel Mgmt., 69 F.3d 520, 524 & n.6 (Fed. Cir. 1995) ("OPM's regulations, and the disability benefits application form completed by Petitioner, require application for . . . Social Security disability benefits prior to filing for FERS disability retirement."). FERS imposes this requirement even though its definition of disability ("inability to perform useful and efficient service in the employee's present position or a reasonable reassignment"), like the definition in CIGNA's LTD policies, is easier to satisfy than

---

asserts that he was *required* [under the LTD plan] to apply for SSDI benefits, despite his doubt that he qualified for such an award"); Ardolino v. Metro. Life Ins. Co., No. Civ. A. 00-12115, 2001 WL 34563168, at *4 n.9 (D. Mass. July 2, 2001) (Bowler, M.J.) (plaintiff alleged that under Tufts University's LTD plan, she was "required . . . to apply for Social Security benefits"); Lolos v. Solutia, Inc., 193 F. Supp. 2d 364, 368 (D. Mass. 2002) (Neiman, M.J.) ("Defendant characterizes the SSDI application requirement as a . . . condition of Defendant's internal disability plan"); Garst v. Wal-Mart Stores, Inc., 30 Fed. Appx. 585, 591 (6th Cir. 2002) (LTD plan stated that claimants were "required to apply for [SSDI] . . . [and] follow the appeal process through to a hearing before an administrative law judge if necessary"; plan included an offset for "estimated Other Income Benefits," including estimated SSDI); Geiszler v. Comm'r of Internal Revenue, No. 4600-01S, 2002 WL 31427006, at *1 (U.S. Tax Ct. Oct. 29, 2002) ("Pursuant to the provisions of her long-term disability plan, she was required to apply for SSDI coverage"); DiGiovanni v. Guardian Life Ins. Co., No. CIV. A. 98-10908, 2002 WL 1477175, at *7 (D. Mass. June 28, 2002) (O'Toole, J.) ("The Policy provided that an insured's benefits . . . 'shall be reduced by the amount [of SSDI benefits] the Employee receives or is entitled to receive' . . . . Guardian reminded DiGiovanni that the Policy required her to apply for Social Security benefits"); Whiteaker v. Metro. Life Ins. Co., No. CIA 0:00-2693-24, 2002 WL 32333147, at *4 (D.S.C. Nov. 13, 2002) ("As a condition of receiving LTD benefits, Plaintiff was required to apply for benefits from the Social Security Administration"); Estades Negroni v. Assocs. Corp. of N. Am., 208 F. Supp. 2d 144, 146 (D.P.R. 2002) (insurer required claimant to apply for SSDI and said failure to do so would result in suspension or termination of LTD benefits), aff'd, 377 F.3d 58, 62 (1st Cir. 2004); MAPCO Coal Inc. v. Godwin, 786 N.E.2d 769, 771 (Ind. App. 2003) (LTD claimant signed reimbursement agreement that stated in part: "I understand that . . . the Plan will estimate my Social Security Award . . . and commence applying the non-duplication provisions of the [ ] Plan. I understand that I must apply for a Social Security Disability Award. If I am denied such benefit by the Social Security Administration, I agree to appeal immediately and pursue my appeal until I receive a second denial (or award)"); Quast v. Square D Co., No. 02:01-CV-1135, 2003 WL 23415018, at *4 (S.D. Ohio July 15, 2003) ("a claimant applying for benefits pursuant to Square D's Plan is required to apply for social security benefits at the same time, ensuring the setoff provision will be triggered"); Napier v. Hartford Life Ins. Co., 282 F. Supp. 2d 531, 535 (E.D. Ky. 2003) (plaintiff applied for SSDI "at the mandate of Hartford").

the SSA's stricter definition (inability to perform any substantial gainful activity).  Id. at 524.

Footnote 14 below lists other state and municipal plans with similar requirements.[14]

        c.      **The Essential Elements of Barrett's Claim Have Been Publicly Disclosed.**

In sum, the above cases and publications constitute public disclosures of the "essential

elements" of Barrett's claim:  that CIGNA – like all the other providers of disability benefits

---

[14]

- Under the Kansas Employee Retirement System, an applicant for LTD benefits "must make an initial application for social security disability benefits and, if denied such benefits, the member must pursue and exhaust all administrative remedies of the [SSA] which include, but are not limited to, reconsideration and hearings." Kan. Stat. Ann. § 74-4927(1)(B) (last amended 1987). "During the period in which such member is pursuing such administrative remedies prior to a final decision of the [SSA], social security disability benefits may be estimated and may be deducted from the amount of [LTD] benefit payments under such plan." Id.

- Under the Maine Employee Retirement System, when a state employee applies for disability retirement benefits, "[i]f the employment for which creditable service with the employer is allowed was also covered under the United States Social Security Act, the application must include proof that the member has made application for benefits under this Act." Me. Rev. Stat. Ann. Tit. 5, § 17925(3) (last amended 1995).

- Under the Missouri Employee Retirement System, "[a]ny employee who applies for disability benefits . . . shall provide proof of application for Social Security disability benefits. If Social Security disability benefits are denied, the employee shall also provide proof that the employee has requested reconsideration, and upon denial of the reconsideration, that an appeal process is prosecuted." Mo. Rev. Stat. § 104.110(5) (last amended 1997). If the employee fails to apply for or re-apply for SSDI or appeal a denial, the employee "will have his/her benefits reduced by the amount which s/he would have received as Social Security primary disability benefits had s/he applied for and been granted these benefits." Mo. Code Regs. Ann. Tit. 16, § 40-3.050(2) (last amended 1996).

