Notably, the Office of the General Counsel of SSA and the United States Attorney's Office were aware of the filing of the CIGNA case in 2003 (Sklar Dep. p. 13-14), although it was not unsealed and made known to CIGNA until December, 2004. Further, many attorneys from the SSA General Counsel's office attended the meetings described above. Id. at 87-88. Nonetheless, in none of these meetings did anyone from SSA advise CIGNA or any other disability insurer that the practice by which private insurers instructed their insureds to apply for SSDI violated law or any SSA rule, regulation or policy, or that some prescreening process should be adopted. To the contrary, notwithstanding the filing of both the CIGNA and *Unum* actions in 2003, SSA has never informed, or even suggested, that private disability insurers, or municipal, state or federal providers of disability benefits, were engaged in fraudulent or improper conduct by directing all LTD claimants also to apply for SSDI.

Moreover, the SSA is also well aware that the widely accepted practice of requiring or encouraging claimants to apply for SSDI is not limited to private disability insurers. The SSA knows, for example, that state welfare offices often require claimants to apply for SSDI – even claimants who clearly are ineligible. For example, one SSA employee stated in 1998: "In the Philadelphia region, cost-shifting actions by state and local governments have been, and I think continue to be, a major contributor to increased claims receipts. All of our states require, or certainly strongly encourage, applicants to their assistance programs to also file with us. *Many local welfare offices continue to refer people to social security (SSA) who are obviously not disabled. Yet, these offices still insist that SSA provide a formal denial.*" An SSA employee from a different office stated: "[W]e quickly heard from applicants that they had to apply with us before the state would take their Medicaid application. Others said they were required to file with us within twenty days of filing for Medicaid." Larry Massanari, "The View from the SSA's

Philadelphia Regional Office" (emphasis added) and Celeste Hemingson, "The View from SSA's Concord, New Hampshire, District Office," *found in* GROWTH IN DISABILITY BENEFITS: EXPLANATIONS AND POLICY IMPLICATIONS 303 and 309. (Copies of these excerpts are attached to the Abati Aff. as Exhibits K and S).

Glenn Sklar, Esquire, Associate Commissioner of the Office of Disability Programs, was designated by the SSA under Fed. R. Civ. P. 30(b)(6) to testify on its behalf at deposition. CIGNA submits that the following testimony is instructive on the *scienter* issue.

From the colloquy beginning on page 42, line 11:

> Q. To your knowledge, was there ever any discussion at SSA prior to the filing of this lawsuit, in which consideration was given as to which claimants for long-term disability insurance were being sent over by or encouraged or required to apply by the long-term disability industry, whether it was all claimants or some subset of their claimants, that that was never discussed or considered by the SSA before this lawsuit was filed?
>
> MR. NADLER: Object to the question as vague and compound.
>
> A. Social Security really doesn't collect information on these claims per se and we really had no reason to. We typically don't ask why somebody is showing up at our door. **We have, quote, unquote, an open-door policy, all comers are welcome.**
>
> We don't track whether it's an individual claim or whether it's somebody who showed up because of the private disability insurers. We really don't ask why they're there and we have no reason to.
>
> From a policy point of view, many instances we've even encouraged, for example, homeless people to come forward and file claims because they're often very difficult to contact. We really don't get behind the why people are showing up at our door and who is encouraging them to apply for benefits. That's just not something we typically ask or do.
>
> Q. You just made reference to open-door policy. Can you expound on, in the context that you just used it, what is meant by the term "open-door policy"?
>
> MR. NADLER: Object to the question as outside the notice, but you may answer.
>
> A. **Typically every American who is paying FICA has the right to file a claim for Social Security disability insurance benefits. That said, again, we certainly hope that they're truthful as they provide information to the Social Security Administration and give us a straight story. But every American has a right to file that claim. And even if somebody**

47

> **wanted to file a claim that we knew was going to be denied and they were very persistent about it and they said, I want to be denied, deny me, we're going to process that claim and deny them.**

