UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel*. DAWN BARRETT,  )<br><br>Plaintiff,  )<br><br>v.  )<br><br>CIGNA CORPORATION and LIFE INSURANCE COMPANY OF NORTH AMERICA,  )<br><br>Defendants.  ) | Civil Action No. 03-12382-MLW |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS FOR LACK OF JURISDICTION
OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT
DUE TO LACK OF *SCIENTER***
*(Leave To File Granted On August 29, 2008)*

Mitchell H. Kaplan
R.J. Cinquegrana
Richard C. Abati
Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110
(617) 248-5000

# TABLE OF CONTENTS

SUMMARY OF ARGUMENT ..................................................................................1

PROCEDURAL HISTORY..................................................................................3

FACTUAL ALLEGATIONS ................................................................................4

    I.    Barrett's Claim that CIGNA Knowingly Causes Its Long-Term Disability Claimants to File Patently Ineligible SSDI Applications with the SSA. ..................................................................4

    II.   Barrett's Claim that CIGNA Violates the False Claims Act by Knowingly Failing to Disclose Adverse Evidence to the SSA...............................7

STANDARD OF REVIEW ...................................................................................7

ARGUMENT ..........................................................................................................8

    I.    The Court Must Dismiss or Enter Summary Judgment on Barrett's Claim that CIGNA Violates the False Claims Act by Knowingly Causing Its LTD Claimants to File Ineligible SSDI Applications with the SSA. ..................................................................9

        A.    The Claim Must Be Dismissed For Lack of Subject Matter Jurisdiction Under the False Claims Act's Public Disclosure Jurisdictional Bar. ..................................................................9

            1.    The Definition of a "Public Disclosure."......................................11

            2.    Barrett's Allegation that CIGNA Imposes Its SSDI Application Requirement on "All" Its LTD Claimants Was Publicly Disclosed Before She Filed This Action in November 2003........................................................13

                a.    CIGNA-Specific Public Disclosures..................................14

                b.    Public Disclosures of the Industry-Wide Practice............................................................21

                c.    The Essential Elements of Barrett's Claim Have Been Publicly Disclosed. ..................................25

            3.    This Action Is Based Upon the Publicly Disclosed Allegations or Transactions. ........................................27

            4.    Barrett Cannot Prove that She Falls Under the "Original Source" Exception to the Public Disclosure Bar. .........................29

a.   Barrett Cannot Prove that She Has Direct and Independent Knowledge of the Information on Which Her Allegations Are Based...................................30

(1)   Relator Must Have Obtained Her Knowledge Directly and Not Through an Intervening Agency, Such as Her Lawyer. ................................................31

(2)   The Relator's Information Must Be Something More than What the Public Already Knows. ....................................32

(3)   Relator Must Have Obtained Her Knowledge Not Only Before She Filed Her Original Complaint, but Also Before the Date the Information Was Publicly Disclosed.................................................33

(4)   Barrett Cannot Establish Any Of the Elements Of "Direct and Independent Knowledge." ......................................33

(5)   As A Matter of Law, Barrett Cannot Have Direct and Independent Knowledge of False Claims Made Before June 2002. ................................37

b.   Barrett Cannot Prove that She Disclosed the Information on Which Her Allegations Are Based to the Government Before She Filed Her Sealed Complaint, Much Less Before the Information Was Publicly Disclosed. ...............................38

B.   In the Alternative, CIGNA Is Entitled to Summary Judgment Because the SSA Has Long Known About and Acquiesced to the Allegedly Unlawful Practice, and, Therefore, It Did Not Act With Its *Scienter*.................................................40

II.   The Court Must Dismiss Barrett's Claim that CIGNA Violates the False Claims Act by Failing to Disclose Adverse Evidence to the SSA Because the SSA Has Expressly Rejected Such a Requirement.........................49

CONCLUSION....................................................................................................54

# TABLE OF AUTHORITIES

**CASES**

Allison Engine Co. v. U.S. ex rel. Sanders,
    128 S. Ct. 2123 (2008)......................................................................................8

Ardolino v. Metro. Life Ins. Co.,
    No. Civ. A. 00-12115, 2001 WL 34563168 (D. Mass. July 2, 2001).....................................24

Boisjoly v. Morton Thiokol, Inc.,
    706 F. Supp. 795 (D. Utah 1988)...........................................................................41

Buck v. Fries & Fries, Inc.,
    953 F. Supp. 896 (S.D. Ohio 1996) ........................................................................23

Calloway v. Pacific Gas & Elec. Co.,
    800 F. Supp. 1444 (E.D. Tex. 1992).......................................................................23

Cooper v. Blue Cross and Blue Shield of Fla., Inc.,
    19 F.3d 562 (11th Cir. 1994) ..............................................................................27

Cox v. Mid-America Dairymen, Inc.,
    965 F.2d 569 (8th Cir. 1992) ..............................................................................23

Deaton v. Conn. Gen. Life Ins. Co.,
    17 S.W.3d 896 (Ky. Ct. App. 2000) ..................................................................16-17

DiGiovanni v. Guardian Life Ins. Co.,
    No. CIV. A. 98-10908, 2002 WL 1477175 (D. Mass. June 28, 2002)...................................24

Edwards v. Life Insurance Co. of North America,
    245 F.3d 791 (5th Cir. 2000) ..........................................................................17-18

Estades Negroni v. Assocs. Corp. of N. Am.,
    208 F. Supp. 2d 144 (D.P.R. 2002), aff'd, 377 F.3d 58 (1st Cir. 2004) ................................24

Fed. Recovery Servs. v. U.S.,
    72 F.3d 447 (5th Cir. 1995) ...............................................................................27

Frost v. Mihm,
    No. 95-CA-38, 1995 WL 737914 (Ohio App. Nov. 15, 1995)..........................................23

Garst v. Wal-Mart Stores, Inc.,
    30 Fed. Appx. 585 (6th Cir. 2002)........................................................................24

Geiszler v. Comm'r of Internal Revenue,
    No. 4600-01S, 2002 WL 31427006 (U.S. Tax Ct. Oct. 29, 2002) ....................................24

Greig v. Metro. Life Ins. Co.,
  980 F. Supp. 169 (W.D. Va. 1997) ........................................................................23

Hackett v. Xerox Corp. Long-Term Disability Income Plan,
  177 F. Supp. 2d 803 (N.D. Ill. 2001)
  rev'd on other grounds, 315 F.3d 771 (7th Cir. 2003)................................. 22-23, 46

Harris v. Marathon Oil Co.,
  948 F. Supp. 27 (W.D. Tex. 1996)........................................................................23

Hughes v. Reinsurance Group,
  957 F. Supp. 1097 (E.D. Mo. 1996).......................................................................23

In re Pharma. Indus. Average Wholesale Price Litig.,
  478 F. Supp. 2d 164 (D. Mass. 2007) ...................................................................40

In re Pharma. Indus. Average Wholesale Price Litig.
  538 F. Supp. 2d 367 (D. Mass. 2008) ............................................................. Passim

Kokkonen v. Guardian Life Ins. Co.,
  511 U.S. 375 (1994).............................................................................................7

Lolos v. Solutia, Inc.,
  193 F. Supp. 2d 364 (D. Mass. 2002) ..................................................................24

MAPCO Coal Inc. v. Godwin,
  786 N.E.2d 769 (Ind. App. 2003) ........................................................................24

Marx v. Meridian Bancorp.,
  No. CIV. A. 99-CV-4484, 2001 WL 706280 (E.D. Pa. June 20, 2001) ..................23

Matz v. Sisters of Providence,
  No. CIV. 98-1598, 1999 WL 1201682 (D. Or. Dec. 8, 1999) ...............................23

Mays v. Ins. Co. of N. Am.,
  284 N.W.2d 256 (Mich. 1979).......................................................................15, 39

Meinze v. Holmes,
  532 N.E.2d 170 (Ohio App. 1987).......................................................................23

Metro. Life Ins. Co. v. Glenn,
  128 S. Ct. 2343 (2008)........................................................................................14

Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.,
  276 F.3d 1032 (8th Cir. 2002) ........................................................................27, 29

Myers v. Hercules, Inc.,
  253 F.3d 761 (4th Cir. 2001) ..............................................................................23

Napier v. Hartford Life Ins. Co.,
    282 F. Supp. 2d 531 (E.D. Ky. 2003) ........................................................................24

Picinich v. UPS,
    321 F. Supp. 2d 485 (N.D.N.Y. 2004) ......................................................................18

Pikora v. Blue Cross & Blue Shield,
    970 F. Supp. 591 (E.D. Mich. 1997)..........................................................................23

Quast v. Square D Co.,
    No. 02:01-CV-1135, 2003 WL 23415018 (S.D. Ohio July 15, 2003)....................24

Rigel v. Rigel,
    No. CT98-0021, 1999 WL 436824 (Ohio App. June 23, 1999) ............................23

Rocca v. Standard Ins. Co.,
    No. 01-2069, 2001 WL 1667807 (E.D. Pa. Dec. 20, 2001)....................................23

Rockwell Int'l Corp. v. U.S.,
    127 S. Ct. 1397 (2007) ..................................................................................... Passim

Rowell v. Life Ins. Co. of N. Am.,
    No. 96 C 8076, 1997 WL 529556 (N.D. Ill. Aug. 18, 1997)..................................15

Scott v. Shalala,
    No. 94-50096, 1994 WL 725034 (5th Cir. Dec. 19, 1994)....................................23

State of Vt. v. G.S. Blodgett Co.,
    656 A.2d 984 (Vt. 1995) ............................................................................................23

Sumner v. Michelin N. Am., Inc.,
    966 F. Supp. 1567 (M.D. Ala. 1997) .........................................................................23

Thompson v. E.I. DuPont de Nemours & Co.,
    140 F. Supp. 2d 764 (E.D. Mich. 2001).....................................................................23

Thornley v. Penton Publ'g, Inc.,
    104 F.3d 26 (2d Cir. 1997).........................................................................................23

Trevan v. Office of Personnel Mgmt.,
    69 F.3d 520 (Fed. Cir. 1995)................................................................................. 24-25

U.S. ex rel. Barth v. Ridgedale Elec., Inc.,
    44 F.3d 699 (8th Cir. 1995) .......................................................................................31

U.S. ex rel. Becker v. Westinghouse Savannah River Co.,
    305 F.3d 284 (4th Cir. 2002) .....................................................................................40

U.S. ex rel. Berge v. Bd. of Trustees of Univ. of Ala.,
    104 F.3d 1453 (4th Cir. 1997) ...................................................50

U.S. ex rel. Biddle v. Bd. of Trustees of Leland Stanford Jr. Univ.,
    161 F.3d 533 (9th Cir. 1998) ....................................................27

U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.,
    342 F.3d 634 (6th Cir. 2003) ....................................................33

U.S. ex rel. Boothe v. Sun Healthcare Group, Inc.,
    496 F.3d 1169 (10th Cir. 2007) .................................................39

U.S. ex rel. Butler v. Hughes Helicopters, Inc.,
    71 F.3d 321 (9th Cir. 1995) .....................................................41

U.S. ex rel. Costner v. U.S.,
    317 F.3d 883 (8th Cir. 2003) ................................................ 40-41

U.S. ex rel. Dick v. Long Island Lighting Co.,
    912 F.2d 13 (2d Cir. 1990)........................................................33

U.S. ex rel. Dingle v. BioPort Corp.,
    388 F.3d 209 (6th Cir. 2004) ....................................................13

U.S. ex rel. Doe v. John Doe Corp.,
    960 F.2d 318 (2d Cir. 1992)......................................................27

U.S. ex rel. Durcholz v. FKW Inc.,
    189 F.3d 542 (7th Cir. 1999) ....................................................40

U.S. ex rel. Duxbury v. Ortho Biotech Prods., L.P.,
    551 F. Supp. 2d 100 (D. Mass. 2008) (Zobel, J.)........................... Passim

U.S. ex rel. Englund v. Los Angeles County,
    2006 WL 3097941 (E.D. Cal. 2006)...........................................41

U.S. ex rel. Ervin & Assocs. v. Hamilton Secs. Group, Inc.,
    370 F. Supp. 2d 18 (D.D.C. 2005)............................................50

U.S. ex rel. Feingold v. AdminaStar Fed., Inc.,
    324 F.3d 492 (7th Cir. 2003) ............................................ 10-11, 26

U.S. ex rel. Findley v. FPC-Boron Employees' Club,
    105 F.3d 675 (D.C. Cir. 1997)..............................................12, 26, 33

U.S. ex rel. Fine v. Advanced Sciences, Inc.,
    99 F.3d 1000 (10th Cir. 1996) ............................................ 31-32

U.S. ex rel. Fried v. West Indep. Sch. Dist.,
  527 F.3d 439 (5th Cir. 2008) ..........................................................................13, 32

U.S. ex rel. Gear v. Emergency Med. Assocs. of Ill.,
  436 F.2d 726 (7th Cir. 2005) ................................................................................21

U.S. ex rel. Gilligan v. Medtronic, Inc.,
  403 F.3d 386 (6th Cir. 2005) ................................................................................13

U.S. ex rel. Glaser v. Wound Care Consultants, Inc.,
  No. 1:05-CV-573, 2007 WL 4285367 (S.D. Ind. Dec. 3, 2007) ...........................31

U.S. ex rel. Grynberg v. Praxair, Inc.,
  389 F.3d 1038 (10th Cir. 2004) ....................................................................... 30-31

U.S. ex rel. Hagood v. Sonoma County Water Agency,
  929 F.2d 1416 (9th Cir. 1991) ..............................................................................40

U.S. ex rel. Hochman v. Nackman,
  145 F.3d 1069 (9th Cir. 1998) ..............................................................................49

U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp.,
  498 F. Supp. 2d 25 (D.D.C. 2007) .................................................................. Passim

U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.,
  360 F.3d 220 (1st Cir. 2004) .................................................................................33

U.S. ex rel. Kennedy v. Aventis Pharms., Inc.,
  No. 03 C 2750, 2007 WL 3145010 (N.D. Ill. Oct. 23, 2007) ..................................9

U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.,
  985 F.2d 1148 (2d Cir. 1993) ..........................................................................10, 40

U.S. ex rel. LaValley v. First Nat'l Bank,
  707 F. Supp. 1351 (D. Mass. 1988) (Wolf, J.) .......................................................28

U.S. ex rel. LeBlanc v. Raytheon Co.,
  874 F. Supp. 35 (D. Mass. 1995) (Lindsay, J.) .....................................................28

U.S. ex rel. Luckey v. Baxter Healthcare Corp.,
  183 F.3d 730 (7th Cir. 1999) ................................................................................50

U.S. ex rel. Mathews v. Bank of Farmington,
  166 F.3d 853 (7th Cir. 1999) ................................................................................28

U.S. ex rel. McElmurray v. Consol. Gov't of Augusta-Richmond County,
  501 F.3d 1244 (11th Cir. 2007) ............................................................................14

U.S. ex rel. McKenzie v. BellSouth Telecomm., Inc.,
    123 F.3d 935 (6th Cir. 1997) ........................................................................14, 27, 33

U.S. ex rel. Mistick PBT v. Housing Auth.,
    186 F.3d 376 (3d Cir. 1999).......................................................................................27

U.S. ex rel. O'Keeffe v. Sverdup Corp.,
    131 F. Supp. 2d 87 (D. Mass. 2001) ....................................................... 4, 11-12, 28

U.S. ex rel. Paranich v. Sorgnard,
    286 F. Supp. 2d 445 (M.D. Pa. 2003) ....................................................................32

U.S. ex rel. Precision Co. v. Koch Indus., Inc.,
    971 F.2d 548 (10th Cir. 1992) .......................................................................... Passim

U.S. ex rel. Quinn v. Omnicare Inc.,
    382 F.3d 432 (3d Cir. 2004).....................................................................................50

U.S. ex rel. Rost v. Pfizer, Inc.,
    446 F. Supp. 2d 6 (D. Mass. 2006),
    vacated on other grounds, 507 F.3d 720 (1st Cir. 2007)................................ Passim

U.S. ex rel. Settlemire v. District of Columbia,
    198 F.3d 913 (D.C. Cir. 1999) ................................................................................33

U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn,
    14 F.3d 645 (D.C. Cir. 1994) ..................................................................... 11-13, 27

U.S. ex rel. Watson v. Conn. Gen. Life Ins. Co.,
    2003 WL 303142 (E.D. Pa. 2003),
    aff'd, 87 Fed. Appx. 257, 2004 WL 234970 (3d Cir. 2004)...................................41

U.S. ex rel. Werner v. Fuentez Sys. Concepts, Inc.,
    319 F. Supp. 2d 682 (N.D. W. Va. 2004) ..............................................................41

U.S. ex rel. Wilkins v. N. Am. Constr. Corp.,
    173 F. Supp. 2d 601 (S.D. Tex. 2001) ...................................................................50

U.S. ex rel. Willard v. Humana Health Plan of Tex Inc.,
    336 F.3d 375 (5th Cir. 2003) ..................................................................................50

U.S. ex rel. Wilson v. Graham County Soil & Water Conservation Dist.,
    528 F.3d 292 (4th Cir. 2008) ..................................................................................28

U.S. v. Alcan Elec. & Eng'g, Inc.,
    197 F.3d 1014 (9th Cir. 1999) ...........................................................................33, 39