- Under the Virginia Employee Retirement System, "[u]nless otherwise directed, to be eligible for [LTD] benefits under this section, the employee must apply for Social Security disability benefits." Va. Code Ann. § 51.1-1112(F) (last amended in 2000 except that "unless otherwise directed" was added in 2004). The requirement is enforced through a provision allowing the system to deduct estimated SSDI benefits. Id. § 51.1-1114(B) (offset in effect as of 2000; some language changed in 2006)

- In Oregon, an employee entitled to receive permanent total disability benefits under the state Workers' Compensation act "shall make application for federal social security disability benefits." Or. Admin. R. 436-100-0020(1) (last revised 1985); see Or. Rev. Stat. § 656.727(1) (directing state agency to issue rules "[r]equiring injured workers to make application for federal Social Security disability benefits") (last amended 1979). An injured worker who fails to apply for SSDI benefits "shall be subject to suspension of benefits until the worker has complied." Or. Admin. R. 436-100-0040(1) (last revised 1985).

- The City of San Diego requires employees who apply for disability benefits under the city's plan to apply for SSDI benefits. "[T]he [city's LTD] plan is entitled to an offset for benefits to eligible employees under the Social Security program. It is reasonable, therefore, for the LTD plan to require employees to apply for benefits and provide the information since the LTD plan and Social Security are mutually exclusive by design. To not provide some enforcement mechanism would defeat the intent and the terms of the LTD policy." Memorandum of Law by attorney for the City of San Diego, CA. ML-96-3, p. 2 (Jan. 9. 1996), available at http://docs.sandiego.gov/memooflaw/ML-96-3.pdf.

- Some state Welfare offices require claimants – even those who clearly are ineligible – to apply for SSDI. See infra at 46-47.

referenced above – requires all of its LTD claimants to apply for SSDI benefits, and that it

enforces this requirement through the Estimated SSDI Offset provision in its policies. This public

disclosure necessarily encompasses Barrett's contention that, included within the universe of

claimants on whom CIGNA imposes this requirement is, by definition, the subset of LTD

claimants whom Barrett alleges to exist, *i.e.*, claimants whose claim files allegedly contain

documentation showing that they "cannot possibly be eligible" for SSDI under the SSA's stringent

definition of "disability."[15] Not one of the public disclosures identified above suggests that any

disability insurer or public provider of disability benefits pre-screens claimants who contend that

they are disabled under the private or public disability program from which they seek benefits

before directing them to apply for SSDI benefits.

In consequence, before Barrett filed this action, the allegedly fraudulent scheme had been

publicly disclosed many times, many ways and by diverse means. Barrett has not alleged a single

new fact to "alert the responsible [government] authority that fraud may be afoot." U.S. ex rel.

Feingold v. AdminaStar Fed., Inc., 324 F.3d 492, 496 (7th Cir. 2003). Other than parroting factual

allegations that have long been in the public domain, she has done nothing except add her novel

conclusion that CIGNA's (and the LTD industry's) well-known, decades-long practice constitutes

fraud on the SSA. Even if her legal theory were correct, which it is not, she still would not be able

to defeat the public disclosure bar. See, e.g., U.S. ex rel. Findley v. FPC-Boron Employees' Club,

---

[15] In addition, there were public disclosures of the following allegations which, though not essential elements of Barrett's claim, also appear in her Complaint:

- CIGNA requires LTD claimants to sign "Reimbursement Agreements" in which they elect either to collect reduced LTD benefits while their SSDI applications are pending and receive the difference later if their SSDI applications are denied, or to collect full LTD benefits while their applications are pending subject to an agreement to repay CIGNA any and all SSDI benefits they are awarded. See Compl. ¶¶ 101, 120, 126-29.
- CIGNA representatives use letters and telephone calls to "threaten" LTD claimants that they must apply for SSDI benefits. See Compl. ¶¶ 67, 104-05, 124.
- Some LTD claimants apply for SSDI benefits only because CIGNA directs them to. See Compl. ¶¶ 123, 177, 188, 196, 209-10.

26

105 F.3d 675, 688 (D.C. Cir. 1997) ("[a] relator's ability to recognize the legal consequences of a publicly disclosed fraudulent transaction does not alter the fact that the material elements of the violation already have been publicly disclosed").

### 3.    This Action Is Based Upon the Publicly Disclosed Allegations or Transactions.

After determining that the transactions or allegations in a relator's *qui tam* complaint were publicly disclosed before she filed suit, the next inquiry is whether her action is "based upon" the public disclosures. See U.S. ex rel. Rost v. Pfizer, Inc., 507 F.3d 720, 728 (1st Cir. 2007). The First and the Federal Circuits are the only courts of appeal that have not yet examined the meaning of "based upon." Of the eleven other circuits, nine follow the majority rule and two follow a minority rule.

Under the majority rule, an action is "based upon" publicly disclosed allegations or transactions when the relator's allegations are similar to the publicly disclosed allegations, regardless of where the relator obtained her information. See U.S. ex rel. Doe v. John Doe Corp., 960 F.2d 318, 324 (2d Cir. 1992); U.S. ex rel. Mistick PBT v. Housing Auth., 186 F.3d 376, 386-88 (3d Cir. 1999); Fed. Recovery Servs. v. U.S., 72 F.3d 447, 451 (5th Cir. 1995); U.S. ex rel. McKenzie v. Bellsouth Telecomms., Inc., 123 F.3d 935, 940-41 (6th Cir. 1997); Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp., 276 F.3d 1032, 1045 (8th Cir. 2002); U.S. ex rel. Biddle v. Bd. of Trustees of Leland Stanford Jr. Univ., 161 F.3d 533, 536-40 (9th Cir. 1998); U.S. ex rel. Precision Co. v. Koch Indus., 971 F.2d 548, 552-53 (10th Cir. 1992); Cooper v. Blue Cross and Blue Shield of Fla., Inc., 19 F.3d 562, 567-68 (11th Cir. 1994); U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn, 14 F.3d 645, 653-55 (D.C. Cir. 1994).

The Fourth and Seventh Circuits are the only appellate courts to follow the minority rule, under which an action is "based upon" publicly disclosed allegations or transactions only when the

27

relator's allegations "derive from" the public disclosure. See U.S. ex rel. Mathews v. Bank of

Farmington, 166 F.3d 853, 863-64 (7th Cir. 1999), and compare, U.S. ex rel. Wilson v. Graham

County Soil & Water Conservation Dist., 528 F.3d 292, 307-08 (4th Cir. 2008).