From the colloquy beginning on page 103, line 17:

> Q. Does the SSA have an opinion as to whether under statutory or regulatory law, a private disability insurer has an obligation to screen a claimant for long-term disability insurance to determine the likelihood that that claimant would also be eligible for SSDI before requiring such claimant to apply for SSDI benefits?
>
> MR. NADLER: Object to the question as calling for a legal conclusion and as calling for speculation.
>
> A. I'm not aware that the Social Security Administration has ever promulgated guidance on this topic, for example, Social Security ruling or a POMS or a regulation to that effect. So I'm not aware of any guidance one way or the other.
>
> Q. To your knowledge, if a long-term disability insurer was interested in determining whether such conduct was violative of the law, is there any place, is there any regulation, bulletin, document, writing of any kind within the SSA that it could look to determine a course of conduct that would be consistent with SSA's view of the law?
>
> A. I lost the first part of the question. I'm sorry.
>
> MR. KAPLAN: I don't know that I could do better so could you read it back, Kathy.
>
> (Question read.)
>
> MR. NADLER: I object to the question as outside the scope of the notice.
>
> A. I will need a clarification on what you mean by "such conduct."
>
> Just the sending of applications to SSA without prescreening them?
>
> Q. That's correct.
> A. Again, as I previously mentioned, this is really going to be a fairly fact-specific situation. It's going to be a case-by-case scenario and I just don't see how any particular guidance can address the myriad of potential factual situations that might come up. I think each case is its own case.
> Q. Each individual claimant?
> A. Right. I don't know how generically – I'm trying to think in my own mind how we could put out guidance on screening of claims. It's not somewhere where we've previously gone, and I'm literally thinking out loud right now whether it's somewhere we should go in the future or not, but the reality is we haven't and **there is currently no published policy out there that requires, certainly requires private disability insurer to, quote,**

48

> **unquote, prescreen an application before a claimant comes and files.
> I'm not aware of any such thing.** [Emphasis added]

In consequence, the reason that Barrett cannot point to a single SSA regulation, rule, or guidance that requires disability insurers to make a preliminary assessment of likely eligibility before asking claimants to apply for SSDI is because none exist. CIGNA cannot be said to have knowingly defrauded the SSA when the SSA does not prohibit this practice, "Absent evidence that the defendants knew that the [government] Guidelines on which they relied did not apply, or that the defendants were deliberately indifferent to or recklessly disregardful of the alleged inapplicability of those provisions, no False Claims Act liability can be found." U.S. ex rel. Hochman v. Nackman, 145 F.3d 1069, 1074 (9th Cir. 1998).

In sum, because the SSA has long known about and tacitly agreed to or acquiesced in CIGNA's practice, which is common for both private and public disability benefit providers and because SSA regulations and guidance do not prohibit the challenged action, the *scienter* required for a False Claims Act violation is absent as a matter of law and summary judgment should enter dismissing this claim.

II.   **The Court Must Dismiss Barrett's Claim that CIGNA Violates the False Claims Act by Failing to Disclose Adverse Evidence to the SSA Because the SSA Has Expressly Rejected Such a Requirement.**

Barrett also alleged that CIGNA "knowingly conceals" information from the SSA purportedly showing that its LTD claimants are ineligible for SSDI benefits. Compl. ¶ 139. Specifically, she alleges that, if CIGNA denies an LTD claim and the claimant has a pending SSDI application, CIGNA has a legal obligation to notify the SSA of its denial and to give the SSA medical or vocational evidence in its claims file that is adverse to the claimant. Id. ¶¶ 142, 145. CIGNA cannot determine whether Barrett intends this "adverse evidence" allegation to

constitute a stand alone claim for violation of the FCA. If she does, it should be dismissed under Rule 12(c), as it cannot possibly state a claim.