U.S. v. N.Y. Med. Coll.,
    252 F.3d 118 (2d Cir. 2001)..................................................................31

Van Meter v. Smith,
    14 S.W.3d 569 (Ky. App. 2000)............................................................23

Wallace v. Transport Life Ins. Co.,
    841 P.2d 613 (Okla. App. 1992)............................................................23

Wang v. FMC Corp.,
    975 F.2d 1412 (9th Cir. 1992)...........................................................33, 41

Whiteaker v. Metro. Life Ins. Co.,
    No. CIA 0:00-2693-24, 2002 WL 32333147 (D.S.C. Nov. 13, 2002) ....................24

STATUTES

5 U.S.C. § 8957.........................................................................................24

31 U.S.C. § 3729(a)(1), (2), (3) ..................................................................40

31 U.S.C. § 3730(e)(4)...........................................................................1, 9

31 U.S.C. § 3730(e)(4)(A) .........................................................................11

31 U.S.C. § 3730(e)(4)(B) ...........................................................29-30, 33, 38

False Claims Act, 31 U.S.C. §§ 3729(a)(1) and (a)(2) ..................................3

Kan. Stat. Ann. § 74-4927(1)(B) ................................................................25

Me. Rev. Stat. Ann. Tit. 5, § 17925(3) ......................................................25

Mo. Rev. Stat. § 104.110(5)........................................................................25

Mo. Code Regs. Ann. Tit. 16, § 40-3.050(2) ..............................................25

Or. Rev. Stat. § 656.727(1) .........................................................................25

Va. Code Ann. § 51.1-1112(F) ....................................................................25

## REGULATIONS

5 C.F.R. § 84.201(b)(1) .................................................................................24

20 C.F.R. § 404.1505 ......................................................................................6

20 C.F.R. § 404.1512 ................................................................................. 50-51

20 C.F.R. § 404.1512(c) ............................................................................. 52-53

68 Fed. Reg. 51,153, 51,161 ..........................................................................52

70 Fed. Reg. 43,590, 43,602 ..........................................................................52

71 Fed. Reg. 16,424, 16,444 ..........................................................................53

## OTHER AUTHORITIES

John T. Boese, *Civil False Claims and Qui Tam Actions* (3d ed. 2007) ...........................14, 30, 38

Kalman Rupp & David C. Stapleton, *Growth in Disability Benefits:  Explanations and
    Policy Implications 310*, (eds. 1998) ..............................................................21, 46

Paul Verkuil & Jeffrey Lubbers, *Alternative Approaches to Judicial Review of Social
    Security Disability Cases: A Report to the Social Security Advisory Board*, ADMIN. L.
    REV., vol. 17 (2003) ............................................................................43

Paul Verkuil & Jeffrey Lubbers, *Alternative Approaches to Judicial Review of Social
    Security Disability Cases: A Report to the Social Security Advisory Board*, ADMIN. L.
    REV., vol. 55 (2003) ............................................................................22

Robert E. Rains, *Professional Responsibility and Social Security Representation:  The
    Myth of the State-Bar Bar to Compliance with Federal Rules on Production of
    Adverse Evidence*, 92 CORNELL L. REV. 363, 380 (2006-2007) ..............................................52

Sarah A.L. Humphreys, Office of the SSA General Counsel, *The Ethics Hour:
    Responsibilities, Obligations, and Expectations* at 2-3 (Feb. 24-25, 2005) ..........................53

## SUMMARY OF ARGUMENT

The relator, Dawn Barrett ("Barrett"), filed this *qui tam* action alleging violations of the False Claims Act ("FCA") in November 2003 against CIGNA Corporation and one of its wholly owned subsidiaries, Life Insurance Company of North America ("LINA"), a private disability insurer.[1]  Like all *qui tam* actions, this litigation was filed on behalf of a federal agency, here the Social Security Administration ("SSA").  After review, the government declined to intervene and Barrett has proceeded on her own.

CIGNA now moves to dismiss for lack of subject matter jurisdiction, or, in the alternative, for summary judgment due to Barrett's inability to establish *scienter*, an essential element of any *qui tam* action.  These two separate bases for dismissal have been joined because the facts on which they are based are much the same.

Barrett's complaint must be dismissed because subject matter jurisdiction is absent due to the public disclosure jurisdictional bar.  See 31 U.S.C. § 3730(e)(4).  This claim is based on the allegation that CIGNA requires all of its long-term disability ("LTD") claimants to file applications for Social Security Disability Insurance ("SSDI") benefits.  However, CIGNA, and virtually all other private disability insurers and many public providers of disability benefits, including the federal government, have for decades required their claimants to apply for SSDI benefits.  This requirement has been openly publicized, well known by the government, and never discouraged, let alone declared unlawful, by SSA.  In consequence, for purposes of the FCA, this "allegation" has been "publicly disclosed" numerous times.  This memorandum will identify a host of public disclosures plainly pointing out this routine practice.

---

[1] CIGNA Corporation does not write insurance.  Insurance is written by LINA and other of CIGNA Corporation's wholly-owned subsidiaries.  For simplicity, the Defendants will collectively be referred to as "CIGNA" unless it is necessary to distinguish between them.

Once CIGNA establishes public disclosure, Barrett must prove that she was an original source of the information on which her allegations are based.  This she cannot do.  Her knowledge of the information was not "direct and independent," because she did not obtain it directly.  One of her attorneys, Patrick Loughren, himself the relator in the parallel and largely identical *qui tam* action filed against Unum (the "*Unum* case") a few months before the CIGNA case, furnished her with the legal theory around which she wraps her publicly disclosed allegations – allegations about which she has little knowledge or understanding.

The publicly disclosed fact that CIGNA coordinates the disability benefits it offers with the availability of federal SSDI benefits for many disabled workers, leads inexorably to the second ground on which this motion is predicated:  the absence of any evidence that CIGNA acted with *scienter*.  As will be seen, the SSA has long known about, met with the private disability insurance industry to discuss, and accepted the practice openly engaged in by CIGNA, as well as virtually all other private and many public providers of disability benefits, which Barrett characterizes as fraud.  In fact, nearly five years after the *Unum* and *CIGNA* cases were filed under seal by Barrett's lawyers and presented to the government for its review, and notwithstanding numerous meetings between SSA and LTD insurers concerning coordination of benefits, the SSA has not told CIGNA to modify its practices and prescreen its claimants before encouraging them to apply for SSDI benefits.  Indeed, the SSA's rules and regulations have never required pre-screening and the SSA does not even know what pre-screening guidelines could be applied.  Because CIGNA has not been and is not now "knowingly" defrauding the government, it is manifest that *scienter* is absent as a matter of law.[2]

---

[2] Further to the *scienter* issue, the SSA has already produced documents and its designated representative has been deposed.  There is no additional discovery Barrett requires regarding the state of SSA's knowledge of the practice at issue in this case.  Therefore, although discovery is not closed, this *scienter* issue is ripe for the Court's consideration.

Finally, Barrett has a tag along allegation that may be described as her "adverse evidence" claim. In this claim Barrett asserts that CIGNA does not volunteer information to the SSA when an applicant for SSDI is denied LTD benefits. There is, however, no legal requirement that SSDI applicants, much less third parties such as CIGNA, voluntarily provide the SSA with such information. As will be seen, the SSA has actually expressly considered, and rejected, imposing just such a requirement on SSDI applicants; a fact well known to Barrett's attorneys. In consequence, if it is Barrett's position that the "adverse evidence" claim constitutes a separate, stand alone, violation of the FCA, it should be dismissed pursuant to Fed. R. Civ. P. 12(c), because it cannot possibly state a cause of action.

## PROCEDURAL HISTORY

Barrett filed her original Complaint under seal on November 25, 2003. In December 2004, shortly after the government declined to intervene, but before the Defendants were served, Barrett filed an Amended Complaint. In both the original Complaint and the Amended Complaint, Barrett alleged that CIGNA had violated the False Claims Act, 31 U.S.C. §§ 3729(a)(1) and (a)(2), by causing false or fraudulent claims for SSDI benefits to be presented to the SSA for payment or approval, and by causing the use of false records or statements in order to get false or fraudulent claims paid by SSA. CIGNA moved to dismiss. The Court granted this motion, but gave Barrett leave to file a Second Amended Complaint, which she did in April 2006. In her Second Amended Complaint Barrett identified, for the first time, four alleged exemplar false claims. She also added an allegation that CIGNA Corporation and LINA conspired to engage in the actions prohibited by Sections 3729(a)(1) and (a)(2), in purported violation of Subsection 3729(a)(3).

Thereafter, CIGNA filed a motion for phased discovery, asking that discovery on the public disclosure issue proceed first, as the discovery of a public disclosure could establish that the Court lacked jurisdiction over the action. The Court denied the motion in January 2007 but stated

3

that CIGNA could seek a discovery stay, if it found a public disclosure: "if I had serious concerns about whether there was subject matter jurisdiction, I would stay what was going on until I decided that issue. . . . The one that might give you the best basis to come back to me and say, 'Stay the case' would be the jurisdictional issue if you find something that you don't yet have." Tr. of Jan. 4, 2007 hearing, at 22-23; see also, e.g., U.S. ex rel. O'Keeffe v. Sverdup Corp., 131 F. Supp. 2d 87, 88 (D. Mass. 2001) (Saris, J.) (court stayed discovery in *qui tam* action pending decision on motion to dismiss for lack of jurisdiction under the public disclosure bar).

CIGNA submits that it has found numerous pre-November 2003 public disclosures of the allegations on which Barrett's case is based, and, therefore, subject matter jurisdiction is lacking. Further, it is equally clear that the government was aware of CIGNA's and the LTD industry's practice and therefore CIGNA did not act with *scienter* to defraud the government. Therefore, CIGNA has also filed a motion to stay discovery until the Court has had the opportunity to consider and rule on this dispositive motion.

## FACTUAL ALLEGATIONS

For purposes of this motion only, CIGNA assumes that all of the factual allegations in the Second Amended Complaint ("Complaint" or "Compl.") are true. These assumed facts are supplemented with undisputed facts developed during discovery. Barrett's two claims, and the factual allegations supporting them, will be described in turn.

### I.    Barrett's Claim that CIGNA Knowingly Causes Its Long-Term Disability Claimants to File Patently Ineligible SSDI Applications with the SSA.

CIGNA sells private disability insurance to employers and individuals. Compl. ¶ 18. It also administers claims under disability plans that are self-funded by large employers. Id. ¶ 23. After sick or injured individuals exhaust their short-term disability ("STD") benefits (meaning

they have already been disabled for three to six months depending on the language of the applicable policy) they may become eligible for LTD benefits.  Id. ¶¶ 54, 57.

Typically, LTD policies underwritten and/or administered by CIGNA contain a coordination-of-benefits provision allowing the company to reduce the claimant's LTD benefits by certain other income received by the claimant, including SSDI benefits (the "Received SSDI Offset" provision).  Id. ¶¶ 62-63, 65.  The policies allow CIGNA to require LTD claimants to apply for SSDI benefits.  Id. ¶¶ 64, 66, 101, 132.  Claimants must sign a "Reimbursement Agreement" agreeing to turn over to CIGNA any SSDI benefits they receive, if CIGNA has already paid them 100% of their LTD benefits without any offset.  Id. ¶¶ 101, 120, 126-29.  If claimants are directed to apply for SSDI benefits but fail or refuse to do so, the policies permit CIGNA to reduce the claimants' LTD benefits by the amount of SSDI benefits that CIGNA estimates they would receive if they did apply (the "Estimated SSDI Offset" provision).  Id. ¶¶ 64, 122.

Barrett asserts that "CIGNA requires *all*[3] of the [LTD] claimants on its disability policies and those written by its subsidiaries, to apply for SSDI" (emphasis added), regardless of apparent eligibility or ineligibility under the SSA's definition of "disability,"[4] and "coerces" some

---

[3] Barrett's Complaint is not a model of clarity.  In some parts she alleges that CIGNA requires "all" LTD claimants or "every" LTD claimant to apply for SSDI.  E.g., Compl. ¶¶ 5, 77, 136.  In other parts she alleges that CIGNA imposes this requirement only after "CIGNA determines … that the LTD claimant may be eligible for SSDI."  Id. ¶¶ 64, 66.  In other parts she alleges that CIGNA imposes this requirement on all LTD claimants with the sole exception of those with simple pregnancy claims.  Id. ¶¶ 67, 71-72, 135.  Moreover, she alleges that, in deciding which claimants to refer to SSDI assistance vendors (who, in turn, inform the claimants that they must apply for SSDI), CIGNA excepts not only claimants with simple pregnancy claims but also those with a firm return-to-work date within nine months following the onset of disability.  Id. ¶¶ 67, 100-03.  For the purposes of this motion, CIGNA accepts as true the broad allegation that it requires "all" LTD claimants to apply for SSDI -- although in fact, none of these allegations accurately describes CIGNA's screening protocols.

[4] Under LTD policies underwritten and/or administered by the CIGNA Companies, the claimant must be unable to perform his/her "own occupation," even if he/she can perform other work.  Compl. ¶¶ 46, 58.  The definition of disability under the relevant SSA regulation is "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  To meet this definition, you must have a

claimants into applying for SSDI even when "the nature and expected duration of their disability" allegedly make clear that they "cannot possibly qualify" for SSDI benefits.  Id. ¶¶ 5, 31, 134. Barrett claims that, based on medical and vocational information in CIGNA's files at the time it directs claimants to apply for SSDI, CIGNA knows or should know that "many" claimants are patently ineligible for SSDI (id. ¶¶ 7, 8(b)), and asserts that if CIGNA would only undertake a "good faith assessment or review" of the information in its files, it would realize that "many" of the claimants cannot meet the SSA's stringent definition of "disability."  Id. ¶ 7.  In other words, Barrett's theory is that CIGNA causes the filing of SSDI applications that would **never,** under any circumstances, be granted by any SSA disability examiner, the SSA Appeals Council, any Administrative Law Judge or any federal district court judge reviewing an SSDI denial on appeal.

CIGNA's alleged "economic duress" is its enforcement of the Estimated SSDI Offset provision in the policies it insures and under the plans for which it administers claims.  According to Barrett:  "CIGNA instructs these financially stressed [claimants] that, unless they file for [SSDI], their disability checks will be reduced by the **estimated** Social Security benefit.  This leaves most insureds with no option other than to file false or fraudulent claims with the Government."  Id. ¶ 123 (emphasis contained in original); see also, id. ¶¶ 64, 66.  Tellingly, Barrett never identifies any statement, true or false, in any claimant application for SSDI benefits. Barrett also conspicuously fails to allege that any claimants misrepresent their condition to the SSA, let alone that CIGNA instructs them to do so.

---

severe impairment(s) that makes you unable to do your past relevant work . . . or any other substantial gainful work that exists in the national economy."  20 C.F.R. § 404.1505.  The distinction between these two definitions of disability is sometimes referred to as the "own occupation" versus "any occupation" distinction.

II.    **Barrett's Claim that CIGNA Violates the False Claims Act by Knowingly Failing to Disclose Adverse Evidence to the SSA.**

Barrett's tag along claim is that CIGNA "knowingly conceals" information (i.e., "adverse evidence") from the SSA which purportedly would show that its LTD claimants are ineligible for SSDI benefits. Id. ¶ 139. Specifically, Barrett alleges that, if CIGNA denies an LTD claim and the claimant has a pending SSDI application, CIGNA has a legal obligation (which it fails to meet) to notify the SSA of its denial and to give the SSA medical or vocational evidence in its claims file that is adverse to the claimant. Id. ¶¶ 142, 145. In other words, Barrett maintains that CIGNA is legally required to torpedo an insured's application for SSDI benefits if, because CIGNA has denied the insured's LTD claim, CIGNA will not benefit financially from an SSDI award to the applicant. As discussed below, Barrett knows full well that there has never been any such legal obligation.

## STANDARD OF REVIEW

"The threshold question in a False Claims Act case is whether the statute bars jurisdiction." U.S. ex rel. Rost v. Pfizer, Inc., 507 F.3d 720, 727 (1st Cir. 2007) (citing Rockwell Int'l Corp. v. U.S., 127 S. Ct. 1397, 1405-07 (2007)). "Federal courts are courts of limited jurisdiction" and "it is to be presumed that a cause lies outside this limited jurisdiction." Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377 (1994). The False Claims Act is to be "'strictly construed, and doubts resolved against federal jurisdiction.'" U.S. ex rel. Duxbury v. Ortho Biotech Prods., L.P., 551 F. Supp. 2d 100, 105 (D. Mass. 2008) (Zobel, J.) (quoting U.S. ex rel. Precision Co. v. Koch Indus., Inc., 971 F.2d 548, 552 (10th Cir. 1992)).