Within this district, two judges have adopted the majority rule. See U.S. ex rel. Duxbury

v. Ortho Biotech Prods., L.P., 551 F. Supp. 2d 100, 107-08 (D. Mass. 2008) (Zobel, J.); U.S. ex

rel. O'Keeffe v. Sverdup Corp., 131 F. Supp. 2d 87, 92-93 (D. Mass. 2001) (Saris, J.).  Three have

followed the minority rule. See U.S. ex rel. Rost v. Pfizer, Inc., 446 F. Supp. 2d 6, 19-22 (D.

Mass. 2006) (Tauro, J.), vacated on other grounds, 507 F.3d 720 (1st Cir. 2007); U.S. ex rel.

LeBlanc v. Raytheon Co., 874 F. Supp. 35, 39-41 (D. Mass. 1995) (Lindsay, J.); U.S. ex rel.

LaValley v. First Nat'l Bank, 707 F. Supp. 1351, 1366-67 (D. Mass. 1988) (Wolf, J.).

Although this Court in LaValley adopted the minority rule, it did so twenty years ago, long

before the development of nearly all of the case law examining this issue.  Moreover, given the

circumstances in LaValley, this Court considered its determination to be "substantially a finding

of fact," rather than a "controlling question of law."  U.S. ex rel. LaValley v. First Nat'l Bank,

Civ. A No. 86-236, 1990 WL 112285, at *6 (D. Mass. July 30, 1990) (Wolf, J.) (denying relator's

request for certification of an interlocutory appeal on the "based upon" issue).

Furthermore, in the only public disclosure decisions issued in this federal district (and

apparently in all other jurisdictions) since the Supreme Court decided Rockwell Int'l Corp. v.

U.S., 127 S. Ct. 1397 (2007), both Judges Saris and Zobel held that Rockwell requires the

majority interpretation of "based upon."  See In re AWP Litig., 538 F. Supp. 2d 367, 379 (D.

Mass. 2008) (Saris, J.); U.S. ex rel. Duxbury v. Ortho Biotech Prods., L.P., 551 F. Supp. 2d 100,

107-08 (D. Mass. 2008).  Examining the "original source" exception to the jurisdictional bar

(described infra), the Rockwell Court held that a relator must prove she is an original source of the

information *on which her allegations are based*, not an original source of the information on which the public disclosures are based. Rockwell, 127 S. Ct. at 1407.[16] As Judge Zobel noted, "[t]he minority view [of the "based upon" requirement], which would not find a *qui tam* action 'based upon' the public disclosure so long as the relator possesses independent knowledge of the allegations, 'swallows the original source exception [as clarified in Rockwell] whole.'" Duxbury, 551 F. Supp. 2d at 108. In other words, Rockwell made clear that it is the relator's burden, in proving she is an original source, to show that the information on which her allegations are based derive from her independent knowledge rather than a public disclosure; it is not the defendant's burden to prove the opposite, i.e., that the relator's allegations derive from a public disclosure. See also, Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp., 276 F.3d 1032, 1045 (8th Cir. 2002) ("[A] relator's knowledge could not be 'independent' of the public disclosure, § 3730(e)(4)(B), if it was derived from the public disclosure. The majority of courts have considered it inconceivable that Congress would have drafted the statute so poorly as to have included a provision that could never have any effect.")

Applying the majority rule, because Barrett's allegations are both similar to and, in many instances, exactly the same as the myriad public disclosures identified above, this action is "based upon" the public disclosures and must be dismissed unless Barrett can prove that she falls under the Original Source Exception.

4.    **Barrett Cannot Prove that She Falls Under the "Original Source" Exception to the Public Disclosure Bar.**

If the Court finds that Barrett's action is based upon publicly disclosed allegations or transactions, the jurisdictional bar applies and the Complaint must be dismissed unless Barrett

---

[16] Although the Rockwell Court did not expressly address the "based upon" requirement, it noted in dictum that the jurisdictional bar prohibits "actions based on publicly disclosed allegations *whether or not the information on which those allegations are based has been made public*," thereby supporting the majority view of the "based upon" requirement. Rockwell, 127 S. Ct. at 1407 (emphasis added).

meets the "original source" exception.  See 31 U.S.C. § 3730(e)(4)(B).  Here Barrett has the

burden of proof.  Rockwell Int'l Corp. v. U.S., 127 S. Ct. 1397, 1405 (2007); U.S. ex rel.

Grynberg v. Praxair, Inc., 389 F.3d 1038, 1052 (10th Cir. 2004).  She must prove that she is an

"original source" for each of her claims in the most recent amendment to her complaint.

Rockwell, 127 S. Ct. at 1409-1410; In re AWP Litig., 538 F. Supp. 2d 367, 379 (D. Mass. 2008)

(Saris, J.).

      To show she is an "original source," Barrett must prove two things.  First, she must

establish that she has "direct and independent" knowledge of the information on which her

allegations are based.  See 31 U.S.C. § 3730(e)(4)(B); Rockwell, 127 S. Ct. at 1405.  Second, she

must prove that she disclosed the information on which her allegations are based to the

government before filing her original sealed complaint.  See 31 U.S.C. § 3730(e)(4)(B); Rockwell,

127 S. Ct. at 1405.  As explained below, Barrett cannot meet either requirement, much less both.

        **a.**     **Barrett Cannot Prove that She Has Direct and Independent**
                  **Knowledge of the Information on Which Her Allegations Are**
                  **Based.**

      CIGNA cannot know, or even imagine, how Barrett will carry her burden of proof.  In this

section, CIGNA (i) sets out the requirements for such proof and (ii) explains why the very unique

circumstances surrounding the manner by which Barrett came to be the relator in this action and

her lack of knowledge concerning the material allegations in her own complaint demonstrate that

she will not meet that burden.