"There can only be liability under the False Claims Act where the defendant has an obligation to disclose omitted information." U.S. ex rel. Berge v. Bd. of Trustees of Univ. of Ala., 104 F.3d 1453, 1461 (4th Cir. 1997); accord, e.g., U.S. ex rel. Ervin & Assocs. v. Hamilton Secs. Group, Inc., 370 F. Supp. 2d 18, 54 (D.D.C. 2005); U.S. ex rel. Wilkins v. N. Am. Constr. Corp., 173 F. Supp. 2d 601, 637 (S.D. Tex. 2001); see also, U.S. ex rel. Quinn v. Omnicare Inc., 382 F.3d 432, 438 (3d Cir. 2004) (where "there is no regulatory requirement" to take a certain action, "there is no [FCA] liability for a failure to do so"); U.S. ex rel. Willard v. Humana Health Plan of Tex Inc., 336 F.3d 375, 383 (5th Cir. 2003) (relator "has not alleged facts sufficient to reflect that there was any regulatory violation"); U.S. ex rel. Luckey v. Baxter Healthcare Corp., 183 F.3d 730, 731 (7th Cir. 1999) (affirming summary judgment in favor of defendant accused of violating the FCA by failing to conduct certain testing, because "[n]one of the federal regulations requires" such testing).

In this case, Barrett cannot point to any SSA regulation or guidance requiring a third party (such as CIGNA) to submit *any* evidence to the SSA, adverse or otherwise, absent a subpoena or other court or administrative order. The only person or entity with an obligation to submit evidence to the SSA is the claimant (or the claimant's representative, if applicable). The claimant's obligation is spelled out in 20 C.F.R. § 404.1512, entitled "Evidence." Subsection (a) states the general rule:

> (a) *General.* In general, you have to prove to us that you are ... disabled. Therefore, you must bring to our attention everything that shows that you are ... disabled. This means that you must furnish medical and other evidence that we can use to reach conclusions about your medical impairment(s) and, if material to the determination of whether you are ... disabled, its effect on your ability to work on a

sustained basis. We will consider only impairment(s) you say you have or about which we receive evidence.

Id. § 404.1512(a). Subsection (c), entitled "Your Responsibility," states what evidence the applicant must present. Like Subsection (a), it places the obligation on "you," meaning the claimant, not an unrelated third party:

> (c) *Your responsibility.* You must provide medical evidence showing that you have an impairment(s) and how severe it is during the time you say that you are disabled. You must provide evidence, without redaction, showing how your impairment(s) affects your functioning during the time you say that you are disabled, and any other information that we need to decide your claim. If we ask you, you must provide evidence about:
> 
> (1)  Your age;
> (2)  Your education and training;
> (3)  Your work experience;
> (4)  Your daily activities both before and after the date you say that you became disabled;
> (5)  Your efforts to work; and
> (6)  Any other factors showing how your impairment(s) affects your ability to work....

Id. § 404.1512(c).

Moreover, not only does 20 C.F.R. § 404.1512 impose the obligation to present evidence only on the claimant, it does not require the claimant to present *any* adverse evidence. Importantly, in 2005 the SSA expressly considered amending this regulation to require the submission of adverse evidence, but, after receiving public comments, elected *not* to impose such a requirement. At the time SSA considered making the change, the first paragraph of Subsection (c) read as follows:

> (c) *Your responsibility.* You must provide medical evidence showing that you have an impairment(s) and how severe it is during the time you say that you are disabled. You must provide evidence showing how your impairment(s) affects your functioning during the time you say that you are disabled, and any other information that we need to decide your case. If we ask you, you must provide evidence about: ...

51

Clarification of Rules Involving Residual Functional Capacity Assessments; Clarification of Use of Vocational Experts and Other Source as Step 4 of the Sequential Evaluation Process; Incorporation of "Special Profile" Into Regulations, 68 Fed. Reg. 51,153, 51,161 (Aug. 26, 2003) (final rules).