Further, the relator must establish that the Court has jurisdiction over each of her claims. Therefore, the Court must conduct a claim-by-claim review. See Rockwell, 127 S. Ct. at 1408-09. As it examines each claim for jurisdiction, the Court is not constrained to review only the

pleadings.  "When evaluating a 12(b)(1) motion to dismiss, the court may conduct a 'broad

inquiry' and may consider extrinsic materials, including exhibits attached to the pleadings and the

evidentiary materials submitted by the parties."  In re Pharma. Indus. Average Wholesale Price

Litig. ("In re AWP Litig."), 538 F. Supp. 2d 367, 375 (D. Mass. 2008) (Saris, J.) (quoting

Hernandez-Santiago v. Ecolab, Inc., 397 F.3d 30, 33 (1st Cir. 2005)).[5]

## ARGUMENT

Barrett's Complaint contains three counts asserting, respectively, violations of subsections

(1), (2), and (3) of 31 U.S.C. § 3729(a).  Those provisions state that a civil penalty must be paid to

the federal government by any person who:

(1)     knowingly presents, or causes to be presented, to an officer or employee of
        the United States Government or a member of the Armed Forces of the
        United States a false or fraudulent claim for payment or approval;

(2)     knowingly makes, uses, or causes to be made or used, a false record or
        statement to get a false or fraudulent claim paid or approved by the
        Government; [or]

(3)     conspires to defraud the Government by getting a false or fraudulent claim
        allowed or paid . . .[6]

Although Barrett has organized her Complaint into three counts, her Complaint does not

allege three separate theories of liability, rather it alleges only two:  a failure to prescreen LTD

---

[5] A court may dismiss some claims for lack of subject matter jurisdiction and others, over which it does have
jurisdiction, for other reasons, e.g., failure to state a claim. Id. at 392 (granting Rule 12(b)(1) motion to dismiss FCA
allegations "to the extent they relate to best price violations"; denying motion to the extent the FCA claim was based
on other theories; and granting motion to dismiss claims as to a particular defendant).

[6] In addition to failing for the jurisdictional and substantive reasons stated in this motion, Barrett's second and third
counts, alleging violations of § 3729(a)(2) and (3) fail for the reasons stated in the Supreme Court's recent decision in
Allison Engine Co. v. U.S. ex rel. Sanders, 128 S. Ct. 2123 (2008).  In Allison Engine, the Court held that, in order to
prove a violation of (a)(2), "it is . . . necessary for the defendant to intend that a claim be 'paid . . . by the
Government,'" and in order to prove a violation of (a)(3), "it must be shown that the conspirators had the purpose of
'getting' the false record or statement to bring about the Government's payment of a false or fraudulent claim." Id. at
2129, 2130.  Barrett does not allege that CIGNA's intent is to "get" the government to pay any allegedly false SSDI
application.  To the contrary, her Complaint focuses on SSDI applications that SSA denies.  She alleges that CIGNA's
motive is to decrease its loss reserves during the pendency of allegedly false SSDI applications that are later denied.
See Compl. ¶ 227 (SSA's damages are not benefits wrongly paid out, but administrative costs that SSA incurs in
processing allegedly false SSDI applications, which it then denies).  Because there is no allegation that CIGNA
intends to cause SSA to pay the SSDI applications which Barrett characterizes as "false claims," her counts under §
3729(a)(2) and (3) fail as a matter of law under Allison Engine.

claimants directed to apply for SSDI benefits, and, to the extent deemed a stand alone claim, the "adverse evidence" claim.  See, e.g., U.S. ex rel. Kennedy v. Aventis Pharms., Inc., No. 03 C 2750, 2007 WL 3145010, at *1 (N.D. Ill. Oct. 23, 2007) (stating that allegations which "relate to [a] single scheme" state a single FCA claim, regardless of how the relator breaks out the counts in the complaint).  Her two claims are addressed below.

I.    **The Court Must Dismiss or Enter Summary Judgment on Barrett's Claim that CIGNA Violates the False Claims Act by Knowingly Causing Its LTD Claimants to File Ineligible SSDI Applications with the SSA.**

Barrett's first theory of liability fails for two independent reasons.  First, the Court lacks subject matter jurisdiction under the FCA's public disclosure bar, found in 31 U.S.C. § 3730(e)(4).  In the alternative, assuming *arguendo* that jurisdiction exists, summary judgment should enter because the SSA has long known about and accepted CIGNA's practice, and, therefore, *scienter* is lacking.

A.    **The Claim Must Be Dismissed For Lack of Subject Matter Jurisdiction Under the False Claims Act's Public Disclosure Jurisdictional Bar.**

The False Claims Act contains the following subject matter jurisdictional bar for *qui tam* actions based on publicly disclosed allegations:

(A)    No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B)    For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4).

The purpose of the public disclosure jurisdictional bar is to discourage "parasitic suits, in which opportunistic plaintiffs sue based upon information already publicly disclosed or that they did not otherwise discover." U.S. ex rel. Duxbury v. Ortho Biotech Prods., L.P., 551 F. Supp. 2d 100, 103 (D. Mass. 2008) (Zobel, J.); accord, e.g., U.S. ex rel. Rost v. Pfizer, Inc., 507 F.3d 720, 729 (1st Cir. 2007); see also, U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1158 (2d Cir. 1993) (the public disclosure jurisdictional bar is "designed to preclude *qui tam* suits based on information that would have been equally available to strangers to the fraud transaction had they chosen to look for it as it was to the relator") (internal citation omitted); U.S. ex rel. Feingold v. AdminaStar Fed., Inc., 324 F.3d 492, 496 (7th Cir. 2003) ("the purpose of a public disclosure is to alert the responsible [government] authority that fraud may be afoot").

"[C]ourts . . . read the public disclosure prong broadly, as a quick trigger, and the original source prong searchingly, because this mode of analysis construes the jurisdiction under the statute narrowly, and jurisdictional provisions are to be construed narrowly." U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp., 498 F. Supp. 2d 25, 44-45 (D.D.C. 2007); accord, e.g., U.S. ex rel. Precision Co. v. Koch Indus., 971 F.2d 548, 552 (10th Cir. 1992) ("the threshold 'based upon' analysis is intended to be a quick trigger for the more exacting original source analysis").

The jurisdictional inquiry proceeds in four steps. See Rost, 507 F.3d at 728. The Court must determine:

> (1) whether there has been public disclosure of the allegations or transactions in the relator's complaint; (2) if so, whether the public disclosure occurred in the manner specified in the statute; (3) if so, whether the relator's suit is "based upon" those publicly disclosed allegations or transactions; and (4) if the answers to these questions are in the affirmative, whether the relator falls within the "original source" exception as defined in § 3730(e)(4)(B).

Id. These questions will be examined in turn, with questions (1) and (2) collapsed and considered together.

10

### 1.    The Definition of a "Public Disclosure."

The fact that (i) CIGNA, specifically, and (ii) virtually all other private LTD insurers, as well as public providers of disability benefits, have routinely required all their LTD applicants also to apply for SSDI benefits has been publicly disclosed dozens of times and for decades.  We begin by briefly examining what constitutes a public disclosure.

A public disclosure is one that is made in "a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media . . . ." 31 U.S.C. § 3730(e)(4)(A).  The information must be "in the public domain in some capacity."  U.S. ex rel. Rost v. Pfizer, Inc., 507 F.3d 720, 730 (1st Cir. 2007) (internal citation omitted).  The disclosure need not be so broad as to extend to the general public.  Id. at 728 n.6.  "There is no requirement that a certain number of people read or receive the information."  Id. at 730 n.7 (internal citation omitted).

Additionally, a public disclosure need not contain every allegation in a relator's complaint.  Rather, a public disclosure has occurred if the "'general practice'" alleged in the complaint has been publicly disclosed.  U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp., 498 F. Supp. 2d 25, 46 (D.D.C. 2007) (quoting U.S. ex rel. Settlemire v. District of Columbia, 198 F.3d 913, 919 (D.C. Cir. 1999)); see also, U.S. ex rel. Feingold v. AdminaStar Fed., Inc., 324 F.3d 492, 495 (7th Cir. 2003) (a public disclosure exists when "the critical elements exposing the transaction as fraudulent" are put into the public domain).

In a decision followed by several other courts, including Judge Saris in In re AWP Litig. and U.S. ex rel. O'Keeffe v. Sverdup Corp., the D.C. Circuit adopted a formula to determine whether allegations or transactions in a *qui tam* complaint have been publicly disclosed.  U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn, 14 F.3d 645, 653-54 (D.C. Cir. 1994) ("Quinn").  The test is $X + Y = Z$, where $Z$ is the allegation of fraud and $X$ and $Y$ are the "essential elements."  Id.

11

at 654; In re AWP Litig., 538 F. Supp. 2d at 383 (quoting Quinn).  "'In order to disclose the

fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers

or listeners may infer Z, i.e., the conclusion that fraud has been committed.'"  U.S. ex rel.

O'Keeffe v. Sverdup Corp., 131 F. Supp. 2d 87, 94 (D. Mass. 2001) (Saris, J.) (quoting Quinn, 14

F.3d at 654).  As the Quinn court explained:

> Obviously, if the elements of the fraudulent transaction (X + Y) are already public,
> plaintiff's additional information, even if nonpublic, cannot suffice to surmount the
> jurisdictional hurdles.  Thus, a qui tam action cannot be sustained where all of the
> material elements of the fraudulent transaction are already in the public domain and
> the qui tam relator comes forward with additional evidence incriminating the
> defendant.

Quinn, 14 F.3d at 655 (citations omitted).

Notably, "[a] relator's ability to recognize the legal consequences of a publicly disclosed

fraudulent transaction does not alter the fact that the material elements of the violation already

have been publicly disclosed."  U.S. ex rel. Findley v. FPC-Boron Employees' Club, 105 F.3d

675, 688 (D.C. Cir. 1997); accord O'Keeffe, 131 F. Supp. 2d at 97 (the relator's "unique expertise

which permits him to understand the significance of publicly disclosed statements does not" create

jurisdiction).

Further "[it] is well established that 'a relator's ability to reveal specific instances of

fraud,'" e.g., exemplar claims, "'where the general practice has already been publicly disclosed is

insufficient to prevent operation of the jurisdictional bar.'"  Hockett, 498 F. Supp. 2d at 50

(quoting U.S. ex rel. Settlemire v. Dist. of Columbia, 198 F.3d 913, 919 (D.C. Cir. 1999)); see

Hockett, 498 F. Supp. 2d at 49 (the jurisdictional bar will apply if the general practice has been

publicly disclosed, even if the complaint adds "the who, when, and where of . . . specific

instance[s]" that have not been publicly disclosed).  Moreover, a relator cannot defeat the

jurisdictional bar merely by establishing that she has more or "better" information in her complaint

than already exists in the public domain.  See, e.g., U.S. ex rel. Precision Co. v. Koch Indus., 971

F.2d 548, 553 (10th Cir. 1992).

> **2.      Barrett's Allegation that CIGNA Imposes Its SSDI Application Requirement on "All" Its LTD Claimants Was Publicly Disclosed Before She Filed This Action in November 2003.**

The factual allegations that form the "material elements" of Barrett's claim, using the

Quinn formulation, are that CIGNA:  (x) requires all of its LTD insurance claimants[7] to apply for

SSDI without reviewing the information in its claim files to screen out those claimants who

allegedly "cannot possibly qualify" under the SSA's stringent definition of "disability;" (y)

enforces this requirement through the Estimated SSDI Offset provision in its policies; and (z)

therefore causes the filing of "thousands" of patently ineligible claims.

Therefore, if CIGNA's alleged practice of requiring *all* LTD claimants to apply for SSDI,

and its use of the Estimated SSDI Offset provision to enforce that requirement, was publicly

disclosed before Barrett filed her sealed complaint in November 2003, then the "essential

elements" of the claim were publicly disclosed.  See, e.g., U.S. ex rel. Dingle v. BioPort Corp.,

388 F.3d 209, 214 (6th Cir. 2004) (finding that public disclosure jurisdictional bar applied where

there were public disclosures of enough facts from which government could infer fraud); U.S. ex

rel. Gilligan v. Medtronic, Inc., 403 F.3d 386, 391 (6th Cir. 2005) (same, where the publicly

disclosed "allegations were sufficient to put the government on notice of the possibility of fraud");

U.S. ex rel. Fried v. West Indep. Sch. Dist., 527 F.3d 439, 442 (5th Cir. 2008) (same, where

---

[7] It is axiomatic that requiring "all" claimants to apply for SSDI benefits presupposes that CIGNA is not screening any out – including those who are, in theory, ineligible.  The fact that private disability insurers, including CIGNA, generally provide coverage when a worker is disabled from performing his "prior occupation" and that the "any occupation" SSDI standard is more restrictive is well known.  (See, supra at p. 5 n.4).  In consequence, if all LTD claimants are allegedly required to apply for SSDI benefits, workers meeting the "prior occupation" standard but in theory not the "any occupation" standard are not screened out.

alleged fraud on SSA had been publicly disclosed, even though relator "uncovered some nuggets of new, *i.e.*, nonpublic, information").

In the present case, all essential facts were indisputably disclosed. Indeed, the sheer volume of disclosures described in the next sections of this brief demonstrates that SSA, as well as anyone else interested in worker disability issues, was well aware of the practices employed by CIGNA and the industry generally – practices that SSA has never questioned over several decades of open use, and which even the Supreme Court has recently acknowledged,[8] but which one employee in one insurance company, following conversations with her attorney, suddenly decided constitute fraud. In other words, all Barrett adds to X plus Y is the novel contention that they equal fraud. This is insufficient as a matter of law.

### a.     CIGNA-Specific Public Disclosures

CIGNA's policies and practices regarding the requirement that LTD claimants apply for SSDI benefits has been plainly disclosed and discussed in numerous prior litigations.[9] The first

---

[8] The MetLife v. Glenn case recently decided by the Supreme Court concerned an LTD plan that both allowed for the offset of estimated SSDI benefits and required claimants to apply for SSDI: "As for MetLife's referral of Glenn to the agency, the plan itself required MetLife to deduct an estimated amount of Social Security disability benefits 'whether or not [Glenn] actually appl[ied] for and receive[d] those amounts,' and to assist plan participants like Glenn in applying for Social Security benefits, see *id.* Hence, it was not the conflict that prompted MetLife to refer Glenn to the agency, but the plan itself, a requirement that any administrator, whether conflicted or not, would be obligated to enforce." Metro. Life Ins. Co. v. Glenn, 128 S. Ct. 2343, 2355 (2008) (Roberts, C.J., concurring) (citations omitted). None of the Justices criticized these plan requirements, much less implied that they were somehow unlawful.

[9] In Rost, the First Circuit stated in dictum that a public court filing might constitute a public disclosure. Rost, 507 F.3d at 728 n.5. Judges Zobel and Saris recently examined the issue and both determined that "'any information disclosed through civil litigation and on file with the clerk's office'" can constitute a public disclosure. U.S. ex rel. Duxbury v. Ortho Biotech Prods., L.P., 551 F. Supp. 2d 100, 105-06 (D. Mass. 2008) (Zobel, J.) (dismissing *qui tam* action for lack of jurisdiction because the case was based upon allegations that had been asserted in a prior civil lawsuit) (quoting U.S. v. Northrop Corp., 59 F.3d 953, 966 (9th Cir. 1995)); accord In re AWP Litig., 538 F. Supp. 2d 367, 377 (D. Mass. 2008) (Saris, J.) ("Although the First Circuit has not addressed the issue, it is generally accepted that publicly available documents, such as a complaint filed in conjunction with a civil lawsuit, qualify as public disclosures under the statute."). Every appellate court to examine the issue has reached the same conclusion. See, e.g., U.S. ex rel. McElmurray v. Consol. Gov't of Augusta-Richmond County, 501 F.3d 1244, 1253 (11th Cir. 2007); U.S. ex rel. McKenzie v. BellSouth Telecomm., Inc., 123 F.3d 935, 939 (6th Cir. 1997); John T. Boese, CIVIL FALSE CLAIMS AND *QUI TAM* ACTIONS § 4.02[B] at 4-61 (3d ed. 2007) ("Every appellate court to consider the issue has concluded that discovery materials and other documents that are actually *filed* with a court are publicly disclosed.") (citing cases).

presently identified public disclosure occurred in a 1977 case called <u>Mays v. Ins. Co. of N. Am.</u>

filed against Insurance Company of North America ("INA"), which was a predecessor company to

CIGNA Corporation.  John Mays claimed the insurer had wrongly offset his SSDI benefits against

his LTD benefits.  In his Motion for Rehearing, he asserted that the insurer could require claimants

to apply for SSDI:  **"As to Social Security, the insurer can … insist upon prompt application**

**and pursuit of such benefit by its insured."** (emphasis added.)  (<u>Mays v. Ins. Co. of N. Am.</u>, No.

77-2604, Mot. for Reh'g p. 3 (Mich. App. Ct. Sept. 8, 1978)) (copy of Motion for Rehearing

attached to Affidavit of Richard C. Abati ("Abati Aff.") as Exhibit A).  Mays based his argument

on the Estimated SSDI Offset provision in the INA policy, which stated:  "'The Weekly Benefit

Amount shall be reduced by the weekly pro-rata portion of . . . the primary disability monthly

benefit payable under the Federal Social Security Act regardless of actual receipt of such benefit

due to the Insured's failure to apply therefor . . . .'"  <u>Mays v. Ins. Co. of N. Am.</u>, 284 N.W.2d 256,

257 (Mich. 1979) (quoting policy).

Another public disclosure occurred in <u>Rowell v. CIGNA</u>, C.A. No. 96C 8076 (N.D. Ill.).