      The Supreme Court's decision last year in Rockwell was its first foray into the meaning of

"direct and independent knowledge" for purposes of the *qui tam* jurisdictional bar.  Rockwell

"establishes that the 'direct and independent knowledge' that a relator must have is at a higher

level than previously required, consistent with the provision's purpose of preventing parasitic suits

with inaccurate predictions or worthless allegations."  John T. Boese, CIVIL FALSE CLAIMS AND

*QUI TAM* ACTIONS § 4.02[D] at 4-102 (3d ed. 2007). Under <u>Rockwell</u>, the information as to which the relator is required to have direct and independent knowledge is the information on which the allegations in her *amended complaint* are based. <u>Rockwell</u>, 127 S. Ct. at 1409 ("when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction").

There are three parts to the "direct and independent knowledge" requirement. First, the information must have come to the relator directly and not through an intervening agency. Second, the information must be something beyond what the public already knows. Third, the relator must have obtained the information not only before she filed her original sealed complaint, but, according to some courts, before the date of the public disclosures.

> (1)   Relator Must Have Obtained Her Knowledge Directly and Not Through an Intervening Agency, Such as Her Lawyer.

A relator cannot be an original source unless she has "direct and independent" knowledge of the information on which her allegations are based, "'marked by the absence of an intervening agency'" and "'unmediated by anything but [her] own labor.'" <u>U.S. ex rel. Grynberg v. Praxair, Inc.</u>, 389 F.3d 1038, 1052 (10th Cir. 2004) (quoting <u>Kennard v. Comstock Res. Inc.</u>, 363 F.3d 1039, 1044 (10th Cir. 2004)) ; <u>accord</u> <u>In re AWP Litig.</u>, 538 F. Supp. 2d 367, 379, 384 (D. Mass. 2008). Her knowledge cannot be "secondhand information." <u>U.S. ex rel. Barth v. Ridgedale Elec., Inc.</u>, 44 F.3d 699, 703 (8th Cir. 1995). Rather, it must have "resulted from [her] direct discovery of information through [her] personal efforts and investigation." <u>U.S. ex rel. Rost v. Pfizer, Inc.</u>, 446 F. Supp. 2d 6, 24 (D. Mass. 2006) (Tauro, J.), <u>vacated on other grounds</u>, 507 F.3d 720 (1st Cir. 2007). <u>See, also, U.S. ex rel. Fine v. Advanced Sciences, Inc.</u>, 99 F.3d 1000, 1006-07 (10th Cir. 1996) (information must be "gained by [her] own efforts and not acquired from the labors of others"); <u>U.S. v. N.Y. Med. Coll.</u>, 252 F.3d 118, 121 (2d Cir. 2001) (same); <u>U.S. ex rel.</u>

Glaser v. Wound Care Consultants, Inc., No. 1:05-CV-573, 2007 WL 4285367, at *1 (S.D. Ind. Dec. 3, 2007) (relator was not an original source because she learned the information on which her allegations were based from her attorney); U.S. ex rel. Paranich v. Sorgnard, 286 F. Supp. 2d 445, 452-53 (M.D. Pa. 2003) (same).

If someone else (*e.g.*, relator's counsel) discovered the alleged fraud, and then relayed that information to the relator, the relator is not an original source of the information, even if the relator continues an investigation and finds additional information. See, e.g., U.S. ex rel. Precision Co. v. Koch Indus., 971 F.2d 548, 553-554 (10th Cir. 1992); Fine, 99 F.3d at 1007 ("to be independent, the relator's knowledge must not be derivative of the information of others, even if those others may qualify as original sources").

> (2)    The Relator's Information Must Be Something More
> than What the Public Already Knows.

The second requirement for "direct and independent" knowledge is that it must be something more than what already exists in the public domain:

> [S]econd-hand information may not be converted into "direct independent knowledge" simply because the plaintiff discovered through investigation or experience what the public already knew. Instead, the investigation or experience of the relator either must translate into some additional compelling fact, or must demonstrate a new and undisclosed relationship between disclosed facts, that puts a governmental agency "on the trail" of fraud, where that fraud might otherwise go unnoticed.

U.S. ex rel. Fried v. West Indep. Sch. Dist., 527 F.3d 439, 443 (5th Cir. 2008) (internal citation omitted) (finding relator was not an original source because he merely conveyed new information about an SSA program that had already been publicly disclosed).

(3)     Relator Must Have Obtained Her Knowledge Not Only
Before She Filed Her Original Complaint, but Also
Before the Date the Information Was Publicly
Disclosed.

It is not only the source and quality of the relator's informational knowledge that is critical

for original source status, but also the date when she obtained that knowledge. All courts agree

that, at the very latest, the relator must have known of the information on which her allegations are

based by the time she filed her *original, sealed complaint.* That is because the statute defines an

original source as a relator who has the information on which her allegations are based, and who

provides it to the government, *before* she files suit. See 31 U.S.C. § 3730(e)(4)(B). The relator

may not become an original source by obtaining that information later, *e.g.*, through discovery or

her continued employment with the defendant. See U.S. ex rel. Karvelas v. Melrose-Wakefield

Hosp., 360 F.3d 220, 231 (1st Cir. 2004).

Many courts go further and require that the relator must have known of the information

*before it was publicly disclosed.* See, e.g., U.S. ex rel. Dick v. Long Island Lighting Co., 912 F.2d

13, 16-17 (2d Cir. 1990); Wang v. FMC Corp., 975 F.2d 1412, 1418 (9th Cir. 1992); U.S. ex rel.

McKenzie v. Bellsouth Telecomms., Inc., 123 F.3d 935, 941-43 (6th Cir. 1997); U.S. ex rel.

Findley v. FPC-Boron Employees' Club, 105 F.3d 675, 689-91 (D.C. Cir. 1997); U.S. v. Alcan

Elec. & Eng'g, Inc., 197 F.3d 1014, 1020 (9th Cir. 1999); Hockett v. Columbia/HCA Healthcare

Corp., 498 F. Supp. 2d 25, 54 (D.D.C. 2007); U.S. ex rel. Settlemire v. District of Columbia, 198

F.3d 913, 916, 918-20 (D.C. Cir. 1999); U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc., 342 F.3d

634, 645 (6th Cir. 2003). There is no First Circuit case that addresses this issue.