The preamble to SSA's 2005 proposed changes explained: "We propose to require that you submit all evidence available to you when you request your hearing. This rule will require you to submit all available evidence that supports the allegations that form the basis of your claim, as well as all available evidence that might undermine or appear contrary to your allegations." Administrative Review Process for Adjudicating Initial Disability Claims, 70 Fed. Reg. 43,590, 43,602 (July 27, 2005) (notice of proposed rulemaking). The SSA proposed adding this requirement through the following changes to the text of the first paragraph of 20 C.F.R. § 404.1512(c):

> (c) *Your responsibility*. You must provide ~~medical~~ evidence showing ~~that you have an~~ **how your** impairment(s) ~~and how severe it is~~ **affect(s) your functioning** during the time you say that you are disabled. ~~You must provide evidence showing how your impairment(s) affects your functioning during the time you say that you are disabled~~, and any other information that we need to decide your ~~case~~ **claim, including evidence that you consider to be unfavorable to your claim**. If we ask you, you must provide evidence about: ….

Id. at 43,607.

However, "the proposed rule was highly controversial." Robert E. Rains, *Professional Responsibility and Social Security Representation: The Myth of the State-Bar Bar to Compliance with Federal Rules on Production of Adverse Evidence*, 92 CORNELL L. REV. 363, 380 (2006-2007). In hearings before the House Ways and Means Committee's Subcommittee on Social Security, the SSA received numerous comments opposed to the proposed change. See id. at 380-81. Thereafter, ***the SSA expressly rejected the proposed addition of language requiring***

52

*applicants to submit adverse evidence.* Instead, it made only the following changes to Subsection (c):

> (c) *Your responsibility.* You must provide ~~medical~~ evidence showing that you have an impairment(s) and how severe it is during the time you say that you are disabled. You must provide evidence**, without redaction,** showing how your impairment(s) affects your functioning during the time you say that you are disabled, and any other information that we need to decide your ~~case~~ **claim**. If we ask you, you must provide evidence about:....

Administrative Review Process for Adjudicating Initial Disability Claims, 71 Fed. Reg. 16,424, 16,444 (Mar. 31, 2006) (final and current rule). The SSA's explanation for rejecting the proposed requirement for the submission of adverse evidence was that "the comments revealed that the requirement was too confusing." Id. at 16,437.

Thus, the language shown above, which does not require the submission of adverse evidence, is the language that has been, and is currently, in effect. See 20 C.F.R. § 404.1512(c) (2008); see also, Sarah A.L. Humphreys, Office of the SSA General Counsel, *The Ethics Hour: Responsibilities, Obligations, and Expectations* at 2-3 (Feb. 24-25, 2005) ("[T]raditionally there has been no requirement for representatives to voluntarily disclose adverse evidence to the Agency … because SSA has interpreted the law to require only the submission of evidence that supports the disability claim.") (Exhibit T to the Abati Aff.).

Since SSDI applicants and their representatives are not required to submit adverse evidence to the SSA or to notify the SSA if their pending LTD claims are denied, it goes without saying that an unrelated third party such as CIGNA is not required to do so either. Any suggestion to the contrary has no support in law.

In sum, CIGNA cannot possibly violate the False Claims Act by failing to notify the SSA about its LTD claim denials or by failing to give the SSA evidence that is adverse to a claimant's pending SSDI application, because no such obligation exists.

53

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Second Amended Complaint.

                                                Respectfully submitted,

CIGNA CORPORATION and LIFE INSURANCE COMPANY OF NORTH AMERICA

By their attorneys,

*/s/ Mitchell H. Kaplan*
Mitchell H. Kaplan (BBO# 258940)
mkaplan@choate.com
R. J. Cinquegrana, (BBO # 084100)
rjcinquegrana@choate.com
Richard C. Abati (BBO # 651037)
rabati@choate.com
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts 02110
(617) 248-5000

Dated: August 22, 2008

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on August 22, 2008.

*/s/ Mitchell H. Kaplan*
Mitchell H. Kaplan