The complaint was filed in December 1996 by an employee of The Pullman Company.  Attached

to the complaint as an exhibit was the Summary Plan Description ("SPD") for Pullman's LTD

plan, which was insured by LINA.  Page 27 of the SPD states, **"You Must Apply for Social**

**Security."** (emphasis added).  (Copy of Complaint and LTD Plan attached to Abati Aff. as Exhibit

B).  <u>See</u>, also, <u>Rowell v. Life Ins. Co. of N. Am.</u>, No. 96 C 8076, 1997 WL 529556, at *6 (N.D.

Ill. Aug. 18, 1997) (final pre-trial order discussing "the social security offset applicable to the

payment of disability benefits").

A third set of public disclosures occurred in a 1996 Kentucky state court action entitled:

<u>Deaton v. Conn. Gen. Life Ins. Co.</u>, C.A. 96-CI-00078 (Martin Circuit Ct. Ky.).  The action

concerned an LTD insurance policy issued by a CIGNA subsidiary, Connecticut General Life

Insurance Company ("CGLIC"). The plaintiffs were two lawyers who represented an LTD

claimant, Grover Murphy, pursue SSDI benefits. After the SSDI benefits were awarded, CGLIC

invoked the SSDI offset provision in its policy and demanded that Mr. Murphy submit the

overpayment. The plaintiff lawyers demanded that CGLIC pay their legal fees, but the company

declined to do so. The lawyers sued CGLIC for quantum meruit. The trial court entered summary

judgment for CGLIC, holding that the lawyers' claim was preempted by ERISA. The Kentucky

Court of Appeals affirmed. Deaton v. Conn. Gen. Life Ins. Co., 17 S.W.3d 896 (Ky. Ct. App.

2000).

Many of Barrett's specific factual allegations in this case are identical to the allegations

that were publicly disclosed in the plaintiff lawyers' opposition to Connecticut General's motion

for summary judgment in Deaton, filed in October 1998 (the "Deaton Opp.") (copy attached to

Abati Aff. as Exhibit C). The following comparisons are examples:

- The Deaton plaintiffs alleged of CGLIC: "*They required their beneficiaries to apply for SSDIB* . . . ." Deaton Opp. at 14 (emphasis added); see also, id. (admitting that "[t]his scheme may be legal"). Cf. Barrett Compl. ¶ 5 ("CIGNA requires all [LTD] claimants . . . to apply for SSDI").

- Grover Murphy's SSDI application, admitted in evidence as part of the administrative hearing, stated that he was **"only filing because insurance company requires him to."** Deaton Transcript from hearing before the ALJ, at 3 (Feb. 13, 1991) (emphasis added) and Claimant's SSDI application, Box 18C (copies attached to Abati Aff. as Exhibit D). Cf. Barrett Compl. ¶ 123 (because their LTD benefits will be reduced if they do not apply for SSDI benefits, "most insureds [are left] with no option other than to file" SSDI applications).

- The LTD policy issued by CGLIC contained an Estimated SSDI Offset provision. See Deaton Opp. at 2-3 **"Under the insurance policy LTDIB [long-term disability insurance benefits] would be offset by 100% of any . . . Social Security Disability (SSDIB) which Grover received or was eligible to receive. The policy presumed eligibility and required the beneficiary, Grover[,] to prove otherwise . . ."** (emphasis added.) Cf. Barrett Compl. ¶¶ 63, 64, 66 (policies issued or administered by CIGNA "entitle CIGNA to reduce the LTD claimant's LTD benefits by . . . the

*estimated* SSDI benefit to which CIGNA determines the LTD claimant would be entitled if [he/she] applied for SSDI") (emphasis contained in original).

- The plaintiffs in <u>Deaton</u> alleged: **"Cigna threatened to reduce LTDIB payments unless Grover hired a lawyer and pursued SSDIB . . . . [Later,] Cigna threatened, by phone and by letter, to start deducting SSDIB immediately from his LTDIB if Grover did not re-file his SSDIB claim."** (emphasis added.) <u>Deaton</u> Opp. at 3; <u>id.</u> at 7, 8 (Connecticut General "threatened" to reduce the claimant's LTD benefits "based on [an] estimated [amount of] SSDIB"). <u>Cf.</u> Barrett Compl. ¶¶ 67 (CIGNA "threaten[s] claimants that if they refuse to file, they will lose a substantial portion of their disability benefits"), 101, (a CIGNA case manager "contacts the claimant, by letter and/or by telephone, and makes the following points [ ]: . . . if the claimant refuses to cooperate with CIGNA and does not apply for SSDI, CIGNA will . . . offset an estimated benefit amount from the claimant's disability benefit"), 131 ("[m]any . . . policies issued by CIGNA subsidiaries . . . require that LTD claimants not only file for SSDI benefits, but that they continue to appeal if the SSDI claim is denied").

- **CGLIC required Grover to choose between receiving lower LTD benefits while his SSDI application was pending, or receiving the full amount of LTD benefits and then repaying to CGLIC any overpayment that accrued as a result of SSDI benefits which he later received**. (emphasis added) <u>Deaton</u> Opp. at 3-4. <u>Cf.</u> Barrett Compl. ¶ 101 (claimants must choose between not applying for SSDI, in which case their LTD benefits are reduced by their estimated SSDI benefits, or applying for SSDI benefits, in which case, if SSDI is awarded, "the claimant must notify CIGNA and will owe that 'overpayment' to CIGNA").

- The <u>Deaton</u> plaintiffs alleged: **"Grover was told by Cigna he had to sign a 'REIMBURSEMENT AGREEMENT' [which stated] 'I agree that I will request a reconsideration of my claim by the [SSA], and if necessary, appeal my claim for Social Security benefits . . .'"** (emphasis added.) <u>Deaton</u> Opp. at 4. <u>Cf.</u> Barrett Compl. ¶ 128 ( "The Reimbursement Agreement . . . provides that . . . CIGNA's agreement not to reduce benefits is valid only if the claimant provides proof that . . . he or she has applied for [SSDI] benefits . . . [and] 'any and all appeals were made for these benefits'").

- CGLIC made Grover sign the Reimbursement Agreement although he was "already entitled" to "full LTDIB payments." <u>Deaton</u> Opp. at 4. <u>Cf.</u> Barrett Compl. ¶ 5 ("CIGNA requires all . . . claimants . . . to apply for SSDI as a condition of receiving the full LTD benefits which the claimants are entitled to receive").

- After an ALJ denied the claimant's SSDI application and the SSA Appeals Council affirmed, the claimant "had no choice . . . but to appeal [to] . . . the Federal District Court" in light of the Reimbursement Agreement he had signed. <u>Deaton</u> Opp. at 5-6. <u>Cf.</u> Barrett Compl. ¶ 123 (CIGNA's offset of estimated SSDI benefits "leaves most insureds with no option other than to" apply for SSDI benefits and appeal any denials).

A fourth set of public disclosures occurred in <u>Edwards v. Life Insurance Co. of North America,</u> 245 F.3d 791 (5th Cir. 2000). Faye Edwards challenged Life Insurance Company of

North America's (LINA's) decision to deny her LTD claim.  The district court entered summary judgment for LINA and the Fifth Circuit affirmed.  In her brief to the appeals court, Ms. Edwards claimed that LINA should be estopped from denying her claim "by its conduct in demanding that [Edwards] seek [SSDI] under a [ ] claim of total disability."  Appellant's Brief (filed July 11, 2000), *available at* 2000 WL 34215785, at *5-6.  She asserted that LINA's finding that she was not totally disabled under the LTD policy was "[s]trange[]" given that LINA had sent her a letter telling her that "in order to obtain [LTD] benefits … she would be required to file a claim for [SSDI] in which she would have to assert that she was totally disabled."  Id. at *5.  LINA's letter, she asserted, "not only suggest[ed], but demand[ed] that she file an application for [SSDI] on the premise that she was totally disabled."  Id. at *13.  In the letter, LINA "went so far as to threaten to estimate her potential Social Security benefits, and deduct [the] amount … from her [LTD] benefits."  Id. at *13-14.[10]

A fifth set of public disclosures occurred in an Americans with Disabilities Act lawsuit filed in 2001 called Picinich v. United Parcel Service.  Plaintiff was an employee who filed for LTD benefits under a Plan self-funded by his employer but where claims were administered by LINA  He filed for SSDI because the plan required him to.  Specifically, the plan required every claimant "***to apply, reapply, and appeal any denials of Social Security Disability insurance benefit[s] . . . to which you may be entitled, until all such applications and appeals are exhausted.***"  Picinich v. UPS, 321 F. Supp. 2d 485, 497 (N.D.N.Y. 2004) (quoting plan) (emphasis added).  This requirement in the LINA-administered Plan was publicly disclosed on November 13, 2003, when plaintiff in Picinich filed a copy of the plan as an exhibit in support of his motion for summary judgment.  See Picinich v. UPS, C.A. No. 5:01-CV-01868 (N.D.N.Y.),

---

[10] Obviously, LINA had not prescreened Ms. Edwards.

Exhibit 22 attached to List of Plaintiff's Exhibits, Responses to Interrogatories, and Deposition

Transcripts filed in support of Plaintiff's Motion For Summary Judgment (filed Nov. 13, 2003)

(copy attached to Abati Aff. as Exhibit E). Page 113 of the Plan stated: "***It is a requirement of

the Plan that you apply for the Social Security disability insurance benefit*** . . . . You are also

required to appeal any denials. If you do not apply or appeal denials, the claims administrator

[CIGNA] will estimate the Social Security amount that you could have received and offset your

benefit by that amount" (emphasis added).

A sixth set of public disclosures occurred in a case filed in federal court in Pennsylvania in

January 2003. Kelly v. Conn. Gen. Life Ins. Co., Case No. 03-CV-00315 (E.D. Pa.). The action

concerned an LTD plan where claims were administered by CIGNA Corporation subsidiary

CGLIC. The plaintiff, John Kelly, alleged that CGLIC had acted arbitrarily and capriciously when

it had denied his claim for LTD benefits after requiring him to apply for SSDI, which he had done

successfully. See Kelly Am. Compl. ¶¶ 12, 13, 24, 35 (filed Apr. 15, 2003) ("Upon the instruction

and demand of Defendant, Plaintiff applied for Social Security Disability."); Exhibit A to Kelly

Am. Compl. (SPD for LTD plan) at p.10 ("You should apply for Social Security benefits at the

same time that you apply for LTD benefits.") (copies attached as Exhibit F to Abati Aff.).[11]  In the

form letter it sent Mr. Kelly when he filed his LTD claim, CGLIC informed him that it would

offset estimated SSDI benefits unless he applied for SSDI and signed a Reimbursement

Agreement. The letter stated in relevant part:

> The contract allows us to estimate, beginning with the 6th month of disability, the
> amount of Social Security benefits you and your dependents would be entitled to
> receive and to reduce your [LTD] benefits accordingly.

> However, to avoid financial hardship, we will agree not to deduct an estimated
> Social Security benefit prior to your receipt of a Social Security Award if you:

---

[11] Again, this demonstrates that CGLIC performed no prescreening.

1.      Sign and return the enclosed Reimbursement Agreement. This Agreement will agree to reimburse Connecticut General Life Insurance Company for any [LTD] benefits overpaid….

2.      Apply for Social Security Disability benefits. In certain circumstances, our Social Security Assistance Team (SSAT) will be able to assist you with the filing process. We ask that you extend your full cooperation to the consultant, if contacted.

3.      Send a copy of your receipt of application of Social Security Disability.

Cited as Administrative Record 408-410 and quoted in part in Plaintiff's Memo. of Law in Support of Mot. for Summary Judgment, p.2 (copy attached as Exhibit G to Abati Aff.).[12]

A seventh set of public disclosures occurred in a case filed against LINA in March 2003.

Harker v. Life Ins. Co. of N. Am., Case No. 03-CIV-20587 (S.D. Fla.). Dianne Harker challenged

LINA's decision to terminate her LTD benefits after one year based on its determination that she

was no longer disabled. She alleged that LINA's decision was wrongful, particularly because she

had been awarded SSDI benefits. The parties settled and the case was dismissed on November 25,

2003. Many of Barrett's factual allegations are identical to the allegations that were publicly

disclosed in various pleadings and motions filed in Harker before Barrett filed the instant action.

For example:

- Complaint (copy attached to Abati Aff. as Exhibit H): Ms. Harker alleged that "LINA demanded . . . Harker . . . pursue an application for [SSDI]. LINA hired, at its own expense, an attorney to represent Harker in the Social Security disability matter. LINA instructed retained counsel to represent to the [SSA] that Harker was totally and permanently disabled and entitled to [SSDI] benefits." Harker Compl. ¶ 15.

- Answer (copy attached to Abati Aff. as Exhibit I): "Defendant admits that the [LTD] Policy required Plaintiff to apply for [SSDI] Benefits and further admits that it assisted Plaintiff in applying for [SSDI] Benefits." Harker Answer ¶ 15.

- LINA's policy, attached to Plaintiff's summary judgment brief (copy attached to Abati Aff. as Exhibit J): "The Insurance Company will assume the Employee . . . [is]

_____

[12] Compare Compl. ¶ 67 (all LTD claimants must apply for SSDIB under threat of their LTD benefits being reduced by estimated SSDIB), ¶¶ 126-29 (LTD claimants who apply for SSDIB must sign a "Reimbursement Agreement" agreeing to pay CIGNA any SSDIB they receive), ¶ 101 (the initial letter or telephone call to claimant conveys the same information as that included in the letter to plaintiff in the Kelly case).

receiving Other Income Benefits if they may be eligible for them.  These assumed benefits will be the amount the Insurance Company estimates the Employee . . . may be eligible to receive.  Disability Benefits will be reduced by the amount of any assumed benefits as if they were actually received." Page 13 of Exhibit 1 to <u>Harker</u> Motion for Final Summary Judgment and Incorporated Memorandum of Law. However, "this assumption will not be made if the Employee gives the Insurance Company proof of the following events.  1. Application was made for these benefits 2. A Reimbursement Agreement is signed  3. Any and all appeals were made for these benefits or the Insurance Company determines further appeals will not be successful 4. Payments were denied." <u>Id.</u>

The pleadings in these cases expressly describe CIGNA's practice of requiring its LTD claimants also to apply for SSDI benefits in virtually identical language to that employed by Barrett in her complaint – Barrett offers <u>no</u> material, new allegations.  Moreover, as described below, CIGNA's practices were also the practices employed by the entire LTD industry and the industry-wide practice was not only known to the United States government but described by it in reports and publications.

### b.    Public Disclosures of the Industry-Wide Practice

Disclosures that do not name the particular *qui tam* defendant, but rather disclose a common industry-wide practice will also give rise to a jurisdictional bar if they "'set the government squarely on the trail of fraud' such that it would not [be] difficult for the government to identify [the defendant] as a potential wrongdoer." <u>In re AWP Litig.</u>, 538 F. Supp. 2d at 383 n. 10 (*quoting* <u>U.S. ex rel. Fine v. Sandia Corp.</u>, 70 F.3d 568, 571-72 (10th Cir. 1995); <u>see also</u>, <u>U.S. ex rel. Gear v. Emergency Med. Assocs. of Ill.</u>, 436 F.2d 726, 729 (7th Cir. 2005).  In the present case, Barrett herself alleges that CIGNA is "the third-largest seller of disability insurance policies in the country, with a market share of 8.7%."  Compl. ¶ 19.  In consequence, disclosures about industry wide SSDI application practices clearly implicate CIGNA's practices.  Perhaps even more significantly, there are several disclosures of this LTD industry practice made by the federal

government itself, thereby establishing that the government did not require Barrett to put it "on the

trail of fraud."  Here are several examples:

- "SSA Disability – Return-to-Work Strategies from Other Systems May Improve Federal Programs," GAO/HEHS Report 96-133, at 22 (July 11, 1996), *available at* http://www.gao.gov/archive/1996/he96133.pdf ("[R]educing private benefits dollar for dollar against DI benefits can lower disability insurance premiums.  As a result, it is common for private plans to require claimants to apply for DI benefits.").

- Celeste Hemingson, "The View from SSA's Concord, New Hampshire, District Office" ("There have also been some changes in the world of work that cause people to apply for Social Security Disability Insurance (DI).  This is the other side of the coin.  More employers are requiring a disability claim before a company's private insurance policy will pay."), *in* GROWTH IN DISABILITY BENEFITS: EXPLANATIONS AND POLICY IMPLICATIONS 310 (Kalman Rupp & David C. Stapleton, eds. 1998) (excerpt attached to Abati Aff. as Exhibit K).

- D. Gregory Rogers, presentation at American Trial Lawyers Association program, "The Effect of Social Security Awards on Long-Term Disability Claims," *available on* Westlaw *at* 1 Ann.2001 ATLA-CLE 1117, at 1 (July 2001) ("The insurance company . . . will insist upon your client obtaining Social Security benefits so that it may reduce its payments by that amount.  The language of the policy usually states that the long-term disability benefits will be offset by that amount the claimant and his or her family members 'receives or is entitled to receive' from the Social Security Administration.  The LTD benefit providers sometimes even go so far as to provide representation from their in-house attorneys for the claimant in his or her Social Security case.").

- Paul Verkuil, Statement to the Social Security Subcommittee of the House Ways and Means Committee (June 2002) (stating that the number of disability claims was expected to rise, in part because of "the increasing tendency of private insurance companies to require as a condition of payment that claimants pursue their offsetting SSA benefits."), *available at* http://waysandmeans.house.gov/legacy/socsec/107cong/6-11-02/107-86final.htm.