(4)     Barrett Cannot Establish Any Of the Elements Of
"Direct and Independent Knowledge."

Dawn Barrett graduated from high school in 1988. She held a number of different jobs

over the next twelve years. Her employment at the time she applied for a job with CIGNA was as

33

a banquet server in a hotel. She had no prior experience with disability insurance. CIGNA hired

Barrett to work as a file clerk in its Pittsburgh office in September 2000. Deposition of Dawn

Barrett, June 26, 2008 ("Barrett Dep."), pp. 9-13 and Ex. 1 (excerpts attached to Abati Aff. as

Exhibit L).

In June 2002, she was promoted to the position of Vendor Coordinator. As a Vendor

Coordinator, Barrett was responsible for sending form letters to LTD claimants referring them to

"vendors," which were companies with which CIGNA contracted to provide assistance to its LTD

claimants in filing their SSDI applications. She also contacted the vendors to inform them that a

claimant was being referred. She did not determine who should be referred to vendors; this was

done by claim managers. She did not deal with claims in which referrals to vendors were not

made. She occasionally spoke to claimants who called after receiving the referral letter. She

would explain the contractual obligation to file an SSDI application and, if the claimant preferred,

that the claimant could use a representative that it selected or file on his/her own. Barrett Dep. pp.

13-15 and 19-22.

In May 2003, the position of Vendor Coordinator was eliminated, and Ms. Barrett was

assigned to a job in which she reviewed for completeness files of claimants who had been awarded

LTD benefits, were "stable and mature," and were now expected to remain on LTD for the entire

benefit period. Id. at 42-44 and Ex. 6. In 2005, she was assigned to a position administering STD

claims. Id. at 50-51. In consequence, only during the period June, 2002 to May, 2003 did Ms.

Barrett's work touch upon the process by which LTD claimants were encouraged to apply for

SSDI benefits.

Patrick Loughren is an attorney who practices in Pittsburgh, Pennsylvania. He first

represented Barrett in March 2002, in connection with an accident in which her brother was

34

injured. He has since represented Barrett in other family law matters. According to Barrett, Loughren began to represent her in connection with her claims against CIGNA in August, 2003. Barrett refused to answer any questions concerning how Attorney Loughren came to represent her in connection with the CIGNA action (Id. at 190-196). She refused to answer questions with respect to whether there was some event that caused Barrett to speak with Loughren concerning CIGNA's SSDI referral practice, as by August she had ceased to be a Vendor Coordinator some months before. Id. at 200-01.

Loughren is, himself, the relator in the *qui tam* case filed against UNUM, now pending before Judge Saris. That action was filed, under seal, in September, 2003, two months before Barrett filed the instant action. In virtually all material respects it asserts the same claims and legal theories as those asserted in the CIGNA *qui tam* action; moreover, counsel for Loughren in the UNUM case and Barrett in the CIGNA case have always been the same. Barrett refused to answer any question as to whether Loughren ever told her that he was or would be suing UNUM. Id. at 195-197.[17]

Barrett has shockingly inadequate knowledge concerning the principal allegations in her complaint against CIGNA. Although she alleges that "CIGNA has actual knowledge that many thousands of claimants cannot possibly qualify for SSDI," she cannot identify a single claimant by either name or descriptive characteristic that was referred to a vendor for assistance in filing an SSDI application that fits that description. She also cannot recall any CIGNA employee telling her that this happened. Id. at 110-113. In her complaint, Barrett alleges that "most LTD claimants cannot possibly be eligible for SSDI benefits" (Compl. ¶ 6), but Barrett does not know whether the

---

[17] It remains to be seen how Barrett will attempt to prove that she is the original source of her allegations, but she clearly cannot hide behind the attorney-client privilege she asserts with respect to all her conversations with Loughren, while asserting that she was the original source of the idea that CIGNA was defrauding the government – the same allegations that Loughren was asserting against UNUM.

word "most" means more than 50%, nor if there is any data that supports that allegation. Barrett Dep. pp. 119-22 . She also alleges that "CIGNA causes thousands of such false and fraudulent claims to be submitted to SSA each year" (Compl. ¶ 14), but cannot identify or describe any data that supports those allegations and does not know how many false claims (using her definition of falsity) are actually submitted. Barrett Dep. pp. 123-127. Her complaint acknowledges that CIGNA has guidelines that screen out certain LTD claimants from the vendor referral process, but alleges that nonetheless "CIGNA still instructs its LTD Case Managers to direct LTD claimants to file for SSDI benefits" and to tell claimants that their benefits will be offset if they do not file. Compl. ¶ 69. Barrett, however, was not a Case Manager, can neither identify nor describe any document which directed, or person who instructed, Case Managers to ignore the referral guidelines-- nor could she name a single person who told her that this actually happened. Barrett Dep. pp. 132-134.

In her original complaint, Barrett alleged: "Because there exists a high attrition rate of senior claim examiners at Social Security as well as a lack of SSA resources to fully investigate the large volumes of SSDI claims, CIGNA knows that a setting exists where non-meritorious claims for SSDI that CIGNA causes or has caused to be filed will inevitably, and improperly, be approved." Barrett Compl., Nov. 25, 2003, ¶ 104. At her deposition, she was unaware of any basis for that allegation and had no knowledge that any such non-meritorious claim was improperly approved by the SSA. Barrett Dep. pp. 105-10.

Barrett further testified that, with respect to the four exemplar claimants first identified in the Second Amended Complaint: (i) she found their claim files after the original complaint was filed, (ii) she looked for them at the direction of an individual named "Jeremy" whom she believed worked for the Department of Justice, (iii) they were not files that she ever actually worked on,

36

and (iv) she was simply looking for files in which a claimant had made an SSDI application but his/her LTD claim had, at some later point, been denied. Barrett Dep. pp. 153-156.