- Paul Verkuil & Jeffrey Lubbers, "Alternative Approaches to Judicial Review of Social Security Disability Cases:  A Report to the Social Security Advisory Board," Admin. L. REV., vol. 55, at 2 (2003) (same), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=418241.

Moreover, the common practice by which LTD insurers and large employers who self-

insure their LTD benefits require or direct their applicants also to apply for SSDI benefits is

disclosed not only by expert commentators, some of whom are listed above, but also by the fact

that this routine practice is plainly described in scores of decisions issued in litigations in state and

federal courts sitting in jurisdictions across the United States.  Footnote 11 provides citations to

22

thirty-two decisions all rendered *before* Barrett's action was filed involving more than twenty-five different insurers, pension plans or employers that required SSDI applications to be filed by claimants seeking private disability benefits.[13]

---

[13] Meinze v. Holmes, 532 N.E.2d 170, 171 (Ohio App. 1987) ("[u]nder the disability policy covering the University's employees, TIAA required Meinze to apply for Social Security benefits because those payments would reduce the amounts contractually payable by TIAA"); Calloway v. Pacific Gas & Elec. Co., 800 F. Supp. 1444, 1445 (E.D. Tex. 1992) (employer's long-term disability plan "requires all LTD recipients to apply for social security disability benefits"); Wallace v. Transport Life Ins. Co., 841 P.2d 613, 614 (Okla. App. 1992) (LTD plan contained offset for SSDI received or "which would have been provided or available if an application for the same were approved" by SSA; "[t]he trial court found the Plan provisions requiring Wallace to apply for Social Security . . . to be clear, unambiguous and not in violation of public policy"); Cox v. Mid-America Dairymen, Inc., 965 F.2d 569, 573 (8th Cir. 1992) (employer's retirement plan "provides that a Plan participant must apply for Social Security disability benefits to be eligible for Plan disability benefits"); Scott v. Shalala, No. 94-50096, 1994 WL 725034, at *1 (5th Cir. Dec. 19, 1994) ("her application for SSDI was required by her insurer"); Frost v. Mihm, No. 95-CA-38, 1995 WL 737914, at *1 (Ohio App. Nov. 15, 1995) ("under Navistar's nonoccupational long-term disability program, . . . Frost was required to apply for Social Security disability benefits"); State of Vt. v. G.S. Blodgett Co., 656 A.2d 984, 988 n.1 (Vt. 1995) ("defendant's insurer required Beauchemin to apply for Social Security [disability] benefits"); Buck v. Fries & Fries, Inc., 953 F. Supp. 896, 906 (S.D. Ohio 1996) ("the Court cannot censure UNUM for having requested or required the Plaintiff to apply for Social Security benefits when it was entitled to a set-off if such benefits were awarded"); Hughes v. Reinsurance Group, 957 F. Supp. 1097, 1100 (E.D. Mo. 1996) ("Plaintiff states in her affidavit that the Personnel Department required her to apply for Social Security disability benefits as a prerequisite to receiving long-term disability benefits. Plaintiff maintains that she informed the doctors and the Social Security employees that she was not disabled from all work."); Harris v. Marathon Oil Co., 948 F. Supp. 27, 28 (W.D. Tex. 1996) ("Under the provisions of the long term disability plan Mr. Harris was required to apply for social security benefits"); Pikora v. Blue Cross & Blue Shield, 970 F. Supp. 591, 593-94 (E.D. Mich. 1997) ("In order to apply for [her employer's LTD] program, the Plaintiff was required to apply for Social Security" disability benefits); Greig v. Metro. Life Ins. Co., 980 F. Supp. 169, 171 (W.D. Va. 1997) ("MetLife may reduce a beneficiary's long-term disability benefits by the estimated amount of Social Security disability benefits for which MetLife considers the beneficiary eligible, even if Social Security has not yet approved the disability application"; plaintiff filed for SSDI "in order to avoid having MetLife reduce his long-term disability benefits"); Thornley v. Penton Publ'g, Inc., 104 F.3d 26, 31 (2d Cir. 1997) ("Under the terms of [the employer's LTD] plan, . . . a beneficiary must apply for social security payments and the benefit amount is reduced by their receipt"); Sumner v. Michelin N. Am., Inc., 966 F. Supp. 1567, 1582 (M.D. Ala. 1997) ("Sumner was told that, in order to apply for his retirement benefits as a totally disabled employee, he would first have to apply for Social Security benefits"); Matz v. Sisters of Providence, No. CIV. 98-1598, 1999 WL 1201682, at *4 (D. Or. Dec. 8, 1999) (plaintiff "applied to social security because Standard Insurance required her to apply"); Rigel v. Rigel, No. CT98-0021, 1999 WL 436824, at *1 (Ohio App. June 23, 1999) ("appellant had begun the process of filing for social security disability benefits, for which he was required to apply pursuant to the terms of his Met Life policy"); Van Meter v. Smith, 14 S.W.3d 569, 571 (Ky. App. 2000) (employer's pension plan "included a coordination of benefits clause whereby Smith was required either to apply for social security disability benefits or to have his pension benefits reduced according to the plan's estimate of what his social security benefit would be"); Myers v. Hercules, Inc., 253 F.3d 761, 763 (4th Cir. 2001) ("Myers, as required by the Plan, applied for disability benefits under the Social Security Act (Her LTD benefits would be reduced by the amount of any Social Security award.)"); Marx v. Meridian Bancorp., No. CIV. A. 99-CV-4484, 2001 WL 706280, at *5 (E.D. Pa. June 20, 2001) ("Plaintiff highlights the provisions of the plan that require a claimant to apply for Social Security Disability Income ('SSDI') in order to retain LTD"); Rocca v. Standard Ins. Co., No. 01-2069, 2001 WL 1667807, at *1 (E.D. Pa. Dec. 20, 2001) ("Standard sent [plaintiff] a letter reminding him of his obligation to pursue Social Security Disability benefits"); Hackett v. Xerox Corp. Long-Term Disability Income Plan, 177 F. Supp. 2d 803, 806 (N.D. Ill. 2001) ("Xerox advised Hackett that as a condition to his continuing to receive long-term disability benefits he was required to apply for social security disability benefits") rev'd on other grounds, 315 F.3d 771 (7th Cir. 2003) ; Thompson v. E.I. DuPont de Nemours & Co., 140 F. Supp. 2d 764, 777 (E.D. Mich. 2001) ("Plaintiff

Finally, it is equally well disclosed that the practice "of requiring a [SSDI] disability

claim" before policy benefits will be paid also extends to government entities that provide long

term disability benefits to their public employees.  Most notably, a review of the applicable federal

statutes and regulations "discloses" that under the Federal Employees Retirement System

("FERS") Act (5 U.S.C. § 8451), federal employees who apply for FERS disability benefits are

required to apply for SSDI benefits which, if awarded, are offset against FERS statutory benefits.

5 C.F.R. § 844.201(b)(1).  See Trevan v. Office of Personnel Mgmt., 69 F.3d 520, 524 & n.6 (Fed.

Cir. 1995) ("OPM's regulations, and the disability benefits application form completed by

Petitioner, require application for . . . Social Security disability benefits prior to filing for FERS

disability retirement.").  FERS imposes this requirement even though its definition of disability

("inability to perform useful and efficient service in the employee's present position or a

reasonable reassignment"), like the definition in CIGNA's LTD policies, is easier to satisfy than

---

asserts that he was *required* [under the LTD plan] to apply for SSDI benefits, despite his doubt that he qualified for such an award"); Ardolino v. Metro. Life Ins. Co., No. Civ. A. 00-12115, 2001 WL 34563168, at *4 n.9 (D. Mass. July 2, 2001) (Bowler, M.J.) (plaintiff alleged that under Tufts University's LTD plan, she was "required . . . to apply for Social Security benefits"); Lolos v. Solutia, Inc., 193 F. Supp. 2d 364, 368 (D. Mass. 2002) (Neiman, M.J.) ("Defendant characterizes the SSDI application requirement as a . . . condition of Defendant's internal disability plan"); Garst v. Wal-Mart Stores, Inc., 30 Fed. Appx. 585, 591 (6th Cir. 2002) (LTD plan stated that claimants were "required to apply for [SSDI] . . . [and] follow the appeal process through to a hearing before an administrative law judge if necessary"; plan included an offset for "estimated Other Income Benefits," including estimated SSDI); Geiszler v. Comm'r of Internal Revenue, No. 4600-01S, 2002 WL 31427006, at *1 (U.S. Tax Ct. Oct. 29, 2002) ("Pursuant to the provisions of her long-term disability plan, she was required to apply for SSDI coverage"); DiGiovanni v. Guardian Life Ins. Co., No. CIV. A. 98-10908, 2002 WL 1477175, at *7 (D. Mass. June 28, 2002) (O'Toole, J.) ("The Policy provided that an insured's benefits . . . 'shall be reduced by the amount [of SSDI benefits] the Employee receives or is entitled to receive' . . . . Guardian reminded DiGiovanni that the Policy required her to apply for Social Security benefits"); Whiteaker v. Metro. Life Ins. Co., No. CIA 0:00-2693-24, 2002 WL 32333147, at *4 (D.S.C. Nov. 13, 2002) ("As a condition of receiving LTD benefits, Plaintiff was required to apply for benefits from the Social Security Administration"); Estades Negroni v. Assocs. Corp. of N. Am., 208 F. Supp. 2d 144, 146 (D.P.R. 2002) (insurer required claimant to apply for SSDI and said failure to do so would result in suspension or termination of LTD benefits), aff'd, 377 F.3d 58, 62 (1st Cir. 2004); MAPCO Coal Inc. v. Godwin, 786 N.E.2d 769, 771 (Ind. App. 2003) (LTD claimant signed reimbursement agreement that stated in part:  "I understand that . . . the Plan will estimate my Social Security Award . . . and commence applying the non-duplication provisions of the [ ] Plan.  I understand that I must apply for a Social Security Disability Award.  If I am denied such benefit by the Social Security Administration, I agree to appeal immediately and pursue my appeal until I receive a second denial (or award)"); Quast v. Square D Co., No. 02:01-CV-1135, 2003 WL 23415018, at *4 (S.D. Ohio July 15, 2003) ("a claimant applying for benefits pursuant to Square D's Plan is required to apply for social security benefits at the same time, ensuring the setoff provision will be triggered"); Napier v. Hartford Life Ins. Co., 282 F. Supp. 2d 531, 535 (E.D. Ky. 2003) (plaintiff applied for SSDI "at the mandate of Hartford").

the SSA's stricter definition (inability to perform any substantial gainful activity).  Id. at 524.

Footnote 14 below lists other state and municipal plans with similar requirements.[14]

### c.    The Essential Elements of Barrett's Claim Have Been Publicly Disclosed.

In sum, the above cases and publications constitute public disclosures of the "essential

elements" of Barrett's claim:  that CIGNA – like all the other providers of disability benefits

---

[14]

- Under the Kansas Employee Retirement System, an applicant for LTD benefits "must make an initial application for social security disability benefits and, if denied such benefits, the member must pursue and exhaust all administrative remedies of the [SSA] which include, but are not limited to, reconsideration and hearings."  Kan. Stat. Ann. § 74-4927(1)(B) (last amended 1987).  "During the period in which such member is pursuing such administrative remedies prior to a final decision of the [SSA], social security disability benefits may be estimated and may be deducted from the amount of [LTD] benefit payments under such plan."  Id.

- Under the Maine Employee Retirement System, when a state employee applies for disability retirement benefits, "[i]f the employment for which creditable service with the employer is allowed was also covered under the United States Social Security Act, the application must include proof that the member has made application for benefits under this Act."  Me. Rev. Stat. Ann. Tit. 5, § 17925(3) (last amended 1995).

- Under the Missouri Employee Retirement System, "[a]ny employee who applies for disability benefits . . . shall provide proof of application for Social Security disability benefits.  If Social Security disability benefits are denied, the employee shall also provide proof that the employee has requested reconsideration, and upon denial of the reconsideration, that an appeal process is prosecuted."  Mo. Rev. Stat. § 104.110(5) (last amended 1997).  If the employee fails to apply or re-apply for SSDI or appeal a denial, the employee "will have his/her benefits reduced by the amount which s/he would have received as Social Security primary disability benefits had s/he applied for and been granted these benefits."  Mo. Code Regs. Ann. Tit. 16, § 40-3.050(2) (last amended 1996).

- Under the Virginia Employee Retirement System, "[u]nless otherwise directed, to be eligible for [LTD] benefits under this section, the employee must apply for Social Security disability benefits."  Va. Code Ann. § 51.1-1112(F) (last amended in 2000 except that "unless otherwise directed" was added in 2004).  The requirement is enforced through a provision allowing the system to deduct estimated SSDI benefits.  Id. § 51.1-1114(B) (offset in effect as of 2000; some language changed in 2006)

- In Oregon, an employee entitled to receive permanent total disability benefits under the state Workers' Compensation act "shall make application for federal social security disability benefits."  Or. Admin. R. 436-100-0020(1) (last revised 1985); see Or. Rev. Stat. § 656.727(1) (directing state agency to issue rules "[r]equiring injured workers to make application for federal Social Security disability benefits") (last amended 1979).  An injured worker who fails to apply for SSDI benefits "shall be subject to suspension of benefits until the worker has complied."  Or. Admin. R. 436-100-0040(1) (last revised 1985).

- The City of San Diego requires employees who apply for disability benefits under the city's plan to apply for SSDI benefits.  "[T]he [city's LTD] plan is entitled to an offset for benefits to eligible employees under the Social Security program.  It is reasonable, therefore, for the LTD plan to require employees to apply for benefits and provide the information since the LTD plan and Social Security are mutually exclusive by design.  To not provide some enforcement mechanism would defeat the intent and the terms of the LTD policy."  Memorandum of Law by attorney for the City of San Diego, CA. ML-96-3, p. 2 (Jan. 9, 1996), available at http://docs.sandiego.gov/memooflaw/ML-96-3.pdf.

- Some state Welfare offices require claimants – even those who clearly are ineligible – to apply for SSDI.  See infra at 46-47.

25

referenced above – requires all of its LTD claimants to apply for SSDI benefits, and that it enforces this requirement through the Estimated SSDI Offset provision in its policies. This public disclosure necessarily encompasses Barrett's contention that, included within the universe of claimants on whom CIGNA imposes this requirement is, by definition, the subset of LTD claimants whom Barrett alleges to exist, *i.e.*, claimants whose claim files allegedly contain documentation showing that they "cannot possibly be eligible" for SSDI under the SSA's stringent definition of "disability."[15] Not one of the public disclosures identified above suggests that any disability insurer or public provider of disability benefits pre-screens claimants who contend that they are disabled under the private or public disability program from which they seek benefits before directing them to apply for SSDI benefits.

In consequence, before Barrett filed this action, the allegedly fraudulent scheme had been publicly disclosed many times, many ways and by diverse means. Barrett has not alleged a single new fact to "alert the responsible [government] authority that fraud may be afoot." U.S. ex rel. Feingold v. AdminaStar Fed., Inc., 324 F.3d 492, 496 (7th Cir. 2003). Other than parroting factual allegations that have long been in the public domain, she has done nothing except add her novel conclusion that CIGNA's (and the LTD industry's) well-known, decades-long practice constitutes fraud on the SSA. Even if her legal theory were correct, which it is not, she still would not be able to defeat the public disclosure bar. See, e.g., U.S. ex rel. Findley v. FPC-Boron Employees' Club,

---

[15] In addition, there were public disclosures of the following allegations which, though not essential elements of Barrett's claim, also appear in her Complaint:

- CIGNA requires LTD claimants to sign "Reimbursement Agreements" in which they elect either to collect reduced LTD benefits while their SSDI applications are pending and receive the difference later if their SSDI applications are denied, or to collect full LTD benefits while their applications are pending subject to an agreement to repay CIGNA any and all SSDI benefits they are awarded. See Compl. ¶¶ 101, 120, 126-29.
- CIGNA representatives use letters and telephone calls to "threaten" LTD claimants that they must apply for SSDI benefits. See Compl. ¶¶ 67, 104-05, 124.
- Some LTD claimants apply for SSDI benefits only because CIGNA directs them to. See Compl. ¶¶ 123, 177, 188, 196, 209-10.

105 F.3d 675, 688 (D.C. Cir. 1997) ("[a] relator's ability to recognize the legal consequences of a publicly disclosed fraudulent transaction does not alter the fact that the material elements of the violation already have been publicly disclosed").

> **3.** **This Action Is Based Upon the Publicly Disclosed Allegations or Transactions.**

After determining that the transactions or allegations in a relator's *qui tam* complaint were publicly disclosed before she filed suit, the next inquiry is whether her action is "based upon" the public disclosures. See U.S. ex rel. Rost v. Pfizer, Inc., 507 F.3d 720, 728 (1st Cir. 2007). The First and the Federal Circuits are the only courts of appeal that have not yet examined the meaning of "based upon." Of the eleven other circuits, nine follow the majority rule and two follow a minority rule.