The central allegation of Barrett's complaint, that CIGNA refers LTD claimants to vendors to assist them in filing SSDI applications without "undertaking any good faith assessment or review to determine whether each LTD claimant could possibly be entitled to receive SSDI benefits" (Compl. ¶ 7), i.e., does not perform some manner of individualized screening, was also alleged with respect to UNUM, and could be alleged with respect to every private LTD insurer and work place LTD plan, as well as the Federal Employee Retirement System and the state and municipal retirement plans, identified in the public disclosure section of this brief. (See supra at 13-27). The four exemplar claims first disclosed in the Second Amended Complaint were not claims about which she had any first hand knowledge. She did not even look for them until after her case was filed.

There is no material new information alleged in Barrett's original, amended, or second amended complaint not publicly disclosed before Barrett filed this qui tam action and certainly none as to which she had direct and independent knowledge.

       (5)    As A Matter of Law, Barrett Cannot Have Direct and Independent Knowledge of False Claims Made Before June 2002.

A relator such as Barrett, who claims to have direct knowledge based solely on her employment with the defendant, can have that direct knowledge only with respect to the period of her employment. See, Rockwell Int'l Corp. v. U.S., 127 S. Ct. 1397, 1409-10 (2007); U.S. ex rel. Duxbury v. Ortho Biotech Prods., L.P., 551 F. Supp. 2d 100, 109 (D. Mass. 2008). In the present case, while Barrett joined LINA in September of 2000, she was a file clerk with no training or experience in SSDI or any other related field until she became a Vendor Coordinator in June 2002. That is the first time when she could possibly have discovered the alleged fraud "with [her]

37

own eyes." In re AWP Litig., 538 F. Supp. 2d 367, 384 (D. Mass. 2008) (internal citations

omitted). In consequence, under no circumstances can she prove that she is an original source of

allegations that relate to CIGNA practices as they existed before June 2002.

> **b.    Barrett Cannot Prove that She Disclosed the Information on Which Her Allegations Are Based to the Government Before She Filed Her Sealed Complaint, Much Less Before the Information Was Publicly Disclosed.**

Even if Barrett could prove that she had direct and independent knowledge prior to

November 2003 of the information on which her Complaint was based, she still could not satisfy

the original-source exception to the public disclosure jurisdictional bar because it appears that she

cannot meet the second requirement of the exception: that she "voluntarily provided the

information [on which her allegations are based] to the Government before filing" her lawsuit.

31 U.S.C. § 3730(e)(4)(B). The purpose of the pre-filing disclosure requirement is twofold: (1) to

alert the government at the earliest possible moment so that it can begin to investigate and, if

possible, prevent the alleged fraud; and (2) to counteract the relator's incentive to wait until as

many false claims as possible have been filed in an attempt to increase the potential damages

award.[18]

To satisfy her burden of proof on this requirement, Barrett must do more than give a mere

"conclusory assertion" that she timely notified the government. U.S. ex rel. Duxbury v. Ortho

Biotech Prods., L.P., 551 F. Supp. 2d 100, 109-10 (D. Mass. 2008) (Zobel, J.) (dismissing qui tam

complaint as to one relator because he "proffered no support for []his conclusory assertion" that he

---

[18] See John T. Boese, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS § 4.02[D] at 4-116 (3d ed. 2007) ("A number of important policies support the prior notice requirement in the original source provision. Providing the government with notice of the fraud at the earliest possible time permits the government to take the steps necessary to mitigate or prevent any harm from the alleged fraud, and to begin its investigation even before the relator has taken the formal steps of filing a qui tam complaint. The prior notice requirement also reduces perverse incentives that otherwise exist in a bounty system under which the reward is based primarily on the amount of damages accrued and the number of false claims submitted.").

had provided the information to the government before the original sealed complaint was filed).

Instead, she must support her assertion with "'competent proof.'" U.S. ex rel. Precision Co. v.

Koch Indus., 971 F.2d 548, 551 (10th Cir. 1992) (quoting McNutt v. Gen. Motors Acceptance

Corp., 298 U.S. 178, 189 (1936)); accord, e.g., U.S. ex rel. Boothe v. Sun Healthcare Group, Inc.,

496 F.3d 1169, 1175 (10th Cir. 2007) ("conclusory and ill-developed arguments" regarding

original source status are insufficient because the court is "obliged to presume the absence of

jurisdiction unless and until convinced otherwise").

Courts have adopted two different standards regarding when a relator must voluntarily

disclose her information to the government. Some courts hold she must do so before the public

disclosure(s) occurred. See, e.g., U.S. v. Alcan Elec. & Eng'g, Inc., 197 F.3d 1014, 1020 (9th Cir.

1999); Hockett v. Columbia/HCA Healthcare Corp., 498 F. Supp. 2d 25, 54 (D.D.C. 2007) (the

"voluntary disclosure must occur prior to the public disclosures which invoke the jurisdictional

bar") (citing U.S. *ex rel.* Settlemire v. District of Columbia, 198 F.3d 913, 918 (D.C. Cir. 1999)

and U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc., 342 F.3d 634, 645 (6th Cir. 2003)). It is not

possible Barrett can meet this requirement since the public disclosures began with the Mays case

in 1977, when she was only seven years old.

Other courts hold that the relator's voluntary disclosure to the government may postdate

the public disclosure so long as it precedes the filing of the original complaint. Even under this

more relaxed standard, Barrett has, to date, presented no evidence that she disclosed the

information on which the allegations in the Amended Complaint are based to the government

before she filed her original Complaint on November 25, 2003. Defendants served Barrett with

interrogatories asking that she identify all communications with the government. Her sworn

responses identified *none*. See Barrett's Supp. Response to Interrog. No. 4(c) (Jan. 18, 2008)

(copy attached to Abati Aff. as Exhibit M). Defendants also asked Barrett to produce all documents containing communications between her and the government, including documents relating to her alleged status as an original source. She produced *none*. See Barrett's Responses and Objections to Defendants' First Request for Prod. of Documents, Nos. 54 and 84 (June 18, 2007) (copy attached to Abati Aff. as Exhibit N).