Under the majority rule, an action is "based upon" publicly disclosed allegations or transactions when the relator's allegations are similar to the publicly disclosed allegations, regardless of where the relator obtained her information. See U.S. ex rel. Doe v. John Doe Corp., 960 F.2d 318, 324 (2d Cir. 1992); U.S. ex rel. Mistick PBT v. Housing Auth., 186 F.3d 376, 386-88 (3d Cir. 1999); Fed. Recovery Servs. v. U.S., 72 F.3d 447, 451 (5th Cir. 1995); U.S. ex rel. McKenzie v. Bellsouth Telecomms., Inc., 123 F.3d 935, 940-41 (6th Cir. 1997); Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp., 276 F.3d 1032, 1045 (8th Cir. 2002); U.S. ex rel. Biddle v. Bd. of Trustees of Leland Stanford Jr. Univ., 161 F.3d 533, 536-40 (9th Cir. 1998); U.S. ex rel. Precision Co. v. Koch Indus., 971 F.2d 548, 552-53 (10th Cir. 1992); Cooper v. Blue Cross and Blue Shield of Fla., Inc., 19 F.3d 562, 567-68 (11th Cir. 1994); U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn, 14 F.3d 645, 653-55 (D.C. Cir. 1994).

The Fourth and Seventh Circuits are the only appellate courts to follow the minority rule, under which an action is "based upon" publicly disclosed allegations or transactions only when the

relator's allegations "derive from" the public disclosure.  See U.S. ex rel. Mathews v. Bank of Farmington, 166 F.3d 853, 863-64 (7th Cir. 1999), and compare, U.S. ex rel. Wilson v. Graham County Soil & Water Conservation Dist., 528 F.3d 292, 307-08 (4th Cir. 2008).

Within this district, two judges have adopted the majority rule.  See U.S. ex rel. Duxbury v. Ortho Biotech Prods., L.P., 551 F. Supp. 2d 100, 107-08 (D. Mass. 2008) (Zobel, J.); U.S. ex rel. O'Keeffe v. Sverdup Corp., 131 F. Supp. 2d 87, 92-93 (D. Mass. 2001) (Saris, J.).  Three have followed the minority rule.  See U.S. ex rel. Rost v. Pfizer, Inc., 446 F. Supp. 2d 6, 19-22 (D. Mass. 2006) (Tauro, J.), vacated on other grounds, 507 F.3d 720 (1st Cir. 2007); U.S. ex rel. LeBlanc v. Raytheon Co., 874 F. Supp. 35, 39-41 (D. Mass. 1995) (Lindsay, J.); U.S. ex rel. LaValley v. First Nat'l Bank, 707 F. Supp. 1351, 1366-67 (D. Mass. 1988) (Wolf, J.).

Although this Court in LaValley adopted the minority rule, it did so twenty years ago, long before the development of nearly all of the case law examining this issue.  Moreover, given the circumstances in LaValley, this Court considered its determination to be "substantially a finding of fact," rather than a "controlling question of law."  U.S. ex rel. LaValley v. First Nat'l Bank, Civ. A No. 86-236, 1990 WL 112285, at *6 (D. Mass. July 30, 1990) (Wolf, J.) (denying relator's request for certification of an interlocutory appeal on the "based upon" issue).

Furthermore, in the only public disclosure decisions issued in this federal district (and apparently in all other jurisdictions) since the Supreme Court decided Rockwell Int'l Corp. v. U.S., 127 S. Ct. 1397 (2007), both Judges Saris and Zobel held that Rockwell requires the majority interpretation of "based upon."  See In re AWP Litig., 538 F. Supp. 2d 367, 379 (D. Mass. 2008) (Saris, J.); U.S. ex rel. Duxbury v. Ortho Biotech Prods., L.P., 551 F. Supp. 2d 100, 107-08 (D. Mass. 2008).  Examining the "original source" exception to the jurisdictional bar (described infra), the Rockwell Court held that a relator must prove she is an original source of the

information *on which her allegations are based*, not an original source of the information on which the public disclosures are based.  Rockwell, 127 S. Ct. at 1407.[16]  As Judge Zobel noted, "[t]he minority view [of the "based upon" requirement], which would not find a *qui tam* action 'based upon' the public disclosure so long as the relator possesses independent knowledge of the allegations, 'swallows the original source exception [as clarified in Rockwell] whole.'"  Duxbury, 551 F. Supp. 2d at 108.  In other words, Rockwell made clear that it is the relator's burden, in proving she is an original source, to show that the information on which her allegations are based derive from her independent knowledge rather than a public disclosure; it is not the defendant's burden to prove the opposite, i.e., that the relator's allegations derive from a public disclosure.  See also, Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp., 276 F.3d 1032, 1045 (8th Cir. 2002) ("[A] relator's knowledge could not be 'independent' of the public disclosure, § 3730(e)(4)(B), if it was derived from the public disclosure.  The majority of courts have considered it inconceivable that Congress would have drafted the statute so poorly as to have included a provision that could never have any effect.")

Applying the majority rule, because Barrett's allegations are both similar to and, in many instances, exactly the same as the myriad public disclosures identified above, this action is "based upon" the public disclosures and must be dismissed unless Barrett can prove that she falls under the Original Source Exception.

### 4.    Barrett Cannot Prove that She Falls Under the "Original Source" Exception to the Public Disclosure Bar.

If the Court finds that Barrett's action is based upon publicly disclosed allegations or transactions, the jurisdictional bar applies and the Complaint must be dismissed unless Barrett

---

[16] Although the Rockwell Court did not expressly address the "based upon" requirement, it noted in dictum that the jurisdictional bar prohibits "actions based on publicly disclosed allegations *whether or not the information on which those allegations are based has been made public*," thereby supporting the majority view of the "based upon" requirement.  Rockwell, 127 S. Ct. at 1407 (emphasis added).

29

meets the "original source" exception.  See 31 U.S.C. § 3730(e)(4)(B).  Here Barrett has the

burden of proof.  Rockwell Int'l Corp. v. U.S., 127 S. Ct. 1397, 1405 (2007); U.S. ex rel.

Grynberg v. Praxair, Inc., 389 F.3d 1038, 1052 (10th Cir. 2004).  She must prove that she is an

"original source" for each of her claims in the most recent amendment to her complaint.

Rockwell, 127 S. Ct. at 1409-1410; In re AWP Litig., 538 F. Supp. 2d 367, 379 (D. Mass. 2008)

(Saris, J.).

     To show she is an "original source," Barrett must prove two things.  First, she must

establish that she has "direct and independent" knowledge of the information on which her

allegations are based.  See 31 U.S.C. § 3730(e)(4)(B); Rockwell, 127 S. Ct. at 1405.  Second, she

must prove that she disclosed the information on which her allegations are based to the

government before filing her original sealed complaint.  See 31 U.S.C. § 3730(e)(4)(B); Rockwell,

127 S. Ct. at 1405.  As explained below, Barrett cannot meet either requirement, much less both.

> a.     Barrett Cannot Prove that She Has Direct and Independent<br>Knowledge of the Information on Which Her Allegations Are<br>Based.

     CIGNA cannot know, or even imagine, how Barrett will carry her burden of proof.  In this

section, CIGNA (i) sets out the requirements for such proof and (ii) explains why the very unique

circumstances surrounding the manner by which Barrett came to be the relator in this action and

her lack of knowledge concerning the material allegations in her own complaint demonstrate that

she will not meet that burden.

     The Supreme Court's decision last year in Rockwell was its first foray into the meaning of

"direct and independent knowledge" for purposes of the *qui tam* jurisdictional bar.  Rockwell

"establishes that the 'direct and independent knowledge' that a relator must have is at a higher

level than previously required, consistent with the provision's purpose of preventing parasitic suits

with inaccurate predictions or worthless allegations."  John T. Boese, CIVIL FALSE CLAIMS AND

QUI TAM ACTIONS § 4.02[D] at 4-102 (3d ed. 2007).  Under Rockwell, the information as to which

the relator is required to have direct and independent knowledge is the information on which the

allegations in her *amended complaint* are based.  Rockwell, 127 S. Ct. at 1409 ("when a plaintiff

files a complaint in federal court and then voluntarily amends the complaint, courts look to the

amended complaint to determine jurisdiction").

There are three parts to the "direct and independent knowledge" requirement.  First, the

information must have come to the relator directly and not through an intervening agency.

Second, the information must be something beyond what the public already knows.  Third, the

relator must have obtained the information not only before she filed her original sealed complaint,

but, according to some courts, before the date of the public disclosures.

(1)     Relator Must Have Obtained Her Knowledge Directly
        and Not Through an Intervening Agency, Such as Her
        Lawyer.

A relator cannot be an original source unless she has "direct and independent" knowledge

of the information on which her allegations are based, "'marked by the absence of an intervening

agency'" and "'unmediated by anything but [her] own labor.'"  U.S. ex rel. Grynberg v. Praxair,

Inc., 389 F.3d 1038, 1052 (10th Cir. 2004) (quoting Kennard v. Comstock Res. Inc., 363 F.3d

1039, 1044 (10th Cir. 2004)) ; accord In re AWP Litig., 538 F. Supp. 2d 367, 379, 384 (D. Mass.

2008).  Her knowledge cannot be "secondhand information."  U.S. ex rel. Barth v. Ridgedale

Elec., Inc., 44 F.3d 699, 703 (8th Cir. 1995).  Rather, it must have "resulted from [her] direct

discovery of information through [her] personal efforts and investigation."  U.S. ex rel. Rost v.

Pfizer, Inc., 446 F. Supp. 2d 6, 24 (D. Mass. 2006) (Tauro, J.), vacated on other grounds, 507 F.3d

720 (1st Cir. 2007).  See, also, U.S. ex rel. Fine v. Advanced Sciences, Inc., 99 F.3d 1000, 1006-

07 (10th Cir. 1996) (information must be "gained by [her] own efforts and not acquired from the

labors of others"); U.S. v. N.Y. Med. Coll., 252 F.3d 118, 121 (2d Cir. 2001) (same); U.S. ex rel.

Glaser v. Wound Care Consultants, Inc., No. 1:05-CV-573, 2007 WL 4285367, at *1 (S.D. Ind. Dec. 3, 2007) (relator was not an original source because she learned the information on which her allegations were based from her attorney); U.S. ex rel. Paranich v. Sorgnard, 286 F. Supp. 2d 445, 452-53 (M.D. Pa. 2003) (same).

   If someone else (*e.g.*, relator's counsel) discovered the alleged fraud, and then relayed that information to the relator, the relator is not an original source of the information, even if the relator continues an investigation and finds additional information.  See, e.g., U.S. ex rel. Precision Co. v. Koch Indus., 971 F.2d 548, 553-554 (10th Cir. 1992); Fine, 99 F.3d at 1007 ("to be independent, the relator's knowledge must not be derivative of the information of others, even if those others may qualify as original sources").

          (2)    The Relator's Information Must Be Something More
                 than What the Public Already Knows.

   The second requirement for "direct and independent" knowledge is that it must be something more than what already exists in the public domain:

> [S]econd-hand information may not be converted into "direct independent knowledge" simply because the plaintiff discovered through investigation or experience what the public already knew.  Instead, the investigation or experience of the relator either must translate into some additional compelling fact, or must demonstrate a new and undisclosed relationship between disclosed facts, that puts a governmental agency "on the trail" of fraud, where that fraud might otherwise go unnoticed.

U.S. ex rel. Fried v. West Indep. Sch. Dist., 527 F.3d 439, 443 (5th Cir. 2008) (internal citation omitted) (finding relator was not an original source because he merely conveyed new information about an SSA program that had already been publicly disclosed).

      (3)    Relator Must Have Obtained Her Knowledge Not Only Before She Filed Her Original Complaint, but Also Before the Date the Information Was Publicly Disclosed.

It is not only the source and quality of the relator's informational knowledge that is critical for original source status, but also the date when she obtained that knowledge. All courts agree that, at the very latest, the relator must have known of the information on which her allegations are based by the time she filed her *original, sealed complaint*. That is because the statute defines an original source as a relator who has the information on which her allegations are based, and who provides it to the government, *before* she files suit. See 31 U.S.C. § 3730(e)(4)(B). The relator may not become an original source by obtaining that information later, *e.g.*, through discovery or her continued employment with the defendant. See U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 231 (1st Cir. 2004).

Many courts go further and require that the relator must have known of the information *before it was publicly disclosed.* See, e.g., U.S. ex rel. Dick v. Long Island Lighting Co., 912 F.2d 13, 16-17 (2d Cir. 1990); Wang v. FMC Corp., 975 F.2d 1412, 1418 (9th Cir. 1992); U.S. ex rel. McKenzie v. Bellsouth Telecomms., Inc., 123 F.3d 935, 941-43 (6th Cir. 1997); U.S. ex rel. Findley v. FPC-Boron Employees' Club, 105 F.3d 675, 689-91 (D.C. Cir. 1997); U.S. v. Alcan Elec. & Eng'g, Inc., 197 F.3d 1014, 1020 (9th Cir. 1999); Hockett v. Columbia/HCA Healthcare Corp., 498 F. Supp. 2d 25, 54 (D.D.C. 2007); U.S. ex rel. Settlemire v. District of Columbia, 198 F.3d 913, 916, 918-20 (D.C. Cir. 1999); U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc., 342 F.3d 634, 645 (6th Cir. 2003). There is no First Circuit case that addresses this issue.

      (4)    Barrett Cannot Establish Any Of the Elements Of "Direct and Independent Knowledge."

Dawn Barrett graduated from high school in 1988. She held a number of different jobs over the next twelve years. Her employment at the time she applied for a job with CIGNA was as

a banquet server in a hotel.  She had no prior experience with disability insurance.  CIGNA hired

Barrett to work as a file clerk in its Pittsburgh office in September 2000.  Deposition of Dawn

Barrett, June 26, 2008 ("Barrett Dep."), pp. 9-13 and Ex. 1 (excerpts attached to Abati Aff. as

Exhibit L).

In June 2002, she was promoted to the position of Vendor Coordinator.  As a Vendor

Coordinator, Barrett was responsible for sending form letters to LTD claimants referring them to

"vendors," which were companies with which CIGNA contracted to provide assistance to its LTD

claimants in filing their SSDI applications.  She also contacted the vendors to inform them that a

claimant was being referred.  She did not determine who should be referred to vendors; this was

done by claim managers.  She did not deal with claims in which referrals to vendors were not

made.  She occasionally spoke to claimants who called after receiving the referral letter.  She

would explain the contractual obligation to file an SSDI application and, if the claimant preferred,

that the claimant could use a representative that it selected or file on his/her own.  Barrett Dep. pp.

13-15 and 19-22.

In May 2003, the position of Vendor Coordinator was eliminated, and Ms. Barrett was

assigned to a job in which she reviewed for completeness files of claimants who had been awarded

LTD benefits, were "stable and mature," and were now expected to remain on LTD for the entire

benefit period.  Id. at 42-44 and Ex. 6.  In 2005, she was assigned to a position administering STD

claims.  Id. at 50-51.  In consequence, only during the period June, 2002 to May, 2003 did Ms.

Barrett's work touch upon the process by which LTD claimants were encouraged to apply for

SSDI benefits.

Patrick Loughren is an attorney who practices in Pittsburgh, Pennsylvania.  He first

represented Barrett in March 2002, in connection with an accident in which her brother was

34

injured.  He has since represented Barrett in other family law matters.  According to Barrett, Loughren began to represent her in connection with her claims against CIGNA in August, 2003. Barrett refused to answer any questions concerning how Attorney Loughren came to represent her in connection with the CIGNA action (Id. at 190-196).  She refused to answer questions with respect to whether there was some event that caused Barrett to speak with Loughren concerning CIGNA's SSDI referral practice, as by August she had ceased to be a Vendor Coordinator some months before.  Id. at 200-01.

Loughren is, himself, the relator in the *qui tam* case filed against UNUM, now pending before Judge Saris.  That action was filed, under seal, in September, 2003, two months before Barrett filed the instant action.  In virtually all material respects it asserts the same claims and legal theories as those asserted in the CIGNA *qui tam* action; moreover, counsel for Loughren in the UNUM case and Barrett in the CIGNA case have always been the same.  Barrett refused to answer any question as to whether Loughren ever told her that he was or would be suing UNUM. Id. at 195-197.[17]

Barrett has shockingly inadequate knowledge concerning the principal allegations in her complaint against CIGNA.  Although she alleges that "CIGNA has actual knowledge that many thousands of claimants cannot possibly qualify for SSDI," she cannot identify a single claimant by either name or descriptive characteristic that was referred to a vendor for assistance in filing an SSDI application that fits that description.  She also cannot recall any CIGNA employee telling her that this happened.  Id. at 110-113.  In her complaint, Barrett alleges that "most LTD claimants cannot possibly be eligible for SSDI benefits" (Compl. ¶ 6), but Barrett does not know whether the

---

[17] It remains to be seen how Barrett will attempt to prove that she is the original source of her allegations, but she clearly cannot hide behind the attorney-client privilege she asserts with respect to all her conversations with Loughren, while asserting that she was the original source of the idea that CIGNA was defrauding the government – the same allegations that Loughren was asserting against UNUM.

word "most" means more than 50%, nor if there is any data that supports that allegation. Barrett

Dep. pp. 119-22 . She also alleges that "CIGNA causes thousands of such false and fraudulent

claims to be submitted to SSA each year" (Compl. ¶ 14), but cannot identify or describe any data

that supports those allegations and does not know how many false claims (using her definition of

falsity) are actually submitted. Barrett Dep. pp. 123-127. Her complaint acknowledges that

CIGNA has guidelines that screen out certain LTD claimants from the vendor referral process, but

alleges that nonetheless "CIGNA still instructs its LTD Case Managers to direct LTD claimants to

file for SSDI benefits" and to tell claimants that their benefits will be offset if they do not file.