Because Barrett has failed to produce "competent proof" that she disclosed the information on which her allegations are based to the government before filing suit, and she clearly could not have disclosed the information before the public disclosures occurred, for this additional reason, she does not fall within the original source exception to the public disclosure bar.

### B.    In the Alternative, CIGNA Is Entitled to Summary Judgment Because the SSA Has Long Known About and Acquiesced to the Allegedly Unlawful Practice, and, Therefore, It Did Not Act With Its *Scienter*.

Barrett has accused CIGNA of defrauding the government. Courts that have examined the issue have held that there is no fraud, and therefore no FCA violation, where, as here, the government is fully aware of the defendant's allegedly fraudulent actions and acquiesces in them. "[P]rior government knowledge of an allegedly false claim can negate the *scienter* required for an FCA violation" as a matter of law.[19] U.S. ex rel. Becker v. Westinghouse Savannah River Co., 305 F.3d 284, 289 (4th Cir. 2002); accord U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1157 (2d Cir. 1993); U.S. ex rel. Durcholz v. FKW Inc., 189 F.3d 542, 545 (7th Cir. 1999); U.S. ex rel. Costner v. U.S., 317 F.3d 883, 887-88 (8th Cir. 2003); U.S. ex rel. Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1421 (9th Cir. 1991); see also, In re Pharma. Indus. Average Wholesale Price Litig., 478 F. Supp. 2d 164, 174 (D. Mass. 2007) (Saris,

---

[19] *Scienter* is an element of a False Claims Act case. See 31 U.S.C. § 3729(a)(1), (2), (3). To establish *scienter*, Barrett must prove that (a) CIGNA has actual knowledge that information in some of the SSDI applications that it supposedly causes its LTD claimants to file is false; or (b) it acts in deliberate ignorance of the truth or falsity of that information; or (c) it acts in reckless disregard of the truth or falsity of the information. See id. § 3729(b).

J.) (acknowledging the government knowledge defense, but denying motion to dismiss because the government asserted it lacked knowledge of the alleged fraud).

Where, as here, the undisputed evidence shows that the government knew about and tacitly approved or acquiesced in conduct that the relator alleges is fraudulent, and the defendant relied on the government's silence in continuing the business practice in question, *scienter* is absent as a matter of law and summary judgment is appropriate. See, e.g., Costner, 317 F.3d at 887-88 (affirming summary judgment); Wang v. FMC Corp., 975 F.2d 1412, 1421 (9th Cir. 1992) (same); U.S. ex rel. Englund v. Los Angeles County, 2006 WL 3097941, at *15-16 (E.D. Cal. 2006) (entering summary judgment for defendant because, "while the County's practices were not necessarily popular with [the government], there was a common understanding that the practices were legal," and, therefore, "there is a want of evidence from which a jury could infer that the County knowingly asserted a false claim to the Federal government"); U.S. ex rel. Werner v. Fuentez Sys. Concepts, Inc., 319 F. Supp. 2d 682, 685 (N.D. W. Va. 2004) (entering summary judgment); U.S. ex rel. Watson v. Conn. Gen. Life Ins. Co., 2003 WL 303142, at *8 (E.D. Pa. 2003) (same), aff'd, 87 Fed. Appx. 257, 2004 WL 234970 (3d Cir. 2004); see also, U.S. ex rel. Butler v. Hughes Helicopters, Inc., 71 F.3d 321, 327-30 (9th Cir. 1995) (same); Boisjoly v. Morton Thiokol, Inc., 706 F. Supp. 795, 809 (D. Utah 1988) (granting 12(b)(6) motion to dismiss).

It is undisputed that the SSA has long known that CIGNA and other private and government disability insurers require or encourage LTD claimants to apply for SSDI benefits. SSA Associate Commissioner Eileen Bradley expressly made reference to this practice in two memoranda that she wrote in 1989. In the first, dated September 22, 1989, she wrote: "This type of situation typically involves a recipient of long-term disability (LTD) benefits paid by *a private insurer which encourages or requires the recipient to file for Social Security disability*

41

*insurance benefits* (DIB).  Under the terms of most LTD policies, the amount of the LTD monthly

benefit is offset by the amount of DIB payable." (Emphasis added.)  Deposition of Glenn Sklar,

July 22, 2008 ("Sklar Dep.") Ex. 4 (copy of deposition and relevant exhibits attached to Abati Aff.

as Exhibit O).  In the second, dated October 18, 1989, Ms. Bradley wrote:  "Typically, *a LTD

policy holder is required by terms of the contract to file for social security benefits*.  If the claim

is allowed, the monthly LTD benefit amount is offset by the amount of the social security benefits

payable." (Emphasis added.)  Sklar Dep. Ex. 5.  It is impossible to understand how CIGNA can

be held to have knowingly defrauded the SSA by encouraging or requiring LTD claimants to

apply for SSDI, when the SSA has known for twenty years that SSDI application requirements in

LTD policies are "typical."

The SSA's knowledge is also documented in a 1996 report by Jane Ross, then the SSA's

Director of Income Security Issues, to Senator William Cohen, then Chairman of the U.S. Senate's

Special Committee on Aging.  In her report, Ms. Ross wrote:  "[R]educing private benefits dollar

for dollar against DI benefits can lower disability insurance premiums.  As a result, *it is common

for private plans to require claimants to apply for DI benefits*."  U.S. Gen. Accounting Office,

SSA Disability: Return to Work Strategies from Other Systems May Improve Federal Programs,

GAO/HEHS Rpt. 96-133, 22 (1996) (emphasis added), *available at*

http://www.gao.gov/archive/1996/he96133.pdf..