Compl. ¶ 69. Barrett, however, was not a Case Manager, can neither identify nor describe any

document which directed, or person who instructed, Case Managers to ignore the referral

guidelines-- nor could she name a single person who told her that this actually happened. Barrett

Dep. pp. 132-134.

In her original complaint, Barrett alleged:  "Because there exists a high attrition rate of

senior claim examiners at Social Security as well as a lack of SSA resources to fully investigate

the large volumes of SSDI claims, CIGNA knows that a setting exists where non-meritorious

claims for SSDI that CIGNA causes or has caused to be filed will inevitably, and improperly, be

approved."  Barrett Compl., Nov. 25, 2003, ¶ 104. At her deposition, she was unaware of any

basis for that allegation and had no knowledge that any such non-meritorious claim was

improperly approved by the SSA. Barrett Dep. pp. 105-10.

Barrett further testified that, with respect to the four exemplar claimants first identified in

the Second Amended Complaint:  (i) she found their claim files after the original complaint was

filed, (ii) she looked for them at the direction of an individual named "Jeremy" whom she believed

worked for the Department of Justice, (iii) they were not files that she ever actually worked on,

and (iv) she was simply looking for files in which a claimant had made an SSDI application but his/her LTD claim had, at some later point, been denied.  Barrett Dep. pp. 153-156.

The central allegation of Barrett's complaint, that CIGNA refers LTD claimants to vendors to assist them in filing SSDI applications without "undertaking any good faith assessment or review to determine whether each LTD claimant could possibly be entitled to receive SSDI benefits" (Compl. ¶ 7), i.e., does not perform some manner of individualized screening, was also alleged with respect to UNUM, and could be alleged with respect to every private LTD insurer and work place LTD plan, as well as the Federal Employee Retirement System and the state and municipal retirement plans, identified in the public disclosure section of this brief.  (See supra at 13-27).  The four exemplar claims first disclosed in the Second Amended Complaint were not claims about which she had any first hand knowledge.  She did not even look for them until after her case was filed.

There is no material new information alleged in Barrett's original, amended, or second amended complaint not publicly disclosed before Barrett filed this qui tam action and certainly none as to which she had direct and independent knowledge.

(5)    As A Matter of Law, Barrett Cannot Have Direct and Independent Knowledge of False Claims Made Before June 2002.

A relator such as Barrett, who claims to have direct knowledge based solely on her employment with the defendant, can have that direct knowledge only with respect to the period of her employment.  See, Rockwell Int'l Corp. v. U.S., 127 S. Ct. 1397, 1409-10 (2007); U.S. ex rel. Duxbury v. Ortho Biotech Prods., L.P., 551 F. Supp. 2d 100, 109 (D. Mass. 2008).  In the present case, while Barrett joined LINA in September of 2000, she was a file clerk with no training or experience in SSDI or any other related field until she became a Vendor  Coordinator in June 2002.  That is the first time when she could possibly have discovered the alleged fraud "with [her]

37

own eyes." In re AWP Litig., 538 F. Supp. 2d 367, 384 (D. Mass. 2008) (internal citations

omitted). In consequence, under no circumstances can she prove that she is an original source of

allegations that relate to CIGNA practices as they existed before June 2002.

> **b.**    **Barrett Cannot Prove that She Disclosed the Information on Which Her Allegations Are Based to the Government Before She Filed Her Sealed Complaint, Much Less Before the Information Was Publicly Disclosed.**

Even if Barrett could prove that she had direct and independent knowledge prior to

November 2003 of the information on which her Complaint was based, she still could not satisfy

the original-source exception to the public disclosure jurisdictional bar because it appears that she

cannot meet the second requirement of the exception: that she "voluntarily provided the

information [on which her allegations are based] to the Government before filing" her lawsuit.

31 U.S.C. § 3730(e)(4)(B). The purpose of the pre-filing disclosure requirement is twofold: (1) to

alert the government at the earliest possible moment so that it can begin to investigate and, if

possible, prevent the alleged fraud; and (2) to counteract the relator's incentive to wait until as

many false claims as possible have been filed in an attempt to increase the potential damages

award.[18]

To satisfy her burden of proof on this requirement, Barrett must do more than give a mere

"conclusory assertion" that she timely notified the government. U.S. ex rel. Duxbury v. Ortho

Biotech Prods., L.P., 551 F. Supp. 2d 100, 109-10 (D. Mass. 2008) (Zobel, J.) (dismissing qui tam

complaint as to one relator because he "proffered no support for []his conclusory assertion" that he

---

[18] See John T. Boese, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS § 4.02[D] at 4-116 (3d ed. 2007) ("A number of important policies support the prior notice requirement in the original source provision. Providing the government with notice of the fraud at the earliest possible time permits the government to take the steps necessary to mitigate or prevent any harm from the alleged fraud, and to begin its investigation even before the relator has taken the formal steps of filing a qui tam complaint. The prior notice requirement also reduces perverse incentives that otherwise exist in a bounty system under which the reward is based primarily on the amount of damages accrued and the number of false claims submitted.").

had provided the information to the government before the original sealed complaint was filed). Instead, she must support her assertion with "'competent proof.'" U.S. ex rel. Precision Co. v. Koch Indus., 971 F.2d 548, 551 (10th Cir. 1992) (quoting McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936)); accord, e.g., U.S. ex rel. Boothe v. Sun Healthcare Group, Inc., 496 F.3d 1169, 1175 (10th Cir. 2007) ("conclusory and ill-developed arguments" regarding original source status are insufficient because the court is "obliged to presume the absence of jurisdiction unless and until convinced otherwise").

Courts have adopted two different standards regarding when a relator must voluntarily disclose her information to the government. Some courts hold she must do so before the public disclosure(s) occurred. See, e.g., U.S. v. Alcan Elec. & Eng'g, Inc., 197 F.3d 1014, 1020 (9th Cir. 1999); Hockett v. Columbia/HCA Healthcare Corp., 498 F. Supp. 2d 25, 54 (D.D.C. 2007) (the "voluntary disclosure must occur prior to the public disclosures which invoke the jurisdictional bar") (citing U.S. ex rel. Settlemire v. District of Columbia, 198 F.3d 913, 918 (D.C. Cir. 1999) and U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc., 342 F.3d 634, 645 (6th Cir. 2003)). It is not possible Barrett can meet this requirement since the public disclosures began with the Mays case in 1977, when she was only seven years old.

Other courts hold that the relator's voluntary disclosure to the government may postdate the public disclosure so long as it precedes the filing of the original complaint. Even under this more relaxed standard, Barrett has, to date, presented no evidence that she disclosed the information on which the allegations in the Amended Complaint are based to the government before she filed her original Complaint on November 25, 2003. Defendants served Barrett with interrogatories asking that she identify all communications with the government. Her sworn responses identified *none*. See Barrett's Supp. Response to Interrog. No. 4(c) (Jan. 18, 2008)

(copy attached to Abati Aff. as Exhibit M). Defendants also asked Barrett to produce all documents containing communications between her and the government, including documents relating to her alleged status as an original source. She produced **none**. See Barrett's Responses and Objections to Defendants' First Request for Prod. of Documents, Nos. 54 and 84 (June 18, 2007) (copy attached to Abati Aff. as Exhibit N).

Because Barrett has failed to produce "competent proof" that she disclosed the information on which her allegations are based to the government before filing suit, and she clearly could not have disclosed the information before the public disclosures occurred, for this additional reason, she does not fall within the original source exception to the public disclosure bar.

### B.    In the Alternative, CIGNA Is Entitled to Summary Judgment Because the SSA Has Long Known About and Acquiesced to the Allegedly Unlawful Practice, and, Therefore, It Did Not Act With Its *Scienter*.

Barrett has accused CIGNA of defrauding the government. Courts that have examined the issue have held that there is no fraud, and therefore no FCA violation, where, as here, the government is fully aware of the defendant's allegedly fraudulent actions and acquiesces in them. "[P]rior government knowledge of an allegedly false claim can negate the *scienter* required for an FCA violation" as a matter of law.[19]  U.S. ex rel. Becker v. Westinghouse Savannah River Co., 305 F.3d 284, 289 (4th Cir. 2002); accord U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1157 (2d Cir. 1993); U.S. ex rel. Durcholz v. FKW Inc., 189 F.3d 542, 545 (7th Cir. 1999); U.S. ex rel. Costner v. U.S., 317 F.3d 883, 887-88 (8th Cir. 2003); U.S. ex rel. Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1421 (9th Cir. 1991); see also, In re Pharma. Indus. Average Wholesale Price Litig., 478 F. Supp. 2d 164, 174 (D. Mass. 2007) (Saris,

---

[19] *Scienter* is an element of a False Claims Act case. See 31 U.S.C. § 3729(a)(1), (2), (3). To establish *scienter*, Barrett must prove that (a) CIGNA has actual knowledge that information in some of the SSDI applications that it supposedly causes its LTD claimants to file is false; or (b) it acts in deliberate ignorance of the truth or falsity of that information; or (c) it acts in reckless disregard of the truth or falsity of the information. See id. § 3729(b).

J.) (acknowledging the government knowledge defense, but denying motion to dismiss because the government asserted it lacked knowledge of the alleged fraud).

Where, as here, the undisputed evidence shows that the government knew about and tacitly approved or acquiesced in conduct that the relator alleges is fraudulent, and the defendant relied on the government's silence in continuing the business practice in question, *scienter* is absent as a matter of law and summary judgment is appropriate.  See, e.g., Costner, 317 F.3d at 887-88 (affirming summary judgment); Wang v. FMC Corp., 975 F.2d 1412, 1421 (9th Cir. 1992) (same); U.S. ex rel. Englund v. Los Angeles County, 2006 WL 3097941, at *15-16 (E.D. Cal. 2006) (entering summary judgment for defendant because, "while the County's practices were not necessarily popular with [the government], there was a common understanding that the practices were legal," and, therefore, "there is a want of evidence from which a jury could infer that the County knowingly asserted a false claim to the Federal government"); U.S. ex rel. Werner v. Fuentez Sys. Concepts, Inc., 319 F. Supp. 2d 682, 685 (N.D. W. Va. 2004) (entering summary judgment); U.S. ex rel. Watson v. Conn. Gen. Life Ins. Co., 2003 WL 303142, at *8 (E.D. Pa. 2003) (same), aff'd, 87 Fed. Appx. 257, 2004 WL 234970 (3d Cir. 2004); see also, U.S. ex rel. Butler v. Hughes Helicopters, Inc., 71 F.3d 321, 327-30 (9th Cir. 1995) (same); Boisjoly v. Morton Thiokol, Inc., 706 F. Supp. 795, 809 (D. Utah 1988) (granting 12(b)(6) motion to dismiss).

It is undisputed that the SSA has long known that CIGNA and other private and government disability insurers require or encourage LTD claimants to apply for SSDI benefits. SSA Associate Commissioner Eileen Bradley expressly made reference to this practice in two memoranda that she wrote in 1989.  In the first, dated September 22, 1989, she wrote:  "This type of situation typically involves a recipient of long-term disability (LTD) benefits paid by *a private insurer which encourages or requires the recipient to file for Social Security disability*

41

*insurance benefits* (DIB).  Under the terms of most LTD policies, the amount of the LTD monthly

benefit is offset by the amount of DIB payable."  (Emphasis added.)  Deposition of Glenn Sklar,

July 22, 2008 ("Sklar Dep.") Ex. 4 (copy of deposition and relevant exhibits attached to Abati Aff.

as Exhibit O).  In the second, dated October 18, 1989, Ms. Bradley wrote:  "Typically, *a LTD*

*policy holder is required by terms of the contract to file for social security benefits*.  If the claim

is allowed, the monthly LTD benefit amount is offset by the amount of the social security benefits

payable."  (Emphasis added.)  Sklar Dep. Ex. 5.  It is impossible to understand how CIGNA can

be held to have knowingly defrauded the SSA by encouraging or requiring LTD claimants to

apply for SSDI, when the SSA has known for twenty years that SSDI application requirements in

LTD policies are "typical."

The SSA's knowledge is also documented in a 1996 report by Jane Ross, then the SSA's

Director of Income Security Issues, to Senator William Cohen, then Chairman of the U.S. Senate's

Special Committee on Aging.  In her report, Ms. Ross wrote:  "[R]educing private benefits dollar

for dollar against DI benefits can lower disability insurance premiums.  As a result, *it is common*

*for private plans to require claimants to apply for DI benefits*."  U.S. Gen. Accounting Office,

SSA Disability: Return to Work Strategies from Other Systems May Improve Federal Programs,

GAO/HEHS Rpt. 96-133, 22 (1996) (emphasis added), *available at*

http://www.gao.gov/archive/1996/he96133.pdf..

The SSA's knowledge is also documented in Professor Paul Verkuil's Statement to the

Social Security Subcommittee of the House Ways and Means Committee in June 2002, in which

he stated that the number of disability claims was expected to rise, in part because of "the

increasing tendency of private insurance companies to require as a condition of payment that

claimants pursue their offsetting SSA benefits."  Second In A Series On Social Security Disability

Programs' Challenges and Opportunities: Hearing Before the Subcomm. on Social Security of the H. Comm. on Ways and Means, 107th Cong. 86 (2002) (statement of Paul Verkuil, Professor of Law, Benjamin N. Cardozo School of Law), *available at* http://waysandmeans.house.gov/legacy/socsec/107cong/6-11-02/107-86final.htm.  Professor Verkuil and a colleague reiterated that statement in a report to the Social Security Advisory Board.[20]  See Paul Verkuil & Jeffrey Lubbers, "Alternative Approaches to Judicial Review of Social Security Disability Cases:  A Report to the Social Security Advisory Board," ADMIN. L. REV., vol. 17, at 2 (2003) (forthcoming), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=418241

The SSA's knowledge was also confirmed by David Barnes, one of the expert witnesses retained by relator's lawyers in the *Unum* case.  Mr. Barnes is a 26-year employee of the SSA and former director of the SSA's Office of Disability Evaluation Policy.[21]  In his deposition given in the *Unum* case, Mr. Barnes testified as follows:

> . . . [I]n my work in Social Security I had occasion to see circumstances where an individual applied for disability, and their explanation of their reason for filing was because my insurance provider made me file, and that – that – that's common knowledge among individuals who work in the disability program that that circumstance occurs.

Deposition of David Barnes, February 12, 2008 ("Barnes Dep.") pp. 39-40 (copy attached to Abati Aff. as Exhibit Q).

Kenneth D. Nibali is another expert witness retained by Relator's lawyers in the *Unum* case.  Mr. Nibali was an SSA official for thirty-one years and its Associate Commissioner for

---

[20] The Social Security Advisory Board is an independent, bipartisan board created by Congress.  The members are appointed by the President and the Congress to advise them and the Commissioner of Social Security on Social Security matters, including the SSDI program.  See http://www.ssab.gov/.

[21] See Relator's Opp. to Unum's Emergency Mot. to Amend the Court's May 21, 2007 Scheduling Order, at p.2 n.4, in U.S. ex rel. Loughren v. UnumProvident Corp., et al., No. 03-11699-PBS (D. Mass.) (docket no. 248, filed Feb. 1, 2008) ("Loughren Opp.") (copy attached to Abati Aff. as Exhibit P).

Disability from 1998 to 2002. Loughren Opp. at 4 n.2. Mr. Nibali testified as follows in the deposition he gave in the *Unum* case: "[A]necdotally, many times, you know, I would hear from individuals on the front lines, the DDSs [Disability Determination Services], et cetera, about cases coming in from private disability insurance companies where individuals were coming in **because they were required by the private insurance company to come in and file a disability claim."**[22] Some of these applicants **"[did not] come anywhere close to meeting our definition"** of disability. Nibali Dep. pp. 163-64. Mr. Nibali described this as "anecdotal information" that he received "during my years there" at SSA. Id. at 163. (emphasis supplied.)

Even more directly on point are materials discussed at a series of meetings between representatives of the private LTD industry and the SSA that began in 2002 and continued at least through 2005. The principal purpose of these meetings was to discuss (i) SSA adopting a standard authorization form to be signed by SSDI applicants who were also making claims under LTD policies that would permit private insurers to obtain information regarding the status of the SSDI applications filed by their insureds directly from the SSA, and (ii) the possibility of private LTD insurers and the SSA exchanging information electronically. Sklar Dep. p. 67. Some of these meetings even took place at the insurers' headquarters. (Id. at 68-69).

In particular, for the first meeting of this group convened on February 19, 2002, the private insurers prepared materials explaining in detail how coordination of benefits worked and displaying, side-by-side, the similarities and differences between LTD insurance and SSDI -- particularly pointing out the differences in the definition of eligibility in the two programs. See Sklar Dep. Ex. 11, the Agenda; and Ex. 12, , p. SSA01043, entitled: "A Closer Look at LTD & SSDI." In response to requests from SSA for additional information made at this initial meeting,

---

[22] Deposition of Kenneth J. Nibali, March 5, 2008 ("Nibali Dep.") p. 153 (copy attached to Abati Aff. as Exhibit R).

the insurers prepared materials in advance of a May 20, 2002 meeting.  See Sklar Dep. Ex. 13.