The SSA's knowledge is also documented in Professor Paul Verkuil's Statement to the

Social Security Subcommittee of the House Ways and Means Committee in June 2002, in which

he stated that the number of disability claims was expected to rise, in part because of "the

increasing tendency of private insurance companies to require as a condition of payment that

claimants pursue their offsetting SSA benefits."  Second In A Series On Social Security Disability

Programs' Challenges and Opportunities: Hearing Before the Subcomm. on Social Security of the

H. Comm. on Ways and Means, 107th Cong. 86 (2002) (statement of Paul Verkuil, Professor of

Law, Benjamin N. Cardozo School of Law), *available at*

http://waysandmeans.house.gov/legacy/socsec/107cong/6-11-02/107-86final.htm.  Professor

Verkuil and a colleague reiterated that statement in a report to the Social Security Advisory

Board.[20]  See Paul Verkuil & Jeffrey Lubbers, "Alternative Approaches to Judicial Review of

Social Security Disability Cases:  A Report to the Social Security Advisory Board," ADMIN. L.

REV., vol. 17, at 2 (2003) (forthcoming), available at

http://papers.ssrn.com/sol3/papers.cfm?abstract_id=418241

The SSA's knowledge was also confirmed by David Barnes, one of the expert witnesses

retained by relator's lawyers in the *Unum* case.  Mr. Barnes is a 26-year employee of the SSA and

former director of the SSA's Office of Disability Evaluation Policy.[21]  In his deposition given in

the *Unum* case, Mr. Barnes testified as follows:

> . . . [I]n my work in Social Security I had occasion to see circumstances where an
> individual applied for disability, and their explanation of their reason for filing was
> because my insurance provider made me file, and that – that – that's common
> knowledge among individuals who work in the disability program that that
> circumstance occurs.

Deposition of David Barnes, February 12, 2008 ("Barnes Dep.") pp. 39-40 (copy attached to Abati

Aff. as Exhibit Q).

Kenneth D. Nibali is another expert witness retained by Relator's lawyers in the *Unum*

case.  Mr. Nibali was an SSA official for thirty-one years and its Associate Commissioner for

---

[20] The Social Security Advisory Board is an independent, bipartisan board created by Congress.  The members are appointed by the President and the Congress to advise them and the Commissioner of Social Security on Social Security matters, including the SSDI program.  See http://www.ssab.gov/.

[21] See Relator's Opp. to Unum's Emergency Mot. to Amend the Court's May 21, 2007 Scheduling Order, at p.2 n.4, in U.S. ex rel. Loughren v. UnumProvident Corp., et al., No. 03-11699-PBS (D. Mass.) (docket no. 248, filed Feb. 1, 2008) ("Loughren Opp.") (copy attached to Abati Aff. as Exhibit P).

43

Disability from 1998 to 2002. Loughren Opp. at 4 n.2. Mr. Nibali testified as follows in the

deposition he gave in the *Unum* case: "[A]necdotally, many times, you know, I would hear from

individuals on the front lines, the DDSs [Disability Determination Services], et cetera, about cases

coming in from private disability insurance companies where individuals were coming in **because**

**they were required by the private insurance company to come in and file a disability**

**claim."**[22] Some of these applicants **"[did not] come anywhere close to meeting our definition"**

of disability. Nibali Dep. pp. 163-64. Mr. Nibali described this as "anecdotal information" that he

received "during my years there" at SSA. Id. at 163. (emphasis supplied.)

 Even more directly on point are materials discussed at a series of meetings between

representatives of the private LTD industry and the SSA that began in 2002 and continued at least

through 2005. The principal purpose of these meetings was to discuss (i) SSA adopting a standard

authorization form to be signed by SSDI applicants who were also making claims under LTD

policies that would permit private insurers to obtain information regarding the status of the SSDI

applications filed by their insureds directly from the SSA, and (ii) the possibility of private LTD

insurers and the SSA exchanging information electronically. Sklar Dep. p. 67. Some of these

meetings even took place at the insurers' headquarters. (Id. at 68-69).

 In particular, for the first meeting of this group convened on February 19, 2002, the private

insurers prepared materials explaining in detail how coordination of benefits worked and

displaying, side-by-side, the similarities and differences between LTD insurance and SSDI --

particularly pointing out the differences in the definition of eligibility in the two programs. See

Sklar Dep. Ex. 11, the Agenda; and Ex. 12, , p. SSA01043, entitled: "A Closer Look at LTD &

SSDI." In response to requests from SSA for additional information made at this initial meeting,

---

[22] Deposition of Kenneth J. Nibali, March 5, 2008 ("Nibali Dep.") p. 153 (copy attached to Abati Aff. as Exhibit R).

the insurers prepared materials in advance of a May 20, 2002 meeting. See Sklar Dep. Ex. 13. These materials contained additional details concerning the manner in which private insurers coordinated their benefits with SSDI benefits. The materials included a document entitled, "High Level Information flow of LTD Claim," which specifically pointed out when the insured was reminded of his/her contractual obligation to apply for SSDI and how the insurer monitored the progress of the SSDI application as it was reviewed by SSA. See Sklar Dep. Ex. 14, p. SSA00994. Materials prepared by the insurers for an October 2, 2002 follow-up meeting of the group listed any concerns that had been raised at the prior meetings by SSA. There is no mention of any concern regarding the expressly disclosed fact that: "[t]he LTD contract requires that the claimant apply for [SSDI] benefits. The contract also specifies the level the claimant must take his application through." See Sklar Dep. Ex. 17, pp. SSA00969; see also, id. at SSA00964, 965.

These meetings continued at least through the end of 2005, when SSA Commissioner Barnhart approved a common authorization form that could be signed by an LTD claimant who was applying for SSDI benefits and would permit the private insurer to receive information on the status of that application directly from SSA. Sklar Dep. Ex. 16. The form that the Commissioner approved expressly states: "If I do not sign this authorization [the company] may estimate how much I could or do receive on Social Security disability benefits and reduce my private disability benefits by this amount." Id. Commissioner Barnhart's cover letter accompanying the form reflected on the SSA's and industry representatives' joint efforts and her intention that they continue to work together to achieve mutually beneficial efficiencies that will, among other things: "improve the coordination of private and public disability income benefits; and minimize the problems that can arise for SSDI beneficiaries and private disability insurers when SSDI benefit status information is delayed or unavailable to private disability claims managers." Id.

45