These materials contained additional details concerning the manner in which private insurers

coordinated their benefits with SSDI benefits.  The materials included a document entitled, "High

Level Information flow of LTD Claim," which specifically pointed out when the insured was

reminded of his/her contractual obligation to apply for SSDI and how the insurer monitored the

progress of the SSDI application as it was reviewed by SSA.  See Sklar Dep. Ex. 14, p.

SSA00994.  Materials prepared by the insurers for an October 2, 2002 follow-up meeting of the

group listed any concerns that had been raised at the prior meetings by SSA.  There is no mention

of any concern regarding the expressly disclosed fact that:  "[t]he LTD contract requires that the

claimant apply for [SSDI] benefits.  The contract also specifies the level the claimant must take his

application through."  See Sklar Dep. Ex. 17, pp. SSA00969; see also, id. at SSA00964, 965.

These meetings continued at least through the end of 2005, when SSA Commissioner

Barnhart approved a common authorization form that could be signed by an LTD claimant who

was applying for SSDI benefits and would permit the private insurer to receive information on the

status of that application directly from SSA.  Sklar Dep. Ex. 16.  The form that the Commissioner

approved expressly states:  "If I do not sign this authorization [the company] may estimate how

much I could or do receive on Social Security disability benefits and reduce my private disability

benefits by this amount."  Id.  Commissioner Barnhart's cover letter accompanying the form

reflected on the SSA's and industry representatives' joint efforts and her intention that they

continue to work together to achieve mutually beneficial efficiencies that will, among other things:

"improve the coordination of private and public disability income benefits; and minimize the

problems that can arise for SSDI beneficiaries and private disability insurers when SSDI benefit

status information is delayed or unavailable to private disability claims managers."  Id.

Notably, the Office of the General Counsel of SSA and the United States Attorney's Office were aware of the filing of the CIGNA case in 2003 (Sklar Dep. p. 13-14), although it was not unsealed and made known to CIGNA until December, 2004.  Further, many attorneys from the SSA General Counsel's office attended the meetings described above.  Id. at 87-88.  Nonetheless, in none of these meetings did anyone from SSA advise CIGNA or any other disability insurer that the practice by which private insurers instructed their insureds to apply for SSDI violated law or any SSA rule, regulation or policy, or that some prescreening process should be adopted.  To the contrary, notwithstanding the filing of both the CIGNA and *Unum* actions in 2003, SSA has never informed, or even suggested, that private disability insurers, or municipal, state or federal providers of disability benefits, were engaged in fraudulent or improper conduct by directing all LTD claimants also to apply for SSDI.

Moreover, the SSA is also well aware that the widely accepted practice of requiring or encouraging claimants to apply for SSDI is not limited to private disability insurers.  The SSA knows, for example, that state welfare offices often require claimants to apply for SSDI – even claimants who clearly are ineligible.  For example, one SSA employee stated in 1998:  "In the Philadelphia region, cost-shifting actions by state and local governments have been, and I think continue to be, a major contributor to increased claims receipts.  All of our states require, or certainly strongly encourage, applicants to their assistance programs to also file with us.  ***Many local welfare offices continue to refer people to social security (SSA) who are obviously not disabled.  Yet, these offices still insist that SSA provide a formal denial***."  An SSA employee from a different office stated:  "[W]e quickly heard from applicants that they had to apply with us before the state would take their Medicaid application.  Others said they were required to file with us within twenty days of filing for Medicaid."  Larry Massanari, "The View from the SSA's

Philadelphia Regional Office" (emphasis added) and Celeste Hemingson, "The View from SSA's

Concord, New Hampshire, District Office," *found in* GROWTH IN DISABILITY BENEFITS:

EXPLANATIONS AND POLICY IMPLICATIONS 303 and 309.  (Copies of these excerpts are attached to

the Abati Aff. as Exhibits K and S).

Glenn Sklar, Esquire, Associate Commissioner of the Office of Disability Programs, was

designated by the SSA under Fed. R. Civ. P. 30(b)(6) to testify on its behalf at deposition.

CIGNA submits that the following testimony is instructive on the *scienter* issue.

From the colloquy beginning on page 42, line 11:

Q.    To your knowledge, was there ever any discussion at SSA prior to the filing
of this lawsuit, in which consideration was given as to which claimants for
long-term disability insurance were being sent over by or encouraged or
required to apply by the long-term disability industry, whether it was all
claimants or some subset of their claimants, that that was never discussed or
considered by the SSA before this lawsuit was filed?

MR. NADLER:  Object to the question as vague and compound.

A.    Social Security really doesn't collect information on these claims per se and
we really had no reason to.  We typically don't ask why somebody is
showing up at our door.  **We have, quote, unquote, an open-door policy,
all comers are welcome.**

We don't track whether it's an individual claim or whether it's somebody
who showed up because of the private disability insurers.  We really don't
ask why they're there and we have no reason to.

From a policy point of view, many instances we've even encouraged, for
example, homeless people to come forward and file claims because they're
often very difficult to contact.  We really don't get behind the why people
are showing up at our door and who is encouraging them to apply for
benefits.  That's just not something we typically ask or do.

Q.    You just made reference to open-door policy.  Can you expound on, in the
context that you just used it, what is meant by the term "open-door policy"?

MR. NADLER:  Object to the question as outside the notice, but
you may answer.

A.    **Typically every American who is paying FICA has the right to file a
claim for Social Security disability insurance benefits.  That said, again,
we certainly hope that they're truthful as they provide information to
the Social Security Administration and give us a straight story.  But
every American has a right to file that claim.  And even if somebody**

47

**wanted to file a claim that we knew was going to be denied and they were very persistent about it and they said, I want to be denied, deny me, we're going to process that claim and deny them.**

From the colloquy beginning on page 103, line 17:

Q.    Does the SSA have an opinion as to whether under statutory or regulatory law, a private disability insurer has an obligation to screen a claimant for long-term disability insurance to determine the likelihood that that claimant would also be eligible for SSDI before requiring such claimant to apply for SSDI benefits?

MR. NADLER:  Object to the question as calling for a legal conclusion and as calling for speculation.

A.    I'm not aware that the Social Security Administration has ever promulgated guidance on this topic, for example, Social Security ruling or a POMS or a regulation to that effect.  So I'm not aware of any guidance one way or the other.

Q.    To your knowledge, if a long-term disability insurer was interested in determining whether such conduct was violative of the law, is there any place, is there any regulation, bulletin, document, writing of any kind within the SSA that it could look to determine a course of conduct that would be consistent with SSA's view of the law?

A.    I lost the first part of the question.  I'm sorry.

MR. KAPLAN:  I don't know that I could do better so could you read it back, Kathy.

(Question read.)

MR. NADLER:  I object to the question as outside the scope of the notice.

A.    I will need a clarification on what you mean by "such conduct."

Just the sending of applications to SSA without prescreening them?

Q.    That's correct.

A.    Again, as I previously mentioned, this is really going to be a fairly fact-specific situation.  It's going to be a case-by-case scenario and I just don't see how any particular guidance can address the myriad of potential factual situations that might come up.  I think each case is its own case.

Q.    Each individual claimant?

A.    Right.  I don't know how generically – I'm trying to think in my own mind how we could put out guidance on screening of claims.  It's not somewhere we've previously gone, and I'm literally thinking out loud right now whether it's somewhere we should go in the future or not, but the reality is we haven't and **there is currently no published policy out there that requires, certainly requires private disability insurer to, quote,**

48

> **unquote, prescreen an application before a claimant comes and files. I'm not aware of any such thing.** [Emphasis added]

In consequence, the reason that Barrett cannot point to a single SSA regulation, rule, or guidance that requires disability insurers to make a preliminary assessment of likely eligibility before asking claimants to apply for SSDI is because none exist. CIGNA cannot be said to have knowingly defrauded the SSA when the SSA does not prohibit this practice, "Absent evidence that the defendants knew that the [government] Guidelines on which they relied did not apply, or that the defendants were deliberately indifferent to or recklessly disregardful of the alleged inapplicability of those provisions, no False Claims Act liability can be found." U.S. ex rel. Hochman v. Nackman, 145 F.3d 1069, 1074 (9th Cir. 1998).

In sum, because the SSA has long known about and tacitly agreed to or acquiesced in CIGNA's practice, which is common for both private and public disability benefit providers and because SSA regulations and guidance do not prohibit the challenged action, the *scienter* required for a False Claims Act violation is absent as a matter of law and summary judgment should enter dismissing this claim.

## II.     The Court Must Dismiss Barrett's Claim that CIGNA Violates the False Claims Act by Failing to Disclose Adverse Evidence to the SSA Because the SSA Has Expressly Rejected Such a Requirement.

Barrett also alleged that CIGNA "knowingly conceals" information from the SSA purportedly showing that its LTD claimants are ineligible for SSDI benefits. Compl. ¶ 139. Specifically, she alleges that, if CIGNA denies an LTD claim and the claimant has a pending SSDI application, CIGNA has a legal obligation to notify the SSA of its denial and to give the SSA medical or vocational evidence in its claims file that is adverse to the claimant. Id. ¶¶ 142, 145. CIGNA cannot determine whether Barrett intends this "adverse evidence" allegation to

constitute a stand alone claim for violation of the FCA.  If she does, it should be dismissed under Rule 12(c), as it cannot possibly state a claim.

"There can only be liability under the False Claims Act where the defendant has an obligation to disclose omitted information."  <u>U.S. ex rel. Berge v. Bd. of Trustees of Univ. of Ala.</u>, 104 F.3d 1453, 1461 (4th Cir. 1997); <u>accord</u>, <u>e.g.</u>, <u>U.S. ex rel. Ervin & Assocs. v. Hamilton Secs. Group, Inc.</u>, 370 F. Supp. 2d 18, 54 (D.D.C. 2005); <u>U.S. ex rel. Wilkins v. N. Am. Constr. Corp.</u>, 173 F. Supp. 2d 601, 637 (S.D. Tex. 2001); <u>see also</u>, <u>U.S. ex rel. Quinn v. Omnicare Inc.</u>, 382 F.3d 432, 438 (3d Cir. 2004) (where "there is no regulatory requirement" to take a certain action, "there is no [FCA] liability for a failure to do so"); <u>U.S. ex rel. Willard v. Humana Health Plan of Tex Inc.</u>, 336 F.3d 375, 383 (5th Cir. 2003) (relator "has not alleged facts sufficient to reflect that there was any regulatory violation"); <u>U.S. ex rel. Luckey v. Baxter Healthcare Corp.</u>, 183 F.3d 730, 731 (7th Cir. 1999) (affirming summary judgment in favor of defendant accused of violating the FCA by failing to conduct certain testing, because "[n]one of the federal regulations requires" such testing).

In this case, Barrett cannot point to any SSA regulation or guidance requiring a third party (such as CIGNA) to submit *any* evidence to the SSA, adverse or otherwise, absent a subpoena or other court or administrative order.  The only person or entity with an obligation to submit evidence to the SSA is the claimant (or the claimant's representative, if applicable).  The claimant's obligation is spelled out in 20 C.F.R. § 404.1512, entitled "Evidence."  Subsection (a) states the general rule:

> (a) *General*.  In general, you have to prove to us that you are … disabled. Therefore, you must bring to our attention everything that shows that you are … disabled.  This means that you must furnish medical and other evidence that we can use to reach conclusions about your medical impairment(s) and, if material to the determination of whether you are … disabled, its effect on your ability to work on a

sustained basis.  We will consider only impairment(s) you say you have or about which we receive evidence.

<u>Id.</u> § 404.1512(a).  Subsection (c), entitled "Your Responsibility," states what evidence the applicant must present.  Like Subsection (a), it places the obligation on "you," meaning the claimant, not an unrelated third party:

> (c) *Your responsibility.* You must provide medical evidence showing that you have an impairment(s) and how severe it is during the time you say that you are disabled. You must provide evidence, without redaction, showing how your impairment(s) affects your functioning during the time you say that you are disabled, and any other information that we need to decide your claim.  If we ask you, you must provide evidence about:
>
> (1)    Your age;
> (2)    Your education and training;
> (3)    Your work experience;
> (4)    Your daily activities both before and after the date you say that you became disabled;
> (5)    Your efforts to work; and
> (6)    Any other factors showing how your impairment(s) affects your ability to work….

<u>Id.</u> § 404.1512(c).

Moreover, not only does 20 C.F.R. § 404.1512 impose the obligation to present evidence only on the claimant, it does not require the claimant to present *any* adverse evidence.  Importantly, in 2005 the SSA expressly considered amending this regulation to require the submission of adverse evidence, but, after receiving public comments, elected *not* to impose such a requirement.  At the time SSA considered making the change, the first paragraph of Subsection (c) read as follows:

> (c) *Your responsibility.* You must provide medical evidence showing that you have an impairment(s) and how severe it is during the time you say that you are disabled. You must provide evidence showing how your impairment(s) affects your functioning during the time you say that you are disabled, and any other information that we need to decide your case.  If we ask you, you must provide evidence about: …

Clarification of Rules Involving Residual Functional Capacity Assessments; Clarification of Use

of Vocational Experts and Other Source as Step 4 of the Sequential Evaluation Process;

Incorporation of "Special Profile" Into Regulations, 68 Fed. Reg. 51,153, 51,161 (Aug. 26, 2003)

(final rules).

The preamble to SSA's 2005 proposed changes explained:  "We propose to require that

you submit all evidence available to you when you request your hearing.  This rule will require

you to submit all available evidence that supports the allegations that form the basis of your claim,

as well as all available evidence that might undermine or appear contrary to your allegations."

Administrative Review Process for Adjudicating Initial Disability Claims, 70 Fed. Reg. 43,590,

43,602 (July 27, 2005) (notice of proposed rulemaking).  The SSA proposed adding this

requirement through the following changes to the text of the first paragraph of 20 C.F.R. §

404.1512(c):

> (c) *Your responsibility.* You must provide ~~medical~~ evidence showing ~~that you have an~~ **how your** impairment(s) ~~and how severe it is~~ **affect(s) your functioning** during the time you say that you are disabled. ~~You must provide evidence showing how your impairment(s) affects your functioning during the time you say that you are disabled,~~ and any other information that we need to decide your ~~case~~ **claim, including evidence that you consider to be unfavorable to your claim**. If we ask you, you must provide evidence about: ….

Id. at 43,607.

However, "the proposed rule was highly controversial."  Robert E. Rains, *Professional*

*Responsibility and Social Security Representation:  The Myth of the State-Bar Bar to Compliance*

*with Federal Rules on Production of Adverse Evidence*, 92 CORNELL L. REV. 363, 380 (2006-

2007).  In hearings before the House Ways and Means Committee's Subcommittee on Social

Security, the SSA received numerous comments opposed to the proposed change.  See id. at 380-

81.  Thereafter, ***the SSA expressly rejected the proposed addition of language requiring***

*applicants to submit adverse evidence*.  Instead, it made only the following changes to

Subsection (c):

> (c) *Your responsibility*. You must provide ~~medical~~ evidence showing that
> you have an impairment(s) and how severe it is during the time you say that you
> are disabled. You must provide evidence**, without redaction,** showing how your
> impairment(s) affects your functioning during the time you say that you are
> disabled, and any other information that we need to decide your ~~case~~ **claim**.  If we
> ask you, you must provide evidence about:….

Administrative Review Process for Adjudicating Initial Disability Claims, 71 Fed. Reg. 16,424,

16,444 (Mar. 31, 2006) (final and current rule).  The SSA's explanation for rejecting the proposed

requirement for the submission of adverse evidence was that "the comments revealed that the

requirement was too confusing."  Id. at 16,437.

Thus, the language shown above, which does not require the submission of adverse

evidence, is the language that has been, and is currently, in effect.  See 20 C.F.R. § 404.1512(c)

(2008); see also, Sarah A.L. Humphreys, Office of the SSA General Counsel, *The Ethics Hour:*

*Responsibilities, Obligations, and Expectations* at 2-3 (Feb. 24-25, 2005) ("[T]raditionally there

has been no requirement for representatives to voluntarily disclose adverse evidence to the Agency

… because SSA has interpreted the law to require only the submission of evidence that supports

the disability claim.") (Exhibit T to the Abati Aff.).

Since SSDI applicants and their representatives are not required to submit adverse

evidence to the SSA or to notify the SSA if their pending LTD claims are denied, it goes without

saying that an unrelated third party such as CIGNA is not required to do so either.  Any suggestion

to the contrary has no support in law.

In sum, CIGNA cannot possibly violate the False Claims Act by failing to notify the SSA

about its LTD claim denials or by failing to give the SSA evidence that is adverse to a claimant's

pending SSDI application, because no such obligation exists.

53

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the

Second Amended Complaint.

Respectfully submitted,

CIGNA CORPORATION and LIFE INSURANCE
COMPANY OF NORTH AMERICA

By their attorneys,

*/s/  Mitchell H. Kaplan*
Mitchell H. Kaplan (BBO# 258940)
mkaplan@choate.com
R. J. Cinquegrana, (BBO # 084100)
rjcinquegrana@choate.com
Richard C. Abati (BBO # 651037)
rabati@choate.com
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts  02110
(617) 248-5000

Dated:  August 29, 2008

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on August 29, 2008.

*/s/ Mitchell H. Kaplan*
Mitchell H. Kaplan

4364263v2